FILED DATE: 9/15/2020 8:39 AM   2020L009850

# QBE® Insurance Corporation
A Stock Company



## *The Solution for Management Liability*

**Home Office:**

c/o CT Corporation System
116 Pine Street, Suite 320
Harrisburg, Pennsylvania  17101

**Administrative Office:**

Wall Street Plaza
88 Pine Street
New York, New York  10005
1-877-772-6771

QBE and the links logo are registered service marks of QBE Insurance Group Limited.

QBEP-3033 (05-14)



PLAINTIFF'S
EXHIBIT
" A "

FILED DATE: 9/15/2020 9:39 AM   2020L009850

This policy consists of:

Declarations
One or more coverage parts.
A coverage part consists of:
— One or more coverage forms
— Applicable forms and endorsements

QBE Insurance Corporation

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Robert V. James
President

Jose Ramon Gonzalez, Jr.
Secretary

QBBP-3033 (05-14)

Page 2 of 2

FILED DATE: 9/15/2020 9:39 AM   2020L009850

POLICY NUMBER: QPL0768616



QBBP-3010 (09-14)

## The Solution
### General Terms and Conditions Declarations

QBE Insurance Corporation
55 Water Street, New York, New York 10041
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

**THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

Item 1:  Parent Company:  Mike Anderson Auto Group

Mailing Address:  4301 E. Market St.
Logansport, IN 46947

Item 2:  Policy Period  From: October 1, 2017 To: October 1, 2018
At 12:01 A.M. Standard Time at the mailing address stated in Item 1

Item 3:  Limit of Liability  $6,000,000 Combined Maximum Aggregate of Liability for Liability Coverage Parts

Item 4:  Coverage Parts:  Directors & Officers Liability
Employment Practices Liability
Fiduciary Liability
Crime

Item 5:  A. Notice to Insurer of a Claim or circumstance:

QBE Insurance Corporation
Attn: The Claims Manager
55 Water Street
New York, New York 10041
Telephone: (877) 772-6771
Email: professional.liability.claims@us.qbe.com

B. All Other Notices to Insurer:

QBE Insurance Corporation
Attn: Underwriting
55 Water Street
New York, New York 10041
Telephone: (877) 772-6771
Email: MLPLadmin@us.qbe.com

Item 6:  Extended Reporting Period
Premium:  100% of Annual Premium
Length:  One Year

Item 7:  Premium: $39,953

In witness whereof, the Insurer has caused this Policy to be executed, but it shall not be valid unless also signed by a duly authorized representative of the Insurer.

FILED DATE: 9/15/2020 9:39 AM   2020L008850



**The Solution**
**General Terms and Conditions**

In consideration of the payment of the premium, the Insurer and the Insureds agree as follows:

**I. PREAMBLE**

The Insurance coverages offered in this Policy are part of a portfolio of Insurance coverages, consisting of this General Terms and Conditions ("GTC") and any Individual Liability Coverage Parts and Non-Liability Coverage Parts purchased, as stated in Item 4 of the Declarations of this GTC. The type of coverage provided by each of the Liability Coverage Parts and Non-Liability Coverage Parts are identified in each particular Coverage Part. Unless expressly stated to the contrary, the terms, conditions and limitations in this GTC apply to the entire Policy, whereas the terms, conditions and limitations of each Individual Coverage Part only apply to that particular Coverage Part. In the event of a conflict between any terms, conditions or limitations of the GTC and any terms, conditions and limitations of any Individual Coverage Part, the terms, conditions and limitations of the Individual Coverage Part shall control.

**II. EXCLUSIONS**

No coverage shall be provided under any Liability Coverage Part for Loss on account of that portion of a Claim:

A. **Bodily Injury/Property Damage** – for bodily injury, mental anguish, emotional distress, humiliation, sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is damaged or destroyed;

B. **Conduct** – based upon, arising out of or resulting from any deliberate fraud, deliberate criminal act or deliberate violation of any statute or regulation, or any illegal profit or remuneration, by an Insured, established by a final, non-appealable adjudication adverse to such insured in any underlying action, and the Insurer shall not utilize a declaratory action or proceeding brought by or against the Insurer to establish such final, non-appealable adjudication;

C. **ERISA** – for any violation of the responsibilities, obligations or duties imposed by ERISA or for any functions identified in ERISA Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions;

D. **Pending or Prior Proceedings** – based upon, arising out of or resulting from an action, proceeding or Claim commenced against an Insured pending on or prior to the Pending or Prior Proceedings Date stated in the Declarations of each applicable Liability Coverage Part;

E. **Pollution** – based upon, arising out of or resulting from any:

 1. discharge, emission, release, dispersal or escape of any Pollutants or any threat thereof;

 2. treatment, removal or disposal of any Pollutants; or

 3. regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any Pollutants,

 including any Claim for financial loss to a Company, its securityholders or its creditors based upon, arising from or in consequence of any matter described in paragraphs 1, 2, or 3 above;

F. **Prior Notice** – based upon, arising out of or resulting from any claim reported, or any circumstance reported and accepted, under the insurance policy (including any policies of which such policy is a renewal policy) replaced by this Policy; and

G. **Wage and Hour** – based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by any law governing wage, hour or payroll, including the Fair Labor Standards Act;

Exclusions D and F above shall not apply where this Policy is a renewal of a policy issued by the Insurer to the Parent Company.

With respect to all Policy exclusions, no conduct or knowledge of any insured shall be imputed to any other insured Person, and solely with respect to Exclusion B, only the conduct or knowledge of any past, present or future chief executive officer or chief financial officer of a Company shall be imputed to such Company and its Subsidiaries.

**III. RETENTION OR DEDUCTIBLE**

A. Any Retention or Deductible applicable to any Coverage Part shall apply as set forth in each Coverage Part and in the amount(s) stated in the Declarations of each Coverage Part. If different parts of a single Claim are

QBBP-1004 (11-14)

FILED DATE: 9/15/2020 9:39 AM   2020L008850

subject to different Retentions or Deductibles, then the total amount of Loss applied to the applicable Retentions or Deductibles shall not exceed the largest applicable Retention or Deductible.

    **B.** No Retention shall apply to any Loss for which an Insured Person is not indemnified by a Company because of such Company's Financial Impairment.

## IV. LIMIT OF LIABILITY

    **A.** The Combined Maximum Aggregate Limit of Liability, stated in Item 3 of the Declarations of this GTC, represents the maximum amount payable under all Liability Coverage Parts during the Policy Period for all Liability Coverage Parts combined.

    **B.** The Limit of Liability, stated in Item 2 of the Declarations of each Liability Coverage Part, represents the maximum amount payable under each Liability Coverage Part during the Policy Period for any one Claim and in the aggregate as set forth in each such Liability Coverage Part.

    **C.** Defense Costs are part of, and not in addition to, the Limit of Liability of each Liability Coverage Part.

    **D.** The remaining portion of each of the limits of liability described above shall be the limits of liability available during any Extended Reporting Period applicable to any Coverage Part.

## V. REPORTING

    **A.** Notice of any Claim under any Liability Coverage Part is considered timely when reported to the Insurer as soon as practicable after the Parent Company's chief executive officer or chief financial officer first becomes aware of such Claim. The Insurer shall not assert that notice of a Claim was untimely unless the Insurer is materially prejudiced by the untimely notice. However, in no event shall any notice be provided later than:

        **1.** If the applicable Liability Coverage Part expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of such expiration or termination; or

        **2.** the expiration date of the Extended Reporting Period, if applicable.

    **B.** Notice requirements involving any Non-Liability Coverage Part shall be in accordance with the reporting requirements set forth in such Non-Liability Coverage Part.

    **C.** Notice of any circumstance which could give rise to a Claim under any Liability Coverage Part is optional. If an Insured elects to report any circumstance which could give rise to a Claim:

        **1.** such notice shall include information regarding the nature of any Wrongful Acts or alleged or potential damages and the names of any actual or potential defendants; and

        **2.** any Claim that may subsequently arise out of a reported circumstance shall be deemed to have been first made during the Policy Period in which such circumstance was first reported.

## VI. DEFENSE AND SETTLEMENT

    **A.** With respect to any Claim under any Liability Coverage Part, the Insurer shall have the right and duty to defend any Claim, unless otherwise specifically stated in a particular Liability Coverage Part. The Insurer shall have such right and duty to defend even if any of the allegations in such Claim are groundless, false or fraudulent. Any such duty to defend shall cease upon exhaustion of the applicable Limit of Liability.

    **B.** With respect to any Claim under any Liability Coverage Part:

        **1.** the Insured shall:

            **(a)** not agree to any settlement, stipulate to any judgment, incur any Defense Costs, admit any liability or assume any contractual obligation, without the Insurer's prior written consent, provided that, unless otherwise stated in a particular Liability Coverage Part, the Insured may settle any Claim, without the Insurer's prior written consent, where the amount of such settlement, including Defense Costs, does not exceed the applicable Retention or Deductible;

            **(b)** not do anything that could prejudice the Insurer's position or its potential or actual rights of recovery; and

            **(c)** agree to provide the Insurer with all information, assistance and cooperation which the Insurer may reasonably require,

        provided that the failure of any Insured to comply with any of the requirements in paragraphs (a) - (c) above, shall not impair the rights of any Insured Person under this Policy; and

        **2.** the Insurer:

QBBP-1004 (11-14)

FILED DATE: 9/15/2020 9:39 AM    2020L008950

(a) may make any investigation it deems reasonably necessary and may, with the consent of the insureds, make any settlement of any Claim it deems appropriate; and

(b) shall not be liable for any such settlement, stipulation, incurred Defense Costs, admission or assumed obligation to which it has not given its prior written consent, and the insurer shall not unreasonably withhold such consent.

## VII.    ALLOCATION

If in any Claim, the insureds who are afforded coverage for a Claim incur Loss that is covered by this Policy and loss that is not covered by this Policy because such Claim includes both covered and uncovered matters, 100% of Defense Costs incurred by such Insured shall be covered Loss, and all loss other than Defense Costs shall be allocated between covered Loss and uncovered loss based upon the relative legal exposures of the parties to such matters.

## VIII.    TREATMENT OF RELATED CLAIMS

All Related Claims shall be deemed a single Claim first made during the policy period in which the earliest of such Related Claims was either first made or deemed to have been first made in accordance with Section V. REPORTING above.

## IX.    SUBROGATION

A.    In the event of any payment under this Policy, the insurer shall be subrogated to the extent of such payment to all of the insureds' rights of recovery, and the insureds shall take all reasonable actions to secure and preserve the insurer's subrogation rights.

B.    In no event shall the insurer exercise any subrogation right against an Insured Person.  In any subrogation action against a Company, it is agreed that each Company agrees to fulfill any indemnification obligations to the fullest extent permitted by law and any contract or agreement providing an indemnification obligation exceeding any such law.

C.    If the insurer recovers, either through subrogation or recoupment, any portion of an amount paid under this Policy, the insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the insurer in its recovery efforts.

## X.    EXTENDED REPORTING PERIOD

With respect to all Liability Coverage Parts:

A.    If this Policy does not renew, or terminates other than for non-payment of premium, the insureds shall have the right to purchase an ERP for the premium and time period stated in Item 6 of the Declarations. In the event of the non-renewal or termination of one or more Liability Coverage Parts of this Policy, the insureds may purchase an ERP solely as respects the Liability Coverage Part(s) that has been non-renewed or terminated.

B.    The right to an ERP shall lapse unless written notice of election to purchase such ERP, together with payment of the specified premium, is received by the insurer within 30 days after the effective date of non-renewal or termination of the Policy. In the event the Parent Company elects not to purchase an ERP and an individual insured or group of insureds elects to purchase such ERP, such ERP shall only apply to Claims against such insured or group of insureds.

C.    The premium for the ERP shall be deemed fully earned at the inception of the ERP.

D.    Any ERP purchased shall become part of the Policy Period, extending such Policy Period to the expiration of the time period stated in Item 6 of the Declarations, but only with respect to Loss on account of a Claim for a Wrongful Act taking place before the effective date of non-renewal or termination.

## XI.    CHANGES IN EXPOSURE

A.    New Companies and Old Companies

This Policy's treatment of Subsidiaries shall be as stated below and as supplemented by any individual Coverage Part.

Any insured of a Subsidiary:

1.    acquired before or during the Policy Period is eligible for coverage under any:

(a) Liability Coverage Part, but only for Loss on account of a Claim for a Wrongful Act which occurs after the date of such acquisition; and

FILED DATE: 9/15/2020 9:39 AM   2020L008850

(b) Non-Liability Coverage Part, but only after the effective date of such acquisition, and with respect to the Crime Coverage Part, subject to Section VIII. Other Insurance of such Coverage Part.

2. ceasing to be a Subsidiary before or during the Policy Period is eligible for coverage under any:

(a) Liability Coverage Part, but only for Loss on account of a Claim for a Wrongful Act which occurs while such entity was a Subsidiary; and

(b) Non-Liability Coverage Part, as provided in such Non-Liability Coverage Part, but such Subsidiary and its insureds shall cease to be insureds under such Non-Liability Coverage Part as of the date of such cessation.

B. Acquisition of the Parent Company

In the event of a Change in Control of the Parent Company during the Policy Period:

1. any Liability Coverage Part shall remain in force until the expiration of the Policy Period, but only for any Claim for a Wrongful Act which occurs prior to such acquisition;

2. the entire premium for this Policy shall be deemed fully earned as of the effective date of such Change in Control; and

3. the Parent Company shall be entitled to receive a quote for an extension of the Liability Coverage Parts ("Run-Off Coverage") solely for Claims for Wrongful Acts which occurred prior to a Change in Control. Coverage offered pursuant to such quote shall be subject to additional or different terms and conditions and payment of additional premium. Any Run-Off Coverage purchased shall replace any Extended Reporting Period provided under Section X. EXTENDED REPORTING PERIOD.

XII. NOTICE

A. All notices to the insurer under this Policy of any event, loss, Claim or circumstances which could give rise to a Claim shall be given in writing to the address listed in Item 5A of the Declarations, and any such notice shall be deemed notice under the Policy in its entirety.

B. All other notices to the insurer under this Policy shall be given in writing to the address listed in Item 5B of the Declarations.

C. Any notice under this Policy shall be effective on the date of mailing or receipt by the insurer, whichever is earlier.

XIII. TERMINATION OF POLICY

This Policy shall terminate at the earliest of:

A. 20 days after receipt by the Parent Company of written notice from the insurer of termination for non-payment of premium;

B. expiration of the Policy Period; or

C. surrender of the Policy to the insurer by the Parent Company or notice to the insurer by the Parent Company stating when such cancellation will take effect, and in either case any returned premium shall be computed on a pro rata basis.

XIV. REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGE

A. In issuing this Policy, the insurer has relied upon the information and representations in the Application as being true and accurate, and the Application is the basis for, and considered incorporated into, this Policy.

B. The Application shall be construed as a separate request for coverage by each insured, without any knowledge possessed by an insured being imputed to any other insured Person.

C. If the Application contains any misrepresentation made with the actual intent to deceive or which, for reasons other than simple negligence or oversight, materially affect the insurer's acceptance of the risk or the hazard assumed, the insurer shall not be liable for Loss on account of any Claim based upon, arising out of or resulting from either of such misrepresentations:

1. with respect to any insured Person who had actual knowledge of any misrepresentation described in paragraph C above, and the insurer can demonstrate that with such actual knowledge, such insured Person reasonably believed that a Claim would arise from such misrepresentation;

2. with respect to any Company, if the insured Person described in paragraph 1 above is a past or present chief executive officer or chief financial officer of the Parent Company.

QBBP-1004 (11-14)

FILED DATE: 9/15/2020 9:39 AM   2020L008850

D.  The Insurer shall not be entitled under any circumstances to void or rescind this Policy with respect to any Insured.

**XV.  EFFECT OF BANKRUPTCY**

Bankruptcy or insolvency of any Insured shall not relieve the Insurer of its obligations nor deprive the Insurer of its rights or defenses under this Policy.

**XVI.  WORLDWIDE TERRITORY**

This Policy shall apply anywhere in the world, and any reference to laws, however described, shall include all U.S. federal, state and local statutory laws, all amendments to and rules and regulations promulgated under any such laws, common law, and any equivalent body of law anywhere in the world, unless specifically stated to the contrary.

**XVII.  ROLE OF THE PARENT COMPANY**

The Parent Company shall act on behalf of each Insured with respect to paying premiums, receiving any return premiums, agreeing to endorsements to this Policy and the giving or receiving of any notice provided for in this Policy (except notices of a Claim or circumstance which could give rise to a Claim or notice to apply for an ERP).

**XVIII.  VALUATION AND FOREIGN CURRENCY**

All premiums, limits, retentions, Loss and other amounts under this Policy are expressed and payable in the currency of the United States of America. If any element of Loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the exchange rate published in The Wall Street Journal on the date the element of Loss is due.

**XIX.  ALTERATION, ASSIGNMENT AND HEADINGS**

A.  Any change in or modification of this Policy or assignment of interest under this Policy must be agreed to in writing by the Insurer.

B.  The descriptions and headings and sub-headings of this Policy are solely for convenience, and form no part of the terms, conditions and limitations of coverage.

**XX.  ESTATES, HEIRS, LEGAL REPRESENTATIVES, ASSIGNS, SPOUSES AND DOMESTIC PARTNERS**

With respect to any Liability Coverage Part, Insured Person shall include:

A.  the estate, heirs, legal representatives or assigns of any Executive, if such Executive is deceased, legally incompetent, insolvent or bankrupt; and

B.  the lawful spouse or domestic partner of any Executive solely by reason of such spouse's or domestic partner's: 1. status as such; or 2. ownership interest in property which a claimant seeks as recovery for an alleged Wrongful Act of such Executive,

provided that no coverage shall apply with respect to loss arising from an act, error or omission by any estate, heir, legal representative, assign, spouse or domestic partner of an Insured Person.

**XXI.  TRADE SANCTIONS**

This insurance coverage does not apply to the extent that trade or economic sanctions of any country prohibit the Insurer or any member of the Insurer's group from providing insurance coverage.

**XXII.  GLOSSARY**

The following terms shall have the meaning ascribed to such terms in each applicable Coverage Part: Claim, Defence Costs, Insured, Insured Person, Loss and Wrongful Act.

A.  **Application** means where provided to the Insurer, the application and any accompanying documentation submitted to the Insurer for this Policy or any documentation submitted to the Insurer in connection with the underwriting of this Policy.

B.  **Change in Control** means:

1.  the Parent Company's merger with, or acquisition by, another entity or the acquisition of all or substantially all of its assets by another entity, such that the Parent Company is not the surviving entity; or

2.  when a person or entity or group of persons or entities acting in concert, acquires securities or voting rights which result in ownership or voting control by such person(s) or entity(ies) of more than 50% of the

FILED DATE: 9/15/2020 9:39 AM    2020L009850

outstanding securities or voting rights representing the present right to vote for or appoint directors or Managers of the Parent Company.

C.  **Company** means the Parent Company and any Subsidiary, any foundation, political action committee or charitable trust controlled or sponsored by the Parent Company or any Subsidiary, and the Parent Company or any Subsidiary in its capacity as a debtor in possession under United States bankruptcy law.

D.  **Employee** means any natural person whose labor or service was, is or will be engaged and directed by a Company, including a part-time, seasonal, leased and temporary employee, intern or volunteer. Employee does not include an independent contractor.

E.  **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")).

F.  **Executive** means any natural person who was, now is or shall become:

1.  a duly elected or appointed director, officer, Manager, trustee, regent, governor, risk manager, comptroller or in-house general counsel of any Company organized in the United States of America, or in a functionally equivalent or comparable role to any of the foregoing; or

2.  a holder of a functionally equivalent position or comparable role to those described in paragraph 1 above in a Company that is organized in a jurisdiction other than the United States of America, including any position on an advisory board or committee.

G.  **Extradition** means any formal process by which an Insured located in any country is or is sought to be surrendered to any other country for trial or otherwise to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

H.  **Financial Impairment** means the status of a Company resulting from: 1. the appointment by a state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate such Company; or 2. such Company becoming a debtor in possession under United States bankruptcy law.

I.  **Liability Coverage Part** means any Coverage Part identified in this Policy as a "Liability Coverage Part" within the heading to such Coverage Part or providing third party liability coverage in such Coverage Part.

J.  **Manager** means any natural person, who was, now is, or shall become, a manager, member of the Board of Managers or equivalent executive of a Company that is a limited liability company.

K.  **Non-Liability Coverage Part** means any Coverage Part or insuring clause in this Policy that does not provide any third party liability coverage.

L.  **Parent Company** means the entity named in Item 1 of the Declarations.

M.  **Policy Period** means the period of time stated in Item 2 of the Declarations of this GTC (subject to any termination in accordance with Section XIII. TERMINATION OF POLICY) and the ERP, if applicable.

N.  **Pollutants** means any solid, liquid, gaseous or thermal irritants or contaminants, including smoke, soot, vapor, fumes, acids, chemicals, alkalis, asbestos, asbestos products or waste. Waste includes materials to be reconditioned, recycled or reclaimed.

O.  **Related Claims** means all Claims based upon, arising out of or resulting from the same or related, or having a common nexus of, facts, circumstances or Wrongful Acts.

P.  **Subsidiary** means:

1.  any entity while more than 50% of the outstanding securities or other equity ownership, representing the present right to vote for election of, or to appoint, directors, Managers, or the foreign equivalent of any such directors or Managers of such entity, are owned or controlled by the Parent Company directly or indirectly through one or more Subsidiaries; or

2.  any entity while the Parent Company has the right, pursuant to either written contract or the bylaws, charter, operating agreement or similar documents of a Company, to elect or appoint a majority of the Board of Directors of a corporation or Managers.

POLICY NUMBER: QPL0766816

 **QBE.**

QBBP-3006 (05-14)

*The Solution* for Directors & Officers and Entity Liability
Coverage Part Declarations

QBE Insurance Corporation
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office: c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE
AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR
SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.
PLEASE READ THIS POLICY CAREFULLY.

Item 1:     Parent Company:     Mike Anderson Auto Group

Item 2:     A.  Limit of Liability

              $2,000,000 per Claim
              $2,000,000 in the aggregate

            B.  Securityholder Derivative Demand Investigation Limit: $250,000

Item 3:     Additional Limit for Non-Indemnifiable Loss: $1,000,000

Item 4:     Retention:

            A.  Insuring Clause B: $25,000 per Claim
            B.  Insuring Clause C: $25,000 per Claim

Item 5:     Pending or Prior Proceedings Date: October 1, 2009

QBBP-3006 (05-14)

Page 1 of 1

FILED DATE: 9/15/2020 9:39 AM   2020L008850

FILED DATE: 9/15/2020 9:39 AM    2020L008850



**The Solution** *for Private Company*
*Directors & Officers and Entity Liability*
*Coverage Part*

In consideration of the payment of the premium and subject to the General Terms and Conditions, the insurer and the Insureds agree as follows:

I. **INSURING CLAUSE**

    A. **Side A - Non-Indemnifiable Loss Coverage for Insured Persons**

        The Insurer shall pay, on behalf of an Insured Person, Loss on account of a Claim first made during the Policy Period, to the extent that such Loss has not been paid or indemnified by any Company.

    B. **Side B - Corporate Reimbursement Coverage for Indemnification of Insured Persons**

        The Insurer shall pay, on behalf of a Company, Loss on account of a Claim first made during the Policy Period to the extent the Company pays or indemnifies an Insured Person for such Loss.

    C. **Side C - Entity Coverages**

        The Insurer shall pay, on behalf of a Company, Loss on account of a Claim, and Defense Costs on account of a Securityholder Derivative Demand Investigation, first made during the Policy Period.

II. **EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim:

    A. **Insured v. Insured** - brought by, or on behalf of:

        1. a Company against another Company;

        2. a Company or Outside Entity against an Insured Person;

        3. an Insured Person, in any capacity, against an Insured,

        provided that:

        (a) Exclusion A2 above shall not apply to a Claim brought: (i) outside the United States of America, Canada or their territories or possessions; (ii) while the Parent Company or Outside Entity is in Financial Impairment; (iii) as a securityholder derivative action; or (iv) while an Insured Person is no longer serving in his capacity as such; and

        (b) Exclusion A3 above shall not apply to any Claim: (i) for employment-related Wrongful Acts against an Insured Person; (ii) for contribution or indemnity; (iii) brought by an Insured Person who has ceased serving in his capacity as such for at least 1 year; or (iv) brought by, on behalf of or with the participation of a whistleblower;

    B. **Publicly Traded Securities** - based upon, arising out of or resulting from any public offering of, or purchase or sale of, equity or debt securities issued by any Company or Outside Entity, provided that this Exclusion B shall not apply to any Claim based upon, arising out of or resulting from the Company's: 1. securities that are not required to be registered; 2. failure to undertake or complete an initial public offering or sale of its securities; or 3. preparation for any public offering, including any "road show" presentation to potential investors or other similar presentation;

Exclusions C - I below shall only apply to Insuring Clause C, Side C - Entity Coverages:

    C. **Antitrust** - based upon, arising out of or resulting from anti-trust, price fixing or discrimination, restraint of trade, monopolization, unfair trade practices, predatory pricing or false advertising;

    D. **Contract** - based upon, arising out of or resulting from any liability in connection with any contract or agreement to which a Company is a party, provided that this Exclusion D shall not apply to the extent that such Company would have been liable in the absence of such contract or agreement;

    E. **Employment Practices** - based upon, arising out of or resulting from any employment-related Wrongful Act;

    F. **Intellectual Property** - based upon, arising out of or resulting from any infringement of copyright, patent, trademark, trade dress, trade name or service mark or any misappropriation of ideas, trade secrets or other intellectual property rights;

FILED DATE: 9/15/2020 9:39 AM   2020L008850

G.  **Personal Injury** - based upon, arising out of or resulting from any defamation (including libel and slander), disparagement, wrongful entry or eviction, invasion of privacy, false arrest, false imprisonment, assault, battery, loss of consortium, malicious use or abuse of process or malicious prosecution.

H.  **Professional Services** - based upon, arising out of or resulting from the performance of or failure to perform Professional Services; and

I.  **Third Party Discrimination or Harassment** - based upon, arising out of or resulting from any discrimination against, or harassment of, any third party.

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1.  Exclusion A. Bodily Injury/Property Damage shall not apply to any Claim under Insuring Clause A; and

2.  Exclusion E. Pollution shall not apply to any Claim: (a) under Insuring Clause A; or (b) brought by a securityholder of a Company against an Insured Person.

## III.  RETENTION

No retention shall apply to any Claim under Insuring Clause A or to any Securityholder Derivative Demand Investigation.

## IV.  LIMIT OF LIABILITY

A.  The Securityholder Derivative Demand Investigation Limit stated in Item 2B of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for Defense Costs on account of all Securityholder Derivative Demand Investigations, which amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2A of such Declarations.

B.  The Additional Limit for Non-Indemnifiable Loss stated in Item 3 of the Declarations of this Coverage Part represents an additional limit of liability available solely to an Executive or natural person General Partner for Loss on account of a Claim covered under Insuring Clause A. This additional limit of liability shall be in addition to and not part of, and excess of any other insurance written specifically as excess of, the Limit of Liability stated in Item 2A of such Declarations.

## V.  ADVANCEMENT

A.  If a Company fails to respond to an Insured Person's request for indemnification within 60 days of the Insured Person's request to the Company for such indemnification, then upon the reporting of the Claim, the Insurer shall advance Defense Costs and any other Incurred Loss until such time that the Company accepts the Insured's request for indemnification or the Limit of Liability set forth in Item 2A of the Declarations of this Coverage Part has been exhausted, whichever occurs first. In any other Claim, the Insurer shall advance Defense Costs on a current basis, but no later than 60 days after receipt of the legal bills and any supporting documentation.

B.  If it is determined by a final adjudication that any advanced Defense Costs are not covered under this Coverage Part, the Insureds, severally according to their respective interests, shall repay such uncovered Defense Costs to the Insurer, provided that nothing in this paragraph B shall limit the final non-appealable adjudication requirement in Exclusion B: Conduct of Section II. EXCLUSIONS of the GTC.  If the Insurer recovers any portion of an amount paid under this Coverage Part, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## VI.  REPORTING

Notice of a Securityholder Derivative Demand Investigation is optional, but only Loss Incurred after such Securityholder Derivative Demand Investigation is reported is eligible for coverage under this Coverage Part. If an Insured elects to report any Securityholder Derivative Demand Investigation, any Claim that may been first made during the Policy Period in which such Investigation was first reported.

## VII.  OTHER INSURANCE

A.  With the exception of insurance written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for Loss for which this Coverage Part also provides coverage, provided that any payment by an Insured of a retention or deductible under any such other insurance shall reduce the applicable Retention under this Coverage Part by the amount of such payment which would otherwise have been Loss under this Coverage Part.

FILED DATE: 9/15/2020 9:39 AM   2020L009850

B.   This Coverage Part shall also be excess of and shall not contribute with any indemnity provided, and any valid and collectible insurance maintained, by an Outside Entity for an Insured Person serving in his capacity as such for the Outside Entity.

C.   Any personal umbrella excess liability insurance, Independent directors liability insurance or any other similar personal liability insurance available to an Insured shall be specifically excess of this Coverage Part.

## VIII.   PRIORITY OF PAYMENTS

A.   In the event that Loss under Insuring Clause A and any other Loss are concurrently due under this Coverage Part, then the Loss under Insuring Clause A shall be paid first. In all other instances, the Insurer may pay Loss as it becomes due under this Coverage Part without regard to the potential for other future payment obligations under this Coverage Part.

B.   The coverage provided by this Coverage Part is intended first and foremost for the benefit and protection of Insured Persons. In the event a liquidation or reorganization proceeding is commenced by or against a Company pursuant to United States bankruptcy law:

1.   the Insureds hereby agree not to oppose or object to any efforts by the Insurer, the Company or an Insured to obtain relief from any stay or injunction issued in such proceeding; and

2.   the Insurer shall first pay Loss on account of a Claim for a Wrongful Act occurring prior to the date such liquidation or reorganization proceeding commences, and then pay Loss in connection with a Claim for a Wrongful Act occurring after the date such liquidation or reorganization proceeding commences.

## IX.   SECURITIES OFFERING

If during the Policy Period, a Company intends a public offering of securities under the Securities Act of 1933 and gives written notice to the Insurer within 30 days of the effective date of the Registration Statement for such offering, together with any additional information requested by the Insurer, the Insurer shall provide the Company with a quote for coverage with respect to such offering. Coverage offered pursuant to this quote shall include coverage for Wrongful Acts occurring in the course of any "road show" presentation to potential investors or other similar presentation and shall be subject to additional or different terms and conditions and payment of additional premium.

## X.   GLOSSARY

A.   Claim means:

1.   with respect to Insuring Clauses A and B, any investigation, evidenced by any written document, including a subpoena, target letter or search warrant, against an Insured Person for a Wrongful Act; and

2.   with respect to Insuring Clauses A, B and C:

(a)   a written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation, waiving or tolling of a statute of limitations or Extradition;

(b)   a civil or criminal proceeding, evidenced by: (i) the service of a complaint or similar pleading in a civil proceeding; or (ii) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

(c)   a formal administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

against an Insured for a Wrongful Act, including any appeal therefrom.

The time when a Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Claim is first made against, served upon or received by the Insured or the applicable notice or order is filed or entered.

B.   Defense Costs means that part of Loss consisting of:

1.   reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any Insured) incurred in: (a) investigating, defending, opposing or appealing any Claim or (b) any Securityholder Derivative Demand Investigation; and

2.   the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

C.   Insured means any Company or Insured Person.

D.   Insured Person means:

1.   an Executive;

QBBP-1000 (06-14)

2. an Employee, but only with respect to a Claim: (a) brought by a securityholder of a Company in his capacity as such; or (b) that is also brought and maintained against an Insured Person included in paragraph 1 above; or

3. a holder of an equivalent position to those included in paragraph 1 above in an Outside Entity, while serving at the specific request or direction of the Company.

E.  **Loss** means the amount that an Insured becomes legally obligated to pay on account of any Claim including:

1. compensatory damages;

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorneys fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. Defense Costs;

5. solely with respect to Insuring Clause A, taxes imposed by law upon an Insured Person in his capacity as such in connection with any bankruptcy, receivership, conservatorship or liquidation of a Company, to the extent such taxes are insurable by law; and

6. punitive, exemplary or multiplied damages, fines or penalties, if and to the extent that any such damages, fines or penalties are insurable under the law of the jurisdiction most favorable to the insurability of such damages, fines or penalties.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant Insureds or to the Claim giving rise to such damages, fines or penalties, and the insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the insurer and the insured) that such damages, fines or penalties are insurable under applicable law.

Loss does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) amount that represents or is substantially equivalent to an increase in consideration paid (or proposed to be paid) by a Company in connection with its purchase of any securities and assets;

(d) tax, other than taxes described in paragraph 5 above; or

(e) cost incurred to clean up, remove, contain, treat, detoxify or neutralize Pollutants.

F.  **Outside Entity** means:

1. any non-profit entity, community chest, fund or foundation; or

2. any other entity specifically added as an Outside Entity by endorsement to this Coverage Part,

that is not a Company.

G.  **Professional Services** means services which are performed for others for a fee.

H.  **Securityholder Derivative Demand Investigation** means an investigation by a Company to determine whether it is in the best interest of such Company to prosecute the claims alleged in a securityholder derivative demand or lawsuit. Where a Securityholder Derivative Demand Investigation is initiated because of a lawsuit rather than a demand, any coverage provided for Defense Costs on account of such Securityholder Derivative Demand Investigation shall in no way limit the coverage otherwise afforded under this Coverage Part to an Insured for Loss on account of a Claim.

J.  **Wrongful Act** means:

1. any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by: (a) an Insured Person in his capacity as such; or (b) by a Company; or

2. any other matter claimed against an Insured Person solely by reason of serving in his capacity as such.

FILED DATE: 9/15/2020 9:39 AM   2020L009850

FILED DATE: 9/15/2020 9:39 AM   2020L008850

POLICY NUMBER: QPL0766816

 **QBE.**

QBBP-3007 (05-14)

*The Solution* for Employment Practices Liability
Coverage Part Declarations

**QBE Insurance Corporation**
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

Item 1:     Parent Company:     Mike Anderson Auto Group

Item 2:     Limit of Liability

              $2,000,000 per Claim
              $2,000,000 in the aggregate

Item 3:     Retention: $50,000 per Claim

Item 4:     Pending or Prior Proceedings Date: October 1, 1998

FILED DATE: 9/15/2020 9:39 AM   2020L009850



*The Solution* for Employment Practices Liability
Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

**I.  INSURING CLAUSE**

The Insurer shall pay, on behalf of an Insured, Loss on account of a Claim first made during the Policy Period.

**II.  EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim:

A.  **Breach of Written Employment Contract** - based upon, arising out of or resulting from any breach of any written employment contract or agreement, provided that this Exclusion A shall not apply to: 1. Loss to the extent an Insured would have been liable for such Loss in the absence of such written employment contract or agreement; or 2. Defense Costs;

B.  **OSHA, Workforce Notification and Labor Relations** - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by the Occupational Safety and Health Act, the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act or any similar law; and

C.  **Workers Compensation, Disability Benefits, Social Security, Unemployment** - based upon, arising out of or resulting from any failure to comply with any obligation under any workers compensation, disability benefits, social security or unemployment insurance law;

Exclusions A - C above shall not apply to any Claim for Retaliation.

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1.  Exclusion A. Bodily Injury/Property Damage shall not apply to Loss for any mental anguish, emotional distress or humiliation when alleged as part of a Claim otherwise covered under this Coverage Part; and

2.  Exclusion C. ERISA and E. Pollution shall not apply to any Claim for Retaliation.

**III.  OTHER INSURANCE**

A.  With respect to any Claim for an Employment Practices Wrongful Act, other than that portion of a Claim made against a leased or temporary employee or Independent Contractor, this Coverage Part shall be primary insurance.

B.  With respect to:

1.  that portion of any Claim made against any leased or temporary employee or Independent Contractor; or

2.  any Claim for a Third Party Wrongful Act, where Loss is covered under this Coverage Part and other valid and collective insurance,

this Coverage Part shall be specifically excess of and shall not contribute with any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by the Coverage Part), regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

**IV.  COORDINATION OF COVERAGE**

Any Loss covered under this Coverage Part and one or more other Liability Coverage Parts shall first be covered under this Coverage Part, subject to its terms, conditions and limitations. Any remaining portion of such Loss shall be covered under such other Liability Coverage Part(s), subject to its terms, conditions and limitations.

**V.  GLOSSARY**

A.  **Benefits** means any payments (including insurance premiums), deferred compensation, perquisites or fringe benefits, in connection with an employee benefit plan and any other payment to or for the benefit of an employee arising out of the employment relationship. However, Benefits shall not include salary, wages, bonuses, commissions, Stock Benefits or non-deferred cash incentive compensation.

FILED DATE: 9/15/2020 9:39 AM   2020L009850

B.  **Claim** means any:

   1.  written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, waiving or tolling of a statute of limitations, reinstatement, reemployment or re-engagement;

   2.  civil or criminal proceeding, evidenced by: (a) the service of a complaint or similar pleading in a civil proceeding; or (b) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

   3.  arbitration proceeding pursuant to an employment contract or agreement, policy or practice of a Company;

   4.  administrative, regulatory or tribunal proceeding, other than a labor, grievance or other proceeding under a collective bargaining agreement, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation; or

   5.  any audit of an insured conducted by the United States of America Office of Federal Contract Compliance Programs ("OFCCP"),

against an insured for a Wrongful Act, including any appeal therefrom.

The time when a Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Claim is first made against, served upon or received by the insured or the applicable notice or order is filed or entered.

C.  **Defense Costs** means that part of Loss consisting of:

   1.  reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any insured) incurred in investigating, defending, opposing or appealing any Claim; or

   2.  the premium for appeal, attachment or similar bonds (but the insurer shall be under no obligation to furnish any bond).

D.  **Discrimination** means any violation of any employment discrimination law.

E.  **Employment Practice Wrongful Act** means any:

   1.  breach of any employment contract or agreement or contractual obligation, including any contract or agreement or contractual obligation arising out of any employee handbook, personnel manual, policy statement or other representation;

   2.  Discrimination;

   3.  Harassment;

   4.  Retaliation;

   5.  Workplace Tort; or

   6.  Wrongful Employment Decision,

committed, attempted, or allegedly committed or attempted by an insured while acting in his or its capacity as such.

F.  **Harassment** means any:

   1.  sexual harassment that is made a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating, hostile or offensive working environment within, a Company; or

   2.  workplace harassment, including bullying that interferes with performance or creates an intimidating, hostile or offensive working environment within a Company.

G.  **Independent Contractor** means any natural person working for a Company pursuant to a written contract or agreement between such natural person and the Company which specifies the terms of the Company's engagement of such natural person.

H.  **Insured** means any Company or Insured Person.

I.  **Insured Person** means any:

   1.  Executive or Employee; or

   2.  Independent Contractor, but only if the Company agrees to indemnify the Independent Contractor in the same manner as Employees for liability arising out of a Claim.

QBEP-1002 (05-14)

FILED DATE: 9/15/2020 9:39 AM   2020L008850

J.  **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1.  compensatory damages (including back pay and front pay);

2.  judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorney fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3.  pre and post-judgment interest;

4.  liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Family Medical Leave Act or Equal Pay Act;

5.  **Defense Costs**; and

6.  punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds**, to the **Company**, or to the **Claim** giving rise to such damages, and the **Insurer** shall not challenge any opinion of independent legal counsel (mutually agreed to by the **Insurer** and the **Insured**) that such damages are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a)  amount not insurable under the law pursuant to which this **Coverage Part** is construed;

(b)  cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c)  future salary, wages, commissions, or **Benefits** or other monetary payments of a claimant who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order or other resolution of any **Claim**;

(d)  salary, wages, commissions, **Benefits** or other monetary payments which constitute severance payments or payments pursuant to a notice period;

(e)  **Benefits** due or to become due or the equivalent value of such **Benefits**;

(f)  cost associated with providing any accommodation for persons with disabilities or any other status which is protected under any law, including the Americans with Disabilities Act and the Civil Rights Act of 1964;

(g)  tax, fine or penalty imposed by law; or

(h)  cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

K.  **Retaliation** means retaliatory treatment against an **Employee** of a **Company** on account of such individual:

1.  exercising his or her rights under law, refusing to violate any law or opposing any unlawful practice;

2.  having assisted or testified in or cooperated with a proceeding or investigation (including any internal investigation conducted by the **Company's** human resources or legal department) regarding alleged violations of law by the **Insured**;

3.  disclosing or threatening to disclose to a superior or any governmental agency any alleged violations of law; or

4.  filing any claim against the **Company** under the Federal False Claims Act, Section 806 of the Sarbanes Oxley Act or any other whistleblower law.

L.  **Stock Benefits** means any:

1.  offering, plan or agreement between a **Company** and any **Employee** which grants stock, warrants, shares or stock options of the **Company** to such **Employee**, including grants of restricted stock, performance stock shares, membership shares or any other compensation or incentive granted in the form of securities of the **Company**; or

2.  payment or instrument, the amount or value of which is derived from the value of securities of the **Company**, including stock appreciation rights or phantom stock plans or arrangements,

provided that **Stock Benefits** shall not include amounts claimed under any employee stock ownership plans or employee stock purchase plans.

FILED DATE: 9/15/2020 9:39 AM 2020L008850

M. **Third Party** means any natural person who is not an Insured Person.

N. **Third Party Wrongful Act** means any sexual harassment, or discrimination based upon status protected under any anti-discrimination law, against a Third Party committed, attempted, or allegedly committed or attempted by any Insured while acting in his or its capacity as such.

O. **Workplace Tort** means any employment-related:

   1. misrepresentation, defamation (including libel and slander), invasion of privacy, wrongful infliction of emotional distress, mental anguish or humiliation; or

   2. negligent retention, supervision, hiring or training, failure to provide or enforce consistent employment-related corporate policies and procedures, false imprisonment, negligent evaluation, wrongful discipline or wrongful deprivation of career opportunity,

   but only when alleged as part of a Claim for any Wrongful Employment Decision, breach of employment contract, Discrimination, Harassment or Retaliation.

P. **Wrongful Act** means an Employment Practices Wrongful Act or Third Party Wrongful Act.

Q. **Wrongful Employment Decision** means any wrongful termination, discharge of employment, demotion, denial of tenure, failure or refusal to employ or promote, or wrongful or negligent employee reference.

POLICY NUMBER: QPL0766516



QBBP-3006 (05-14)

*The Solution* for Fiduciary Liability
Coverage Part Declarations

QBE Insurance Corporation
55 Water Street, New York, New York 10041
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

Item 1:  Parent Company:  Mike Anderson Auto Group

Item 2:  A. Limit of Liability

          $2,000,000 per Claim
          $2,000,000 in the aggregate

        B. Voluntary Compliance Program Loss Limit: $150,000

        C. ERISA Civil Penalties Limit: $100,000

        D. HIPAA Privacy Civil Penalties Limit: $50,000

Item 3:  Insuring Clause A Retention: $0 per Claim

Item 4:  Pending or Prior Proceedings Date: May 1, 2005

FILED DATE: 9/15/2020 9:39 AM   2020L008850



**FILED DATE: 9/15/2020 9:39 AM    2020L000850**

**The Solution for Fiduciary Liability Coverage Part**

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

**I.  INSURING CLAUSE**

A. The Insurer shall pay, on behalf of an Insured, Loss on account of a Claim first made during the Policy Period.

B. The Insurer shall pay, on behalf of an Insured, Voluntary Compliance Program Loss first ascertained by or assessed against an Insured during the Policy Period, provided that the payment of any Voluntary Compliance Program Loss under this Coverage Part shall not waive any of the Insurer's rights under this Policy.

**II.  EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim:

A. **Liability Assumed Under Contract** - based upon, arising out of or resulting from any liability of others assumed by an Insured under any contract or agreement, provided that this Exclusion A shall not apply to Loss to the extent that: 1. an Insured would have been liable for such Loss in the absence of such contract or agreement; or 2. the liability assumed was under the agreement or declaration trust pursuant to which a Plan was established; and

B. **Workers Compensation, Disability Benefits, Social Security, Unemployment** - based upon, arising out of or resulting from any failure to comply with any obligation under any workers compensation, disability benefits, social security or unemployment insurance law, provided that this Exclusion B shall not apply to any Wrongful Act based upon, arising out of or resulting from: 1. COBRA; or 2. HIPAA;

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1. Exclusion C. ERISA shall not apply to this Coverage Part; and

2. Exclusion E. Pollution shall not apply to any Claim:

   (a) brought by or on behalf of a participant in, or beneficiary of, any Sponsored Plan based upon, arising out of or resulting from the diminution in value of any securities owned by such Sponsored Plan in any organization, where such diminution in value is allegedly the result of the matters described in Exclusion E; and

   (b) for which an Insured Person is not indemnified by a Company because of such Company's Financial Impairment.

**III.  RETENTION**

No retention shall apply to any Voluntary Compliance Program Loss or Loss constituting civil penalties as described in paragraphs 7(b)(iii) and (iv) of the definition of Loss.

**IV.  LIMIT OF LIABILITY**

A. The Voluntary Compliance Program Loss Limit stated in Item 2B of the Declarations of this Coverage Part represents the Insurer's maximum liability for all Voluntary Compliance Program Loss, including Defense Costs related to the assessment or correction of a Plan's non-compliance with any Voluntary Compliance Program, payable under this Coverage Part during the Policy Period.

B. The ERISA Civil Penalties Limit stated in Item 2C of the Declarations of this Coverage Part represents the Insurer's maximum liability for all civil penalties described in paragraph 7(b)(iii) of the definition of Loss ("ERISA Civil Penalties") payable under this Coverage Part during the Policy Period.

C. The HIPAA Privacy Civil Penalties Limit stated in Item 2D of the Declarations of this Coverage Part represents the Insurer's maximum liability for all civil penalties described in paragraph 7(b)(iv) of the definition of Loss ("HIPAA Privacy Civil Penalties") payable under this Coverage Part during the Policy Period.

All amounts set forth above shall be part of, and not in addition to, the Limit of Liability set forth in Item 2A of the Declarations of this Coverage Part.

FILED DATE: 9/15/2020 9:39 AM  2020L008850

**V.   REPORTING**

The Insured shall notify the Insurer of Voluntary Compliance Program Loss as soon as practicable after such Voluntary Compliance Program Loss is first ascertained by or assessed against an Insured.  However, in no event shall any notice be provided later than:

A.   if this Coverage Part expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of expiration or termination of this Coverage Part; or

B.   the expiration date of the ERP, if applicable.

**VI.   OTHER INSURANCE**

With the exception of insurance which is written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for Loss for which this Coverage Part provides coverage, provided that any payment by an Insured of a retention or deductible under any such other insurance shall reduce the Retention under this Coverage Part by the amount of such payment which would otherwise have been Loss under this Coverage Part.

**VII.   PRIORITY OF PAYMENTS**

In the event a liquidation or reorganization proceeding is commenced by or against a Company pursuant to United States bankruptcy law, the Insurer shall first pay Loss incurred by an Insured Person and the Plans and then pay Loss incurred by any Company.

**VIII.   CHANGES IN A PLAN**

A.   if the Pension Benefit Guaranty Corporation ("PBGC") becomes the trustee of a Plan before or after the inception date of this Coverage Part, coverage for such Plan shall continue until termination of this Coverage Part for those who were Insureds at the time the PBGC became the trustee, but only with respect to Wrongful Acts which occurred prior to the effective date the PBGC became the trustee; or

B.   if a Company terminates a Plan before or after the inception date of this Coverage Part, coverage for such Plan shall continue until termination of this Coverage Part for those who were Insureds at the time of such Plan termination or who would have been an Insured at the time of such termination if this Coverage Part had been in effect, but only with respect to Wrongful Acts which occurred prior to or after the date the Plan was terminated.

**IX.   GLOSSARY**

A.   **Administration** means advising, counseling, interpreting, providing notice to or handling of records, enrollment, termination or cancellation of, any Plan for Employees, Executives, participants or beneficiaries.

B.   **Claim** means any:

1.   written notice of commencement of a fact finding investigation by the U.S. Department of Labor ("DOL"), the PBGC or any similar governmental authority located outside of the United States;

2.   written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation or waiving or tolling of a statute of limitations or Extradition;

3.   civil or criminal proceeding, evidenced by: (a) the service of a complaint or similar pleading in a civil proceeding; or (b) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; or .

4.   formal administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

against an Insured for a Wrongful Act, including any appeal therefrom.

The time when a Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Claim is first made against, served upon or received by the Insured.

C.   **Defense Costs** means that part of Loss consisting of:

1.   reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any Insured) incurred in investigating, defending, opposing or appealing any Claim or Voluntary Compliance Program Loss; or

QBBP-1003 (05-14)

FILED DATE: 9/15/2020 9:39 AM   2020L008850

2.  the premium for appeal, attachment or similar bonds (but the insurer shall be under no obligation to furnish any bond).

D.  **Insured** means any Company, Plan or Insured Person.

E.  **Insured Person** means any:

1.  Executive of a Company;

2.  Employee of a Company or Sponsored Plan; and

3.  past, present or future natural person trustee of a Sponsored Plan.

F.  **Loss** means the amount that an Insured becomes legally obligated to pay on account of any Claim including:

1.  compensatory damages;

2.  judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorneys fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3.  pre and post-judgment interest;

4.  Defense Costs;

5.  Voluntary Compliance Program Loss;

6.  punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages; and

7.  the following civil penalties:

    (a) the 5% or less, or 20% or less, civil penalties imposed upon an Insured as a fiduciary under § 502(i) or (l) of E R I S A;

    (b) civil penalties imposed:

        (i) by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions, the United Kingdom Occupational Pensions Regulatory Authority or the Pensions Regulator, pursuant to the Pension Scheme Act of 1993, the Pensions Act of 1995 and the Pensions Act of 2004; or

        (ii) by Ireland's Pensions Board or Pensions Ombudsman,

        provided that any coverage for such civil penalties applies only if the funds or assets of the pension scheme are not used to fund, pay or reimburse the premium for this Coverage Part;

        (iii) upon an Insured as a fiduciary under Section 502(c) of ERISA; or

        (iv) upon an Insured for violation of the privacy provisions of HIPAA.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant Insureds or to the Claim giving rise to such damages, and the insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the insurer and the insured) that such damages are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) tax imposed by law;

(d) fine or penalty imposed by law, other than as described in paragraph 7 above;

(e) benefits due or would become due under any Plan, including the payment of plaintiffs' attorneys fees as a percentage of such benefits or from a common fund established to pay such benefits, unless:

    (i) such benefits are payable as an Insured Person's personal obligation based upon, arising out of or

QBSP-1003 (05-14)                                                                                      Page 3 of 4

FILED DATE: 9/15/2020 9:39 AM  2020L009850

resulting from a Wrongful Act; or

> (ii) a Claim alleges a loss to the Plan or to the accounts of such Plan's participants resulting from a change in the value of Plan investments, even where the amounts sought or recovered by the plaintiffs in such Claim are described in any way as "benefits"; or

(f) cost incurred to clean up, remove, contain, treat, detoxify or neutralize Pollutants.

G. **Plan means:**

1. any Sponsored Plan; and

2. any government mandated workers compensation, disability benefits, social security or unemployment insurance for Employees and Executives.

H. **Sponsored Plan means:**

1. any employee benefit plan, pension benefit plan or welfare benefit plan, as defined in and subject to ERISA, including any VEBA, which is operated by a Company or a Company and a labor organization solely for the benefit of Employees or Executives of a Company; or

2. any other employee benefit plan or program similar to those described in paragraph 1, but which is not subject to ERISA, including any fringe benefit or excess benefit plan,

provided that Sponsored Plan shall not include any employee stock ownership plan created after inception of the Policy Period.

I. **VEBA means** any Voluntary Employees' Beneficiary Associations as defined in Section 501(c)(9) of the Internal Revenue Code of 1986.

J. **Voluntary Compliance Program means** any voluntary compliance resolution program or similar voluntary settlement program administered by the Internal Revenue Service or DOL or any other domestic or foreign governmental authority. Such programs include the Employee Plans Compliance Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Walk-In Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correspondence Program, Delinquent Filer Voluntary Compliance Program and Voluntary Fiduciary Correction Program.

K. **Voluntary Compliance Program Loss means** fees, fines, penalties or sanctions paid by an Insured to a governmental authority under a Voluntary Compliance Program for a Plan's inadvertent non-compliance with any law. However, Voluntary Compliance Program Loss shall not include any costs to correct any non-compliance.

L. **Wrongful Act means** any:

1. actual or alleged breach of the responsibilities, obligations or duties imposed by ERISA upon fiduciaries of the Sponsored Plan;

2. negligent act, error or omission in the Administration of any Plan committed, attempted or allegedly committed or attempted by an Insured in his or its capacity as such;

3. other matter claimed against an Insured Person solely by reason of the Insured Person's serving as a fiduciary of a Sponsored Plan; or

4. negligent act, error or omission committed, attempted or allegedly committed or attempted by an Insured Person in performing any functions identified in ERISA Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions

POLICY NUMBER: QPL6766816



QBBP-3012 (05-14)

**The Solution** for Crime
Coverage Part Declarations

FILED DATE: 9/15/2020 9:39 AM   2020L009850

QBE Insurance Corporation
55 Water Street, New York, New York  10041
Home Office:  c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania  17101

| Item 1: | Parent Company: | Mike Anderson Auto Group | | |
|---|---|---|---|---|
| Item 2: | Limits of Liability and Retentions | | | |

| | Insuring Clause | | Limit of Liability | Retention |
|---|---|---|---|---|
| | A. | Employee Theft | $1,000,000 | $25,000 |
| | B. | In Transit | $1,000,000 | $25,000 |
| | C. | Inside the Premises | $1,000,000 | $25,000 |
| | D. | Forgery and Alteration | $1,000,000 | $25,000 |
| | E. | Computer Fraud | $1,000,000 | $25,000 |
| | F. | Funds Transfer Fraud Coverage | $1,000,000 | $25,000 |
| | G. | Credit Card Fraud | $1,000,000 | $25,000 |
| | H.. | Money Orders and Counterfeit Currency Fraud | $1,000,000 | $25,000 |
| | I. | Client Coverage | $1,000,000 | $25,000 |

| Item 3: | Expense Limit | $25,000 |
|---|---|---|
| Item 4: | Computer Fraud Expense Limit | $25,000 |
| Item 5: | Information Reproduction Limit | $25,000 |

FILED DATE: 9/15/2020 9:39 AM    2020L009850



**The Solution** for Crime
Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

**I.    INSURING CLAUSES**

The Insurer shall pay the Insured for direct loss:

**A.    Employee Theft**

of Money, Securities or Property sustained by an Insured resulting from Theft or Forgery by an Employee, whether acting alone or in collusion with others.

**B.    In Transit**

sustained by an Insured resulting from:

1.    a Third Party's:

    (a)    Robbery or other unlawful taking of Money, Securities or Property

    (b)    damage to Property resulting from Robbery; and

2.    actual destruction or disappearance of Money or Securities,

while In Transit or temporarily in an Employee's or a partner of the Company's home.

**C.    Inside the Premises**

sustained by an Insured resulting from:

1.    a Third Party's

    (a)    Robbery or Safe Burglary, including damage to Property, or Premises or its exterior, resulting from such Robbery or Safe Burglary;

    (b)    unlawful taking of Money, Securities or Property; and

2.    actual destruction or disappearance of Money or Securities,

within or from the Premises.

**D.    Forgery or Alteration**

resulting from Forgery or alteration of any Financial Instrument by a Third Party, including any reasonable legal expenses that the Insured pays, with the Insurer's prior written consent, in defending any action brought against an Insured for refusing to pay such Financial Instrument, which any such amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2 of the Declarations of this Coverage Part for this Insuring Clause D.

**E.    Computer Fraud**

of Money, Securities or Property resulting from  a Third Party's Computer Fraud, including any Computer Fraud Expenses.

**F.    Funds Transfer Fraud Coverage**

of Money or Securities resulting from a Third Party's Funds Transfer Fraud.

**G.    Credit Card Fraud**

resulting from a Third Party's Credit Card Fraud .

**H.    Money Orders and Counterfeit Currency Fraud**

resulting from a Company's good faith acceptance: 1. In exchange for merchandise, Money or services, of any post office or express money order, issued or purporting to have been issued by any post office or express company, if such money order is not paid upon presentation; or 2. in the regular course of business, of counterfeit paper currency.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

I.   Client Coverage

of Money, Securities or Property sustained by a Client resulting from an Employee's Theft or Forgery committed without collusion with a Client's employee.

## II.   EXCLUSIONS

No coverage shall be available for:

A.   **Acts Committed by a Partner** – loss based upon, arising out of or resulting from Theft or Forgery committed by a partner of a Company, whether acting alone or in collusion with others, provided that this Exclusion A shall not apply where the Theft or Forgery would otherwise be covered under Insuring Clauses A or I, and the coverage provided is excess of the amount of such partner's ownership percentage of such Company on the day immediately preceding the date of Discovery, multiplied by such Company's total assets as reflected in such Company's most recent financial statements; provided such statements have been audited or prepared by an independent Certified Public Accountant;

B.   **Advantage** – loss sustained by one insured to the advantage of another insured;

C.   **Authorized Representative** – loss or damage based on, arising out of or resulting from Theft, Forgery, Funds Transfer Fraud, Computer Fraud, Credit Card Fraud or other fraudulent, dishonest or criminal act (other than Robbery and Safe Burglary) committed by any authorized representative, except an independent Contractor, of an insured, acting alone or in collusion with others, provided that this Exclusion C shall not apply to loss under Insuring Clauses A or I where the Theft or Forgery is committed by an Employee acting in collusion with such authorized representative;

D.   **Custodial** – loss of or damage to Money, Securities or Property in the custody of any bank, trust company or similar place of safe deposit, armored vehicle company, or any person duly organized by a Company to have custody of such Money, Securities or Property, provided that this Exclusion D shall not apply where coverage provided is excess of: 1. any amount recovered or received by the Company under any contract with, or any insurance available to, any of the foregoing; or 2. any other insurance or indemnity covering the loss, in whole or in part;

E.   **Data Costs, Fees, or Expenses** – costs, fees or expenses incurred:

   1. as a result of: (a) the reconstitution of Data where a Company knowingly used illegal copies of programs; (b) an alteration in Data held on magnetic media due to the effect of magnetic fields, their incorrect use or the obsolescence of the computer or its facilities; or (c) any effort to render the Data usable by replacement processing equipment; or

   2. to design, improve or update software or programs or perfect their operation or performance;

F.   **Fire** – loss based upon, arising out of or resulting from fire, provided that this Exclusion F shall not apply to: 1. loss of Money or Securities; or 2. damage to any safe or vault caused by fire for the purposes of Safe Burglary;

G.   **Income** – loss of income, whether or not earned or accrued or potential income, not realized as the result of any loss covered under this Coverage Part;

H.   **Indirect or Consequential Loss** – indirect or consequential loss of any kind, provided that this Exclusion H shall not apply to Expenses;

I.   **Intellectual Property** – loss of trade secrets, confidential processing methods or other confidential information of any kind;

J.   **Inventory Shortage** – loss, the proof of which is dependent solely on 1. a profit and loss computation or comparison; or 2. comparison of inventory records with an actual physical count, provided that where an Employee is involved and has been identified, inventory records and actual physical count of inventory can be submitted as supporting documentation of loss;

K.   **Legal Costs, Fees or Expenses** – costs, fees or expenses incurred or paid in defending or prosecuting any legal proceeding or claim, provided that this Exclusion K shall not apply to Expenses;

L.   **Nuclear** – loss or damage based upon, arising out of or resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any act or condition related to any of the foregoing;

M.   **Trading Losses** – loss based upon, arising out of or resulting from any trading of Money, Securities or Property, provided that this Exclusion M shall not apply to direct loss caused by Theft or Forgery resulting in improper personal financial gains to an Employee. Improper personal financial gains does not include salaries, bonuses, commissions, fees, bonuses, promotions, awards, profit sharing or pensions;

FILED DATE: 9/15/2020 9:39 AM   2020L008850

N.   Voluntary Purchase or Exchange – loss based upon, arising out of, or resulting from an Insured knowingly giving or surrendering Money, Securities or Property in any purchase or exchange with a Third Party without collusion with an Employee, provided that this Exclusion N shall not apply to Insuring Clauses A, H or I;

O.   War and similar actions – loss or damage based upon, arising out of or resulting from war, whether or not declared, civil war, insurrection, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization or any act or condition related to any of the foregoing;

Exclusions P – Q below shall only apply to Insuring Clauses A. Employee Theft and I. Client Coverage:

P.   Broker/Independent Contractor – loss caused by any broker, commission, merchant, factor, consignee, contractor, independent contractor (other than an Independent Contractor) or other similar agent or representative;

Q.   Prior Dishonesty – loss caused by an Employee, which is sustained by an Insured:

   1. after an Executive or Insurance Representative becomes aware of a Theft, Forgery or other fraudulent, dishonest or criminal act:

      (a)  valued at $1,000 or more and committed while in the employ or service of an Insured;

      (b)  involving Money, Securities or other property, valued at $25,000 or more and committed prior to the employ or service of an Insured; or

   2. more than 90 days following termination of such Employee;

Exclusions R - S below shall only apply to Insuring Clauses B. In Transit and C. Inside the Premises:

R.   Mail/Carrier for Hire – loss of or damage to Money, Securities or Property while in the mail or in the custody of any carrier for hire other than an armored motor vehicle company

S.   Other Insuring Clauses - loss or damage based on, arising out of or resulting from Forgery, Funds Transfer Fraud, Computer Fraud or Credit Card Fraud;

Exclusion T. below shall only apply to Insuring Clauses B. In Transit, C. Inside the Premises, E. Computer Fraud and F. Funds Transfer Fraud Coverage:

T.   Kidnap, Ransom or Extortion – loss or damage based upon, arising out of or resulting from any kidnap, ransom or extortion payment;

Exclusion U. below shall only apply to Insuring Clause D. Forgery or Alteration:

U.   Forgery or Alteration – loss based upon, arising out of or resulting from  a Third Party's Forgery or alteration of: 1. any Financial Instrument committed in collusion with any Employee; or 2. any registered or coupon obligations of the Insured, or any coupons whether attached or detached; and

Exclusion V. below shall only apply to Insuring Clause G. Credit Card Fraud:

V.   Forgery or Alteration – loss based upon, arising out of or resulting from any forgery or alteration of, on or in any written instrument, provided that this Exclusion V shall not apply: 1. where there was full compliance with the provisions, conditions and other terms under which the involved credit card was issued; and 2. the Company is legally liable for the loss to the issuer of such credit card.

**III.   RETENTION**

The Insurer shall not pay for any loss until that part of each loss exceeds the applicable Retention stated in Item 2 of the Declarations of this Coverage Part. No Retention shall apply to loss sustained by an ERISA Plan.

**IV.   LIMIT OF LIABILITY**

A.   The Limits of Liability, stated in Item 2 of the Declarations of this Coverage Part, represent the maximum amount payable under each Insuring Clause for each loss Discovered during the Policy Period.

B.   The Expense Limit stated in Item 3 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for Expenses, which amount shall be part of, and not in addition to, the Limits of Liability stated in Item 2 of such Declarations.

C.   The Computer Fraud Expense Limit stated in Item 4 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for Computer Fraud Expenses, which amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2 of such Declarations for Insuring Clause E. Computer Fraud.

D.   The Information Reproduction Limit stated in Item 5 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for the cost of reproducing information contained in any lost or damaged manuscripts, records, accounts, microfilms, tapes or other

FILED DATE: 9/15/2020 9:39 AM   2020L008850

records resulting from a covered loss, which amount shall be part of, and not in addition to, the Limits of Liability stated in Item 2 of such Declarations.

E.   The Insurer shall not pay the Insured more for loss or losses sustained by more than one Insured then the amount the Insurer would pay if all loss or losses had been sustained by one Insured.

F.   All loss resulting from a single act or series of related acts of the same Employee or Third Party, and all loss whether such act or acts occurred before or during the Policy Period, shall be treated as a single loss subject to the Limits of Liability stated in Item 2 of the Declarations.

G.   If a loss is covered under more than one Insuring Clause, the maximum amount payable under this Coverage Part shall not exceed the largest applicable Limit of Liability of any such Insuring Clause.

## V.   DISCOVERY

A.   This Coverage Part provides coverage for loss sustained by an Insured at any time but Discovered during the Policy Period.

B.   The Insurer shall pay for loss that an Insured sustained prior to the effective date of expiration or termination of this Coverage Part, which is Discovered by the Insured:

1.   no later than 60 days after the effective date of such expiration or termination; and

2.   with respect to any ERISA Plan, no later than 1 year from the effective date of such expiration or termination.

This extended period to Discover loss terminates immediately upon the effective date of any other insurance obtained by the Insured to replace, in whole or in part, the insurance provided by this Coverage Part, regardless of whether such insurance provides coverage for loss sustained prior to its effective date.

## VI.   DUTIES IN THE EVENT OF LOSS

A.   An Insured's knowledge of any information relevant to this Coverage Part or Discovery shall be deemed knowledge possessed by all Insureds.

B.   Upon Discovery, the Insured shall:

1.   give written notice to the Insurer as soon as practicable, but in no event later than 90 days after such Discovery;

2.   provide the Insurer with a detailed, sworn proof of loss within 120 days after such Discovery;

3.   submit to an examination under oath at the Insurer's request;

4.   cooperate with the Insurer in the investigation and settlement of any claim.

## VII.   OWNERSHIP

Solely with respect to:

A.   Insuring Clauses A – H, this Coverage Part shall only apply:
1.   to Money, Securities or Property owned by a Company, for which the Company is legally liable, or held by the Company in any capacity; and
2.   no coverage shall be provided under this Coverage Part for any damage to the Premises unless the Company is the owner of such Premises or is legally liable for such damage;

provided that with respect to Insuring Clause A, the Insurer's liability shall not apply to Money, Securities or Property of a Client.

B.   Insuring Clause I, this Coverage Part shall only apply to Money, Securities or Property owned by a Client, which is held by a Company in any capacity or for which the Company is legally liable.

## VIII.   OTHER INSURANCE

With the exception of insurance which is written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for loss for which this Coverage Part provides coverage (including any prior insurance replaced by this Coverage Part, which provided a period of time to discover loss occurring prior to the termination or cancellation of such replaced policy), provided that any payment by an Insured of a retention or deductible under any such other insurance shall reduce the Retention under this Coverage Part by the amount of such payment which would otherwise have been loss under this Coverage Part.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

**IX.   ERISA PROVISION**

A.   Any payment made by the Insurer under this Coverage Part for loss sustained by an ERISA Plan shall be paid to such ERISA Plan. If such loss payment is in excess of the amount of coverage required by ERISA, any such excess amount shall be held for the use and benefit of any other ERISA Plan, should such ERISA Plan also Discover loss covered under this Coverage Part.

B.   With respect to each ERISA Plan, if covered loss is sustained by any ERISA Plan:

1.   which does not have any employer securities, the Limit of Liability applicable to such covered loss shall be the greater of $1,000; or 10% of the ERISA Plan's funds handled as of the beginning of such ERISA Plan's fiscal year, up to a maximum limit of $500,000;

2.   which does have any employer securities, the limit of liability applicable to such covered loss shall be the greater of $1,000; 10% of the ERISA Plan's funds handled as of the beginning of such ERISA Plan's fiscal year, up to a maximum limit of $1,000,000.

C.   If the Limits of Liability stated in item 2 of the Declarations of this Coverage Part are:

1.   less than or equal to the amounts set forth in B1. and 2. above, then the applicable Limit of Liability shall be amended to such respective amounts; or

2.   greater than the amounts set forth in B1. and 2. above, then the limit of liability for each ERISA Plan shall be the amounts stated above with the remaining limit allocated equally between all ERISA Plans sustaining loss.

**X.   VALUATION**

The Insurer shall pay:

A.   the actual market value of lost, damaged or destroyed Securities at the closing price of such Securities on the business day immediately preceding the day on which a loss is Discovered; or the cost of replacing Securities, whichever is less, plus the cost to post a Lost Instrument Bond;

B.   the least of:
1. the actual cash value of the Property; or
2. the cost to repair or replace Property, other than precious metals, with that of similar quality and value,

at the time Parent Company complies with Section VI. DUTIES IN THE EVENT OF LOSS, regarding the furnishing of a proof of loss;

C.   the United States of America dollar value of:
1.   foreign currency based on the rate of exchange published in The Wall Street Journal on the day loss involving foreign currency is Discovered; or
2.   any precious metals based on the amount published in The Wall Street Journal Cash Prices, Precious Metals, on the day loss involving such precious metals is Discovered.

**XI.   GLOSSARY**

A.   Client means a customer of a Company to whom a Company provides goods or services for a fee or with whom the Company has a written contract or agreement.

B.   Computer Fraud means the unlawful taking of Money, Securities or Property resulting from an unauthorized:

1.'   entry into, change to or deletion of Data from a Computer System; or

2.   introduction of instructions propagating through a Computer System,

directed solely against a Company.

C.   Computer Fraud Expenses means reasonable costs, charges, fees and expenses (other than regular or overtime wages, salaries, fees or benefits of any Company) incurred by the Company to reproduce damaged or destroyed electronic Data computer programs or enable the Company to restore the Company's Computer System to the level of operational capability that existed immediately preceding the covered loss under Insuring Clause E.

D.   Computer System means a computer or network of computers, including off-line media libraries.

E.   Credit Card Fraud means the Forgery or alteration of, on or in, any written instrument required in connection with any credit card issued to a Company or at the request of a Company, to any Executive or Employee of a Company.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

F.  **Data** means information contained in any records, manuscripts, accounts, microfilms or tapes processed and stored in a Computer System.

G.  **Discover, Discovered** or **Discovery** means knowledge acquired by an Executive or Insurance Representative which would cause a reasonable person to believe that that a covered loss or occurrence which could give rise to a covered loss has occurred, regardless of when the act(s) causing or contributing to such loss occurred or whether the exact amount or details of such loss are known.

**Discover, Discovered** or **Discovery** shall not include knowledge acquired by an Executive or Insurance Representative acting alone or in collusion with an Employee, or knowledge possessed by any Executive or Insurance Representative who is a participant in the Theft or Forgery.

H.  **Employee** means any:

1.  natural person who labor or service was, is or will be engaged and directed by a Company, including a part-time, seasonal, leased and temporary employee, intern or volunteer;

2.  Executive while performing acts within the scope of the usual duties of an Employee;

3.  Independent Contractor;

4.  natural person fiduciary, trustee, administrator, employee as defined in paragraph 1 above or Executive of an ERISA Plan and any other natural person, who any of which handle ERISA Plan assets and are required by ERISA to be bonded by the Company in connection with such ERISA Plan;

5.  former or retired employee described in paragraph 1 above or Executive retained as a consultant to the Company; or

6.  employee described in paragraph 1 above or Executive, while on leave for military services.

I.  **ERISA Plan** means any welfare or pension plan as defined by ERISA and which is operated solely by a Company or jointly by a Company and a labor organization for the benefit of Employees and which existed on or before the inception of this Coverage Part or which is created or acquired after the inception of this Coverage Part. ERISA Plan shall not include any multi-employer plan.

J.  **Expenses** means reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any insured): 1. incurred by the Insured to determine the amount and extent of loss covered under this Coverage Part; or 2. incurred and paid by the Insured to establish the existence, amount and preparation of the Insured's proof of loss in support of a covered loss under Insuring Clauses A – I.

K.  **Financial Instruments** means checks, drafts, promissory notices or similar written promises, orders or directions to pay a certain sum of Money that are:

1.  made or drawn upon a Company; or

2.  made or drawn by one acting as an Insured's agent and drawn on an Insured's account or that are purported to have been so made or drawn.

L.  **Forgery** means the signing, whether by hand, mechanically or electronically, of another natural person's name with intent to deceive.

M.  **Funds Transfer Fraud** means fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions (other than instructions which bear a Forgery), purportedly issued by a Company, to a financial institution directing the transfer, payment or delivery of Money or Securities from any of the Company's accounts at such institution, without such Company's knowledge or consent.

N.  **Independent Contractor** means any natural person working for a Company pursuant to a written contract or agreement between such natural person and the Company which specifies the terms of the Company's engagement of such natural person.

O.  **Insurance Representative** means an Employee, designated to represent an Insured for the purpose of effecting and maintaining insurance.

P.  **Insured** means any Company or Sponsored Plan.

Q.  **In Transit** means being conveyed by the Company outside the Premises, from one person or place to another, under the custody of an Employee, partner of a Company or another person duly authorized by such Company to have custody of Money, Securities or Property. The conveyance described in this paragraph begins immediately upon receipt of Money, Securities or Property by the person described herein and ceases immediately upon delivery to the designated recipient or its agent.

R.  **Money** means currency, coins, bank notes and bullion.

FILED DATE: 9/15/2020 9:39 AM 2020L009850

S. **Premises** means the interior of that portion of: 1. any building that a Company occupies in conducting its business; or 2. that part of any building occupied by a bank, trust company or similar financial institution.

T. **Property** means tangible property, other than Money or Securities, that has intrinsic value.

U. **Robbery** means actual or attempted unlawful taking of Money, Securities or Property from the custody of an Employee or other person (except a person acting as a watchman, janitor or porter) duly authorized by a Company to have custody of Money, Securities or Property, by violence or threat of violence, committed in the presence and cognizance of such Employee or other person.

V. **Safe Burglary** means: 1. the actual or attempted unlawful taking of Money, Securities or Property by forcible or violent entry evidenced by visible marks, from a locked vault or safe located within the Premises and any resultant damage to the safe or vault from such entry; or 2. damage to a locked safe, cash drawer, cash box or cash register by actual or attempted felonious entry or abstraction of such container.

W. **Securities** means negotiable or non-negotiable instruments or contracts representing either Money or Property. Securities shall not include Money.

X. **Sponsored Plan** means any ERISA Plan and any plan similar to an ERISA Plan that is not governed by ERISA.

Y. **Theft** means the unlawful taking of Money, Securities or Property to the deprivation of an Insured, solely for the purposes of Insuring Clause A, or a Client, solely for the purposes of Insuring Clause I.

Z. **Third Party** means any natural person who is not an Employee.

**POLICY NUMBER: QPL0766916**
*Endorsement Effective Date: October 1, 2017*

QBBP-5056 (05-14)

FILED DATE: 9/15/2020 9:39 AM   2020L009850

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## INDIANA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

It is hereby agreed that:

I.  Section XII. NOTICE is amended by the addition of the following:

Notwithstanding anything to the contrary in the Declarations, any Coverage Part, or any endorsements attached to this Policy, notice of any Claim or circumstances that could give rise to a Claim may also be provided to an authorized agent of the Insurer.

II.  This Policy is amended by the addition of the following:

**NON-RENEWAL**

If the Insurer decides not to renew this Policy, the Insurer will deliver or mail written notice of non-renewal to the Parent Company at the address set forth in the Declarations of the GTC at least forty-five (45) days before the expiration date of the Policy.  Proof of mailing of any notice shall be sufficient proof of notice.

All other terms and conditions of this Policy remain unchanged.

QBBP-5056 (05-14)

Page 1 of 1

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBEPP-2045 (06-15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ILLEGAL ALIEN INVESTIGATIVE DEFENSE COSTS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that:

I.    The definition of Claim in paragraph B. of Section V. GLOSSARY is amended by the addition of the following:

Claim shall also mean a criminal investigation of the Company by any governmental agency for allegedly hiring or harboring illegal aliens.

II.   This Coverage Part is amended by the addition of the following:

All Defense Costs arising out of all Claims made against the Insured with respect to the coverage provided by this endorsement shall be subject to a sublimit of liability of $25,000, which shall be part of, and not in addition to, the Limit of Liability set forth in item 2 of the Declarations of this Coverage Part.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L008650

QBEPP-2045 (06-15)

Page 1 of 1

POLICY NUMBER: QPL0766616
Endorsement Effective Date: October 1, 2017

QBBPP-2156 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PPACA AND PPA CIVIL PENALTIES ENDORSEMENT

This endorsement modifies insurance provided under the following:

FIDUCIARY LIABILITY COVERAGE PART

It is hereby agreed that:

I.  Section III. RETENTION is amended by the addition of the following:

No retention shall apply to Loss constituting civil penalties imposed upon an Insured for inadvertent violation of the Patient Protection and Affordable Care Act ("PPACA") or the Pension Protection Act of 2006 ("PPA").

II.  Section IV. LIMIT OF LIABILITY is amended by the addition of the following:

All Loss arising from Claims alleging inadvertent violations of PPACA or the PPA shall be subject to a sublimit of liability of $50,000, which amount shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of this Coverage Part.

III.  The definition of Loss in paragraph F.7. of Section IX. GLOSSARY is amended by the addition of the following:

any civil penalties imposed upon an Insured for inadvertent violation of PPACA or the PPA.

All other terms and conditions of this Policy remain unchanged.

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBEPP-2200 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF CLAIM TO INCLUDE MEDIATION

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that Section V. GLOSSARY, paragraph B. Claim 1. is amended by the addition of the word "mediation," after the word "arbitration,".

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 8:39 AM   2020L008850

FILED DATE: 9/15/2020 9:39 AM   2020L009850

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2219 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EQUAL PAY ACT CARVEBACK ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that Exclusion G. Wage and Hour in Section II. EXCLUSIONS of the GTC shall not apply to any Claim for any violation of the responsibilities, obligations or duties imposed by the Equal Pay Act.

All other terms and conditions of this Policy remain unchanged.

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBSPP-2220 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WAGE AND HOUR CLAIM DEFENSE COSTS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that:

I. Section I. INSURING CLAUSE is amended by the addition of the following:

The Insurer shall pay, on behalf of an Insured, Defense Costs on account of a Wage and Hour Claim first made during the Policy Period.

II. Section V. GLOSSARY is amended by the addition of the following:

Wage and Hour Claim means any:

1. written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, waiving or tolling of a statute of limitations, reinstatement, reemployment or re-engagement;

2. civil proceeding, evidenced by the service of a complaint or similar pleading;

3. arbitration proceeding, evidenced by the receipt of a demand for arbitration; or

4. administrative, regulatory or tribunal proceeding, other than a labor, grievance or other proceeding under a collective bargaining agreement, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

which is brought by an Employee against an Insured and is based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act) or any similar law governing wage, hour or payroll.

The time when a Wage and Hour Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Wage and Hour Claim is first made against, served upon or received by the insured or the applicable notice or order is filed or entered.

III. This Coverage Part is amended by the addition of the following:

LIMIT OF LIABILITY

All Defense Costs arising from a Wage and Hour Claim shall be subject to a Wage and Hour Sublimit of Liability of $100,000, which shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations of this Coverage Part and shall be excess of a Wage and Hour Retention of $50,000.

IV. Exclusion G. Wage and Hour in Section II. EXCLUSIONS of the GTC shall not apply to Defense Costs for a Wage and Hour Claim.

All other terms and conditions of this Policy remain unchanged.

QBSPP-2220 (10-14)

Page 1 of 1

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2225 (10-14)

FILED DATE: 9/15/2020 9:39 AM   2020L008850

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF RETALIATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that the definition of Retaliation in paragraph K. of Section V. GLOSSARY is amended by deleting the word "Employee" and replacing it with the word "Insured Person".

All other terms and conditions of this Policy remain unchanged.

QBBPP-2225 (10-14)

POLICY NUMBER: QPL0768816
Endorsement Effective Date: October 1, 2017

QBBPP-2277 (07-15)

FILED DATE: 9/15/2020 9:39 AM    2020L008850

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## FRAUDULENT PAYMENT INSTRUCTION COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

CRIME COVERAGE PART

It is hereby agreed that:

I. Item 2 of the Crime Coverage Part Declarations is amended by the addition of the following:

| Insuring Clause | Limit of Liability | Retention |
|---|---|---|
| Fraudulent Payment Instruction | $100,000 | $25,000 |

II. Section I. INSURING CLAUSES is amended by the addition of the following:

Fraudulent Payment Instruction

resulting from a Company having paid, transferred or delivered any Money or Securities resulting from Fraudulent Payment Instruction.

III. Section II. EXCLUSIONS, paragraph C. is amended by the addition of the words "Fraudulent Payment Instruction" after the words "Credit Card Fraud".

IV. Solely with respect to the coverage provided by this endorsement, Section II. EXCLUSIONS, paragraph N. is deleted.

V. Section II. EXCLUSIONS, paragraph P. shall also apply to the Fraudulent Payment Instruction Insuring Clause.

VI. Section II. EXCLUSIONS, paragraphs R. through T. shall also apply to the Fraudulent Payment Instruction Insuring Clause.

VII. Section II. EXCLUSIONS is amended by the addition of the following:

The Exclusions below shall only apply to the Fraudulent Payment Instruction Insuring Clause:
Credit Card Loss - based upon, arising out of or resulting from any party's use of or acceptance of any debit card, credit card or similar instrument;

Games of Chance - based upon, arising out of or resulting from any gambling, contest, lottery, sweepstake, coupon, promotional game, or other game of chance, including any redemption in connection therewith;

Investments – based upon, arising out of or resulting from any investment in Securities, or ownership in, any corporation, partnership, real property or similar investment;

Loans and Credit - based upon, arising out of or resulting from any extension of any credit, loan or similar promise to pay;

Performance Under Contract - based upon, arising out of or resulting from any party to perform under any contract;

Products or Services - based upon, arising out of or resulting from any failure, malfunction, illegitimacy or inadequacy of any product or service; and

Property - based upon, arising out of or resulting from any damage to Property.

QBBPP-2277 (07-15)

Page 1 of 2

FILED DATE: 9/15/2020 9:39 AM 2020L009850

VIII. Section XI. GLOSSARY is amended by the addition of the following:

**Service Provider** means a business the Insured does not own, operate or control, but that an Insured hires for a fee pursuant to an agreement or a written contract to perform services or provide goods related to an Insured's business. **Service Provider** does not include any broker-dealer, financial institution, asset manager, armored motor vehicle company or similar entity.

**Fraudulent Payment Instruction** means the intentional misleading of an Employee through a misrepresentation of a material fact which is: (a) relied upon by an Employee; and (b) committed by a person purporting to be a Client, **Service Provider** or Employee who was authorized by the Company to instruct other Employees to transfer Money or Securities.

All other terms and conditions of this Policy remain unchanged.

QBBPP-2277 (07-15)

POLICY NUMBER: QPL0768916
Endorsement Effective Date: October 1, 2017

QBBPP-2147 (05-14)

FILED DATE: 9/15/2020 9:39 AM   2020L008650

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED COMPANY ENDORSEMENT

This endorsement modifies insurance provided under the following:
GENERAL TERMS AND CONDITIONS

It is hereby agreed that the definition of Company in paragraph C. of Section XXII. GLOSSARY is amended by the addition of the following:

Company also means any Entity listed below.

Anderson Kane County Properties, LLC
Anderson Lake County Properties Ltd., LLC
Anderson Management Group Inc.
Anderson Management Group II Inc.
Anderson Thompson Cass County Properties LLC
Anderson Thompson Elkhart County Properties LLC
Anderson Thompson Fulton County Properties, Ltd., LLC
Anderson Thompson Gas City Properties LLC
Anderson Thompson Grant County Properties, Ltd., LLC
Anderson Thompson Wells County Properties LLC
Bob Anderson Pontiac, Inc. dba Mike Anderson Chevrolet of Merrillville
Drive Now Auto Credit Company, Inc.
Midwest Warranty Associates, Inc.
Mike Anderson Cass County Properties Inc.
Mike Anderson Chevrolet Enterprises, LLC
Mike Anderson Chevrolet of Chicago, LLC
Mike Anderson Chevrolet of Ossian
Mike Anderson Chevrolet, Buick, GMC Truck
Mike Anderson Chevrolet, Inc.
Mike Anderson Chrysler Dodge SuperCenter of Logansport, Inc.
Mike Anderson Chrysler, Dodge, Jeep Inc.
Mike Anderson Dodge, Inc.
Mike Anderson Howard County Properties Inc.
Mike Anderson Logansport Properties, Ltd., LLC
Mike Anderson Used Car Super Store LLC
Mike Anderson Used Car Supercenter Inc.
Mike Anderson Used Cars, Inc.

All other terms and conditions of this Policy remain unchanged.

QBBPP-2147 (05-14)

Page 1 of 1

POLICY NUMBER: QPL0766916
Endorsement Effective Date: October 1, 2017

QBBPP-2149 (05-14)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMEND REPORTING AND NOTICE PROVISION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that Section V. REPORTING, A.1. is replaced by the following:

1.  If the applicable Liability Coverage Part expires (or is otherwise terminated) without being renewed with the Insurer, 90 days after the effective date of such expiration or termination; or

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

POLICY NUMBER: QPL0766616
Endorsement Effective Date: October 1, 2017

QBBPP-2223 (10-14)

FILED DATE: 9/15/2020 8:39 AM   2020L008650

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF INSURED PERSON ENDORSEMENT

This endorsement modifies insurance provided under the following:
**DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART**

It is hereby agreed that the definition of Insured Person in paragraph D. of Section X. GLOSSARY is replaced by the following:

D.  Insured Person means:

1.  an Executive;

2.  an Employee; or

3.  a holder of an equivalent position to those included in paragraph 1 above in an Outside Entity, while serving at the specific request or direction of the Company.

All other terms and conditions of this Policy remain unchanged.

QBBPP-2223 (10-14)

Page 1 of 1

POLICY NUMBER: QPL0788818
Endorsement Effective Date: October 1, 2017

QBBPP-2227 (10-14)

FILED DATE: 9/15/2020 9:39 AM   2020L008850

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND PROFESSIONAL SERVICES  EXCLUSION

This endorsement modifies insurance provided under the following:
DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Exclusion I. Professional Services in Section II. EXCLUSIONS is replaced by the following:

H.   Professional Services - for the performance of or failure to perform Professional Services, provided that this Exclusion H shall not apply to any Claim brought by a securityholder or limited partner of a Company against an insured; and

All other terms and conditions of this Policy remain unchanged.

POLICY NUMBER: QPL0768816
Endorsement Effective Date: October 1, 2017

QBEPP-2235 (11-14)

FILED DATE: 9/15/2020 8:39 AM   2020L008850

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND INSURED VERSUS INSURED CARVEBACK FOR EMPLOYEE AND FINANCIAL IMPAIRMENT ENDORSEMENT

This endorsement modifies insurance provided under the following:
DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that:

I.   Paragraph (b) of Exclusion A. Insured v. Insured in Section II. EXCLUSIONS is replaced by the following:

(b)   Exclusion A3 above shall not apply to any Claim: (i) for employment-related Wrongful Acts against an Insured Person; (ii) for contribution or indemnity; (iii) brought by an Insured Person who has ceased serving in his capacity as such for at least 1 year; (iv) brought by an Employee; (v) brought while the Parent Company is in Financial Impairment; or (vi) brought by, on behalf of or with the participation of a whistleblower;

II.  The definition of Insured Person in paragraph D. of Section X. GLOSSARY is replaced by the following:

D.   Insured Person means:

1.   an Executive;

2.   an Employee; or

3.   a holder of an equivalent position to those included in paragraph 1 above in an Outside Entity, while serving at the specific request or direction of the Company.

All other terms and conditions of this Policy remain unchanged.

POLICY NUMBER: QPL0766815
Endorsement Effective Date: October 1, 2017

QBBPP-2117 (04-15)

FILED DATE: 9/15/2020 9:39 AM   2020L008650

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## INSURED PERSON AMENDED TO INCLUDE ANY ADVISORY BOARD MEMBER ENDORSEMENT

This endorsement modifies insurance provided under the following:
DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that:

I.    The definition of Insured Person in paragraph D. of Section X. GLOSSARY is amended by the addition of the following:

An Insured Person shall include any natural person who was, now is or shall be a board observer or duly elected member of an advisory board including a Scientific Advisory Board.

II.   Section X. GLOSSARY is amended by the addition of the following:

Scientific Advisory Board means a group of scientists, independent from management, created by or requested by the Company to provide objective feedback and guidance on the Company's progress and goals.

All other terms and conditions of this Policy remain unchanged.

QBBPP-2117 (04-15)

Page 1 of 1

POLICY NUMBER: QPL0768816
Endorsement Effective Date: October 1, 2017

QBBPP-2120 (05-14)

FILED DATE: 9/15/2020 9:39 AM   2020L008850

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ANTITRUST EXCLUSION DELETED ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Exclusion C. Antitrust in Section II. EXCLUSIONS is deleted.

All other terms and conditions of this Policy remain unchanged.

QBBPP-2120 (05-14)

Page 1 of 1

POLICY NUMBER: QPL0765516
Endorsement Effective Date: October 1, 2017

QBBPP-2210 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND REPORTING PROVISION ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that Section V. REPORTING, paragraph A. is replaced by the following:

A. Notice of any Claim under any Liability Coverage Part is considered timely when reported to the Insurer as soon as practicable after the Parent Company's chief executive officer or chief financial officer first becomes aware of such Claim. However, the Insurer shall not assert that notice of a Claim is untimely unless the Insurer is materially prejudiced by the untimely notice, as determined by a final adjudication rendered only after the Insurer has exhausted all other reasonable means of determining whether it has been materially prejudiced.

All other terms and conditions of this Policy remain unchanged.

POLICY NUMBER: QPL0766816
Effective Date of Endorsement: October 1, 2017

QBBPP-2065 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SPECIFIED EVENT EXCLUSION

This endorsement modifies insurance provided under the following:
DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
FIDUCIARY LIABILITY COVERAGE PART

It is hereby agreed that Section II. EXCLUSIONS is amended by the addition of the following:

No coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim based upon, arising out of or resulting from any Event listed below.

Chris Klatter, Claim #: T1316627

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2263 (04-15)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND IVI – OUTSIDE ENTITY EXCLUSION

This endorsement modifies insurance provided under the following:
DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Section II. EXCLUSIONS, paragraph A.2. is replaced by the following:

2. a Company against an Insured Person or Outside Entity against an Insured Person described in paragraph 3 of the definition of Insured Person;

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

FILED DATE: 9/15/2020 9:39 AM  2020L008850

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBPD-6000 (02-15)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

It is hereby agreed that:

I.   This Policy is amended by the addition of the following:

If aggregate insured losses attributable to a Certified Act of Terrorism under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

II.  Solely for the purposes of this endorsement, this Policy is amended by the addition of the following:

Certified Act of Terrorism means an act that is certified by the Secretary of Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism.  The criteria contained in the Terrorism Risk Insurance Act for a Certified Act of Terrorism include the following:
   1.   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and
   2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

III. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any Loss that is otherwise excluded under this Policy.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L009850

*Cancelled 3/1/18 need to examine.*
3/6/18 Called Priya 212-805-9859
She will review what I had submitted + call
me by the end of the week. She didn't review
what I had sent thoroughly.

**QBE.**

**SWORN PROOF OF LOSS**

Parent Company: **Mike Anderson Chevrolet of Chicago** (the "Parent Company")

Insuring Company: **QBE Insurance Corporation**

Policy No.: **QPL0700010 (the "Policy")**

Policy Period: **October 1, 2017 to October 1, 2018**

Claim No.: **8800928N**

State of ___**In**___

County of ___**Lake**___ ss:

I, ___**Mike Anderson**___
(Name and Title of Authorized Representative of the Insured)

hereby certify that ___**Mike Anderson Chevrolet of Chicago**___ suffered direct loss of Money,
(Insured)

Securities or Property resulting from Theft or Forgery as those terms are defined by the Policy by

___**Jason Kolodzinski**___ who was employed by the insured as
(Name of Employee)

___**General Manager**___ at the time of the Theft or Forgery.
(Title and/or Position)

The loss of Money, Securities or Property resulting from Theft or Forgery totals

$___**250,000. - (under investigation)**___ (USD). Attached is a detailed Statement of Loss (Attachment A).

including any recoveries and all other credits, and the balance stated is the true net loss from

___**3/7/16**___ (Date) to ___**1/15/18**___ (Date).

Further, I, on behalf of the insured, certify that the loss was discovered on

___**approx. 12-15,**___ 20___**17**___ by ___**Mike Anderson, owner**___
(Name(s) and Title(s))

Initial ___

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

PLAINTIFF'S EXHIBIT "B"

FILED DATE: 9/15/2020 9:39 AM   2020.008850

**Attachment B** provides a detailed statement of the known facts and circumstances surrounding the direct loss of Money, Securities or Property to the Named Insured resulting from Theft or Forgery by
_Jason Kolodzinski_, including the circumstances surrounding Discovery of the loss.
(Name of Employee)

By signing below, I represent and warrant that I have the authority to execute this sworn proof of loss. I further attest that nothing has been withheld or misrepresented regarding said loss and that this statement along with any attachments, incorporated herein by reference, is a complete and truthful recital of the known facts. To my knowledge, the loss did not originate by any act or design on the part of the insured, nothing has been done by or with the consent of the insured to violate the conditions of the Policy, or render it void, and no attempt to deceive the said insurer as to the extent of said loss, has in any manner been made. I also represent that no other potentially applicable insurance is available for the claimed loss.

By providing this blank form, the insurer does not waive and expressly reserves all rights and defenses, including the right to seek additional information and documentation in connection with its investigation and settlement of the claim. Any other information that may be required will be furnished and considered a part of this proof of loss.

Insured: _Mike Anderson Chevrolet of Chicago_

By: _[signature]_

Name: _Mike Anderson_

Title: _Managing Member_

Sworn to and subscribed before me this _1_ day of _MARCH_, 20_18_

_[signature]_
Notary Public
My Commission Expires: _6/19/2021_

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

FILED DATE: 9/15/2020 8:39 AM   2020L009850

## IN THE CIRCUIT COURT OF ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Mike Anderson Auto Group,               )
                                        )
            Plaintiff                   )        Case No.
                                        )
    v.                                  )
                                        )        JURY TRIAL DEMANDED
                                        )
QBE Insurance Corporation               )
                                        )
            Defendants.                 )

### AMENDED SWORN PROOF OF LOSS

State of ___I N___
                        ss
County of ___Lake___

    I, Mike Anderson, hereby certify that on March 1, 2018 I signed under oath the attached Sworn Proof of Loss Form for the direct loss of Money suffered by Mike Anderson Chevrolet of Chicago, the Insured, under the Policy of Insurance with QBE Insurance Corporation, the Insurer, which Sworn Proof of Loss Form is attached hereto and incorporated herein.

    At that time investigation revealed that the direct loss of Money from Theft or Forgery was greater than $250,000.00 (USD) with the matter under continued investigation. Additional investigation discloses that up to the present time the amount of direct loss of Money from Theft or Forgery totals $968,800.00 (USD) and falls within the following categories of Theft or Forgery committed by Jason Kolodzinski, who was employed by the Insured as General Manager, at the time of the Theft or Forgery.

    (c). **Direct Mail Advertising.**       $191,000
Kolodzinski claimed to have used a company called J&N for mail advertising. Mike Anderson Chevy was billed $191,000, but no mail was sent. The owner of a graphic design firm used by J&N said that no work was actually done. Kolodzinski failed to submit the materials to Mike Anderson for review prior to mailing, contrary to his instructions. He was told to stop but continued to

PLAINTIFF'S EXHIBIT "C"

FILED DATE: 9/15/2020 9:39 AM   2020L008850

submit invoices that were paid by the dealership without Mike Anderson's knowledge or approval. He did not submit the proper receipts from the USPS for the alleged mailings. The dealership was told that the one purported USPS receipt Kolodziejski submitted was fraudulent.

| | |
|---|---|
| (h.) **Radio Advertising.** Kolodziejski claims to have placed radio ads through a company called TKC in the amount of $75,000. TKC, despite requests, refused to submit proof of running the ads. To pay TKC invoices, Kolodziejski, instead of mailing the checks, gave the checks to someone who picked them up at the dealership. The checks were cashed at a nearby currency exchange. | $75,000 |
| (c.) **Purchase of Used Cars from Epic.** Kolodziejski purchased 91 cars from a company called Epic from March 2016 through January 2018. These cars were purchased at prices significantly higher than market, and many had hidden damage, tying the lot in and caused many customer complaints. Losses are estimated at approximately $151,000. Kolodziejski was told to stop purchasing cars from Epic in October 2017 but continued to do so until he was terminated in January 2018. A text message from Kolodziejski | $151,000 |

FILED DATE: 9/15/2020 8:39 AM 2020L009850

| | |
|---|---|
| indicated that he did it because he needed money, which suggests that a kickback was involved. | |
| (d). **Purchase of Cars from Sir Hooptie.** Kolodziecki caused the dealership to lose $5,800 for two cars purchased from Sir Hooptie, and associated repair and accessory charges. Kolodziecki had been told not to deal with this company. | $5,800 |
| (e). **Inflated Repair Charges.** Kolodziecki sent cars to a company called AC and incurred inflated and sometimes unnecessary repair charges of approximately $175,000. These charges were incurred even though the dealership has its own mechanics on staff. Some of these repair charges were for cars purchased from AC and Sir Hooptie. | $175,000 |
| (f). **Personal Trade-in.** Kolodziecki traded-in a Corvette he owned, and gave himself an inflated appraisal of the car, at approximately $10,000 more than it was worth. | $10,000 |

Insured:     Mike Anderson Chevrolet of Chicago

Signed by:     Mike Anderson

Signed:     _[signature]_

Sworn and subscribed before me this  20  day of July 2020

Notary Public   _[signature]_

My Commission Expires:   11/2/87



FILED DATE: 9/15/2020 9:39 AM 2020L009850

*Dispated 3-1-18* need to evaluate
3/6/18 Called Priya 212-805-9859
She will review what I had submitted + call
me by the end of the week. She didn't review
what I had sent thoroughly.

## QBE

### SWORN PROOF OF LOSS

**Parent Company:** Mike Anderson Chevrolet of Chicago (the "Parent Company")

**Insuring Company:** QBE Insurance Corporation

**Policy No.:** QPL0706616 (the "Policy")

**Policy Period:** October 1, 2017 to October 1, 2018

**Claim No.:** 522822N

State of _In_

County of _Lake_ ss:

I, _Mike Anderson_
(Name and Title of Authorized Representative of the Insured)

hereby certify that _Mike Anderson Chevrolet of Chicago_ suffered direct loss of Money,
(Insured)

Securities or Property resulting from Theft or Forgery as those terms are defined by the Policy by

_Jason Kolodzinski_ who was employed by the insured as
(Name of Employee)

_General Manager_ at the time of the Theft or Forgery.
(Title and/or Position)

The loss of Money, Securities or Property resulting from Theft or Forgery totals

$ _>250,000.—_ (under investigation) (USD). Attached is a detailed Statement of Loss (**Attachment A**),

including any recoveries and all other credits, and the balance stated is the true net loss from

_3/7/16_ (Date) to _1/15/18_ (Date).

Further, I, on behalf of the insured, certify that the loss was discovered on

approx _12-15,_ 20_17_ by _Mike Anderson, Owner_
(Name(s) and Title(s))

Initials [signature]

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above explained matter on its behalf.

PLAINTIFF'S
EXHIBIT
"B"

FILED DATE: 9/15/2020 9:39 AM   2020L008850

Attachment B provides a detailed statement of the known facts and circumstances surrounding the direct loss of Money, Securities or Property to the Named Insured resulting from Theft or Forgery by Jason Kolmzinski, including the circumstance surrounding Discovery of the loss.
(Name of Employee)

By signing below, I represent and warrant that I have the authority to execute this sworn proof of loss. I further attest that nothing has been withheld or misrepresented regarding said loss and that this statement along with any attachments, incorporated herein by reference, is a complete and truthful recital of the known facts. To my knowledge, the loss did not originate by any act or design on the part of the insured, nothing has been done by or with the consent of the insured to violate the conditions of the Policy, or render it void, and no attempt to deceive the said insurer as to the extent of said loss, has in any manner been made. I also represent that no other potentially applicable insurance is available for the claimed loss.

By providing this blank form, the insurer does not waive and expressly reserves all rights and defenses, including the right to seek additional information and documentation in connection with its investigation and settlement of the claim. Any other information that may be required will be furnished and considered a part of this proof of loss.

Insured:    Mike Anderson Chevrolet of Chicago

By:

Name:    Mike Anderson

Title:    Managing Member

Sworn to and subscribed before me this 1 day of MARCH, 2018

Notary Public
My Commission Expires: 6/19/2021

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.