UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MIKE ANDERSON CHEVROLET OF CHICAGO, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> QBE INSURANCE CORPORATION, <br><br> Defendant. | Case No. 1:20-cv-06161 <br><br> Judge Franklin U. Valderrama <br><br> Magistrate Judge Sunil R. Harjani |

**DEFENDANT'S MOTION TO RE-DEPOSE OR CONTINUE PLAINTIFF'S RULE 30(B)(6) DEPOSITION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37**

NOW COMES Defendant QBE Insurance Corporation ("QBE"), by and through its attorneys Kaufman Dolowich & Voluck, LLP, and for its Motion to Re-Depose or Combine Plaintiff's Rule 30(b)(6) Deposition Pursuant to Federal Rule of Civil Procedure 37, states as follows:

**Background**

1. On December 9, 2020, Plaintiff filed its Amended Complaint, which is the operative complaint in this lawsuit. (Dkt. 20.) Plaintiff alleges therein that its former employee Jason R. Kolodzinski committed "Employee Theft" giving rise to coverage under a Commercial Crime Policy issued by Defendant QBE to Plaintiff. Specifically, Plaintiff seeks to recover $588,800 from Defendant QBE composed of six different components of alleged loss:

   (a) $191,000 purportedly in connection to direct mail advertising with a company called "J&N";

   (b) $75,000 purportedly in connection to radio advertising with a company called "TKC";

   (c) $131,000 purportedly in connection to used car purchases from a company called "Epic";

(d) $5,800 purportedly in connection to car purchases from a company called "Sir Hooptie";

(e) $176,000 purportedly in connection to car repairs with a company called "AC"; and

(f) $10,000 in connection with a personal vehicle trade-in by Mr. Kolodzinski.

2. On September 16, 2021, QBE served Plaintiff with a Notice of Deposition for Plaintiff's witness Mike Anderson. *See Anderson Notice of Deposition, attached as* **Exhibit A**.

3. On September 16, 2021, QBE also served Plaintiff with a Federal Rule of Civil Procedure 30(b)(6) Notice. *See FRCP 30(b)(6) Notice, attached as* **Exhibit B.** In this Notice, QBE listed 10 matters for examination:

a. Kolodzinski's employment, including his employment duties while employed with MACC.

b. The alleged loss at issue in this litigation, including the purported acts alleged in the loss further set forth in Paragraph 10 of the Amended Complaint filed in this Lawsuit.

c. The Transactions.[1]

d. Any communications related to the Transactions.

e. Jason Kolodzinski's relationship to the Transactions and/or the alleged loss at issue in this Lawsuit.

f. Investigation(s) of the Transactions.

g. MACC's policies, procedures, and/or protocols for obtaining and paying for the types of services or items purportedly purchased in the Transactions.

h. MACC's document retention or document destruction policies, practices, or procedures between 2015 to 2018.

i. Jason Kolodzinski's MACC email account.

j. MACC employees who worked with Jason Kolodzinski between 2015 and 2018, including supervisor(s) and individual(s) who reported to him.

---

[1] As defined in the FRCP 30(b)(6) Notice, the "Transactions" shall mean the transactions purportedly resulting in Plaintiff's alleged loss as described in Paragraph 10 of the Amended Complaint filed in this Lawsuit.

4. On September 16, 2021, Plaintiff's counsel sent an email to QBE's counsel stating Plaintiff will be presenting Mike Anderson and Judy Arnold as the 30(b)(6) witnesses. *See September 16, 2021 Email, attached as* **Exhibit C.**

5. On September 27, 2021, QBE's counsel issued an email to Plaintiff's counsel noting in part that "I understand that Judy Arnold and Mike Anderson will collectively constitute [Plaintiff's] 30(b)(6) witness. However, I have yet to receive a breakdown of who will be responding to which topics on [Plaintiff's] behalf." In response, on September 27, 2021, Plaintiff's counsel responded, "Mike Anderson will be the 30(b)(6) witness." *See September 27, 2021 Email, attached as* **Exhibit D.**

6. On September 30, 2021, Mike Anderson appeared for his deposition both in his individual capacity and as a Rule 30(b)(6) witness. During this deposition, Mr. Anderson was asked certain questions in his individual capacity and certain questions as a corporate representative pursuant to Rule 30(b)(6). *See Mike Anderson's Deposition Transcript, attached as* **Exhibit E.** The September 30th deposition lasted approximately seven-hours of on-record time, and QBE's counsel left the deposition open with multiple on-record reservations, including: a) to continue Mr. Anderson's deposition based on Mr. Anderson being deposed both in his individual capacity and separately as a Rule 30(b)(6) witness (technically, two separate notices); b) based on documents involving AC Customs which had not been (as of the September 30th deposition) produced to QBE; c) based on numerous pertinent areas of inquiry about which Mr. Anderson was either not prepared, not knowledgeable or referred to others (primarily Judy Arnold) as knowledgeable about the particular topic; and 4) with respect to the transactions at issue in Plaintiff's lawsuit, based on Mr. Anderson's computer system containing different records from those that had previously been produced to QBE. Further, in depositions taken subsequent to the 30(b)(6) deposition, it has become abundantly clear that Plaintiff has withheld material evidence

and documentation, all of which had previously been requested and which is now the subject of new, outstanding discovery requests issued by QBE. Finally, QBE recently received (on November 17th) documents from Epic Motor Sports pursuant to subpoena that reflect transactions that Plaintiff failed to disclose or produce. For these reasons, QBE is entitled to re-depose or at least continue Plaintiff's 30(b)(6) deposition.

## Argument

I. **Mike Anderson's Deposition in his Individual Capacity and Mike Anderson's Deposition as Plaintiff's Rule 30(b)(6) Witness are Subject to Independent Seven-Hour Limits**

As courts have frequently acknowledged, depositions of individuals in their individual capacity are to be treated separately from depositions of individuals being deposed as Rule 30(b)(6) witnesses. *See* Fed. R. Civ. P. 30, Advisory Committee Notes; *see, e.g., LKQ Corp. v. General Motors Co.*, 2021 WL 4125097, *4 (N.D. Ill. Sept. 9, 2021); *see also Medline Indus., Inc. v. C.R. Bard, Inc.*, 2016 WL 11739883, at *3 (N.D. Ill. Apr. 26, 2016) (counting the depositions of witnesses in their individual capacities and in their Rule 30(b)(6) capacities separately). "The depositions of an individual who is noticed as an individual witness pursuant to Fed.R.Civ.P. 30(b)(1) and who is also produced as a corporate representative pursuant to Fed.R.Civ.P. 30(b)(6) are presumptively subject to independent seven-hour limits." *Sabre v. First Dominion Capital, LLC*, 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001) ("As a separate deposition that probes the knowledge of the entity and not the personal knowledge of the individual testifying, a 30(b)(6) deposition should be subject to its own independent seven-hour limit."). Mr. Anderson was presented both in his individual capacity and in his corporate capacity on September 30, and thus, two separate seven-hour time limits apply. *See Sabre*, at *1 (imposing a single seven-hour limit for an individual being deposed in his individual capacity and in a corporate capacity would "lead

to such absurd results [and] must be rejected."). Indeed, to treat Mr. Anderson's separate depositions as a single deposition would result in undue prejudice against QBE.

II. **Mike Anderson was not Properly Prepared as a Rule 30(b)(6) Witness**

Mr. Anderson was not properly prepared as a Rule 30(b)(6) witness. At his deposition, he testified:

> Q: . . . As you know, you're being deposed in part as a corporate representative. And I just wanted to know a little bit about what you have done to prepare as the corporate representative.
>
> A: Prepare for today?
>
> Q: Correct.
>
> A: **Nothing.**
>
> Q: Okay. So you haven't reviewed anything?
>
> A: Oh, yeah, I've done that.
>
> Q: Okay.
>
> A: **But I've not like studied - -**
>
> Q: So - -
>
> A: **- - stuff or anything, you know - -**
>
> Q: Can you give me an estimation of, like time as far as how much time you spent reviewing?
>
> A: **I may have spent ten minutes looking at the stuff last night.** And then of course - - when you say leading up to this, do you mean like since we filed the lawsuit or before that?
>
> Q: Since you learned that you were being designated as Mike Anderson Chevy's corporate representative.
>
> A: Oh, that would probably just be – that – that exact terminology that you just used, maybe yesterday.
>
> Q: Okay. And when you say yesterday, you're referring to the ten minutes just looking over certain documents. Correct?

A: Mm-hmm.

(**Exhibit E,** Anderson Dep., 28:5-29:11.)[2]

It is well-settled that an organization must prepare the person who it designates to testify as a Rule 30(b)(6) witness so that the testifying individual can "answer fully, completely, unevasively, the questions posed by [the discovering party] as to the relevant subject matters." *See, e.g., Buycks-Roberson v. Citibank Federal Sav. Bank*, 162 F.R.D. 338, 342 (N.D. Ill. 1995) (internal quotations and citations omitted). Where a corporation produces an individual "not knowledgeable about the relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all." *Id.* (internal quotations and citations omitted). For the reasons set forth below, the appearance of Mr. Anderson as a claimed Rule 30(b)(6) witness is tantamount to no appearance at all. *See id.*

As set forth above, Plaintiff's operative complaint contained allegations regarding six components of purported loss. However, when Mr. Anderson was asked basic questions regarding the basis and computation of these various components, he often responded that he "did not remember" or noted that he could not immediately respond to requests for examples of the transactions giving rise to Plaintiff's claimed loss. For example, when asked how Plaintiff calculated a loss of $176,000 with respect to transactions involving "AC," Mr. Anderson testified "It was based on – we had all that. We've spent hours on this, pulling, you know, everything that was done and spent with it and what it would have cost and what was charged. **And I think that's how we came up with that. <u>I don't remember.</u>**" (**Exhibit E,** Anderson Dep., 150:3-11.)

---

[2] Mr. Anderson also testified that he spoke with his attorneys over Zoom on September 29 for "50 minutes maybe" and that this September 29 discussion was the only time he had talked to his attorneys regarding this deposition. (**Exhibit E,** Anderson Dep., 29:24-30:18.)

(Emphasis added.) When asked again whether Mr. Anderson knew how Plaintiff calculated its claimed loss with respect to AC Kustoms, Mr. Anderson responded, ". . . **I can't remember how we came up with it.** But I did at the time." (Id., 210:1-5.) (Emphasis added.) When asked to provide an example of how Plaintiff came to the conclusion (as alleged in Plaintiff's operative complaint) that it was overcharged by AC Kustoms (and at QBE's counsel's proposal that the parties take a five-to-ten-minute break so that Mr. Anderson could familiarize himself with the documents produced by Plaintiff as relating to AC Kustoms), Mr. Anderson responded "**It's going to take me longer than that to go through every single one of these. I don't remember.** It's been so long." (Id., 213:12-214:23.) (Emphasis added). Mr. Anderson's lack of preparation was apparent in his responses:

> Q: . . . I'd like to understand how Mike Anderson Chevy has come to the conclusion that there are inflated and sometimes unnecessary repair charges of approximately $176,000.
>
> A: I've told you this. Like, when they did work that wasn't done or when they put – said there were wheels on cars that weren't there, or when they – the losses on the cars or overinflated – I can't even think anymore, over inflated prices on stuff that they would have supposedly said they did.
>
> Q: What documentation do you have showing what was done versus what was not done, what was supposedly inflated versus what was the accurate or correct price?
>
> A: Whatever was in that – that big bankers box.
>
> Q: Can you identify what was in the big bankers box that you're referring to?
>
> A: Tons of – I mean everything. We went through – we spent tons of time on this. I wasn't the one that ran the adding machine, but I was the one that said this is, yeah, this is this sign, this is this sign.
>
> * * *
>
> Q: Can you point to something in this document that you believe [was] provided to my firm showing at least one example of the purported inflation?

7

> A: At this moment? I don't have anything highlighted. I'd have to look.

(Id., 222:14-223:14, 224:10-15.)

Likewise, when asked questions regarding how many transactions Sir Hooptie LLC (a vendor at issue in the litigation) had with Plaintiff, Mr. Anderson testified as follows:

> Q: . . . Do you know how many transactions Sir Hooptie had with Mike Anderson Chevy?
>
> A: No
>
> Q: No?
>
> A: I can get it. **I don't know off the top of my head, no.** Not many.
>
> Q: Do you know if it's more than ten?
>
> A: **No, I have no idea.** I told you I can get it but I don't have it.

(Id. 180:23-181:6.) (Emphasis added.)

Mr. Anderson was produced as Plaintiff's 30(b)(6) witness who was most knowledgeable about Plaintiff's alleged loss and the transactions purportedly resulting in Plaintiff's claimed loss. However, when asked to clarify whether Plaintiff was claiming a loss of $5,806.99 in connection with Sir Hooptie, as reflected on documents produced by Plaintiff and relied upon in Plaintiff's Response to QBE's First Set of Requests for Production, or whether Plaintiff sought $5,800, as referenced in Plaintiff's operative complaint, Mr. Anderson could not give a straight answer, responding instead, "[w]ell, it's $6.99. 5800 is fine." (Id., 178:10-15.) When further asked by QBE's counsel to confirm whether Plaintiff sought $5,806.99 for this component of Plaintiff's claimed loss, Mr. Anderson stated "Around it. It doesn't mean it's the same thing $6.99. . . 5800. It's the same thing to me. It doesn't matter. So whatever. 5800, if that's what's in the complaint." (Id., 179:16-180:21.) Similarly, when QBE's counsel asked Mr. Anderson to clarify whether amounts charged by AC Kustoms, referenced in documents related to the Sir Hooptie transactions,

8

were also calculated into Plaintiff's claimed loss arising from its AC Kustoms transactions, Mr. Anderson testified "I don't know if that was in there or not." (Id., 204:19-205:9.)

During Mr. Anderson's deposition, he was also asked about the role of Plaintiff's employee Katie Keenan with respect to the allegations at issue:

> Q: Do you know what her connection is with respect to the allegations at issue?
>
> A: I don't know that she would have any.
>
> Q: So, to your knowledge, you don't think she has any direct knowledge of anything. Correct?
>
> A: I mean, she's probably – she was – she's the type that would gossip, so I'm sure she probably if she heard anything would spread it around. But I don't think she has any connection.

(Id., 389:16-391:6.)[3] Contrary to Mr. Anderson's representations as a corporate witness, however, Barbara Flores (Plaintiff's former controller) subsequently testified on October 21 that Katie Keenan verified the values of the used vehicles at issue prior to Plaintiff issuing a check to a vendor. *See Barbara Flores' Deposition Transcript, attached as* **Exhibit F** (**Exhibit F**, Flores Dep., 74:4-77:23.) Moreover, Ms. Flores testified that with respect to cars purchased by Plaintiff at auction or wholesale, including those purchased from Sir Hooptie and Epic Motor Sports, Ms. Keenan was responsible for verifying the related documentation and cutting the checks. (Id., 78:22-79:10.) QBE has been severely prejudiced in reliance on Mr. Anderson's inaccurate testimony in that QBE agreed to take Ms. Keenan off the deposition calendar based on Mr. Anderson's testimony. The review of documentation and processing of wholesale car purchases is critical to this case. (*See* **Exhibit G,** Dkt. 44 (Deposition Scheduling Report listing Katie Keenan); **Exhibit H,** Dkt. 45 (Order to proceed with the depositions in the Deposition Scheduling Report); and **Exhibit I,** Dkt. 49 Stipulation entered October 26, 2021.)

---

[3] Based on these representations, QBE agreed to withdraw its Notice of Deposition, issued to Katie Keenan.

Mr. Anderson was also produced as Plaintiff's 30(b)(6) witness who was most knowledgeable about Plaintiff's policies, procedures, and/or protocols for obtaining and paying for the types of services or items purportedly purchased in the Transactions. However, when testifying regarding a purported policy whereby Plaintiff always mails checks to vendors, Mr. Anderson testified "I don't know if they have it written anywhere…" (Id. 43:23-44:15.) Similarly, when asked about which MACC employees were authorized to perform appraisals between 2016 to 2018, Mr. Anderson testified that he knew that one was Haz Mutawe but that he did not remember who else had this authority. (Id: 100:3:23.)

Mr. Anderson was presented as a Rule 30(b)(6) witness who was under obligation to "testify about information known or reasonably available to the organization." F.R.C.P. 30(b)(6). The deposition topics for Plaintiff's Rule 30(b)(6) witness were clearly set forth in QBE's Rule 30(b)(6) Notice to Plaintiff, yet among other things, Mr. Anderson was unable to testify regarding the most basic of topics: how Plaintiff calculated its claimed loss. Plaintiff was adequately put on notice that QBE would be seeking testimony regarding the 10 topics set forth in the 30(b)(6) notice, and Plaintiff's violation of Rule 30(b)(6)'s requirement that Plaintiff make a good faith effort to find out relevant facts and prepare a representative to testify about the subjects set forth in QBE's Notice necessitates the re-opening of Plaintiff's Rule 30(b)(6) deposition. *See, e.g., Sprint Solutions, Inc. v. iCell Guru, Inc.*, 310 F.R.D. 563, 569 (N.D. Ill. 2015) (finding that a purported Rule 30(b)(6) witness' inability to answer questions related to the topics identified in a Rule 30(b)(6) notice obligated the corporation to thereafter present a "fully prepared Rule 30(b)(6) representative on these topics for deposition again.").

### III. QBE was Significantly Prejudiced without Access to Plaintiff's Records Regarding AC Customs, Epic Motor Sports, and TKC Entertainment

During Mr. Anderson's deposition, it became apparent that Mr. Anderson and/or Plaintiff had access to certain documents that QBE had no access to. Initially, Mr. Anderson testified that the "AC" referenced in the operative complaint refers to "AC Kustoms." (**Exhibit E**, Anderson Dep.., 111:22-116:18.) He further testified that Plaintiff's relationship with AC Kustoms spanned from February 13, 2017 to approximately January 2018. (Id., 208:7-14.) This initial testimony was consistent with the fact that Plaintiff's counsel issued a document subpoena to "AC Kustoms" bearing address 1120 N. 31th Ave., Melrose Park, Illinois, but did not issue any subpoena to any other "AC" entity. However, during Mr. Anderson's deposition, Plaintiff's counsel interjected and claimed that he had provided to QBE approximately 100 pages of documents from 2016, relating to "AC Customs" bearing address 523 N. Ogden Ave., Chicago, Illinois. (Id., 215:24-222.) QBE maintains that it did not have these documents at the time of Mr. Anderson's deposition and Plaintiff's counsel has not provided any evidence that these documents were previously provided to QBE's counsel. Notwithstanding the fact that Mr. Anderson initially testified that Plaintiff's allegations against "AC" in Plaintiff's complaint referred to "AC Kustoms," it appears that Plaintiff's current position is that the claimed $176,000 component of loss attributable to "AC" is related both to AC Kustoms and AC Customs, two separate entities. Despite repeated requests by QBE's counsel for Plaintiff's counsel to transmit these documents during Mr. Anderson's deposition on September 30, Plaintiff's counsel did not transmit these documents until the following day. QBE has had no opportunity to question Plaintiff regarding documents related to AC Customs, which Plaintiff relies on to quantify its putative loss.

It also became apparent during Mr. Anderson's deposition that Plaintiff had access to data about the subject transactions that was not provided to QBE. For example, when testifying

11

regarding Plaintiff's claimed loss as it relates to Epic Motor Sports, Mr. Anderson noted that the documents previously produced by Plaintiff to QBE relating to a Toyota Camry bearing identification number CP3336 were "not what matches the deal at all." (**Exhibit E,** Anderson Dep., 306:8-20). Specifically, the documents produced by Plaintiff reflected a sales price for this vehicle of $19,096, but Mr. Anderson testified that Plaintiff's computer system showed a sales price of $13,500. (Id., 306:21-312:8.) (noting in part "I would have to dig into this. It doesn't seem – that doesn't seem right to me at all. It doesn't match what's in the system right now.") Mr. Anderson confirmed that the records on his computer relating to the cars at issue with respect to the portion of Plaintiff's claim relating to Epic Motor Sports differed from those previously produced by Plaintiff to QBE. (Id., 316:17-23.) To date, Plaintiff has not supplemented its document production to provide what the "system" purportedly provided. QBE has had no opportunity to question Plaintiff regarding what the "system" purportedly reflects or the recalculations. Further, subsequent to Mr. Anderson's deposition, Plaintiff provided a further recount of several calculations related to vehicles Plaintiff purchased from Epic Motor Sports which directly and materially impacts the nature and amount of the claim at issue. *See October 15, 2021 Email, attached as* **Exhibit J.**

Mr. Anderson testified on September 30, 2021 that TKC Entertainment "never gave any information that said [that the advertisements] ran." (**Exhibit E,** Anderson Dep., 331:5-11.) However, on October 20, 2021, QBE's counsel received an email from third-party TKC Entertainment's attorney, who forwarded an email that he sent to Plaintiff's counsel on July 15, 2021, with a copy of an audio file evidencing a radio advertisement that TKC ran for Plaintiff.[4] *See* **Exhibit K.** Plaintiff never provided this audio file, which directly refutes Plaintiff's claim that

---

[4] In part, Plaintiff's claimed loss consists of $75,000 it purportedly expended for radio advertisements that Plaintiff claims were never run.

no radio advertisements were ever run, until *after* QBE's counsel raised this issue on October 21, 2021, nearly a month after Mr. Anderson's deposition and three months after it was in the possession of Plaintiff's counsel. In light of the foregoing, QBE must therefore be afforded an opportunity to re-depose Plaintiff.

## Conclusion

Pursuant to Federal Rule of Civil Procedure 37(a)(1) and Local Rule 37.2, QBE's counsel has in good faith attempted to confer with Plaintiff's counsel on multiple occasions to obtain the continued deposition of Mike Anderson, as Plaintiff's Rule 30(b)(6) witness. Specifically:

(a) On September 30, 2021, Plaintiff's and QBE's counsel telephonically conferred multiple times during breaks of Mike Anderson's deposition. During these conferences, Plaintiff's counsel refused to make Mr. Anderson available on a different date, insisting instead that he was "prepared" for Plaintiff's Rule 30(b)(6) deposition.

(b) On October 21, 2021, in response to an email from Plaintiff's counsel wherein Plaintiff's counsel admitted that he withheld a subpoena response received on July 15, 2021, QBE's counsel responded, "This is obviously problematic and will still need to [be] raise[d] with the court. We will need to call back Mike Anderson for this and likely other things." This email was unanswered.

(c) On October 22, 2021, QBE's counsel emailed Plaintiff's counsel, requesting that Plaintiff "advise some times in the next couple weeks that Mike Anderson (or other 30b6 designee) can be available for the continuation of the 30b6 deposition in this case." This email was unanswered.

As set forth herein, QBE would suffer undue prejudice unless Plaintiff's Rule 30(b)(6) deposition is reopened. As a threshold matter, the Rule 30(b)(6) deposition is subject to an independent time limit, such that QBE has a meritorious basis to proceed with the continued deposition of Plaintiff's corporate witness under Rule 30(d). Moreover, Mr. Anderson's admitted lack of preparation and Plaintiff's failure to produce material evidence directly at issue in this litigation puts QBE at a significant disadvantage. Accordingly, QBE respectfully requests that this Court grant its Motion to Re-Open Plaintiff's Rule 30(b)(6) Deposition, and grant any other relief

as appropriate, including but not limited to attorney's fees and costs expended by QBE with respect to this Motion and with respect to a continued Rule 30(b)(6) deposition.

November 19, 2021

        Respectfully submitted,

        KAUFMAN DOLOWICH & VOLUCK, LLP

        */s/ Stefan R. Dandelles*
        Attorneys for Defendant QBE Insurance Corporation

Stefan R. Dandelles (ARDC No. 6244438)
Jean Y. Liu (ARDC No. 6321017)
KAUFMAN DOLOWICH & VOLUCK, LLP
135 S LaSalle St., Ste. 2100
Chicago, Illinois 60603
(312) 759-1400
sdandelles@kdvlaw.com
jliu@kdvlaw.com

4863-8694-3488, v. 1