# EXHIBIT E-1

Page 1

1         IN THE UNITED STATES DISTRICT COURT

         FOR THE NORTHERN DISTRICT OF ILLINOIS

2              EASTERN DIVISION

3

MIKE ANDERSON CHEVROLET OF    )

4  CHICAGO, LLC,             )

                         )

5           Plaintiff,    )

                         )   1:20-cv-06161

6     v.                  )

                         )

7  QBE INSURANCE CORPORATION,    )

                         )

8           Defendant.    )

  _____)

9

10

11     The deposition of MIKE ANDERSON, taken on

12  behalf of the defendant in the above-entitled

13  case before Debra L. Kleszyk, a Certified

14  Shorthand Reporter within and for the State of

15  Illinois, taken remotely via videoconference on

16  September 30, 2021, commencing at 9:07 a.m.,

17  pursuant to the Federal Rules of Civil Procedure.

18  The witness was located at 1847 South Prairie

19  Avenue, Chicago, Illinois.

20

21

22

23

24

25

Page 2

```
 1         A P P E A R A N C E S
 2
 3  SCHARF BANKS MARMOR LLC
      BY: MR. THEODORE L. BANKS
 4    MR. ERIC F. QUANDT
      333 West Wacker Drive, Suite 450
 5  Chicago, Illinois 60606
      (312) 726-6000
 6  tbanks@scharfbanks.com
      equandt@scharfbanks.com
 7
      Appeared via videoconference on behalf
 8    of the plaintiff
 9
10  KAUFMAN DOLOWICH & VOLUCK LLP
      BY: MS. JEAN Y. LIU
11  135 South LaSalle Street, Suite 2100
      Chicago, Illinois 60603
12  (312) 759-1400
      jliu@kdvlaw.com
13
      Appeared via videoconference on behalf
14    of the defendant
15
16
17
18  ALSO PRESENT VIA VIDEOCONFERENCE:
19  MS. GABRIELA CALDERON, Law Clerk
      Scharf Banks Marmor LLC
20
      MS. SARAH SUDDARTH, Law Clerk
21  Kaufman Dolowich & Voluck
22
23
24
25
```

Page 4

```
 1          INDEX OF EXHIBITS
 2  EXHIBIT      DESCRIPTION          MARKED
 3  Exhibit 7   Second Amended Complaint    113
              at Law
 4            (MACC:Complaint 65 - 131)
 5  Exhibit 8   Jason Kolodzinski Corvette   161
              (MAC:JK 1 -16)
 6
    Exhibit 9   Sir Hooptie Losses         178
 7            (MAC-SH 1 - 36)
 8  Exhibit 10  AC Kustoms Corp.           231
              (MAC:ACKustoms 1 - 393)
 9
    Exhibit 11  J&N Marketing             239
10            (MAC:J&N 1 - 90)
11  Exhibit 12  J&N documents             254
              (J&N 84 - 109)
12
    Exhibit 13  e-mail                    292
13            (J&N 110)
14  Exhibit 14  2016 Epic Losses          303
              (MACC:Epic 634 - 892)
15
    Exhibit 15  text messages             309
16            (MACC:JK 98 - 101)
17  Exhibit 16  TKC Entertainment         329
              (MACC:TKC 1 - 59)
18
    Exhibit 17  original police report     333
19            (MACC:POL 5 - 6)
20  Exhibit 18  supplemental police       337
              report
21
    Exhibit 19  e-mails                   356
22            (MACC 118 - 120)
23  Exhibit 20  e-mails                   363
              (MACC 279 - 281)
24
    Exhibit 21  e-mails                   371
25            (MAC 259 - 269)
```

Page 3

```
 1          I N D E X
 2
 3  WITNESS: MIKE ANDERSON
    EXAMINATION                     PAGE
 5    By Ms. Liu               6, 388
 6    By Mr. Quandt            386
 7
 8
 9        INDEX OF EXHIBITS
10  EXHIBIT      DESCRIPTION          MARKED
11  Exhibit 1   Defendant QBE Insurance    10
              Corporation's Notice of
12            Deposition of Mike
              Anderson Pursuant to
13            Federal Rule of Civil
              Procedure Rule 30
14
    Exhibit 2   Defendant QBE Insurance    10
15            Corporation's Notice of
              Deposition of Mike
16            Anderson Chevrolet of
              Chicago, LLC Pursuant
17            to Federal Rule of Civil
              Procedure 30(b)(6)
18
    Exhibit 3   Used Vehicle Purchase      98
19            Procedures
              (MACC 318)
20
    Exhibit 4   Police report and original  108
21            insurance claim
              (MACC:POL 1 - 13)
22
    Exhibit 5   Amended Sworn Proof of Loss 108
23            (MACC:POL 14 - 18)
24  Exhibit 6   Amended Complaint at Law   109
              (MACC:Complaint 1 - 64)
25
```

Page 5

```
 1        THE COURT REPORTER: My name is
 2  Debbie Kleszyk. I am an Illinois Certified
 3  Shorthand Reporter.
 4        The parties participating in this
 5  deposition acknowledge that, due to COVID-19, I am
 6  not physically present in the room with the
 7  witness and that I will be reporting this
 8  deposition remotely.
 9        At this time I ask counsel to
10  identify yourself, state whom you represent, and
11  then indicate your stipulation to waive any
12  objections to the validity of the oath
13  administered remotely and to proceeding in this
14  manner, starting with the noticing attorney.
15        MS. LIU: My name is Jean Liu, last
16  name L-i-u. And I agree to the terms set forth.
17        MR. QUANDT: Eric Quandt and
18  Ted Theolakis for the -- Theodore Banks, sorry,
19  Ted Banks, for the witness and for the plaintiff
20  in this case. And we agree to the stipulation.
21        (The witness was duly
22          sworn.)
23        MIKE ANDERSON,
24  called as a witness herein, having been
25  first duly sworn, was examined and
```

Page 6

1 testified as follows:
2         EXAMINATION
3         BY MS. LIU
4   Q.  Mr. Anderson, my name is Jean Liu.
5 I'm an attorney for QBE Insurance Corporation in a
6 lawsuit filed by Mike Anderson Chevrolet of
7 Chicago, LLC against QBE Insurance Company. This
8 lawsuit relates to an insurance coverage matter.
9 Are you familiar with the matter?
10   A.  Yes.
11   Q.  I see right now on Zoom you have your
12 hand raised. Is there a reason or is that
13 accidental?
14   A.  No. I put it down.
15   Q.  Okay.
16   A.  See? Oh.
17   Q.  It's virtually.
18   A.  How do I get rid of that?
19   Q.  It's okay. I'm going to ignore it
20 unless you tell me otherwise.
21     MR. QUANDT: It's still on.
22     THE WITNESS: Sorry. Lower it, I
23 guess.
24 BY MS. LIU:
25   Q.  No, it's okay.

Page 7

1     So, Mr. Anderson, I'm just going to
2 go over a few ground rules, your attorneys might
3 have done so already, but bear with me, just on
4 how this deposition is going to be run.
5     Rule number one. We have to
6 verbalize all of our questions and answers, and
7 that's because Debbie here is writing down every-
8 thing either of us says. So, to that extent, we
9 should avoid any uh-huhs, uh-uhs frankly because
10 she can't write it down.
11   A.  Gotcha. Oh, I just did.
12   Q.  It's okay. That brings me to my next
13 rule. One person talks as a time, and it's for
14 that very same reason.
15     And if I state a question that you
16 don't understand, I'm not trying to trick you.
17 Just tell me. I'll try my best to rephrase it in
18 a manner that makes sense. Is that fair?
19   A.  Sure. Yes.
20   Q.  And if at any time you feel like you
21 would like a break, just let me know. We'll find
22 a convenient place to stop and we'll go ahead and
23 take that break. Okay?
24   A.  Okay.
25   Q.  So I'm going to screen share with

Page 8

1 you --
2   A.  You're going to what?
3   Q.  Screen share. Can you see this?
4   A.  Okay.
5   Q.  Have you seen this document before?
6   A.  Yes. But I -- I think so. But the
7 one -- if it's the one that I have, it's much
8 harder to read than that.
9   Q.  Harder to read by it's lengthier or
10 harder to read by it's just a bad copy?
11   A.  No. The print copy that I have is
12 very like -- it's been faxed and e-mailed and
13 faxed and e-mailed.
14   Q.  But in substance this looks familiar.
15 Correct?
16   A.  Mm-hmm.
17   Q.  And you're generally aware that you're
18 giving a deposition under oath in your individual
19 capacity based on your personal knowledge of the
20 allegations?
21   A.  Oh, I take that back. I haven't seen
22 this. Wait.
23   Q.  Oh, you have not seen this?
24   A.  Wait. Let me see.
25     MR. QUANDT: And, yeah, for the

Page 9

1 record, what follows there in the specifics he has
2 seen.
3     THE WITNESS: Yes. I've seen. Okay.
4 I'm good.
5 BY MS. LIU:
6   Q.  Okay. So back to my original
7 question. You're generally aware you're giving a
8 deposition --
9   A.  Yes.
10   Q.  -- here under oath?
11   A.  Oh, yes. Yes. Yes. Yes.
12   Q.  And, Mr. Anderson, I don't mean to be
13 rude. It's just for the court reporter. Please
14 let me finish my thought. It's very counter-
15 intuitive --
16   A.  Oh.
17   Q.  So back to my question. You're aware
18 of giving a deposition under oath in your
19 individual capacity based on your personal
20 knowledge in this matter. Correct?
21   A.  Yes.
22   Q.  And then I'm going to share a second
23 document with you. Have you seen this document
24 before?
25     MR. QUANDT: For the record, he may

3 (Pages 6 - 9)

1  not have seen the first page but he has seen the
2  content of it and we have reviewed that with him.
3       MS. LIU:  And I'm happy to scroll
4  through this.
5       And this is my fault for not making
6  the record clearer.  The first document that I
7  showed you I would like to mark as Exhibit 1.
8  And, for the record, that was Mike Anderson's
9  individual notice of deposition.
10       (Deposition Exhibit 1 was
11       marked.)
12       MS. LIU:  What I'm showing you right
13  now is the 30(b)(6) notice of deposition.  And I
14  would like to mark this as Exhibit 2.
15       (Deposition Exhibit 2 was
16       marked.)
17  BY MS. LIU:
18   Q.  Now, scrolling through this,
19  Mr. Anderson, please let me know at any time if
20  you want me to slow down.  Do you have a general
21  understanding of what this document is?
22   A.  Yes.  This looks very familiar.
23   Q.  Okay.  And you understand that you're
24  being also deposed, in addition to your individual
25  capacity, as a corporate representative of

1  Mike Anderson Chevy pursuant to Federal Rule
2  30(b)(6).  Correct?
3   A.  What was the second word you said?
4       MS. LIU:  Court Reporter, I'm really
5  sorry, do you mind reading that back for me?
6       (The following question
7       was read back:
8       "Q.  And you understand
9       that you're being also
10       deposed, in addition to
11       your individual capacity,
12       as a corporate represen-
13       tative of Mike Anderson
14       Chevy pursuant to Federal
15       Rule 30(b)(6).  Correct?")
16       THE WITNESS:  Opposed?  What do you
17  mean opposed?
18  BY MS. LIU:
19   Q.  Deposed is what we're doing right now.
20  You are participating --
21   A.  Oh, a deposition.
22   Q.  -- in your deposition.  Yeah.
23   A.  I got that.
24   Q.  And you reviewed these matters for
25  examination.  Correct?

1   A.  Yes.
2   Q.  And you're --
3   A.  Yes.
4   Q.  -- comfortable speaking on behalf of
5  your corporation on these --
6   A.  Yes.
7   Q.  -- matters.  Correct?
8       (Court reporter clarifi-
9       cation.
10  BY MS. LIU:
11   Q.  And, Mr. Anderson, this happens in
12  every deposition, so we'll do our best on both
13  ends.
14       Mr. Anderson, I'd like to ask you a
15  couple of background questions just generally
16  about you.
17       Can you please provide your date of
18  birth?
19   A.  11/6/73.
20   Q.  And what is your current primary
21  business address?
22   A.  5333 or it could be 5301, it's two
23  different parcels, West Irving Park Road, Chicago,
24  Illinois 60641.
25   Q.  And is that the primary business

1  address of Mike Anderson Chevy?
2   A.  Yeah.
3   Q.  Okay.
4   A.  Or -- yeah.  Chicago, yeah.
5   Q.  Can you tell me a little bit about
6  your educational background?
7   A.  Yeah.  I was at Colombia College, I
8  transferred to Roosevelt University downtown, and
9  then I dropped out to start selling cars.
10   Q.  And around when did you drop out?
11   A.  1997, March maybe.
12   Q.  And approximately how many years of
13  post high school education have you received?
14   A.  I went -- I worked at Marshall Field's
15  downtown.  I worked.  And then so four years part
16  time.  So probably two years full time.  But I
17  never got an associate's degree.
18   Q.  Okay.  And were you concentrating in
19  any particular field?
20   A.  Accounting.
21   Q.  So you said starting in 1997, approxi-
22  mately March, you began selling cars.  Where did
23  you begin selling cars?
24   A.  I started at my grandfather's dealer-
25  ship which was in Crown Point, Indiana.  I was

4 (Pages 10 - 13)

Page 14

1  there for about a month and a half and then left
2  and went to Jacobs Twin which used to be on Grand
3  and Oak Park Avenue in Chicago. And then I was
4  there until 2003, July of 2003.
5      Q.  Okay. I'm going to stop you right
6  there just to kind of rehash some of what you just
7  told me.
8          With respect to your grandfather's
9  dealership, what did you do there?
10     A.  I sold cars.
11     Q.  So you were just a general salesman or
12  did you have --
13     A.  No. No.
14     Q.  -- management --
15     A.  I was just -- yeah, general salesman,
16  yes.
17     Q.  Okay. And during the -- how many
18  years were you at your grandfather's dealership?
19     A.  About a month and a half, and then I
20  left.
21     Q.  And then you went into -- you went to
22  an Oak Park-Chicago dealership. Correct?
23     A.  It was in Chicago. But it was at
24  Oak Park and Grand Avenue in Chicago. Jacobs
25  Twin --

Page 15

1      Q.  Ah.
2      A.  -- Buick Honda.
3      Q.  Okay. And what did you do there?
4      A.  Sold cars. And then later I became a
5  manager.
6      Q.  And approximately how long were you
7  purely a salesman?
8      A.  It was from 1997 to right after the
9  millennial, so somewhere early 2000, maybe -- I
10  mean, if you really had to have it, I could
11  probably pull out my W-2s and stuff, but --
12     Q.  It was a couple years ago --
13     A.  -- it would be March --
14     Q.  -- that you --
15     A.  March. And it was still kind of cold
16  out.
17     Q.  And then you said you became a
18  manager. Was there a division you were in charge
19  of or what kind of manager with you?
20     A.  I was a sales manager for the Buick
21  and Pontiac store.
22     Q.  And were you a manager from roughly
23  March to July 2003?
24     A.  'Til actually I think it was June, the
25  end of June, June 28, 2003, yeah. Well, I had got

Page 16

1  like a lateral promotion where I was over every-
2  thing. And when the internet kind of first came
3  out, you know --
4      Q.  Yeah.
5      A.  -- and they called it a special
6  account. So it was over all the franchises that
7  they had. And that was -- I want to say that was
8  fall. I couldn't tell you what year. Maybe --
9  oh, and, actually, it was before September 11,
10  2001. So it was -- maybe I was already a manager
11  during the millennial.
12         I just remember the millennial and
13  sitting my office and somebody saying, okay, the
14  millennial. No computers crashed or anything.
15  Because they were so afraid of that, you know.
16  And because, what is it, Australia and, oh, the
17  place that kiwis come from, New Zealand, had
18  already, you know, hit the next year in 2000. And
19  I just remember sitting there because we all
20  thought, you know, the computers were going to
21  crash. Because our phones actually crashed and
22  our -- and the phones actually did, the voicemail
23  did, because it wasn't able to do the date, not
24  that it matters, but. I just remember sitting
25  there when they said, okay, we're good.

Page 17

1      Q.  So that -- it sounds like you were --
2  you were there right after the year 2000 or so or
3  I think you said 2003 originally. Where did you
4  go after that?
5      A.  Wait. Back up. Can you repeat that,
6  please?
7      Q.  Yeah. When did you leave that Buick
8  and Pontiac store?
9      A.  Well, I was at Jacobs Twin from July
10  -- no. June.
11     Q.  Okay.
12     A.  May through -- May 1997 through June
13  2003.
14     Q.  Where did you go after that?
15     A.  Oh. My grandpa's. Oh, okay, I'm
16  sorry. Then I went back to my grandfather's
17  dealership as a general manager.
18     Q.  Okay.
19     A.  My uncle was the general manager there
20  and they had fired him. My uncle had -- my
21  grandfather passed away, and so it was like
22  spiraling down. And then I got the job as a
23  general manager there. And that was -- so 2005,
24  October 2005. And then we bought a Chevy store
25  and closed that store.

5 (Pages 14 - 17)

Page 18

1    Q.   So from October 2005 onward you were
2 general manager at your grandfather's store --
3    A.   No.
4    Q.   -- when did you --
5    A.   No, no, no, no, no.  2003 until
6 October of 2005.
7    Q.   Okay.
8    A.   And then in October 2005 we bought a
9 Chevy store.  General Motors came in, saying we
10 have an opportunity for you.  They basically
11 made -- helped us make a transition to get rid of
12 the Pontiac franchise because of the performance
13 because we had done so well in that year and a
14 half or whatever and assisted with the transaction
15 on the Chevy store in Merrillville.  And then
16 after that it was -- and then I was the dealer.
17         And then November of 2008 we bought
18 this Chevy store.
19    Q.   Okay.
20    A.   But again General Motors stepped in
21 and put the deal to go basically.
22    Q.   So I just want to repeat the timeline
23 back to you because you've given me a lot of
24 information and I want to make sure I understand
25 it.  So in 2005 you essentially bought a Chevy

Page 19

1 store in Merrillville, Indiana.  Correct?
2    A.   Mm-hmm.
3    Q.   And what was your --
4    A.   October 2005.
5    Q.   October 2005.  And what was your role
6 in that?  Were you a GM or were you something
7 higher?
8    A.   A dealer principal.  I was the
9 highest.  My present -- my title of the company
10 was president.  And I was also an owner at that
11 point.
12    Q.   Okay.  And then, as far as at that
13 point in time, I know -- well, let me back up.
14         Prior to that point in time, you
15 were a GM at your grandfather's dealership.  Did
16 you stop being a GM once you bought that Chevy
17 store in --
18    A.   Yes.
19    Q.   -- 2005?  Okay.
20    A.   Yes.
21    Q.   Okay.  And then in 2008 you said you
22 bought the Mike Anderson Chevy store that's at
23 issue here.  Correct?
24    A.   Mike Anderson Chevy store what?
25    Q.   That's at issue in this lawsuit.

Page 20

1    A.   Yes.
2    Q.   Okay.  And at that point in time were
3 you still -- in November 2008 were you still
4 operating that Merrillville Chevy store?
5    A.   Oh yes.  Yes.
6    Q.   Okay.  So, and I know this is just a
7 little background --
8    A.   Actually, just to get the dates right,
9 we agreed in November 2008.  I don't think we
10 closed until December 18, 2008.
11    Q.   Okay.  And I'm just asking for a
12 little background information so I have an under-
13 standing of your background.
14         But with respect to Mike Anderson
15 Chevy, the plaintiff in this lawsuit, is it a
16 single dealership or is it a multi-dealership kind
17 of situation?  Where does it fall in your
18 corporate chart, so to speak?
19    A.   On just the one on Irving Park?  Is
20 that what you're talking about?
21    Q.   Yes.
22    A.   Or both of them?
23    Q.   Yes.  Just the one on Irving Park.
24    A.   Just -- the one on Irving Park is only
25 Chevy.  And we had to sign off saying that we

Page 21

1 wouldn't put any other franchise with that.  It
2 had to be standalone Chevy.
3    Q.   So tell me about your position at the
4 Irving Park Chevy dealer.
5    A.   Dealer principal.  And then it's an
6 LLC, so I was management -- I was a managing --
7 and a managing member.
8    Q.   Okay.  Are there any other members of
9 the LLC?
10    A.   Yes.
11    Q.   Who are the other members?
12    A.   My brother, Danny.  My sister, Katy.
13 My uncle, Chris Anderson.  My aunt, Joan Scott.
14 And then my uncle, Paul Anderson.
15    Q.   And do any of these members currently
16 work at this dealership?
17    A.   No.
18    Q.   Okay.  Can you tell me what your
19 general day-to-day job responsibilities are as the
20 dealer principal of Mike Anderson Chevy?
21    A.   What I do is I look at reports.  Look
22 for things that -- to increase efficiency.  I look
23 for ways -- I look to make better procedures,
24 quicker, faster, easier.  You know, review the
25 financial statements.  Do a walk around the

6 (Pages 18 - 21)

Page 22

1  building to make sure nothing needs -- you know,
2  it drives me crazy when you see, like, stuff on
3  the walls and nobody has done anything or a door,
4  you know, broken and nobody says anything. I know
5  it sounds kind of petty, but it makes me whacky.
6      Q.  Do you have any direct reports, like
7  anyone directly reporting to you?
8      A.  Yeah. I would have the general
9  manager at each store, the general sales manager
10  or the department managers.
11     Q.  And I think you said earlier there's
12  no one higher than you. Correct?
13     A.  No.
14     Q.  So, in a way, everyone kind of reports
15  to you?
16     A.  Indirectly.
17     Q.  Okay.
18     A.  I like -- I have an open door policy,
19  but I want them to go through like the chain of
20  command. Go to your manager. If that doesn't
21  work, then you go to the --
22     Q.  And I understand you're the dealer
23  principal of the Chevy dealership that's at issue
24  in this lawsuit. Are you -- do you have any other
25  titles anywhere else?

Page 23

1      A.  Yeah. The one in Merrillville.
2      Q.  And that's it?
3      A.  Mm-hmm.
4      Q.  Okay.
5      A.  Wait. Titles like any other
6  companies?
7      Q.  Not necessarily ownership titles but
8  anything you're actively doing as far as like your
9  occupation goes.
10     A.  I'm on the board for Reynolds and
11  Reynolds, which is a computer company, that meets
12  about once a year, but that's it.
13     Q.  Okay. So has your job responsi-
14  bilities of just generally making sure things are
15  running efficiency, looking over what's going on
16  in the dealership, has that changed from the time
17  that you acquired the Chevy store to the present
18  day?
19     A.  Has it changed? The day-to-day stuff
20  -- I wouldn't say the overall capacity has
21  changed, but I would say that maybe the way we
22  do things or, you know, because it's more
23  computerized now than it was back then.
24     Q.  Sure.
25     A.  You know, customers don't shop five

Page 24

1  different dealerships before they buy a car like
2  they used to, things like that.
3      Q.  So as far as like the sales
4  department, the services department, customer
5  service, marketing, does that all fall under you
6  in some respect or how does all that fall?
7      A.  It would fall indirectly underneath
8  me.
9      Q.  Okay.
10     A.  So that I leave, like, up to the
11  general manager and the department managers
12  because they'll know -- they'll know better what
13  works and what doesn't work.
14     Q.  Okay.
15     A.  And then I look at usually reports
16  that show that it doesn't work. But, you know.
17     Q.  And with respect to these general
18  managers and these department managers that report
19  to you, is this like a day-to-day report? Do you
20  check in once a week? Give me an idea --
21     A.  It's sporadic.
22     Q.  I'm sorry?
23     A.  It's sporadic on what's going on.
24     Q.  Okay.
25     A.  So if we're doing a renovation and --

Page 25

1  let's just say hypothetically. Hypothetically,
2  say we're doing a renovation in Merrillville.
3  Like we just did a new roof, a new HVAC system.
4  So I usually get involved with the partners
5  thinking about what the issues were with the
6  climate, when is it hot, when is it cold, things
7  of that nature so that we, you know, get every-
8  thing covered. So that tied up my time, maybe,
9  like, I'm in the general office for a week and
10  then the showroom for a week where normally I
11  wouldn't spend that much time in that department.
12     Q.  Do you have like a second in command
13  in case you're not there who the people go to?
14     A.  That would be the general manager or
15  the general sales manager. Or like my right hand
16  would be Judy -- [audio distortion]
17         (Court reporter clarifi-
18          cation.)
19         THE WITNESS: Arnold. A-r-n-o-d-l.
20  No. A-r-n-o-l-d.
21  BY MS. LIU:
22     Q.  You know your business much better
23  than I do. So I just want a general understanding
24  of the different departments that your dealership
25  has.

7 (Pages 22 - 25)

Page 26

1    A.   Okay.  So in Merrillville we have new
2   cars, used cars, the general office, finance,
3   service, parts, like parts department, and then
4   the body shop.  And then in Chicago we have new
5   cars, used cars, service, and parts.  We don't
6   have a body shop.  And the general office.  The
7   only difference is the body shop between the two.
8    Q.   And, just so I understand, the general
9   manager is in charge of just overseeing the
10   general office or all of these departments?
11    A.   Over all the departments.
12    Q.   Okay.  Can you give me a description
13   of what the general manager does at Mike Anderson
14   Chevy?  And, just for clarification, when I say
15   Mike Anderson Chevy, I'm talking about the Chicago
16   store.
17    A.   Okay.  The day-to-day operations.  I
18   mean sales, service, parts, you know, making sure
19   that they're selling cars, we're servicing, taking
20   care of the customers.  They run -- basically run
21   the store, you know, under me.
22    Q.   And can you give me an estimation of
23   in 2015 how many employees the Chicago store had?
24    A.   I would -- I can get you an exact, but
25   I'd say somewhere around a hundred.

Page 27

1    Q.   Okay.  And has that number changed
2   from 2015 to the present?
3    A.   Oh, yeah, we had to because of this
4   COVID thing for sure.  But we're not back up at a
5   hundred because it's so hard to hire people.
6    Q.   Sure.
7    A.   But I'm guessing somewhere around 85,
8   88.
9    Q.   Currently.  Correct?
10    A.   Yes.  But I can get exacts.
11    Q.   That's okay.  In 2016 to 2018, which
12   is what I understand the time period we're really
13   talking about here, can you give me a general
14   estimation of how many employees were at Mike
15   Anderson?
16    A.   Probably around a hundred.
17    Q.   Around a hundred?
18    A.   Mm-hmm.
19    Q.   And then going back to the employees
20   that you directly supervised, I think you said
21   department heads.  If I'm counting this right, you
22   have four departments in Chicago and then the GM
23   and the sales manager, so that's --
24    A.   Five if you include the office.
25    Q.   Okay.  So it would be new cars, used

Page 28

1   cars, general office, service, parts.  So would it
2   be five employees you'd be -- or six employees
3   including the general manager?
4    A.   Correct.
5    Q.   Okay.  So I wanted to back up a little
6   bit.  As you know, you're being deposed in part as
7   a corporate representative.  And I just wanted to
8   know a little bit about what you have done to
9   prepare as the corporate representative.
10    A.   Prepare for today?
11    Q.   Correct.
12    A.   Nothing.
13    Q.   Okay.  So you haven't reviewed
14   anything?
15    A.   Oh, yeah, I've done that.
16    Q.   Okay.
17    A.   But I've not like studied --
18    Q.   So --
19    A.   -- stuff or anything, you know --
20    Q.   Can you give me an estimation of,
21   like, time as far as how much time you spent
22   reviewing?
23    A.   I may have spent ten minutes looking
24   at the stuff last night.  And then of course --
25   when you say leading up to this, do you mean like

Page 29

1   since we filed the lawsuit or before that?
2    Q.   Since you learned that you were being
3   designated as Mike Anderson Chevy's corporate
4   representative.
5    A.   Oh, that would probably just be --
6   that -- that exact terminology that you just used,
7   maybe yesterday.
8    Q.   Okay.  And when you say yesterday,
9   you're referring to the ten minutes just looking
10   over certain documents.  Correct?
11    A.   Mm-hmm.
12    Q.   And then can you give me just a
13   general understanding of what you were flipping
14   through?
15    A.   The lawsuit filed against the
16   insurance company.  The employee documents that we
17   have the employees sign.
18        And there was another attachment to
19   that, but I don't remember what.  It was some
20   lawsuit, some part of the lawsuit or something.
21   It was the easiest one to read out of all of them
22   as far as, like, print, like font.  All of it
23   wasn't faxed and, you know, copied 30 times.
24    Q.   Got it.  And I don't want to hear
25   about any actual discussion you've had with your

8 (Pages 26 - 29)

Page 30

1 counsel. I'm not entitled to that. But I just
2 want to know have you met with your counsel prior
3 to this deposition for the purpose of preparing
4 for this deposition?
5     A.  Have we met in person? No. We talked
6 on the phone -- or talked on this thing yesterday,
7 the Zoom thing yesterday, for, I don't know, not
8 very long.
9     Q.  Can you give an estimation of how
10 long?
11    A.  50 minutes maybe.
12    Q.  15, one-five?
13    A.  No. Five zero.
14    Q.  Okay. Got it. And that's the only
15 time you've talked to counsel regarding this
16 deposition. Correct?
17    A.  Yeah. Mm-hmm. Other than can you
18 meet on this date or that date.
19    Q.  Got it. So I want to understand a
20 little bit because a lot of the allegations in
21 this complaint have to do with marketing or
22 payment of vendors. So I want to just have an
23 understanding of Mike Anderson's accounting
24 practices, vendor payment practices. So every-
25 thing I'm going to ask you right now is in your

Page 31

1 capacity as a corporate representative.
2          Because we are doing this
3 deposition kind of like a two-in-one both for you
4 as an individual and also you as a corporate
5 representative, if at any time you're not sure how
6 I'm asking you the question, just ask me, I'll
7 clarify. But assume for this series of questions
8 that I'm asking you on behalf of Mike Anderson
9 Chevy. Okay?
10    A.  Okay.
11    Q.  So can you just give me an under-
12 standing of how a vendor becomes a vendor for
13 Mike Anderson Chevy?
14    A.  They have to -- usually they have to
15 fill out a form. They have to turn in their W-2,
16 9, whatever that tax form is. There's usually
17 references that we check depending on who the
18 vendor is. And then I have to approve all
19 vendors.
20    Q.  Okay. So when you say they have to
21 fill out a form, what is that form?
22    A.  It's a vendor -- like it gives with a
23 name and address and who you talked to and what
24 they do, you know, if they put tints on a window,
25 if they refinish bumpers or whatever. And then I

Page 32

1 always, almost always require a -- not background
2 check, that's for employees -- a reference check
3 just to make sure they're good.
4     Q.  Who do vendors typically come in
5 under? What I mean by that is are you generally
6 solicited by vendors or is it normally -- are
7 vendors normally introduced by someone?
8     A.  All of the above.
9     Q.  Okay. And are vendors typically
10 introduced by existing employees of Mike Anderson
11 Chevy?
12    A.  Not so -- not so much.
13    Q.  Okay. And with respect to these
14 forms, do you still have these forms with respect
15 to Epic Motorsports, J&N, basically the purported
16 wrongdoers in this lawsuit?
17    A.  Since we've done -- since this has
18 happened, I've added a lot more to it and now
19 there's an electronic form that the manager has to
20 fill out and send to me with -- and it's done in
21 the system because it time stamps everything.
22    Q.  Okay.
23    A.  So but they would have had to fill out
24 something to get paid. But they should have
25 filled out a vendor acknowledgement, you know, I'm

Page 33

1 so-and-so, here's my EIN number, you know, this is
2 what I do, here's my references, whatever.
3     Q.  To the extent that those documents
4 still exist, would you please check? And then, if
5 they do, please provide them to your counsel?
6     A.  Mm-hmm.
7         MS. LIU: Counsel, I'm just making a
8 formal request here on the record --
9         THE WITNESS: Mm-hmm.
10        MS. LIU: -- for those documents.
11        THE WITNESS: Mm-hmm.
12 BY MS. LIU:
13    Q.  Yes?
14    A.  You should have everything. I mean
15 there's a big bankers box you guys have or
16 somebody has.
17    Q.  Right. Now, let's go one step
18 further. Once this vendor has filled out this
19 form, has provided the tax documents, has under-
20 gone your internal vetting -- and my understanding
21 is that you would review their credentials, you
22 would check their references, and then you would
23 look at, you know, do I want to use these people
24 for whatever needs I have. Let's assume for a
25 second that you're past that mark. What happens

9 (Pages 30 - 33)

1 then? Are they free to do work? How does that --
2 how does that all shake out?
3     A.   After it's approved, yeah. After I
4 approve it, yes.
5     Q.   Okay. And typically is the relation-
6 ship managed by you or is the relationship managed
7 by someone else?
8     A.   The relationship -- it wouldn't really
9 -- I mean -- when you say relationship, you mean,
10 like, the person that comes in and does the work
11 or the person that you deal with or?
12     Q.   What I mean is who at Mike Anderson
13 Chevy would be dealing with these vendors on a
14 day-to-day basis?
15     A.   It depends what the vendor is. If
16 it's a service-related vendor, something for
17 sublet, something for parts, something for the
18 copy machine in the office, if it's something for
19 garage doors, I mean it could be whoever, you
20 know, whoever runs that department, whoever's over
21 that department.
22     Q.   Okay. So in the case of the
23 allegations in this lawsuit with respect to
24 advertising, who would be responsible or who would
25 be the --

1     A.   Like the general manager.
2     Q.   Okay. And then with respect to the
3 radio ads, would you say it's the same?
4     A.   Yes.
5          But so they're supposed to get all
6 that approved by me. He never got any of that
7 approved by me check.
8     Q.   Right. I'm not asking you
9 specifically with respect to Jason Kolodzinski
10 right now. I'm just asking you background --
11     A.   Oh, yeah.
12     Q.   -- so I understand Mike Anderson's
13 practices.
14     A.   So the practice as it is today, that
15 the vendor has to be approved. And the reason I
16 do it in the system is because it's all time
17 stamped and you can't say send me an e-mail, I
18 lost it, because you can always pull it back up.
19 Right? For I think it's a year. But it's all
20 time stamped.
21          And so it will show when I look at
22 it. Like the vendor authorization form, it will
23 show when they sent it. It will tell -- show if
24 I approved it or denied it. I'll put a note in
25 there. And then I send it to the office that,

1 yes, it's approved.
2          They take it and then they know
3 that it's okay to cut the check. And they create
4 what they call a NAD number, name and address
5 number. And that's when they put in, like, the
6 control number for that particular vendor.
7     Q.   Now, I understand that that was --
8 that electronic system is something that's kind of
9 recently developed. Correct? So let's go back in
10 time to, like, 2016. In 2016, the way I under-
11 stand it, and please correct my understanding if
12 it's wrong, a vendor would submit the form, fill
13 it out. And at that point in time the form was
14 less robust?
15     A.   Oh yeah.
16     Q.   I'm sorry?
17     A.   Yes.
18     Q.   Okay. And after you vetted the
19 vendor, the prospective vendor, by checking
20 references, you would approve the vendor. Once
21 approved -- well, first of all, who does that
22 approval get communicated to?
23     A.   Usually the controller or the
24 department head.
25     Q.   And the reason that that is communi-

1 cated to the controller, is that because the
2 controller cuts the checks to vendors? Or why is
3 that?
4     A.   Well, that would be the one that would
5 have to, you know -- that's usually the one that I
6 would talk to in the office. And then she's the
7 one that would give me the form. You know, at
8 that time I would initial the bottom of the form
9 or whatever. And then -- sorry, I'm not supposed
10 to use those kind of words. But, anyway, then she
11 knows it's okay to proceed.
12     Q.   So let's use the example of a broken
13 window because it's something that I assume will
14 happen from time to time. If a window were broken
15 and a window replacement company came to you and
16 said, hey, I can do this, they would fill out the
17 form. Let's say they go all through all the
18 hoops. They're approved. You tell the department
19 head that, okay, I've now hired this window
20 company. They perform the work. I assume you
21 would get an invoice. Is that right?
22     A.   Yes. Well, okay, so the way that it
23 works is I wouldn't be necessarily the point of
24 contact when you're looking for somebody to
25 replace windows. It would usually be like the

10 (Pages 34 - 37)

1 service manager or store manager maybe, depending
2 on what it was.
3          So they fill it out.  You check the
4 references to make sure they're good.  Then after
5 they, yeah, I want to use this company, then --
6 you know, now they send me the electronic form.
7 But then they would give me the form.  I said did
8 you check the references, whatever?  Why are we
9 switching?  Why specifically do you want to use
10 them?  And then approve or deny it.  Most of the
11 time approve it.
12          And then they have to do what's
13 called a PRC, which is basically a purchase order
14 in the system, and that generates authorization
15 to, you know, for this amount of money on this
16 stock number or VIN number or RO number, repair
17 order number, with the -- and then what happens is
18 that invoice comes in.  And then, you know, that
19 PRC -- we already know what it is because when the
20 PRC is done it posts to accounting so you know to
21 expect that invoice.  And that invoice comes at
22 the end of the month.  They reconcile it against
23 the statement.  We require a statement of all
24 things to get paid in order to get paid.  And do
25 the reconciliation on it and then get paid from

1 there.  But without a PRC we don't -- we don't do
2 it.
3     Q.   The PRC sounds like it's an internal
4 process.
5     A.   Do you know what a purchase order is?
6 Like if you were --
7     Q.   I do.  I do.
8     A.   It's the same thing except it's an
9 acronym for the actual program in our system that
10 does it.
11     Q.   Got it.  I just want to make sure,
12 though, because every company is run differently.
13 And it sounds very elementary the way I'm
14 describing it.  I just want to make sure we get it
15 right.
16          So, in my hypothetical, let's say
17 the window costs a hundred bucks.  Someone at
18 Mike Anderson would go into the system, say, hey,
19 we're expecting a window for a hundred dollars.
20 They put it in the PRC system.  However many days
21 go by -- you're shaking your head.
22     A.   No.  No.
23     Q.   Okay.
24     A.   I didn't --
25     Q.   Yes.  Absolutely.

1     A.   Did I do what I wasn't supposed to do?
2     Q.   No, that's okay.
3     A.   Okay.  No.  So they're not -- the
4 vendor is not allowed to touch or do anything
5 until they have a PRC.  So they can't come in and
6 replace a window until they have a purchase order.
7 And we have a -- and it might have been after the
8 fact that after this happened, like, I would wake
9 up in the middle of the night and I dream up these
10 things, these forms and stuff we need to come up
11 with, that they sign off on agreeing that they
12 will not perform any work on any vehicle or
13 anything to us until they've received a purchase
14 -- the requisition request with that amount.  And,
15 if they do, they're of the understanding that they
16 will not get paid.
17     Q.   Okay.  So let me back up and
18 redescribe my understanding.  If a window vendor
19 were to come in, they would tell you I'm
20 estimating a hundred bucks.  Then someone at
21 Mike Anderson Chevy would say, okay, I'm going to
22 put in the PRC system that it's going to cost a
23 hundred dollars.  Once that's in the system,
24 essentially the vendor has the approval, so to
25 speak, to go --

1     A.   They get a piece of paper which is an
2 authorization.
3     Q.   Right.  To do the work?
4     A.   Mm-hmm.
5     Q.   Correct?
6     A.   Mm-hmm.
7     Q.   And then once they perform the work,
8 however many days later, they would provide an
9 invoice on Mike Anderson --
10     A.   They usually do the invoice right then
11 and there or --
12     Q.   Okay.
13     A.   -- and then at the end of the month
14 what we require is a statement to reconcile
15 against all the invoices because if you're doing
16 -- most of the time if you're doing a company like
17 we just described, the window company, you're
18 doing more than a one-time job.
19     Q.   Sure.
20     A.   It's not like a guy will fix a garage
21 door spring.  They're doing, you know, multiple
22 invoices a month, not just one.
23     Q.   So at the end of the month you have
24 their list of invoices, their list that says this
25 is how much Mike Anderson had previously asked me

11 (Pages 38 - 41)

Page 42

1  to do and had approved me to do, now pay me.
2  Correct?
3      A.  They would send a statement.  We
4  require a statement, which isn't, I guess, that
5  common in the industry overall or industries.
6  They usually just do invoices.  We don't pay off
7  invoices.  We only pay off statements.  We pay off
8  statements because we can reconcile that against
9  the invoices they say to make sure that all the
10  invoices have the PRCs attached to them, we've
11  accounted for it, that whatever it was added
12  to the repair order or to the cost of the used
13  vehicle or new vehicle or expense depending on
14  what it was.
15      Q.  Got it.  And then was this practice in
16  place in 2016?
17      A.  The PRC?  Yes.
18      Q.  Okay.  So once you've reconciled
19  everything, walk me through how a vendor actually
20  gets the money in their hands.
21      A.  Once they send the statement?
22      Q.  Yes.
23      A.  Then they cut the check whenever the
24  statement is due.  If the statement is due within
25  30 days, then they cut the check in 30 days.

Page 43

1      Q.  And is that check normally mailed or
2  is that --
3      A.  Our policy is to mail, always mail,
4  the checks.  But that was circumvented during this
5  time.
6      Q.  So I'm going to talk about the year
7  prior, 2015.  In 2015 your policy was to mail the
8  check and there --
9      A.  Always.
10      Q.  -- were no exceptions?
11      A.  No.  You have to.  Right.
12      Q.  If a vendor said, you know, I happen
13  to be in your area, I want to pick up the check,
14  could they do that?
15      A.  (Nodding)
16      Q.  No?  You're shaking, though.  Can you
17  answer no, though, for --
18      A.  Oh.  No.  No.  No.  Now, you said --
19      Q.  So you said --
20      A.  -- 2015 and prior?
21      Q.  Yeah, the year prior.
22      A.  No.
23      Q.  You made a reference just now that
24  this process was circumvented during the time at
25  issue in this lawsuit.  Can you tell me what you

Page 44

1  meant by that?
2      A.  Because what would happen is they
3  would -- so Barbara Flores was the controller at
4  the time.  And Jason would say I need the check,
5  the vendor is downstairs.  And she thought because
6  he was the general manager that he was able to
7  override or circumvent, you know, the process or
8  procedure or whatever.
9      Q.  So --
10      A.  But we always mail everything.
11      Q.  Got it.  Is that memorialized
12  anywhere?  Is that in a training manual, anything
13  like that?
14      A.  That's -- it's known.  I don't know if
15  they have it written down anywhere.  But it's
16  known that -- the accounts payable, they know they
17  are not to hand out checks.
18          Now, you may have a rare situation
19  where if you have like a -- actually, I can't
20  think of one.  I mean, I could say like a one-time
21  job where somebody came in to put in like --
22  actually, one I can think of is that big blue
23  Chevy thing where you pay upon deliverance, once
24  it's delivered and it's all being paid.  That
25  would be a very unique situation.  Like, I can't

Page 45

1  remember the last time we would have had one like
2  that.
3      Q.  In these rare situations, can you give
4  me like a percentage of times it would happen?
5  Like, how rare are we talking?  Can you put a
6  percentage on it approximately?
7      A.  One percent maybe.
8      Q.  Okay.  So I know earlier you said you
9  had a new car department and a used car depart-
10  ment.  Correct?
11      A.  Mm-hmm.
12      Q.  And the allegations in this lawsuit
13  pertain to the used car department of Mike
14  Anderson Chevy.  Is that your understanding?
15      A.  Yeah.  That's where he -- yeah, that's
16  where all the theft -- well, you know, you could
17  say new cars, too.  If you had -- it was also in
18  the new cars.
19      Q.  Okay.
20      A.  It was in everything.  But the
21  advertising --
22      Q.  Okay.
23      A.  -- stuff that he said he did that he
24  didn't do, that was -- pertains to new cars.
25      Q.  So give me an understanding of new

12 (Pages 42 - 45)

1 cars versus used cars. How much of the car sales
2 percentage-wise at Mike Anderson Chevy between
3 2016 and 2018 was dedicated to the new cars versus
4 the old cars?
5     A.  How much what was dedicated?
6     Q.  Percentage. Like, can you give me a
7 percentage? Was it half of them were new, half of
8 them were old?
9     A.  Oh, it was probably a two-to-one
10 ratio, two new to one used.
11     Q.  Okay. And how does Mike Anderson get
12 its supply of used cars?
13     A.  Usually trade-ins or you buy them from
14 an auction.
15     Q.  Okay. And tell me about the auction
16 process. Is that like a weekly auction? Is that
17 generally a --
18     A.  Mostly weekly.
19     Q.  I'm sorry?
20     A.  Mostly weekly or biweekly. I'm sorry,
21 twice a week.
22     Q.  And what percentage of used cars that
23 Mike Anderson has for its inventory does it obtain
24 trade-in versus auction?
25     A.  Oh, I can get you the exact numbers.

1 Maybe -- this is a guess. I'd say half maybe.
2     Q.  So roughly --
3     A.  It's always better to get the cars as
4 trade-in.
5     Q.  That's better --
6     A.  Or if you can buy directly from a
7 customer rather than going through an auction.
8     Q.  Why is that?
9     A.  Because it's usually you don't have to
10 pay the auction fees, you don't have to pay
11 transport fees. If it's a customer that is
12 trading a car in, more than likely they bought it
13 from you and, service, you've got all that
14 history. Right?
15     Q.  So generally, because you want to
16 avoid third-party fees with auctions, you would
17 prefer --
18     A.  If it was -- especially if it was one
19 of your own customers. We've more than likely
20 done all the service work on the car.
21     Q.  And then as far as numbers, give me an
22 idea because, unfortunately, I've never set foot
23 on your dealership, how many cars you generally
24 have in your used car inventory.
25     A.  That's a loaded question because if

1 you -- business picks up and what time of the year
2 and you could get backlogged with, like, wholesale
3 pileups. It could be anywhere between 100, 150,
4 you know. There's been times it's gotten to 200
5 probably.
6     Q.  So every month it's generally in the
7 100 to 150 car range?
8     A.  Yeah. It could be -- there's months,
9 too, when, you know, you're dry and you don't --
10 you know, you're low. It could be maybe a high of
11 85, you know.
12     Q.  It just fluctuates based on market
13 demand --
14     A.  Yes. Market --
15     Q.  -- things like that?
16     A.  -- demand.
17         (Simultaneous speaking.)
18         (A discussion was held off
19          the record with the court
20          reporter.)
21 BY MS. LIU:
22     Q.  Let me think about my next question.
23         Was the general inventory of used
24 cars in 2016 the same kind of statistics, around
25 100 to 150 cars at any one time, used cars?

1     A.  At what year?
2     Q.  2016.
3     A.  Probably.
4     Q.  Okay. What about 2017?
5     A.  No. It shot up. Jason, when he was
6 there, he was buying cars like crazy.
7     Q.  So 2017 shot up?
8     A.  Mm-hmm.
9     Q.  And what kind of numbers are we
10 talking about when you say shot up?
11     A.  He was probably -- I can get you the
12 exacts on all of this, so I don't want to say the
13 wrong thing. But I'm guessing. So I would say
14 maybe 150 range, which I had told him repeatedly
15 my philosophy is you only need as many used cars
16 retail in stock as you sell in a month because
17 you're looking to buy used cars every single day
18 and you're taking trade-ins every single day. We
19 don't need 150 to sell 100. We need 100 to sell
20 100 because you're constantly turning it. Not
21 like new.
22     Q.  So it sounds like the number of used
23 cars was on the higher end of the spectrum in
24 2017. And then what about 2018?
25     A.  I'm trying to think 2018. No. I

Page 50

1  think it would have dropped in 2018.
2      Q.   Okay.  So tell me a little bit --
3      A.   No.  It was down because we had a lot
4  of mess to clean up in 2018.
5      Q.   I'm sorry, I missed what you said.
6  You said you had a lot of mess?
7      A.   A mess to clean up.
8      Q.   What are you referring to?
9      A.   All the used cars that Jason bought.
10     Q.   Tell me a little bit about the used
11  car market.  How long does a used car on a
12  general -- as a general matter typically stay on
13  your lot for?
14     A.   The quicker it gets in the quicker it
15  gets out, and that's what we -- we try to sell as
16  many used cars as possible or new cars, right, as
17  much as possible, meaning that you take a deal
18  that makes sense to turn your inventory.
19     Q.   Okay.  So I understand what you're
20  saying there.  But as far as a general time frame
21  goes, do you have like an average shelf life that
22  it sits on your lot for?
23     A.   It varies.  It varies on so many other
24  things.  But at 90 days you better have an exit
25  plan for the car, meaning that you better figure

Page 51

1  out a way to get rid of it.
2      Q.   So the three month mark is kind of
3  the, okay, you need to act soon.  What's a great
4  turnaround as far as a used car --
5      A.   30 or under.
6      Q.   -- sale?  30 or under?
7      A.   30 or under.
8      Q.   Okay.  And how is the used car
9  pricing, like, affected the longer it sits on your
10  lot?  Does it go down significantly, is it
11  generally about the same, within that three
12  months?
13     A.   Well, not -- it's so different today
14  in today's, meaning since COVID.  But, yes, they
15  depreciate.  New cars don't depreciate until you
16  sell them.  Right?  But used cars depreciate daily
17  unless there's a spike for some reason.  But most
18  of the time they depreciate.  So you want to get
19  rid of them as fast as possible.
20     Q.   All right.  So I understand in today's
21  world the used car market is doing very well.  But
22  in 2016 to 2018 my understanding is that generally
23  you want to try and get rid of a used car within
24  30 days of purchase and --
25     A.   Ideally, right.  Even at 45, that's

Page 52

1  still good.  But the sooner the better.  And the
2  under 30 is great.
3      Q.   Okay.  And then around the three month
4  mark you, as a dealer principal, get a little
5  worried because the depreciation is racking up?
6      A.   Not worry so much as you better be on
7  top of it because that's when -- that's when --
8  I'll start to look at things at 60 and over.
9      Q.   Okay.  So when you say you start
10  looking at things 60 and over, do you get reports
11  on stale cars?  Or what happens?
12     A.   Mm-hmm.
13     Q.   Okay.  And how often do you get those
14  reports?
15     A.   Whenever I run them.
16     Q.   Just generally once a month?
17     A.   It depends on what -- what I have on
18  my plate at the time.  So at the end of the month,
19  yeah, for sure.  At the end of the month I'd see
20  everything.  But if you got a new manager
21  starting, I would run them constantly because I
22  want them to understand them and, you know.  I
23  have a ton of reports.
24     Q.   I know earlier you mentioned you had
25  about half of your used car inventory from

Page 53

1  trade-ins and half of them from auction.  Is
2  there, like, one auction you guys -- when I say
3  you, I mean Mike Anderson Chevy, that you attend
4  or are there multiple?
5      A.   There is, I'd say, maybe three or
6  four.
7      Q.   Okay.  What are their names?
8      A.   GM Financial.  Ally Smart Auction.  I
9  believe one is called Odessa.  I'm drawing a blank
10  on the other one.
11     Q.   With respect to these auctions, is
12  there any requirement that a -- I assume it's like
13  a wholesaler that comes and sells cars, correct,
14  at these auctions?
15     A.   No.  So it would be weird if they --
16     Q.   How does it --
17     A.   -- at the auction.  So if it's a car
18  that, you know, at, like, 90 days you haven't done
19  anything with it, it's not sold, you can send it
20  to the auction and, you know, to pay up the
21  inventory or to buy cars or whatever.
22          But the auctions I'm referring to
23  are dealer owned, the auctions.  So it would be
24  other dealers selling cars or it would be a lot of
25  off-lease vehicles from, like, GM Financial or

14 (Pages 50 - 53)

1 Ally where the people's leases have expired and
2 now they're selling off that car, meaning the
3 lienholder.
4    Q.   And are there any -- are there any
5 requirements as far as what condition the car must
6 be in or anything like that in order to --
7    A.   Well, that's a judgment call. I mean,
8 that would be -- that's common sense basically.
9 You're not going to -- you've got book values that
10 we use to see what the cars are worth. You know
11 your market. You've got reports that show what
12 cars do the best on the lots and what cars -- the
13 other thing it's called the auto -- you can see
14 what does good in your market. And then they also
15 use, like, a cross-sell report that shows by ZIP
16 code what cars. So a good manager would know that
17 and would know to look at that, and that's how he
18 stocks his inventory.
19    Q.   You mentioned the report. Can you
20 spell the name of that report for the court
21 reporter, please?
22    A.   What report?
23    Q.   You said, I think, a crossover report?
24    A.   Cross-sell, c-r-o --
25    Q.   Oh, cross-sell. Okay.

1    A.   -- s-s dash s-e-l-l.
2    Q.   Okay. So with respect to Mike
3 Anderson Chevy, was there a protocol that is
4 generally told to your general managers?
5        Well, let me back up.
6        Do general managers generally buy
7 the cars or is that --
8    A.   No. So when Jason started -- so I
9 guess my question to you is are you asking
10 specifically during the time Jason was there or as
11 overall?
12    Q.   Well, I want to know, at the minimum,
13 that 2016 to 2018 period. If the answer is
14 different during that period versus --
15    A.   Oh yeah.
16    Q.   -- overall, tell me.
17    A.   Yes. Yes.
18    Q.   Okay. So let's -- maybe let's start
19 in 2015 for the clarity of having a baseline. In
20 2015 who would go to these auctions?
21    A.   A lot of them are online.
22    Q.   Okay.
23    A.   But the used car manager would be the
24 one that would go. You know, one of the used car
25 managers would be the one that would go to the

1 auction or online to buy the cars, the same one
2 that would appraise the cars when a customer comes
3 in.
4    Q.   So then in 2016 did this change?
5    A.   Yes.
6    Q.   Okay. How did this change?
7    A.   Because when Jason started I said my
8 maintenance -- we didn't have a used car manager
9 at the time and kind of up and down. And I
10 started out with, like, this -- with every manager
11 -- every employee that I personally get involved
12 with. I have ADD, attention deficit disorder, to
13 the max. If I'm not medicated for it, my head is
14 a complete disaster.
15        But I have to have structure, and
16 the structure cannot be circumvented. There are
17 three Ps: Policy, procedure, and process. Do you
18 know the difference? And they're like, oh,
19 they're all usually the same thing. A typical
20 answer I get. I said they're the not the same
21 thing at all. They work in conjunction with each
22 other. And I said -- I use the airlines as an
23 example not for customer service but how those
24 things fall into place.
25        Policy is, you know, your rules

1 basically. We don't lie to customers. We don't
2 cheat. We don't steal. You know, we honor our
3 word, whatever the case. The rules basically,
4 whatever the rules are. Right?
5        And then the process is the sale of
6 a car or the service of a vehicle, meaning from
7 the time the lead was submitted to the time the
8 salesman got it to the time the sales manager took
9 it over to the finance, to the office, and off to
10 the bank with a contract. Those individual jobs
11 are the procedure in that process.
12        I said when you understand -- I
13 said everything has a process and procedure. When
14 you understand them, you might not necessarily
15 agree with them but you'll understand the
16 reflexes [sic] of not following them.
17    Q.   So that's what -- I'm sorry, I am
18 trying to understand a little bit about backing
19 into the 2016 portion with Jason starting and
20 there being no -- no used car manager. You were
21 starting to say the process changed a little bit
22 because there was no used car manager. Correct?
23    A.   It didn't change. He circumvented it.
24 It didn't change.
25    Q.   Okay.

15 (Pages 54 - 57)

Page 58

1    A.   So if I said it changed, I meant,
2 yeah, it changed because he wasn't following what
3 was supposed to be done.
4    Q.   Well, was -- there not being a used
5 car manager, who was supposed to be buying the
6 cars?
7    A.   Then at that point the general manager
8 would be.
9    Q.   Okay.  And in 2015, if there was no
10 used car manager, would the general manager also
11 be buying cars?
12    A.   Yes.  The general sales manager, yes.
13    Q.   And that's -- if I'm understanding you
14 correctly, that's how Jason became the person
15 purchasing the cars.  Correct?
16    A.   So when he came in, we didn't have
17 one.  I said my main goal for you right now is to
18 get the used car department back up and running,
19 that's your main focus, and then we'll move into
20 service and sales, whatever, but that has to
21 happen first.
22    Q.   And with respect to getting the used
23 car department back up and running in the absence
24 at that time in 2016 of a used car manager, did
25 you provide any training or protocols, as you were

Page 59

1 talking about before, to Jason on how to gauge or
2 under what circumstances to buy a used car from
3 auction?
4    A.   You wouldn't -- so he -- here's --
5 this is where it changed.  He started buying cars
6 off the street from this -- his name was Rory.
7 It's in that lawsuit.
8    Q.   Is it Epic?
9    A.   Yes.
10    Q.   Okay.
11    A.   And which -- occasionally you might
12 buy a car from a used car dealer like that.  Say
13 they took in a trade that they can't afford,
14 meaning that it's too high priced of a car for
15 their lot.  Right?
16        So an example would be if we take
17 in a Mercedes-Benz and a Corvette.  Right?  We're
18 not a Mercedes dealer.  We're not going to be a
19 place somebody is ever going to think of to go
20 look for a Mercedes.  So that would be a car that
21 you would sell off to another dealer.  Right?  But
22 the Mercedes dealer may have the same situations
23 where he takes in a Corvette.  He's not a Corvette
24 dealer.  No one is going to think there to buy a
25 Corvette.  So we would, you know, depending on the

Page 60

1 car, buy the car if it made sense.  Right?
2        But the protocol as far as buying
3 a car, that would come with, I mean, the simple
4 knowledge of being the general manager, to run the
5 business properly and what made sense for your lot
6 and what makes sense for the dealership and, you
7 know.
8    Q.   What I'm hearing from you is that, as
9 far as the protocol, it would depend on his
10 industry knowledge.  Correct?
11    A.   Right.  He had been in the business a
12 long, long time.
13    Q.   Was there a particular valuation guide
14 that you wanted your general managers to follow
15 in --
16    A.   We usually use -- we use two books.
17 We use NADA.
18    Q.   Okay.
19    A.   And we use Black Book.
20    Q.   Okay.  When you look at NADA and Black
21 Book, if their figures -- because sometimes my
22 understanding is their figures might differ, which
23 one would you follow?
24    A.   It depends on the car.  Is it a car
25 that you need?  Is it a car that you have a

Page 61

1 potential sale on?  Is it a car that you think you
2 could turn quick?  Is it a car that does overwell
3 on your lot?
4    Q.   And what guidelines do you follow?
5 I'm using very simple numbers.  For example, if
6 both NADA and Black Book tell me that the value of
7 a used car is $100 and I know that I could get it
8 for 100 -- or I'm at auction right now and I want
9 to put up $105.  Is that an absolute no or is that
10 within my discretion?
11    A.   Well, you can -- that's where at your
12 discretion, if that makes sense, you know.  Look,
13 because there's such a short supply and demand,
14 high demand and short supply, right, and it hasn't
15 affected -- it hasn't hit the value yet but you
16 know that you can sell it, you know that you can't
17 find that car anywhere.  Right?  Then, yeah, does
18 it make business sense?  Yes.  Then you would
19 accept it and buy it.
20    Q.   Am I understanding you correctly it
21 kind of goes back to what we were talking about
22 before?  It goes back to market demand, can I be
23 profitable, does this make business sense?
24    A.   Yes.  And, also, is it a car that
25 would make sense for you.  The biggest thing is,

16 (Pages 58 - 61)

Page 62

1  is it a car that makes sense for your lot. You
2  know, going and buying a Rolls Royce or Mercedes
3  for our lot makes no sense whatsoever. None.
4  Okay? Buying a Chevy Malibu makes a lot of sense.
5       So if you bought a Chevy Malibu
6  that was 3 years old but only had 10,000 miles on
7  it and was garage kept and no dings or dents or
8  anything on it and the book called it for, let's
9  just say, 10 grand but the customer or whatever
10  wanted 11 for it, you at that point could say,
11  yes, that makes sense, that makes business sense,
12  because the book isn't going to have a value for
13  it. The averages are going to be too skewed
14  because that is a gem basically. You don't find
15  cars that are 3 years old and have 10,000 miles on
16  it that have no damage or anything on it. Right?
17  So at that point, yeah, that makes a lot sense.
18  But on a car that's got, you know, 60,000 miles on
19  it and it's 2 grand or 3 grand over book, that
20  makes no sense.
21       Q.   I understand you primarily sell Chevys
22  at your car dealership. And let's talk about --
23       A.   New. Used, everything we do.
24       Q.   You said, used, you sell everything?
25       A.   Mm-hmm.

Page 63

1       Q.   So if -- let's talk about today.
2  Would it be -- would it be surprising to you to
3  know that your used car lot has, like, Toyota
4  Camrys?
5       A.   Okay. No. So today is going to be a
6  completely different story than a year or year and
7  a half ago because there are no cars.
8       Q.   Right.
9       A.   So you're buying anything you can kind
10  of get just to have inventory. So today is not
11  the --
12       Q.   Let's talk about -- oh, sorry, go
13  ahead.
14       A.   Let's go back. Let's back up to like
15  2019. Okay?
16       Q.   Correct.
17       A.   There, like, and I said this
18  repeatedly at that store, imports do not do well
19  at this store. I don't care if it's a Honda, a
20  Toyota, whatever. It's an inner city store. They
21  don't do well. Don't buy them. If we take them
22  on trade, that's one thing. But don't -- those
23  cars historically have not done well. I mean, I
24  can show you a report to show you. Don't buy
25  them.

Page 64

1       Q.   What about something like a Ford
2  Focus?
3       A.   That's something that we would --
4  depending on the vehicle that we -- and the book
5  value, we could do well with.
6       Q.   And then with respect to what you
7  choose to sell the car for, I understand that
8  there are just -- like you were saying before,
9  there are guidelines. But sometimes market
10  fluctuations, demand and supply, things like that
11  all influence pricing. So is there any kind of
12  general guideline you can tell me as far as what
13  you typically look to to price your cars, your
14  used cars?
15       A.   Yeah, we have a guideline. I have a
16  policy, like a procedure on it, what we do.
17       Q.   Okay.
18       A.   We have built in what -- how much
19  money we want to make on the car. And then, when
20  we price it, we look at what those cars have sold
21  for in our market and how many are available in
22  our market. Right? We can see that through this
23  vAuto.
24       So if in our market there's, you
25  know, 50 Ford Focuses and we have a Ford Focus,

Page 65

1  then we need to lower the price to be on the lower
2  end of the price scale, right, because (A) we're
3  not a Ford dealer and (B) we want to get rid of
4  that car because if there's 50 out there on
5  dealers' lots in your area chances are that car is
6  going to age.
7       Q.   Was this policy in play in 2015?
8       A.   Yeah. We've had that -- I don't know
9  what year we got -- when vAuto came out, but it's
10  been, yeah, we've had it for since they trained us
11  on it.
12       Q.   Do you have that, like, in written
13  form?
14       A.   Yeah, I'm sure I do.
15       Q.   Are you able to provide that to your
16  attorneys and --
17       A.   And do you want --
18       Q.   I mean, if it's accessible, it would
19  be great. If not --
20       A.   It will take me a while to find it.
21  But, yeah, we have it.
22       Q.   Maybe at a break we can do that.
23       Now, I know with used cars often
24  they have door dings, existing damage, things like
25  that. Is there a rule for Mike Anderson as far as

Page 66

1  we will not consider cars with existing damage?
2  How does that work in your company?
3      A.   If it's a trade-in you mean or if it's
4  you're buying?
5      Q.   Auction.
6      A.   Well, you would not -- that would be
7  common sense.  That would be under -- you know, I
8  mean it's common sense of the management.  It's
9  not even good business sense to buy a car like
10  that.
11      Q.   Well, let me clarify my question.
12  It's pretty often that you see with used cars like
13  door dings.  That's not someone totaling a car.
14  Correct?
15      A.   Right.  You mean just like a scratch
16  here or scratch there?
17      Q.   Yeah.  Like minor damage.  Is that --
18      A.   If you can fix it, if you can what we
19  call recondition the car and what you think you
20  can recondition the car for makes sense and it
21  falls, you know, within what you think you can
22  sell the car for or what you can buy the car
23  against the book for, meaning what the book value
24  of the car is, right, then if it makes sense buy
25  it.  If it doesn't, then don't.  But that's a

Page 67

1  judgment call on, like, the used car manager or
2  general manager or general sales manager, whoever
3  is buying the car.
4      Q.   When you talk about reconditioning
5  cars, I might be wrong, so please correct me, but
6  I understand that Mike Anderson Chevy Chicago does
7  not have a body shop.  Right?
8      A.   No.
9      Q.   So where is the reconditioning done?
10      A.   Depending on the reconditioning.  If
11  it's like a minor dent, there is a company that
12  comes out that pops the dents out.  If it's a
13  bumper scratch or something, there's, like, an air
14  brush company that would come out and air brush
15  it.  If it's -- if like the front end was crashed
16  or something, we wouldn't buy any car like that.
17      Q.   So if all that --
18      A.   If it needed body work like on a
19  trade-in, then that would be at auction.  Plus
20  you're never going to tell the customer, no, I
21  don't want the car.  But if it had to go to the
22  body shop, right, then we had at that time it was
23  Jersey Auto.  And then I can't remember the one
24  after that.  I think it was --
25      Q.   When you say --

Page 68

1      A.   I think it was Jersey.
2      Q.   When you say at that time it was
3  Jersey Auto, what time are you referring to?
4      A.   Right around like before Jason
5  started, right around that time.
6      Q.   So in 2015, let's just stick with
7  2015, any minor dent, air brushing, just facelift
8  looking kind of stuff --
9      A.   Okay.  There.  That's a good way to
10  put it.  So that would be like something where
11  you'd have a vendor come on your lot that would
12  have to have a PRC to go out and you'd give them
13  10 or 15 PRCs that had the stock numbers on it to
14  go air brush the bumpers or pop the dents out of
15  the car or, you know, get the cigarette smell out
16  of it or steam clean it or whatever the case may
17  be, you know, polish the wheels or center caps or
18  whatever.
19      Q.   Okay.  And in 2015 all of these
20  vendors for this kind of minor facelift-ish work
21  would come onto your lot.  You would not send the
22  cars out.  Correct?
23      A.   You could send them.  It depends on
24  the -- it depends on the company.  Most of the
25  time they're small companies and they come to you

Page 69

1  for that kind of stuff.
2      Q.   Okay.
3      A.   Some of the stuff you can't -- like
4  you can't paint a car on your lot.  That's an EPA.
5  I mean, you can't do that.  Right?  It has to be
6  in a -- in a body shop inside like a ventilated,
7  you know, with fans and all the filters and
8  everything.  So something minor, yes.  But you
9  can't do -- I mean, no, you'd have -- geez, I'd be
10  in jail probably.
11      Q.   Tell me about the timeline on repairs.
12  So you buy a used car from auction.  Do you
13  instantly go and repair that or does some time
14  pass before you go and repair that car?
15      A.   No.  You do it right away.
16      Q.   Right away.
17      A.   So the process is this.  When you take
18  in a trade, it goes into what we call status -- we
19  have statuses for the vehicles.  It goes into
20  finance mode.  Once finance says, yes, that's a
21  good deal, meaning that the customer has checked
22  out, the contract is good, it's approved, you
23  know, go ahead, and then gives an authorization to
24  the used car manager to, you know, send it through
25  service.

18 (Pages 66 - 69)

Page 70

1          You're not supposed to ever sell a
2   car that hasn't gone through service. Now, that
3   changed then and it changed now until Monday
4   because we had technicians on strike for two or
5   three months. So if it was what we call frontline
6   ready, meaning it was a car that was under
7   warranty, that we felt was safe, that was, you
8   know, driven, you know, and looked at by the used
9   car manager, then at that time we would sell it.
10  But, as a general rule, no, we would never sell a
11  car until it's gone through service. And that's
12  the first thing that would happen after it's
13  financed as a trade or if it goes through an
14  auction. It goes through service.
15         So we repair a repair order. And
16  when it's ready for make ready status, make
17  ready --
18     Q.   Okay.
19     A.   -- meaning it's in service getting
20  ready. And then once service is done with it,
21  they close the repair order on it, you know,
22  invoice the vehicle. Whatever the charge is gets
23  added to the cost of the car. And then it gets
24  transferred to ready to sell. And then at that
25  point it will show up on the internet, it will

Page 71

1   show up, you know, on third-party sites and it's
2   ready to go.
3      Q.   So with respect to the minor kind of
4   work, the dents, the minor scrapes, things like
5   that, what kind of timeline are we talking about
6   does it typically take, let's say, once you get it
7   into your lot? A week? A month?
8      A.   Typically -- oh, okay, no, not a
9   month. It better not. Now, there's times where
10  it could take a month because you can't get a part
11  that needs to -- the car needs to fix.
12         Or if there happens to be a recall
13  on a car that popped up when it came in, you
14  can't -- it could sit there until the manufacturer
15  has a fix for it, a programming fix or a part or,
16  you know. Because when they do a recall, if it's
17  what I would call or we call homemade or, like,
18  General Motors car, you can't sell it period until
19  you've got the recall fixed. And usually when
20  that happens they never have the part. You know,
21  it's not an overnight process for you to get the
22  part the next day and it's done. Right?
23     Q.   Right.
24     A.   You've got to get the part and fix on
25  the car and whatever and there you go.

Page 72

1          But ideally it would be -- under
2   ten days would be a good number to shoot for from
3   the time you took the car in on trade. From the
4   time you took the car in through the auction, I
5   would say a week would be a good time.
6          But that fluctuates as well
7   because, for an example, you could have a really
8   big month or week or whatever sales-wise where
9   you're taking in a ton of used cars, right, and
10  then you get backlogged because, you know, you've
11  only got so many stalls and so many technicians.
12  Right? And then you say you have an overflow of
13  service customers that your used car technician
14  has to help out on there because you want to make
15  sure they're taken care of. Right? So it could
16  be I mean -- it could be longer depending on what
17  the -- what the business, what the market
18  conditions at the time let's say.
19     Q.   So with respect -- I think what I
20  understood is once you get the car, whether it's
21  through auction or if it's through a trade-in,
22  your service department takes a look at it and
23  kind of goes, okay, this, this, this, this, needs
24  to be fixed.
25     A.   Mm-hmm.

Page 73

1      Q.   Do you always take their advice on
2   what needs to be fixed or is there discretion?
3      A.   No. We take advice. I mean, there is
4   safety things.
5          If it's -- it's an as-is car,
6   meaning, say, the car is a 100,000 mile, you know,
7   Buick Century or something. Right? That's not
8   going to be a buyer that comes in that's going to
9   use that car -- it's a different buyer. Right?
10  It's going to be a lot less expensive car. So
11  that's not going to get all the stuff done.
12  Right?
13         But if it's what we call like a
14  certified car or retail car, that, yeah. The --
15  has to be within a certain millimeter. The tires
16  have to be within a certain tire depth.
17         My simple way of saying this to
18  everybody is you need to be able to walk any one
19  of your friends or family who's out there and sell
20  them a car and know and feel confident that if
21  they buy it it's going to be safe and it's going
22  to be good.
23     Q.   Do you ever, like, improve the car?
24  What I mean, for example, is replacing the rims
25  into something that might make the car more

19 (Pages 70 - 73)

Page 74

1  appealable to someone.
2      A.   Sure.  At times.  Depending on the
3  car.
4      Q.   It's just kind of a judgment call?
5      A.   Well, it depends on the car, too.
6  Yes, judgment call.  And, yes, it depends on the
7  car because now the cars -- a lot of the cars know
8  the tire, the wheel that's on there, so but the
9  warning signals, the low tire pressure lights,
10  and things like that are programmed for that
11  particular type of wheel.  Right?
12      Q.   Right.
13      A.   So you can't switch things around like
14  we used to.
15      Q.   Who makes the judgment calls on
16  whether or not to do something?  Is that the
17  service --
18      A.   Used car manager.
19      Q.   Okay.
20      A.   Oh, service needs authorization to do
21  that.  But if you're going to switch wheels or
22  something, most of the time it would be like after
23  market and it would be on a car that didn't have
24  that -- you know, that wasn't that sophisticated
25  that had all that technology.

Page 75

1      Q.   Okay.  And then with respect to the
2  used car manager, I know earlier you had alluded
3  to in 2016 when Jason started there was no used
4  car manager.  Was there ever a used car manager
5  while he was there?
6      A.   No.
7      Q.   Okay.
8      A.   He was -- I was on him to get somebody.
9  But I think he was going to hire one or may have
10  hired one to train around Christmastime.  So that
11  would have been '16 I think he may have -- but
12  then it didn't work out, I think.
13      Q.   Okay.  So at the time that Jason was
14  employed with Mike Anderson Chevy, not only was he
15  kind of wearing the hat of the general manager but
16  he was also wearing the hat of the used car
17  manager.  Is that accurate?
18      A.   Correct.
19      Q.   Okay.
20      A.   He never really let go of that, that
21  used car role.
22      Q.   He never let go of the used car role?
23      A.   Right.  So it wasn't like -- I told
24  him your priority is to get the thing up and
25  going, not be the used car manager.

Page 76

1      Q.   Okay.  Let's talk a little bit about
2  marketing.  Actually, you know, it's been about an
3  hour and 20.  I wanted to check in with you, did
4  you want to take a quick break or do you want to
5  keep going?
6          MR. QUANDT:  Why don't we take about a
7  five-minute break, Jean.
8          MS. LIU:  Okay.  Can we come back at
9  10:25?
10          MR. QUANDT:  That sounds fine.
11          (A break was taken from
12                10:20 a.m. until
13                10:32 a.m.)
14  BY MS. LIU:
15      Q.   Mr. Anderson, earlier we talked a
16  little bit about used cars purchase and sale
17  procedures.  I wanted to talk a little bit about
18  marketing.  So what I mean by marketing is radio
19  advertisements, signs in the store, mail
20  advertisements, things of that nature.  Okay?
21      A.   Are you asking me?
22      Q.   Yes.  I just want to -- when I use the
23  term "marketing" that's what I'm referring to.
24  Okay?
25      A.   Oh, okay.

Page 77

1      Q.   With respect to marketing at the
2  Mike Anderson Chevy store, can you tell me
3  generally how items for marketing are procured?
4      A.   One more time with that.  How what?
5      Q.   How you get these items for marketing.
6  So how do you get these radios ads?  How do you --
7      A.   You generally have -- the advertising
8  agency usually does most of that.  So, in this
9  case, when he was there he didn't do that.  He was
10  doing all these side deals that I didn't know
11  about until the bills came.
12      Q.   So let's go back to 2015 before Jason
13  was there.  Was there --
14      A.   Mm-hmm.
15      Q.   Was there an advertising agency at
16  this point in time?
17      A.   Mm-hmm.
18      Q.   And what is the advertising agency?
19  Is it an external advertising agency?
20      A.   It's always somebody, yes.  Right?
21  We've switched companies so many times, I couldn't
22  tell you who it was.
23      Q.   So it's someone that you pay
24  separately to --
25      A.   You pay them usually for everything

20 (Pages 74 - 77)

Page 78

1  that you do for the month.  And you don't do --
2  and you don't pay, you know, like the Chicago
3  Tribune or cars.com.  You don't pay all these
4  separate bills.  You usually pay them and they do
5  your marketing, meaning they will allocate, if
6  you're going to spend 50 grand they'll allocate
7  20 grand to Google Clicks.  Or you know what I
8  mean.  They're the ones that do that.
9         That's not what happened here.
10  Q.   Are they more or less a broker of
11  sorts?
12  A.   A broker?
13  Q.   Like they broker your services?
14  A.   Yeah, I guess you could call it a
15  broker.
16  Q.   Okay.
17  A.   They're the ones that are putting it
18  together.  So they're the ones that are setting up
19  the, you know, commercials either with -- you
20  know, whatever, mailers or whatever you're going
21  to do.  They usually do all of that.
22  Q.   Right.  So with respect to the
23  mailers, my understanding is that these
24  advertising agencies don't actually print or --
25  A.   No.  They do.  A lot of them do.

Page 79

1  Q.   Okay.  So let's move to 2016.  What
2  happened in 2016 as far as how the flow of
3  advertising worked?
4  A.   It was backwards.  It was he would do
5  it and not run it past me and then say, "Oh, we
6  just did a mailer."
7        I said, "Okay.  We don't do mailers
8  without my approval.  I'm very clear on that.  And
9  we don't do a mailer until we have an attorney
10  approval on the mailer saying, yes, this is legal,
11  yes everything.  You know, we've been over this."
12        And he said, "Oh, I know, but you
13  know," whatever, whatever the excuse is.
14        But I was very clear every time I
15  mean.
16        And then I said -- he said, "It's
17  to our customer list.  This is the one."
18        I said, "To our customers?  How?"
19        He goes, "Well, we had the names."
20        I said, "Where did you get the
21  names from?  Because the only person that can pull
22  the names from the system is me.  So who did you
23  get the names from?"
24        He said, oh, well, it was in I
25  think he said GM Dealer World or something.  I

Page 80

1  don't remember exactly what it was.  But I said I
2  would have to do that.
3        And I believe at one time we did a
4  mailer that we got approved and I did the report
5  on it, I got it, we pulled it, he did it, sent it.
6        And then the one that really that
7  got me off was the mailer that we did and I didn't
8  know anything about.  It was towards the end of
9  his career with us.  And I said, "Well, again,
10  where did you get that?"  Because I usually
11  even -- when we do the mailer, I flag the customer
12  in the system so that we know when they came in,
13  you know, it's the same household, I can see if
14  they -- if it worked, if they actually came in off
15  of that or not.
16        And he said, "Oh, no.  I bought a
17  lead from -- it was for Corvette customers.  I
18  bought a list of names."
19        I said, "But where are the names?"
20        He said, "Well, I'll get them," or
21  something.
22        I said, "We need the names."  And
23  again you have to get the name approved.  You
24  can't do this.  And I said the attorney has to
25  approve the mailer as well, meaning that the

Page 81

1  language is right, that you're not putting any
2  deceptive ads out there.  I get everything checked
3  by an attorney before we ever do anything
4  advertising or contract-wise.
5  Q.   Okay.  So let me --
6        MR. QUANDT:  Counsel, just if I may
7  just for a moment, this is Eric Quandt.
8        Mr. Anderson, when you -- in this
9  last question you made reference to a he and he
10  said and he did.  Is the he you're referring to
11  Jason Kolodzinski.
12        THE WITNESS:  Yes.  Yes.
13  BY MS. LIU:
14  Q.   Mr. Anderson, let me back up because I
15  think you were talking about your approval and the
16  attorney approval.  Let me get the process down.
17  When Mike Anderson Chevy has something that they
18  want to market, whatever it might be, via whatever
19  media, what happens?  What's the process?
20  A.   Well, if it's -- it would be different
21  depending on what it is.  If it's your typical
22  Google Clicks and you wanted to market, you would
23  just say, hey, allocate more clicks or money
24  towards clicks towards Camaros or Corvettes or
25  whatever at this time, you know.  If it's -- if

21 (Pages 78 - 81)

Page 82

1  it's a mailer, that's different because --
2      Q.  Let's talk about -- because I know a
3  component of this lawsuit is the mailers at issue.
4  Right?  So let's talk a little bit about a mailer.
5  Let's say Mike Anderson Chevy in 2015 wanted to
6  put out a mailer.  What would happen?
7      A.  Mm-hmm.  That would -- what kind of
8  mailer was it?  You know, if the ad agency would
9  come back with a mailer, then I would want some,
10 you know, release or identification from them.
11 Then I would have an attorney review it to make
12 sure that it was okay and compliant.  Then, after
13 that, we say what are we targeting.  And then I
14 would run a report or I would build a report, say,
15 get the names, send it to them.  They bounce it
16 off the national change of address.  Right?  They
17 give us the information right back.  And then they
18 do the mailer.  And then that's it.
19     Q.  So with respect to an advertising
20 agency, were you the primary source of contact
21 because it would be your approval and everything
22 else or would the GM at the time be involved?
23     A.  The GM would be at the time.  The only
24 time I would get involved is if it was a mailer
25 because I'm so particular.  It's like playing with

Page 83

1  dynamite when it comes to having the wrong
2  language in there.
3      Q.  Sure.
4      A.  And with, like, class action lawsuits
5  and things.  So I want all the Is dotted, the Ts
6  crossed, everything before we ever do anything
7  with it.
8      Q.  So that's what you mean by you would
9  have to approve it?
10     A.  Right.
11     Q.  So would you have to approve the
12 decision to have a mailer period or would you have
13 to approve form?
14     A.  They would say -- typically what I
15 would say is -- like right now I want to do a
16 mailer, a blanket mailer, on used cars.  Okay.
17 Get the mailer approved.  We use Dennis O'Keefe as
18 an attorney.  He knows the Illinois laws for
19 advertising.  He thumbs up, thumbs down.
20         Then there's a series of things
21 that I'll go through to pull the names to build
22 the report and get them that information.  And
23 then they'll take it, you know, process the names.
24 There shouldn't be duplicates.  But if there are
25 duplicates, pin up the names, bounce that against

Page 84

1  the national do not -- not national do not
2  calls -- national change of address.  We get the
3  information back of the ones that they actually
4  sent.  And then I'll take that and I'll upload
5  that back into our system to make sure the
6  addresses are updated in our system as well.
7          And then the order goes out.  And
8  typically we would it in drops so it doesn't all
9  hit at once.  We would spread it out over a two-
10 to four-week period.
11     Q.  So would you be more involved in this
12 process?  Because it sounds like you were doing a
13 lot --
14     A.  A mailer?  Yes.  Because it goes out
15 -- there was a lawsuit against Capital One and all
16 these dealers in 2003 and it turned into like some
17 big class action lawsuit.  No, I'm sorry, 2005.  I
18 think it was 2005.  But it was Capital One.  But
19 at that point, yes.  And then when Illinois would
20 change their laws, how strict they got with the
21 laws and everything, yes, I absolutely yes.
22     Q.  What about radio ads, same kind of
23 process?
24     A.  I would never approve radio ads, ever,
25 because that's -- no.  I mean that -- the only

Page 85

1  time we ever did radio ads was on WGN and it was
2  for a short stint.  And other than that, no, we
3  wouldn't do any -- I don't no radio ads because in
4  advertising studies, unless you're a big mega
5  company like Best Buy or something, you don't
6  get -- the TRP, or whatever the acronym is, you
7  don't get the return on it.  Right?  That's
8  passive advertising.  There's not a direct impact
9  on it.
10     Q.  Okay.  So let me get a little bit of
11 the history on Mike Anderson and the different
12 forms of advertisements they've used in the past.
13 It sounds like you've done mailers.
14     A.  Mm-hmm.
15     Q.  Since when have you done mailers?
16     A.  Since --
17     Q.  What -- I'm sorry?
18     A.  We've always done them.  We've always
19 done mailers.
20     Q.  So since you've been open?
21     A.  Right.
22     Q.  And I think that was 2008, if I'm not
23 mistaken?
24     A.  Yeah.  Mm-hmm.
25     Q.  Okay.  And then I understand the

22 (Pages 82 - 85)

Page 86

1  allegations at least in part from 2016 to 2018
2  pertain to radio ads. Taking that aside, have you
3  as Mike Anderson Chevy ever done radio ads?
4      A.  We did. I told you we did the one
5  WGN ad.
6      Q.  In approximately what year?
7      A.  Geez. 2000-  -- my dad did them. It
8  was probably 2011 maybe.
9      Q.  Okay.
10     A.  Because I don't think I had kids.
11  Maybe 2012.
12     Q.  Is that it?
13     A.  Oh yeah. No, we don't do radio.
14     Q.  Okay. Let's talk a little bit about a
15  GM's authority levels. Is the GM the person that
16  would sign off on, I think earlier, what was it,
17  the purchase order? Like, who signs off on those?
18     A.  Well, so for advertising you're not
19  going to have that because you've got an agency to
20  deal with.
21     Q.  Okay.
22     A.  And it's different. You're going to
23  say I'm going to -- you're going to allocate
24  different things depending on what your inventory
25  levels are. If you have a budget, you generally

Page 87

1  set aside every month it's the same. Right? So,
2  like, your billboards would be the same bill
3  usually every single month. And that's when --
4  that's contracted. Right? You sign a contract
5  with the billboard company.
6          And no manager, no anybody is
7  allowed to sign anything. And I even have them
8  sign off on that when they start, that they're not
9  allowed to sign contracts, deals, subscription
10  services like some of those click ad things, the
11  third parties. Anything that's going to get me --
12  put me on the hook, right, for money down the
13  road, they can't sign anything, no agreements or
14  anything, not for a computer, not for anything.
15     Q.  So --
16     A.  So, an ad agency, I'd have to sign off
17  on the new ad agency.
18     Q.  Okay. And in the 2016 to 2018 period
19  my understanding is that those rules on no general
20  manager can sign off on anything that would put
21  you on the hook for money still applied? Is
22  that --
23     A.  Yeah. Let me -- so I don't ever --
24  like, you can't sign a contract. You can't sign
25  an agreement. You can't sign anything with

Page 88

1  verbiage on it basically. I mean, you really just
2  can't approve any agreement that you have with the
3  dealership. Nobody can sign that.
4      Q.  With the exception, if I'm under-
5  standing correctly, of, like, car sales because
6  that's part of --
7      A.  Right. Well of course. No, that's
8  their job.
9          I'm talking about like if you're
10  switching, you know, alarm companies and you're
11  going from, you know, whatever to whatever, or if
12  you're switching phone companies or you're
13  switching ad agencies or anything with a contract.
14  I'm trying to think of -- Snap-on which is one we
15  use for a parts catalog. You can't -- even though
16  they use it every single day, when the contract is
17  up the parts manager can't sign a new contract.
18     Q.  Right. Okay. So --
19     A.  Which is not typical. That's not a
20  typical. It's not typical especially in this
21  industry. Normally the managers or department
22  managers or general managers can sign that stuff.
23  But not with me.
24     Q.  It sounds like you have the final --
25  the only person -- you are the only person? I'm

Page 89

1  sorry, I worded that badly.
2      A.  Right.
3      Q.  You are the only person that has
4  authority to sign off on anything other than the
5  purchase in the regular -- like the purchase and
6  sale of cars?
7      A.  Of the day-to-day business.
8      Q.  Okay. With respect to the budgets in
9  2016 to 2018, do you still have those as far as
10  the marketing goes?
11     A.  The budgets? We don't do budgets. We
12  do what -- you know, what we think would work or
13  what we -- what we're trying to sell or move or if
14  we're going to do a mailer to try to jump start
15  something, you know, if we're going to boost
16  Comcast to try to -- we don't do like --
17     Q.  Maybe I misunderstood earlier. I
18  thought you said that you have a budget set aside.
19     A.  Oh, I'm sorry, if you're going to say
20  with Google or something, and that's more
21  recent --
22     Q.  Okay.
23     A.  -- since the internet has really taken
24  off that you would set aside -- in your click ad
25  budget you would set aside, you know, whatever for

23 (Pages 86 - 89)

Page 90

1 a particular model, right, at a particular time.
2    Q.  Okay.  So --
3    A.  So your budget with, like, Google,
4 you're going to say take 10,000 of that and move
5 it towards Malibu.  Right?  Or don't put any of
6 that budget on Corvettes because most of the time
7 kids click on Corvette ads.
8    Q.  So in 2016, for the sake of clarity,
9 my understanding is, and please correct me if I'm
10 wrong, is that Mike Anderson did not have a
11 particular budget set for different departments of
12 its dealership.  Is that correct?
13    A.  Different budgets?
14    Q.  Like for the marketing budget.  Do you
15 typically have --
16    A.  No.  Because you would -- if you do,
17 like, a service mailer or something, it would need
18 to be approved by me.  It would have to be
19 approved.  You wouldn't just go out and spend
20 money just to do something, no.
21    Q.  Okay.  Okay.  What about signs in the
22 dealership?  I know from being in dealerships
23 sometimes like on top of a car there will be a
24 sign saying this is the special right now or on
25 windows there will be decals.  What about stuff

Page 91

1 like that?
2    A.  Most of the time that comes from the
3 manufacturer.
4    Q.  Okay.  Would Mike Anderson ever hire
5 anyone to do any special event banners, for
6 example?
7    A.  Special event banners?  No.  But we
8 would hire somebody to make banners that we would
9 hang like on the light poles or something.
10    Q.  Okay.  And whose authority does that
11 fall under?
12    A.  That would have to be -- if it was
13 something other than replacing a current one that
14 was ripped or something, then it was -- it would
15 be me.  And they're required to get a couple
16 different bids to see who's got the best rate.
17    Q.  They're required to get a couple of
18 what?
19    A.  A couple bids.  Like not just say, oh,
20 sure, go ahead, replace them all.
21    Q.  Okay.  Other than direct mailers and
22 in that one case that radio ad, what in 2015 did
23 Mike Anderson Chevy do to market itself?
24    A.  2015?
25    Q.  Correct.

Page 92

1    A.  Well, we did -- we did internet
2 advertising in 2015.  Comcast probably, TV.  But I
3 mean I could get it for you.  But I don't remember
4 off the top of my head.
5    Q.  Okay.  And my understanding, based on
6 what you said earlier, is that you would be the
7 one to sign off on all of that.  Correct?
8    A.  I would be the one to sign off on
9 anything new or different out of what, you know,
10 we typically do in a month as far as advertising.
11 So if you're going to do a mailer that's out of
12 the realm of monthly -- because you don't do them
13 very often.  If it's going to be changing up the
14 commercial, right, like the TV commercial is going
15 to be changed, I wouldn't be involved in that
16 because nothing is changing.  It's national,
17 right, as long as it's going to be or whatever.
18 And we typically just do generic passive type
19 advertising with employees and stuff anyway, so.
20 So I wouldn't be involved in that.
21    Q.  Let's talk a little bit about the
22 current signage in the dealership.  I know that
23 you said typically you get a lot of signs from the
24 manufacturer.  Are there any current signs,
25 whether it's on a window, whether it's in a

Page 93

1 showroom in the dealership now, that did not
2 originate from a manufacturer?
3    A.  What do you mean when you say signs?
4 You mean like washroom, do not enter?
5    Q.  No.  I'm thinking like the vinyl signs
6 that are sometimes on interior windows or on the
7 doors.  Sometimes they'll have, like, Mike
8 Anderson Chevy --
9    A.  We don't really do that.  That looks --
10    Q.  Okay.
11    A.  -- tacky.
12    Q.  Have you ever done that?
13    A.  No, not that I recall.  Not that
14 something that wouldn't have come from the
15 manufacturer.
16    Q.  Okay.  And then --
17    A.  We would do something -- a banner like
18 that, if I'm understanding you right, where it's
19 like a vinyl banner where it's got like a slit so
20 the wind can blow through it, we would typically
21 do on a fence maybe, you know.  But not often.  It
22 would be very rare.
23    Q.  And I'm sorry to switch back.  I know
24 we talked earlier that vendors are paid by checks
25 and the checks are mailed to addresses.  I didn't

24 (Pages 90 - 93)

Page 94

1  ask you, who typically signs the checks?
2      A.   Judy or myself.  Or I have my
3  sister-in-law because I needed -- she works for me
4  in the Chicago store, sign as a backup in Chicago.
5      Q.   Has that changed from 2015 to the
6  present?
7      A.   Oh yeah.
8      Q.   Okay.  So let's talk about the time at
9  issue, 2016 to 2018.  Who had signing authority?
10     A.   It was -- at that time it was myself,
11 Judy, and then my sister-in-law.
12     Q.   What was the last one after Judy?
13     A.   My sister-in-law.
14     Q.   What's your sister-in-law's name?
15     A.   Araceli Ulloa.  A-r-a-c-e-l-i.  Last
16 name is U-l-l-o-a.
17     Q.   And then are there check requests?
18 How does that process work?
19     A.   Well, yeah.  Well, if you get a
20 statement and everything is there and everything
21 checks out, you wouldn't have a check request
22 because it's a bill that's due, you authorized it,
23 the PRCs, the work's been done, you've got to pay
24 it.  Right?
25         If it's something that you need to

Page 95

1  give a customer a refund on something, it's a
2  check request done in the system now since it's
3  all time stamped, and the process is it's sent to
4  me for approval and sent back.
5      Q.   So in 2016 if there was no purchase
6  order on file, a check request would be sent
7  generally?
8      A.   Generally speaking, yes.  But, again,
9  he backdoored a lot of this stuff --
10     Q.   Okay.
11     A.   -- and said it was done.  So then if
12 it's done you owe the money.  I mean, you know,
13 you technically have the authority to say, yeah,
14 go ahead.  And we did do this, right, I authorized
15 this, then you've got to -- I'm a man of word,
16 you've got to pay it.  Right?
17     Q.   Right.  I'm just asking you about the
18 process, though, the, like, logistical process.
19 If it was not something with a purchase order
20 and --
21     A.   Yeah, you would have a check request,
22 yes.  Or -- oh, you can't just go say give me a
23 check or something.  Right?  You've got to have a
24 check request.
25     Q.   Right.  So a check request would be

Page 96

1  filled out by one of your employees for a
2  non-previously --
3      A.   And then --
4      Q.   -- purchase ordered item.
5      A.   Then the general manager would sign
6  off on it.
7      Q.   Okay.
8      A.   And then send it upstairs and cut the
9  check.
10     Q.   Okay.  So the general manager would be
11 the one approving with any kind of --
12     A.   Something like that, yeah.  Mm-hmm.
13     Q.   Okay.  And then were there ever any
14 protocols in place if the requester and the
15 general manager were the same person?
16     A.   Yeah.  But I -- you'd -- you would
17 have that because he was running the used car
18 department so he was the one who was telling the
19 -- supposedly he used to do this or do that and
20 then the advertising.  But that is -- again, he
21 backdoored everything.  He didn't follow the
22 protocol.
23     Q.   And I forgot to ask this.  In 2016 I
24 understand that Jason did not use some of the
25 advertising agencies that you used in the past.

Page 97

1  Did you have an advertising agency in 2016?
2      A.   Yeah.  We've always had one.
3      Q.   Was it -- you've always had it.  You
4  just -- my understanding is just didn't use it?
5      A.   No.  You use them every month.
6          But he maybe, you know, scaled way
7  down on it.  Maybe he said, you know, I've got a
8  mailer I did with someone else this month or I'm
9  got you know, some TK dance thing, that he said he
10 did that, you know.
11         MR. QUANDT:  This is just counsel
12 again.
13         Again, Mr. Anderson, when you're
14 referring to the he in those previous answers,
15 you're referring to --
16         THE WITNESS:  Jason.
17         MR. QUANDT:  -- Jason Kolodzinski?
18 Yes?
19         THE WITNESS:  Yes.
20         MR. QUANDT:  Thank you.
21 BY MS. LIU:
22     Q.   I'm going to share a document with
23 you.  Can you see this?
24     A.   Yes.
25     Q.   Okay.  I am marking this as Exhibit 3.

25 (Pages 94 - 97)

Page 98

1 It's titled Used Vehicle Purchase Procedures.
2          (Deposition Exhibit 3 was
3            marked.)
4 BY MS. LIU:
5     Q.   This was a document that was provided
6 to us by Mike Anderson Chevy --
7     A.   Yeah, yeah.
8     Q.   Are you --
9     A.   Yeah, yeah.
10    Q.   Are you familiar with this document?
11    A.   Yeah. Mm-hmm.
12    Q.   Okay. Can you just tell me generally
13 what this document is?
14    A.   Yes. (Reviewing document sotto voce.)
15          (Court reporter clarifi-
16            cation.)
17       THE WITNESS: Okay. Scroll down.
18 BY MS. LIU:
19    Q.   There's nothing else. There's just
20 this.
21    A.   Okay. So what's your question I
22 guess?
23    Q.   You're familiar with this document.
24 Correct?
25    A.   Yes.

Page 99

1     Q.   Okay. And, for the record, this is --
2 I've Bates labeled this MACC 318.
3     A.   I don't know what MACC 318 means.
4     Q.   I'm telling you I've identified this
5 document --
6     A.   Oh okay.
7     Q.   -- with that number just so it's
8 easier to find later.
9          Is this policy and procedure the
10 policy and procedure in place in 2016?
11    A.   It would have been since we had vAuto
12 I know because that -- we would have had a policy
13 similar to this if we didn't have vAuto then. And
14 if we had vAuto in 2016 -- actually, we had vAuto
15 in '16. So, yes, that would have been.
16    Q.   Okay. So I'm just going to read
17 through it, and tell me if I'm reading anything
18 wrong. The first paragraph says: Sales manager,
19 MGR, negotiates with seller on price of vehicle.
20          In 2016 who was the sales manager?
21    A.   That would be any one of the sales
22 managers or Jason would fall under that or the
23 general sales manager would fall under that.
24 Anyone that's authorized --
25    Q.   Do you remember --

Page 100

1     A.   -- to appraise or sell cars, you know,
2 sign off on a deal would be authorized with that.
3     Q.   Okay. Do you remember who your sales
4 managers or people who were authorized to do
5 appraisals were in 2016 to 2018?
6     A.   Oh, geez. I know one was Haz Mutawe.
7          (Court reporter clarifi-
8            cation.)
9       THE WITNESS: H-a-z. I think it's
10 H-a-z-e-m is the first name. Mutawe, M-u-t-a-w-e
11 is the last name.
12 BY MS. LIU:
13    Q.   Is that the only one you remember
14 besides Jason?
15    A.   Because I don't remember -- I don't --
16 I can get you the exact people.
17    Q.   And I don't want you to guess either.
18 This is not supposed to be a memory test. I'm
19 just trying to --
20    A.   Okay. Then I don't remember.
21    Q.   Okay.
22    A.   But I can get them. We have them in
23 the system, so I can get them.
24    Q.   On here it says: MGR confirms on
25 vAuto that price is within range to resell with a

Page 101

1 profit.
2     A.   Mm-hmm.
3     Q.   What does the MGR do on vAuto to
4 confirm that the price is within a range to resell
5 with a profit?
6     A.   Like, in our setups you put in that
7 vehicle and it tells you -- like, we have what we
8 want to make on average per vehicle, and then it
9 tells you what the book -- you know, what the back
10 value is and then what your average reconditioning
11 cost is. And if that falls within that guide-
12 line or that falls within that range, then you
13 move forward.
14    Q.   With respect to the average profit per
15 vehicle, is that a percentage number? Is that a
16 general couple --
17    A.   It's a dollar -- it's a dollar number.
18    Q.   And what is that dollar range, if it's
19 a range, or a particular dollar number?
20    A.   At that time --
21    Q.   In that time.
22    A.   Yes. Because it changes. I mean, it
23 changes on how many cars you're selling, if
24 business is up or down, the economy is good or
25 bad. Like, right now, honestly, it's high because

26 (Pages 98 - 101)

Page 102

1  you can get the money for it. Right?
2      Q.   Yeah. Let's talk about 2016 and 2018.
3      A.   I would -- I'm guessing, I'm going to
4  guess 3,000, 2500.
5      Q.   And within the range -- I know you
6  talked about the book price. But earlier you had
7  also said a couple other factors, market demand,
8  things like that. That still applies even with
9  this. Correct?
10     A.   Well, yeah, because it's -- you know,
11  if the bottom falls out of the economy, it's going
12  to change. You're going to lower that because
13  you're going to need to keep things moving.
14     Q.   Okay. I'm going to switch over to the
15  insurance claim portion. I'm going to represent
16  to you that this document I'm about to show you is
17  part of a set of documents that your office
18  provided us. And, for the record, I marked this
19  as MACC:POL 1 through 13. I'm going to scroll
20  through it.
21          If you have this in front of you,
22  Mr. Anderson, because you were e-mailed that link,
23  it might be helpful for you to have it so you can
24  scroll through it.
25          And it's labeled Proof of Loss as

Page 103

1  far as the document itself is called.
2          And I'm happy to share my screen
3  with you, too.
4      A.   No. It's too small. Proof of loss?
5      Q.   Correct.
6          MR. QUANDT: Just for the record,
7  Mike, that is something that -- that's part of the
8  documents that we sent you I think yesterday after
9  our discussion.
10         THE WITNESS: This is?
11         MR. QUANDT: Yeah.
12         THE WITNESS: I have to sign in to
13  Adobe to see it.
14         MR. QUANDT: It was a proof of loss
15  and there's an amended proof of loss.
16         THE WITNESS: Oh yeah. Yeah. I know
17  this.
18  BY MS. LIU:
19     Q.   Okay. So you're familiar with this
20  document?
21     A.   Yes. Yes.
22     Q.   Do you understand why this document
23  was filled out?
24     A.   Do I understand why it was filled out?
25     Q.   Right.

Page 104

1      A.   Yeah. Because it's a police report.
2      Q.   The sworn proof of loss with my
3  client's name on it, QBE --
4      A.   One more time.
5      Q.   What I'm showing you on the screen
6  right now, the sworn proof of loss, this portion
7  of it.
8      A.   Oh. Oh, I'm sorry, I was looking at
9  my screen.
10     Q.   That's okay.
11          Do you understand why this was
12  filled out?
13     A.   Yeah. I filed an insurance claim.
14     Q.   Right. And I just wanted to under-
15  stand your motivation of why Mike Anderson Chevy
16  filed an insurance claim.
17     A.   Because we were defrauded.
18     Q.   Okay. What is your understanding of
19  what this insurance policy -- and, for the
20  purposes of this deposition, I'm going to be
21  referring to the insurance policy at issue in this
22  lawsuit as the policy. What is your understanding
23  of what the policy covers?
24     A.   Theft. Deception. Forgery. Fraud.
25     Q.   Okay. So I'm reading through this and

Page 105

1  it says that you're certifying --
2          I, Mike Anderson, hereby certify that
3          Mike Anderson Chevrolet of Chicago
4          suffered direct loss of money,
5          securities, or property reflecting --
6          I'm sorry -- resulting from theft or
7          forgery as those terms are defined by
8          the policy by Jason Kolodzinski who
9          was employed by the insured as general
10         manager at the time of the theft or
11         forgery. The loss of money,
12         securities or property resulting from
13         theft or forgery totals over
14         $250,000 -- and in parentheses it
15         says under investigation -- USD.
16         Attached is a detailed statement of
17         loss, Attachment A, including any
18         recoveries and any other credits, and
19         the balance stated is the true net
20         loss from 3/7/16 to 1/15/18.
21          Is that accurate?
22     A.   Yes.
23     Q.   Okay. I wanted to talk to you a
24  little bit about the dates on here, the 3/7/16 to
25  1/15/18. What are those dates?

27 (Pages 102 - 105)

Page 106

1    A.   Those are his employment dates.
2    Q.   Okay.  So are you saying that anything
3  he did -- I just want to get an understanding of
4  your claim.  Are you saying that anything he did
5  during this period of time was a recoverable loss
6  under the policy?
7    A.   Am I saying anything he would have
8  done illegally or, like, forgery or fraud under
9  that?  Well, yeah.
10   Q.   Yeah, I'm just getting -- trying to
11  get a sense of timing.  Is there a particular
12  event that you are claiming gave rise to your
13  loss?  Are you saying the whole time he was there
14  everything he did was illegal?  What are you
15  saying?
16   A.   Oh, no, not everything he did was
17  illegal.  He started out good.
18   Q.   Okay.  So if he started off good, I
19  just want a little clarification on why we're
20  pinpointing from 3/7/16.
21   A.   Because that's when he worked there.
22   Q.   Okay.  So correct me if I'm wrong.
23  Your testimony today is that it's -- even though
24  he started off good, the reason why you put these
25  dates in here, it's just his dates of employment,

Page 107

1  not necessarily that everything he did from the
2  first day he stepped into Mike Anderson Chevrolet
3  to the last day he stepped out of Mike Anderson
4  Chevrolet was theft?
5    A.   Right.
6    Q.   Okay.  And then, scrolling down here,
7  this is your signature.  Correct?
8    A.   Yes.
9    Q.   And that says managing member?
10   A.   Yes.
11   Q.   And it looks like you signed this on
12  March 1, 2018.  Correct?
13   A.   If that's what -- I don't remember the
14  day.  But if that's what it says, yes.
15   Q.   Okay.  I'm going to bring your
16  attention to an amended proof of loss.
17       MR. QUANDT:  Counsel, just before we
18  do that, since we made reference to this document,
19  can we -- can we have this marked as an exhibit?
20       MS. LIU:  Yes, please.  I'm sorry, I
21  didn't realize I didn't mark it.
22       Sarah, do you know what number
23  we're on?
24       MR. QUANDT:  I think it's Number 4.
25       MS. LIU:  Four?  Court reporter, I'd

Page 108

1  like to mark what's been Bates as MACC:POL 1
2  through 13 as Exhibit 4.
3           (Deposition Exhibit 4 was
4            marked.)
5       MS. LIU:  I'm going to move on to what
6  I Bates MACC:POL 14 through 18 which I will mark
7  as Exhibit 5.
8           (Deposition Exhibit 5 was
9            marked.)
10  BY MS. LIU:
11   Q.   Have you seen this document before,
12  Mr. Anderson?
13   A.   Yes.
14   Q.   And for your reference, because I know
15  you have it in front of you also, it's amended
16  proof of loss in that folder.
17       And you've reviewed this document.
18  You're familiar with this document --
19   A.   Yes.
20   Q.   -- correct?
21   A.   Yes.
22   Q.   Okay.  I'm going to scroll down.  And
23  it looks like you had also signed this document.
24  Correct?
25   A.   Yes.

Page 109

1    Q.   And would it be accurate to say you
2  signed it on July 20, 2020?
3    A.   It would be whatever the date that --
4  where is the date on there?
5    Q.   The notary has a stamp and it says
6  sworn and subscribed before me --
7    A.   Well, yeah, because it would be I had
8  to sign it in front of a notary.
9    Q.   Right.  And, having reviewed this
10  document, is it your testimony today that the loss
11  that Mike Anderson Chevy is claiming is with
12  respect to the various -- various events that
13  are --
14   A.   Yes.
15   Q.   -- that are listed on this document?
16   A.   Yes.
17       MS. LIU:  Okay.  I want to go through
18  the operative complaint in this case.  So if you
19  don't mind me pulling up the amended complaint.
20       Court reporter, I'd like to mark
21  this as Exhibit 6 the amended complaint at law.
22           (Deposition Exhibit 6 was
23            marked.)
24  BY MS. LIU:
25   Q.   Do you have that in front of you?

28 (Pages 106 - 109)

Page 110

1    A.   You're talking to me?
2    Q.   Yes.
3    A.   You want me to pull that up on my
4  computer?
5    Q.   If you can see it on here, I'm happy
6  to scroll through, too.
7    A.   Whatever is quicker.
8    Q.   Okay.  Are you familiar with this
9  document?
10   A.   Yes.
11   Q.   Okay.  And, going through here, if you
12 go in to Paragraph 6 it says:  Plaintiff has made
13 demand for coverage under the QBE policy for the
14 direct financial losses suffered as a result of
15 the employee theft covered under the QBE policy.
16         Do you know what direct financial
17 losses mean?
18   A.   That it hit your bottom line, it hit
19 the -- all the stockholders' pockets basically.
20   Q.   And have you seen what's being alleged
21 in Count I of this complaint?  Specifically, there
22 are allegations regarding direct mail advertising
23 in the amount of $191,000 with respect to a
24 company called J&N --
25   A.   Yes.

Page 111

1    Q.   -- radio advertising for the amount of
2  75,000 with respect to a company called TKC --
3    A.   Mm-hmm.
4    Q.   -- $131,000 with respect to a purchase
5  of used cars from Epic.  And specifically I
6  believe there's 91 cars that are at issue here.
7    A.   Mm-hmm.
8    Q.   The purchase of two cars from a vendor
9  named Sir Hooptie for $5800.
10   A.   Mm-hmm.
11   Q.   And two additional things that are
12 alleged on here, a $176,000 purchase in inflated
13 repair charges with a company called AC.  Do you
14 see that?
15   A.   Mm-hmm.  Mm-hmm.
16   Q.   A real quick question on AC.  I've
17 seen AC Kustoms --
18   A.   That's it.
19   Q.   -- is that -- that's what you're
20 referring to?
21   A.   Yep.
22   Q.   Is it AC Kustoms with a K?
23   A.   I don't know.
24   Q.   The reason -- and just to give you a
25 little background, the reason I ask is because I

Page 112

1  see AC on here.  I don't see the full name.  And
2  it may be simply that we've been misspelling this.
3  I've seen AC Kustoms with a C and with a K.  I can
4  represent to you that the subpoenas that your
5  attorneys issued in this file were to AC Kustoms
6  with a K.  I just want to make sure that we are
7  all --
8    A.   I'll tell you right now.  Hold on.
9  You can move on, continue on, and I'll look it up.
10 I'm just logging in.
11   Q.   And the last allegation here has to do
12 with an appraisal for approximately $10,000 more
13 than --
14   A.   Yeah.
15   Q.   -- a car was purportedly worth for a
16 trade-in that Mr. Kolodzinski effectuated.  Is
17 that right?
18   A.   Right.  He did his own.  You're not
19 allowed to do your own transaction.  He did his
20 own transaction.
21   Q.   So would it be accurate that these are
22 the allegations at issue and the basis for which
23 you are seeking, and by you I mean Mike Anderson
24 Chevy --
25   A.   Yes.

Page 113

1    Q.   -- approximately $588,000?
2    A.   Yes.
3    Q.   Okay.  I wanted to bring your
4  attention to the second amended complaint.  And
5  this I would like to mark as Exhibit -- am I on 7?
6  Exhibit 7.
7         (Deposition Exhibit 7 was
8          marked.)
9  BY MS. LIU:
10   Q.   Are you familiar with this document?
11        MR. QUANDT:  For the record, Mike,
12 that's a document that Ted and I sent to you
13 yesterday after our --
14        THE WITNESS:  Yes --
15        MR. QUANDT:  -- conference yesterday.
16        THE WITNESS:  -- I am.
17 BY MS. LIU:
18   Q.   And you understand that currently this
19 document is being proposed by the court but it's
20 not the actual operative complaint on file yet
21 because your attorneys have not yet filed leave to
22 file it?
23   A.   Right.
24   Q.   Okay.  And --
25        MR. QUANDT:  Just for the record,

29 (Pages 110 - 113)

Page 114

1  counsel, we have filed a motion for leave to file
2  a second amended complaint.
3       MS. LIU:  Right.
4       MR. QUANDT:  The court -- the court
5  has yet to rule on it.
6       MS. LIU:  Correct.  I said it was
7  pending.  So I think we're all on the same page.
8       MR. QUANDT:  I'm sorry, I misunder-
9  stood you.
10      MS. LIU:  Yep.
11 BY MS. LIU:
12     Q.  And do you understand the reason why
13 this second amended complaint was filed?
14     A.  I don't understand legal when it gets
15 to this level.
16     Q.  That's totally fine --
17     A.  It's something that we were -- I
18 probably would have had a conversation about it.
19     Q.  And I'm not asking for any -- any
20 details of specific conversations between you and
21 your attorney.  I'm just -- I'm just curious.  In
22 this second amended complaint, and I am sure your
23 counsel will correct me if I'm mischaracterizing
24 this, but there are three additional defendants
25 that are pled as defendants here.  In the

Page 115

1  operative complaint, the one that is currently
2  controlling this litigation, the complaint is only
3  filed against my client, QBE Insurance
4  Corporation.
5       A.  Right.
6       Q.  This one proposes to also sue
7  Mr. Kolodzinski, J&N Marketing and TKC
8  Entertainment.
9       A.  Right.
10      Q.  I'd like to understand why --
11      A.  I thought it was a total of three plus
12 the insurance company.
13      Q.  Right.  In addition.
14          But I'd like to understand why
15 these three additional purported defendants are
16 being sued.
17      MR. QUANDT:  Well, let me note an
18 objection for the record here.  That's a deter-
19 mination made by counsel.  QBE presently has not
20 denied coverage but has not accepted coverage.
21      MS. LIU:  Eric, if you're going to
22 make your objection, can you just make it?  Don't
23 give a speaking objection, please.
24      MR. QUANDT:  Well, well, yes.  That
25 seeks a legal conclusion.

Page 116

1       MS. LIU:  Okay.
2       MR. QUANDT:  Okay?
3  BY MS. LIU:
4       Q.  Mr. Anderson, back to my question.  Is
5  there a reason that Mike Anderson is suing Jason
6  Kolodzinski -- or attempting to sue Jason
7  Kolodzinski, J&N Marketing, TKC Entertainment most
8  recently?
9       MR. QUANDT:  Same objection.
10 BY MS. LIU:
11      Q.  And you can answer the question.
12      A.  I mean, I know he explained it to me.
13 But I can't remember exactly why.
14      Q.  Okay.
15      A.  And I don't understand the law part of
16 it.
17          And it's AC Kustoms with a K,
18 K-u-s-t-o-m-s.
19      Q.  Okay.
20      A.  But we also had it in the system as
21 AC Customs with a C and it looks like it was
22 changed, like a new record was added.  So it was
23 probably whoever thought that customs with a C, I
24 don't know -- I mean, with a K.
25      Q.  And I read through that list earlier

Page 117

1  of the -- a component of the claim at issue.  And
2  there are two parties, two third parties, on here
3  that I don't see in this list of proposed
4  defendants, and they are Epic Motorsports, LLC and
5  also Sir Hooptie.  Do you know why you're choosing
6  not to sue them?
7       MR. QUANDT:  Same objection.  Calls
8  for a legal conclusion.
9  BY MS. LIU:
10      Q.  Mike, you can answer, if you know.
11      A.  Do I know why?  Whatever he just said.
12      Q.  Right.  I'm sorry?
13      A.  Whatever he just said.
14      Q.  He objected, which means you -- he can
15 place his objection on the record.  Whether or not
16 it's an appropriate objection is something we
17 would consider later on.  But if you understand
18 the question as to why you didn't sue the
19 additional third parties at issue, Epic,
20 Sir Hooptie, and AC Kustoms, you can answer.
21      A.  No.
22      Q.  Okay.  Actually, sorry, I'm going to
23 go back to this.  This second amended complaint,
24 the proposed second amended complaint, does this
25 reflect Mike Anderson's current claim under the

30 (Pages 114 - 117)

Page 118

1 policy? The allegations here reflect the current
2 claim?
3    A.  Yes.  It's the same thing.
4    Q.  Okay.  So I wanted to run through each
5 of these.  The $191,000 under Paragraph 12(a) it
6 says:
7       Kolodzinski claimed to have used a
8       company called J&N for mail
9       advertising.  Mike Anderson Chevy was
10      billed $191,000, but no mail was sent.
11      The owner of a graphic design firm
12      used by J&N said that no work was
13      actually done.  Kolodzinski failed to
14      submit the materials to Mike Anderson
15      for review prior to mailing, contrary
16      to his instructions.  He was told to
17      stop but continued to submit invoices
18      that were paid by the dealership
19      without Mike Anderson's knowledge or
20      approval.  He did not submit the
21      proper receipts from the USPS for the
22      alleged mailings.  The dealership was
23      told that the one purported USPS
24      receipt Kolodzinski submitted was
25      fraudulent.

Page 119

1       I want to run through the basis
2 for this allegation with respect to the second
3 sentence:  Mike Anderson Chevy was billed
4 $191,000, but no mail was sent.  What's the basis
5 for that contention?
6    A.  We never got anything -- we never got
7 anything back from the bill to pay.  Normally
8 you -- like we're going to do a mail -- they'll
9 give you the mailer, they'll give the names,
10 they'll give you the receipt from the post office,
11 they'll give you back the -- the names, the change
12 of address.  They give you everything immediately,
13 I mean like a day or two.  I mean, if you call,
14 they probably have it the same day.  But you
15 usually don't even have to call, they just do it.
16    Q.  So my understanding is what you're
17 saying is that's like industry practice for you to
18 get all of those documents --
19    A.  Oh, I think it -- and I'm not an
20 attorney, but I think that's legal that you have
21 to for a mailer provide that.  I know for USPS I
22 know when you do a mailer you have to have, like,
23 the NCOA thing filled out.  You can't just go dump
24 10,000 envelopes in a mailbox.
25    Q.  Right.  So your basis for this is that

Page 120

1 J&N did not provide you with that information.
2 Correct?
3    A.  No.  Never.  Well, they provided us
4 with a fraud one because the lady that I talked to
5 told me she's the one that created a mailer and
6 then after the fact found out that it was fraud --
7 or were going to be used for fraud or whatever and
8 that's when she got so upset and then happened
9 coincidentally do a mailer for one of my dad's
10 stores who has the same name and said, "I need to
11 tell you something.  You know, J&N had me do this
12 and then he goes, 'That's the easiest money I ever
13 made.'  He goes, you know, 'Now the owner wants a
14 copy of the mailer.'"  So, you know, that's why he
15 had to create the mailer.
16       And she goes -- I just can't
17 remember if she said -- I was in the -- I was in
18 the back of an Uber in Houston.  I was on the
19 phone with her.  She says -- I can't remember if
20 she said "I couldn't sleep" or "I was stick to my
21 stomach," you know.  But it was done and it was
22 over and she had already done it.  And she felt
23 like, "I had to do something when I saw that name
24 and it was like I had to just tell them what
25 happened."

Page 121

1       And that's when my dad's general
2 manager called me and said, hey, this is -- you
3 might want to look into this.  And that's how I
4 got in touch with that lady.
5    Q.  When you say that lady, do you
6 remember her name?
7    A.  I knew you were going to ask that.
8 No, not -- not now that you're asking me, no.  But
9 I could find it.
10    Q.  Does her first name sound like Alicia?
11    A.  Yeah, yeah, I think so.
12    Q.  Okay.  And you said she said she was
13 asked to do work with respect to a mailer that
14 never went out?  Is that -- am I understanding you
15 correctly?
16    A.  She didn't -- if I remember correctly,
17 she did not know ahead of time that that was fraud
18 until, like, the very end and then found out that,
19 you know, it was fraud.
20    Q.  When you say --
21    A.  After the fact.
22    Q.  When you say that was fraud, do you
23 mean she was -- I'm just trying to clarify.  Was
24 she asked to do work for the mailer that you are
25 contending did not go out?

31 (Pages 118 - 121)

1    A.   Mailers, yes.  But she was asked to --
2  she was asked to produce a mailer.  And then when
3  it was all said and done, evidently she knew this
4  guy or something, the J&N guy, and they were
5  friendly conversation or e-mail or whatever,
6  because "That's been the easiest money I've ever
7  made" or something like that or "That's the
8  easiest money I've ever made."
9    Q.   So he made a comment about that being
10 an easy deal or something like that?
11   A.   Oh right.  But it never went out.  I
12 think he basically told her everything.  She told
13 me like everything he said, that, you know, based
14 -- I think he said that they split the money or
15 whatever the case may be or.
16   Q.   So your -- I just want to understand
17 the facts a little bit more.
18   A.   This is foggy because my dad had been
19 diagnosed with stage four esophageal cancer and I
20 was in Houston when I got that phone call in the
21 back of the car going to the hospital.  So there
22 was a lot going through my mind at that time.  And
23 I'm not looking for a scapegoat.  But I remember
24 her telling me that.  And she was so upset because
25 of what had happened, when she saw the name, she

1  reached out to Bill Thompson, which was the
2  general manager basically over all my dad's
3  stores.
4          And he called me and said here's
5  this lady's information, she said she'd be willing
6  to tell you what this guy told her.
7          And I called and left a message.
8  And I believe she called me back when I was -- but
9  not at that time I wouldn't have called somebody,
10 you know.  So she would have been having to call
11 me back at that time.
12   Q.   Sure.  But did she expressly tell you
13 that someone at J&N told her no work was actually
14 done?
15   A.   I believe so, yes.
16   Q.   Okay.  Is that memorialized anywhere
17 other than a phone call?
18   A.   To me?
19   Q.   Yes.  Or if you -- to anyone.  Do you
20 have --
21   A.   You know, she may have sent an
22 e-mail.  Maybe she sent an e-mail.  To me it was a
23 phone call.  We never had an e-mail communication.
24 But to her it might have been an e-mail.  I don't
25 remember.

1    Q.   Okay.
2    A.   I could tell you where I was at.  I
3  could tell you where I was at in Houston.  There
4  was so much racing through my mind at the time
5  like.
6    Q.   It's okay.  I understand.  And I'm not
7  trying to ask you to speculate or guess.  What you
8  remember is what you remember.
9          Going back to this allegation, it
10 says also in that second sentence that Mike
11 Anderson Chevy was billed $191,000 but no mail was
12 sent.  Were the services you were billed for, the
13 $191,000 that are at issue right now, exclusively
14 for mailers?
15   A.   Yeah.
16   Q.   Okay.  Further down in this paragraph,
17 it talks about Kolodzinski being told to stop but
18 continued to submit invoices that were paid
19 through the dealership without Mike Anderson's
20 knowledge or approval.
21   A.   Yes.
22   Q.   I understand, through our earlier
23 conversation, that as a matter of procedure or
24 protocol your approval is needed on anything out
25 of the ordinary.  Would you agree --

1    A.   Mm-hmm.
2    Q.   -- with that statement?
3    A.   Mm-hmm.  Yeah.
4    Q.   And he broke protocol, based on these
5  allegations, by not obtaining your prior knowledge
6  or approval.  Correct?
7    A.   Yes.
8    Q.   Did he do anything illegal by not
9  obtaining your prior knowledge or approval?
10   A.   He --
11          (Simultaneous speaking.)
12        MR. QUANDT:  Wait, wait, wait, Mike.
13        Objection to the form of the
14 question.  Asks for a legal conclusion.  I mean,
15 he's not an attorney.  He doesn't know of crime,
16 but.
17        MS. LIU:  Yeah, again, I appreciate
18 your objection.  I understand.
19 BY MS. LIU:
20   Q.   But I just in the sake of time because
21 I do know we're on a little bit of a crunch, Mike,
22 if you understand the question --
23   A.   A big crunch.
24          Do I understand the question
25 meaning -- illegal meaning that he didn't follow

32 (Pages 122 - 125)

1  my protocol?
2      Q.   Correct.
3      A.   I'm not a senator.  I can't pass a
4  law.
5      Q.   Okay.
6      A.   So.
7      Q.   Let's go on to the second one.  Radio
8  advertising.
9        Kolodzinski claims to place radio ads
10        through a company TKC in the amount
11        of 75,000.  TKC, despite requests,
12        refused to submit proof of running
13        the ads.  To pay TKC invoices,
14        Kolodzinski, instead of mailing the
15        checks, gave the checks to someone who
16        picked them up at the dealership.
17      A.   Right.
18      Q.   The checks were cashed at a nearby
19  currency exchange.
20          I want to break that down and ask
21  you about the allegations made here.  So the
22  second sentence says:  TKC, despite requests,
23  refused to submit proof of running the ads.  Is a
24  refusal to submit proof of running an
25  advertisement, is that conclusory evidence that

1  the ads were not run?
2      A.   Oh, yeah, absolutely, because you
3  normally get -- so when I found out that was going
4  on -- so I told you my dad was diagnosed with
5  cancer.  I at that time was gone every other week
6  for two and a half years flying back and forth to
7  Houston taking him down there.  And when I would
8  normally see this ahead of time, it was after the
9  fact.  Right?
10          And I said, no, that didn't happen
11  because they have to show you the TRPs when it ran
12  for auditing purposes.  So I had Barbara Flores,
13  which is the controller, call them repeatedly.
14  And they finally hung up on her and quit calling
15  her back and I believe said to her, "They ran.
16  They ran.  Quit calling me," and hung up.
17          And I said, no, you have to -- they
18  have to provide it.  If you -- like, on Comcast if
19  you do any sort of media advertising, they have to
20  show proof.  And it's -- I believe it's audited on
21  their part that that ad actually ran, that TV
22  commercial actually ran.
23      Q.   Is there any obligation -- and I
24  understand what you were saying earlier that there
25  may be a requirement for auditing purposes on

1  their end, to have that, quote, proof.  But is
2  there any requirement, whether contractual or
3  anything like that, that any vendor provide you
4  with any -- and I'm quoting the complaint here --
5  proof of running the ads?
6      A.   You have to, yeah.
7      Q.   Okay.  And then the next sentence
8  says:  To pay TKC invoices, Kolodzinski, instead
9  of mailing the checks, gave the checks to someone
10  who picked them up at the dealership.  Do you see
11  that?
12      A.   Yes.
13      Q.   What is the significance -- and I
14  guess to -- let me strike that and rephrase that.
15          What was the theft portion of this,
16  this allegation --
17      A.   Well, I see two.  One is the ads never
18  ran.  Two, he broke the policy that you do not
19  hand out checks to a customer -- I'm sorry, to a
20  vendor, that you -- everything gets mailed.
21          But he would throw his weight
22  around, "Well, I'm the general manager.  The guy
23  is downstairs.  Give me the check."
24      Q.   So he broke policy, and that's --
25      A.   Right.

1      Q.   -- the basis for this.  Okay.
2          So let's go on to --
3      A.   And the fact that it didn't run.  I
4  mean, you can't even show proof that it ran.
5  Never in my life do you never get in the bill
6  alone all the days and times down to the second of
7  when it ran.
8      Q.   So when you're saying proof, you're
9  talking about at least the days, the times, just
10  something that notates when it ran?
11      A.   They have to -- I believe -- I believe
12  there's a law or something, again I'm not an
13  attorney, that they have to be able to provide you
14  the date, the time down to the second of when that
15  ad and how long it ran for.  Like, if it was a
16  7 second, 13 second, 15 second commercial they
17  have to everything.  Even if they didn't bill you,
18  I think they still have to show it.
19      Q.   Okay.  Let's move on to 12(c),
20  purchase of used cars from Epic.
21        Kolodzinski purchased 91 cars from a
22        company called Epic from March 2016
23        through January 2018.  These cars were
24        produced [sic] at prices significantly
25        higher than market, and many had

1    hidden damages that led to and caused
2    many customer complaints. Losses are
3    estimated at approximately $131,000.
4    Kolodzinski was told to stop
5    purchasing the cars from Epic in
6    November [sic] 2017 but continued to
7    do so surreptitiously until he was
8    terminated in January 2018. A text
9    message from Kolodzinski indicated
10   that he did it because he needed the
11   money, which suggests that a kickback
12   was involved.
13       A.   Yeah. He inadvertently texted my dad
14   and said to this guy -- it probably is a voice
15   text or something -- saying, "Oh, come on, Rory.
16   You know I buy cars from you for money," which
17   obviously clear as day I'm buying them from you
18   because I get the money, you're giving me the
19   money for buying the cars.
20       Q.   So let's go back to the allegation.
21   The $131,000 was effected by 91 cars from Epic.
22   What fee basis -- and I know you just talked about
23   the text messages -- and, unless I'm mistaken, I
24   assume is part of the basis -- for contending that
25   this is theft under the policy.

1        A.   Because they were way over value.
2    Those are cars that were just average cars that
3    you wouldn't spend that kind of money on that were
4    significantly more.
5        Q.   And I just want to go back to our
6    original conversation. I know it's not always
7    exactly so black and white on what you would spend
8    money on, there are other factors that play.
9    What's the basis for saying that you would
10   otherwise not spend that kind of money on these
11   cars?
12       A.   Because they weren't like -- I told
13   you earlier -- actually, funny enough, like I told
14   you earlier, that Malibu for 10,000 miles at
15   3 years old as an example that you would step up
16   into and spend more on it because it was a one-of-
17   a-kind car you couldn't shop, right, you couldn't
18   get it anywhere else.
19       Q.   Right.
20       A.   These were not -- there was nothing
21   special about any of these cars. They weren't low
22   miles. They weren't like cream-puff-type cars.
23   They were just average cars. You would never in
24   good practice spend that kind of money. It was
25   like foolishness basically. You don't do that.

1    That's just common business practice.
2        Q.   So it was just like bad business
3    decisions?
4        A.   Oh, it wasn't even bad business. It
5    was like intentional. It was like you don't --
6    I mean. That wasn't a mistake. You purposely did
7    that.
8        Q.   So let's go on to 12(d), the purchase
9    of parts from Sir Hooptie.
10       Kolodzinski caused the dealership to
11   lose $5800 for two cars purchased from
12   Sir Hooptie and associated repair and
13   accessory charges. Kolodzinski had
14   been told not to deal with this
15   company.
16           What's the basis on the loss
17   referenced, the $5800 loss referenced here?
18       A.   What we lost on the car after we
19   bought it.
20       Q.   You lost what?
21       A.   That's the money we lost on the cars
22   to sell them after we bought them.
23       Q.   When you say the amount of money you
24   lost on the car, you're talking about, like,
25   profit loss?

1        A.   Actually, net loss.
2            And then I believe he owned part of
3    that company we found out or owned that company or
4    something.
5        Q.   On that note, Sir Hooptie, do you know
6    anything about that company? Because that's a
7    company that both sides here have had trouble
8    serving.
9        A.   That was a company that I believe it
10   was an LLC. I remember it struck me as being
11   weird with the name and, after a lot of digging,
12   found out that he was a part owner or owners or
13   something of that company. It was like in
14   St. Louis or someplace. The whole thing seemed
15   real sketchy.
16           So absolutely not, no, you're not
17   to buy anything else from there.
18           MR. QUANDT: And, just for the record,
19   Mr. Anderson, again when you refer to --
20           THE WITNESS: Jason. Jason. Jason.
21           MR. QUANDT: Referring to Jason.
22   Thank you.
23   BY MS. LIU:
24       Q.   Both of the allegations against -- or
25   both of the allegations regarding Epic and

Page 134

1  regarding Sir Hooptie pertained to used cars. And
2  I just want to clarify. Were these cars bought at
3  auction or were these cars --
4      A.  Okay. So he was buying the cars from
5  them. And I'm like don't -- why are we buying
6  cars from a used car lot? No. No. Don't buy any
7  more cars from them. And then he still did.
8  Again, I said do not do it again. I think I even
9  sent him an e-mail said do not buy another car
10  period. And then all of a sudden he starts buying
11  the exact same type of cars but through the
12  auction. And I was like this is -- this is odd
13  because these are the same cars that are sitting
14  around that aren't selling.
15          And then it hit me one day. I
16  thought, I wonder if he's using the auction as a
17  middleman from, you know, this Epic and Epic is
18  just taking -- he's buying the car. And that's
19  exactly what it was because we found through title
20  searches where those cars actually came from Epic.
21  So he was taking the cars later on because he
22  wasn't allowed to buy them there and having Epic
23  run it through the auction and then he would buy
24  the car. And even after he was told to stop
25  buying cars at the auction, and then I said you

Page 135

1  are not allowed to buy another used car, he went
2  out and did it anyway.
3          And I had a feeling something was
4  up. And we tried to get his name off the auction
5  list, like the authorization list, but it took
6  like three days or something. And, in the
7  interim, he bought -- I mean, it was stupid, like
8  cars that needed work and that would not fit
9  anything that we would sell or buy or just blatant
10  like purposeful like I'm going to get you, almost
11  like a slap in the face I felt like at the end.
12      Q.  A couple questions for you, and this
13  is just because you are well versed in the auto
14  industry and I am not. When you said, "Why are
15  you buying directly from a used car lot? We don't
16  do that," what do you mean you don't do that?
17  It's just not something that --
18      A.  Well, it's funny that you ask me.
19  Like I told you earlier, you don't -- would buy
20  from an auction. We'd get a car that was an
21  off-lease car, right, before you get a car that
22  another dealer took in that generally doesn't sell
23  those kind of cars or do well with them. Where do
24  you think this guy is getting the cars? This guy
25  is getting the cars probably from the auction

Page 136

1  because he doesn't have new cars, and new cars are
2  generally where you get your trade-ins from.
3      Q.  Okay.
4      A.  Your better trade-ins.
5      Q.  So you said that you had told Jason
6  that to stop doing this, it doesn't make sense,
7  it's I think you said beyond bad business
8  decisions, it was intentional, and it --
9      A.  I didn't tell him -- I didn't tell him
10  it was intentional. When it was -- when he bought
11  those last five or whatever they were after he was
12  told directly not to and after we tried to get his
13  name off but it took three days or whatever to get
14  his name off the approved authorized auction
15  thing, you know.
16      Q.  Mm-hmm.
17      A.  The purchase -- authorized purchase
18  agent or whatever at the auction. And he
19  purposely bought those cars. It was like a poke
20  in the eyes. That's what I felt. I felt so
21  betrayed, so just slapped in the face basically.
22      Q.  Well, so I'm looking at this Epic
23  paragraph here, this subparagraph C, and it talks
24  about March 2016 through January 2018. And that's
25  a decent amount of time.

Page 137

1      A.  Mm-hmm.
2      Q.  At what point, and I know it's going
3  to be an approximation, at what point did you tell
4  Jason quit that, stop buying cars directly from
5  Epic?
6      A.  When we started to get -- it would
7  have been -- it always seemed high. But we were
8  selling them. But then we had a technician
9  strike, and maybe a month or two before that
10  something else happened, and then they started
11  kind of piling up, an aging issue, and he was
12  still buying them. Slow down, slow down, slow
13  down. You know, you've got more cars than you
14  need.
15          That's when he said, "I want to
16  sell 100 a month." I said you don't need a 150 a
17  month. You don't need 150 cars to sell a month,
18  you need 100.
19      Q.  So at that point in time do you know
20  approximately was that 2017, was that closer --
21      A.  That was 2017 when I told him that.
22      Q.  Like late 2017 or early 2018?
23      A.  No. I would say -- because I remember
24  we were outside and it was warm and I remember
25  standing on the corner of Lockwood and Irving

35 (Pages 134 - 137)

Page 138

1  looking at those cars.  I remember seeing a puddle
2  of water.  So it must have been rainy season or it
3  had rained or something.  Maybe May or June.  I
4  mean, I don't remember.  It wasn't hot I know --
5      Q.   So it was like mid-2017 would be
6  accurate?
7      A.   Yeah.
8      Q.   And then he continued to buy cars from
9  Epic.  Is that right?
10     A.   Mm-hmm.
11     Q.   And did you tell him to stop it again?
12     A.   Yes.  And then I told him in an e-mail
13  no more, stop.  And then I believe I told the
14  controller that, too, to make sure.
15          And then that's when we started
16  getting these same kind of cars at the auction.
17  And I'm like why is he buying these same cars?
18  Why are you buying these same cars?  These are the
19  cars you were buying before.  They're not selling.
20  They're sitting around.  They're higher mileage.
21  There's nothing special about these cars.  And
22  then I remember it hit me, I'm like I wonder if
23  he's using us as a middleman.  And then, you
24  know --
25     Q.   So the first -- the first inkling that

Page 139

1  you had that he was being dishonest was later on?
2  Am I hearing you correctly?
3      A.   Yes.  Because this was a guy that
4  was -- that worked at Bill Jacobs Chevrolet in
5  Joliet for his entire life basically.  And I knew
6  him before he worked for us.
7      Q.   Okay.
8      A.   And he was -- our Chevrolet-area-
9  sales-manager-that-would-come-in's husband was the
10  general manager of Bill Jacobs Chevrolet.  And
11  then I knew them both.  And they both raved about
12  him, you know.  Brad Wise was the general
13  manager's name.  Oh, I raised him -- he didn't
14  really raise him, but, you know, he was using that
15  as a loose statement -- and he's a great kid.  He
16  started out, I forgot, what, like washing cars or
17  something and that he worked his way up.  And
18  anyway, whatever.  But he came highly recommended
19  by them, too.
20          And I didn't -- I couldn't -- I was
21  hearing rumors.  People were bringing things to
22  my -- you know, bringing this to my attention.
23  And I couldn't believe in my heart that this guy
24  would do this.  I just -- there was no way it made
25  sense.  It was how could this guy that was so

Page 140

1  highly -- that I've known.  No.  No.  No.  These
2  guys are -- these guys are upset because they
3  probably got in trouble or something, you know, or
4  he doesn't like them, they don't like being held
5  accountable.
6          And then it got to the point where
7  it was so evident that it didn't matter what I
8  believed in my heart.  It was evident that he was
9  doing was stealing, theft basically, what I
10  would --
11     Q.   But --
12     A.   -- call theft by deception.
13     Q.   At what point did you realize that it
14  was -- or did you believe that it was, and I quote
15  you, theft by deception?
16     A.   When it was -- when he started buying
17  the same type of vehicles but they were coming
18  from the auction at way over book value.  And it
19  was like something went off and it was like -- and
20  then -- because even that text to my dad, even
21  though it was black and white, yeah, he's
22  stealing, I'm like I've known this guy for a
23  while, he wouldn't, you know, no, no, you know.
24  That would be like your wife cheating or your
25  husband cheating on you and your neighbor telling

Page 141

1  you that something -- you know, this guy is coming
2  over every day and you're like no, no, no, no.
3  You just, you don't believe it.  I couldn't wrap
4  my head around somebody like that actually doing
5  that to me.
6      Q.   And then at what point, though?  Like,
7  was it around that mid-2017 date or was it, like,
8  earlier?
9      A.   That was -- that was me putting more
10  safeguards to make sure it wasn't -- or to try to
11  catch it if it was basically.
12     Q.   Okay.  And at what point, though?
13  Like, I'm just trying to get an understanding of,
14  like, okay, we think he's stealing now.  Was there
15  a point in time that that happened?
16     A.   It was during the strike, I think,
17  when I really thought maybe some of this stuff is
18  true.  Where there's smoke there's fire.  And
19  that's when I started looking into it, like,
20  we're overpaying for everything he does.  And
21  these aren't bad business decisions, this is
22  intentional.
23     Q.   Yeah.  And was the strike --
24     A.   It's one thing if he screwed up and
25  he's like, oh, I bought too big of an air

36 (Pages 138 - 141)

Page 142

1 conditioner or something or I paid too much, I
2 should have done -- this was intentional. This
3 was --
4    Q.   During the strike, like, was that --
5 was it January time frame or when was the strike?
6    A.   No. No. The strike would have been
7 August. It would have been in August.
8    Q.   Okay. August 2017. Yeah. And I'm
9 just trying to get an understanding of, like, what
10 transpired because --
11    A.   Well, because he was using that other
12 company to safety check the cars and stuff. And
13 it was like more than we pay our own people. This
14 is like more than we even charge ourselves. Why?
15 This doesn't make sense. He goes, oh, he was
16 doing it as a favor because he's so backed up
17 because all the dealers are coming in. I said,
18 okay, I could see where there would be a premium
19 because of that. But then I was, like, no, this
20 really isn't sounding right.
21        And the more I got involved, the
22 more I started looking, the more questions I
23 started asking, the more distant he got.
24        And I remember one morning I
25 purposely came in there because he thought I was

Page 143

1 going to Merrillville. And I didn't see him and I
2 text him, "Where are you?"
3        He goes, "I'm at the store."
4        I said, "Where?"
5        And he goes, "In my office."
6        And I said, "No, you're not. I'm
7 standing here."
8        He goes, "Oh, I ran to Starbucks."
9        I'm like, "You're at a Starbucks?"
10 In the two seconds that took, you know, if I sent
11 another text to him or thought that.
12        But then it was like I tried -- the
13 more I got involved, the closer I looked, the more
14 questions I asked, the more things I pulled, the
15 more he found out. Because he would always
16 circumvent.
17        Even, like, the way you purchased
18 vehicles, he had like a bucket in his office. I
19 said, "Those don't go there. They go upstairs.
20 You don't fill that out. That gets filled out
21 upstairs." And most of the stuff gets printed.
22 You don't do it by hand.
23        And he was like, "Oh, you know, I
24 forgot you're advanced like that."
25        I'm like, no, everything is done

Page 144

1 through the system. Everything is done through
2 the system. It's all trackable and it's all time
3 stamped. You can see everything, you know,
4 everything. We don't do, you know, handwritten
5 notes. We don't do hand -- you know, everything
6 is noted in the system because it's time stamped,
7 you can't change it, you can't delete it.
8    Q.   I want to go back to this paragraph
9 because I want to get through the allegations.
10 But on to E, I think you alluded to it earlier,
11 the allegation is inflated repair charges.
12    Kolodzinski sent cars to a company
13    called AC -- now we know it's
14    AC Kustoms with a K -- and incurred
15    inflated and sometimes unnecessary
16    repair charges of approximately
17    $176,000. These charges were incurred
18    even though the dealership has its own
19    mechanics on staff. Some of the
20    repair charges were for cars purchased
21    from AC and Sir Hooptie.
22        I want to break that down. So with
23 respect to mechanics on staff versus when you send
24 something out, can you tell me how that works in
25 your dealership? At what point --

Page 145

1    A.   Yeah, you don't ever want -- you want
2 to do everything you can in-house.
3    Q.   Why?
4    A.   Why?
5    Q.   Yeah.
6    A.   So you can --
7    Q.   Because what?
8    A.   You keep the money in house.
9    Q.   So it's cheaper really to do it
10 in-house --
11    A.   Well, you're making money -- I mean,
12 you know, you're making money doing it in-house
13 and saving money at the same time I guess.
14    Q.   Okay. When -- so let me -- let me
15 back up. Were these -- the cars that were sent to
16 AC Kustoms, were these cars that were used cars?
17    A.   Mm-hmm.
18    Q.   Okay. And they were generally used
19 cars that you generally got from trade-in or
20 auction. Correct?
21    A.   Yeah, they would have been.
22    Q.   Okay. So coming back to what you were
23 saying earlier in the process, and this is why I
24 was asking the background information, when you
25 have a used car that comes into your lot, I

Page 146

1 believe you said your services department goes
2 there and checks all the boxes and makes sure --
3      A.   Mm-hmm.
4      Q.   -- you know, the service things and
5 whatever.  And I know you had said you work with
6 vendors to get rid of some of that light aesthetic
7 damage, the facelifts.  What kind of work would
8 you do in-house?
9      A.   Everything we can.
10      Q.   Like --
11      A.   Everything mechanical, anything
12 mechanical, electrical, mechanical.  We wouldn't
13 do any body repairs, anything related to paint.
14      Q.   Everything under the hood?  Is that
15 accurate?
16      A.   Everything under the hood we would do.
17      Q.   Okay.  So everything under the hood.
18           And I understand from your
19 references earlier that there have been strikes
20 and various things that sometimes happen in an
21 average car dealership that might influence the
22 ability for you to fix things under the hood
23 in-house.  Is that accurate?
24      A.   Mm-hmm.  Mm-hmm.
25      Q.   And are there times where you would

Page 147

1 refer things out of your dealership?
2      A.   Are there times I would what?
3      Q.   Refer repairs, under-the-hood repairs,
4 out of your dealership.
5      A.   We -- if we did, it would be because
6 it was, you know, an oddball car.  Not what we
7 would call a homemade -- like maybe an Audi or
8 something that needed a special tech computer
9 thing to program the key or something that maybe
10 at Chrysler you had to have a special programming
11 device to, you know, clear a code or something.
12      Q.   Okay.
13      A.   But it wouldn't be to a guy -- it
14 wouldn't be to a guy like this.  It would be to a
15 franchise dealer that would have access to that
16 stuff.
17      Q.   Well, let's say a Chevy Malibu because
18 I know that's like your bread and butter and let's
19 say it's super busy in the service department that
20 week.  I know from talking to you earlier you want
21 to turn these cars around as fast as you can to
22 get them on the floor so that they'll sell before
23 they start depreciating further.
24      A.   Mm-hmm.
25      Q.   When you're backed up like that, are

Page 148

1 there instances where you'll send it to someone
2 like AC Kustoms?
3      A.   No.  He did that.  But, no, that's not
4 allowed.
5      Q.   Okay.  What would you, though?
6 Because my understanding is you don't --
7      A.   You would -- it would wait.  I mean,
8 that's where I told you you get backed up.  You
9 would wait --
10      Q.   You would just wait --
11      A.   If you're going to do it and, you
12 know, this guy, you know, didn't do the repair
13 right or screwed it up and God forbid it causes an
14 accident or something and they could, you know,
15 point that back to you with not being done right.
16 Right?  At least I know my guys have been, you
17 know, trained and gone through the certification
18 and have the GM requirements to fix the cars and
19 clear the codes or whatever the case may be.  I --
20 this guy wouldn't have access to that GM, you
21 know, what do they call it, tech line which is
22 what you use to plug into a car to clear a code or
23 read a code or see what's wrong, you know, a
24 record basically off the vehicle.
25      Q.   How was Kolodzinski apparently able to

Page 149

1 send these cars logistically to AC Kustoms?  I
2 mean --
3      A.   I don't even know that he sent all of
4 them for sure because I remember one time it was
5 Joe or Frank said there was nothing done to that
6 car, there is no way, it's still -- look at the
7 part.  And I didn't see it.  But he said that was
8 not replaced, that was not fixed.
9      Q.   Okay.  Now, I understand that was that
10 one example that you referred Joe with.  But with
11 respect to -- and I don't know based on this
12 allegation how many cars here you're contending
13 were at issue.
14           But with respect to the cars that
15 were supposedly sent to AC Kustoms, is your
16 opinion -- or not opinion -- is your position at
17 Mike Anderson Chevy that the repairs were never
18 performed or that they were inflated?
19      A.   My position would be both.  I don't
20 have a crystal ball, but I would say that there
21 were probably, I don't know how many, but there
22 were repairs that were said that were done that
23 were not done.
24      Q.   Okay.
25      A.   And there were definitely repairs that

Page 150

1  were purposely and intentionally overinflated for
2  kickback reasons.
3      Q.  So how did you get to the 176 number?
4  Is that just based on the total amount that
5  would --
6      A.  It was based on -- we had all that.
7  We've spent hours on this, pulling, you know,
8  everything that was done and spent with it and
9  what it would have cost and what was charged. And
10 I think that's how we came up with that. I don't
11 remember.
12     Q.  I'm just making sure I understood you.
13 You're saying that your number 176 is based on
14 what was charged period?
15     A.  No. No. I think it was --
16     Q.  Okay.
17     A.  -- a difference of what it would have
18 cost to what he charged.
19     Q.  Okay.
20     A.  That's how we -- you should have all
21 that. Don't you have all that?
22     Q.  We're going to go through it. I just
23 need to know for the purposes of understanding --
24         (Simultaneous speaking.)
25     THE WITNESS:  -- all the stuff on

Page 151

1  this.
2  BY MS. LIU:
3      Q.  Okay. So the last one on here is
4  12(f): Kolodzinski traded in a Corvette he owned
5  and gave himself an inflated appraisal of the car
6  at approximately $10,000 more than it was worth.
7      A.  Mm-hmm.
8      Q.  What is the basis for that -- for that
9  allegation?
10     A.  It was he -- you know, you take in a
11 car, right, what you would traditionally appraise
12 a car for, and it was like 10,000 -- I mean, it
13 made no rhyme or reason. It was intentional. It
14 was -- he purposely did that. He walked it in to
15 the finance manager -- I wasn't there that day --
16 told him to bill it out. Well, you don't sign off
17 on your own deal. Right? I mean even if --
18 that's just common sense. I mean, if I worked
19 anywhere I would never do my own deal. It's just
20 you don't do that. That was purposeful.
21     Q.  Okay.
22     A.  It was purposeful I wasn't there. It
23 was purposeful that he thought he could hide it.
24         It was, you know, towards the end.
25 Like I said, the more that I started seeing --

Page 152

1  questioning this stuff and looking at it, the more
2  distant he got and then just basically
3  disappeared.
4      Q.  Mr. Anderson, I know you had to make a
5  phone call before noon. Did you want to take a
6  ten-minute break?
7      A.  How much longer is this going to take?
8      Q.  A couple more hours. I don't think
9  you're going to make a 3:00 p.m. deadline.
10     MR. QUANDT:  Do you want to take a --
11 let him make the call. Do you want to take like
12 about a 20-minute break and then come back and
13 keep going or, Mike, how are you doing?
14     MS. LIU:  Hold on one second.
15         Debbie, can we go off the record.
16         (A break was taken from
17          11:51 a.m. until
18          12:30 p.m.)
19 BY MS. LIU:
20     Q.  Mike, I want to talk a little bit about
21 the hiring of Jason Kolodzinski. Did you decide,
22 and just solely you, to hire Mr. Kolodzinski?
23     A.  Yes.
24     Q.  And why did you hire him? And what I
25 mean by that, was there an opening at the time?

Page 153

1      A.  Yes. Yeah, there was an opening.
2  Yes. And it kind of created that for him, yes.
3      Q.  Okay. Was there a prior GM at this
4  dealership?
5      A.  GSM. And I don't remember the last
6  GM.
7      Q.  When you say GSM, general --
8      A.  Sales manager.
9      Q.  -- service -- sales manager?
10     A.  Yeah.
11     Q.  Okay. And did that GSM leave before
12 Mr. Kolodzinski came?
13     A.  No.
14     Q.  Okay. So would it be accurate to say
15 that Mr. Kolodzinski's job duties during the time
16 he was there were not designated to any one person
17 prior to his arrival at the dealership?
18     A.  Yeah, you could say that.
19     Q.  Okay. I want to talk a little bit
20 about the terms, to the extent that there were
21 any, under which Mr. Kolodzinski was working for
22 you. For example, was there an exclusivity clause
23 in play? And I can explain what that means --
24     A.  No.
25     Q.  -- was he only allowed to work for you

39 (Pages 150 - 153)

Page 154

1 and no one else?
2     A.   Moonlighting?  I think we have moon-
3 lighting in our handbook.
4     Q.   Okay.  And when you say moonlighting,
5 are you thinking about the situation where he
6 might work somewhere on the weekends?
7     A.   Yeah.  Or like if it was some conflict
8 with some other job, yes, some other job that
9 would cause a conflict.
10    Q.   And when you say conflict, are you
11 talking about a conflict of interest --
12    A.   Yes.
13    Q.   -- or conflict of time?
14    A.   Conflict of interest.
15    Q.   And what if there were no conflict of
16 interest, you wanted to do something to do
17 something completely unrelated to the auto
18 industry, would he be allowed under his agreement
19 with Mike Anderson Chevy to do that?
20    A.   I don't remember exactly what the
21 handbook says.  I believe it's moonlighting, so
22 they'd have to let us know, in the evenings --
23    Q.   Okay.  So, to the extent it exists, it
24 would exist in the handbook?
25    A.   Right.

Page 155

1     Q.   Okay.  After he was hired, was
2 Kolodzinski ever formally trained by anyone at
3 Mike Anderson Chevy?
4     A.   Not in a position like that.  He
5 wouldn't, no.  He would come in qualified for a
6 position like that.
7     Q.   Mike Anderson Chevy has their own way
8 of doing things.  For example, you approved
9 things.  So was there someone that would tell
10 him --
11    A.   Yes.  I told him all that stuff.  That
12 unique stuff to us, I will.
13    Q.   So unique stuff you would tell him.
14         So in the course of the time that
15 he was there, did his responsibilities change at
16 all?
17    A.   No.
18    Q.   When -- I understand that you were his
19 supervisor.  Correct?
20    A.   Yes.
21    Q.   And if he had a question and you
22 weren't there, who would he go to?
23    A.   He would probably text me or call me.
24    Q.   Okay.  So generally you were very
25 available if --

Page 156

1     A.   Yes.
2     Q.   -- he had any questions?
3     A.   Yes.
4     Q.   Okay.  Were there any instances prior
5 to 2018 where Mr. Kolodzinski was ever disciplined
6 or reprimanded related to his work performance?
7     A.   No.
8     Q.   Other than the allegations at issue
9 here, would you -- how would you characterize his
10 work performance?
11    A.   It started out really good.  I mean,
12 he started out really good.  And then it's like he
13 shifted gears and it became -- his focus -- I feel
14 like he shifted gears and his focus was on how he
15 was going to get money, you know, embezzle money
16 or whatever, and not at the same focus at the job
17 at hand, the issue at hand.  Right?  Not the
18 issue.  The job at hand.
19         And then when I really feel like it
20 got unraveled and, like, went crazy was when I had
21 to basically go take care of my dad.
22    Q.   When did you -- when did you start
23 having to take care of your dad?  Do you have --
24    A.   No.
25    Q.   -- an approximate date?

Page 157

1         Wait.  Let me finish my sentence,
2 though.
3     A.   Well --
4     Q.   Do you know an approximate date on
5 when you started taking care of your dad?
6     A.   It was 2017 and it was fall.
7     Q.   Okay.  September, October, something
8 like that?
9     A.   Yes.  It wasn't -- it might have been.
10 Because his birthday was yesterday.  I know this
11 is dumb, and I'm going off on a tangent, but I
12 remember the goofy things and that's how I
13 remember.  Like I remember I didn't have to wear a
14 coat.  I didn't need a coat outside, a coat to go
15 from the car to the hospital.  So it might have
16 been around maybe around this time, maybe a little
17 earlier.
18    Q.   Okay.
19    A.   Don't hold me to the exact.  I can get
20 you the exact.  If you want, I could call the
21 hospital.
22    Q.   Just an approximation, I think, will
23 suffice.
24    A.   Two and a half years.  And he died
25 September 1 of this year, so whatever that is.

40 (Pages 154 - 157)

Page 158

1    Q.   Okay.  Let's talk a little bit about
2  MACC's profitability in -- or Mike Anderson Chevy.
3  In 2016 was Mike Anderson Chevy profitable?
4    A.   Yes.
5    Q.   Was it less profitable than you would
6  have otherwise projected?
7    A.   No.
8    Q.   Okay.  In 2017 was Mike Anderson Chevy
9  profitable?
10    A.   No.
11    Q.   And when you say no, was it by quite
12  some margin or was it just slightly --
13    A.   It was a big -- it was a big margin,
14  yeah.  And that's -- you know, you had -- like I
15  said, I think what happened was that stuff started
16  piling up and then he was kind of playing the
17  shell game.  And then we had the strike and that
18  went on forever.  That killed us.  And that kind
19  of really muddied the waters for him.  So then we
20  came out of that.  And then it was kind of like,
21  you know, back to the shell game again.
22            And then when it was so evident
23  that -- that it was -- that he was stealing, that
24  there was fraud, that he was purposely doing this,
25  and the more I got involved the more he distanced

Page 159

1  himself, then it was like he was just totally
2  absentminded from the whole day-to-day routine of
3  his job.
4    Q.   When you say you weren't profitable in
5  2017 by a big margin, can you give me an approxi-
6  mation?
7    A.   Oh, I think -- I think we lost a
8  million bucks or something.
9    Q.   And then you mentioned the strike a
10  few times now.  Were there many strikes in 2017 or
11  was there one long strike?
12    A.   The one.  It lasted forever.  It was
13  -- oh, my gosh, it was -- well, you could pull it.
14  It was public record I'm sure.  Two and a half
15  months maybe.
16    Q.   Okay.  What happened -- with respect
17  to the cars that were in line for service, what
18  happened to those cars if all your workers were on
19  strike?
20    A.   I told you earlier.  I said the ones
21  that we could sell we would sell.  The ones that
22  we would need to get checked we'd get checked at
23  AC Kustoms.  And then the other ones we'd
24  wholesale them.
25    Q.   So was the AC Kustoms one, though --

Page 160

1  my understanding from before was it was not
2  permitted for Jason to send these to AC Kustoms.
3  So --
4    A.   No.  What I told you was -- this is
5  what irks me because I feel like you're circle
6  talking and it's like you're coming back in.  I'm
7  an honest person.  I'm not going to say something
8  different at a different time.  Okay?
9            I told you before that in a
10  situation like that where you would have to send a
11  car out in order to sell it, that would be the
12  only time you could do it.  When we got backed up
13  in normal time when we had technicians, we would
14  never send a car out because I'd be on the hook
15  for something in the event that they didn't --
16  they didn't do the repair right or it was not
17  following the factory specs or whatever.
18    Q.   Okay.  Mr. Anderson, I'm asking you
19  these questions because I don't want to
20  misconstrue you.  I'm not trying to trick you.  I
21  literally don't want to misconstrue you.
22    A.   Okay.  Well, then --
23    Q.   So please don't say --
24    A.   I'm not trying to be a jagoff, but
25  that's what I feel like.

Page 161

1    Q.   Okay.  All right.  Let's talk a little
2  bit about the allegations regarding Jason's
3  Corvette.  So I'm going to represent to you that
4  these are documents that I received from Mike
5  Anderson.  I'm going to mark this for the record
6  as Exhibit -- I believe we're on 8.  Is that
7  correct?  Eight?
8            (Deposition Exhibit 8 was
9              marked.)
10  BY MS. LIU:
11    Q.   And I've marked these MACC-JK 1
12  through 16.  If you like, you can have access to
13  this also.
14    A.   Go ahead.  Go ahead.  Go ahead.
15    Q.   It's labeled Corvette, for what it's
16  worth.
17            Are you familiar with these
18  documents?
19    A.   Yes.
20    Q.   And I'm just going to scroll through
21  real fast.  Tell me if you want me to stop.
22            And just for refresher purposes,
23  the allegations that Mike Anderson is making is
24  that Kolodzinski traded in a Corvette that he
25  owned, gave himself an inflated appraisal of the

41 (Pages 158 - 161)

Page 162

1  car approximately $10,000 more than it was worth.
2  Is that accurate?
3      A.  Yes.
4      Q.  Okay.  Looking at page two here, it
5  says customer order on the top.  Can you just --
6      A.  Yes.
7      Q.  -- briefly identify this document for
8  me?
9      A.  Yeah.  It's the buyer's order.  That's
10  what you would sign when you buy a car.
11      Q.  Okay.  So it looks like on here that
12  this is regarding a 2017 Maserati --
13      A.  Mm-hmm.
14      Q.  -- although --
15      A.  That's what he bought.
16      Q.  Okay.  And when you say he, you mean
17  Jason?
18      A.  Jason.
19      Q.  And then it looks like the purchase
20  price was $61,401.93.  Correct?
21      A.  Mm-hmm.
22      Q.  Are you disputing at all the
23  appropriateness of this purchase price?
24      A.  No.  It's the trade-in.
25      Q.  Okay.  All right.  So you're disputing

Page 163

1  this next line, the trade-in allowance of
2  $60,000 --
3      A.  Mm-hmm.
4      Q.  -- 901.93.  Correct?
5      A.  Right.  Mm-hmm.
6      Q.  Okay.  And the trade-in information,
7  there's a little section on the bottom, says a
8  2017 Chevrolet Corvette, and it has a mileage of
9  8992.
10      A.  Mm-hmm.
11      Q.  Okay?  And on the trade-in -- or I'm
12  sorry.  So this trade-in allowance is referring
13  back to the trade-in of the Chevy Corvette.
14  Right?
15      A.  Mm-hmm.
16      Q.  Okay.  Yes?
17      A.  Yes.
18      Q.  Okay.  Looking to the top of this
19  form, and I can zoom in here, I want to talk to
20  you about the various spots here.  It looks like
21  on the very top right there's a date of
22  January 12, 2018.  Is that accurate?
23      A.  Yes.
24      Q.  And is that when the sale is made?
25      A.  Yes.

Page 164

1      Q.  Okay.  What is this on the left, SLSP
2  number 1?
3      A.  Salesperson number one.  So normally
4  it would be a person's name.  But because it was a
5  house deal, meaning that there's no salesperson
6  involved in it.
7      Q.  Okay.  And then the sales manager, I
8  believe that's Mr. Kolodzinski who's --
9      A.  Yes.
10      Q.  -- indicated on here.  Correct?
11      A.  Yes.
12      Q.  If this were not -- let me back up.
13          Would it be typical for
14  Mr. Kolodzinski's name to show up there?
15      A.  Yes, if it wasn't his deal.
16      Q.  Okay.  And then on the right side
17  there's business manager, Roland DeLuna.  Do you
18  see that?
19      A.  Rolando DeLuna, yes.
20      Q.  Oh, Rolanda.  Okay.  It's cut off
21  there.
22      A.  Rolando.  Rolando.
23      Q.  Rolando?
24          And generally what is the business
25  manager's role in a customer order like this?

Page 165

1      A.  They would do the -- any financing
2  involved.  They would process the paperwork needed
3  to do the deal.  They would process the title work
4  for the vehicle, the state forms, license,
5  arbitration agreement, anything related to the
6  deal the customer would need to sign and go over
7  whether.  If they're paying cash or financing.  If
8  they're financing, then they would provide the
9  financing as well.
10      Q.  So, just to clarify, it sounds like he
11  would be responsible for administrative and
12  financial-related tasks --
13      A.  Right.
14      Q.  -- correct?
15      A.  And he can't -- right.  And he can't
16  take a deal until it's signed by a sales manager.
17      Q.  Is Rolanda -- Rolando involved at all
18  in approving a purchase?
19      A.  No.  Well, now he is because he works
20  a miracle.  But not then.
21      Q.  Okay.  I'm only talking about January
22  of 2018.  What about with respect to trade-ins, is
23  he responsible at all with respect to pricing a
24  trade-in or --
25      A.  No.

42 (Pages 162 - 165)

Page 166

1    Q.   -- approving a trade-in?
2    A.   Mm-mm.
3    Q.   Okay.  I'm referring you to what's
4  been Bates-stamped page number five.  What am I
5  looking at here?
6    A.   That is vAuto.  That's what tells what
7  the cars are worth.
8    Q.   And that's what you were saying
9  before, your software that you use?
10   A.   Yes.
11   Q.   Now, I see on the very top there's
12 Haz Mutawe's name on here.
13   A.   Mm-hmm.
14   Q.   I guess why is his name on here?
15   A.   That's probably the login that was
16 there when he went to appraise the car or put the
17 information in there.
18   Q.   And when you say login that was there,
19 is it a computer terminal that's just generally
20 on?
21   A.   It's just -- all that -- it could be
22 your phone or it could be a website.  So all this
23 is website.
24   Q.   So does it mean that Haz was involved
25 in this trade-in or does that mean --

Page 167

1    A.   No.  My -- you know, my guess, and
2  this is a guess, is he purposely did that knowing
3  that it was Haz's name on there, knowing that it
4  was him logged in to the --
5    Q.   He being Jason?
6    A.   Yes.
7    Q.   Okay.
8    A.   And that's a guess.
9    Q.   Okay.  Now, there's a couple of
10 different things on here.  You have the appraised
11 value and I see on here it says $50,000.
12   A.   Yeah.
13   Q.   Is that a value that is automatically
14 generated based on putting in a VIN number,
15 odometer information, make, model, things like
16 that?
17   A.   Right.  If you go above there where it
18 says summary and then rBook, Black Book, NADA --
19   Q.   Okay.
20   A.   We would go off Black Book.
21   Q.   Okay.
22   A.   And that's -- and that Black Book
23 figure is based on what we talked about earlier,
24 like the reconditioning, whatever.
25   Q.   What does rBook mean?

Page 168

1    A.   rBook was -- I don't know what rBook
2  is.  We use Black Book and NADA.
3    Q.   And then this reconditioning figure,
4  is that something that Mike Anderson puts in or is
5  that something that is --
6    A.   That's the number -- that's our
7  average -- that's the average reconditioning cost
8  for the used vehicle.  That's what we spend on
9  average reconditioning a used vehicle.
10   Q.   Okay.  Then looking --
11   A.   That we're going to sell on the lot.
12   Q.   Got it.  Okay.  Then, looking down,
13 there's a price rank one out of eight.  What does
14 that mean?
15   A.   That means that that price rank would
16 be where that appraised value would be at.
17   Q.   What does that mean in layman's terms,
18 appraised value being at?
19   A.   So that would be -- he put in 50,000
20 there.  And of the eight vehicles around it, that
21 would be the best price.  Because he put that --
22 you know, he put the wrong price in there.  Right?
23 He played with the numbers so that it would show
24 that it was the -- you know, the best priced
25 vehicle, like that we did the best -- we took that

Page 169

1  car in better than anybody else at those big
2  dealer things.
3    Q.   So let me understand.  This appraised
4  value, this is something that, based on what the
5  appraiser looks at with the rBook, Black Book, and
6  I understand that you rely on the Black Book
7  figure, and the NADA number, this is what the
8  appraiser is independently coming up with?
9    A.   Mm-hmm.
10   Q.   And then --
11   A.   Unless --
12   Q.   Go ahead.
13   A.   It may come up with something that
14 they override in there.  But that's a field you
15 can fill in.
16   Q.   Okay.  And then what does vRank mean?
17   A.   Same thing as price rank.
18   Q.   Okay.  And then adjusting for the
19 market?
20   A.   That's where if you're going to be
21 like where you want to be as far as market
22 percent.  You want to be over or under.  Like if a
23 car was -- if that car was like a real nice car, I
24 was telling you before, if it was, you know,
25 really low miles, no damage, it had 5,000 miles on

43 (Pages 166 - 169)

Page 170

1  it, something like that, right, well, you could be
2  102, 103, 104 because it didn't matter because
3  your car is going to stand out. You can't shop
4  that car or buy it anywhere else.
5     Q.  Got it. And then market days supply,
6  what is this, the 67 on here?
7     A.  That's at -- at 67 that's what the
8  average day the -- that's the average day a
9  Corvette takes to sell on our lot.
10    Q.  On your lot?
11    A.  So it's 67 days. If you have one
12  Corvette, you have a 67-day supply basically.
13    Q.  And then what does "like mine" mean?
14    A.  I don't know.
15    Q.  Okay. And then let's look in the
16  middle. There's this group stores and it looks
17  like there's some grading scale on here. Under
18  Mike Anderson Chevrolet it says average list
19  price. What is this list price based on?
20    A.  That's if we had another car at the
21  other location, what the average price is on that
22  car.
23    Q.  On that specific -- I'm sorry, go
24  ahead.
25    A.  On that specific -- if we had

Page 171

1  multiple -- like, say we had five of those cars in
2  Merrillville. It would show there that -- that
3  average price of the car for each location.
4     Q.  And then I --
5     A.  But since there's only one, there's
6  only one, then it's only going to show that one
7  price.
8     Q.  And then I see a grading system here.
9  I see a C and a D plus.
10    A.  Mm-hmm.
11    Q.  Do you know what that means?
12    A.  Yeah, because there's so many miles on
13  the car it looks like.
14    Q.  So looking -- I'm going to zoom out --
15  on to what's been Bates-stamped number 7, this is
16  an odometer disclosure statement. I'm just
17  wondering, do you know whose signature is on here
18  on the top for Mike Anderson Chevrolet?
19    A.  Well, it would probably be Rolando
20  DeLuna's. But I don't know that that's his
21  signature, but --
22    Q.  Is there a reason --
23    A.  But that's who would sign that.
24    Q.  I'm sorry, we spoke over each other.
25    A.  That's who would sign that.

Page 172

1     Q.  Okay. So typically Rolando would sign
2  this and --
3     A.  Yeah. Right.
4     Q.  And Rolando would sign it just for the
5  purposes of what we were talking of before, the
6  administrative and financial portions. Correct?
7     A.  Right. Mm-hmm.
8     Q.  So these are all the documents that we
9  received from Mike Anderson Chevy with respect to
10 this purchase. But typically are there additional
11 documents like title document, things like that?
12    A.  Yeah. Yeah.
13    Q.  Is there any reason those weren't
14 provided to us?
15    A.  There's no reason. I mean, there's
16 nothing on them. There's nothing but figures on
17 them. You can have them if you want them.
18 There's nothing else in there.
19    Q.  Tell me a little bit about how the car
20 trading -- trade-in process works. I understand
21 -- I don't want to go through it again, but I
22 understand that you put it into here, into this
23 vAuto database, and based on the figures, the
24 values, you arrive at appraised value. But once
25 you're done getting that appraised value, how does

Page 173

1  that factor into the actual customer order?
2     A.  Well, so he put in there an appraisal
3  of 50,000. Right? But then he put in the
4  system, like our computer system that does
5  everything, he put that 60,901 as the trade-in.
6     Q.  So if -- and I know that we don't know
7  if it's Haz that logged in to vAuto or if it was
8  Jason Kolodzinski. The document says Haz. But
9  whoever appraised it --
10    A.  He appraised it because, Haz, I
11 remember him saying he didn't. I do remember Haz
12 saying no.
13    Q.  Okay.
14    A.  Because Haz is a very, very honest
15 person.
16    Q.  Okay. So whoever would get a trade-in
17 allowance and then -- or trade-in value and then
18 put it in here. And you basically net out every-
19 thing. Is that accurate?
20    A.  Right.
21    Q.  And then can anyone else facilitate a
22 trade-in?
23    A.  No. Just the sales manager, like I
24 told your earlier.
25    Q.  So it's the same people that could do

44 (Pages 170 - 173)

Page 174

1 the appraisal process?
2     A.    Right.  Right.  It's the same thing.
3     Q.    If there was ever a situation where an
4 individual wanted to purchase a car in part by
5 trading in his vehicle and, you know, what the
6 individual is willing to pay and what the trade-in
7 value of his car he's trading in to total was just
8 a little shy of what Mike Anderson was asking as
9 far as the new vehicle, is there any wiggle room?
10     A.    Not an employee deal.  But on a street
11 deal there would be.
12     Q.    Okay.  What do you mean not on an
13 employee deal?
14     A.    Well, because the employee -- like,
15 for an example, if the car sat for 30 days, the
16 employee buys it $100 over net cost, like dead
17 cost or maybe it's cost.  So whatever we own the
18 car for they get to buy it for.  So there is no
19 wiggle room.
20     Q.    So this 61,401.93 for the Maserati,
21 that's your net cost?  You're not making profit
22 off that?
23     A.    No.
24     Q.    Is that accurate?
25     A.    Uh-uh.  Right.

Page 175

1     Q.    Okay.
2     A.    That would have had to have been --
3 because he's down to the 401.93 so that would have
4 had to have been our price.
5     Q.    The Chevy Corvette, do you know how
6 much you ended up selling that for?
7     A.    I don't.  But it should be -- it
8 should be in that box that we had sold it at the
9 time.
10     Q.    Now, talking about your personal
11 knowledge, because I had told you that my line of
12 questioning previously was with respect to
13 Mike Anderson, I want to ask you when you first
14 became aware of the alleged facts that give rise
15 to this component was.
16     A.    When I first became aware of it?
17     Q.    Correct.
18     A.    Well, there was a lot of smoke about
19 it.  But it was right around the strike or right
20 before the strike when what we were paying for,
21 some of the safeties and some of the stuff, it
22 didn't make any sense because they were so high.
23     Q.    I'm going to cut you off real quick.
24 I'm only talking about the trade-in, this one,
25 this particular Corvette trade-in.

Page 176

1     A.    Then what was your question?
2     Q.    I said when did you first learn that
3 the trade-in value was supposedly inflated?
4     A.    Oh.  Somebody came and told me.
5     Q.    Okay.  And do you remember if it was
6 -- because I'm looking.  This was January 12,
7 2018, so it was right around the time he stopped
8 showing up to work?
9     A.    Right.  I think it was Haz who told
10 me, now that I -- because it would have showed up
11 when he signed in.
12     Q.    When you say he signed in, what do you
13 mean?
14     A.    Haz.
15     Q.    Signed what?
16     A.    When he signs in.  So when he signs
17 in, it's going to show everything he appraised.
18     Q.    Oh, signed in for the day?
19     A.    And he would have seen that and been
20 like "I didn't appraise that."
21     Q.    Got it.  So Haz told you and then
22 that's when -- did you investigate?
23     A.    Well, that was obvious that it was,
24 like, purposeful.  It was clearly misstated.  I
25 mean, he purposely did it.  And the fact that he

Page 177

1 did his own deal, I mean --
2     Q.    Yeah.  Can we --
3     A.    -- and he'd throw his weight
4 around, "I'm the general manager."  You know, what
5 are you going to do?  Your boss is telling you to
6 do it.
7     Q.    So the fact that he did his own deal,
8 is there any kind of -- anything that you have
9 guidance-wise that says like, hey, you are not
10 allowed to do it or anything of that nature?
11     A.    There might be something in the
12 manual.  But that's -- that's common practice.  I
13 mean, even if you work at Walgreens you know you
14 don't ring up your own transaction.
15     Q.    Right.  Okay.  All right.
16         Let's move on to Sir Hooptie.  So,
17 again, unless I tell you otherwise, I'm asking you
18 these questions as a 30(b)(6) corporate witness.
19         I will represent to you that what I
20 am marking as Exhibit 9, Bates-stamped MACC-SH 1
21 through 36, are documents that Mike Anderson Chevy
22 provided my law firm with respect to the
23 allegations pertaining to Sir Hooptie,
24 specifically the $5800 that's referenced on the
25 complaint.

45 (Pages 174 - 177)

Page 178

1     (Deposition Exhibit 9 was
2         marked.)
3  BY MS. LIU:
4     Q.   So looking to the coverage page, in
5  fact it says Sir Hooptie losses, 5806.99.  I just
6  wanted to check with you, is it 5806.99 or is it
7  5800 that you're alleging?
8     A.   Well, what does it say?  It says
9  5806.99.
10    Q.   Well, I'm just clarifying.  Am I going
11 off of what's on here or am I going off of what's
12 in the complaint?  Because they don't match.
13    A.   What's the one -- the complaint say?
14    Q.   5800.
15    A.   Well it's $6.99.  5800 is fine.
16    Q.   Do you know whose writing this is?
17    A.   Judy Arnold.
18    Q.   Okay.  So have you -- give me a
19 history of your -- Sir Hooptie, had you done
20 business before 2016 together?
21    A.   No.  No.
22    Q.   So the only business that you --
23        MR. QUANDT:  Just, counsel, just let
24 me note just one objection for the record here.
25 The 5800, if you will note, each of the -- each of

Page 179

1  the damages claimed A through F do not go to the
2  dollar sign and cents sign.  They only go to the
3  largest figure, which is the -- which is either
4  the thousand dollar sign or the hundred dollar
5  sign.  We did not break down the complaint as to
6  dollars and cents.
7         MS. LIU:  Right.  And just -- I'm just
8  clarifying what is being sought right now.  I'm
9  not trying to fact check.
10        MR. QUANDT:  Well, no, but you asked
11 the question:  Which is correct, this or the
12 complaint?  So I'm explaining to you why the
13 complaint is written as it is in light of this
14 figure of 5,806.99.
15 BY MS. LIU:
16    Q.   Okay.  So, Mike, right now as we sit
17 here right now, your testimony is that you're
18 seeking with respect to the Sir Hooptie losses
19 5806.99.  Correct?
20    A.   Around it.  It doesn't mean it's the
21 same thing.  $6.99.
22    Q.   Yes or no?  Just for the sake of the
23 record.
24    A.   That's what?
25    Q.   Yes or no for the sake of the record

Page 180

1  just so I know what you're seeking.  I understand
2  it's a $6.99 difference.
3         MR. QUANDT:  Again, on the complaint --
4         THE WITNESS:  5800.
5         MR. QUANDT:  Again, the complaint
6  seeks $5,800.  If you wish, we can amend the
7  complaint to add in $6.99, if that would satisfy
8  QBE.
9         MS. LIU:  That's not -- Eric, that's
10 not what I'm asking here right now.  I'm asking in
11 his capacity as a corporate representative what is
12 Mike Anderson seeking with respect to Sir Hooptie.
13 I don't think that has anything to do with the
14 complaint.  I'm just asking him what he's seeking.
15 BY MS. LIU:
16    Q.   So back to that.  Are you seeking as a
17 corporate representative for Mike Anderson Chevy
18 $5,806.99 with respect to Sir Hooptie losses?
19    A.   5800.  It's the same thing to me.  It
20 doesn't matter.  So whatever.  5800, if that's
21 what's in the complaint.
22    Q.   Okay.  So you're -- okay.  Fine.
23        Do you know how many transactions
24 Sir Hooptie had with Mike Anderson Chevy?
25    A.   No.

Page 181

1     Q.   No?
2     A.   I can get it.  I don't know off the
3  top of my head, no.  I don't know.
4     Q.   Do you know if it's more than ten?
5     A.   No, I have no idea.  I told you I can
6  get it but I don't have it.
7     Q.   Okay.  And do you know generally what
8  kind of services Sir Hooptie offered Mike Anderson
9  Chevy?
10    A.   Yeah.  Like used cars he was buying or
11 selling or something.
12    Q.   And do you know if Sir Hooptie
13 corresponded solely with Jason or did Sir Hooptie
14 correspond with anyone else?
15    A.   It was only to Jason.  These people on
16 here were only allowed to deal with Jason.
17    Q.   When you say allowed to --
18    A.   That's what I found out later on.
19    Q.   When you say allowed to, what do you
20 mean?
21    A.   I mean, like they were told "No, I'll
22 handle them.  I'll handle it.  I'll handle it."
23    Q.   Okay.  So would it be accurate to say
24 that Mike Anderson's business relationship with
25 Sir Hooptie commenced approximately in March 2016

46 (Pages 178 - 181)

1 when Jason started working for Mike Anderson?
2     A.   No.  It didn't start until later on.
3 It was down the road when that started, if memory
4 serves me right.
5     Q.   Are you aware if there's a contract
6 between Sir Hooptie and Mike Anderson Chevy?
7     A.   There is not.
8     Q.   And is -- with respect to the cars
9 purchased from Sir Hooptie, are you aware whether
10 those cars were purchased via auction or via
11 direct purchase?
12     A.   It was direct purchase.
13     Q.   Do you need a second to review these
14 documents with respect --
15     A.   No.
16     Q.   No?
17     A.   (Nodding)
18     Q.   Okay.  So turning to -- I'm going to
19 flip through these really quickly because I think
20 they are duplicative.  I just want to show it to
21 you.  I received 36 pages.  Pages 19 through 36
22 look identical to pages 1 through 18.  It's just
23 flipped really.  So just so you know that's why
24 I'm only going through half of them.  If you have
25 any reason to dispute that, please let me know.

1         Looking to page nine of this set,
2 do you know who created that?
3     A.   Mm-mm.
4     Q.   Do you recognize that document?
5     A.   That looks like somebody just listed
6 on there what the loss was like in a word
7 document.  That's not from our system.
8     Q.   It's not from your system?
9     A.   No.
10     Q.   Is it possible that it was something
11 that Judy came up with?
12     A.   It could have.
13     Q.   Okay.
14     A.   Or she could have had somebody pull it
15 and send it to her.
16     Q.   Got it.
17         So looking to page two, do you know
18 whose writing that is?
19     A.   That's Judy's.
20     Q.   Okay.  And I'm going to scroll in
21 because the writing is slightly small.
22     A.   That's Judy's.
23     Q.   I'm sorry?
24     A.   That's Judy's writing.
25     Q.   Okay.  Do you know what this number

1 represents?
2     A.   That, I would guess, would have to do
3 with that second line.
4     Q.   Okay.  Now, we talked a little bit
5 about your check writing procedures.  And there is
6 a check that's cut to Sir Hooptie.  Are you aware
7 if this check was cut in the course of the regular
8 purchase order procedure we had talked about
9 earlier or outside of that procedure?
10     A.   It was out -- it would have probably
11 been outside of that.
12     Q.   So you see on this check -- or the
13 check in the memo portion the check was cut
14 May 19, 2017.  Correct?
15     A.   Yes.
16     Q.   Okay.  And on here it looks like there
17 are three different cars that are listed.
18     A.   Mm-hmm.
19     Q.   I see a Ram 1500, a Chevy Tahoe, and a
20 Cadillac Escalade.  Do you see that?
21     A.   Mm-hmm.
22     Q.   And there is a mark next to the Chevy
23 Tahoe with the reference number CP3724.  Do you
24 see that?
25     A.   Mm-hmm.  Mm-hmm.

1     Q.   And that line, which if I'm under-
2 standing correctly is the one that's at issue, is
3 for $46,000.  Do you see that?
4     A.   Mm-hmm.
5     Q.   So as of 2017 would a 2017 Chevy Tahoe
6 priced at $46,000 surprise you?
7     A.   I don't -- you're talking the market
8 in 2017 on a -- I would have no idea.
9     Q.   Okay.
10     A.   But my assumption would be by looking
11 at the mark next to the stock number with that
12 amount written there in the brackets that those
13 two correspond to each other.
14     Q.   Okay.
15     A.   There.  Well, there it is right there.
16 Hold on.  There.  That's what it is.  Look, it's
17 this car right here, 43,250.  And then back up one
18 page.
19     Q.   Back one up page?  Yeah.
20     A.   And then 46,000.  So that's probably
21 what that is.  What did they sell the car for?
22 43,250?
23     Q.   Mm-hmm.
24     A.   What was the other number?  34 some-
25 thing?

Page 186

1    Q.   46.
2    A.   46. So that's probably that, the loss
3  there, the 46,000, plus whatever they did in
4  service to recondition the vehicle would be my
5  guess.
6    Q.   Can we -- can we run through it?  I
7  just want to know the basis for this calculation.
8  I have all the documents, I believe, from either
9  Judy or just your company generally attached to
10 this particular reference number.  And you see
11 this slip?  Is this one of the service invoices
12 that you were referring to?
13   A.   That's a service invoice.  Mm-hmm.
14   Q.   Okay.  So this is a -- is it an
15 internal service invoice?
16   A.   Mm-hmm.
17   Q.   Okay.  And all the work reflected on
18 this invoice would have been provided by your --
19 by Mike Anderson Chevy.  Right?
20   A.   Touchup?  No, that was probably done
21 by -- that was a sublet.  It looks like it was
22 done by Auto Tec.
23   Q.   Okay.  So under description that's
24 what -- that's how you would tell who did the
25 work?

Page 187

1    A.   Yeah.  Because it would have been a
2  sublet.
3    Q.   If --
4    A.   Right there.  Sublet charge, 216.
5    Q.   Where are you seeing that?
6    A.   Down to the left.
7    Q.   Oh, okay.  So if this were done
8  internally, the under-the-hood stuff you were
9  talking about earlier, what would this say
10 instead?
11   A.   It wouldn't look like that.  It would
12 have -- the concern would be like a safety
13 inspection or GM certified inspection or something
14 like that.
15   Q.   Okay.
16   A.   And then -- used car safety.  And then
17 correction would be, you know, to factory specs or
18 to GM certified certification specs or whatever.
19   Q.   Okay.  So let's -- let's start from
20 the top number.  We had 46,000.  I just want to do
21 the math with you.  And the sale price was at
22 43,250.  And then were you saying you were
23 factoring this in?
24   A.   I said that's probably -- before I saw
25 that, I said the difference is probably stuff that

Page 188

1  was done to the car.
2    Q.   Okay.
3    A.   If you remember I said that's my
4  guess.  So 46,000, 43,250 is 2750 difference.
5  216.  That's 2534 difference.
6    Q.   Mr. Anderson, there are more that look
7  like this.  So if that's what you're trying to
8  reconcile, I can scroll down also.
9    A.   Yeah.  I was waiting for you.
10   Q.   Oh, I'm sorry, scrolling down on to
11 page five.  Is this a similar sublet kind of --
12   A.   This is not a sublet.  The one -- this
13 is not a sublet.  This is in-house.
14   Q.   Okay.  And the reason you can tell
15 that this invoice is in-house is because it does
16 not say sublet anywhere.  Correct?
17   A.   Right.  Exactly.
18   Q.   Okay.  Now, with respect to the
19 charges here, the 31.26 internal, can you I guess
20 -- let me understand how the in-house charges work
21 because my understanding is you do stuff in-house
22 to save yourself money but there's charges.  So
23 help me reconcile that.
24   A.   So you take that $31.26 and you add it
25 to the cost of the car you've got in stock and

Page 189

1  that's the new value, the county cost, of what you
2  own the car for.
3    Q.   I understand that.  But when you say
4  in-house, do you end up paying someone else that
5  happens to operate a service department in your
6  dealership or is this just a way for you to keep
7  track of how much would have -- it would have cost
8  if you went somewhere else?  Like, give me an idea
9  of --
10   A.   No.  This would have been cheaper.
11 No.  It would have saved money because it would
12 have been less than if we had gone somewhere else.
13 And then, too, you're paying your own technician
14 and not somebody else to do the work.
15   Q.   Okay.  I'm going to keep scrolling
16 down.  This is another invoice, it's page six.  It
17 looks like it's still talking about tag 3724.  And
18 the total charge is for 138.  Is this invoice also
19 for an in-house performance?
20   A.   It's a sublet.  It's a sublet.
21   Q.   Because it says sublet repairs.
22 Correct?
23   A.   Mm-hmm.  Mm-hmm.
24   Q.   Okay.  So we're at $138.
25       And the next page is page seven.

48 (Pages 186 - 189)

Page 190

1   A.  Sublet.
2   Q.  I'm sorry?
3   A.  That's a sublet.
4   Q.  Another sublet for additional work.
5   Correct?
6   A.  Mm-hmm.  For a detail.
7   Q.  And then what is page eight?
8   A.  That's a safety inspection.  That's
9   what they do to -- when you take a car in on
10  trade.
11  Q.  So safety inspections are done on
12  trade-ins as a matter of course?
13  A.  Oh, yeah, on everything.  That's --
14  that's servicing of the used cars.
15  Q.  Oh, that's just what they do.  Okay.
16        So the safety inspection is
17  generally around $150 it looks like.  Is that
18  pretty consistent?
19  A.  That's if it doesn't need anything.
20  That's just for them to go inspect the vehicle, to
21  go through and make sure that the brakes meet the
22  specs, make sure the tires have the tread and
23  correct tire depth and that, you know.  They spend
24  about -- I think it takes them about an hour and a
25  half, two hours to go through.

Page 191

1   Q.  Okay.  So that's $231.40.
2        So, going back, this safety
3   inspection was done on May 23, 2017.  Do we know,
4   based on these documents, when this vehicle was
5   actually purchased?
6   A.  Purchased, meaning that we purchased
7   it?
8   Q.  Correct.  Because I see a check typed
9   but I don't see when the purchase --
10  A.  Right there at the top.  It says
11  5/19/2017.
12  Q.  I'm sorry, I've got to finish my
13  question.  Otherwise, it's really hard for the
14  court reporter to keep track.
15        I'm saying this check says it's cut
16  5/19/2017.  But can I tell when the car was
17  actually invoiced in?  How do I tell when you
18  actually obtained possession of the car?
19  A.  From that, you wouldn't be able to.
20  And that's been so long I'm not sure that I could
21  either.  But it would have been around that date
22  because they usually want the money right away.
23  Q.  Okay.  I'm looking at some of these
24  invoices that we went through earlier.  I'm on
25  page four.  And there's work being done in

Page 192

1   September 2017.  The safety inspection was in May.
2   Is there a reason that repairs are being done
3   later on?
4   A.  Yeah.  Like that one somebody could
5   have backed into the car when it was sitting in
6   the lot or ran into a -- you know, we have a
7   storage garage, the poles that hold up the roof,
8   you know, or like a lamp, the lot lights.
9   Q.  Oh, so this could have been subsequent
10  damage that needed touchup is what you're saying?
11  A.  Could have been.  There could have
12  been not spotted or found.  It could have been,
13  you know.
14  Q.  A number of things?
15  A.  Mm-hmm.
16  Q.  Whose signature --
17  A.  That was also in '17, so that was
18  during that strike.
19  Q.  Okay.  Whose signature is on the
20  bottom?
21  A.  I don't know.
22  Q.  Who would typically sign off on these?
23  A.  That would be the used car manager
24  typically.
25  Q.  And the used car manager at this

Page 193

1   time --
2   A.  Jason never -- he never hired a used
3   car manager.  The only -- like I told you, the
4   only time he ever got close was during
5   Christmastime of I guess it would have had to have
6   been '16.  Yeah.
7   Q.  So I understand the used car manager
8   typically signs off on this.  But if you had two
9   years without a used car manager, who would
10  typically sign off on this?
11  A.  That -- that even could have been the
12  invoicer is calling and saying, hey, this is the
13  charge, is it okay, and then, yeah, or whatever,
14  signed it and went on.
15  Q.  The invoicer would call whom?
16  A.  Jason.
17  Q.  And I see on the very left side ADV
18  405 Timothy Jenney.
19  A.  That's the guy that invoiced for used
20  cars.
21  Q.  That's the guy who what?
22  A.  Would invoice used cars.
23  Q.  What about on the next invoice, page
24  five, Nassar Fakhoury.  Who was that?
25  A.  He was a service advisor.

49 (Pages 190 - 193)

Page 194

1    Q.   What is the difference between an
2  invoicer and a service advisor?
3    A.   The advisor would be the one that
4  writes it up.  The invoicer is the one that would
5  close it.  The advisor would be the one that
6  writes it up, sends it in, gives it to dispatch.
7  The invoicer would be the one who finishes it up
8  and then sends it upstairs to the accounting.
9    Q.   And then this invoice reflects some
10  services done with respect to the tire of this car
11  done in July 2017, again about two months after
12  this safety inspection.  Is there a reason that
13  that's two months later?  Is that similar to what
14  you were saying before, it could be a bunch of
15  unrelated incidents --
16    A.   A screw in the tire could -- a screw
17  in the tire, could have simply been the tire went
18  flat.
19    Q.   Okay.  So back to our initial -- the
20  initial reason we went through all of this.  If
21  we're doing the math, how did you arrive -- or how
22  did Mike Anderson Chevy arrive at the number, it
23  was 3468.66, now that you have all the numbers in
24  front of you?
25    A.   Okay.  These are different -- are

Page 195

1  these different cars or are they all the Tahoe?
2    Q.   They are all the same stock number,
3  the 3724, the pages we went through just now.
4    A.   2750.  And then can you scroll down
5  again?
6    Q.   Yeah.  Tell me when to stop.
7    A.   One invoice for 216.  31.26.  138.
8  102.  231.
9    Q.   That's it.
10    A.   Can you scroll up one more time --
11  scroll down I mean.  Down.  Down.  Is that -- so
12  3468.66.  Yeah, so if you add up those invoices,
13  okay --
14    Q.   Okay.
15    A.   -- the 216, 31.26, 138, 102, and
16  231.40 you get 1,018.66.  Right?
17    Q.   Yes.
18    A.   And then if you take the difference
19  between what we bought the car for and what we
20  sold it for, it's 2750.  So you add the two
21  together.  It's 3768.66 -- 3468.
22    Q.   3468.  Okay.  So the calculation of
23  loss is based on the purchase price plus any work
24  that was done to the car and then taking the
25  difference between that and what you ended up

Page 196

1  selling it for --
2    A.   Right.
3    Q.   -- correct?
4    A.   Because we normally add a pack to it,
5  like a hard pack to the car.  Obviously an
6  insurance can back that out.
7    Q.   You add a hard pack?
8    A.   Like, so, in other words, we increase
9  the value by like a thousand dollars that we use
10  to write down on the cars for further things.  But
11  in an insurance claim you don't get that money, so
12  you have to back it out.
13    Q.   Okay.
14    A.   So that's net net net net.
15    Q.   On this customer order -- I know
16  earlier when we were looking at Jason's Corvette
17  it had Jason's name.  Now we have Emmanuel Kalou.
18    A.   Yes.
19    Q.   And he, I assume, is a sales manager.
20  Correct?
21    A.   Yes.  He was, yes.
22    Q.   Is he able to negotiate a purchase
23  price with the buyer?
24    A.   Yeah.
25    Q.   And ultimately he's the person that

Page 197

1  determines the purchase price.  Correct?
2    A.   You mean the selling price to the
3  buyer?
4    Q.   Yes.
5    A.   Yes.
6    Q.   And, I'm sorry, I'm misusing that.
7  I'm using what's on here as far as the purchase
8  price.
9    A.   Right.  Because that would be from the
10  customer's point of view.  Right.
11    Q.   Okay.  I see two other vehicles on
12  here, the Ram 1500 and the Cadillac Escalade.  Is
13  there a reason that -- at least there doesn't seem
14  like there's being a claim brought with respect to
15  these two vehicles.
16    A.   We probably broke out of them okay.
17    Q.   So the reason that you're --
18    A.   It worked out right or.
19    Q.   Okay.  So the reason that the Chevy
20  Tahoe is on here is because eventually it became a
21  net loss to like -- when I say loss, I mean --
22    A.   Well, it was -- the reason is because
23  it was probably overstated would be my guess,
24  would be the initial, like, exception that popped
25  up, and then the loss of it.  To lose that kind of

50 (Pages 194 - 197)

Page 198

1  money on a car, you probably paid too much for the
2  car, put too much into the car. You don't lose
3  34. You'd be out of business in two weeks if you
4  lost money like that on a car every time you sold
5  a car.
6      Q. It's not completely unusual for you to
7  lose money period on a used car sale. Correct?
8      A. Yeah, it would be pretty untypical.
9      Q. Like what percentage of cars do you
10 typically lose --
11     A. A used car?
12     Q. Yeah, used cars.
13     A. You don't typically lose money on used
14 cars. Today's market is completely different.
15 Prior to COVID, you know, you lose money on a car
16 if it was a bad front deal, meaning the trade that
17 came in and they overinflated it or you paid too
18 much for the car or the car ended up not checking
19 out or the transmission blew on it or something
20 like that.
21     Q. But it can be a number of factors that
22 would be the reason that you would lose money on a
23 car. In the best of worlds, you would like not to
24 lose money ever on a used car sale. Correct?
25     A. You typically wouldn't. You would

Page 199

1  never -- you would typically never lose money on a
2  car, used car, to a customer unless you were
3  buried in the car or it's just been an aging issue
4  or something like that. If it was going to be
5  like something that a blown trans or a front end
6  fell off or you got into an accident or something,
7  you'd wholesale it, you wouldn't sell it retail.
8      Q. Okay. So back to my original question
9  with these two cars not being here. I think you
10 said you believe you broke even on these?
11     A. I said that would be my guess, that we
12 would have broken even on it or they booked out
13 right. My guess is that the reason that that
14 46,000 one was that it probably booked out way
15 above.
16     Q. It booked way off above? Is that what
17 you said?
18     A. It booked out. It booked out. So, in
19 other words, they paid more than what the car
20 booked out for.
21     Q. Okay. Booked out as in the --
22     A. Black Book.
23     Q. -- valuation books. Correct?
24     A. Correct.
25     Q. Sorry. A term of art that I'm not

Page 200

1  quite familiar with.
2      So, in other words, you lost money
3  in a profit-loss scenario with respect to this
4  vehicle. Correct?
5      A. Yeah. But they probably overpaid for
6  the car.
7      Q. Do you know -- I think earlier in your
8  deposition you said Kolodzinski might have had
9  some connection with Sir Hooptie.
10     A. Mm-hmm.
11     Q. Are you aware who the owners are?
12     A. No. I think he was an owner or part
13 of an owner or related, something to do with it.
14 But I don't know.
15     Q. On the right side on here, it says
16 Brian Gardner. Are you familiar with this name at
17 all?
18     A. Mm-mm. You wouldn't buy -- you
19 wouldn't buy cars out of state like that either.
20 And, again, you wouldn't buy cars from a used car
21 dealer.
22     Q. So looking at what is page 11 of this
23 set of documents, and that's -- it looks like a
24 check. Would you agree with me that's cut to
25 Sir Hooptie for $45,500 for the purchase of a 2016

Page 201

1  GMC Yukon? Would you agree with that?
2      A. Mm-hmm.
3      Q. And there's a control reference number
4  of 3741. Just so that I have at least more than
5  one example of how you came up with the calculation
6  of the alleged loss, can we run through these
7  numbers really quickly?
8      A. Mm-hmm.
9      Q. Okay. I'm going to scroll down. It
10 looks like this is all Judy's writing. 2,338.33
11 is what's claimed here. Would you agree with
12 that?
13     A. If that's what it is.
14     Q. Well, I'm asking you --
15     A. Without seeing it, I don't know.
16     Q. I'm showing you. Can you not see my
17 screen?
18     A. Yes. But I don't know what that
19 totals, so without seeing it I don't know.
20     Q. Oh, okay. So without seeing the
21 totals. But what you're saying, there's not a
22 dispute that this in handwriting says 2,338.33.
23 Correct?
24     A. No.
25     Q. Okay. And I know I'm asking you a lot

51 (Pages 198 - 201)

1 of obvious questions. It's just for the record.
2 There's no way for us to know what we're talking
3 about --
4      A.    I mean that -- okay.
5      Q.    So in this case I see on page 12 a
6 purchase price of 47,965. And then I see some
7 handwriting on the right of it. What does this
8 handwriting say or mean?
9      A.    I don't -- 530. Okay. So the 530 --
10 see, this is purchase price including options.
11 The 530 includes the 530 on the left. So it looks
12 like she's taking that out. So if you take 530
13 from 47,965, it would be 47,435.
14     Q.    Okay. Do you want me to scroll down?
15     A.    Yep. You have a repair for 317.10,
16 286.95.
17     Q.    And on page 15 it says internal
18 321.90.
19     A.    Okay.
20     Q.    Page 16, sublet repairs for 102.
21     A.    Okay.
22     Q.    Page 17, there's two --
23     A.    It looks like it's -- continue on.
24 There you go. 3,532.33.
25     Q.    And that's on page 18.

1      A.    Is there anything else there?
2      Q.    It's the duplication that we talked
3 about earlier.
4      A.    Okay. Which stock number is this? Is
5 it the -- scroll down. Can you do me a favor and
6 scroll down for a second? Is it the 3724 or
7 the --
8      Q.    3741.
9      A.    We're on 3741?
10     Q.    Correct.
11     A.    She's showing 2,338.33. Okay. Then
12 you've got 3,532.33. Okay. And then scroll up,
13 please.
14     Q.    Tell me when to stop.
15     A.    Stop. Back down.
16     Q.    We're on page 17.
17     A.    Yeah. See, I80621. Can you scroll
18 down and see if the next one says page two? Okay.
19 Last page. Okay. So that is the total for that
20 one, 3,532.33. Okay. Then will you scroll back
21 up?
22     Q.    Past this page?
23     A.    Yeah. Okay. Stop. 102. Scroll up,
24 please. Okay. Scroll up, please. Stop. Let's
25 see. I'm sorry, stay there. 286.95. Okay. Then

1 scroll up, please. Okay. Stop. 317.10. Okay.
2 Scroll up, please. Scroll up. What's that?
3 That's 45,5. So can you go to that one that says
4 286.9?
5      Q.    Yes. Page 14. Right here.
6      A.    What does it say? Tire cannot be
7 repaired. Puncture is too close to sidewall.
8 Goodyear. That looks like she took that off
9 because it was something that happened on the lot.
10     Q.    When you're saying it looks like she
11 took it off, are you talking about from her total
12 calculation?
13     A.    Yeah. It looks like she reduced her
14 calculation because the loss that I came up with
15 was 200 and --
16     Q.    This 286 -- I'm sorry, go ahead.
17     A.    Yeah. $286 more. So that looks like
18 for some reason that was taken off.
19     Q.    Okay. I had a question for you. I
20 went -- while we were going through this, I
21 noticed AC Kustoms' name is listed on here and
22 it's 22 inch wheels like $3,000 on
23 page 18. Do you see that?
24     A.    Uh-huh.
25     Q.    Is that a typical price for three sets

1 of wheels?
2      A.    That seems really high.
3      Q.    Okay. And is this one of the charges
4 that you are disputing with AC Kustoms as to --
5 you know, there's a whole set of allegations
6 against charges incurred via AC Kustoms. Do you
7 know if this is part of it?
8      A.    I don't know if that was in there or
9 not.
10     Q.    Okay. So as far as the calculation
11 method, did the calculation method with respect to
12 this second -- this second component of the
13 Sir Hooptie alleged loss, the 2,338.33, was that
14 different from the calculation method with respect
15 to the first that we did on --
16     A.    It was different in the fact that the
17 286.89 [sic] wasn't added in there or subtracted
18 from there for some reason. She either forgot to
19 add that in there or she subtracted it for some
20 reason.
21     Q.    Mr. Anderson, just for the clarity of
22 the record, you've got to let me finish.
23          So just to recap and just for the
24 clarity of the record, the two calculation methods
25 we went through -- or the two calculations that we

Page 206

1 went through just now are identical as to method
2 except for that extra 200 dollars and change with
3 respect to -- correct?
4    A.  Yes, I believe so.  If I understand
5 your question correctly.
6    Q.  Okay.  If someone was willing to pay
7 more than is reflected on the customer order
8 and --
9    A.  Mm-hmm.
10    Q.  -- these transactions netted positive,
11 would you be claiming that there was a theft here?
12    A.  No.
13    Q.  Okay.  Now I want to ask about
14 personal knowledge.
15    A.  Not unless -- not unless you had -- if
16 you had bought -- say you bought this blue
17 Chevrolet Tahoe, right, and say you paid 10 grand
18 for it, right, and the car booked at 5 grand.
19 Well, you wouldn't -- if that was just a typical,
20 you know, car, you wouldn't do that.  So that
21 would -- would be inflated.  It would be so out of
22 the typical procedure not to -- I mean to pay that
23 kind of money.
24    Q.  I want to move on to your personal
25 knowledge.  When did you first find out that

Page 207

1 Mike Anderson Chevy had been doing business at any
2 time with Sir Hooptie?
3    A.  Probably towards the end before he
4 left.  So maybe the end of '17, beginning of '18.
5    Q.  And I know you mentioned it was really
6 unusual to lose money on a used car purchase.
7 Were there reports where you could see where, you
8 know, you were making gains or you were suffering
9 from financial losses, like you as a supervisor?
10    A.  On used vehicles?  Yeah.  Mm-hmm.
11    Q.  And that's what you were saying
12 earlier, that it's just whenever you have time to
13 look at these documents.  Correct?
14    A.  Mm-hmm.
15    Q.  Okay.
16    A.  And this is -- what date range is this
17 when this was going on with him?
18    Q.  This was 10 -- it was 2017.  Yeah.
19 May onward.
20    A.  So, yeah, that's when it kind of get
21 wild with the strike and I was gone a ton.
22    Q.  And have you ever spoken to anyone
23 affiliated with Sir Hooptie?
24    A.  No.
25    Q.  I'm going on to AC Kustoms.  So the

Page 208

1 allegation here that we went over earlier is that
2 Mr. Kolodzinski sent cars to a company called AC
3 and incurred inflated and sometimes unnecessary
4 repairs of approximately $176,000.  When did
5 Mike Anderson Chevy start its relationship with
6 AC Kustoms?
7    A.  I can tell you.  2/13/17.
8    Q.  And do you know when that relationship
9 terminated?
10    A.  The last was when he left.
11    Q.  Around January 2018?
12    A.  I have a feeling -- well, here, the
13 last -- my assumption would be somewhere like at
14 the end of '17, '18, somewhere in that range.
15    Q.  Okay.
16    A.  I think we owed them money or
17 something and held off a while paying, if I'm not
18 mistaken.
19    Q.  And the services that AC Kustoms
20 offered MACC were exclusively repair and body work
21 kind of services or was there more?
22    A.  Mechanical.  Body.  I believe it was
23 body.  But I know it was mechanical.
24    Q.  There's a reference in the complaint
25 that says some of those repair charges -- and this

Page 209

1 is with respect to the AC Kustoms paragraph --
2 were for cars purchased from AC and Sir Hooptie.
3 Are you aware of any cars that were purchased from
4 AC Kustoms?
5    A.  No.  Not without looking I wouldn't
6 know.
7    Q.  Okay.  Now, I pulled up what we've
8 received from your company with respect to
9 AC Kustoms.  And, based on what you said just
10 earlier, it sounds like 2017 is really what we're
11 looking at for a time frame.
12        I was hoping you could reconcile
13 something for me --
14    A.  Mm-hmm.
15    Q.  -- because we are looking at -- the
16 complaint allegations say 176,000.  The amended
17 proof of loss says 176,000.  This is saying
18 125,000.  And I believe I also did my math and I
19 came shy of 176 also.  Do you know, I guess, which
20 number is accurate?  What number should I be
21 looking at?
22    A.  Well, it would be whatever the --
23 whatever is there filed in the suit, I guess,
24 because -- 125,562, I don't know what that
25 represents.

53 (Pages 206 - 209)

1    Q.   Okay.  Do you know how Mike Anderson
2  Chevy came up with its claimed loss with regard to
3  AC Kustoms?
4    A.   I did at the time.  I can't remember
5  how we came up with it.  But I did at the time.
6    Q.   You understand that you're testifying
7  as a corporate representative which means you were
8  supposed to prepare as a corporate representative
9  to testify as to the basis of your allegations.
10  Correct?
11    A.   Yeah.  But how would I --
12         MR. QUANDT:  Let me note -- let me
13  note an objection for the record.  He is prepared.
14         MS. LIU:  It's not an objection.  But
15  okay.
16  BY MS. LIU:
17    Q.   Go ahead.
18    A.   If you're talking about specific
19  transactions from 2017 --
20    Q.   I'm not talking about specific
21  transactions as to 2017.  I'm just asking what's
22  the basis for your claim of $176,000 and how did
23  you get there?
24    A.   We would have taken anything that was
25  overinflated from what the price would have been,

1  anything that was paid more for like a car, like
2  I say, if we bought a car from them.
3         I feel like you're trying to trick
4  me into answering something wrong, so I'm --
5    Q.   Well, I'm just asking for methodology.
6  It's the same questions I've been asking
7  throughout this whole thing.
8    A.   It would have been the same method.
9  We did the same thing all the way through.
10    Q.   So but with AC Kustoms there is not a
11  purchase price versus a sale price where it's a
12  specific number.  So I'm trying to understand how
13  you got to the $176,000 number.
14         MR. QUANDT:  I'll note an objection.
15  You mean in addition to what he's already answered
16  as to procedure?
17         MS. LIU:  I'm sorry?  He didn't answer
18  the question with respect to AC Kustoms.
19         MR. QUANDT:  Yes, he did.
20         Ms. Reporter, could we please read
21  back the witness's prior answer, two before, about
22  how they went through the process.
23         (The following answer was
24         read back:
25         "Q.  We would have taken

1         anything that was over-
2         inflated from what the
3         price would have been,
4         anything that was paid
5         more for like a car, like
6         I say, if we bought a car
7         from them.  I feel like
8         you're trying to trick me
9         into answering something
10         wrong, so I'm --"
11         MR. QUANDT:  Then my objection is that
12  question has been asked and answered.
13         MS. LIU:  Okay.  You can just state
14  your objection.
15  BY MS. LIU:
16    Q.   So my question to you is what is the
17  basis for that?  Are there specific examples you
18  can point me to, like we did earlier with respect
19  to Sir Hooptie?  And I have -- I provided you with
20  the AC Kustoms documents.  You're welcome to pull
21  them up and scroll through them.  I'm just trying
22  to understand how you got to your numbers.
23    A.   Scroll down.  Is this the only thing
24  you see -- I'm sorry, is this the only -- I can't
25  talk.  Is this the only attachment for AC Kustoms?

1    Q.   This is the only one that we received
2  as part of this stuff here that I believe Judy
3  provided to us.
4         And, Mr. Anderson, if it's easier
5  for you, also you have this on your computer.  I
6  know you were saying on your iPad it's a little --
7    A.   I'm to a point now I'm so tired and so
8  aggravated I don't -- it's hard to even focus on
9  this.
10         What was the AC Kustoms ones
11  called?
12    Q.   It's just AC Kustoms.  And then it
13  says MACC:ACKustoms 1 through 393.  Are you able
14  to pull those up, Mr. Anderson?
15    A.   I'm looking now.  There's hundreds,
16  like tons of pages.  I mean, you're asking me to
17  run through and calculate every single thing on
18  here?
19    Q.   No.  I'm just asking for one example.
20  If you look at one example of what you contend is
21  either an overcharge, which I believe is alleged
22  in your complaint, show me an example of how you
23  got to determine that that's an overcharge.
24  Because, like you're looking at, I'm looking at
25  the exact same documents right now, and I see it

Page 214

1  looks like purchase orders potentially, some
2  things that are letterhead with AC Kustoms. I
3  just don't know how you came to the determination.
4  I understand what you're saying with respect to
5  you took what you thought was too high and then
6  you adjusted, but --
7       A.  Or not done.  You know, like the stuff
8  that wasn't done.
9       Q.  Correct.  Which, if that's the
10 position, let me know where.  Give me an example
11 of where.
12           Mr. Anderson, just so we're not
13 staring at you staring at your computer, I'd like
14 to propose we take a five- or ten-minute break so
15 that you can familiarize yourself a little bit --
16      A.  It's going to take me longer than that
17 to go through every single one of these.  I don't
18 remember.  It's been so long.  Unless you want to
19 move on to something else.
20          MS. LIU:  Yeah, I mean, counsel, I'm
21 kind of at a crossroads because I'm deposing him
22 as a 30(b)(6) who was supposed to be educated on
23 how he came up with these numbers --
24          THE WITNESS:  Time out, lady.  I'm
25 sorry.

Page 215

1          MR. QUANDT:  No.  Wait.  No.  Wait.
2  Wait, wait, wait, wait, wait.  Mr. Anderson, wait.
3  Wait.
4          Note an objection.  Please do not
5  infer that he's not prepared.  He is prepared.
6          MS. LIU:  I haven't finished --
7          MR. QUANDT:  Wait, wait, wait.
8  Counsel, he gave you the methodology that they
9  used.
10         MS. LIU:  Eric, I'm not done with
11 talking.  I didn't even go there.  I said it might
12 make sense for us to continue this portion so that
13 Mr. Anderson has an opportunity to review the
14 documents and we can ask him questions instead of
15 wasting time, and potentially shorten today's
16 deposition.  Because I'm getting from his
17 expression in looking at the documents, I under-
18 stand they're long, and I understand that I'm
19 asking you questions that perhaps you don't have
20 the answers to right now.  I'm not saying you
21 don't have the answers.  But I don't want to waste
22 everyone's time standing here watching you stare
23 at the screen.
24         MR. BANKS:  Counsel, I just checked
25 our document production and found a large

Page 216

1  collection of 2016 AC Kustoms documents that were
2  provided to you.  I don't have the total dollar
3  amount yet, but I'll get that.  If for some reason
4  you don't have those documents, we can provide
5  them.
6          MR. QUANDT:  Just for the record, the
7  only documents you're showing him right now are
8  losses of I think approximately $125,562 only for
9  the year 2017.  We think we also had documents for
10 losses in the year 2016.  We're going to try to
11 get you that total as well.
12         MS. LIU:  Okay.  Well --
13         MR. QUANDT:  We thought those had been
14 provided.
15         MS. LIU:  Okay.  Well, then I,
16 unfortunately, have to reserve my right to ask
17 Mr. Anderson questions regarding those documents
18 because he just told me that his contact with
19 AC Kustoms was from February 13, 2017, to
20 approximately January 2018.
21         THE WITNESS:  I said I thought.  I
22 said that was when it was created.  That was when
23 this nadnem [sic] was created.
24         MS. LIU:  So I'm not -- listen, I'm
25 just saying if he's not -- and I'm not saying

Page 217

1  you're not prepared.  I'm just saying the reality
2  is if you need more time to look at this, then
3  let's --
4          THE WITNESS:  No.  The reality is that
5  you have to study this forever --
6          MR. QUANDT:  Let's -- let's do this.
7  Let's do this.  Let's take a ten-minute break.
8  Our paralegal now is going through the 2016
9  documents and will try and give you a loss for
10 that -- for that year as well.
11         MS. LIU:  Okay.
12         MR. QUANDT:  Let's take a -- let's
13 take a ten-minute break and we'll be back on at
14 2:00 o'clock.
15         MS. LIU:  Okay.  Sounds good.  Thank
16 you.
17             (A break was taken from
18             1:49 p.m. until 2:04 p.m.)
19         MS. LIU:  We can start.
20         MR. QUANDT:  Okay.  Are we all back on
21 the record?
22         THE COURT REPORTER:  We are.
23         MR. QUANDT:  Okay.
24         MS. LIU:  Hold on.  Hold on.  Hold on.
25 It still is my deposition.

55 (Pages 214 - 217)

1    So I do want to ask Eric, Eric, did
2 you end up saying that you found the AC Kustoms
3 records?
4    MR. QUANDT: Yes. I'll tell you what
5 we've found here is that, as Mr. Anderson
6 testified to and as you pointed out, that you saw
7 in your own file AC Customs spelled AC Customs
8 with a C-u-s-t-o-m-s and AC Kustoms with a K,
9 K-u-s-t-o-m-s. Now, you just showed Mr. Anderson
10 records of 2017 with AC Kustoms with a K, claiming
11 damages of $125,562.76.
12    Now, three years ago, three years
13 ago, October 3 of 2018, Judy Arnold provided
14 Mr. Dandelles boxes of documents. Included in
15 those documents were documents from AC Customs
16 spelled with a C going back into 2016. Okay? For
17 example, I'm looking at a document AC Customs,
18 Inc. dated August 11 of 2016. Now, you, counsel,
19 and QBE have had those documents in your file for
20 three years. So, frankly, I think it's
21 disingenuous to show Mr. Anderson damages only for
22 2017 with an AC Kustoms with a K when you know
23 very well AC Customs with a C and a K you have
24 those same documents.
25    So what we did is what -- what

1 Mike Anderson did is they used the same
2 methodology --
3    MS. LIU: Wait. No. You're not
4 testifying for Mike Anderson. You're not
5 testifying for Mike Anderson.
6    MR. QUANDT: No, no, no. Wait, wait,
7 wait. Also, counsel, you did a very disingenuous
8 thing.
9    MS. LIU: I did not. You're accusing
10 me of doing something disingenuous.
11    MR. QUANDT: You failed to show him
12 all the documents in your file --
13    MS. LIU: Okay. Well, let's go off
14 the record. We're just arguing. Please.
15    MR. QUANDT: Okay. You can ask
16 whatever question you want, but now you said did
17 you send us the records. In response, you've had
18 them for three years.
19    MS. LIU: Can you show me proof that I
20 have had them for three years? Because I don't
21 see them. And, regardless of the point, I was
22 asking Mr. Anderson -- and we are off the record
23 now --
24    MR. QUANDT: No, no. We're on the
25 record. I want all of this on the record.

1    MS. LIU: Well, you know what? It's
2 not your deposition, so you don't decide what's on
3 the record.
4    MR. QUANDT: Well, yes, I do. We
5 don't go off the record unless there's agreement.
6    MS. LIU: There's obviously a
7 disagreement with AC Kustoms with a K or a C.
8 Mr. Quandt, I do not agree with your
9 characteristic -- or your characterizing of what
10 I've gone over and what I've not gone over.
11    I've asked Mr. Anderson with
12 respect to AC Kustoms with a K. I asked him what
13 dates. I presented him documents with AC Kustoms
14 with a K. I gave him the opportunity to talk
15 about AC Customs with a C. He checked his records
16 and said, no, it's with a K. So I don't know what
17 you're accusing me of.
18    THE WITNESS: No, no, no, no, no, no,
19 no. I said there's both. I said there was both
20 in here.
21    MS. LIU: Well, regardless, it
22 appears --
23    THE WITNESS: No, not regardless. You
24 don't change my words.
25    MS. LIU: I'm not --

1    THE WITNESS: I said both. I said
2 both.
3    MS. LIU: Well, the record will speak
4 for itself, Mr. Anderson.
5    Regardless of the fact, I would
6 like us to proceed in a civil manner.
7    MR. QUANDT: Wait, counsel. We're
8 proceeding civilly. So why don't you go ahead and
9 continue asking your questions now that we have an
10 understanding of the K and the C and you have the
11 C records.
12    MS. LIU: I don't have the C records
13 right now. So that's what I'm telling you,
14 Mr. Quandt. I'm asking you if you have the C
15 records, and you're telling me you have the C
16 records. I don't understand why you're refusing
17 to send them to me.
18    MR. QUANDT: Well, I mean they're
19 about a hundred pages. Do you want them e-mailed
20 right now?
21    MS. LIU: Yes.
22    MR. QUANDT: Okay. But the deposition
23 is -- we're not continuing the deposition because
24 of records that you already have in your file.
25    MS. LIU: I'm not -- I'm not saying I

56 (Pages 218 - 221)

Page 222

1  have them in my file. I don't see them in my
2  file. You're telling me that you have no paper
3  trail of them being actually provided, so how do
4  you -- what proof do you have that they're in my
5  file? Do you have an e-mail showing that they
6  came in to my inbox?
7      MR. QUANDT: Well, I think Judy Arnold
8  can describe exactly what she provided
9  Mr. Dandelles tomorrow in her deposition.
10     MS. LIU: That's completely fine. But
11 please don't mischaracterize what I do or do not
12 have in my file which you are not privy to.
13 BY MS. LIU:
14     Q.  So moving on, Mr. Anderson, let's
15 please go back to AC Kustoms with a K. I'd like
16 to understand how Mike Anderson Chevy has come to
17 the conclusion that there are inflated and some-
18 times unnecessary repair charges of approximately
19 $176,000.
20     A.  I've told you this. Like, when they
21 did work that wasn't done or when they put -- said
22 there were wheels on cars that weren't there, or
23 when they -- the losses on the cars or over-
24 inflated -- I can't even think anymore -- over-
25 inflated prices on stuff that they would have

Page 223

1  supposedly said they did.
2      Q.  What documentation do you have showing
3  what was done versus what was not done, what was
4  supposedly inflated versus what was the accurate
5  or correct price?
6      A.  Whatever was in that -- that big
7  bankers box.
8      Q.  Can you identify what was in the big
9  bankers box that you're referring to?
10     A.  Tons of -- I mean everything. We went
11 through -- we spent tons of time on this. I
12 wasn't the one that ran the adding machine, but I
13 was the one that said this is, yeah, this is this
14 sign, this is this sign.
15     Q.  Mr. Anderson, you understand that
16 there's a disagreement right now as to what
17 documents that I have in my position or my law
18 firm has in my possession with respect to
19 AC Kustoms and AC Customs, both with a K and a C.
20 Correct?
21     A.  Do I understand --
22     MR. QUANDT: Objection. Objection to
23 the form. I mean, he's not --
24     MS. LIU: That's fine. You can object
25 to the form. Please don't -- don't start with

Page 224

1  your speaking objections.
2  BY MS. LIU:
3      Q.  I guess --
4      A.  You're doing the same thing.
5      Q.  What?
6      A.  You're doing the same thing.
7      Q.  Doing the same thing as what?
8      A.  You just argue. You just argue back
9  and forth. It's like you -- just go on.
10     Q.  Can you point to something in the
11 document that you believe were provided to my firm
12 showing at least one example of the purported
13 overinflation?
14     A.  At this moment? I don't have anything
15 highlighted. I'd have to look.
16     Q.  Okay.
17     A.  You're talking about hundreds and
18 hundreds of transactions.
19     Q.  I understand that. I'm just asking if
20 you're able as you sit here right now --
21     A.  You're trying to put me like in a bear
22 trap.
23     Q.  Well, it's a yes-or-no question. You
24 can either do it right now or you can't.
25     A.  Can I do it right now? If you want to

Page 225

1  sit there and wait. Can I do it? Yes. Can it be
2  this second? No. But you a few minutes ago said,
3  "We don't want to sit there and watch you stare at
4  your computer," when I was going through the
5  stuff. I'd have to pull it all up and go through
6  it again.
7      Which, again, it goes back to my
8  original thing is I don't understand why it got to
9  this point, the reason I buy the insurance is to
10 protect myself, and why I have to get to this
11 point to get it covered.
12     Q.  What --
13     A.  I mean everything is clear, everything
14 is clear as can be. You've got everything.
15 Document everything. I just feel like you just
16 purposely circle talk and try to confuse me.
17     Good God, I didn't think it was
18 going to take this long. I'm exhausted.
19     Q.  What facts or evidence do you have, as
20 we sit here today, that show that Jason took the
21 money that Mike Anderson Chevy sent to AC Kustoms?
22     A.  That I have in front of me?
23     Q.  As you sit here right now, what facts
24 or evidence can you point me to or tell me
25 specifically that show about that Jason

57 (Pages 222 - 225)

Page 226

1  Kolodzinski took money from Mike Anderson --
2  A.  Didn't we --
3  Q.  Let me finish my question, please.
4  -- from Mike Anderson Chevy that
5  was sent to AC Kustoms or meant for AC Kustoms?
6  A.  Didn't we get their checking account
7  subpoenaed, Eric?
8  MR. QUANDT:  That was --
9  BY MS. LIU:
10  Q.  He's not allowed to coach you in the
11  middle of a question.  Please answer my question.
12  MR. QUANDT:  Mike, just answer the
13  question to the best of your knowledge and then
14  we'll deal with it.
15  THE WITNESS:  To the best of my
16  knowledge, we had a -- what we found, that he had
17  been given money and been deposited into his
18  account.
19  BY MS. LIU:
20  Q.  From -- that money being money that
21  was meant for AC Kustoms with respect to the
22  services that were purportedly provided?
23  A.  Yes.
24  Q.  Do you have any --
25  A.  Well, there were -- I mean, there was

Page 227

1  like a Tahoe, something else that we had the
2  wheels on that were never done, things like that.
3  I specifically remember things like that.
4  Q.  Okay.  So --
5  A.  If you're asking for every single
6  transaction, well, no, you're not going to pay and
7  say it was done when it wasn't done and pay to
8  have, you know, $3500 worth of wheels done on a
9  car that wasn't done.
10  Q.  So with respect to the Chevy Tahoe and
11  the wheels -- and this is what I'm asking you
12  about.  I'm not -- I'm not here to judge what
13  you're claiming.  I'm just trying to understand
14  what you're claiming.  With respect --
15  A.  No.  I don't believe -- I don't
16  believe that at all.  I'm sorry.
17  Q.  Okay.  Well, with respect to the
18  wheels on the Chevy Tahoe that you're talking
19  about, is there any kind of e-mails where you're
20  talking to a colleague saying, hey, this was never
21  done?
22  A.  I think it was mostly by phone call or
23  by -- in meetings and things.
24  Q.  Is that memorialized anywhere, like
25  meeting minutes, anything like that?

Page 228

1  A.  Meeting minutes?  No.  We don't do
2  meeting minutes.
3  Q.  Okay.
4  A.  We're a car dealership, not a condo
5  association.
6  Q.  What made repairs unnecessary repairs?
7  A.  Repairs -- well, an unnecessary repair
8  would be a repair that was never done.
9  Q.  Okay.
10  A.  A repair would be if you replace brand
11  new wheels on a car that already had stuff that
12  was done on it that was already there, you know.
13  You could -- a thing that was done when it wasn't
14  done.
15  Q.  And if there were evidence that
16  AC Kustoms, either with a K or a C, actually
17  performed work for Mike Anderson Chevy, would you
18  agree that Mike Anderson Chevy would be
19  responsible for paying for the services performed?
20  A.  What was that again?
21  Q.  If a vendor actually performed work
22  for Mike Anderson Chevy, if AC Kustoms actually
23  performed the work that you were invoiced for, you
24  have no reason to suggest that Mike Anderson Chevy
25  would not be responsible for paying for such work.

Page 229

1  Correct?
2  A.  Well, I'm a man of my word.  If we owe
3  somebody, we'll pay it.
4  Q.  And are you taking a position, as you
5  sit here today, that Mike Anderson received no
6  services whatsoever from AC Kustoms either with a
7  K or a C?
8  A.  There are -- there are times that we
9  received no service, no wheels on cars, and things
10  like that.
11  Q.  Okay.  What about as a general matter?
12  Are you saying that you've never received any
13  services from AC Kustoms with a C or a K?
14  A.  I'm not saying that we didn't -- I
15  wouldn't know every single transaction.  It would
16  be impossible for me to know every single
17  transaction.
18  Q.  Do you know at least one transaction
19  where Mike Anderson Chevy received a service from
20  AC Kustoms that was indeed performed and billed
21  and paid?
22  A.  Well, I know they were billed and
23  paid.  But one that was actually done, I don't
24  know of.  I know of -- I have vivid memories of
25  stuff that wasn't done, several that wasn't done.

58 (Pages 226 - 229)

1 And during the strike, like, the un-Godly price
2 they were charging to supposedly safety the car.
3          MR. QUANDT: Just for the record,
4 counsel, I want to object. The complaint is not
5 claiming in Paragraph E that there was never
6 any --
7          MS. LIU: I didn't accuse his
8 complaint of saying that. I just asked him as he
9 sits here right now what his position is.
10          MR. QUANDT: Well, as the complaint
11 states, they were incurred, inflated, and
12 sometimes unnecessary repair charges in the amount
13 of $176,000.
14          MS. LIU: Counsel, again, I'm just
15 asking the witness a question. I'm not saying
16 what the complaint says.
17          MR. QUANDT: You can answer.
18          MS. LIU: I'm sorry, Ms. Court
19 Reporter, did I mark this as an exhibit? It's
20 AC Kustoms 1 through 393.
21               (Court reporter clarifi-
22               cation.)
23          MS. LIU: So it's going to be
24 Exhibit 10. It wasn't marked. I would like to
25 mark AC Kustoms with a K which is Bates-stamped

1 MACC:ACKustoms 1 through 393 as Exhibit 10.
2               (Deposition Exhibit 10 was
3               marked.)
4 BY MS. LIU:
5     Q.   I'm looking at page 11 of this
6 document. Mr. Anderson, this document just as a
7 general form, not specifically this document, but
8 does the form look familiar to you?
9     A.   Yes.
10    Q.   Okay. What kind of document is that?
11    A.   That's a PRC, a purchase requisition.
12    Q.   Okay. Now, looking down, do you know
13 whose signature that is?
14    A.   No.
15    Q.   Okay. There is a line and I think it
16 says right next to the signature "authorized." Is
17 that what that says? And I can scroll in.
18    A.   Yes.
19    Q.   Okay. What's generally the purpose of
20 that line?
21    A.   Authorizing the work on the car.
22    Q.   With respect to AC Kustoms, was
23 AC Kustoms with a K a vendor that was loaded and
24 approved into your --
25    A.   No.

1     Q.   -- PRC system?
2     A.   Yes. He was loaded. But it was not
3 done the proper way.
4     Q.   Okay. So even without your okay,
5 there is a way for a vendor to be loaded into the
6 PRC system? Is that --
7     A.   Not anymore. No, not anymore.
8     Q.   Okay. Back in 2017 was there --
9     A.   Yes.
10    Q.   -- a method --
11    A.   Yeah, clearly there was a backdoor way
12 to do that. But not anymore there's not.
13    Q.   And then on the top here it says
14 Timothy Jenney is the purchaser.
15    A.   Mm-hmm.
16    Q.   Is there a reason that he's listed as
17 the purchaser here?
18    A.   He -- what probably happened here was
19 Jason went, and especially if this is like towards
20 the end of the year, and said, here, get these
21 cars safety'd through so and so, through
22 AC Kustoms, and cut the PRCs for him so it wasn't
23 in his name. This is when I was telling you
24 earlier he tried to muddy the waters.
25    Q.   So the safety inspection that's listed

1 on here, if I understood correctly, normally
2 that's done in-house. Is that right?
3     A.   Oh yeah. Mm-hmm.
4     Q.   And --
5     A.   In '14 [sic] it would have been done
6 in-house.
7     Q.   I'm sorry, I missed what year.
8     A.   Well, no, they were -- were they
9 striking? I don't know if they were striking or
10 not then.
11    Q.   September 2017?
12    A.   Yeah, I don't remember if they were on
13 strike then or not. But I know they were on
14 strike in '17.
15    Q.   So looking at the safety inspection,
16 it's $150 in here. Is that in line with what
17 safety inspections generally cost --
18    A.   At a secondhand --
19    Q.   -- in-house?
20    A.   At a secondhand place like that,
21 shooting from the hip, I'd say 75, 80 bucks.
22    Q.   And I saw a couple other names in
23 here. For the sake of time, I'm not going to look
24 for all of them. But I saw a name such as
25 Joseph Fricano. Who's Joseph?

Page 234

1      A.   He was a service manager.
2      Q.   And he was listed under purchaser
3   also.  So would that -- is your --
4      A.   That would just be the person that had
5   the authorization to print the PRC.
6      Q.   Okay.  And then there is a Victor
7   Patricio.  Does that ring a bell?
8      A.   Yeah.  He was a service advisor.  Same
9   thing.
10     Q.   Okay.
11     A.   It would have been sublet.
12     Q.   Were there any other vendors that
13  Jason Kolodzinski worked with that did not include
14  Epic, AC Kustoms, TKC, J&N, Sir Hooptie?  Anyone
15  else?
16     A.   No, not that I'm aware of.
17     Q.   Are there any that he worked with that
18  other people at Mike Anderson Chevy also worked
19  with?
20     A.   No.
21     Q.   Do you have any facts or evidence that
22  you can cite to, as you sit here right now,
23  showing that Jason Kolodzinski controlled
24  AC Kustoms, whether with a K or a C, their
25  pricing?

Page 235

1      A.   Do I have evidence that he controlled
2   their pricing?
3      Q.   Correct.
4      A.   Well, it's evident that he controlled
5   it by the price that they were charging and he
6   approved.
7      Q.   So, if I'm hearing you correctly, you
8   say -- your answer is yes?
9      A.   What?  I said it's evident by what he
10  charged and what he approved that there is clearly
11  fraud there by the price that he approved for what
12  was on the PRC or what was on the sublet or what
13  was on -- approved to pay on the repair order
14  which was the sublet line for wheels and whatever
15  that was done -- were done that were not done or
16  that tires that weren't ever actually put on or
17  tires that were supposedly replaced that didn't
18  need to be replaced, things that --
19     Q.   Well --
20     A.   -- he can hide and cover to look like
21  it was done when it really wasn't done.
22     Q.   My question was, do you have any
23  evidence that Jason controlled the pricing?
24     A.   And I answered you to the best of my
25  knowledge.

Page 236

1      Q.   It's a yes-or-no question and you gave
2   me --
3      A.   I answered you to the best of my
4   knowledge.
5      Q.   Okay.
6      A.   I mean --
7      Q.   Were you aware of any of your in-house
8   mechanics working elsewhere for a time?
9      A.   No.
10     Q.   Would it surprise you if I -- well,
11  would it surprise you to learn that any of your
12  mechanics worked for AC Kustoms?
13          MR. QUANDT:  Objection as to form,
14  "surprise."
15  BY MS. LIU:
16     Q.   You can answer the question.
17     A.   It would surprise me.  It would
18  surprise me if I found out they worked there, yes.
19     Q.   Would it be against company policy if
20  they worked there?
21     A.   For that, yes.  Well, but they're in
22  the union.  Yes.  I believe it's in the union
23  handbook.
24     Q.   Let's start with AC Kustoms with a C.
25  I want to know about your personal knowledge

Page 237

1   regarding any allegations that you're making, as
2   you sit here right now, regarding wrongdoings with
3   AC Kustoms with a C.  When did you first find out
4   about these supposed --
5      A.   When we started showing big losses.
6      Q.   I'm sorry?
7      A.   When we started showing big losses.
8      Q.   And I think from earlier we said that
9   was around 2017.  Correct?
10     A.   I didn't realize -- yeah, probably.
11     Q.   And then when did you first have
12  knowledge of any purported wrongdoing involving
13  AC Kustoms with a K?
14     A.   Well, like when the work wasn't done
15  on the car and they said it was done.
16     Q.   And did someone escalate that to you
17  or how did you find out?
18     A.   I stumbled across -- I remember seeing
19  a car on the used car lot and thinking, wait a
20  minute, I thought the tires or wheels or whatever
21  was done were replaced, because we were at a big
22  push from GM to sell the tires, and it didn't look
23  like they were new.  Then I looked in his chart
24  and he's like, oh, he's coming to do it, he's
25  coming to do it.  And then I don't remember what

Page 238

1  happened after that. I'm sure the car sold or
2  whatever, but.
3          I can't remember your question now.
4      Q.   I'm just -- this is actually what I'm
5  trying to understand is how you came about to
6  learn of the purported wrongdoing. And I think,
7  and correct me if I'm wrong --
8      A.   People started telling me, yeah. I
9  mean --
10     Q.   Okay.
11     A.   -- it was so evident to everybody else
12 that, you know, I'm not going to see that stuff
13 right away.
14     Q.   And then what did you do in response
15 to this?
16     A.   When we started digging into this,
17 when he started disappearing and then all of a
18 sudden, you know, he was gone. And then we looked
19 into this and, the more we looked into it, I'm
20 like you would never do this. You would never do
21 this. This was clearly fraud. You would never do
22 this. This car never had that. We had several
23 people involved in this.
24     Q.   Okay. We'll move on to J&N. I'm
25 showing you what I am marking as Exhibit 11.

Page 239

1          (Deposition Exhibit 11 was
2              marked.)
3  BY MS. LIU:
4      Q.   And these are documents that we
5  received from Mike Anderson Chevy regarding J&N.
6  Are you able to see my screen?
7      A.   Mm-hmm.
8      Q.   And looking to the allegations in the
9  complaint, it says:
10         Kolodzinski claimed to have used a
11         company called J&N for mail
12         advertising. Mike Anderson Chevy was
13         billed $191,000, but no mail was sent.
14         The owner of a graphic design firm
15         used by J&N said no work was actually
16         done. Kolodzinski failed to submit
17         the materials to Mike Anderson for
18         review prior to mailing, contrary to
19         his instructions. He was told to stop
20         but continued to submit invoices that
21         were paid by the dealership without
22         Mike Anderson's knowledge or approval.
23         He did not submit the proper receipts
24         from USPS for the alleged mailings.
25         And the dealership was told that the

Page 240

1          one purported USPS receipt Kolodzinski
2          submitted was fraudulent.
3          These are the allegations in your
4  complaint. Correct?
5      A.   What?
6      Q.   These are the allegations that are set
7  forth in Mike Anderson's complaint. Correct?
8      A.   Yes.
9      Q.   And I see two numbers on here. I see
10 a 2016 number and I see a 2017 number. And the
11 2017 number on this first page is roughly -- it's
12 a little cut off for me, but it looks like 80 some
13 thousand dollars. Do you see that?
14     A.   Can you scroll up so I can see it?
15     Q.   I think it's cut off.
16     A.   Oh, it's cut off.
17     Q.   Yeah, I think it's cut off. Can you
18 see that?
19     A.   It looks like 80,178.
20     Q.   Yeah, 80,178 approximately. Would you
21 agree with that?
22     A.   Yeah, it looks like that.
23     Q.   And then there's a 2016 number, and
24 it's about $111,432.30. Do you see that?
25     A.   Mm-hmm. Yes.

Page 241

1      Q.   And, adding those two together, it
2  looks like it forms the basis for the 191,000
3  approximately that is cited in your complaint. Do
4  you agree?
5      A.   Mm-hmm. Yes.
6      Q.   Okay. In Paragraph 24 of the second
7  amended -- the proposed second amended complaint,
8  there's an allegation saying J&N breached an oral
9  contract by not providing any direct mail
10 advertising. Do you know what that's referring
11 to?
12     A.   Yeah. I told you earlier. It was
13 that phone call with the lady that I had that he
14 had told her that he, you know, had to get this
15 because I was asking for the mail piece. And then
16 when we asked for the national change of address
17 -- you have to have proof that you actually sent
18 the mail out. Right? He wouldn't get -- it took
19 forever, wouldn't get back to Barbara, the
20 controller. I said you got to get that. And we
21 never had --
22     Q.   I'm sorry, I don't mean to interrupt
23 you. I think you misheard my question.
24         Paragraph 24 says: Defendant J&N
25 breached an oral contract by not providing any

61 (Pages 238 - 241)

Page 242

1 direct mail advertising. I'm asking if you know
2 what that oral contract is about.
3      A.   Yes. I told you yes.
4      Q.   Oh, okay.
5      A.   I told you it was a conversation I
6 had with a lady that said that he -- that
7 correspondence she had with him. He's like,
8 "This is the easiest money I ever made."
9      Q.   But what's the contract?
10      A.   Oral contract? That he provided the
11 mail? Yeah, he said he provided the mail.
12      Q.   I'm asking you. It's your allegation.
13 So I'm asking what oral contract you're --
14      A.   Again, you're trying to trick me
15 into --
16      MR. QUANDT: So counsel, counsel,
17 since you're referring to the complaint and the
18 oral contract, I think you have to read the entire
19 paragraph. Defendant J&N Marketing --
20      MS. LIU: Eric, Eric --
21      MR. QUANDT: Wait, wait, wait, wait.
22 No, counsel, I'll put my objection on the record.
23      MS. LIU: This is not -- well, it's
24 not an appropriate objection.
25      MR. QUANDT: Yes, it is, because

Page 243

1 you're asking about the oral contract in the
2 complaint, so I'm referring you -- and you
3 referred to exactly the paragraph. So let's read
4 the entire --
5      MS. LIU: I did. I said Paragraph 24
6 says defendant -- I'm reading from it: Defendant
7 J&N breached the oral contract and did not provide
8 the direct mail advertising.
9      MR. QUANDT: Yes. And now you're
10 asking him -- you asked him specifically about the
11 oral contract.
12      MS. LIU: Correct.
13      MR. QUANDT: That question was asked
14 three times in the complaint. So go to
15 Paragraph 22. It's an oral contract communicated
16 through MACC's employee, Jason R. Kolodzinski, to
17 provide direct mailing. Okay?
18      MS. LIU: Eric, I'm asking him as a
19 corporate representative. I would appreciate you
20 not testifying on his behalf or citing the
21 complaint. I'm just asking him what he knows
22 about the oral contract. There's nothing improper
23 about the way I'm asking this.
24      MR. QUANDT: Well, but you asked him
25 twice about the oral contract and the claim being

Page 244

1 made. And the claim being made is in the
2 complaint.
3      MS. LIU: It doesn't matter. I'm
4 asking him as he sits here today. You drafted the
5 complaint, so --
6      THE WITNESS: Right. Based on the --
7      MR. QUANDT: Wait, wait, wait.
8      THE WITNESS: -- conversations we had.
9      MS. LIU: Hold on.
10      MR. QUANDT: We drafted the complaint
11 in consultation with the clients. Okay? So,
12 yes, yes, the oral contract refers to Jason
13 Kolodzinski.
14      MS. LIU: Again, please stop
15 testifying for the witness.
16 BY MS. LIU:
17      Q.   Mr. Anderson, what were the terms of
18 this oral contract?
19      A.   To send a mailer.
20      Q.   Okay. How many mailers?
21      A.   Well, however many checks were cut.
22 But I never approved any of them. I know when I
23 started digging and digging backwards and saying,
24 "I want this information. Where are you getting
25 these names from?" And then he said our database.

Page 245

1 And then I was like, okay, there's no way because
2 I'm the only one that can pull the names from the
3 database from the system. So there's no way.
4      Q.   Did Jason have authority to enter into
5 any kind of oral contracts with any vendors?
6      A.   No. I mean no.
7      Q.   Okay. How do you know that there was
8 an oral contract?
9      A.   Because he said he did a mailer.
10      Q.   Because Jason said so?
11      A.   Yes.
12      Q.   Thank you. I wasn't trying to trick
13 you. I was just asking that question.
14      So we reviewed the documents that
15 are in this folder. If you look at the documents
16 that were provided to you earlier today, it's
17 labeled J&N Marketing, MACC-J&N Bates numbers 1
18 through 90. And I did go through and total up
19 these checks, and I will represent to you that you my
20 total reflects approximately $191,000. I just
21 want to clarify with you that the amount that
22 Mike Anderson is claiming as a component of its
23 claimed loss under the policy is all amounts ever
24 paid to J&N by Mike Anderson. Is that correct.
25      A.   I'm sorry, what?

Page 246

1    Q.   Are you claiming that all money you --
2  that Mike Anderson has ever paid to J&N is at
3  issue here, all money versus --
4    A.   I would say. Because he never did --
5  I mean none of the stuff that -- he never did the
6  banners -- or the flag pole, blue rectangle flag
7  pole signs, nothing.
8    Q.   Okay. Can you describe your relation-
9  ship with J&N?
10   A.   There is no relationship with them.
11   Q.   Well, your past relationship, how did
12  that past relationship initiate?
13   A.   With -- with Jason.
14   Q.   Did Jason ever tell you that he was
15  retaining J&N for any services?
16   A.   No.
17   Q.   When was the first time you were aware
18  that J&N performed -- or purportedly performed any
19  work for Mike Anderson Chevy?
20   A.   There was a really big bill one month.
21  I don't remember what month it was. I was like
22  what the heck is that for. And it was on the
23  expense report. I'm like what is that. And then
24  I looked into it and it was a mailer. I was like,
25  okay, so remember you have to get that approved.

Page 247

1  You have to get the mailer approved by the
2  attorney. You get all that stuff back and we keep
3  it. We have to have a hold homeless from the mail
4  house saying they're compliant and whatnot. And,
5  again, you know, everything goes to the attorney
6  to get approved before we mail it out.
7    Q.   And once you saw that really big bill,
8  what happened? Did you approach Jason?
9    A.   I said, "Did we get any business off
10  of this?" He said, "Oh, yeah. We did great off
11  of it," I believe was the first time.
12   Q.   I'm sorry, I completely missed what
13  you said.
14   A.   He said the first time he was like,
15  "Oh, we did great off of this. This was great."
16   Q.   And then you say the first time. Was
17  there a second time?
18   A.   The second time there was a big bill?
19  Yeah. Was it '17? '16? '17? I think it was
20  in -- actually, I think it was the end of '16, now
21  that I think about it. There are a couple of big
22  bills that sparked it off because I have a trend
23  analysis that I look at.
24   Q.   Mr. Anderson, I have the checks
25  summarized in front of me. If you can give me an

Page 248

1  idea of what is considered a big bill, I can tell
2  you --
3    A.   Well, okay, so what I look at with a
4  vendor would be these added up the total. It
5  wouldn't be an individual check.
6    Q.   Okay. So after the second time that
7  there was a, as you say, big bill, what happened?
8    A.   I said what was that? He said it's a
9  mailer. I said, well, clearly -- I remember
10  saying this, it clearly didn't do anything. I
11  think it was two or three -- the one was right
12  after -- I know he did like two back to back. And
13  I was like, no, why would you do that? The first
14  one didn't even do anything. The one the month
15  before didn't do anything. And then he was like
16  circle talking.
17        And then that's when I started
18  asking for the information, well, where did you
19  get the names? Where did you get the -- and then
20  it came back finally he said, oh, no, we ended up
21  buying a list. I said, well, give me the list of
22  names. And then he couldn't provide the list of
23  names. And I said, well, then give me the post
24  office, the thing from the post office.
25        And then Barbara, who is the

Page 249

1  controller at the time, go -- I said call the post
2  office and find out where -- they have to have a
3  record of that. And then she -- I believe
4  somebody from the post office came over and
5  said -- you know, brought her something as if she
6  was going to do the mailer. And she said no.
7  They looked at it and said, oh, no, this is fraud,
8  this isn't -- this isn't how it's done, this isn't
9  right.
10   Q.   You're saying the post office said
11  that?
12   A.   Yes.
13   Q.   Okay. Let's go back to the first big
14  bill when you first noticed that there was a large
15  amount of money or a large check being cut to J&N.
16  Did you --
17   A.   Not check. I said the total.
18   Q.   What? I'm sorry?
19   A.   It would be by total. It wouldn't be
20  by check.
21   Q.   Okay. So when you first noticed that,
22  did you question him who J&N was?
23   A.   Yeah, I'm sure I did. I would imagine
24  I did. And she probably said he's a mailer.
25   Q.   Did you talk about what we talked

63 (Pages 246 - 249)

1 about earlier, that you would never approve J&N?
2   A.  Yeah. Oh yeah. Oh yeah. Anyone that
3 knows me knows that you have to have it done.
4   Q.  And then when this happened the second
5 time where there was the second big bill, did this
6 conversation come up again?
7   A.  Yes.
8   Q.  Well, why, I guess, was he never
9 reprimanded?
10   A.  Well, I was -- remember, this was the
11 second -- third time -- I keep telling you the
12 same thing -- is when I was gone most of the time
13 in Houston. And I finally said no more,
14 absolutely not, no more, no more. He's like, "I
15 couldn't get ahold of you." I said you can always
16 get a hold of me by text or e-mail, always.
17   Q.  During the 2016 to 2017 period, did
18 Mike Anderson Chevy use anyone else for mailers?
19   A.  Not that I recall. Which we would
20 normally use like Aspen or Epsilon. We may have
21 used them for some stuff. Because some of that
22 stuff is automatically GM mailers but we get
23 billed for it.
24   Q.  Do you remember what advertising or
25 marketing materials that Mike Anderson Chevy had

1 in 2016 and 2017?
2   A.  No. Do I remember what we did in --
3 no. For mailers? No.
4   Q.  Well, just advertising generally.
5   A.  I mean no. Specifics like what --
6 like what clicks we bought and what pieces went
7 out? No. That actually went out? No.
8   Q.  Yeah, I'm just thinking in general
9 terms. Did you have fliers? Did you have a TV
10 ad --
11   A.  Yeah, well, we had -- yeah, we had TV
12 ads. But like GM or Chevrolet has their -- I
13 think it was Epsilon or Aspen Marketing that they
14 automatically bill you for but that you don't
15 really design it, they just send it out with
16 Groupons or whatnot. It looks like everybody
17 else's.
18   Q.  And that's different from the
19 advertising agencies you were talking about.
20 Correct?
21   A.  Oh yes. Right. Mm-hmm.
22   Q.  Okay.
23   A.  Because that one is, you know, done
24 from -- GM may have got the name based --
25   Q.  And -- sorry. Go ahead.

1   A.  They just bill you.
2   Q.  And that's just because you're a part
3 of that GM Chevrolet family. Correct?
4   A.  Yeah.
5   Q.  Okay. It sounds like there are two
6 things that you mentioned with respect to the
7 basis for the allegation that no mail was sent.
8 And the first one was that conversation that you
9 had with -- I forget her name -- Alicia --
10   A.  That wasn't the first one. That was
11 the second one, second or third one.
12   Q.  So the series of conversations that
13 you had with Alicia.
14   A.  No. I had one conversation with her.
15   Q.  Oh, okay.
16   A.  And that was after the second or third
17 time the mailer thing popped up.
18   Q.  Okay. So it sounds like a few rounds.
19 The conversations with Alicia, the big bills that
20 you alluded to, and the post office --
21   A.  Not bills. The totals. I told you
22 totals.
23   Q.  Totals. Correct.
24       And the post office correspondence
25 regarding the --

1   A.  That was at the end. And that's when
2 he really -- when we started asking for this
3 information, he really got sketchy and distanced
4 and one day didn't show up for work and really,
5 really distant.
6   Q.  Is there anything else I missed as far
7 as the basis for the allegation today?
8   A.  On the J&N? I mean, how much clearer
9 could it be? The fact that couldn't provide the
10 thing from the post office, couldn't provide the
11 national change of address stuff, couldn't provide
12 the names it was sent to, couldn't provide the
13 mailer at first, it took forever to get it back
14 when normally you get it back -- I mean, if I
15 called Epsilon or Aspen right now and said I need
16 the piece and names for something that was done
17 last year or whatever, I'd have it tomorrow
18 morning at the latest.
19   Q.  Do you have any insight on J&N's own
20 business practices other than in conjunction with
21 your allegations?
22   A.  I don't know anything about them.
23   Q.  Okay. So you don't know if they use
24 one graphic design firm or multiple. Correct?
25   A.  I don't have no idea.

64 (Pages 250 - 253)

1    But there's no way this lady would
2 have known everything she knew had he not had
3 correspondence with this -- oh, that's her name.
4 I think that's her right there.
5    MS. LIU:  All right.  So I'm going to
6 mark as I think this is Exhibit 12, J&N subpoena
7 response, the Alicia Brown e-mails.  It's Bates-
8 stamped J&N 84 through 109.
9        (Deposition Exhibit 12 was
10             marked.)
11 BY MS. LIU:
12    Q.  Have you seen this e-mail before --
13    A.  No.
14    Q.  -- Mr. Anderson?
15    A.  Okay.  And you're welcome to scroll
16 through with me on your computer if it makes it
17 easier for reading.  But these were e-mails that
18 J&N produced -- or documents that J&N produced
19 pursuant to the subpoenas that have been issued in
20 this case.  And I just want you to look at -- I'm
21 going to scroll through it and give you an
22 opportunity to look at it.  Just let me know
23 whenever you want me to slow down.
24    A.  Back up.  Back up.  Back up.  What
25 does that say?  Yeah, no, we never had any of

1 that.  We didn't have any of that.
2    Q.  Okay.  And because -- for the clarity
3 of the record, I'll ask you those questions.
4    A.  Wait.  Back up two pages, please.
5    Q.  This one or the one before?
6    A.  The one before.  Yeah.  Right there.
7 He would have known to put that on there before he
8 even sent that.  She had to catch that.  And
9 that's I mean ...
10    Q.  That's the end of the PDF.
11        I'm going to direct your attention
12 to J&N 84.  It appears to be an e-mail from
13 Alicia Chestnut Brown to Nick Cornfield dated
14 May 8, 2017.  And there appear to be three
15 attachments.  Are you familiar at all with these
16 attachments?
17    A.  Are these the ones he probably brought
18 back and said, oh, here's what we did?  But then
19 we asked for more information that was never
20 provided.
21    Q.  And when you say he, do you mean
22 Jason?
23    A.  Jason.  Jason.
24    Q.  In 2017 was there a general spring
25 sale that you know as a spring sale?

1    A.  No.
2    Q.  Okay.  The special vehicle code that's
3 referenced on J&N 86, the 7164 --
4    A.  That meant --
5    Q.  -- 416 --
6    A.  -- that's nothing that we ever would
7 have had that ever would have corresponded with
8 that number.
9    Q.  Okay.  And then is Haz Mutawe, I think
10 you referenced earlier, is that someone who would
11 have written or advertised to write a letter like
12 this?
13    A.  That was a sales manager.
14    Q.  Mm-hmm.
15    A.  And, again, this is an assumption.  He
16 probably put his name on there, again, for show.
17    Q.  Do you have a decent Spanish-speaking
18 clientele, like a decent number of Spanish-
19 speaking clientele, or is it surprising that
20 there's Spanish on here?
21    A.  Yeah, we have a lot of -- we have like
22 very, very, very -- we have a huge Spanish
23 clientele.
24    Q.  So I'm going to start from the
25 beginning of the e-mail on J&N 88.  It appears to

1 be an April 11, 2017, e-mail from Alicia Chestnut
2 Brown to Nick Cornfield and it says file attached.
3 I believe the file number that she's
4 referring to, this is how this was produced to me,
5 on page 89.  Have you seen anything that looks
6 like this?
7    A.  We have.  If that's what you're
8 referring to as the banners on the door, we would
9 have -- we have something like that.  But I don't
10 believe it's that because I would immediately
11 notice the way the website is on there and said
12 no.
13    Q.  Do you remember, and I know this was a
14 couple of years back, whether or not there was
15 something similar to this on a door?
16    A.  Well, we have like entrance 5301 or
17 something similar to the -- for the service -- for
18 the service department.
19    Q.  And what you're saying is -- if the
20 website was listed like this, what would be wrong
21 with it?
22    A.  It wouldn't -- it would just be
23 mikeandersonchevy.com and no capitals.  It would
24 be all lower case.
25    Q.  Other than that, is this all Mike

65 (Pages 254 - 257)

1  Anderson Chevy's information from 2017?
2      A.  7:00 to 6:00, yeah.  But that -- but
3  like the phone number wouldn't have been that.
4  But I would have noticed that right away.
5      Q.  I'm sorry, you said the phone number
6  wouldn't have been that one?
7      A.  It would have been moved up.
8      Q.  Oh, okay.  So just formatting is what
9  you're referring to.  Correct?
10     A.  Mm-hmm.
11     Q.  And then you see on here on page 87
12  there's an e-mail from Alicia Chestnut Brown dated
13  April 4, 2017, to Nick Cornfield, and the subject
14  line is Mike Anderson 4 Windows.
15         And the response is:  No.  Because
16  it's a door, don't they want to be able to see
17  through it?  If not, I will add it.
18         And the response is:  Yes, add it
19  cause the material we use is a view-through vinyl?
20         Do you know of any vinyl signs/
21  stickers on see-through doors?
22     A.  The only ones that would be would be
23  like the hours that the Secretary of State
24  requires for the no smoking within whatever amount
25  of feet for the -- I'm trying to think what else

1  is on there.
2      Q.  And, just for clarity, I'm talking
3  about 2017.
4      A.  Well, I don't remember what was on the
5  door in 2017.
6      Q.  Would it surprise you if there was a
7  sign on the door in 2017?
8      A.  There would not be a big -- there
9  would not be -- there would not have been a big
10  graphic sign on the door.  I would have had it
11  taken down immediately.
12     Q.  And then this is similar to the
13  graphics we saw earlier.  Instead of spring sale
14  on the top, it now says summer sale.  Does Mike
15  Anderson Chevy traditionally have any summer
16  sales?
17     A.  No.
18     Q.  Have there been targeted advertise-
19  ments in the past where only previous Mike
20  Anderson Chevy customers are targeted?
21     A.  Yeah.  By the mailer.  Right.
22     Q.  Is Mike Anderson -- if you know, is
23  MikeAndersonChevyChicago.com a valid domain?
24     A.  Mm-hmm.
25     Q.  Will that take one to the -- it will

1  take them to your website?
2      A.  It will take them to one of our
3  websites.  I don't remember if it takes them to --
4  directly to the Chicago one or not, but it takes
5  them to.
6      Q.  Do you know what -- well, was there in
7  2017 such a thing as a credit --
8      A.  No.
9      Q.  -- builder program?
10     A.  Absolutely not.  And you know what?
11  No.  Because the credit -- that's where you get
12  yourself into big trouble with the Attorney
13  General.
14     Q.  Okay.  Tell me about that.
15     A.  Well, it was Lisa Madigan and she
16  was -- I mean she hated dealers.  So I mean I made
17  sure everything -- anything credit related at all,
18  it had to be like -- you couldn't say
19  "pre-approval."  You couldn't say -- it was
20  like --
21     Q.  Go ahead.
22     A.  You could barely say anything.
23     Q.  Can I scroll in?  Is that better?
24     A.  Yes.  See, we would never have done up
25  to an amount.  Right?  You can say "preselected,"

1  but you can't say up to an amount because you
2  can't have any access to credit.
3      Q.  Was that phone number on there --
4      A.  You can't tell somebody how to
5  increase their -- I'm sorry, improve their credit.
6  That would insinuate that you know what their
7  credit is.  See, and then right there.
8         (Reviewing document sotto voce.)
9         Yes, see, now this would mean --
10  Dennis O'Keefe never would have approved that
11  ever.
12     Q.  Up here it says Mike Anderson Chevy is
13  number five largest preowned dealer in the USA.
14  Is that an accurate --
15     A.  I don't -- no, it's not accurate at
16  all.  In the United States for preowned?  No.
17     Q.  And then there's reference to an
18  approval code to provide to Haz, 16510?
19     A.  That would mean nothing.
20     Q.  In 2017 do you remember what car
21  interest rates were generally?
22     A.  3.9 would have been, yeah.
23     Q.  Nothing out of the ordinary?
24     A.  No.
25     Q.  I'm going to try and -- I'm going to

66 (Pages 258 - 261)

Page 262

1  try and rotate this.
2      A.   We had a sign like that, but it was
3  white.
4      Q.   I'm sorry?
5      A.   We had a sign like that, but it was
6  white.
7      Q.   Like the one on page 11?
8      A.   The one that you just turned around.
9      Q.   Okay.
10     A.   It was white.
11     Q.   And where was the sign located?
12     A.   On the fence.
13     Q.   Okay.  And did it feature Rolando
14  also?
15     A.   It had a picture of him.  It didn't
16  look like that.  And it didn't look -- didn't have
17  the salga whatever on it.
18     Q.   Do you know who created that sign that
19  you're talking about?
20     A.   Uh-uh.
21     Q.   Do you know around when that was
22  created?
23     A.   No.
24     Q.   So on here it's a May 5, 2017, e-mail
25  from Alicia Chestnut Brown to Nick Cornfield, and

Page 263

1  it says:
2          Mike Anderson Spanish banner.  Here
3      you go.  Let me know if there are any
4      changes.  I am leaving at 2:00 p.m.
5      and will be out for a couple hours
6      FYI.
7          And I'm going to assume here,
8  because I don't seem to have the attachment, but
9  there was an attachment right before it about a
10  Spanish banner, that these come together.  Do you
11  have any reason to question that Alicia Chestnut
12  Brown and Nick Cornfield on May 5, 2017, were
13  discussing creating a Mike Anderson Chevy Spanish
14  banner?
15     A.   Do I have any reason to question what?
16     Q.   That at that point in time they were
17  discussing putting a Spanish banner together based
18  on this e-mail.
19          MR. QUANDT:  Counsel, I'm sorry, I
20  missed -- I missed the preamble to your sentence.
21  Could you repeat it, please?
22  BY MS. LIU:
23     Q.   I said, do you have any reason to
24  question based on this e-mail that they were --
25  they were discussing creating a Spanish banner for

Page 264

1  Mike Anderson Chevy?
2      A.   Uh-uh.  I wouldn't know.
3      Q.   Does this on page 97 look familiar to
4  you?
5      A.   No.
6      Q.   On the left side here it says:  You
7  qualify for a $2,000 Corvette --
8      A.   Oh, no, you can't -- you can't do
9  that.
10     Q.   Can I finish reading and then you can
11  respond?
12     A.   Sure.
13     Q.   On the left side it says:  You qualify
14  for a $2,000 Corvette owner loyalty discount plus
15  receive a $5,000 rebate on all big brake cars.
16  Option code J57.
17          Is that something that Mike
18  Anderson Chevy would offer?
19     A.   No.
20     Q.   And what's your basis for saying?
21     A.   You can't.
22     Q.   Okay.
23     A.   The only one -- am I allowed to talk
24  or are you going to talk?
25     Q.   Yeah, yeah, yeah.  Go ahead.  I'm

Page 265

1  sorry, I didn't mean to cut you off.
2      A.   The only one that's allowed to
3  advertise a loyalty rebate is the manufacturer.
4      Q.   And does this look like a
5  manufacturer --
6      A.   No.
7      Q.   -- created advertisement?
8          On the bottom right it says:  New
9  2017 Corvettes starting at only $47,995.  Do you
10  see that?
11     A.   Mm-hmm.
12     Q.   Is that approximately the price, to
13  your recollection, of a 2017 Corvette?
14     A.   I have no idea.  Maybe if it was a
15  base one maybe.  I don't remember what they cost
16  then.
17     Q.   Okay.  Does the document on page 98
18  look familiar to you?
19     A.   No.
20     Q.   Okay.  Has Mike Anderson Chevy ever
21  honored any oil change discount coupon?
22     A.   Yeah.  But they come from Chevrolet.
23     Q.   From the manufacturer.  Correct?
24     A.   Right.  Those are the ones that they
25  preprint and then you've got to pay for and they

67 (Pages 262 - 265)

Page 266

1 send out. They do all the marketing for the
2 follow-up on the service customers.
3     Q.   Is Mike Anderson Chevy the --
4 Chicago's largest Corvette dealership?
5     A.   Based on what? Based on, like, three
6 dealers in Chicago --
7     Q.   Based on the Chicagoland area dealer-
8 ships that carry these cars.
9     A.   Can I talk now?
10     Q.   Yes.
11     A.   I would never put that in there,
12 because you can't verify it. So, like, at the
13 other store, I'm using number one and number two
14 in the Chicagoland area. Right? I put that
15 because I can verify it. I would never put
16 something like that because you cannot verify it.
17     Q.   I understand that -- I asked you a
18 couple of questions on graphics that you've seen
19 and you've commented that "I would never approve
20 that," "I would never verify that," "I won't print
21 something like that." Correct?
22     A.   Uh-huh.
23     Q.   Do you have any reason to believe that
24 Jason either instructed or did not instruct J&N to
25 put together a flier like this?

Page 267

1     A.   I'm sure he told them to do it.
2     Q.   And your position is that him doing
3 that is against policy?
4     A.   Well, because he never got it approved
5 by me. Right.
6     Q.   Right.
7     A.   And anyone that knows me, especially
8 when it comes to mailers, knows that everything
9 has to be approved first.
10     Q.   And the failure to obtain approval is
11 the basis --
12     A.   Right.
13     Q.   -- for the policy claim. Correct?
14     A.   Mm-hmm. Exactly.
15     Q.   I'm looking at this postage statement
16 on page 103 of the J&N production. Do you see
17 this?
18     A.   Mm-hmm.
19     Q.   I know it's a little small. Can you
20 read that? I'm not --
21     A.   Mm-hmm.
22     Q.   -- asking you to read it out loud. I
23 just want to make sure you can see it.
24     A.   I can see it.
25     MR. QUANDT: Counsel, for the record,

Page 268

1 has that part been marked as an exhibit?
2     MS. LIU: No. It's only 26 pages.
3     MR. QUANDT: No, no, no. I mean the
4 U.S. Postal Service statement is a two-page
5 statement. Is that separately marked?
6     MS. LIU: No. This is part of J&N's
7 production, subpoena production, supplemental
8 subpoena production.
9     MR. QUANDT: Well, I would like to
10 have this one marked as an exhibit, if we could,
11 because you referred to the United States Postal
12 Service earlier.
13     MS. LIU: I understand that. It's
14 part of this exhibit. Can we just say -- can we
15 just refer to it as the Bates-stamped number? I
16 don't know what --
17     MR. QUANDT: Oh, wait, wait. I'm
18 sorry. So you're saying -- is it part of
19 Exhibit 12?
20     MS. LIU: Is that what we're on?
21 Yeah, it's part of Exhibit 12.
22     MR. QUANDT: Maybe is there a doc page
23 number for those two pages?
24     MS. LIU: Yes, there is. That's what
25 I was referring to. I Bates-stamped these J&N 103

Page 269

1 and 104.
2     MR. QUANDT: Okay. So that's 103 and
3 104 of Exhibit Number 12. Thank you.
4     MS. LIU: Correct. And you have a
5 copy of that, too.
6     MR. QUANDT: Oh, yeah, we do. We gave
7 it to you.
8     MS. LIU: I don't believe so. I think
9 this came from Mr. Jacobson, J&N's attorney.
10     MR. QUANDT: No, no, counsel,
11 actually, that is what -- that's what the witness
12 referred to. That claim is what's -- is included
13 in the complaint, long before a subpoena was
14 issued.
15 BY MS. LIU:
16     Q.   Okay. So, looking at this document
17 right now, can you say that this is the document
18 that you were referring to earlier on the -- on
19 the USPS mailer proofs that you were talking
20 about?
21     A.   Me?
22     Q.   Yes.
23     A.   Yeah, is this the one that you can
24 just go online and get?
25     Q.   I don't know. I'm asking you what

68 (Pages 266 - 269)

Page 270

1  you -- you're testifying.
2     A.   There's one that they -- Barbara, that
3  used to work for us, told us that the postal
4  people showed up -- actually, it might have been
5  two people showed up.  And, I tell you, I think
6  they were under the impression that she was trying
7  to do one.  And she was trying to get the one that
8  was already done.  And when she showed them what
9  she received, they said, oh, no, that's not --
10 that's fraud.  That's not accurate.  That's not --
11 someone made that up.
12    Q.   So, sitting right here, do you know
13 for a fact whether or not this is one that you
14 brought to the post office and asked --
15    A.   We would -- we would never bring that.
16 We would never do --
17    Q.   Okay.
18    A.   -- that part of that.  That would be
19 them.  But when we ask for that back, it's usually
20 immediate.  But I don't remember if the forms all
21 looked like that or not.  But I know that the one
22 that he provided -- the only one he provided was
23 told to be fraud to us by the post office.
24    Q.   Okay.  So, if I'm hearing you
25 correctly, you received some kind of proof, you're

Page 271

1  not positive if it looks like this, but the proof
2  that you received, you believe because you were
3  told, was fraud.  Correct?
4     A.   By the post office.  Yes.
5     Q.   By the post office.  Okay.
6           And then on to this J&N 105.  It
7  looks like an e-mail dated October 27 from
8  Nick Cornfield to Barbara Flores.  And it says:
9  Attached you will find the mailing list per your
10 request.  PDF --
11    A.   Yeah.  That's the one that's fraud.
12 That's the one -- that's the one that she called
13 the post office.  I think she called the post
14 office --
15    Q.   Okay.
16    A.   -- at Irving and Narragansett I
17 believe --
18    Q.   Hold on one second.  Let me just read
19 through this e-mail so it's on the record.  This
20 e-mail says:
21        Attached you will find the mailing
22        list per your request.  PDF will be
23        sent over shortly.  We outsource the
24        graphics, so waiting for her to get
25        back to the office and send it.

Page 272

1           So do you know what the motivation
2  behind the request to Nick Cornfield that he's
3  referring to was?
4     A.   Do I what?
5     Q.   In other words, why did Barbara ask
6  for this mailing list?
7     A.   I was on her to get it because Jason
8  wasn't getting it.  And I said call him and get
9  that information, they have to provide it, they
10 have to have a record of it.
11    Q.   Okay.
12    A.   And then what tipped it off, too, is
13 that he said, well, we outsourced the mailing.
14 They are the mail house supposedly.  The other
15 place is just a graphic design place.
16    Q.   Okay.  On here there's an attachment
17 that's referenced and it's .csv.  I don't know if
18 it's this or not.  Was this what you were
19 expecting, this kind of document that's reflected
20 on page 107?
21    A.   No.  I didn't know what to expect
22 because I don't know what the post office is.  But
23 I know that when she called and then they came
24 down and told her it was fraud.
25    Q.   Okay.

Page 273

1     A.   And this was a Corvette, this was a
2  specific Corvette, where when they bought the
3  names from it, from something, and, you know.
4     Q.   When you say they bought the names,
5  what do you mean?
6     A.   He said he bought a name list of
7  Corvette owners.
8     Q.   Jason said he bought that?
9     A.   Mm-hmm.
10    Q.   And did he say he provided that name
11 list to J&N?
12    A.   I kept asking for it and never got it.
13    Q.   So I'm switching back to I believe
14 this is Exhibit 11.  It's the J&N documents
15 produced by Mike Anderson Chevy 1 through 90.  And
16 I just wanted to bring your attention to Bates
17 number 7.  And I'm going to zoom in because I know
18 it's kind of hard to read.  On here it says:
19        Graphics layout for service sign and
20        window graphic, 37 by 96 inch full
21        color vinyl with laminate affixed to a
22        10 milliliter coroplast sheet.  Then
23        delivered and installed in service
24        department.  4 by 8 printed on
25        perforated window film.  Trimmed and

Page 274

1 delivered and installed on new car
2 showroom window.
3    A.   You can't -- you can't have anything
4 like that.  That's against the Chevrolet --
5    Q.   Okay.  Let me -- let me break that
6 down so we can address each of these lines.  On
7 the -- so let's start from the bottom because I
8 think we were talking about the new car showroom
9 window.  There's a 4 by 8 printed on perforated
10 rated window film that was supposedly trimmed,
11 delivered, and installed on new car showroom
12 window.  And you said that you can't do that?
13    A.   Chevrolet has an image that you have
14 to abide by.  Right?  And you can't have any,
15 like, typical card -- I don't know what the word
16 is, like -- not corrugated -- you can't have --
17 you can't have like gimmicky looking things.  You
18 can't have anything on the window at all really.
19         That, for sure, there's no way in
20 the world we bought that.
21    Q.   Let's move up one.  It says:
22    37 inch by 96 inch full color vinyl
23    with laminate fixed to a 10 milliliter
24    coroplast sheet.  Then delivered and
25    installed in service department.

Page 275

1         Is there anywhere in the service
2 department that a vinyl could be installed?
3    A.   I'm not aware, no.
4    Q.   Okay.  Do you remember there ever
5 being anything installed in the service department
6 as far as any graphics, images --
7    A.   I remember -- I remember a tire one
8 that came from GM that we had to hang up to try to
9 push their tires.
10    Q.   And that just came straight from a
11 manufacturer --
12    A.   Yeah.
13    Q.   -- and not a third party.  Correct?
14    A.   Right.  Yeah.  Mm-hmm.
15    Q.   So do you dispute the services that
16 are reflected on this invoice?
17    A.   Yeah, because I don't remember those
18 at all.  And the second one for sure because
19 there's no way on this planet that would have been
20 allowed.
21    Q.   So this is an invoice it looks like
22 that was sent from J&N Marketing to Mike Anderson
23 Chevy in Chicago.
24    A.   Mm-hmm.
25    Q.   When this comes in to your office and

Page 276

1 it's mailed in, who does it go to?
2    A.   That would go to the accounts payable
3 clerk.
4    Q.   And what is accounts payable?  Because
5 I know getting an actual invoice for a
6 non-previously PRC'd vendor --
7    A.   This would -- because, remember, I
8 told you that when you come see your advertising
9 is different because usually you use your ad
10 agency for everything.
11    Q.   Right.
12    A.   But what we would do is -- so we don't
13 pay off invoices.  Our policy is we pay off
14 statements.  Okay?
15         He would take these up to the
16 accounts payable -- accounts payable and say, "Cut
17 this check," and stand there.  And then she'd say,
18 "But I mean," XYZ.  And he said, "I said cut the
19 check."
20    Q.   So I'm going to scroll up to what
21 looks like -- on page 6, an accounts payable check
22 request.
23    A.   Mm-hmm.
24    Q.   We talked about check requests
25 earlier.  Right?

Page 277

1    A.   Mm-hmm.
2    Q.   Is this what you were referring to?
3    A.   Mm-hmm.  The old one, yeah.  Not the
4 new ones.
5    Q.   This is what was in place in approxi-
6 mately January --
7    A.   Right.
8    Q.   -- 2017?
9    A.   Mm-hmm.
10    Q.   And who would typically fill these
11 out?
12    A.   The person requesting the check.  And
13 then whoever like, it was like Jason, he would
14 sign off on it.
15    Q.   Okay.  And in this case do you
16 recognize the signature on the left?
17    A.   It's the same as the one on the right.
18 I'm guessing that's Jason.
19    Q.   Okay.  And I know you said that the
20 rule is to always mail out the check.
21    A.   Mm-hmm.
22    Q.   Why is there a pickup slot on here?
23    A.   Because that was an old form before we
24 changed it.  But that actually was a Z Frank form.
25 Our other form, there isn't anything.  We don't

70 (Pages 274 - 277)

Page 278

1  pick up checks.  You ask anybody there, we
2  don't -- we don't pick up checks.
3      Q.   I think you talked about an old form.
4  When was the old form in use?
5      A.   For a while until -- that was a
6  Z Frank form that was carried over.  And then we
7  updated it down the road, whenever they ran out of
8  them I suppose.
9      Q.   Do you know if it was like -- was it
10  around 2017?  Was it around 2018?  Can you give me
11  an idea?
12      A.   I'm sure we still had them.  They had
13  so many things left over.
14      Q.   So you don't just remember an exact
15  date?
16      A.   You're asking about a form from three
17  years?  I don't.
18      Q.   And I'm just understanding it was just
19  something where you figured you'll reuse the form
20  until it runs out of paper.  Is that right?
21      A.   Until we ran out of them.
22      Q.   Yeah.
23           So the same kind of questions here.
24  I'm on J&N 19.  There's reference in this invoice
25  to a 4 by 8 mesh vinyl banner printed full color,

Page 279

1  all outside edges -- I think it says seamed with
2  banner tape and grommeted and that these banners
3  were shipped to a dealer in Chicago.
4           Do you remember ever having --
5      A.   No.
6      Q.   -- in approximately May 2017 anything
7  like this?
8      A.   Uh-uh.
9      Q.   Does MACC just historically --
10      A.   They didn't even spell "dealer" right.
11      Q.   I see that.
12           Just historically --
13      A.   Nor does he even have the address on
14  there.
15      Q.   I'm sorry?
16      A.   Nor does he even have the address on
17  there.
18      Q.   In 2017 do you know if MACC ever had
19  any kind of -- if Mike Anderson Chevy ever had any
20  kind of banners or anything like that?
21      A.   No.  There we did very, very, very,
22  very few because we didn't have any place to put
23  them.
24      Q.   So you don't have --
25      A.   And then but the City is really strict

Page 280

1  with a lot of that stuff, too.
2      Q.   Did you ever have events that you
3  would, you know, put a tent up?
4      A.   No.
5      Q.   Okay.
6      A.   No.  No.
7      Q.   I wanted to ask because these
8  documents came from your company's production.
9  And I know we went over a few similar to what's on
10  J&N 24.  And I just am curious --
11      A.   "Find new roads" is a Chevrolet --
12  Chevrolet image -- I mean Chevrolet slogan --
13           (Court reporter clarifi-
14           cation.)
15      THE WITNESS:  "Find new roads" used to
16  be a Chevrolet tagline.
17  BY MS. LIU:
18      Q.   Okay.  I'm just looking for context,
19  though.  Do you know why this is in your
20  production --
21      MR. QUANDT:  Just for the record,
22  counsel, for the record, those were provided to
23  you through the subpoena that we served on J&N.
24      MS. LIU:  I have separate subpoena
25  responses that are not these.

Page 281

1      MR. QUANDT:  The documents that I'm
2  seeing on the screen right now were provided to
3  your office in response to a production response
4  to subpoena to J&N.
5      MS. LIU:  I don't believe that's true.
6  I'm looking right now, and these documents are
7  in the folder that was marked by I believe
8  Judy Arnold.  I have J&N --
9      THE WITNESS:  That's Judy's writing.
10      MS. LIU:  Yeah.  I have J&N subpoena
11  responses, initially 83 pages, that you provided.
12  But separately I also have this folder from J&N.
13      MR. QUANDT:  Well, whatever you have
14  you have.
15      MS. LIU:  Okay.
16  BY MS. LIU:
17      Q.   Have you seen this document before
18  that's on page 24?
19      A.   It doesn't ring a bell, no.
20      Q.   Okay.  Do you know why there would be
21  a copy of this in --
22      A.   Well, because it was probably some-
23  thing that he turned in for a bill.  It was
24  probably something that he turned in to get paid
25  on something, yeah.

71 (Pages 278 - 281)

Page 282

1    Q.   So when you say that he might have
2 turned it in for a bill, what do you mean?  Is
3 there generally support that he has to provide?
4    A.   Well, with something like that, you
5 would have to support it.  Or if he was trying to
6 co-op it where you get the money from, you know,
7 Chevrolet, try to do that.
8        But, again, you go to that
9 "credit," I don't use the word "credit."  Do you
10 know how much trouble you get in for that?
11    Q.   When you say you get money back from
12 Chevrolet for turning something like this in, what
13 do you mean?
14    A.   You co-op it so you get -- if you meet
15 their guidelines, i.e. you have so much of the ad
16 dedicated to new, you've got -- depending on how
17 many cars you invoice, you get so much set aside
18 that you get to use and spend in advertising.
19 It's called like an advertising reimbursement,
20 advertising credit.
21    Q.   So --
22    A.   So --
23    Q.   Okay.  Go ahead.
24    A.   He may have used -- gotten this to
25 turn that in to get the money from GM so it didn't

Page 283

1 -- so then it got paid to the dealership so it
2 didn't look like anything funny.
3    Q.   And if it got paid to the dealership,
4 would the dealer -- would the manufacturer take
5 issue with some of the things that you pointed out
6 that you --
7    A.   There's lots of things they would
8 say like, no, that wouldn't -- that wouldn't --
9 they wouldn't know the laws.  They would want to
10 make sure like "find new roads," a tagline, that's
11 a big one that has to be there.  Right?  You have
12 to have a picture of a couple cars there.  That's
13 one thing.  You've got to have -- it's gotten
14 really strict now with, you know, gimmicky, you're
15 not allowed any gimmicky-type things.
16        But there were just a few things
17 that you had to have before to be able to submit
18 the bill to get paid, like reimbursed basically.
19 So, like, if you look at an invoice, you'll see an
20 advertising charge for every single invoice that
21 we get charged that actually we get back with a
22 match if it fits their program.
23        So Chevrolet would have no idea
24 that that credit builder program would be, you
25 know, probably illegal in Illinois.

Page 284

1    Q.   Okay.  I've seen a couple of check
2 requests where there's a "return to" portion and
3 it's filled out that Jason paid.
4    A.   Mm-hmm.  Mm-hmm.
5    Q.   Under what circumstances generally are
6 checks returned to the person that's --
7    A.   They're not.  That's against our
8 policy.  Because I told you those are the old
9 forms.
10    Q.   Yeah.  And that's the only reason that
11 this is even on there is because it's an old form.
12 Right?
13    A.   Right.  Mm-hmm.
14    Q.   Have you seen this document before?
15    A.   No.  Keeping kids safe?  We had a --
16 that was in Merrillville, though.
17    Q.   I can scroll down.  It says Mike
18 Anderson Chevy of Chicago.
19    A.   I remember something with keep kids
20 safe.  But I thought it was a fingerprinting of
21 the kids at the store.
22    Q.   Do you know where this is from?
23    A.   No.
24    Q.   Okay.  And there is on the very bottom
25 of here, it looks like, I don't know, but it

Page 285

1 looks like something from Jason Kolodzinski to
2 Dan Grisko.  Who's Dan Grisko?
3    A.   He was a -- I think he did the Spanish
4 advertising or did the advertising, one or the
5 other, that Jason brought in.  I want to say I met
6 the guy.  I think I met the guy.  But, anyway, he
7 was like an agency basically.
8    Q.   So he's an ad agency of sorts?
9    A.   Mm-hmm.
10    Q.   What about Eric Jones?
11    A.   He was a -- he was a -- he was
12 somebody that Jason brought in as well.  And he
13 ran BDC, Business Development Center.
14    Q.   Is Eric Jones still there?
15    A.   No.
16    Q.   Did he leave before Jason left?
17    A.   I don't know if he left before or
18 after.  It was around the time, though.
19        And can I tell you something else
20 that tipped me off?  His best friend worked there,
21 Jason's, and then he abruptly quit like right as
22 this stuff started uncovering.  And I thought that
23 was odd and then -- for him to just get up and
24 leave like that.
25    Q.   Did you ever suspect anyone else at

72 (Pages 282 - 285)

Page 286

1  Mike Anderson Chevy being involved in the, like,
2  alleged incidents at issue?
3      A.  No.  Did I ever suspect anybody?  No.
4  I -- what would happen, and I believe why he got
5  away with as much as he did was he would throw
6  around "I'm the general manager," "I'm the general
7  manager," "I'm the general manager."  Right?
8          And, since then, I've made it
9  perfectly clear to everyone nobody has the
10  authority to override or supersede a procedure or
11  policy, period, the end.  It doesn't matter who
12  they are.  If it's a policy, it's a policy for a
13  reason.  So, therefore, it doesn't matter that he
14  said, "I need this now.  Give me the check.  I'm
15  going to hand it to the guy."  You don't do that.
16  And like our old controller is like, well, he's
17  the GM, he has the authority.  I said, no, he
18  doesn't.  That policy is there for a reason.  And
19  it didn't make any sense to her.  And I said,
20  look, this is something that is just a standard
21  procedure and it happens and we mail them out,
22  period.  You do not hand out the checks.
23      Q.  Let's turn to 74 to 75 of this
24  production.  Have you seen this before, the
25  payment swap program?

Page 287

1      A.  No.  And that's -- again, that's
2  something you're going to get in a lot of trouble
3  for from the Attorney General.  And I would never
4  allow something like that to go out.
5      Q.  And, again, you don't know if Jason
6  directed J&N to send something like this out or
7  anything like that?
8      A.  Right.  And, I mean, guessing he
9  probably did this to get some sort of co-op
10  reimbursement from GM or for backup on a payment
11  or something.
12      Q.  I know this is extremely hard to read
13  on page 79.  To the extent that you can make it
14  out, does this look familiar at all?
15      A.  Uh-uh.  Anything where you see
16  gimmicky special vehicle code and that stuff, it
17  would never have been approved for a mailer ever.
18      Q.  Looking at page 88 of this production,
19  it's another invoice that's dated May 13, 2016.
20  And I'm going to ask you to go halfway down
21  through the description list, and there's a
22  fulfillment item that says: My prize status
23  website landing page for customers to log in.  Do
24  you know what that is?
25      A.  No.  And nor would I allow them to

Page 288

1  have a URL that had -- no.  And, again, there's no
2  address on there.
3      Q.  The total on here says 15,000.  Would
4  that be a high amount?
5      A.  That would be a high amount that would
6  have sparked something, yes.
7      Q.  Did anyone ever tell you in the course
8  of Jason working there something like I know we're
9  supposed to mail these out but he keeps insisting
10  that I hand them to him or that someone is going
11  to pick them up --
12      A.  No.
13      Q.  -- or anything like that --
14      A.  No.  Uh-uh.  We found out on accident
15  really.
16      Q.  What do you mean on accident?
17      A.  Well, like Barb is like they're going
18  to pick it up.  And she's a lady that used to work
19  for me.  They can't pick it up.  We have to mail
20  it.  She said, well, he said that the customer --
21  whoever the vendor was.  I said, no, it gets
22  mailed.  And she's like, well -- no, it
23  doesn't matter.  We mail the checks, period.  He
24  said -- she said, well, they're here now.  I said
25  I don't care.  The checks get mailed.

Page 289

1      Q.  Who does Barbara report to -- or did
2  she report to --
3      A.  She reported to -- she reported to me.
4          But when, you know, again, when I
5  was gone is kind of when all this really, you
6  know, wild west happened, and that's where she
7  was, I guess, confused maybe because he's a GM and
8  he's telling her to do something and she's like
9  against, you know, what I was told or taught and
10  instructed to do.  And she -- I mean, she would
11  follow him because she probably didn't want to get
12  in trouble.
13          But, since then, I make it very
14  clear it doesn't matter who it is, it doesn't get
15  override.
16      Q.  I'm looking at J&N 89 and 90.  And I
17  know these are a little hard to read, so I'm going
18  to do my best to blow them up for you.
19          Various dealerships, just by my own
20  experience, have holiday weekend sales.
21      A.  Mm-hmm.
22      Q.  Did Mike Anderson Chevy ever have
23  any --
24      A.  We don't do --
25      Q.  -- holiday sales?

73 (Pages 286 - 289)

Page 290

1    A.   No.  If -- what we'll do is what the
2  manufacturer does.
3    Q.   Okay.
4    A.   Because that's the only way you pick
5  up any kind of traction.
6    Q.   So do you recall in past years if the
7  manufacturer has promoted or encouraged you to
8  have a Memorial Day sale?
9    A.   Memorial Day they may have had
10 something.  Christmastime they always usually have
11 the cheapest and New Year's, year end, you know.
12 But not Memorial Day per se because they tend to
13 stay away from those, and I think it's because a
14 lot of dealers are closed on kind of holidays like
15 that.
16   Q.   Now, if you look at the bottom, there
17 seems to be -- and this has -- it has "sample"
18 stamped across it.  There seems to be a "scratch
19 now" with a big scratcher.  Do you see that?
20   A.   Scratch now win big?
21   Q.   In the left --
22   A.   Yeah, no, see, we don't do gimmicky
23 things.  Nor would I ever approve a gimmick ever.
24   Q.   And, again, Jason might have just
25 violated company policy?

Page 291

1    A.   Oh, he violated all sorts of things up
2  and down and all around.
3    Q.   With respect to something like this,
4  if he put something like this on here or directed
5  J&N to do it, your position is --
6    A.   Yeah.
7    Q.   -- it was without authority and he
8  still he did it?
9    A.   He was absolutely, absolutely not
10 allowed to do that.
11   Q.   If a vendor were to pick up a check, I
12 imagine your offices, your administrative staff,
13 accounts payable, they're not right in the front
14 where customer service is.  Right?
15   A.   No.  He would go get the check and
16 have them do it and he would be the one that would
17 give it to them.
18   Q.   So --
19   A.   The office wouldn't give them a check.
20   Q.   So no vendor would come to the back
21 and meet Barbara or your --
22   A.   They couldn't, no.  They couldn't
23 because there was no way for them to get up there.
24   Q.   Would Mike Anderson ever consider
25 working with J&N --

Page 292

1    A.   No.
2    Q.   -- again?
3    A.   Never.  Never.  Never.  Absolutely
4  not.
5    Q.   Would it surprise you if your
6  advertising agency reached out to J&N?
7    A.   If they didn't know the background.  I
8  might be shocked but would immediately stop it.
9    Q.   So I received this from J&N's
10 attorney, and it's an e-mail dated May 19, 2021,
11 from Dan Grisko.  From my understanding from
12 earlier, it's an advertising agency gentleman.
13 And it reads -- and I'm going to mark this --
14 Exhibit 13 am I on?  13.
15             (Deposition Exhibit 13 was
16             marked.)
17 BY MS. LIU:
18   Q.   Hey Nick, long time no talk.
19       Are you still in the biz or did you
20       get smart and retire?  If still doing
21       mail, I'm looking for a preapproved
22       credit mailer, score 620-plus for Mike
23       Anderson Chicago.  Let me know what's
24       in your arsenal.  Thanks, Dan.
25   A.   When is this?

Page 293

1    Q.   May 19, 2021.  Four months ago.
2    A.   We haven't worked with Dan Grisko in
3  ages.
4    Q.   Do you know why he would be looking
5  for --
6    A.   I have no clue why he would be looking
7  for that.
8    Q.   Do you know what a preapproved credit
9  mailer is?
10   A.   Yeah.  And we don't do them.
11   Q.   Okay.  And is that --
12   A.   I would --
13   Q.   Go ahead.
14   A.   I would want to investigate that.  I
15 don't know why.  What does it say at the bottom?
16   Q.   It's from a gmail.  It's a mail.google
17 gmail URL.  I can scroll in.
18   A.   I've never seen -- I mean that -- mine
19 don't do this.
20   Q.   Yeah, I don't know.  I received this
21 from --
22   A.   Do not click on links or open
23 attachments unless you know they're safe.
24       What's me.com?
25   Q.   I think that's MicrosoftExchange.com.

74 (Pages 290 - 293)

1    So as of May 19 were you still
2  doing business with Dan Grisko?
3    A.  I don't think so. I don't think we've
4  done anything with Dan Grisko in a while,
5  literally -- I don't believe we've done anything
6  for a while. He was Spanish. I believe he did
7  the Spanish, had a connection in Spanish somehow.
8    Q.  Would it --
9    MR. QUANDT:  And, counsel, just for
10  the record, Exhibit 13 you're saying is something
11  that you received from counsel for J&N?
12    MS. LIU:  Correct. That was not
13  responsive to any subpoena.
14  BY MS. LIU:
15    Q.  Do you know if your father ever asked
16  J&N to perform any marketing work for any of his
17  other dealerships?
18    A.  I have no idea.
19    Q.  Would it surprise you?
20    A.  I don't know. I can give you somebody
21  that would know. People that own the stores now.
22  We ran as separate entities.
23    Q.  You ran as separate entities, your
24  different locations as separate entities, is what
25  you're saying?

1    A.  Well, yeah. But we didn't -- we
2  didn't have like common ownership. We didn't even
3  have like -- we didn't do anything the same, I
4  mean nothing.
5    Q.  Earlier you talked about seeing
6  certain big bills involving J&N and that piqued
7  your interest.
8    A.  I said big totals.
9    Q.  Big totals. I'm sorry. I keep using
10  the word "big bills," and I apologize for that.
11    Are there any other incidents
12  involving J&N that you personally experienced or
13  personally found out about? So what I'm asking
14  essentially is your personal knowledge regarding
15  the allegations involving J&N.
16    A.  Are there any other ones other than we
17  talked about?
18    Q.  Yeah. So, for example, has anyone,
19  other than things we've already talked about,
20  escalated any issues with J&N to you?
21    A.  Uh-huh.
22    Q.  No?
23    A.  No. Because there was none because
24  there wasn't anything ever done that I know of.
25    Q.  Let's talk about Epic Motorsports.

1  Can you --
2    A.  It's -- it's almost 3:30. Aren't we
3  done?
4    Q.  We're not done yet. But I understand
5  it's --
6    A.  You told me 3:30.
7    Q.  And I believe counsel misspoke. But
8  I'll let counsel speak for himself. It's 7 hours
9  at 4:30, and that's if we don't count all the
10  breaks we've taken.
11    MR. QUANDT:  Well, 4:30 is the latest,
12  counting the lunch break.
13    THE WITNESS:  I thought 3:30. But we
14  didn't even take a lunch break. We took a 20-
15  minute break.
16    MS. LIU:  Ms. Court Reporter, if you
17  have how much time has transpired and we can just
18  know officially how much time is left, I'd really
19  appreciate that.
20    MR. QUANDT:  We've been on the record
21  except for the break we took at lunch, whatever
22  that break was.
23    MS. LIU:  Ms. Court Reporter, do you
24  have the time?
25    MR. QUANDT:  I think we broke for a

1  half an hour.
2    MS. LIU:  Eric, can we just let her
3  figure it out, please?
4    MR. QUANDT:  Well, what question are
5  you asking her?
6    MS. LIU:  She's been keeping track of
7  time.
8    MR. QUANDT:  Yeah. We started at
9  9:00 o'clock --
10    MS. LIU:  I'm asking the court
11  reporter. Can you just let her respond?
12    MR. QUANDT:  Yeah.
13    (Court reporter clarifi-
14    cation.)
15    THE WITNESS:  Are you saying we
16  started at 9:00 a.m.?
17    MS. LIU:  Yes. So it's 5 hours and
18  16 minutes, which means we have an hour and 30
19  minutes up to the 7 hour mark.
20    MR. QUANDT:  I don't know how you're
21  calculating the seven hours. But we calculate
22  from the time we sat down here until --
23    MS. LIU:  It's on the record.
24    MR. QUANDT:  -- took a break.
25    MS. LIU:  Eric, it's what the court

75 (Pages 294 - 297)

Page 298

1  reporter is saying. So I'm just going to keep
2  going before we just waste all this time and
3  Mr. Anderson is here even later.
4  BY MS. LIU:
5      Q.   So Mr. --
6      A.   Mr. Anderson what?
7      Q.   Is here later than you need to be.
8      A.   Right now I'm here later than I need
9  to be because of all the circle talk and nonsense.
10     Q.   Let's talk a little bit --
11         MR. QUANDT: Let's move on.
12         MS. LIU: I'm sorry.
13         MR. QUANDT: Let's move on.
14         MS. LIU: That's what I'm trying to
15  do.
16  BY MS. LIU:
17     Q.   Let's talk about Epic Motorsports.
18  Can you tell me about the past history of Michael
19  -- Mike Anderson Chevy and Epic Motorsports?
20     A.   Haven't we gone over this already?
21  There wasn't one. Prior to Jason, it didn't have
22  one.
23     Q.   Okay. So from March 2016, is that the
24  first time that you ever did business with Epic
25  Motorsports?

Page 299

1      A.   The first time we ever did business
2  with Epic Motorsports is when Jason started.
3      Q.   So March 2016. And when did the
4  relationship officially end?
5      A.   When he left. Well, it officially
6  ended when I said no more from them and then he
7  started buying cars from the auction that came
8  from Epic.
9      Q.   Do you remember when exactly you said
10  "no more"?
11     A.   The exact day when I finally said
12  absolutely not, no more? No. But it was in an
13  e-mail that you have in your -- it was in that
14  bankers box.
15     Q.   Okay. I think I know which e-mail
16  you're talking about. And then after --
17     A.   And I purposely did that so it was --
18  it was documented.
19     Q.   And then, after that, he went through
20  auction and still continued to purchase cars from
21  Epic until he was no longer an employee in
22  approximately January --
23     A.   Well, even when he, like, technically
24  like just vanished and then was buying cars and
25  not telling anybody, never coming back to work or

Page 300

1  anything and we got the inkling. And then I think
2  the auction called and said you need to pick up
3  these cars. And what are you talking about? And
4  it was past the time that you can cancel the deal.
5  And I mean it was so blatant that it was --
6  because he didn't care. He was buying them for
7  whatever, whatever the money was.
8          MR. QUANDT: Counsel, let me just --
9  let me just note an objection for the record. As
10  the witness has testified to, this was gone into
11  before. You're prefacing your questions with "and
12  as I understand your testimony," "as I
13  understand." He's testified on these issues.
14  Please don't repeat the same questions hoping for
15  a different answer.
16         MS. LIU: I'm not. I just don't want
17  to misconstrue what he said.
18         MR. QUANDT: Well, then -- the
19  record --
20         MS. LIU: Let's continue on --
21         MR. QUANDT: The record is clear. You
22  do not have to construe his testimony at all.
23  It's on the record.
24         MS. LIU: That's not a proper
25  objection. But I'll continue on.

Page 301

1  BY MS. LIU:
2      Q.   In the allegations in the complaint,
3  there's reference to 91 cars purchased from Epic.
4  How many vehicles all time did Epic provide to
5  Mike Anderson?
6      A.   I don't know. I could find out. But
7  I don't know.
8      Q.   Is it more than 91?
9      A.   I'm sure it probably is. I'm guessing
10  it probably is.
11     Q.   And just to short-circuit our
12  conversation, is the way that the vehicle --
13  vehicles that Mike Anderson chose to identify as
14  part of this loss, were those identified in the
15  same manner as those in the Sir Hooptie documents
16  we went through --
17     A.   Yes.
18     Q.   -- in other words -- yes?
19     A.   Yes. Wherever we show a loss. If we
20  showed a profit, you know --
21     Q.   Okay.
22     A.   It would be if you showed a loss on it
23  and then you looked at it and said, well, yeah, we
24  way overpaid for the car.
25     Q.   So I'm not going to ask you to do the

76 (Pages 298 - 301)

Page 302

1 whole demonstration of how we got there because
2 the understanding is it was the purchase price
3 factored in with any kind of repairs and then the
4 ultimate sales price that you determined whether
5 or not there was a profit or loss. Correct?
6     A.   (Nodding)
7     Q.   But I do have a couple of specific
8 questions for you. Now, we've received voluminous
9 documents from Mike Anderson for the Epic -- I'm
10 going to turn this around -- for the Epic sales.
11 I've split them into years 2016, 2017, and 2018
12 just because they're very large.
13         So if you'd like to look at the
14 Epic 2016 document in front of you, please feel
15 free to. I've gone through that calculation that
16 you were talking about, and I've come to some
17 positive numbers instead of some negative. So I
18 wanted to run it by you to see if I'm calculating
19 anything wrong, anything like that.
20         So I'm going to bring your
21 attention to CP3336. And, on here, again this
22 looks like Judy's writing. Correct?
23     A.   Yes.
24         MS. LIU: And, for the record, I'm
25 marking this as Exhibit 14. It is MACC:Epic 634

Page 303

1 to 892.
2         (Deposition Exhibit 14 was
3         marked.)
4 BY MS. LIU:
5     Q.   On here, and it's quite a large
6 number, 4,391.41 is what she has written down
7 here. If I go down to the documents for 3336, I'm
8 looking at a check that is on a page Bates-stamped
9 as MACC-Epic 725. It is dated July 1, 2016, and
10 it's in the total amount of $63,000. Do you see
11 that?
12     A.   Yeah.
13     Q.   And then on the first line, the
14 description, it says $13,000 in the amount section
15 for CP3336, it looks like a 2013 Toyota Camry.
16 And it looks like Mike Anderson bought this
17 vehicle for $13,700. Would you agree?
18     A.   Uh-huh.
19     Q.   Okay. I am happy to scroll through.
20 I just am getting different -- I'm getting a
21 positive instead of a negative, which I would like
22 to sort through if you could help me with it. I'm
23 on the customer order page --
24     A.   Can you make it bigger and move it
25 around?

Page 304

1     Q.   Sure. 726. And please feel free to
2 direct me so I know where to move stuff for you.
3     A.   Okay.
4     Q.   So it appears that there was a service
5 plan built into this price of $21,096.82 --
6     A.   Right.
7     Q.   -- so it would truly be --
8     A.   Yes.
9     Q.   -- the sale price of --
10         (Simultaneous speaking.)
11         (Court reporter clarifi-
12         cation.)
13 BY MS. LIU:
14     Q.   The sales price of the vehicle is
15 $19,096.82. Correct?
16     A.   Yes.
17     Q.   And I understand that there are other
18 documents that Mike Anderson looks through in
19 determining what that's claiming, so I'm going to
20 go through the next couple of documents.
21         This is page 727. It appears to be
22 part of a service order invoice. And I'm going to
23 scroll through. Feel free to tell me when to
24 stop.
25     A.   Stop. 686.79. Go on. Wait. Go back

Page 305

1 up. Go back up. Stop. Okay. Go down. Go back
2 up. Stop. Is that the same invoice?
3     Q.   I can look for the invoice number.
4 Invoice 63353. Yeah, it is the same invoice. I
5 don't know why it's there twice. Are you okay
6 with me scrolling past it?
7     A.   Uh-huh.
8     Q.   And now we're at page 732. Is this
9 what you were talking about with the safety
10 check --
11     A.   Mm-hmm.
12     Q.   -- this document right here?
13     A.   Mm-hmm.
14     Q.   Okay. And this appears to be a
15 different invoice, I64658, Bates 735.
16     A.   Okay. Okay. Go on.
17     Q.   And the next page is now a check for a
18 separate transaction, so 737.
19         So based on --
20     A.   Okay.
21     Q.   -- these documents, do you think you
22 could do the math?
23     A.   Scroll down again. What was that next
24 check for?
25     Q.   It looks like it's a duplicate.

77 (Pages 302 - 305)

Page 306

1   A.   It's the same thing.
2   Q.   Right.  I can keep going down and
3 seeing if it's another duplicate.  No.  This is
4 3339.  So it looks like this check was just
5 duplicated for some reason.
6   A.   Scroll down, please.  Scroll down,
7 please.  Stop.  Is this the one?
8   Q.   No.  The one we're looking at is 3336,
9 Toyota Camry.  This is a Dodge.
10   A.   CP3336.  Right?
11   Q.   Correct.
12   A.   Is that -- where is the invoice -- I'm
13 sorry, the buyer's order?
14   Q.   Yeah, I'm -- I've spent enough time
15 with you I actually knew what you meant.
16   A.   Can you scroll down and see if it's
17 signed?
18   Q.   Who signed it?
19   A.   That's not what -- that's not what
20 matches the deal at all.
21   Q.   What do you mean?
22   A.   I'm looking at the deal right now, and
23 the deal shows a sales price of 13,500.
24   Q.   I received this from your office, so
25 if there's something else that I should be having.

Page 307

1 The Toyota Camry that you're looking at for 2013?
2   A.   Yeah.  For Grant Collen, Collen Grant.
3   Q.   Yeah, that's what I'm looking at.
4   A.   But I have a sales price of 13,500.
5   Q.   Mr. Anderson, are you just looking
6 within your internal system or is there a
7 different customer order that you're looking at?
8   A.   I'm looking at the internal system.
9 But if you printed the buyer's order from here, it
10 would.
11   Q.   Mr. Anderson, I'm just going to be
12 transparent with you.  The reason I'm pulling this
13 up is there were a couple of transactions that we
14 saw using the methodology that you were alluding
15 to earlier that we talked about at length today
16 that seemed to come up with positive numbers where
17 they were indicated negative, and I didn't
18 understand why.  I'm wondering if the documents I
19 received perhaps were not either accurate or what
20 is reflected in your system.
21   A.   That doesn't -- 10/8/16.  Is that 10/3
22 or 10/8 on there?
23   Q.   It says I think -- let me scroll up.
24 It looks like 10/3.
25   A.   This is a sales price of 13,5.  And

Page 308

1 you're telling me -- and that one says 21,096?
2   Q.   Yeah.  I mean, and this appears to be
3 Judy's handwriting.
4   A.   Right.
5   Q.   I have a few examples.  I didn't --
6 I didn't expect this to happen, in full trans-
7 parency today, that I've isolated.  Do you want to
8 check out another one and see if it's the same
9 case?
10   A.   No.  I want to see what this is
11 because this isn't making sense.
12   Q.   Mr. Anderson, would it make sense for
13 us to get off for like five or ten minutes where
14 you can try and reconcile the differences --
15   A.   It makes sense to end this because
16 this is just insane.
17      MR. QUANDT:  Let's just -- let's just
18 keep going.  Just answer the question to the best
19 of your knowledge.
20      THE WITNESS:  I would have to dig into
21 this.  It doesn't seem -- that doesn't seem right
22 to me at all.  It doesn't match what's in the
23 system right now.
24      MS. LIU:  Okay.  And I just want the
25 record to reflect it appears that perhaps we do

Page 309

1 not have all the records, and we reserve our right
2 to further question this witness once we do.
3      MR. QUANDT:  Just wait.  For the
4 record, we've been responsive with the documents
5 in our possession.
6      MS. LIU:  I'm marking this as Exhibit
7 I believe 14.
8      MR. QUANDT:  Exhibit 15.
9      MS. LIU:  15.
10          (Deposition Exhibit 15 was
11           marked.)
12 BY MS. LIU:
13   Q.   15, Mr. --
14   A.   That was a text --
15   Q.   These were the text messages with your
16 father?
17   A.   Mm-hmm.
18   Q.   Do you know what date these text
19 messages were exchanged?
20   A.   It's on there.
21   Q.   It just says "today."
22   A.   Well, what was that -- what day was
23 that?  Hang on a sec.  Because I purposely put it
24 in an e-mail and sent it so that it had it on
25 there.

78 (Pages 306 - 309)

Page 310

1    Q.   It was on the same day that the e-mail
2  was sent?  Is that what you're telling me?
3    A.   That I -- that was --
4    Q.   If this was attached to an e-mail that
5  you sent and you can represent that the e-mail in
6  the text messages was on the same day, we can move
7  on.  Is that what you're telling me?
8    A.   I'm, like, certain I did that and put
9  in e-mails and forwarded it so it would have a
10  time stamp on there.
11    Q.   Okay.  Can I ask is it around January
12  2018 or is it earlier?
13        Okay.  Regardless, let's move on.
14    A.   I've got a tutoring thing.  Hold on.
15  I'm going to have to take a five-minute break.
16        MS. LIU:  We're going off the record.
17        MR. QUANDT:  We'll take a five-minute
18  break.
19            (A break was taken from
20             3:50 p.m. until 4:34 p.m.)
21  BY MS. LIU:
22    Q.   Mr. Anderson, I'm going back to this
23  customer order --
24    A.   Yes.  Yes.
25    Q.   -- Bates stamped --

Page 311

1    A.   I mean --
2            (Simultaneous speaking.)
3            (Court reporter clarifi-
4             cation.)
5        THE WITNESS:  Here we go with this
6  again.
7  BY MS. LIU:
8    Q.   Please let me ask the question.
9  Earlier, we were talking about the purchase price.
10  And we noted on here that there was a handwritten
11  purchase price of 19,096.82 and in your computer
12  you saw a different purchase price.  Is that
13  correct?
14    A.   Yes.  But I don't know what is built
15  in to that.  No.  I said something else is built
16  in to it.
17    Q.   What do you mean by something else is
18  built in to it?
19    A.   Like if we had to cut a check -- cut
20  a customer a check back to pay off a car or
21  something.  I don't know what's built in to that.
22  So I don't know without digging into it.
23    Q.   So, as you sit here right now looking
24  at this document, could you tell me what this car,
25  this Toyota Camry 2013 car, was sold for?

Page 312

1    A.   It would have been 2,000 -- no.
2  19,096.82.  It's right there.
3    Q.   Okay.  So your testimony today is that
4  when Mike Anderson Chevy sold this car it was for
5  $19,096.82?
6    A.   What you're showing me right now would
7  have been the net -- you've got $2,000 included in
8  the service contract included in the price.
9    Q.   Okay.  So based on this document and
10  based on the subsequent invoices that we already
11  went over, you were starting to do the math and
12  see what we're really talking about.  And I've
13  represented to you that I came up with a positive
14  number.  You were going to look on your end and
15  see what you were going to come up with.  Did you
16  end up coming up with a number?
17    A.   I don't know where it's at now.
18    Q.   And I can run through these numbers
19  one more time with you if you want.  The check on
20  725 shows $13,700 that Mike Anderson Chevy
21  purchased this vehicle for.  So it's that number.
22  On 726, what you just said, $19,096.82.  On 728,
23  there is a service charge, an internal service
24  charge, of 686.79.  As we established, these pages
25  are duplicates.  And on page 735 there is a charge

Page 313

1  for 106.25.  And on page 736 there is an internal
2  service charge for 212.37.  And the documents
3  thereafter no longer reflect invoices for vehicle
4  number 3336.  So, based on those figures, what is
5  your calculation?
6    A.   Based on that, it looks like it's a
7  negative -- wait.
8    Q.   Mr. Anderson, perhaps we can do it on
9  our screen share with a calculator in front of us
10  together so we're on the --
11    A.   I'll do it on my -- I'll do it on
12  mine.
13    Q.   Okay.
14    A.   I don't trust yours.
15        And what was this showing on there?
16  What is she showing there?
17    Q.   She showed a negative -- let me -- let
18  me actually go to the page number.  3336, she
19  shows a negative 4,391.41.  That's what she's
20  claiming the loss is.
21    A.   4,391.41?
22    Q.   Correct.
23    A.   It looks like she reversed the
24  numbers.  Can you see this?
25    Q.   I can't.

79 (Pages 310 - 313)

Page 314

1     A.   It looks like it was -- she did -- she
2 did it backwards.  That's what it looks like.  Can
3 you see it or no?
4     Q.   I can't.  Can you read it out loud for
5 the record?  Because I can't.  It looks like she
6 did --
7     A.   She reversed it.
8     Q.   She thought you purchased it for the
9 sale price 19,096 --
10    A.   It looks like she reversed the two
11 numbers.
12    Q.   So would it be accurate to say that,
13 in this case for this particular vehicle, your
14 position as you sit here right now after doing the
15 numbers, looking at the documents that we were
16 provided, is that there was no loss?
17    A.   No, on this one it doesn't look
18 like -- it looks like it was the exact but she --
19 she flipped the two numbers on accident.  Because
20 it's exact.
21    Q.   So, as you sit here right now, what is
22 the loss with respect to vehicle 3336?
23    A.   It doesn't show that there's a loss.
24    Q.   Okay.
25    A.   And if I do what she did -- if I do

Page 315

1 the numbers as she did, it comes to 4,391.41 as a
2 negative.  But I think what she meant to do was
3 subtract 14,705.41 from 19,096.82.  But I think
4 she did the opposite.
5     Q.   And that's why she came up with the
6 number that she came up with --
7     A.   Right.
8     Q.   Based on the methodology we went over
9 today, that would not be the accurate -- that
10 would not be the accurate result.  Correct?
11    A.   This -- right.  This would be --
12    Q.   For this one transaction.  I'm not
13 asking you for everything.  Just this one trans-
14 action.
15    A.   Right.  It looks like it was
16 backwards --
17    Q.   To save us --
18    A.   -- because she meant --
19    Q.   To save us a lot of time,
20 Mr. Anderson, if I went through and did the same
21 thing for all of these transactions based on the
22 methodology that you told me today --
23    A.   Mm-hmm.
24    Q.   -- and I caught any other arithmetic
25 or just scrivener's errors, would you agree with

Page 316

1 me, based on the numbers, not based on my
2 interpretation, but your methodology that we would
3 be able to agree on the numbers showing whatever
4 they show?
5     A.   Yeah.  The methodology, it is there.
6 I think she just made a mistake on this one.
7     Q.   Okay.  And, just for clarification,
8 what were you looking at on your computer with
9 respect to a different purchase price?
10    A.   I was looking at on the main screen
11 where it has a sell price and a -- and it shows a
12 loss.  So I don't know what -- but I don't know if
13 they had included a payoff or something or if they
14 had to include like a check back to the customer
15 to pay a vehicle off.  I'm not sure what it was.
16 But it is a loss.  It shows a loss.
17    Q.   For whatever reason, your records on
18 your computer differ from the records we are
19 looking at right now?
20    A.   Right.  And it looked like it may have
21 been opened up later on, like it was redone later
22 on.  So, if that was the case, then you probably
23 got that and then they had to re-bill it.
24    Q.   So, with respect to records, should
25 I -- for accuracy's sake, would I be looking at

Page 317

1 the records that were produced to me or would I be
2 looking at the records that you have in front of
3 you on your computer?
4     A.   I would need to pull the deal to look
5 at the deal.
6     Q.   So you don't know, right, as you sit
7 here right now?  Okay?
8     A.   Huh?
9     Q.   As you sit here right now, you don't
10 know which one would be accurate?
11    A.   As it -- no.  This one, I would have
12 to pull the deal and actually look at it.
13    Q.   Okay.
14    A.   Because I came up with the exact
15 numbers she came up with doing it where she
16 flipped the numbers.  Right?  So I could see how
17 that could happen.  But I don't know what
18 happened, if there was something after the fact
19 that happened, because that said 10/3.
20    Q.   Okay.
21    A.   And then this looks like it was
22 reopened on 10/8 for some reason -- I'm sorry,
23 10/10, 10/5, or 10/8, 10/10.
24    Q.   Okay.  Moving on to these text
25 messages, these were the text messages that you

80 (Pages 314 - 317)

1 were referring to earlier that were exchanged
2 between Jason and your father. Correct?
3    A.   Mm-hmm. Yes.
4    Q.   And I don't want to spend even more
5 time, but, as you sit here right now, you're not
6 sure when this text message was exchanged.
7 Correct?
8    A.   It was in an e-mail that was sent. I
9 don't --
10    Q.   You know, I think it might be here. I
11 don't know what e-mail you're referring to. But,
12 for the sake of time, let's just keep going.
13       The text message from your father:
14 Are we getting any of the new ZR1 Corvettes?
15       And the Jason says: One I hope.
16 We have sold to the doctor down the street.
17 That's it. They'll be super limited.
18    Any issues with these two messages?
19    A.   No. It wasn't 'til the next one when
20 he thought he was texting Rory.
21       MS. LIU: And, court reporter, I
22 forgot if I marked this as an exhibit, the text
23 messages.
24       (Court reporter clarifi-
25          cation)

1 BY MS. LIU:
2    Q.   Okay. So the next message, and I'll
3 just read it for the record:
4       And you're right, Rory. I've been
5       doing this for 20 years. I need you
6       as a partner and a friend, not to buy
7       cars.
8       So far into this -- these two
9 sentences, do you have an issue with this?
10    A.   No.
11    Q.   Okay.
12    I buy them for money from you. You
13    know that. And I was told not to do
14    it and I do anyways cause I need the
15    money.
16       Do you have an issue with that?
17    A.   Yes.
18    Q.   Tell me. What issue do you have?
19    A.   I was told not to do it and I do it
20 anyway and I do it because I need the money.
21    Q.   So does that go back into what we were
22 saying all along, that he's broken policy, he was
23 told not to do --
24    A.   Yes.
25    Q.   -- certain things and he --

1    A.   Yes.
2    Q.   -- has done it --
3    A.   Yes.
4    Q.   Okay. "Be more concerned with going
5 into business, not doing business, please." Any
6 concern with that?
7    A.   No. Yeah. Because I don't know what
8 he's meaning with that.
9    Q.   Okay. "I want to make sandwiches and
10 sell cars and make Mike number one."
11    A.   Okay. I think what happened there is
12 he realized what he did and tried to -- tried to
13 pull himself out of the hole.
14    Q.   Okay. Reading this in and of itself,
15 is there anything that you take issue with as far
16 as evidencing that he was involved in some
17 wrongdoing, just this one message?
18    A.   That one message clearly -- I mean, it
19 looks like he's trying to pull himself out, like
20 he realized he screwed up and sent the text to the
21 wrong person.
22    Q.   But as far as taking issue with that
23 individual message, and I'm just trying to narrow
24 the scope, do you have an issue with that?
25    A.   That I want to make Mike Anderson

1 number one? No.
2    Q.   "It's all about the bucks, kid." Any
3 issue with that?
4    A.   Yeah. That means that he's getting
5 kickbacks.
6    Q.   How does that mean that he's getting
7 kickbacks?
8    A.   It's all about the money.
9    Q.   Okay. "I need all the help I can get.
10 Thank you. Please sell my cars. We all need it."
11 Do you have an issue with that?
12    A.   Yeah. There's something weird about
13 that.
14    Q.   It's just something weird meaning you
15 think something is up with it or there's something
16 else that --
17    A.   It just doesn't -- it's not something
18 you would say unless you're trying, I mean,
19 something.
20    Q.   Were you saying something? I'm sorry.
21    A.   I don't -- it's not -- there's
22 something -- yeah, there's something fishy with it
23 for sure.
24    Q.   Go to the next one:
25    I'm trying to help you with your

81 (Pages 318 - 321)

Page 322

1     inventory.  Help me with mine, please.
2     I can't lose these cars.  I need all
3     the money.
4             Anything, any issue with that?
5        A.   Yeah.  Meaning that he knew he over-
6     paid for those cars and he needs to get rid of
7     them because they're probably aging and he knows
8     that he's got to get them addressed.
9        Q.   And the next one says:
10    Arena sucks to sell.  Just buy.  You
11    can rip some under book and make money
12    on Traverse, Impalas and stuff.  Sell
13    at Matteson in the Ally or bank lanes.
14    Unless it's junk, then lanes one two,
15    or three.  You'll hit home runs here
16    and there.  That's what we do now with
17    our older stuff.
18            What does this mean to you, if
19    anything?
20       A.   Nothing.  Nothing.  Nothing sticks
21    out.
22       Q.   Okay.  The next message says:
23    I'm pulling in to the store.  Go have
24    a better day and make some money.
25    We're all trying to grind this month

Page 323

1     out and come on top.  Don't be
2     stressed.
3             Do you have any issue with that?
4        A.   No.
5        Q.   The next section looks like some kind
6     of drain system.  Do you have any idea what that's
7     about?
8        A.   He did say that he owned some business
9     or something, some company that he bought, that
10    did something with basement water or walls or
11    something.
12       Q.   Would that be against company policy
13    for him to have a side business like that?
14       A.   It was -- it was -- he had that when
15    he started with us.
16       Q.   Okay.  And then the next one:
17    See, you help me make money by saving
18    me time so I can do it all.  Timmer's
19    been killing it.
20            Do you have any issue with that?
21       A.   I don't know what that means.
22       Q.   Okay.  That's perfectly fine.
23            And then it looks like your father
24    put a question mark on there.  Right?
25       A.   Yes.

Page 324

1        Q.   And the next message -- next two
2     messages say:
3     Sorry.  I was group texting my buddy
4     from another dealer.  Now I know why
5     he didn't respond.  LOL -- with a
6     smiley face -- trying to help him
7     out and trade some old inventory and
8     tell him where to buy better stuff.
9     Everyone's hurting time of year.
10    Sorry about that, Mike.
11            Do you have any issue with this?
12       A.   No, not really.
13       Q.   Do you think that this was a feasible
14    explanation for the previous text messages?
15       A.   Like I said, that looks like he's
16    trying to, like, muddy the waters, like you would
17    try to, you know, make it harder to follow.
18       Q.   I think you said earlier that --
19    something about the money reference meant to you a
20    kickback.  Is that right?
21       A.   Yes.  Absolutely.
22       Q.   Is a kickback against company policy?
23       A.   Oh yeah.  We even have them sign a
24    form.  Yeah.
25       Q.   Okay.  Would that form be part of his

Page 325

1     personnel file?
2        A.   Yeah.  It better be.
3        Q.   And if you ever found out that someone
4     was having a kickback at Mike Anderson Chevy,
5     would you fire them on the spot?
6        A.   Immediately.  Immediately.
7             And here's the thing.  I don't want
8     a gift card that, you know, a customer gave to a
9     customer -- I'm sorry, to an employee.  But then
10    they'd ask if they can keep it.
11       Q.   Okay.
12       A.   And I've had that happen especially
13    around Christmas and so.  And I don't want that.
14    They can have it.
15            But then you can't have kickback
16    especially from an auction, no, or buying cars,
17    no.
18       Q.   When you say gift card, is that
19    typically what people do is they give gift cards
20    or --
21       A.   No, it's not typical.  It's few and
22    far between.  But when something like that comes
23    up, they'll bring it and say James Ireland
24    received a $20 gift card to some restaurant --
25            (Simultaneous speaking.)

82 (Pages 322 - 325)

Page 326

1 BY MS. LIU:
2    Q.   Go ahead.
3    A.   And it's not that it's a $20 gift
4 card. It's that we put that in place to protect
5 us against thing like this.
6    Q.   Does Mike Anderson pay any referral
7 fees for anyone that introduces a potential
8 customer on to your --
9    A.   If they're buying a car. If they buy
10 a car.
11    Q.   And who are those fees -- like, who's
12 your typical references that are sending these
13 over, referrals?
14    A.   It could be like somebody that bought
15 a car there, maybe a customer that's bought a few
16 cars from there and brings somebody in that has
17 not done business with us before.
18    Q.   So it's generally customers that bring
19 other customers in. Is that --
20    A.   Yes. Oh right. Yes. That's it.
21 It's never employee -- it's not like a sales
22 manager bringing in a customer or, you know.
23    Q.   What about -- and I know you said your
24 demographic typically only buys domestic-made
25 cars. What about --

Page 327

1    A.   No. I said that domestic -- I didn't
2 say that. I said domestic cars do well here.
3 Imports do not do well at this location.
4    Q.   Okay.
5    A.   They don't do well. I said --
6    Q.   Okay.
7    A.   -- and our clientele is not going to
8 come looking for a Mercedes-Benz or Rolls Royce at
9 our facility.
10    Q.   Is there ever an instance where, for
11 example, someone at a Toyota dealership or a Lexus
12 dealership, a salesperson refers a customer to
13 Mike Anderson Chevy?
14    A.   I would think not.
15    Q.   Hypothetically, if that were ever to
16 happen, would you pay a referral fee then or is
17 that referral fee --
18    A.   To another dealer? No. No.
19    Q.   Okay. And is that just a policy that
20 you don't do that?
21    A.   Well, for one, that's never come up
22 that I can recall. And, two, that would be so
23 upsidedown crazy.
24    Q.   Other than this text message, do you
25 have anything else you can point to as proof or

Page 328

1 facts that you've come to discover personally, so
2 I'm not asking in your corporate capacity right
3 now, just personally, that either prove that Jason
4 was getting a kickback from Epic or suggests that
5 Jason was getting a kickback from Epic?
6    A.   Yeah. We -- I don't remember, but we
7 had proof that I believe he got paid from Epic.
8    Q.   Okay.
9    A.   Right, Eric?
10       MR. QUANDT: Just for the record,
11 we'll get into that. I have one question. But
12 that's -- that was a response that J&N made, that
13 they had paid him directly.
14 BY MS. LIU:
15    Q.   So, as you sit here right now, you're
16 not sure? You think that there may have been
17 something showing that he was paid from Epic?
18    A.   I thought -- I thought for some reason
19 that we -- after this was all done that they
20 subpoenaed it and got proof that it was -- I mean,
21 it was more than evident that he was getting paid
22 in kickbacks in just what he was doing as a
23 business practice, and even how they changed from
24 when he first started there until he left, by the
25 time he left.

Page 329

1    Q.   So TKC Entertainment. The allegations
2 generally are that Kolodzinski claims to have
3 placed radio ads through a company called TKC in
4 the amount of $75,000. Is that accurate?
5    A.   Correct.
6    Q.   Okay.
7    A.   If those are the numbers, yeah.
8    Q.   Yeah, that's -- I'm not -- and that,
9 despite requests from Mike Anderson Chevy, that
10 TKC refused to submit proof of running these ads.
11 Correct?
12    A.   Correct. And would not even take or
13 return a phone call.
14    Q.   What proof do you have that -- I'm
15 looking at TKC, Bates-stamped number 6 which I
16 believe is Exhibit Number 15. Is that correct?
17 16?
18       MS. SUDDARTH: 16.
19       MS. LIU: 16?
20          (Deposition Exhibit 16 was
21          marked.)
22 BY MS. LIU:
23    Q.   What proof do you have that the
24 services referenced on what appears to be this
25 invoice from September 19, 20 -- and,

Page 330

1 unfortunately, that invoice seems to be cut off --
2 but this invoice on here that these services were
3 not run?
4     A.   Because when we called and asked for
5 it, it's media, they have to have all of that.
6 They have to tell you the date, the time, how long
7 it ran, how many seconds it ran, just like I told
8 you earlier.
9     Q.   And that's your basis, the only basis
10 you have?
11     A.   The basis on what you have to be able
12 to provide it.  Never once had a media company not
13 been able to provide it.  It normally comes with a
14 bill.
15     Q.   Did TKC ever have a written contract
16 with Mike Anderson --
17     A.   No.
18     Q.   -- Chevy?
19     A.   No.
20     Q.   And is it your understanding that TKC
21 was only in a business relationship with Mike
22 Anderson Chevy during the time that Jason was
23 employed with --
24     A.   Yes.
25     Q.   -- Mike Anderson Chevy?  Okay.

Page 331

1         Are you aware of any oral contract
2 that Jason might have entered into on Mike [sic]
3 Chevy's behalf with TKC?
4     A.   No.
5     Q.   Has TKC ever told you -- [inaudible]
6 -- that it never provided any services?
7         (Court reporter clarifi-
8         cation.)
9     THE WITNESS:  No.  We asked for dates
10 and times and everything else.  They never -- they
11 never gave any information that said they ran.
12         (Court reporter clarifi-
13         cation.)
14     MS. LIU:  I know.  My question was:
15 Has TKC ever affirmatively ever told Mike Anderson
16 Chevrolet that they did not provide services?
17         And did you get the answer?
18         (Court reporter clarifi-
19         cation.)
20 BY MS. LIU:
21     Q.   Tell me about your knowledge regarding
22 the allegations involving TKC, personal knowledge,
23 personal knowledge.  Like, when did you first --
24     A.   When I saw that, I was like what is
25 this.  And then when we asked for the backup on it

Page 332

1 of when they ran, never provided it, give us
2 any -- anything.  And we continued to follow up
3 with them until they hung up on the controller and
4 they quit answering the phone.
5     Q.   And was this after Mr. Kolodzinski
6 just stopped showing up for work that you started
7 looking at these records and saying --
8     A.   No.  This is before.  This is before.
9 This is when he was, like, distancing himself.
10     Q.   Okay.  I'm going to ask you these
11 questions in your capacity as a 30(b)(6) witness,
12 a corporate witness.
13         You're aware that Mike Anderson
14 Chevy made a police report --
15     A.   Yeah --
16     Q.   -- regarding this.  Correct?
17     A.   -- I made it.
18     Q.   Did you make it personally?
19     A.   Yes.
20     Q.   Okay.  And was it just you?  I just
21 see a reference to Judy Arnold one time --
22     A.   It was Judy and I in my office in
23 Chicago.  They came to us.
24     Q.   Okay.  And I'm scrolling down through
25 this.  And I'm going to mark this Exhibit 17.

Page 333

1         (Deposition Exhibit 17 was
2         marked.)
3 BY MS. LIU:
4     Q.   It's the original case incident
5 report.  It is -- there's an arrival date of
6 February 27, 2018.  To the best of your
7 recollection, does that sound about right when
8 they showed up and perhaps interviewed you?
9         Well, let me back up.
10         Did they -- did they show up in
11 person?  Did the police --
12     A.   They showed -- three detectives came
13 in.
14     Q.   Came in person to the dealership?
15 Does February 18 -- I'm sorry?
16     A.   What did you say?
17     Q.   I said three detectives came in person
18 into the dealership?
19     A.   Yes.
20     Q.   Okay.  And it was around February 2018
21 that this happened?
22     A.   I thought it was a little earlier than
23 that, but.
24     Q.   I have on the first page of this
25 exhibit RO arrival date, February 27, 2018.

84 (Pages 330 - 333)

Page 334

1    A.   Yeah.  But it wasn't 7:30 in the
2    morning.
3    Q.   Okay.  Can we agree -- maybe
4    January 15, 2018.  Does that sound about right?
5    A.   That sounds more, way more likely.
6    Q.   Okay.  So somewhere around the January
7    2018 mark.  And then --
8    A.   It took forever to get the police
9    report.  And then I had to go down -- I had to go
10   to 35th and Michigan to pick it up.  They wouldn't
11   even mail it because of the sensitivity.  And then
12   drafted -- redacted it.  I'm like, well, what is
13   this?
14   Q.   You're talking about this report.
15   Correct?
16   A.   Yes.
17   Q.   Okay.
18   A.   Like, none of the stuff we went over.
19   Like, I expected the report to be like 25 pages
20   long.
21   Q.   And I'm looking at the second page,
22   the only narrative portion of this report.  And it
23   says:
24        Controller for Mike Anderson Chevrolet
25        reported it was discovered the former

Page 335

1        general manager -- and they redacted
2        part of it -- from Mike Anderson
3        Chevrolet located at 5333 West Irving
4        Park Road, hired various vendors for
5        advertising and services which never
6        occurred.  Blank reported that there
7        was a text from, blank, that was sent
8        to the owner of Mike Anderson
9        Chevrolet in error asking for his,
10       quote, kickback.  Blank reported that
11       at the time of the report there is
12       approximately a loss in excess of
13       $200,000.
14        Is that an accurate description of
15   what statement was given to the --
16   A.   Yeah, kind of.  I just think it was --
17   like, we spent a long time with these people.  And
18   that's really disappointing that that's what they
19   come back with.
20   Q.   Did you ever follow up after --
21   A.   Oh yeah.
22   Q.   Let me finish my question.
23        -- after this police report was
24   obtained to see if there's anything else?
25   A.   Of course.  Several times.

Page 336

1    Q.   And did they -- did the police provide
2    you anything else?
3    A.   No.  She was on a different case.  She
4    was tied up.  She had vacation.  She had furlough.
5    She'd get to it when she can.
6        And then finally I think I got an
7    e-mail notification or something that it was --
8    that it was ready.  So then when we tried to get
9    it, they said you had to -- I had to go there and
10   get it.  It was like a dollar or something to make
11   a copy of it.  And I'm expecting like a book and
12   it's two pages or three pages or something.
13   Q.   But what I'm asking is after this
14   report did you ever hear anything else further?
15   A.   Yeah.  I just told you we called
16   repeatedly.  And more again what are you doing,
17   where is this at?  And she's on furlough, working
18   on a different case.
19   Q.   But nothing else?  She didn't tell
20   you, oh, the investigation showed like, or
21   anything like that?
22   A.   Oh, no, she didn't tell us anything.
23   So then we even called the -- not the Secretary of
24   State -- the Cook County State's Attorney, called
25   her back, called the head of grand theft auto

Page 337

1    because that's how I got in contact with her to
2    begin with, called somebody that used to work at
3    the -- or ran into somebody that used to work at
4    the State's Attorney's Office and was shocked that
5    they didn't pick this up and run with it and that
6    they redacted this and that it was missing as much
7    documentation as it was even though they walked
8    out with a big box of stuff.
9    Q.   Have you seen a supplemental police
10   report?
11   A.   No.
12   Q.   I'm going to represent to you and mark
13   this as Exhibit 17 [sic].
14        (Deposition Exhibit 18 was
15         marked.)
16   BY MS. LIU:
17   Q.   We requested this from the police
18   department and received this case supplementary
19   report.  It is with the date of occurrence it
20   looks like around Jason's date of employment,
21   March 7, 2016, to January 15, 2018.  And I trust
22   this is the first time you've seen this document?
23   A.   Mm-hmm.  I didn't know it existed.
24   Q.   And scrolling about halfway down the
25   first page, it has reporting officer Mark Blasucci

85 (Pages 334 - 337)

Page 338

1 and then primary detective assigned Sandra Bryant
2 and then it talks about the date submitted and
3 approved, February 27, 2018.
4         Can I trust that you've never even
5 heard about the supplementary police report?
6    A.  Mm-mm.  Mm-mm.  And we called and
7 called and called and called.
8    Q.  I'm going to scroll down to the last
9 page here.  And it talks about the investigation.
10 In fact, the heading says investigation.  This is
11 a ex clear closed and then it has --
12    A.  My daughter is at the door.  She's
13 getting dropped off from tutoring.  Can you hold
14 on a minute?
15    Q.  Yes.  Absolutely.  Mike, do you need
16 to take a couple minutes or are you okay?
17    A.  Well, I think my daughter is going
18 to -- I want to get this done because I have to
19 take her to volleyball.
20         (A discussion was held off
21         the record.)
22 BY MS. LIU:
23    Q.  Did you ever hear about a resolution,
24 whether they closed the case, opened the case, or
25 anything like that --

Page 339

1    A.  Yeah.
2    Q.  -- kept it open?
3    A.  Yes.  So they -- we didn't find out
4 that they closed the case until we continued to
5 call the State's Attorney's Office and they
6 couldn't find anything.  And finally Judy got
7 ahold of somebody that was willing to look into
8 this and requested all sorts of information from
9 Sandra, I think the lady's name was Sandra
10 something.  And then she didn't get back to the
11 State's Attorney and they continued to follow up
12 and then left it.  And then this whole COVID thing
13 hit.  And then still called and they were closed.
14 And I want to say she got ahold of somebody
15 else -- she'll tell you more about it tomorrow
16 because she did it firsthand -- that was trying to
17 get Sandra or her boss or somebody to provide more
18 information or to reopen it or find out why they
19 closed it.
20    Q.  So I'm going to read from the
21 investigation.  I started reading the first line.
22 But it says:
23         R/D requests this report be read in
24         conjunction with all other reports
25         generated.  R/D met Judy Arnold, Mike

Page 340

1 Anderson Chevrolet.  R/D met ASA
2 Kennedy, Cook County State's
3 Attorney's Office, and provided her
4 with the facts of the investigation
5 and documentation provided.  ASA
6 Kennedy closed the investigation
7 pending further evidence to
8 substantiate the allegations.  ASA
9 Kennedy stated that the burden of
10 proof cannot be met.  Based on the
11 above-mentioned facts, R/D requests
12 this case be exceptionally clear
13 closed, other exceptional.
14         Okay.  Was this --
15    A.  Okay.  That's not -- no.  I don't
16 believe that that was accurate at all from what
17 she was told.
18    Q.  And what you're saying is Judy Arnold
19 was told something differently from what's --
20    A.  Yes.  She continued to call, call,
21 call.  And I know she was driving that detective
22 crazy because she was calling so much.  And it was
23 like that detective didn't want to be bothered
24 with it.
25    Q.  Was the detective that you're talking

Page 341

1 about Detective Bryant that signed off --
2    A.  Sandra.
3    Q.  -- right here?
4    A.  Sandra Bryant I think was her name.
5    Q.  We can scroll up and look real fast.
6 Sandra Bryant?
7    A.  Yeah.
8    Q.  So would it be accurate to say the
9 first time you're hearing about this --
10    A.  Yes.  Yes.
11    Q.  -- investigation --
12    A.  I had no idea.  That was almost like
13 they did that to cover their butt.
14    Q.  With the burden of proof not being
15 met, not --
16    A.  Yeah.  How can you --
17    Q.  -- substantiate the allegations?
18    A.  -- they got a bankers box full of
19 stuff, too.  How do you -- I mean, there's plenty.
20 And one of my best friends is a Chicago detective.
21 He goes how can they possibly look at that and not
22 know that there's, you know, tons of information
23 in there for them to go off of.
24    Q.  Okay.  Other than making an insurance
25 claim, can you tell me what Mike Anderson Chevy

86 (Pages 338 - 341)

Page 342

1  has done to recover the claimed loss funds?
2      A.  To recover it?  Just continue to call
3  the police department and State's Attorney and try
4  to get them -- I wanted this to be -- I wanted
5  this not to be civil.  I wanted it to be criminal
6  was my goal because --
7      Q.  Okay.
8      A.  -- if not, he's going to go do this to
9  somebody else and somebody else and somebody else
10  and somebody else.
11      Q.  Earlier, you testified that there were
12  a series of transactions that you don't believe
13  actually occurred.  For --
14      A.  Yeah.
15      Q.  -- example -- I guess yes, right?  Did
16  you ever try to pursue the third parties such as
17  Epic or J&N --
18      A.  They would not respond.  They would
19  not even talk.  At first -- not at first.  But
20  after a few calls Judy thought she was able to
21  kind of crack him.
22          And I believe Haz, who used to
23  work for us, thought he might be able to get some
24  information from them.  But he then shut down and
25  wouldn't even answer the phone.

Page 343

1      Q.  When you say him, are you talking
2  about Jason?
3      A.  I'm sorry.  Haz called -- Rory? --
4  Rory and thought he was going to be able to make
5  some headway with him but then Rory like shut down
6  and quit taking his calls, wouldn't return his
7  calls, wouldn't take anyone's calls from the
8  dealership.
9      Q.  Rory from Epic.  Correct?
10      A.  Mm-hm.  R-o-r-y.
11      Q.  And with respect to Sir Hooptie, J&N
12  Marketing, TKC, AC Kustoms, was there ever any
13  successful communication or demand ever made on
14  these --
15      A.  They never --
16      Q.  -- entities?
17      A.  With the AC Kustoms we thought we
18  might have a chance to.  And he was like tight-
19  lipped, not a word.  And the J&N Marketing, I
20  thought for sure it would be like a federal --
21  federal mail fraud thing.
22      Q.  When you say you thought it would be a
23  federal mail fraud thing, do you mean you brought
24  that up to J&N Marketing?  What do you mean by
25  that comment?

Page 344

1      A.  No.  I mean, I thought for sure they'd
2  get them on that.  That's a federal law.  That's
3  not, you know.
4      Q.  Law enforcement you mean?
5      A.  Yeah.
6      Q.  Okay.
7      A.  I mean, I thought that he should be
8  like in jail for that.
9      Q.  So obviously Mike Anderson sued QBE
10  Insurance Corporation under -- with respect to the
11  policy at issue.  But why did Mike Anderson not
12  sue all these other third parties at the
13  beginning?
14      A.  We talked about that --
15          MR. QUANDT:  Objection.  Calls for a
16  legal conclusion, counsel.
17          You can answer the question,
18  though.
19  BY MS. LIU:
20      Q.  Your answer?
21      A.  Are you talking to me?
22      Q.  Yeah.  Your counsel just directed you
23  to answer the question.
24      A.  Do I know why he didn't sue the rest
25  of them?  No, I don't remember -- or I don't know

Page 345

1  exactly how that fell into place.  They were
2  waiting to see what would happen, I guess.  I
3  don't know.
4      Q.  Does Mike Anderson Chevy still have
5  access to Jason's e-mails?
6      A.  We -- I don't know if it's still -- we
7  disabled it so he couldn't get into it.  And then
8  we couldn't find anything in there.
9          I did find with going through it
10  that sometimes he would send it from his own
11  e-mail, so it would show as Jason K and not the --
12  you know, we have a policy you have to use the
13  work e-mail.  And he was using, like, his personal
14  e-mail.
15          And then we also found, like, on
16  the computer he didn't really do anything on the
17  computer but he used the phone a lot.
18      Q.  I'm going back to the proof of loss
19  which I previously marked as an exhibit.  And page
20  seven of this proof of loss letter seems to be
21  meeting minutes.  Would you agree?
22      A.  Yes.
23      Q.  Okay.  And I'm just reading from the
24  top.  It says:  Mike Anderson --
25      A.  This is -- this is when we had the

87 (Pages 342 - 345)

Page 346

1 meeting after -- right when he, like, disappeared
2 and vanished and we saw him on camera going and
3 taking a gift card or something out of one of the
4 salesman's office. So we had a meeting after the
5 fact, or that day or the next day there, right
6 around that time, and took notes from everybody
7 that we talked to. That was Barbara Flores,
8 Tiffany, Haz, I think Joe Fricano was in there,
9 myself.
10     Q.   Who is Tiffany?
11     A.   She was the payroll HR lady, human
12 resources lady.
13     Q.   So it reads from the top:
14          Mike started the meeting. He said
15          that there were rumors in the summer
16          of 2017 regarding Jason with the
17          purchasing of used vehicles from Epic.
18          Mike said that Terry Fakhoury was
19          trying to get Rolando DeLuna fired
20          so Terry can be the F&I manager.
21     A.   Right.
22     Q.   Who's Terry?
23     A.   Terry Fakhoury was a sales manager
24 that used to work for us that coincidentally
25 worked for Jason K at Jason's last job when he

Page 347

1 left Bill Jacobs and went to, I think, Bill Kay
2 Chevrolet. And Jason fired Terry. And then when
3 Jason started with us, Terry was like, you know,
4 in spaz mode and was sending Rolando in, you know,
5 to me. Right? And the rumor was he was doing
6 that to get fired -- to get him fired so that he
7 would have that job because he wanted it.
8     Q.   And then the next sentence says: Mike
9 said that Terry Fakhoury and Jesse Fakhoury
10 approached him regarding the used vehicle
11 purchases.
12     A.   Mm-hmm.
13     Q.   Do you recall Terry and Jesse
14 approaching you?
15     A.   Yeah.
16     Q.   What was --
17     A.   Vaguely, yeah.
18     Q.   Do you just generally remember what
19 was said in that conversation?
20     A.   That, you know, he was getting paid on
21 the side. See, you don't have proof, you don't
22 know that. He goes he's paying too much for these
23 cars that weren't even close to what the book
24 value is. And then he did it to my dad, too. Or,
25 actually, Jesse may have been. But, anyway, the

Page 348

1 same thing, you don't have proof, you don't know.
2 At the time at the beginning he was selling him,
3 you know, I mean he was like turning him, so it
4 was kind of like well -- it doesn't -- it doesn't
5 -- I mean he was turning around and selling them
6 and he was making money on them. Right?
7     Q.   So --
8     A.   But then over time it just got so out
9 of balance and out of whack it was crazy.
10     Q.   So the next -- the next sentence is
11 what you were just saying, that Johanna Vazquez
12 and that Jess Fakhoury also approached your
13 father, Mike Anderson --
14     A.   Can you make that so I can see it,
15 though? Can you make it bigger?
16     Q.   Oh, yeah, yeah. Absolutely. I'm
17 sorry. Is this better?
18     A.   If you could make it a little bit
19 bigger, it would be better, but.
20     Q.   I can. I can.
21     A.   All right.
22     Q.   The next sentence is consistent with
23 what you were saying: Johanna and Jess --
24     A.   Oh yeah. I remember. Yeah, yeah,
25 yeah. I do remember that now. Mm-hmm.

Page 349

1     Q.   -- Mike Anderson Sr. regarding the
2 matter. Mike stated that he looked into the
3 numbers.
4          Is this he referring to you?
5     A.   No. That was my dad.
6     Q.   Okay. That Mike Anderson Sr. looked
7 into the numbers and did not find that the rumor
8 was substantiated.
9          Do you agree with this, this
10 statement, as far as --
11     A.   My dad -- I could agree with it
12 because he would just say, you know, we're making
13 money on it. He would have no clue. He wouldn't
14 sit there and book the cars. He wouldn't have any
15 idea.
16     Q.   Okay. Fall of 2017, Mike
17 questioned J&N Marketing bills. They
18          are supposed to send out mailers from
19          our database we provide them. We no
20          longer use this company.
21          Just for clarification, wherever it
22 says Mike it's referring to you and anyplace it
23 says Mike Sr. it's referring to your father.
24 Correct?
25     A.   I would not clarify that until I read

88 (Pages 346 - 349)

Page 350

1  it.
2    Q.   Okay.
3    A.   These are just -- this was --
4    Q.   Okay.
5    A.   -- we did this so nothing -- we tried
6  to keep things from flowing through the cracks so
7  people wouldn't forget things, so we just tried to
8  jot down as much information we possibly could.
9    Q.   Okay.  October of 2017, Mike Sr.
10  advised Mike Jr. to ask Hazem Mutawe and Dan
11  Remboski, off site, what they --
12    A.   Yes.
13    Q.   -- thought about the rumors of the
14  used car issue.
15    A.   Because they were flying real hard at
16  that time.
17    Q.   Okay.  Mike said that Dan said he did
18  not understand how this was happening.
19    A.   Mm-hmm.
20    Q.   Who is Dan?
21    A.   Dan Remboski used to be a salesman and
22  then he was a finance manager.
23    Q.   Okay.  October of 2017, Mike
24  instructed Jason to not purchase any
25  more vehicles from Sir Hooptie and

Page 351

1    Epic Motorsports.  Rather, Jason was
2    to purchase vehicles directly from the
3    auction.
4        Is this accurate?
5    A.   Where at?  You lost me.  It's hard for
6  me to see that because it's so small, but.
7    Q.   This is -- that's as big as I can go
8  without --
9    A.   Okay.  All right.
10    Q.   Without losing the side.  Is that
11  okay?
12    A.   What word -- where are you at?
13    Q.   October of 2017.  The second one.
14    A.   Mike instructed Jason not to purchase
15  any more vehicles from -- Right.  Yes.  I did.
16  Yes.  Uh-oh, you just -- you just moved.
17    Q.   I'm sorry.
18    A.   Where are you at now?
19    Q.   Same place.
20    A.   Yeah.  October -- yes.  Yes.  Yes.
21  November wholesale loss was atrocious.  I was all
22  over about that, the aging and everything.  And
23  then he lost 60 or 59 thousand dollars in
24  wholesale losses, which is unheard of.  And Jason
25  was defensive.  I do remember that.  He was like

Page 352

1  pointing fingers at everybody else, it wasn't his
2  fault.  And that was, like, trying to even have a
3  conversation, it was like --
4    Q.   Is it unusual just as a general --
5  general matter of course from the time period of
6  let's say 2015 to have any wholesale loss in a
7  month?
8    A.   You'll have wholesale loss, but you
9  will never -- you should never have a $59,000
10  wholesale loss.  If you do, that's like a major
11  red flag.
12    Q.   Okay.  Would $20,000 be equally
13  atrocious or is that --
14    A.   It could be -- it could be -- there's
15  a number of things that are attributed to that.
16  You know, like I told you before, we add a hard
17  pack to the cost of the car to increase it to
18  write down inventory.  But I don't allow them to
19  take that off on wholesale vehicles.  They have to
20  break out of them.  Right?  So if you had a month
21  or two where you took in a bunch of junk, right,
22  you could potentially have some losses.
23        Now, with the way the used car
24  market is today, you can't use anything today
25  right now, meaning the last, you know, six to

Page 353

1  eight months or whatever.  Usually if you had a
2  loss it would be 500 bucks, 1,000 bucks, whatever.
3        But the goal is to make a couple
4  grand a month on the wholesale because you've
5  already got the hard pack in.
6    Q.   I want to kind of skip forward to the
7  third to last paragraph.  Do you see that?  Mike
8  asked Barbara Flores?
9    A.   Yes.
10    Q.   Mike asked Barbara Flores to call VST
11  to get the cameras shut down from Jason's access.
12        What is VST?
13    A.   That's a camera system.
14    Q.   Okay.  And what do you mean get the
15  cameras shut down?
16    A.   Well, what happened was, when they
17  came and they set it up, they set it up with one
18  password that everybody had and if you got the app
19  or whatever and you could see what was going on,
20  which they were all supposed to have their own --
21  they do now, their own user ID and password so
22  that we can turn them off or they can only access
23  from inside the store.  So I think they had to
24  switch the master password just to be able to
25  disconnect and be able to connect because it was

89 (Pages 350 - 353)

Page 354

1    like a generic admin password.
2        Q.    And then the next sentence says:  He
3    also asked for all accesses to software and
4    Mannheim auction access to be removed.
5        A.    Yes.
6        Q.    Is that accurate?
7        A.    Yes.
8        Q.    Do you remember around when you asked
9    for all this access to be removed?
10       A.    When it was -- when we -- when he quit
11   showing up and then all of a sudden showed up out
12   of nowhere, like early, early, early in the
13   morning, and supposedly took a gift card from one
14   of the salesman's desks.  And then at that point
15   we're like, no, he's done.  Because he dropped a
16   demo off.  And we're like he's done.  Everything
17   is shut off.  And that's when we were trying to
18   get the auction cars shut off and they're like
19   you've got cars here to pick up.  And we're
20   like -- and he had bought like bizarre stuff for
21   way, way, way, way too much money and junk.
22       Q.    With the auction purchases that you
23   said he purchased later on, are you referring
24   to --
25       A.    Oh, yeah, there it is.  Yes.  That's

Page 355

1    it.  The nine -- actually, we were able to find
2    out that four of them actually came from Epic,
3    which they probably all nine did but we were only
4    able to be four that we verified.  I mean, we
5    probably could have gone further.  But at that
6    time that day we found that four of them actually
7    were --
8        Q.    Did Jason just stop showing up to work
9    period?  Did he ever turn in a termination --
10       A.    He never had -- he never had a formal
11   termination.  He just dropped his demo off, he
12   quit showing up, and then at that point he was
13   self-terminated.
14       Q.    I'm going to show you what I'm marking
15   as Exhibit I believe 18 I'm on.
16              (Court reporter clarifi-
17               cation.)
18              (A discussion was held off
19               the record.)
20          MR. QUANDT:  The last marked exhibit I
21   have is 17.
22          MS. LIU:  Okay.  So this should be 18
23   and any reference to 18 with respect to the
24   supplemental police report was meant to be 17.
25          I am marking as 18 what I've

Page 356

1    Bates-stamped MACC 118 to 120.
2              (Deposition Exhibit 19 was
3               marked.)
4    BY MS. LIU:
5        Q.    And let me start -- this is the e-mail
6    that I'm trying to show you.  Are you able to read
7    it from your computer?
8        A.    I think I need it bigger.
9        Q.    Let me try.  Is that okay?
10       A.    Let's see.  Yeah.
11       Q.    This e-mail is dated October 26,
12   2017 --
13       A.    Yes.
14       Q.    -- from Bill Thompson to --
15       A.    Yes.  Bill Thompson was my dad's
16   general manager.  He's the one that told me all
17   about the J&N thing, Nick Cornfield.
18       Q.    Yep.  So this e-mail is dated
19   October 26, 2017, from Bill Thompson to Michael J.
20   Anderson.  Is Michael J. Anderson you?
21       A.    That's me.
22       Q.    Okay.  Do you recognize this e-mail?
23       A.    Well, yeah, I -- for some reason I
24   thought we talked on the phone, but he actually
25   sent me an e-mail.

Page 357

1        Q.    Okay.  And it says here:
2        Mike, heard something today you need
3        to investigate.  Short story first,
4        you might have a thief.  Supposedly
5        your employee asked the mail house to
6        bill Chicago $9,000 for mail that
7        never happened and then split the
8        money with the mail house.  Long
9        story, we have been using Nick
10       Cornfield from J&N Mailings.  We got
11       him through Mike Sr. as a recommenda-
12       tion from someone in Chicago that uses
13       them all the time.  Nick has done
14       several mailings for me.  Got a call
15       today from a guy we have been using
16       for promotions.  His name is Tim
17       Ditonto.  He has been handling several
18       events lately for the smaller stores.
19       Tim and I have been working very
20       closely with a graphic artist for
21       Nick Cornfield, and her name is
22       Alicia Brown.  She does not want to
23       be mentioned.
24          This is the same Alicia that we've
25   been talking about throughout this deposition.

1  Correct?
2      A.  Yes.  Yes.
3      Q.  Okay.  And I think you said just now
4  that you thought that this conversation that's
5  memorialized in this e-mail was via phone but --
6      A.  Yes.
7      Q.  But it's instead via e-mail.  Correct?
8      A.  Yes.
9      Q.  Okay.
10  Alicia also does most of the graphic
11  work art for Chicago, although she
12  commented to Tim that she never talks
13  to anyone in Chicago, everything from
14  Chicago goes directly through Nick
15  Cornfield.
16          This first part of this sentence
17  was everything from Chicago going through Nick
18  Cornfield.  Is this, in your opinion, evidence of
19  that?
20      A.  Yes.
21      Q.  Okay.
22      A.  Totally.
23      Q.  Why?
24      A.  Because nothing goes through anything
25  except him.  Why wouldn't he be talking to the

1  sales managers or anybody else to get the feedback
2  on what to do or -- it's almost like it's perfect
3  -- like it's -- not perfectly.  It's -- I can't
4  think of the word I'm trying to use.  But they
5  basically steered towards him and out of every-
6  body else's way so they can't get involved.
7      Q.  And by him are you talking about
8  Nick Cornfield or are you talking about --
9      A.  Like everything is to go through him
10  because he's the one that's got the connection
11  with Jason.
12      Q.  Okay.  So the him you're referring to
13  is Nick Cornfield.  Correct?
14      A.  Yes.  Yes.
15      Q.  Even art changes and then to her.
16          Do you know what that means?
17      A.  And then to her.  That means that she
18  didn't deal directly with, like, anyone at the
19  store.  She was dealing with him because it was --
20  probably never ever happened.
21      Q.  The next sentence says:
22  She says there was an invoice last
23  month for mail for $9,000 to the
24  Chicago store, and then Nick made the
25  comment after the invoice that he made

1  a quick $4500 off our Chicago store.
2  But she did not design anything and
3  does not believe --
4          Well, actually let me stop there,
5  after the "Chicago store."  Do you have an issue
6  with this first half of this sentence?
7      A.  Yeah.  She said there was an invoice
8  last month for $9,000 to the Chicago store and
9  then Nick made the comment after the invoice that
10  he just made a quick 45 off our Chicago store.
11  Yeah.  Yeah.  That means he didn't do the work but
12  yet he billed for it.
13      Q.  Do you know what J&N's profit margins
14  are?
15      A.  Do I know what their profit margin is?
16  No.  But it can't be that.  I mean, if you just do
17  the postage on it alone with the paperwork, with
18  the paperwork cost, there's no way.
19      Q.  The next part of the sentence says:
20  But she did not design anything and
21  does not believe there was ever any
22  mail sent and is assuming that Nick
23  split the money with the Chicago
24  employee.
25          Do you, based on this sentence,

1  believe that -- or based on this e-mail, that
2  Alicia was the sole graphic designer that did work
3  at issue with respect to J&N --
4      A.  I don't know if she was -- I don't
5  know if she was the sole design artist.  But I
6  know that he had worked with her for a long time.
7      Q.  And based on her private -- sorry.
8  Based on prior work with her, you are of the
9  opinion that there must be wrongdoing and theft
10  with respect to J&N.  Correct?
11      A.  Then what happened was I believe after
12  this, and please don't hold me to exact dates
13  because this is when I was gone all the time and
14  with my dad.  And it was bad, it was just really
15  bad overall.  But that -- when we pushed for more
16  and more and more, then what finally tipped it
17  with her where she said she would open up and talk
18  is when he had her make up a mail piece and that
19  after she made up a mail piece and sent it off, he
20  had basically said -- he basically let the cat out
21  of the bag and said, you know, they never did
22  this -- [audio difficulty]
23          (Court reporter clarifi-
24          cation.)
25          / / /

91 (Pages 358 - 361)

Page 362

1          (A discussion was held off
2          the record.)
3  BY MS. LIU:
4     Q.   Mike, do you want to pull that in?
5     A.   I'm sorry.  I'm so tired, I can't even
6  stay awake.
7          So when we were pushing for the
8  proof of the mail piece, he couldn't produce
9  anything.  So then he called her, had her produce
10  something.  And after she did the graphic design,
11  since then he made a comment to her either by
12  e-mail or by phone that this was for something
13  that never happened, he just had to show that they
14  had something.
15     Q.   And is that --
16     A.   And that's -- she was so bothered --
17  and I believe her words to me were she was so
18  bothered by that that she said at that point she
19  would -- she would open up and talk, she would be
20  okay with talking to me, because she felt that
21  that was absolutely wrong, which she did --
22     Q.   And is it your understanding that what
23  she told you is consistent with this last sentence
24  here, that the story that I got is the Chicago
25  store made a comment about not having any mail

Page 363

1  going on and asked Nick to bill them for $9,000
2  and then they could split it?
3     A.   That, yeah.  But I talked to her after
4  that, I believe, like after some other -- we were
5  pushing for proof of this.  That is when I talked
6  to her.  And then he had her produce that mail
7  piece that never went.
8          MS. LIU:  So I'm marking this
9  Exhibit 19 [sic].  It is MACC 279 to 281.
10          (Deposition Exhibit 20 was
11          marked.)
12  BY MS. LIU:
13     Q.   Mike, would you agree that this
14  appears to be an e-mail that you authored on
15  January 18, 2018, to Debbie Wick and Bill
16  Thompson?
17     A.   Can you make it so I can see it?
18     Q.   Yes.
19          (Court reporter clarifi-
20          cation.)
21          MS. LIU:  Sarah, do you know?
22          MS. SUDDARTH:  Yeah.  I have that 17
23  was the original case incident report, the police
24  report.  18 was the supplemental police report.
25  And then 19 was the previous e-mail.

Page 364

1          MS. LIU:  This is 20.  Okay.
2  BY MS. LIU:
3     Q.   Can you see this?
4     A.   Can I see it?  Oh, I can see it better
5  now.  You did something.
6     Q.   Yeah.  I moved it over.
7          So what I was saying is this
8  appears to be an e-mail from you dated January 18,
9  2018 --
10     A.   That's mine.  That's me to Debbie
11  Wick.  Yeah, that was my dad's controller.  And
12  Bill Thompson.  Yes, that's from me.
13     Q.   Okay.
14     A.   I remember -- I remember sending this.
15     Q.   How do I tell your e-mail address from
16  your dad's e-mail address?
17     A.   I was Mike -- I'm
18  mike@mikeandersonchevy.com.  My dad was
19  mike@mikeanderson.com
20     Q.   And in here it's a January 18 e-mail
21  that says:
22          Good morning.  I am confident that
23          Jason K, the GM in Chicago, is
24          stealing.  We had all sorts of people
25          saying that he was getting paid for

Page 365

1          buying cars from Epic Sports.  Nothing
2          seemed too out of line until we
3          started losing money on those vehicles
4          and crazy issues with titles,
5          et cetera.  I told him not to buy
6          anything from Epic in November.  He
7          still did.  And then I told again
8          not to buy anything from Epic.  He
9          started going to the auction and
10          buying cars.  I started getting a
11          funny feeling about the vehicles he
12          was buying when he wholesaled a P car
13          that was purchased a month earlier.
14     Q.   What is P?
15     A.   P means purchase.  So if you have a
16  number that starts with P or a CP, it means a
17  purchased car that came from an auction.
18     Q.   We also had massive wholesale
19  losses in November and December.  And
20  when I asked him about it, his reply
21  was, "You told me to make sure we had
22  all the wholesale and aging cleaned up
23  by the end of the year."  Yes, I said
24  that, but not as massive losses.  That
25  makes no sense.  He didn't have much

Page 366

1  to say after that.
2       It seems like there was a series
3  of, I guess, inadequacies by Jason with respect to
4  how he was performing his duties and --
5    A.  Mm-hmm.
6    Q.  -- and that these were documented
7  here.  Why didn't you fire him --
8    A.  Well, like I told you, I was gone --
9    Q.  -- by December?
10    A.  I was taking care of my dad.  And if I
11  had -- had my dad not had cancer and died, I would
12  have launched him probably in October, November.
13  But it was --
14    Q.  So, during this period of time, you
15  were out of town and he was your --
16    A.  It was a really traumatic time in my
17  family's life, so it --
18    Q.  I'm sorry to hear that.
19    A.  And yesterday was his birthday, so
20  then it's like you got this and then all this
21  coming up and --
22    Q.  A few weeks ago, my dad text
23  Jason and asked him about a Corvette.
24  Jason was also texting Rory, the owner
25  of Epic, and inadvertently texted my

Page 367

1  dad a message that was meant for Rory.
2       So knowing that this e-mail is
3  January 2018, I think we can safely see a couple
4  weeks ago this text message was exchanged.  Is
5  that fair?
6    A.  There is -- I am like -- I'd be
7  willing to bet almost anything that when I got
8  that, my dad sent that text to me, and then I
9  purposely e-mailed myself those text messages so
10  that I would have the date.  So it has to be in
11  this.  I just can't imagine myself not doing that
12  because I like everything documented.
13    Q.  Right.  But in here you're saying a
14  few weeks ago the text thread happened.  And this
15  was January 18.  So would it be fair to say that a
16  few weeks before January 18 these texts were
17  exchanged?
18    A.  Yeah, if that's what I said.
19    Q.  Well, I wanted to ask you.  The first
20  full paragraph in the second page, the last
21  sentence, it says:  He also bought a used Maserati
22  for his wife and traded in a Corvette he bought a
23  year ago and put 5K more if the trade than it was
24  worth.  Is that an accurate statement?
25    A.  Probably -- well, no, I think we found

Page 368

1  out it to be more than that.
2    Q.  So I'm trying to reconcile, though,
3  because I have $10,000 that we talked about
4  earlier today --
5    A.  Well, this was a -- this was probably
6  an emotional e-mail I just shot off to them.  And
7  it seemed high.  But then when we actually booked
8  it out -- because I want to say that that car I
9  want to say -- I want to say ended up booking out
10  for like 10 grand less than what he put in there.
11       Actually, we talked about this
12  earlier, didn't we?
13    Q.  So it's your position that it is the
14  10,000 difference versus the --
15    A.  It's whatever the book value was.  It
16  would be -- this was the e-mail, I was confused
17  and, you know, everything in the world was going
18  on at the time that I just shot off to them for --
19  I mean, this was for feedback.
20    Q.  On the last sentence -- or last
21  paragraph it says:  I mentioned this to my dad.
22  We had a horrible year in Chicago and amongst the
23  union strike I was getting excuse after excuse.
24       What excuses was Jason providing
25  you?

Page 369

1    A.  Where are you at?
2    Q.  The last -- the last paragraph:  I
3  mentioned this to my dad.
4    A.  Oh.  I mentioned it to my dad, like I
5  told him that -- I was just looking for it.
6  Basically I was looking for maybe guidance or
7  something like that.  Bill has been in a business
8  a long time.  Debbie Wick was a controller, and
9  she was good at -- I forget what she had.  She had
10  taken some course or something on internal theft
11  and how to spot it and whatnot.  So that's the
12  only reason I would have sent them any of this.
13       And at that time I tried to keep my
14  dad away from anything stressful.
15    Q.  Mike, while I'm pulling up the next
16  exhibit, I have to ask you questions that I ask
17  every witness, so please don't be offended.
18       Have you ever been accused of a
19  crime of dishonesty?
20    A.  No.
21    Q.  Have you ever given a deposition
22  before?
23    A.  No.
24    Q.  Have you ever been involved in another
25  lawsuit before?

93 (Pages 366 - 369)

Page 370

1 A. I'm sure, yeah, like, yeah. Well, let
2 me ask you this to clarify that. So we've gotten
3 sued by a customer that fell on the lot. We got
4 sued by a customer that slipped and fell. We got
5 sued by a customer that said that their brakes
6 were built wrong or something else that turned out
7 to be a GM issue. They actually got involved
8 because it turned out to be a bigger issue than
9 that. We had an ex-employee try to sue us for
10 something, but then we counter-sued and actually
11 won. So is that the kind of stuff you're asking
12 me?
13 Q. Yeah. I just want a general under-
14 standing if you've been involved in litigation
15 before. And that was exactly the answer I was
16 just looking for as a general matter.
17 A. Okay.
18 Q. So --
19 A. You know, I guess I get a little irked
20 with this because I'm an honest person and I'm up
21 and down honest. And I'll give you a two-second
22 example, not to try and tie up your time.
23 My wife had diamond earrings that
24 she lost. Well, two pair, a couple pair, two of
25 them she lost. We didn't realize the second one,

Page 371

1 the more expensive one, was insured until I called
2 to get the one covered. And then it turned out
3 she found them in our Florida house about six
4 months after that. And I called the insurance
5 company and said can we just keep these and pay
6 the money back. And he (A) couldn't believe I
7 called him back and (B) couldn't believe I told
8 him it was the more expensive pair.
9 And then I got so much flack for
10 that from people. I said I would never not do
11 that in the event that if there's somebody that's
12 going to get audited, if somebody is going to get
13 caught, it's going to be me.
14 And, second of all, I wouldn't do
15 this. And thirdly -- so I guess that I take --
16 maybe I take this personally and maybe that's why.
17 MS. LIU: I'm marking this as
18 Exhibit 22. Is that correct? Right, Sarah?
19 MS. SUDDARTH: I have it as 21.
20 MS. LIU: Sorry. 21.
21 (Deposition Exhibit 21 was
22 marked.)
23 BY MS. LIU:
24 Q. It is what I marked as MACC 259 to
25 269. And I am bringing your attention to MACC

Page 372

1 263. This appears to be an e-mail. Can you see
2 this?
3 A. You're asking me, Mike, this?
4 Q. Yes. I'm asking you if you can see
5 it.
6 A. Can you make it bigger? Can you make
7 it like you did the last one?
8 Q. Oh yes. Is that better?
9 A. If you can make it -- blow it up now.
10 Okay. Good morning, we --
11 Q. I would start from the bottom, the
12 September 25 e-mail at 9:34. It looks like you
13 were the author. "Why did this vehicle go to
14 AC Kustoms --
15 A. Okay.
16 Q. -- to have a trans put in?"
17 What are you -- do you know what
18 you were referring to?
19 A. Well, go down. There had to be an
20 attachment or something or had to be -- in the
21 subject line, there had to be a stock number or
22 something.
23 Q. It says image --
24 A. Yeah.
25 Q. -- 0017 --

Page 373

1 A. I attached -- I attached. That's a
2 service invoice 179 -- -- no. I'm sorry. 79036
3 is an invoice.
4 Q. And I'm not asking for the specifics
5 of the invoice. But what was the basis for your
6 question as far as -- like, was it unusual to send
7 a vehicle out --
8 A. You would never -- you would never do
9 that. And then later on I think that's one of the
10 ones that we found out that that never got
11 replaced.
12 Q. And then here the response is from
13 Joe Fricano. And forgive me if I asked. Who's
14 Joe Fricano again?
15 A. He was the service manager.
16 Q. Okay. To you, with a CC to Jason.
17 And it said: Good morning. We priced trans
18 repair and replacement, and I believe AC was able
19 to get it done cheaper.
20 Who would generally do the pricing
21 for the trans repair? Would it be the service
22 manager or would it be -- would it be the GM?
23 A. Well, it would be the service manager.
24 And then -- okay. So the way this reads, okay,
25 I'm asking Joe Fricano why we sent that vehicle to

94 (Pages 370 - 373)

Page 374

1  AC Kustoms for to put the trans in. Then his
2  response to me was: We priced the trans
3  replacement, and I believe AC was cheaper to get
4  it done. He didn't authorize it. Jason said.
5     Q.   Okay.
6     A.   I said: Cheaper than 7K? Either way
7  it should have gone to service, not a vendor.
8     Q.   So is 7K expensive for what was -- to
9  put a trans in?
10    A.   Yeah. Especially when we found out
11 like -- I'm pretty sure this was the one that
12 was -- we didn't think it was even done, fixed.
13 Because it would have been a used one anyway, it
14 would have been a used trans, like a rebuilt.
15    Q.   So I see this e-mail it starts on page
16 267 and it seems to be an e-mail forwarding
17 another e-mail. But the forwarded e-mail is dated
18 November 29, 2017, 5:23 p.m., from you to Jason.
19 And it has a list of numbers and it says Epic
20 Motorsports. Can you tell me what I'm looking at?
21    A.   Yes. That is a report that I built.
22 I would love to get a copy of that so I can bill
23 it again because it got deleted from our system.
24 I took -- and this is all the cars that we bought
25 from them. And it wrapped around I believe what

Page 375

1  we paid and what we sold it for or vice versa. I
2  believe. I'd have to look into it to figure it
3  out again. But I wanted to recreate this. So
4  that's a -- can you, like, make it bigger and then
5  not move the screen?
6     Q.   Yes. I'm sorry.
7     A.   Can you, like, page up one? Maybe one
8  more. Okay. Stop. Okay. That CP3901 one,
9  that's a stock number, like you asked what the P
10 number was earlier.
11    Q.   Mm-hmm.
12    A.   That means purchased car. R means
13 ready to sell. And then P means purchased, you
14 purchased it outright from like a third party, it
15 wasn't a trade-in. That would have been the
16 reference number. That would have been -- I'm
17 sorry, that's the NAD number, name and address
18 number, like the control number, Epic Motorsports.
19 And then that amount I believe was what we --
20    Q.   When you're saying that amount, you're
21 saying the 17,305?
22    A.   Yeah. That's what we paid for it.
23 But then I believe the next amount was --
24    Q.   The 15,800?
25    A.   That's what we -- that's probably what

Page 376

1  we should have paid for it.
2     Q.   Okay. And that should have paid for
3  is an independent calculation that you created
4  based on --
5     A.   Right.
6     Q.   -- the various things we talked about?
7     A.   Right. Like, as a general rule, this
8  is how we would purchase these cars.
9     Q.   Okay. And what's this date?
10    A.   That is -- that is probably the date
11 that it was done, I would guess. I'd have to --
12 yeah, that's probably the date that we received
13 the vehicle.
14    Q.   Do you remember what this 28 is?
15    A.   That was probably the days in stock
16 maybe before. No. That would have been -- oh, if
17 I had this, I sent this? Then I can probably --
18 I wonder if I -- but, anyway, what's the title on
19 it, the subject line?
20    Q.   It just says Epic. But, regardless,
21 do you remember what this last 17,750 is
22 reflecting?
23    A.   No, I don't.
24    Q.   And was this something you sent to
25 Jason for a particular purpose?

Page 377

1     A.   Yeah. To show him that we were losing
2  money on all these cars.
3     Q.   Okay. And turning to page 259, there
4  is an e-mail from you to Barbara Flores dated
5  December 23, 2017, and it reads: Barbara, don't
6  approve any check to Epic or ATrendz.
7     A.   Oh, I remember. ATrendz was Epic, I
8  believe.
9     Q.   Was Epic?
10    A.   I believe ATrendz was Epic or there
11 was a connection there or something. I forgot
12 about ATrendz.
13    Q.   Just to maybe refresh your memory, I'm
14 going up a little built. It's still the same
15 e-mail thread. The subsequent e-mails are dated
16 December 23. But Barbara responds:
17       Okay. We haven't bought anything from
18       Epic since Jason is going to the
19       auction himself. ATrendz is the guy
20       who puts on the packages. Are we
21       stopping that service?
22    A.   Oh, right. Okay. That's fine.
23 That's fine. ATrendz is like a --
24    Q.   Okay. So back to this Epic. Do not
25 approve any checks to Epic. This is you telling

95 (Pages 374 - 377)

Page 378

1 Barbara not to do it based on what?
2    A.   On -- I don't want it done.
3    Q.   Was it based on recent -- what you
4 just sent to Jason?  Was it --
5    A.   It was based on everything that was
6 going on and the loss that we were taking.  It was
7 like, no, there's way, way, way, way, way, way,
8 way too much going on here.  I mean, obviously
9 theft all over the place.  And I said -- that's
10 my way of stopping as much as I could from a
11 distance.
12    Q.   And on January 11, 2018, there's an
13 e-mail.  This is Bates-stamped 260.
14       Barbara, who is Sir Hooptie that we
15    are wholesaling cars to?  I have to
16    approve all wholesalers, and I don't
17    recall this one.  Do you have the
18    dealer license/tax exempt form?
19          Do you remember sending that
20 e-mail?
21    A.   No.  But that looks like an e-mail
22 that I would send.
23    Q.   Okay.  And this was around the time
24 that Jason stopped showing up to work.  Correct?
25    A.   Okay.  Mm-hmm.

Page 379

1    Q.   And it was just part of your investi-
2 gation you were asking who Sir Hooptie was?
3    A.   Yeah.
4    Q.   Do you know if Judy ever -- or, I'm
5 sorry, Barbara ever responded?
6    A.   Yeah.  Well, can you go down?  She
7 probably -- it's probably underneath it.
8    Q.   Unfortunately, these are not in order.
9    A.   Then maybe she called me instead and
10 said that no.  I know she had a horrible time
11 trying to find anything out about them at all.
12 And then it was like in not St. Louis, Missouri,
13 but someplace around there that somehow somebody
14 was connected and we found out he was connected to
15 the owner of it or something it was like an LLC.
16       I'm sorry, my brain is fried right
17 now.
18    Q.   It's okay.  I'm hopefully getting to
19 the simple part of my questioning.
20          Do you have any indication that
21 Jason cut checks for himself from Mike Anderson's
22 accounts?
23    A.   No.  Wait.  Wait.  Can you rephrase
24 or --
25    Q.   Yeah.  Did Jason, for example, ever

Page 380

1 request a check to his own -- as payee, so Mike
2 Anderson please cut me a check and make it out to
3 Jason Kolodzinski?
4    A.   Not that I recall.
5    Q.   Okay.
6    A.   I can't think of what for that we
7 would have done that unless it was an advance or
8 he needed to borrow money or something.
9    Q.   And none of that ever happened.
10 Correct?
11    A.   I don't think he ever -- I mean,
12 there's been times when we -- you know, I've
13 loaned people, employees, money and then they take
14 it out of their paycheck, you know, over a course
15 of time.  I don't recall ever doing that with him.
16    Q.   Did he ever do anything like stealing
17 cars off the lot that you know of?
18    A.   Not that I know of.  We do an
19 inventory.
20    Q.   Did he have access to the bank
21 account, direct access like --
22    A.   Uh-uh.
23    Q.   No?
24    A.   (Nodding)
25    Q.   And then I believe you said he was not

Page 381

1 a signatory.  It was just you, your sister-in-
2 law --
3    A.   Uh-uh.
4    Q.   -- and I believe one other person.
5 Correct?
6    A.   Judy.  Judy.
7    Q.   Judy?
8          And then was there anything -- I
9 know we've gone through a lot of paperwork.  But
10 have you as Mike Anderson Chevy come to a
11 conclusion that he's forged anything?
12    A.   Forged anything?
13    Q.   Right.  Like altered paperwork saying
14 anything?
15    A.   He -- I don't know.  I don't know.  I
16 don't know if he, like, altered it, like, where he
17 changed the language in a document.  Is that what
18 you mean?
19    Q.   Or signed someone else's name or
20 anything --
21    A.   Oh, I don't know.  I never thought of
22 that.  That very well could have happened.
23    Q.   But you have no indication that that
24 did happen, correct, as you sit here right now?  I
25 understand you haven't thought about it.

96 (Pages 378 - 381)

Page 382

1    A.   I'm sorry, can you give me one second?
2    Q.   Yeah.
3             (A discussion was held off
4             the record.)
5         THE WITNESS:  I'm sorry.
6    BY MS. LIU:
7    Q.   It's okay.
8             What facts or evidence do you have
9    that show that Jason Kolodzinski did this, that
10   Jason directly took money from -- when I say
11   directly, I mean reached his hand into the till,
12   so to speak, from Mike Anderson Chevy?
13   A.   Well, he didn't do it directly into
14   our checking account.
15   Q.   Okay.
16   A.   He did it like he moved things around
17   and got, like, on the back end of things.  Do you
18   know what I'm saying?  So he did it by buying
19   these cars from Maury -- Rory.  And then when
20   that -- just a minute.
21            (A discussion was held off
22            the record.)
23        THE WITNESS:  I don't mean to yell.
24   I'm sorry.  What did you ask me again?
25            / / /

Page 383

1    BY MS. LIU:
2    Q.   You said he did not reach in the till
3    directly.
4    A.   So he would do it to where he would
5    never put himself like frontline of anything.  You
6    know what I mean?  So he would be -- it would be
7    around.  So then when we said no more from Epic,
8    then he, I mean, based on his part at least had
9    those cars sent to the auction and then, you know,
10   obviously outbid anybody else there by stupid
11   numbers, because nobody else would ever even
12   propose to spend that money on those cars.  And
13   then, you know, Rory would just -- I'm sure it was
14   cash, give him cash.
15   Q.   I know earlier we had talked about
16   potential ownership interest in at least one of
17   the other third parties here, the J&N, the Epic,
18   Sir Hooptie.  To be honest, it's been a long day
19   for me, too, I don't recall specifically which one
20   we talked about.  So I was just hoping to run
21   through real quickly.
22            Do you have any reason to believe
23   that Jason had any ownership interest in TKC
24   Entertainment?
25   A.   I would not be surprised if he did,

Page 384

1    now that you say that, because his wife was like a
2    dance studio teacher or something or --
3    Q.   Do you have any evidence showing that
4    he has ownership evidence -- ownership interest?
5    A.   No.  I would have no evidence.
6    Q.   Okay.
7    A.   I thought you said would you have any
8    reason to believe.
9    Q.   With respect to Epic, the same
10   question.  Do you have any facts or evidence
11   showing that Jason had ownership interest in Epic?
12   A.   I don't think he had any ownership of
13   Epic.
14   Q.   And the same question with
15   Sir Hooptie.
16   A.   I think he had some connection with
17   Sir Hooptie, but I have no evidence of it.
18   Q.   Okay.
19   A.   It was like too weird that you would
20   find some company from two or three states away to
21   grossly overpay for cars.
22   Q.   So I'm understanding you you think
23   there's a connection to Sir Hooptie but you are
24   not sure if it's an ownership interest.  Correct?
25   A.   Well, because we couldn't find the

Page 385

1    information out about them.  Right?  Again, he
2    didn't go through the proper -- you know, get them
3    approved and everything.  And then when we tried
4    to, like, pull like the LLC stuff online, you know
5    how you can go online, we couldn't find anything.
6    It was just too odd.  And then the rumor was that
7    he had or maybe was related to or something.
8    Q.   All right.  And the rumor was that he
9    was connected with them, not that he owned it.
10   Correct?
11   A.   Well, I've heard all sorts of rumors,
12   so I'm sure one of them was he owned a part of it
13   or something.  But I do remember or recall finding
14   out who a managing member was or something, and it
15   wasn't him.  I believe, don't hold me to the
16   exact, but I thought it was something like
17   unrelated name, like it wasn't --
18   Q.   I think we saw a Brian Gardner name at
19   some point.  Does that sound familiar?
20   A.   No.  Did we see that today?
21   Q.   Yeah.
22   A.   Oh geez.
23   Q.   The same question with AC Kustoms.
24   Do you have any facts or evidence showing that
25   Jason Kolodzinski had any ownership interest in

97 (Pages 382 - 385)

Page 386

1  AC Kustoms?
2      A.  Uh-uh.  I don't think that either.
3      Q.  I'm going to go over my outline and
4  see if I have any other questions for you.
5          Counsel, if you have anything.
6          EXAMINATION
7          BY MR. QUANDT
8      Q.  I just have one follow-up question,
9  Mr. Anderson, with regards to J&N.
10         Counsel marked as Exhibit Number 7
11  the second amended complaint.  I just want to
12  refer to paragraph 25.
13         Recently J&N produced documents
14  indicating that during the time that Mike Anderson
15  paid J&N $191,000 that J&N cut checks to Jason
16  Kolodzinski in the amount of $54,000 which Jason
17  deposited in one of his personal bank accounts.
18  Would that violate Mike Anderson policies and
19  procedures?
20     A.  Well, yeah.  We even had them sign a
21  form when they start that says you can't get any
22  sort of a kickback or payback or any side deal
23  payment like that.
24     Q.  Would it be correct that during the
25  time that Jason was employed by you that you did

Page 387

1  not have any knowledge that he was receiving a
2  kickback from Nick Cornfield and J&N Marketing?
3      A.  No, not until the -- not until -- no.
4  No.  No.  Not until I got that e-mail or the phone
5  call.  I thought it was a phone call.  And then I
6  started looking at it.  And then -- well, before
7  that, I questioned the fact of these mailers and
8  getting nothing off of it, they were circum-
9  venting, not getting proof, not getting the things
10  to sign off on the mailer before we'd do it.
11     Q.  So until -- until we provided you
12  information that J&N pursuant to the subpoena
13  produced documents that Jason deposited $54,000
14  directly from J&N, you had no knowledge of any
15  kickback prior to that time.  Is that correct?
16     A.  No proof.
17     Q.  Yes.
18     A.  But I felt it.  It's like I knew it.
19     Q.  Had you known at the time that Jason
20  was employed by you that he was receiving a
21  kickback from J&N, would you have terminated him
22  at that time?
23     A.  I would have tried to have him
24  arrested at that time.
25     Q.  Thank you.  We have no further

Page 388

1  questions.  Thank you.
2          RE-EXAMINATION
3          BY MS. LIU
4      Q.  I have a couple follow-ups.
5          The $54,000 that your attorney just
6  referred to, do you know for a fact what that
7  $54,000 was for?
8      A.  Do I know what it was for?
9      Q.  Correct.
10     A.  No.  It was for a kickback I'm sure.
11     Q.  That's based on your belief.  But
12  versus something that you've seen showing
13  absolutely without a doubt it's a kickback?
14     A.  No.  I haven't seen anything.
15     Q.  So it's your opinion that it's a
16  kickback.  Is that accurate?
17     A.  It has to be.  I mean, you can say
18  opinion.  But it's -- to me, it's as evident as it
19  can get.  What else would you be doing with them
20  for that time that he's going to give him a check
21  for that period for that kind of money?  It would
22  have to be.
23     Q.  Are you aware that Jason Kolodzinski
24  provided website design services to certain
25  entities?

Page 389

1      A.  No.  Jason provided website?  No.
2      Q.  I was asking you if you were aware of
3  it.
4      A.  No.  I don't -- I mean did he -- like
5  he did it and you're asking me if he did it?
6      Q.  Right.  I'm asking if you were aware
7  whether he did it --
8      A.  No.
9      Q.  -- for other entities.
10     A.  No.  He didn't.  Not that I know of
11  anyways.
12     Q.  There were a couple witnesses that
13  were identified in the course of this litigation.
14  I just wanted to ask you what their involvement
15  with the allegations at issue were.
16         One name that came up was Katie
17  Keenen.  My understanding is that she is an
18  accounting title clerk at Mike Anderson.  Is that
19  correct?
20     A.  Yes.  Katie -- yes, yes, yes.  She's
21  upstairs.  Yes.
22     Q.  Do you know what her connection is
23  with respect to the allegations at issue?
24     A.  I don't know that she would have any.
25     Q.  So, to your knowledge, you don't think

98 (Pages 386 - 389)

Page 390

1 she has any direct knowledge of anything.
2 Correct?
3     A.  I mean, she's probably -- she was --
4 she's the type that would gossip, so I'm sure
5 she probably if she heard anything would spread it
6 around.  But I don't think she has any connection.
7     Q.  And then forgive me if I misheard you.
8 I thought I heard that Judy Arnold and Barbara
9 Flores were both controllers at Mike Anderson
10 Chevy.  Is that correct?
11     A.  So Judy is more like a CFO.  And
12 Barbara was hired because the controller that we
13 had before was subpar at best.  And Barbara --
14 I've known Barbara for years.  And I wanted
15 somebody that I could trust that was trainable,
16 and that's why we hired Barbara.  And Judy's, you
17 know, role in that was -- Judy is really like a
18 CFO.  She's over everything.  Barbara would have
19 just been over a portion of.  Like Judy closes the
20 month in Chicago, does the financial statement
21 whatever.  And then Barbara was eventually
22 supposed to go into that, but.
23     Q.  So they worked together at the same
24 time?
25     A.  They worked, yes.

Page 391

1     Q.  Okay.
2     A.  Judy was Barbara's boss.
3     Q.  And then when did Barbara leave?
4     A.  She left right after Grossinger
5 sold -- did you say you're from Chicago or no?
6     Q.  I'm in Chicago.
7     A.  Okay.  Grossinger.  You know
8 Grossinger?  AutoPlex?
9     Q.  Where is that?
10    A.  It's like on North Avenue and Dayton.
11 And then there's one like --
12    Q.  Yes, I know where that is.
13    A.  Okay.
14    Q.  Yeah.
15    A.  When they sold to that Canadian group,
16 that lady that was part of that Canadian group,
17 Tammy something, was -- recruited her through
18 another lady.  And then she went there because she
19 got like some big promotion but then got let go
20 recently.  So it didn't last very long.  It hasn't
21 been very long, if that's what you're asking.
22        And no hard feelings.  I mean, I
23 like Barbara.  Barbara is an honest person, too, I
24 believe in my heart.  I believe Haz is an honest
25 person in my heart, too.

Page 392

1        MS. LIU:  So I think we're finished
2 for today.  I am --
3        THE WITNESS:  Geez.  Thank you.  I'm
4 sorry for being a jagoff.
5        MS. PARKER:  -- for the purposes of
6 the record, keeping this deposition open as far as
7 the reservations that I previously stated on the
8 record with respect to the computer data that
9 seemed to differ, with respect to AC Kustoms with
10 a C's records that I don't have in my file and I
11 still have not received, and with respect to the
12 AC Kustoms calculations based on the unfamiliarity
13 with the specific documents that were placed
14 before the witness.
15        Ted, Eric, do you have any other
16 questions or anything else?
17        MR. QUANDT:  No.  We will -- we will
18 reserve our right to call Mr. Anderson in
19 plaintiff's case in chief for further questioning.
20        We would also, pursuant to Rule
21 30(b), reserve our right to review and make any
22 changes.
23        MS. LIU:  And, I'm sorry, one more
24 further reservation and, Mr. Anderson, you will be
25 done.

Page 393

1        We also are reserving our right to
2 continue our deposition based on Mr. Anderson is
3 being deposed in his individual capacity and
4 separately as a 30(b)(6) witness.
5        That being said, I would like a
6 copy of this transcript.
7        MR. QUANDT:  Yes.  We would as well.
8        (The deposition was
9         concluded at 6:00 p.m.)
10        (Signature was reserved.)
11        --oo0oo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

99 (Pages 390 - 393)

Page 394

CERTIFICATE
OF
CERTIFIED SHORTHAND REPORTER

I, DEBRA L. KLESZYK, a Certified Shorthand
Reporter of the State of Illinois, CSR License
084-002981, do hereby certify:

That previous to the commencement of the
examination of the aforesaid witness, the witness
was duly sworn by me to testify the whole truth
concerning the matters herein;

That the foregoing deposition transcript
was stenographically reported by me and was there-
after reduced to typewriting under my personal
direction and constitutes, to the best of my
ability, a true and accurate record of the
testimony given and the proceedings had at the
aforesaid deposition;

That the said deposition was taken before
me remotely via videoconference at the time and
place specified;

That I am not a relative or employee or
attorney or counsel for any of the parties herein,
nor a relative or employee of such attorney or
counsel for any of the parties hereto, nor am I

Page 395

interested directly or indirectly in the outcome
of this action.

IN WITNESS WHEREOF, I do hereunto set my
hand at Elk Grove Village, Illinois, this 13th day
of October, 2021.

DEBRA L. KLESZYK
Certified Shorthand Reporter
License No. 084-002981

Page 396

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

October 14, 2021

To: Eric Quandt, Esq.

Case Name: Mike Anderson Chevrolet of Chicago, LLC v.
QBE Insurance Corporation
Veritext Reference Number: 4823016
Witness: Mike Anderson      Deposition Date: 9/30/2021

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness
review the transcript and note any changes or corrections on the
included errata sheet, indicating the page, line number, change, and
the reason for the change. Have the witness' signature notarized and
forward the completed page(s) back to us at the Production address
shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of
this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 397

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4823016
CASE NAME: Mike Anderson Chevrolet of Chicago, LLC v.
QBE Insurance Corporation
DATE OF DEPOSITION: 9/30/2021
WITNESS' NAME: Mike Anderson
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have made no changes to the testimony
as transcribed by the court reporter.

_____      _____
Date                Mike Anderson
Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

100 (Pages 394 - 397)

Page 398

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 4823016
3        CASE NAME: Mike Anderson Chevrolet of Chicago, LLC v.
            QBE Insurance Corporation
         DATE OF DEPOSITION: 9/30/2021
4        WITNESS' NAME: Mike Anderson
5        In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7        I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9        I request that these changes be entered
      as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
      that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
      Date           Mike Anderson
14
         Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
      the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
         They have listed all of their corrections
18       in the appended Errata Sheet;
         They signed the foregoing Sworn
19       Statement; and
         Their execution of this Statement is of
20       their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
      Notary Public
24
25 Commission Expiration Date
```

Page 399

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 4823016
3  PAGE/LINE(S) /      CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____   _____
20 Date           Mike Anderson
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
      Notary Public
24
   _____
25 Commission Expiration Date
```

101 (Pages 398 - 399)

**[& - 19,096.82.]**

| & | | |
|---|---|---|
| **&** 2:10,21 | | |

**0**

**0017** 372:25
**06161** 1:5
**084-002981** 394:7
　395:9

**1**

**1** 3:11,21,24 4:5,7
　4:8,10,17 10:7,10
　102:19 107:12
　108:1 157:25
　161:11 164:2
　177:20 182:22
　213:13 230:20
　231:1 245:17
　273:15 303:9
**1,000** 353:2
**1,018.66.** 195:16
**1/15/18** 105:20,25
**10** 3:11,14 4:8
　62:9 68:13 206:17
　207:18 230:24
　231:1,2 273:22
　274:23 368:10
**10,000** 62:6,15
　90:4 112:12
　119:24 131:14
　151:6,12 162:1
　368:3,14
**10/10** 317:23,23
**10/3** 307:21,24
　317:19
**10/5** 317:23
**10/8** 307:22
　317:22,23
**10/8/16** 307:21
**100** 48:3,7,25
　49:19,19,20 61:7,8
　137:16,18 174:16

**100,000** 73:6
**101** 4:16
**102** 170:2 195:8,15
　202:20 203:23
**103** 170:2 267:16
　268:25 269:2
**104** 170:2 269:1,3
**105** 61:9 271:6
**106.25.** 313:1
**107** 272:20
**108** 3:20,22
**109** 3:24 4:11
　254:8
**10:20** 76:12
**10:25** 76:9
**10:32** 76:13
**11** 4:9 16:9 62:10
　200:22 218:18
　231:5 238:25
　239:1 257:1 262:7
　273:14 378:12
**11/6/73** 12:19
**110** 4:13
**1100** 396:1
**111,432.30.** 240:24
**113** 4:3
**118** 4:22 356:1
**11:51** 152:17
**12** 4:11 118:5
　129:19 132:8
　151:4 163:22
　176:6 202:5 254:6
　254:9 268:19,21
　269:3
**120** 4:22 356:1
**125,000** 209:18
**125,562** 209:24
　216:8
**125,562.76.** 218:11
**12:30** 152:18

**13** 3:21 4:12
　102:19 108:2
　129:16 216:19
　287:19 292:14,14
　292:15 294:10
**13,000** 303:14
**13,5** 307:25
**13,500** 306:23
　307:4
**13,700** 303:17
　312:20
**131** 4:4
**131,000** 111:4
　130:3,21
**135** 2:11
**138** 189:18,24
　195:7,15
**13th** 395:4
**14** 3:23 4:14 108:6
　204:5 233:5
　302:25 303:2
　309:7 396:4
**14,705.41** 315:3
**15** 4:15 30:12
　68:13 129:16
　202:17 309:8,9,10
　309:13 329:16
　334:4 337:21
**15,000** 288:3
**15,800** 375:24
**150** 48:3,7,25
　49:14,19 137:16
　137:17 190:17
　233:16
**1500** 184:19
　197:12
**16** 4:5,17 75:11
　99:15 161:12
　193:6 202:20
　247:19,20 297:18
　329:17,18,19,20

**161** 4:5
**16510** 261:18
**17** 4:18 192:17
　202:22 203:16
　207:4 208:14
　233:14 247:19,19
　332:25 333:1
　337:13 355:21,24
　363:22
**17,305** 375:21
**17,750** 376:21
**176** 150:3,13
　209:19
**176,000** 111:12
　144:17 208:4
　209:16,17 210:22
　211:13 222:19
　230:13
**178** 4:6
**179** 373:2
**18** 3:23 4:20 20:10
　108:6 182:22
　202:25 204:23
　207:4 208:14
　333:15 337:14
　355:15,22,23,25
　363:15,24 364:8
　364:20 367:15,16
**1820** 396:2
**1847** 1:18
**1875** 395:8
**19** 4:21 5:5 182:21
　184:14 278:24
　292:10 293:1
　294:1 329:25
　356:2 363:9,25
**19,096** 314:9
**19,096.82** 311:11
　312:5
**19,096.82.** 304:15
　312:2,22 315:3

**191,000** 110:23 118:5,10 119:4 124:11,13 239:13 241:2 245:20 386:15

**1997** 13:11,21 15:8 17:12

**1:20** 1:5

**1:49** 217:18

**2**

**2** 3:14 10:14,15 31:15 62:19

**2,000** 264:7,14 312:1,7

**2,338.33** 201:10 205:13

**2,338.33.** 201:22 203:11

**2/13/17** 208:7

**20** 4:23 76:3 78:7 109:2 152:12 296:14 319:5 325:24 326:3 329:25 363:10 364:1 397:16 398:22 399:22

**20,000** 352:12

**200** 48:4 204:15 206:2

**200,000** 335:13

**2000** 15:9 16:18 17:2 86:7

**2001** 16:10

**2003** 14:4,4 15:23 15:25 17:3,13 18:5 84:16

**2005** 17:23,24 18:1 18:6,8,25 19:4,5 19:19 84:17,18

**2008** 18:17 19:21 20:3,9,10 85:22

**2011** 86:8

**2012** 86:11

**2013** 303:15 307:1 311:25

**2015** 26:23 27:2 43:7,20 55:19,20 58:9 65:7 68:6,7 68:19 77:12 82:5 91:22,24 92:2 94:5 352:6

**2016** 4:14 27:11 36:10,10 42:16 46:3 48:24 49:2 51:22 55:13 56:4 57:19 58:24 75:3 79:1,2 86:1 87:18 89:9 90:8 94:9 95:5 96:23 97:1 99:10,14,20 100:5 102:2 129:22 136:24 158:3 178:20 181:25 200:25 216:1,10 217:8 218:16,18 240:10,23 250:17 251:1 287:19 298:23 299:3 302:11,14 303:9 337:21

**2017** 49:4,7,24 130:6 137:20,21 137:22 138:5 141:7 142:8 157:6 158:8 159:5,10 162:12 163:8 184:14 185:5,5,8 191:3 192:1 194:11 207:18 209:10 210:19,21 216:9,19 218:10 218:22 232:8

233:11 237:9 240:10,11 250:17 251:1 255:14,24 257:1 258:1,13 259:3,5,7 260:7 261:20 262:24 263:12 265:9,13 277:8 278:10 279:6,18 302:11 346:16 349:16 350:9,23 351:13 356:12,19 374:18 377:5

**2018** 27:11 46:3 49:24,25 50:1,4 51:22 55:13 86:1 87:18 89:9 94:9 100:5 102:2 107:12 129:23 130:8 136:24 137:22 156:5 163:22 165:22 176:7 208:11 216:20 218:13 278:10 302:11 310:12 333:6,20 333:25 334:4,7 337:21 338:3 363:15 364:9 367:3 378:12

**2019** 63:15

**2020** 109:2

**2021** 1:16 292:10 293:1 395:5 396:4

**21** 4:24 371:19,20 371:21

**21,096** 308:1

**21,096.82** 304:5

**2100** 2:11

**212.37.** 313:2

**216** 187:4 188:5 195:7,15

**216-523-1313** 396:3

**22** 204:22 243:15 371:18

**23** 191:3 377:5,16

**231** 4:8 195:8

**231.40** 195:16

**231.40.** 191:1

**239** 4:9

**24** 241:6,24 243:5 280:10 281:18

**25** 334:19 372:12 386:12

**250,000** 105:14

**2500** 102:4

**2534** 188:5

**254** 4:11

**259** 4:25 371:24 377:3

**26** 268:2 356:11,19

**260** 378:13

**263** 372:1

**267** 374:16

**269** 4:25 371:25

**27** 271:7 333:6,25 338:3

**2750** 188:4 195:4 195:20

**279** 4:23 363:9

**28** 15:25 376:14

**281** 4:23 363:9

**286** 204:16,17

**286.89** 205:17

**286.95** 204:4

**286.95.** 202:16 203:25

**29** 374:18

**292** 4:12

**2:00**  217:14 263:4
**2:04**  217:18
**2s**  15:11

**3**

**3**  3:18 62:6,15,19
97:25 98:2 131:15
218:13
**3,000**  102:4 204:22
**3,532.33.**  202:24
203:12,20
**3.9**  261:22
**3/7/16**  105:20,24
106:20
**30**  1:16 3:13,17
10:13 11:2,15
29:23 42:25,25
51:5,6,7,24 52:2
174:15 177:18
214:22 297:18
332:11 392:21
393:4
**303**  4:14
**309**  4:15
**31.26**  188:19,24
195:15
**31.26.**  195:7
**312**  2:5,12
**317.10**  202:15
**317.10.**  204:1
**318**  3:19 99:2,3
**321.90.**  202:18
**329**  4:17
**333**  2:4 4:18
**3336**  303:7 306:8
313:4,18 314:22
**3339**  306:4
**337**  4:20
**34**  185:24 198:3
**3468**  195:21,22
**3468.66**  194:23

**3468.66.**  195:12
**3500**  227:8
**356**  4:21
**35th**  334:10
**36**  4:7 177:21
182:21,21
**363**  4:23
**37**  273:20 274:22
**371**  4:24
**3724**  189:17 195:3
203:6
**3741**  201:4 203:8,9
**3768.66**  195:21
**386**  3:6
**388**  3:5
**393**  4:8 213:13
230:20 231:1
**3:00**  152:9
**3:30**  296:2,6,13
**3:50**  310:20

**4**

**4**  3:20 107:24
108:2,3 258:13,14
273:24 274:9
278:25
**4,391.41**  303:6
313:21 315:1
**4,391.41.**  313:19
**401.93**  175:3
**405**  193:18
**416**  256:5
**43,250**  185:17,22
187:22 188:4
**44114**  396:2
**45**  51:25 360:10
**45,5**  204:3
**45,500**  200:25
**450**  2:4
**4500**  360:1
**46**  186:1,2

**46,000**  185:3,6,20
186:3 187:20
188:4 199:14
**47,435**  202:13
**47,965**  202:6,13
**47,995**  265:9
**4823016**  396:8
397:2 398:2 399:2
**4:30**  296:9,11
**4:34**  310:20

**5**

**5**  3:22 4:19 108:7
108:8 206:18
262:24 263:12
297:17
**5,000**  169:25
264:15
**5,800**  180:6
**5,806.99**  180:18
**5,806.99.**  179:14
**5/19/2017**  191:11
191:16
**50**  30:11 64:25
65:4 78:6
**50,000**  167:11
168:19 173:3
**500**  353:2
**530**  202:9,9,11,11
202:12
**5301**  12:22 257:16
**5333**  12:22 335:3
**54,000**  386:16
387:13 388:5,7
**5800**  111:9 132:11
132:17 177:24
178:7,14,15,25
180:4,19,20
**5806.99**  178:6
**5806.99.**  178:5,9
179:19

**588,000**  113:1
**59**  4:17 351:23
**59,000**  352:9
**5:23**  374:18
**5k**  367:23

**6**

**6**  3:5,17,24 4:19
10:13 11:2,15
109:21,22 110:12
177:18 214:22
276:21 329:15
332:11 393:4
**6.99**  180:2,7
**6.99.**  178:15
179:21
**60**  52:8,10 351:23
**60,000**  62:18 163:2
**60,901**  173:5
**60603**  2:11
**60606**  2:5
**60641**  12:24
**61,401.93**  174:20
**61,401.93.**  162:20
**620**  292:22
**63,000**  303:10
**63353**  305:4
**634**  4:14 302:25
**64**  3:24
**65**  4:4
**67**  170:6,7,11,12
**686.79.**  304:25
312:24
**6:00**  258:2 393:9

**7**

**7**  4:3 113:5,6,7
129:16 171:15
273:17 296:8
297:19 337:21
386:10

**7164** 256:3
**725** 303:9 312:20
**726** 304:1 312:22
**726-6000** 2:5
**727** 304:21
**728** 312:22
**732** 305:8
**735** 305:15 312:25
**736** 313:1
**737** 305:18
**74** 286:23
**75** 233:21 286:23
**75,000** 111:2
126:11 329:4
**759-1400** 2:12
**79** 287:13
**79036** 373:2
**7:00** 258:2
**7:30** 334:1
**7k** 374:6,8

**8**

**8** 4:5 161:6,8
255:14 273:24
274:9 278:25
**80** 233:21 240:12
**80,178** 240:19,20
**83** 281:11
**84** 4:11 254:8
255:12
**85** 27:7 48:11
**86** 256:3
**87** 258:11
**88** 27:8 256:25
287:18
**89** 257:5 289:16
**892** 4:14 303:1
**8992** 163:9

**9**

**9** 4:6 31:16 177:20
178:1

**9,000** 357:6 359:23
360:8 363:1
**9/30/2021** 396:9
397:3 398:3
**90** 4:10 50:24
53:18 245:18
273:15 289:16
**901.93.** 163:4
**91** 111:6 129:21
130:21 301:3,8
**96** 273:20 274:22
**97** 264:3
**98** 3:18 4:16
265:17
**9:00** 297:9,16
**9:07** 1:16
**9:34** 372:12

**a**

**a.m.** 1:16 76:12,13
152:17 297:16
**abide** 274:14
**ability** 146:22
394:16
**able** 16:23 44:6
65:15 73:18
129:13 148:25
191:19 196:22
213:13 224:20
239:6 258:16
283:17 316:3
330:11,13 342:20
342:23 343:4
353:24,25 355:1,4
356:6 373:18
**abruptly** 285:21
**absence** 58:23
**absentminded**
159:2
**absolute** 61:9
**absolutely** 39:25
84:21 127:2

133:16 250:14
260:10 291:9,9
292:3 299:12
324:21 338:15
348:16 362:21
388:13
**ac** 4:8 111:13,16
111:17,22 112:1,3
112:5 116:17,21
117:20 144:13,14
144:21 145:16
148:2 149:1,15
159:23,25 160:2
204:21 205:4,6
207:25 208:2,6,19
209:1,2,4,9 210:3
211:10,18 212:20
212:25 213:10,12
214:2 216:1,19
218:2,7,7,8,10,15
218:17,22,23
220:7,12,13,15
222:15 223:19,19
225:21 226:5,5,21
228:16,22 229:6
229:13,20 230:20
230:25 231:22,23
232:22 234:14,24
236:12,24 237:3
237:13 343:12,17
372:14 373:18
374:1,3 385:23
386:1 392:9,12
**accept** 61:19
**accepted** 115:20
**access** 147:15
148:20 161:12
261:2 345:5
353:11,22 354:4,9
380:20,21

**accesses** 354:3
**accessible** 65:18
**accessory** 132:13
**accident** 148:14
199:6 288:14,16
314:19
**accidental** 6:13
**account** 16:6
226:6,18 380:21
382:14
**accountable** 140:5
**accounted** 42:11
**accounting** 13:20
30:23 38:20 194:8
389:18
**accounts** 44:16
276:2,4,16,16,21
291:13 379:22
386:17
**accuracy's** 316:25
**accurate** 75:17
105:21 109:1
112:21 138:6
146:15,23 153:14
162:2 163:22
173:19 174:24
181:23 209:20
223:4 261:14,15
270:10 307:19
314:12 315:9,10
317:10 329:4
335:14 340:16
341:8 351:4 354:6
367:24 388:16
394:16
**accuse** 230:7
**accused** 369:18
**accusing** 219:9
220:17
**acknowledge** 5:5
397:11 398:16

**acknowledgement** 32:25
**ackustoms** 4:8 213:13 231:1
**acquired** 23:17
**acronym** 39:9 85:6
**act** 51:3 397:14 398:20
**action** 83:4 84:17 315:14 395:2
**actively** 23:8
**actual** 29:25 39:9 113:20 173:1 276:5
**ad** 82:8 86:5 87:10 87:16,17 88:13 89:24 91:22 127:21 129:15 251:10 276:9 282:15 285:8
**add** 56:12 180:7 188:24 195:12,20 196:4,7 205:19 258:17,18 352:16
**added** 32:18 42:11 70:23 116:22 205:17 248:4
**adding** 223:12 241:1
**addition** 10:24 11:10 115:13 211:15
**additional** 111:11 114:24 115:15 117:19 172:10 190:4
**address** 12:21 13:1 31:23 36:4 82:16 84:2 119:12 241:16 253:11

274:6 279:13,16 288:2 364:15,16 375:17 396:16
**addressed** 322:8
**addresses** 84:6 93:25
**adjusted** 214:6
**adjusting** 169:18
**admin** 354:1
**administered** 5:13
**administrative** 165:11 172:6 291:12
**adobe** 103:13
**ads** 35:3 77:6 81:2 84:22,24 85:1,3 86:2,3 90:7 126:9 126:13,23 127:1 128:5,17 251:12 329:3,10
**adv** 193:17
**advance** 380:7
**advanced** 143:24
**advertise** 259:18 265:3
**advertised** 256:11
**advertisement** 126:25 265:7
**advertisements** 76:19,20 85:12
**advertising** 34:24 45:21 77:7,15,18 77:19 78:24 79:3 81:4 82:19 83:19 85:4,8 86:18 92:2 92:10,19 96:20,25 97:1 110:22 111:1 118:9 126:8 127:19 239:12 241:10 242:1 243:8 250:24

251:4,19 276:8 282:18,19,20 283:20 285:4,4 292:6,12 335:5
**advice** 73:1,3
**advised** 350:10
**advisor** 193:25 194:2,3,5 234:8
**aesthetic** 146:6
**affiliated** 207:23
**affirmatively** 331:15
**affixed** 273:21 397:15 398:21
**afford** 59:13
**aforesaid** 394:9,18
**afraid** 16:15
**age** 65:6
**agencies** 78:24 88:13 96:25 251:19
**agency** 77:8,15,18 77:19 82:8,20 86:19 87:16,17 97:1 276:10 285:7 285:8 292:6,12
**agent** 136:18
**ages** 293:3
**aggravated** 213:8
**aging** 137:11 199:3 322:7 351:22 365:22
**ago** 15:12 63:7 218:12,13 225:2 293:1 366:22 367:4,14,23
**agree** 5:16,20 57:15 124:25 200:24 201:1,11 220:8 228:18 240:21 241:4

303:17 315:25 316:3 334:3 345:21 349:9,11 363:13
**agreed** 20:9
**agreeing** 40:11
**agreement** 87:25 88:2 154:18 165:5 220:5
**agreements** 87:13
**ah** 15:1
**ahead** 7:22 63:13 69:23 91:20 95:14 121:17 127:8 161:14,14,14 169:12 170:24 204:16 210:17 221:8 251:25 260:21 264:25 282:23 293:13 362:2
**ahold** 250:15 339:7,14
**air** 67:13,14 68:7 68:14 141:25
**airlines** 56:22
**alarm** 88:10
**alicia** 121:10 252:9,13,19 254:7 255:13 257:1 258:12 262:25 263:11 357:22,24 358:10 361:2
**allegation** 112:11 119:2 124:9 128:16 130:20 144:11 149:12 151:9 208:1 241:8 242:12 252:7 253:7

**allegations** 8:20
30:20 34:23 45:12
86:1 110:22
112:22 118:1
125:5 126:21
133:24,25 144:9
156:8 161:2,23
177:23 205:5
209:16 210:9
237:1 239:8 240:3
240:6 253:21
295:15 301:2
329:1 331:22
340:8 341:17
389:15,23
**alleged** 110:20
111:12 118:22
175:14 201:6
205:13 213:21
239:24 286:2
**alleging** 178:7
**allocate** 78:5,6
81:23 86:23
**allow** 287:4,25
352:18
**allowance** 163:1
163:12 173:17
**allowed** 40:4 87:7
87:9 112:19
134:22 135:1
148:4 153:25
154:18 177:10
181:16,17,19
226:10 264:23
265:2 275:20
283:15 291:10
**alluded** 75:2
144:10 252:20
**alluding** 307:14
**ally** 53:8 54:1
322:13

**altered** 381:13,16
**amend** 180:6
**amended** 3:22,24
4:3 103:15 107:16
108:15 109:19,21
113:4 114:2,13,22
117:23,24 209:16
241:7,7 386:11
**amount** 38:15
40:14 110:23
111:1 126:10
132:23 136:25
150:4 185:12
216:3 230:12
245:21 249:15
258:24 260:25
261:1 288:4,5
303:10,14 329:4
375:19,20,23
386:16
**amounts** 245:23
**analysis** 247:23
**anderson** 1:3,11
3:3,12,16 5:23 6:4
6:6 7:1 9:12 10:19
11:1,13 12:11,14
13:1 19:22,24
20:14 21:13,14,20
26:13,15 27:15
29:3 31:8,13
32:10 34:12 39:18
40:21 41:9,25
45:14 46:2,11,23
53:3 55:3 65:25
67:6 75:14 76:15
77:2 81:8,14,17
82:5 85:11 86:3
90:10 91:4,23
93:8 97:13 98:6
102:22 104:15
105:2,3 107:2,3

108:12 109:11
112:23 116:4,5
118:9,14 119:3
124:11 133:19
149:17 152:4
154:19 155:3,7
158:2,3,8 160:18
161:5,23 168:4
170:18 171:18
172:9 174:8
175:13 177:21
180:12,17,24
181:8 182:1,6
186:19 188:6
194:22 205:21
207:1 208:5 210:1
213:4,14 214:12
215:2,13 216:17
218:5,9,21 219:1,4
219:5,22 220:11
221:4 222:14,16
223:15 225:21
226:1,4 228:17,18
228:22,24 229:5
229:19 231:6
234:18 239:5,12
239:17 244:17
245:22,24 246:2
246:19 247:24
250:18,25 254:14
258:1,14 259:15
259:20,22 261:12
263:2,13 264:1,18
265:20 266:3
273:15 275:22
279:19 284:18
286:1 289:22
291:24 292:23
298:3,6,19 301:5
301:13 302:9
303:16 304:18

307:5,11 308:12
310:22 312:4,20
313:8 315:20
320:25 325:4
326:6 327:13
329:9 330:16,22
330:25 331:15
332:13 334:24
335:2,8 340:1
341:25 344:9,11
345:4,24 348:13
349:1,6 356:20,20
380:2 381:10
382:12 386:9,14
386:18 389:18
390:9 392:18,24
393:2 396:6,9
397:3,4,9 398:3,4
398:13 399:20
**anderson's** 10:8
30:23 35:12
117:25 118:19
124:19 181:24
239:22 240:7
379:21
**answer** 43:17
55:13 56:20
116:11 117:10,20
211:17,21,23
226:11,12 230:17
235:8 236:16
300:15 308:18
331:17 342:25
344:17,20,23
370:15
**answered** 211:15
212:12 235:24
236:3
**answering** 211:4
212:9 332:4

**answers** 7:6 97:14
215:20,21
**anybody** 87:6
169:1 278:1 286:3
299:25 359:1
383:10
**anymore** 222:24
232:7,7,12
**anyone's** 343:7
**anyplace** 349:22
**anyway** 37:10
92:19 135:2
139:18 285:6
319:20 347:25
374:13 376:18
**anyways** 319:14
389:11
**apologize** 295:10
**app** 353:18
**apparently** 148:25
**appealable** 74:1
**appear** 255:14
397:11 398:15
**appeared** 2:7,13
**appears** 220:22
255:12 256:25
304:4,21 305:14
308:2,25 329:24
363:14 364:8
372:1
**appended** 398:11
398:18
**applied** 87:21
**applies** 102:8
**appraisal** 112:12
151:5 161:25
173:2 174:1
**appraisals** 100:5
**appraise** 56:2
100:1 151:11
166:16 176:20

**appraised** 167:10
168:16,18 169:3
172:24,25 173:9
173:10 176:17
**appraiser** 169:5,8
**appreciate** 125:17
243:19 296:19
**approach** 247:8
**approached**
347:10 348:12
**approaching**
347:14
**appropriate**
117:16 242:24
**appropriateness**
162:23
**approval** 36:22
40:24 79:8,10
81:15,16 82:21
95:4 118:20
124:20,24 125:6,9
239:22 260:19
261:18 267:10
**approve** 31:18
34:4 36:20 38:10
38:11 80:25 83:9
83:11,13 84:24
88:2 250:1 266:19
290:23 377:6,25
378:16
**approved** 34:3
35:6,7,15,24 36:1
36:21 37:18 42:1
69:22 80:4,23
83:17 90:18,19
136:14 155:8
231:24 235:6,10
235:11,13 244:22
246:25 247:1,6
261:10 267:4,9
287:17 338:3

385:3
**approving** 96:11
165:18 166:1
**approxi** 13:21
159:5 277:5
**approximate**
156:25 157:4
**approximately**
13:12 15:6 45:6
86:6 112:12 113:1
130:3 137:20
144:16 151:6
162:1 181:25
208:4 216:8,20
222:18 240:20
241:3 245:20
265:12 279:6
299:22 335:12
**approximation**
137:3 157:22
**april** 257:1 258:13
**araceli** 94:15
**arbitration** 165:5
**area** 43:13 65:5
139:8 266:7,14
**arena** 322:10
**argue** 224:8,8
**arguing** 219:14
**arithmetic** 315:24
**arnold** 25:19
178:17 218:13
222:7 281:8
332:21 339:25
340:18 390:8
**arrested** 387:24
**arrival** 153:17
333:5,25
**arrive** 172:24
194:21,22
**arsenal** 292:24

**art** 199:25 358:11
359:15
**artist** 357:20
361:5
**asa** 340:1,5,8
**aside** 86:2 87:1
89:18,24,25
282:17
**asked** 41:25
121:13,24 122:1,2
143:14 179:10
212:12 220:11,12
230:8 241:16
243:10,13,24
255:19 266:17
270:14 294:15
330:4 331:9,25
353:8,10 354:3,8
357:5 363:1
365:20 366:23
373:13 375:9
**asking** 20:11 31:6
31:8 35:8,10 55:9
76:21 95:17
114:19 121:8
142:23 145:24
160:18 174:8
177:17 180:10,10
180:14 201:14,25
210:21 211:5,6
213:16,19 215:19
219:22 221:9,14
224:19 227:5,11
230:15 241:15
242:1,12,13 243:1
243:10,18,21,23
244:4 245:13
248:18 253:2
267:22 269:25
273:12 278:16
295:13 297:5,10

315:13 328:2
335:9 336:13
370:11 372:3,4
373:4,25 379:2
389:2,5,6 391:21
**asks** 125:14
**aspen** 250:20
251:13 253:15
**assigned** 338:1
**assignment** 397:2
398:2 399:2
**assisted** 18:14
**associate's** 13:17
**associated** 132:12
**association** 228:5
**assume** 31:7 33:24
37:13,20 53:12
130:24 196:19
263:7
**assuming** 360:22
**assumption**
185:10 208:13
256:15
**atrendz** 377:6,7,10
377:12,19,23
**atrocious** 351:21
352:13
**attached** 42:10
105:16 186:9
257:2 271:9,21
310:4 373:1,1
398:7
**attachment** 29:18
105:17 212:25
263:8,9 272:16
372:20
**attachments**
255:15,16 293:23
**attempting** 116:6
**attend** 53:3

**attention** 56:12
107:16 113:4
139:22 255:11
273:16 302:21
371:25
**attorney** 5:14 6:5
79:9 80:24 81:3
81:16 82:11 83:18
114:21 119:20
125:15 129:13
247:2,5 260:12
269:9 287:3
292:10 336:24
339:11 342:3
388:5 394:23,24
**attorney's** 337:4
339:5 340:3
**attorneys** 7:2
65:16 112:5
113:21
**attributed** 352:15
**auction** 46:14,15
46:16,24 47:7,10
53:1,2,8,17,20
56:1 59:3 61:8
66:5 67:19 69:12
70:14 72:4,21
134:3,12,16,23,25
135:4,20,25
136:14,18 138:16
140:18 145:20
182:10 299:7,20
300:2 325:16
351:3 354:4,18,22
365:9,17 377:19
383:9
**auctions** 47:16
53:11,14,22,23
55:20
**audi** 147:7

**audio** 25:16
361:22
**audited** 127:20
371:12
**auditing** 127:12
127:25
**august** 142:7,7,8
218:18
**aunt** 21:13
**australia** 16:16
**author** 372:13
**authored** 363:14
**authority** 86:15
89:4 91:10 94:9
95:13 245:4
286:10,17 291:7
**authorization**
35:22 38:14 41:2
69:23 74:20 135:5
234:5
**authorize** 374:4
398:11
**authorized** 94:22
95:14 99:24 100:2
100:4 136:14,17
231:16
**authorizing**
231:21
**auto** 54:13 67:23
68:3 135:13
154:17 186:22
336:25
**automatically**
167:13 250:22
251:14
**autoplex** 391:8
**available** 64:21
155:25
**ave** 396:1
**avenue** 1:19 14:3
14:24 391:10

**average** 50:21
101:8,10,14 131:2
131:23 146:21
168:7,7,9 170:8,8
170:18,21 171:3
**averages** 62:13
**avoid** 7:9 47:16
**awake** 362:6
**aware** 8:17 9:7,17
175:14,16 182:5,9
184:6 200:11
209:3 234:16
236:7 246:17
275:3 331:1
332:13 388:23
389:2,6

| **b** |
| --- |

**b** 3:17 10:13 11:2
11:15 65:3 177:18
214:22 332:11
371:7 392:21
393:4
**back** 8:21 9:6,17
11:5,7 17:5,16
18:23 19:13 23:23
27:4,19 28:5
35:18 36:9 40:17
55:5 58:18,23
61:21,22 63:14,14
76:8 77:12 81:14
82:9,17 84:3,5
93:23 95:4 101:9
116:4 117:23
119:7,11 120:18
122:21 123:8,11
124:9 127:6,15
130:20 131:5
144:8 145:15,22
148:15 152:12
158:21 160:6
163:13 164:12

180:16 185:17,19
191:2 194:19
196:6,12 199:8
203:15,20 211:21
211:24 217:13,20
218:16 222:15
224:8 225:7 232:8
241:19 247:2
248:12,12,20
249:13 253:13,14
254:24,24,24
255:4,18 257:14
270:19 271:25
273:13 282:11
283:21 291:20
299:25 304:25
305:1,1 310:22
311:20 316:14
319:21 333:9
335:19 336:25
339:10 345:18
371:6,7 377:24
382:17 396:16
**backdoor** 232:11
**backdoored** 95:9
96:21
**backed** 142:16
147:25 148:8
160:12 192:5
**background** 12:15
13:6 20:7,12,13
32:1 35:10 111:25
145:24 292:7
**backing** 57:18
**backlogged** 48:2
72:10
**backup** 94:4
287:10 331:25
**backwards** 79:4
244:23 314:2
315:16

**bad** 8:10 101:25
132:2,4 136:7
141:21 198:16
361:14,15
**badly** 89:1
**bag** 361:21
**balance** 105:19
348:9
**ball** 149:20
**bank** 57:10 322:13
380:20 386:17
**bankers** 33:15
223:7,9 299:14
341:18
**banks** 2:3,3,19
5:18,19 215:24
**banner** 93:17,19
263:2,10,14,17,25
278:25 279:2
**banners** 91:5,7,8
246:6 257:8 279:2
279:20
**barb** 288:17
**barbara** 44:3
127:12 241:19
248:25 270:2
271:8 272:5 289:1
291:21 346:7
353:8,10 377:4,5
377:16 378:1,14
379:5 390:8,12,13
390:14,16,18,21
391:3,23,23
**barbara's** 391:2
**barely** 260:22
**base** 265:15
**based** 8:19 9:19
48:12 92:5 122:13
125:4 149:11
150:4,6,13 167:14
167:23 169:4

170:19 172:23
191:4 195:23
209:9 244:6
251:24 263:17,24
266:5,5,7 305:19
312:9,10 313:4,6
315:8,21 316:1,1
340:10 360:25
361:1,7,8 376:4
378:1,3,5 383:8
388:11 392:12
393:2
**baseline** 55:19
**basement** 323:10
**basically** 18:10,21
26:20 32:15 38:13
54:8 57:1,3 62:14
88:1 110:19
122:12 123:2
131:25 136:21
139:5 140:9
141:11 148:24
152:2 156:21
170:12 173:18
283:18 285:7
359:5 361:20,20
369:6
**basis** 34:14 112:22
119:1,4,25 129:1
130:22,24 131:9
132:16 151:8
186:7 210:9,22
212:17 241:2
252:7 253:7
264:20 267:11
330:9,9,11 373:5
**bates** 99:2 108:1,6
166:4 171:15
177:20 230:25
245:17 254:7
268:15,25 273:16

303:8 305:15
310:25 329:15
356:1 378:13
**bdc** 285:13
**bear** 7:3 224:21
**began** 13:22
**beginning** 207:4
256:25 344:13
348:2
**behalf** 1:12 2:7,13
12:4 31:8 243:20
331:3
**belief** 388:11
**believe** 53:9 80:3
111:6 123:8,15
127:15,20 129:11
129:11 133:2,9
138:13 139:23
140:14 141:3
146:1 154:21
161:6 164:8 186:8
199:10 206:4
208:22 209:18
213:2,21 224:11
227:15,16 236:22
247:11 249:3
257:3,10 266:23
269:8 271:2,17
273:13 281:5,7
286:4 294:5,6
296:7 309:7 328:7
329:16 340:16
342:12,22 355:15
360:3,21 361:1,11
362:17 363:4
371:6,7 373:18
374:3,25 375:2,19
375:23 377:8,10
380:25 381:4
383:22 384:8
385:15 391:24,24

**believed** 140:8
**bell** 234:7 281:19
**benz** 59:17 327:8
**best** 7:17 12:12
  54:12 85:5 91:16
  168:21,24,25
  198:23 226:13,15
  235:24 236:3
  285:20 289:18
  308:18 333:6
  341:20 390:13
  394:15
**bet** 367:7
**betrayed** 136:21
**better** 21:23 24:12
  25:22 47:3,5
  50:24,25 52:1,6
  71:9 136:4 169:1
  260:23 322:24
  324:8 325:2
  348:17,19 364:4
  372:8
**beyond** 136:7
**bids** 91:16,19
**big** 33:15 44:22
  72:8 84:17 85:4
  125:23 141:25
  158:13,13 159:5
  169:1 223:6,8
  237:5,7,21 246:20
  247:7,18,21 248:1
  248:7 249:13
  250:5 252:19
  259:8,9 260:12
  264:15 283:11
  290:19,20 295:6,8
  295:9,10 337:8
  351:7 391:19
**bigger** 303:24
  348:15,19 356:8
  370:8 372:6 375:4

**biggest** 61:25
**bilities** 23:14
**bill** 87:2 94:22
  119:7 123:1 129:5
  129:17 139:4,10
  151:16 246:20
  247:7,18 248:1,7
  249:14 250:5
  251:14 252:1
  281:23 282:2
  283:18 316:23
  330:14 347:1,1
  356:14,15,19
  357:6 363:1,15
  364:12 369:7
  374:22
**billboard** 87:5
**billboards** 87:2
**billed** 118:10
  119:3 124:11,12
  229:20,22 239:13
  250:23 360:12
**bills** 77:11 78:4
  247:22 252:19,21
  295:6,10 349:17
**birth** 12:18
**birthday** 157:10
  366:19
**bit** 13:5 28:6,8
  30:20 50:2,10
  57:18,21 76:1,16
  76:17 82:4 85:10
  86:14 92:21
  105:24 122:17
  125:21 152:20
  153:19 158:1
  161:2 172:19
  184:4 214:15
  298:10 348:18
**biweekly** 46:20

**biz** 292:19
**bizarre** 354:20
**black** 60:19,20
  61:6 131:7 140:21
  167:18,20,22
  168:2 169:5,6
  199:22
**blank** 53:9 335:6,7
  335:10
**blanket** 83:16
**blasucci** 337:25
**blatant** 135:9
  300:5
**blew** 198:19
**blow** 93:20 289:18
  372:9
**blown** 199:5
**blue** 44:22 206:16
  246:6
**board** 23:10
**body** 26:4,6,7 67:7
  67:18,22 69:6
  146:13 208:20,22
  208:23 359:6
**book** 54:9 60:19
  60:21 61:6 62:8
  62:12,19 64:4
  66:23,23 101:9
  102:6 140:18
  167:18,20,22
  168:2 169:5,6
  199:22 322:11
  336:11 347:23
  349:14 368:15
**booked** 199:12,14
  199:16,18,18,20
  199:21 206:18
  368:7
**booking** 368:9
**books** 60:16
  199:23

**boost** 89:15
**borrow** 380:8
**boss** 177:5 339:17
  391:2
**bothered** 340:23
  362:16,18
**bottom** 37:8
  102:11 110:18
  163:7 192:20
  265:8 274:7
  284:24 290:16
  293:15 372:11
**bought** 17:24 18:8
  18:17,25 19:16,22
  47:12 50:9 62:5
  80:16,18 132:19
  132:22 134:2
  135:7 136:10,19
  141:25 162:15
  195:19 206:16,16
  211:2 212:6 251:6
  273:2,4,6,8 274:20
  303:16 323:9
  326:14,15 354:20
  367:21,22 374:24
  377:17
**bounce** 82:15
  83:25
**box** 33:15 175:8
  223:7,9 299:14
  337:8 341:18
**boxes** 146:2
  218:14
**brackets** 185:12
**brad** 139:12
**brain** 379:16
**brake** 264:15
**brakes** 190:21
  370:5
**brand** 228:10

**breached** 241:8,25
  243:7
**bread** 147:18
**break** 7:21,23
  65:22 76:4,7,11
  126:20 144:22
  152:6,12,16 179:5
  214:14 217:7,13
  217:17 274:5
  296:12,14,15,21
  296:22 297:24
  310:15,18,19
  352:20
**breaks** 296:10
**brian** 200:16
  385:18
**briefly** 162:7
**bring** 107:15
  113:3 270:15
  273:16 302:20
  325:23 326:18
**bringing** 139:21
  139:22 326:22
  371:25
**brings** 7:12 326:16
**broke** 125:4
  128:18,24 197:16
  199:10 296:25
**broken** 22:4 37:12
  37:14 199:12
  319:22
**broker** 78:10,12
  78:13,15
**brother** 21:12
**brought** 197:14
  249:5 255:17
  270:14 285:5,12
  343:23
**brown** 254:7
  255:13 257:2
  258:12 262:25

263:12 357:22
**brush** 67:14,14
  68:14
**brushing** 68:7
**bryant** 338:1
  341:1,4,6
**bucket** 143:18
**bucks** 39:17 40:20
  159:8 233:21
  321:2 353:2,2
**buddy** 324:3
**budget** 86:25
  89:18,25 90:3,6,11
  90:14
**budgets** 89:8,11
  89:11 90:13
**buick** 15:2,20 17:7
  73:7
**build** 82:14 83:21
**builder** 260:9
  283:24
**building** 22:1
**built** 64:18 304:5
  311:14,15,18,21
  370:6 374:21
  377:14
**bumper** 67:13
**bumpers** 31:25
  68:14
**bunch** 194:14
  352:21
**burden** 340:9
  341:14
**buried** 199:3
**business** 12:21,25
  25:22 48:1 60:5
  60:11 61:18,23
  62:11 66:9 72:17
  89:7 101:24 132:1
  132:2,4 136:7
  141:21 164:17,24

178:20,22 181:24
  198:3 207:1 247:9
  253:20 285:13
  294:2 298:24
  299:1 320:5,5
  323:8,13 326:17
  328:23 330:21
  369:7
**busy** 147:19
**butt** 341:13
**butter** 147:18
**buy** 24:1 46:13
  47:6 49:17 53:21
  55:6 56:1 59:2,12
  59:24 60:1 61:19
  63:21,24 66:9,22
  66:24 67:16 69:12
  73:21 85:5 130:16
  133:17 134:6,9,22
  134:23 135:1,9,19
  138:8 162:10
  170:4 174:18
  200:18,19,20
  225:9 319:6,12
  322:10 324:8
  326:9 365:5,8
**buyer** 73:8,9
  196:23 197:3
**buyer's** 162:9
  306:13 307:9
**buying** 49:6 58:5
  58:11 59:5 60:2
  62:2,4 63:9 66:4
  67:3 130:17,19
  134:4,5,10,18,25
  135:15 137:4,12
  138:17,18,19
  140:16 181:10
  248:21 299:7,24
  300:6 325:16
  326:9 365:1,10,12

382:18
**buys** 174:16
  326:24

**c**

**c** 2:1 54:24 94:15
  112:3 116:21,23
  129:19 136:23
  171:9 218:8,16,23
  220:7,15 221:10
  221:11,12,14,15
  223:19 228:16
  229:7,13 234:24
  236:24 237:3
**c's** 392:10
**ca** 396:25
**cadillac** 184:20
  197:12
**calculate** 213:17
  297:21
**calculating** 297:21
  302:18
**calculation** 186:7
  195:22 201:5
  204:12,14 205:10
  205:11,14,24
  302:15 313:5
  376:3
**calculations**
  205:25 392:12
**calculator** 313:9
**calderon** 2:19
**call** 36:4 54:7
  66:19 67:1 69:18
  70:5 71:17,17
  73:13 74:4,6
  78:14 119:13,15
  122:20 123:10,17
  123:23 127:13
  140:12 147:7
  148:21 152:5,11
  155:23 157:20

193:15 227:22
241:13 249:1
272:8 329:13
339:5 340:20,20
340:21 342:2
353:10 357:14
387:5,5 392:18
**called** 5:24 16:5
38:13 53:9 54:13
62:8 103:1 110:24
111:2,13 118:8
121:2 123:4,7,8,9
129:22 144:13
208:2 213:11
239:11 253:15
271:12,13 272:23
282:19 300:2
329:3 330:4
336:15,23,24,25
337:2 338:6,7,7,7
339:13 343:3
362:9 371:1,4,7
379:9
**calling** 127:14,16
193:12 340:22
**calls** 74:15 84:2
117:7 342:20
343:6,7,7 344:15
**camaros** 81:24
**camera** 346:2
353:13
**cameras** 353:11
353:15
**camry** 303:15
306:9 307:1
311:25
**camrys** 63:4
**canadian** 391:15
391:16
**cancel** 300:4

**cancer** 122:19
127:5 366:11
**capacity** 8:19 9:19
10:25 11:11 23:20
31:1 180:11 328:2
332:11 393:3
**capital** 84:15,18
**capitals** 257:23
**caps** 68:17
**car** 24:1 45:9,9,13
46:1 47:12,20,24
48:7 50:11,11,25
51:4,8,21,23 52:25
53:17 54:2,5
55:23,24 56:8
57:6,20,22 58:5,10
58:18,23,24 59:2
59:12,12,14,20
60:1,1,3,24,24,25
61:1,2,7,17,24
62:1,18,22 63:3
64:7,19 65:4,5
66:9,13,19,20,22
66:22,24 67:1,3,16
67:21 68:15 69:4
69:12,14,24 70:2,6
70:9,11,23 71:11
71:13,18,25 72:3,4
72:13,20 73:5,6,9
73:10,14,14,20,23
73:25 74:3,5,7,18
74:23 75:2,4,4,16
75:21,22,25 88:5
90:23 96:17
112:15 122:21
131:17 132:18,24
134:6,9,18,24
135:1,15,20,21,21
145:25 146:21
147:6 148:22
149:6 151:5,11,12

157:15 160:11,14
162:1,10 166:16
169:1,23,23,23
170:3,4,20,22
171:3,13 172:19
174:4,7,15,18
185:17,21 187:16
188:1,25 189:2
190:9 191:16,18
192:5,23,25 193:3
193:7,9 194:10
195:19,24 196:5
198:1,2,2,4,5,7,11
198:15,18,18,23
198:24 199:2,2,3
199:19 200:6,20
206:18,20 207:6
211:1,2 212:5,6
227:9 228:4,11
230:2 231:21
237:15,19,19
238:1,22 261:20
274:1,8,11 301:24
311:20,24,25
312:4 326:9,10,15
350:14 352:17,23
365:12,17 368:8
375:12
**card** 274:15 325:8
325:18,24 326:4
346:3 354:13
**cards** 325:19
**care** 26:20 63:19
72:15 156:21,23
157:5 288:25
300:6 366:10
**career** 80:9
**carried** 278:6
**carry** 266:8
**cars** 13:9,22,23
14:10 15:4 26:2,2

26:5,5,19 27:25
28:1 45:17,18,24
46:1,1,3,4,12,22
47:3,23 48:24,25
48:25 49:6,15,17
49:23 50:9,16,16
51:15,16 52:11
53:13,21,24 54:10
54:12,12,16 55:7
56:1,2 58:6,11,15
59:5 62:15 63:7
63:23 64:13,14,20
65:23 66:1,12
67:5 68:22 72:9
74:7,7 76:16
83:16 89:6 100:1
101:23 111:5,6,8
129:20,21,23
130:5,16,19,21
131:2,2,11,21,22
131:23 132:11,21
134:1,2,3,4,6,7,11
134:13,20,21,25
135:8,23,24,25
136:1,1,19 137:4
137:13,17 138:1,8
138:16,17,18,19
138:21 139:16
142:12 144:12,20
145:15,16,16,19
147:21 148:18
149:1,12,14
159:17,18 166:7
171:1 181:10
182:8,10 184:17
190:14 193:20,22
195:1 196:10
198:9,12,14 199:9
200:19,20 208:2
209:2,3 222:22,23
229:9 232:21

264:15 266:8
282:17 283:12
299:7,20,24 300:3
301:3 319:7
320:10 321:10
322:2,6 325:16
326:16,25 327:2
347:23 349:14
354:18,19 365:1
365:10 374:24
376:8 377:2
378:15 380:17
382:19 383:9,12
384:21
**cars.com.** 78:3
**case** 1:13 5:20
25:13 34:22 57:3
68:16 77:9 91:22
109:18 122:15
148:19 202:5
254:20 257:24
277:15 308:9
314:13 316:22
333:4 336:3,18
337:18 338:24,24
339:4 340:12
363:23 392:19
396:6 397:3 398:3
**cash** 165:7 383:14
383:14
**cashed** 126:18
**cat** 361:20
**catalog** 88:15
**catch** 141:11
255:8
**cated** 37:1
**cation** 12:9 25:18
98:16 100:8
230:22 280:14
297:14 304:12
311:4 318:25

331:8,13,19
355:17 361:24
363:20
**caught** 315:24
371:13
**cause** 154:9
258:19 319:14
**caused** 130:1
132:10
**causes** 148:13
**cc** 373:16
**center** 68:17
285:13
**cents** 179:2,6
**century** 73:7
**certain** 29:10
73:15,16 295:6
310:8 319:25
388:24
**certificate** 394:1
398:11
**certification**
148:17 187:18
397:1 398:1
**certified** 1:13 5:2
73:14 187:13,18
394:3,5 395:9
**certify** 105:2
394:7
**certifying** 105:1
**cetera** 365:5
**cfo** 390:11,18
**chain** 22:19
**chance** 343:18
**chances** 65:5
**change** 56:4,6
57:23,24 82:16
84:2,20 102:12
119:11 144:7
155:15 206:2
220:24 241:16

253:11 265:21
396:14,15 398:8
399:3
**changed** 23:16,19
23:21 27:1 57:21
58:1,2 59:5 70:3,3
92:15 94:5 116:22
277:24 328:23
381:17
**changes** 101:22,23
263:4 359:15
392:22 396:13
397:7 398:7,9
**changing** 92:13,16
**characteristic**
220:9
**characterize** 156:9
**characterizing**
220:9
**charge** 15:18 26:9
70:22 142:14
187:4 189:18
193:13 283:20
312:23,24,25
313:2
**charged** 150:9,14
150:18 235:10
283:21
**charges** 111:13
132:13 144:11,16
144:17,20 188:19
188:20,22 205:3,6
208:25 222:18
230:12
**charging** 230:2
235:5
**chart** 20:18
237:23
**cheaper** 145:9
189:10 373:19
374:3,6

**cheapest** 290:11
**cheat** 57:2
**cheating** 140:24
140:25
**check** 24:20 31:17
32:2,2 33:4,22
35:7 36:3 38:3,8
42:23,25 43:1,8,13
44:4 76:3 94:17
94:21 95:2,6,21,23
95:24,25 96:9
128:23 142:12
178:6 179:9 184:5
184:6,7,12,13,13
191:8,15 200:24
248:5 249:15,17
249:20 276:17,19
276:21,24 277:12
277:20 284:1
286:14 291:11,15
291:19 303:8
305:10,17,24
306:4 308:8
311:19,20 312:19
316:14 377:6
380:1,2 388:20
**checked** 69:21
81:2 159:22,22
215:24 220:15
**checking** 36:19
198:18 226:6
382:14
**checks** 37:2 43:4
44:17 93:24,25
94:1,21 126:15,15
126:18 128:9,9,19
146:2 244:21
245:19 247:24
278:1,2 284:6
286:22 288:23,25
377:25 379:21

386:15
**chestnut** 255:13
257:1 258:12
262:25 263:11
**chevrolet** 1:3 3:16
6:6 105:3 107:2,4
139:4,8,10 163:8
170:18 171:18
206:17 251:12
252:3 265:22
274:4,13 280:11
280:12,12,16
282:7,12 283:23
331:16 334:24
335:3,9 340:1
347:2 396:6 397:3
398:3
**chevy** 11:1,14 13:1
17:24 18:9,15,18
18:25 19:16,22,24
20:4,15,25 21:2,4
21:20 22:23 23:17
26:14,15 31:9,13
32:11 34:13 40:21
44:23 45:14 46:2
53:3 55:3 62:4,5
67:6 75:14 77:2
81:17 82:5 86:3
91:23 93:8 98:6
104:15 109:11
112:24 118:9
119:3 124:11
147:17 149:17
154:19 155:3,7
158:2,3,8 163:13
172:9 175:5
177:21 180:17,24
181:9 182:6
184:19,22 185:5
186:19 194:22
197:19 207:1

208:5 210:2
222:16 225:21
226:4 227:10,18
228:17,18,22,24
229:19 234:18
239:5,12 246:19
250:18,25 259:15
259:20 261:12
263:13 264:1,18
265:20 266:3
273:15 275:23
279:19 284:18
286:1 289:22
298:19 312:4,20
325:4 327:13
329:9 330:18,22
330:25 332:14
341:25 345:4
381:10 382:12
390:10
**chevy's** 29:3 258:1
331:3
**chevys** 62:21
**chicago** 1:4,19 2:5
2:11 3:16 6:7
12:23 13:4 14:3
14:22,23,24 26:4
26:15,23 27:22
67:6 78:2 94:4,4
105:3 260:4 266:6
275:23 279:3
284:18 292:23
332:23 341:20
357:6,12 358:11
358:13,14,17
359:24 360:1,5,8
360:10,23 362:24
364:23 368:22
390:20 391:5,6
396:6 397:3 398:3

**chicago's** 266:4
**chicagoland** 266:7
266:14
**chief** 392:19
**choose** 64:7
**choosing** 117:5
**chose** 301:13
**chris** 21:13
**christmas** 325:13
**christmastime**
75:10 193:5
290:10
**chrysler** 147:10
**cigarette** 68:15
**circle** 160:5
225:16 248:16
298:9
**circuit** 301:11
**circum** 387:8
**circumstances**
59:2 284:5
**circumvent** 44:7
143:16
**circumvented**
43:4,24 56:16
57:23
**cite** 234:22
**cited** 241:3
**citing** 243:20
**city** 63:20 279:25
**civil** 1:17 3:13,17
221:6 342:5 397:5
398:5
**civilly** 221:8
**claim** 3:21 102:15
104:13,16 106:4
117:1,25 118:2
196:11 197:14
210:22 243:25
244:1 267:13
269:12 341:25

**claimed** 118:7
179:1 201:11
210:2 239:10
245:23 342:1
**claiming** 106:12
109:11 206:11
218:10 227:13,14
230:5 245:22
246:1 304:19
313:20
**claims** 126:9 329:2
**clarifi** 12:8 25:17
98:15 100:7
230:21 280:13
297:13 304:11
311:3 318:24
331:7,12,18
355:16 361:23
363:19
**clarification** 26:14
106:19 316:7
349:21
**clarify** 31:7 66:11
121:23 134:2
165:10 245:21
349:25 370:2
**clarifying** 178:10
179:8
**clarity** 55:19 90:8
205:21,24 255:2
259:2
**class** 83:4 84:17
**clause** 153:22
**clean** 50:4,7 68:16
**cleaned** 365:22
**clear** 79:8,14
130:17 147:11
148:19,22 225:13
225:14 286:9
289:14 300:21
338:11 340:12

**clearer** 10:6 253:8
**clearly** 176:24
  232:11 235:10
  238:21 248:9,10
  320:18
**clerk** 2:19,20
  276:3 389:18
**cleveland** 396:2
**click** 87:10 89:24
  90:7 293:22
**clicks** 78:7 81:22
  81:23,24 251:6
**client** 115:3
**client's** 104:3
**clientele** 256:18,19
  256:23 327:7
**clients** 244:11
**climate** 25:6
**close** 70:21 193:4
  194:5 204:7
  347:23
**closed** 17:25 20:10
  290:14 338:11,24
  339:4,13,19 340:6
  340:13
**closely** 357:20
**closer** 137:20
  143:13
**closes** 390:19
**clue** 293:6 349:13
**coach** 226:10
**coat** 157:14,14,14
**code** 54:16 147:11
  148:22,23 256:2
  261:18 264:16
  287:16
**codes** 148:19
**coincidentally**
  120:9 346:24
**cold** 15:15 25:6

**colleague** 227:20
**collection** 216:1
**college** 13:7
**collen** 307:2,2
**colombia** 13:7
**color** 273:21
  274:22 278:25
**comcast** 89:16
  92:2 127:18
**come** 16:17 32:4
  40:5,10,19 60:3
  67:14 68:11,21,25
  76:8 82:9 93:14
  130:15 139:9
  152:12 155:5
  169:13 222:16
  250:6 263:10
  265:22 276:8
  291:20 302:16
  307:16 312:15
  323:1 327:8,21
  328:1 335:19
  381:10
**comes** 34:10 38:18
  38:21 53:13 56:2
  67:12 73:8 83:1
  91:2 145:25 267:8
  275:25 315:1
  325:22 330:13
**comfortable** 12:4
**coming** 140:17
  141:1 142:17
  145:22 160:6
  169:8 237:24,25
  299:25 312:16
  366:21
**command** 22:20
  25:12
**commenced**
  181:25

**commencement**
  394:8
**commencing** 1:16
**comment** 122:9
  343:25 359:25
  360:9 362:11,25
**commented**
  266:19 358:12
**commercial** 92:14
  92:14 127:22
  129:16
**commercials**
  78:19
**commission**
  397:19 398:25
  399:25
**common** 42:5 54:8
  66:7,8 132:1
  151:18 177:12
  295:2
**communi** 36:25
**communicated**
  36:22 243:15
**communication**
  123:23 343:13
**companies** 23:6
  68:25 77:21 88:10
  88:12
**company** 6:7 19:9
  23:11 29:16 37:15
  37:20 38:5 39:12
  41:16,17 66:2
  67:11,14 68:24
  85:5 87:5 110:24
  111:2,13 115:12
  118:8 126:10
  129:22 132:15
  133:3,3,6,7,9,13
  142:12 144:12
  186:9 208:2 209:8
  236:19 239:11

  290:25 323:9,12
  324:22 329:3
  330:12 349:20
  371:5 384:20
**company's** 280:8
**complaint** 3:24,24
  4:3,4 30:21
  109:18,19,21
  110:21 113:4,20
  114:2,13,22 115:1
  115:2 117:23,24
  128:4 177:25
  178:12,13 179:5
  179:12,13 180:3,5
  180:7,14,21
  208:24 209:16
  213:22 230:4,8,10
  230:16 239:9
  240:4,7 241:3,7
  242:17 243:2,14
  243:21 244:2,5,10
  269:13 301:2
  386:11
**complaints** 130:2
**complete** 56:14
**completed** 396:16
**completely** 63:6
  154:17 198:6,14
  222:10 247:12
**compliant** 82:12
  247:4
**component** 82:3
  117:1 175:15
  205:12 245:22
**computer** 23:11
  87:14 110:4 147:8
  166:19 173:4
  213:5 214:13
  225:4 254:16
  311:11 316:8,18
  317:3 345:16,17

356:7 392:8
**computerized** 23:23
**computers** 16:14 16:20
**concentrating** 13:18
**concern** 187:12 320:6
**concerned** 320:4
**concerning** 394:11
**concluded** 393:9
**conclusion** 115:25 117:8 125:14 222:17 344:16 381:11
**conclusory** 126:25
**condition** 54:5
**conditioner** 142:1
**conditions** 72:18
**condo** 228:4
**conference** 113:15
**confident** 73:20 364:22
**confirm** 101:4
**confirms** 100:24
**conflict** 154:7,9,10 154:11,13,14,15
**confuse** 225:16
**confused** 289:7 368:16
**conjunction** 56:21 253:20 339:24
**connect** 353:25
**connected** 379:14 379:14 385:9
**connection** 200:9 294:7 359:10 377:11 384:16,23 389:22 390:6

**consider** 66:1 117:17 291:24
**considered** 248:1
**consistent** 190:18 348:22 362:23
**constantly** 49:20 52:21
**constitutes** 394:15
**construe** 300:22
**consultation** 244:11
**contact** 37:24 82:20 216:18 337:1
**contend** 213:20
**contending** 121:25 130:24 149:12
**content** 10:2
**contention** 119:5
**context** 280:18
**continue** 112:9 202:23 215:12 221:9 300:20,25 342:2 393:2
**continued** 118:17 124:18 130:6 138:8 239:20 299:20 332:2 339:4,11 340:20
**continuing** 221:23
**contract** 57:10 69:22 81:4 87:4 87:24 88:13,16,17 182:5 241:9,25 242:2,9,10,13,18 243:1,7,11,15,22 243:25 244:12,18 245:8 312:8 330:15 331:1
**contracted** 87:4

**contracts** 87:9 245:5
**contractual** 128:2
**contrary** 118:15 239:18
**control** 36:6 201:3 375:18
**controlled** 234:23 235:1,4,23
**controller** 36:23 37:1,2 44:3 127:13 138:14 241:20 249:1 286:16 332:3 334:24 364:11 369:8 390:12
**controllers** 390:9
**controlling** 115:2
**convenient** 7:22
**conversation** 114:18 122:5 124:23 131:6 242:5 250:6 252:8 252:14 301:12 347:19 352:3 358:4
**conversations** 114:20 244:8 252:12,19
**cook** 336:24 340:2
**copied** 29:23
**copy** 8:10,11 34:18 120:14 269:5 281:21 336:11 374:22 393:6
**corner** 137:25
**cornfield** 255:13 257:2 258:13 262:25 263:12 271:8 272:2

356:17 357:10,21 358:15,18 359:8 359:13 387:2
**coroplast** 273:22 274:24
**corp** 4:8
**corporate** 10:25 11:12 20:18 28:7 28:9 29:3 31:1,4 177:18 180:11,17 210:7,8 243:19 328:2 332:12
**corporation** 1:7 6:5 12:5 115:4 344:10 396:7 397:3 398:3
**corporation's** 3:11 3:15
**correct** 8:15 9:20 11:2,15,25 12:7 14:22 19:1,23 22:12 27:9 28:4 28:11 29:10 30:16 36:9,11 41:5 42:2 45:10 53:13 57:22 58:15 60:10 63:16 66:14 67:5 68:22 75:18 90:9,12 91:25 92:7 98:24 102:9 103:5 106:22 107:7,12 108:20,24 114:6 114:23 120:2 125:6 126:2 145:20 155:19 161:7 162:20 163:4 164:10 165:14 172:6 175:17 179:11,19 184:14 188:16 189:22 190:5,23

191:8 196:3,20
197:1 198:7,24
199:23,24 200:4
201:23 203:10
206:3 207:13
210:10 214:9
223:5,20 229:1
235:3 237:9 238:7
240:4,7 243:12
245:24 251:20
252:3,23 253:24
258:9 265:23
266:21 267:13
269:4 271:3
275:13 294:12
302:5,22 304:15
306:11 311:13
313:22 315:10
318:2,7 329:5,11
329:12,16 332:16
334:15 343:9
349:24 358:1,7
359:13 361:10
371:18 378:24
380:10 381:5,24
384:24 385:10
386:24 387:15
388:9 389:19
390:2,10
**correction** 187:17
**corrections** 396:13
398:17
**correctly** 58:14
61:20 88:5 121:15
121:16 139:2
185:2 206:5 233:1
235:7 270:25
**correspond**
181:14 185:13
**corresponded**
181:13 256:7

**correspondence**
242:7 252:24
254:3
**corrugated** 274:16
**corvette** 4:5 59:17
59:23,23,25 80:17
90:7 151:4 161:3
161:15,24 163:8
163:13 170:9,12
175:5,25 196:16
264:7,14 265:13
266:4 273:1,2,7
366:23 367:22
**corvettes** 81:24
90:6 265:9 318:14
**cost** 40:22 42:12
70:23 101:11
150:9,18 168:7
174:16,17,17,21
188:25 189:1,7
233:17 265:15
352:17 360:18
**costs** 39:17
**counsel** 5:9 30:1,2
30:15 33:5,7 81:6
97:11 107:17
114:1,23 115:19
178:23 214:20
215:8,24 218:18
219:7 221:7 230:4
230:14 242:16,16
242:22 263:19
267:25 269:10
280:22 294:9,11
296:7,8 300:8
344:16,22 386:5
386:10 394:23,25
**count** 110:21
296:9
**counter** 9:14
370:10

**counting** 27:21
296:12
**county** 189:1
336:24 340:2
397:10 398:15
**couple** 12:15
15:12 91:15,17,19
101:16 102:7
135:12 152:8
167:9 233:22
247:21 257:14
263:5 266:18
283:12 284:1
302:7 304:20
307:13 338:16
353:3 367:3
370:24 388:4
389:12
**coupon** 265:21
**course** 28:24 88:7
155:14 184:7
190:12 288:7
335:25 352:5
369:10 380:14
389:13
**court** 1:1 5:1 9:13
11:4 12:8 25:17
48:19 54:20 98:15
100:7 107:25
109:20 113:19
114:4,4 191:14
217:22 230:18,21
280:13 296:16,23
297:10,13,25
304:11 311:3
318:21,24 331:7
331:12,18 355:16
361:23 363:19
397:7
**cover** 235:20
341:13

**coverage** 6:8
110:13 115:20,20
178:4
**covered** 25:8
110:15 225:11
371:2
**covers** 104:23
**covid** 5:5 27:4
51:14 198:15
339:12
**cp** 365:16
**cp3336** 302:21
303:15 306:10
**cp3724** 184:23
**cp3901** 375:8
**crack** 342:21
**cracks** 350:6
**crash** 16:21
**crashed** 16:14,21
67:15
**crazy** 22:2 49:6
156:20 327:23
340:22 348:9
365:4
**cream** 131:22
**create** 36:3 120:15
**created** 120:5
153:2 183:2
216:22,23 262:18
262:22 265:7
376:3
**creating** 263:13,25
**credentials** 33:21
**credit** 260:7,11,17
261:2,5,7 282:9,9
282:20 283:24
292:22 293:8
**credits** 105:18
**crime** 125:15
369:19

**criminal** 342:5
**cross** 54:15,24,25
**crossed** 83:6
**crossover** 54:23
**crossroads** 214:21
**crown** 13:25
**crunch** 125:21,23
**crystal** 149:20
**csr** 394:6
**csv** 272:17
**curious** 114:21
  280:10
**currency** 126:19
**current** 12:20
  91:13 92:22,24
  117:25 118:1
**currently** 21:15
  27:9 113:18 115:1
**customer** 24:4
  47:7,11 56:2,23
  62:9 67:20 69:21
  79:17 80:11 95:1
  128:19 130:2
  162:5 164:25
  165:6 173:1
  196:15 199:2
  206:7 288:20
  291:14 303:23
  307:7 310:23
  311:20 316:14
  325:8,9 326:8,15
  326:22 327:12
  370:3,4,5
**customer's** 197:10
**customers** 23:25
  26:20 47:19 57:1
  72:13 79:18 80:17
  259:20 266:2
  287:23 326:18,19
**customs** 116:21,23
  218:7,7,15,17,23

220:15 223:19
**cut** 36:3 42:23,25
  96:8 164:20
  175:23 184:6,7,13
  191:15 200:24
  232:22 240:12,15
  240:16,17 244:21
  249:15 265:1
  276:16,18 311:19
  311:19 330:1
  379:21 380:2
  386:15
**cuts** 37:2
**cv** 1:5

**d**

**d** 3:1 25:19,20
  132:8 171:9
  339:23,25 340:1
  340:11
**dad** 86:7 122:18
  127:4 130:13
  140:20 156:21,23
  157:5 347:24
  349:5,11 361:14
  364:18 366:10,11
  366:22 367:1,8
  368:21 369:3,4,14
**dad's** 120:9 121:1
  123:2 356:15
  364:11,16
**daily** 51:16
**damage** 62:16
  65:24 66:1,17
  146:7 169:25
  192:10
**damages** 130:1
  179:1 218:11,21
**dan** 285:2,2
  292:11,24 293:2
  294:2,4 350:10,17
  350:20,21

**dance** 97:9 384:2
**dandelles** 218:14
  222:9
**danny** 21:12
**dash** 55:1
**data** 392:8
**database** 172:23
  244:25 245:3
  349:19
**date** 12:17 16:23
  30:18,18 109:3,4
  129:14 141:7
  156:25 157:4
  163:21 191:21
  207:16 278:15
  309:18 330:6
  333:5,25 337:19
  337:20 338:2
  367:10 376:9,10
  376:12 396:9
  397:3,9,19 398:3
  398:13,25 399:20
  399:25
**dated** 218:18
  255:13 258:12
  271:7 287:19
  292:10 303:9
  356:11,18 364:8
  374:17 377:4,15
**dates** 20:8 105:24
  105:25 106:1,25
  106:25 220:13
  331:9 361:12
**daughter** 338:12
  338:17
**day** 21:19,19
  23:18,19,19 24:19
  24:19 26:17,17
  34:14,14 49:17,18
  71:22 88:16 89:7
  89:7 107:2,3,14

119:13,14 130:17
  134:15 141:2
  151:15 159:2,2
  170:8,8,12 176:18
  253:4 290:8,9,12
  299:11 309:22
  310:1,6 322:24
  346:5,5 355:6
  383:18 395:4
  397:16 398:22
  399:22
**days** 39:20 41:8
  42:25,25 50:24
  51:24 53:18 72:2
  129:6,9 135:6
  136:13 170:5,11
  174:15 376:15
  396:19
**dayton** 391:10
**dead** 174:16
**deadline** 152:9
**deal** 18:21 34:11
  50:17 69:21 86:20
  100:2 122:10
  132:14 151:17,19
  164:5,15 165:3,6
  165:16 174:10,11
  174:13 177:1,7
  181:16 198:16
  226:14 300:4
  306:20,22,23
  317:4,5,12 359:18
  386:22
**dealer** 13:24 18:16
  19:8 21:4,5,20
  22:22 52:4 53:23
  59:12,18,21,22,24
  65:3 79:25 135:22
  147:15 169:2
  200:21 261:13
  266:7 279:3,10

283:4 324:4
327:18 378:18
**dealers** 53:24 65:5
84:16 142:17
260:16 266:6
290:14
**dealership** 14:9,18
14:22 17:17 19:15
20:16,16 21:16
22:23 23:16 25:24
47:23 60:6 62:22
88:3 90:12,22
92:22 93:1 118:18
118:22 124:19
126:16 128:10
132:10 144:18,25
146:21 147:1,4
153:4,17 189:6
228:4 239:21,25
266:4 283:1,3
327:11,12 333:14
333:18 343:8
**dealerships** 24:1
90:22 289:19
294:17
**dealing** 34:13
359:19
**deals** 77:10 87:9
**dear** 396:10
**debbie** 5:2 7:7
152:15 363:15
364:10 369:8
**debra** 1:13 394:5
395:8
**decals** 90:25
**december** 20:10
365:19 366:9
377:5,16
**decent** 136:25
256:17,18

**deception** 104:24
140:12,15
**deceptive** 81:2
**decide** 152:21
220:2
**decision** 83:12
**decisions** 132:3
136:8 141:21
**dedicated** 46:3,5
282:16
**deed** 397:14
398:20
**deemed** 396:20
**defendant** 1:8,12
2:14 3:11,14
241:24 242:19
243:6,6
**defendants** 114:24
114:25 115:15
117:4
**defensive** 351:25
**deficit** 56:12
**defined** 105:7
**definitely** 149:25
**defrauded** 104:17
**degree** 13:17
**delete** 144:7
**deleted** 374:23
**deliverance** 44:23
**delivered** 44:24
273:23 274:1,11
274:24
**deluna** 164:17,19
346:19
**deluna's** 171:20
**demand** 48:13,16
61:13,14,22 64:10
102:7 110:13
343:13
**demo** 354:16
355:11

**demographic**
326:24
**demonstration**
302:1
**denied** 35:24
115:20
**dennis** 83:17
261:10
**dent** 67:11 68:7
**dents** 62:7 67:12
68:14 71:4
**deny** 38:10
**depart** 45:9
**department** 22:10
24:4,4,11,18 25:11
26:3 27:21 34:20
34:21 36:24 37:18
45:9,13 58:18,23
72:22 88:21 96:18
146:1 147:19
189:5 257:18
273:24 274:25
275:2,5 337:18
342:3 396:22
**departments**
25:24 26:10,11
27:22 90:11
**depend** 60:9
**depending** 31:17
38:1 42:13 59:25
64:4 67:10 72:16
74:2 81:21 86:24
282:16
**depends** 34:15
52:17 60:24 68:23
68:24 74:5,6
**deposed** 10:24
11:10,19 28:6
393:3
**deposing** 214:21

**deposited** 226:17
386:17 387:13
**deposition** 1:11
3:12,15 5:5,8 7:4
8:18 9:8,18 10:9
10:10,13,15 11:21
11:22 12:12 30:3
30:4,16 31:3 98:2
104:20 108:3,8
109:22 113:7
161:8 178:1 200:8
215:16 217:25
220:2 221:22,23
222:9 231:2 239:1
254:9 292:15
303:2 309:10
329:20 333:1
337:14 356:2
357:25 363:10
369:21 371:21
392:6 393:2,8
394:12,18,19
396:9,12 397:1,3
398:1,3
**depreciate** 51:15
51:15,16,18
**depreciating**
147:23
**depreciation** 52:5
**depth** 73:16
190:23
**describe** 222:8
246:8
**described** 41:17
**describing** 39:14
**description** 3:10
4:2 26:12 186:23
287:21 303:14
335:14
**design** 118:11
239:14 251:15

[design - documents]

253:24 272:15
360:2,20 361:5
362:10 388:24
**designated** 29:3
153:16
**designer** 361:2
**desks** 354:14
**despite** 126:11,22
329:9
**detail** 190:6
**detailed** 105:16
**details** 114:20
**detective** 338:1
340:21,23,25
341:1,20
**detectives** 333:12
333:17
**deter** 115:18
**determination**
214:3
**determine** 213:23
**determined** 302:4
**determines** 197:1
**determining**
304:19
**developed** 36:9
**development**
285:13
**device** 147:11
**diagnosed** 122:19
127:4
**diamond** 370:23
**died** 157:24
366:11
**differ** 60:22
316:18 392:9
**difference** 26:7
56:18 150:17
180:2 187:25
188:4,5 194:1
195:18,25 368:14

**differences** 308:14
**different** 12:23
24:1 25:24 51:13
55:14 63:6 73:9
81:20 82:1 85:11
86:22,24 90:11,13
91:16 92:9 160:8
160:8 167:10
184:17 194:25
195:1 198:14
205:14,16 251:18
276:9 294:24
300:15 303:20
305:15 307:7
311:12 316:9
336:3,18
**differently** 39:12
340:19
**difficulty** 361:22
**dig** 308:20
**digging** 133:11
238:16 244:23,23
311:22
**dings** 62:7 65:24
66:13
**direct** 22:6 85:8
91:21 105:4
110:14,16,22
182:11,12 241:9
242:1 243:8,17
255:11 304:2
380:21 390:1
**directed** 287:6
291:4 344:22
**direction** 394:15
**directly** 22:7
27:20 47:6 135:15
136:12 137:4
260:4 328:13
351:2 358:14
359:18 382:10,11

382:13 383:3
387:14 395:1
**disabled** 345:7
**disagreement**
220:7 223:16
**disappeared** 152:3
346:1
**disappearing**
238:17
**disappointing**
335:18
**disaster** 56:14
**disciplined** 156:5
**disclosure** 171:16
**disconnect** 353:25
**discount** 264:14
265:21
**discover** 328:1
**discovered** 334:25
**discretion** 61:10
61:12 73:2
**discussing** 263:13
263:17,25
**discussion** 29:25
48:18 103:9
338:20 355:18
362:1 382:3,21
**dishonest** 139:1
**dishonesty** 369:19
**disingenuous**
218:21 219:7,10
**disorder** 56:12
**dispatch** 194:6
**dispute** 182:25
201:22 275:15
**disputing** 162:22
162:25 205:4
**distance** 378:11
**distanced** 158:25
253:3

**distancing** 332:9
**distant** 142:23
152:2 253:5
**distortion** 25:16
**district** 1:1,1
**ditonto** 357:17
**division** 1:2 15:18
**doc** 268:22
**doctor** 318:16
**document** 8:5 9:23
9:23 10:6,21
97:22 98:5,10,13
98:14,23 99:5
102:16 103:1,20
103:22 107:18
108:11,17,18,23
109:10,15 110:9
113:10,12,19
162:7 172:11
173:8 183:4,7
215:25 218:17
224:11 225:15
231:6,6,7,10 261:8
265:17 269:16,17
272:19 281:17
284:14 302:14
305:12 311:24
312:9 337:22
381:17
**documentation**
223:2 337:7 340:5
**documented**
299:18 366:6
367:12
**documents** 4:11
29:10,16 33:3,10
33:19 102:17
103:8 119:18
161:4,18 172:8,11
177:21 182:14
186:8 191:4

200:23 207:13
212:20 213:25
215:14,17 216:1,4
216:7,9,17 217:9
218:14,15,15,19
218:24 219:12
220:13 223:17
239:4 245:14,15
254:18 273:14
280:8 281:1,6
301:15 302:9
303:7 304:18,20
305:21 307:18
309:4 313:2
314:15 386:13
387:13 392:13
**dodge** 306:9
**doing** 11:19 23:8
24:25 25:2 31:2
41:15,16,18,21
51:21 77:10 84:12
136:6 140:9 141:4
142:16 145:12
152:13 155:8
158:24 194:21
207:1 219:10
224:4,6,7 267:2
292:20 294:2
314:14 317:15
319:5 320:5
328:22 336:16
347:5 367:11
380:15 388:19
**dollar** 101:17,17
101:18,19 179:2,4
179:4 216:2
336:10
**dollars** 39:19
40:23 179:6 196:9
206:2 240:13
351:23

**dolowich** 2:10,21
**domain** 259:23
**domestic** 326:24
327:1,2
**door** 22:3,18 41:21
65:24 66:13 257:8
257:15 258:16
259:5,7,10 338:12
**doors** 34:19 93:7
258:21
**dotted** 83:5
**doubt** 388:13
**downstairs** 44:5
128:23
**downtown** 13:8,15
**drafted** 244:4,10
334:12
**drain** 323:6
**drawing** 53:9
**dream** 40:9
**drive** 2:4
**driven** 70:8
**drives** 22:2
**driving** 340:21
**drop** 13:10
**dropped** 13:9 50:1
338:13 354:15
355:11
**drops** 84:8
**dry** 48:9
**due** 5:5 42:24,24
94:22
**duly** 5:21,25
394:10
**dumb** 157:11
**dump** 119:23
**duplicate** 305:25
306:3
**duplicated** 306:5
**duplicates** 83:24
83:25 312:25

**duplication** 203:2
**duplicative** 182:20
**duties** 153:15
366:4
**dynamite** 83:1

**e**

**e** 2:1,1 3:1 4:12,21
4:23,24 8:12,13
35:17 55:1 94:15
100:10,10 102:22
122:5 123:22,22
123:23,24 134:9
138:12 144:10
221:19 222:5
227:19 230:5
250:16 254:7,12
254:17 255:12
256:25 257:1
258:12 262:24
263:18,24 271:7
271:19,20 292:10
299:13,15 309:24
310:1,4,5,9 318:8
318:11 336:7
345:5,11,13,14
356:5,11,18,22,25
358:5,7 361:1
362:12 363:14,25
364:8,15,16,20
367:2,9 368:6,16
372:1,12 374:15
374:16,17,17
377:4,15,15
378:13,20,21
387:4
**earlier** 22:11 45:8
52:24 75:2 76:15
86:16 89:17 92:6
93:24 102:6
116:25 124:22
127:24 131:13,14

135:19 141:8
144:10 145:23
146:19 147:20
157:17 159:20
167:23 173:24
184:9 187:9
191:24 196:16
200:7 203:3
207:12 208:1
209:10 212:18
232:24 237:8
241:12 245:16
250:1 256:10
259:13 268:12
269:18 276:25
292:12 295:5
307:15 310:12
311:9 318:1
324:18 330:8
333:22 342:11
365:13 368:4,12
375:10 383:15
**early** 15:9 137:22
354:12,12,12
**earrings** 370:23
**easier** 21:24 99:8
213:4 254:17
**easiest** 29:21
120:12 122:6,8
242:8
**eastern** 1:2
**easy** 122:10
**economy** 101:24
102:11
**edges** 279:1
**educated** 214:22
**education** 13:13
**educational** 13:6
**effected** 130:21
**effectuated** 112:16

efficiency   21:22
  23:15
eight   161:7 168:13
  168:20 190:7
  353:1
ein   33:1
either   7:8 78:19
  100:17 179:3
  186:8 191:21
  200:19 205:18
  213:21 224:24
  228:16 229:6
  266:24 307:19
  328:3 362:11
  374:6 386:2
electrical   146:12
electronic   32:19
  36:8 38:6
elementary   39:13
elk   395:4
else's   251:17 359:6
  381:19
email   396:17
embezzle   156:15
emmanuel   196:17
emotional   368:6
employed   75:14
  105:9 330:23
  386:25 387:20
employee   29:16
  56:11 110:15
  174:10,13,14,16
  243:16 299:21
  325:9 326:21
  357:5 360:24
  370:9 394:22,24
employees   26:23
  27:14,19 28:2,2
  29:17 32:2,10
  92:19 96:1 380:13

employment   106:1
  106:25 337:20
enclosed   396:12
encouraged   290:7
ended   175:6
  195:25 198:18
  248:20 299:6
  368:9
ends   12:13
enforcement
  344:4
enter   93:4 245:4
entered   331:2
  398:9
entertainment
  4:17 115:8 116:7
  329:1 383:24
entire   139:5
  242:18 243:4
  397:5 398:5
entities   294:22,23
  294:24 343:16
  388:25 389:9
entitled   1:12 30:1
entrance   257:16
envelopes   119:24
epa   69:4
epic   4:14,14 32:15
  59:8 111:5 117:4
  117:19 129:20,22
  130:5,21 133:25
  134:17,17,20,22
  136:22 137:5
  138:9 234:14
  295:25 298:17,19
  298:24 299:2,8,21
  301:3,4 302:9,10
  302:14,25 303:9
  328:4,5,7,17
  342:17 343:9
  346:17 351:1

355:2 365:1,6,8
  366:25 374:19
  375:18 376:20
  377:6,7,9,10,18,24
  377:25 383:7,17
  384:9,11,13
epsilon   250:20
  251:13 253:15
equally   352:12
equandt   2:6
eric   2:4 5:17 81:7
  115:21 180:9
  215:10 218:1,1
  226:7 242:20,20
  243:18 285:10,14
  297:2,25 328:9
  392:15 396:5
errata   396:14,19
  398:7,10,18 399:1
error   335:9
errors   315:25
escalade   184:20
  197:12
escalate   237:16
escalated   295:20
esophageal   122:19
especially   47:18
  88:20 232:19
  267:7 325:12,16
  374:10
esq   396:5
essentially   18:25
  40:24 295:14
established   312:24
estimated   130:3
estimating   40:20
estimation   26:22
  27:14 28:20 30:9
et   365:5
evenings   154:22

event   91:5,7
  106:12 160:15
  371:11
events   109:12
  280:2 357:18
eventually   197:20
  390:21
everybody   73:18
  238:11 251:16
  346:6 352:1
  353:18
everyone's   215:22
  324:9
evidence   126:25
  225:19,24 228:15
  234:21 235:1,23
  340:7 358:18
  382:8 384:3,4,5,10
  384:17 385:24
evidencing   320:16
evident   140:7,8
  158:22 235:4,9
  238:11 328:21
  388:18
evidently   122:3
ex   338:11 370:9
exact   26:24 29:6
  46:25 100:16
  134:11 157:19,20
  213:25 278:14
  299:11 314:18,20
  317:14 361:12
  385:16
exactly   80:1
  116:13 131:7
  134:19 154:20
  188:17 222:8
  243:3 267:14
  299:9 345:1
  370:15

exacts 27:10 49:12
examination 3:4
6:2 11:25 386:6
388:2 394:9
examined 5:25
example 37:12
56:23 59:16 61:5
72:7 73:24 91:6
131:15 149:10
153:22 155:8
174:15 201:5
213:19,20,22
214:10 218:17
224:12 295:18
327:11 342:15
370:22 379:25
examples 212:17
308:5
exception 88:4
197:24
exceptional
340:13
exceptionally
340:12
exceptions 43:10
excess 335:12
exchange 126:19
exchanged 309:19
318:1,6 367:4,17
exclusively 124:13
208:20
exclusivity 153:22
excuse 79:13
368:23,23
excuses 368:24
executed 398:10
execution 397:14
398:19
exempt 378:18
exhausted 225:18

exhibit 3:10,11,14
3:18,20,22,24 4:2
4:3,5,6,8,9,11,12
4:14,15,17,18,20
4:21,23,24 10:7,10
10:14,15 97:25
98:2 107:19 108:2
108:3,7,8 109:21
109:22 113:5,6,7
161:6,8 177:20
178:1 230:19,24
231:1,2 238:25
239:1 254:6,9
268:1,10,14,19,21
269:3 273:14
292:14,15 294:10
302:25 303:2
309:6,8,10 318:22
329:16,20 332:25
333:1,25 337:13
337:14 345:19
355:15,20 356:2
363:9,10 369:16
371:18,21 386:10
exhibits 3:9 4:1
exist 33:4 154:24
existed 337:23
existing 32:10
65:24 66:1
exists 154:23
exit 50:24
expect 38:21
272:21 308:6
expected 334:19
expecting 39:19
272:19 336:11
expense 42:13
246:23
expensive 73:10
371:1,8 374:8

experience 289:20
experienced
295:12
expiration 397:19
398:25 399:25
expired 54:1
explain 153:23
explained 116:12
explaining 179:12
explanation
324:14
expression 215:17
expressly 123:12
extent 7:8 33:3
153:20 154:23
287:13
external 77:19
extra 206:2
extremely 287:12
eyes 136:20

**f**

f 2:4 151:4 179:1
f&i 346:20
face 135:11 136:21
324:6
facelift 68:7,20
facelifts 146:7
facilitate 173:21
facility 327:9
fact 40:8 120:6
121:21 127:9
129:3 176:25
177:7 178:5 179:9
205:16 221:5
253:9 270:13
317:18 338:10
346:5 387:7 388:6
factor 173:1
factored 302:3
factoring 187:23

factors 102:7
131:8 198:21
factory 160:17
187:17
facts 122:17
175:14 225:19,23
234:21 328:1
340:4,11 382:8
384:10 385:24
failed 118:13
219:11 239:16
failure 267:10
fair 7:18 367:5,15
fakhoury 193:24
346:18,23 347:9,9
348:12
fall 16:8 20:17
24:5,6,7 56:24
91:11 99:22,23
157:6 349:16
falls 66:21 101:11
101:12 102:11
familiar 6:9 8:14
10:22 98:10,23
103:19 108:18
110:8 113:10
161:17 200:1,16
231:8 255:15
264:3 265:18
287:14 385:19
familiarize 214:15
family 73:19 252:3
family's 366:17
fans 69:7
far 19:12 23:8
24:3 28:21 29:22
47:21 50:20 51:4
54:5 60:2,9 64:12
65:25 79:2 89:9
92:10 103:1
169:21 174:9

197:7 205:10
253:6 275:6 319:8
320:15,22 325:22
349:10 373:6
392:6
**fast** 51:19 147:21
161:21 341:5
**faster** 21:24
**father** 294:15
309:16 318:2,13
323:23 348:13
349:23
**fault** 10:5 352:2
**favor** 142:16
203:5
**faxed** 8:12,13
29:23
**feasible** 324:13
**feature** 262:13
**february** 216:19
333:6,15,20,25
338:3
**federal** 1:17 3:13
3:17 11:1,14
343:20,21,23
344:2
**fee** 130:22 327:16
327:17
**feedback** 359:1
368:19
**feel** 7:20 73:20
156:13,19 160:5
160:25 211:3
212:7 225:15
302:14 304:1,23
**feeling** 135:3
208:12 365:11
**feelings** 391:22
**fees** 47:10,11,16
326:7,11

**feet** 258:25
**fell** 199:6 345:1
370:3,4
**felt** 70:7 120:22
135:11 136:20,20
362:20 387:18
**fence** 93:21 262:12
**field** 13:19 169:14
**field's** 13:14
**figure** 50:25
167:23 168:3
169:7 179:3,14
297:3 375:2
**figured** 278:19
**figures** 60:21,22
172:16,23 313:4
**file** 95:6 112:5
113:20,22 114:1
218:7,19 219:12
221:24 222:1,2,5
222:12 257:2,3
325:1 392:10
**filed** 6:6 29:1,15
104:13,16 113:21
114:1,13 115:3
209:23
**fill** 31:15,21 32:20
32:23 36:12 37:16
38:3 143:20
169:15 277:10
**filled** 32:25 33:18
96:1 103:23,24
104:12 119:23
143:20 284:3
**film** 273:25 274:10
**filters** 69:7
**final** 88:24
**finally** 127:14
248:20 250:13
299:11 336:6
339:6 361:16

**finance** 26:2 57:9
69:20,20 151:15
350:22
**financed** 70:13
**financial** 21:25
53:8,25 110:14,16
165:12 172:6
207:9 390:20
**financing** 165:1,7
165:8,9
**find** 7:21 61:17
62:14 65:20 99:8
121:9 206:25
237:3,17 249:2
271:9,21 280:11
280:15 283:10
301:6 339:3,6,18
345:8,9 349:7
355:1 379:11
384:20,25 385:5
396:12
**finding** 385:13
**fine** 76:10 114:16
178:15 180:22
222:10 223:24
323:22 377:22,23
**fingerprinting**
284:20
**fingers** 352:1
**finish** 9:14 157:1
191:12 205:22
226:3 264:10
335:22
**finished** 215:6
392:1
**finishes** 194:7
**fire** 141:18 325:5
366:7
**fired** 17:20 346:19
347:2,6,6

**firm** 118:11
177:22 223:18
224:11 239:14
253:24
**first** 5:25 10:1,6
16:2 36:21 58:21
70:12 99:18
100:10 107:2
121:10 138:25,25
175:13,16 176:2
205:15 206:25
237:3,11 240:11
246:17 247:11,14
247:16 248:13
249:13,14,21
252:8,10 253:13
267:9 298:24
299:1 303:13
328:24 331:23
333:24 337:22,25
339:21 341:9
342:19,19 357:3
358:16 360:6
367:19
**firsthand** 339:16
**fishy** 321:22
**fit** 135:8
**fits** 283:22
**five** 23:25 27:24
28:2 30:12,13
76:7 136:11 166:4
171:1 188:11
193:24 214:14
261:13 308:13
310:15,17
**fix** 41:20 66:18
71:11,15,15,24
146:22 148:18
**fixed** 71:19 72:24
73:2 149:8 274:23
374:12

**flack** 371:9
**flag** 80:11 246:6,6 352:11
**flat** 194:18
**flier** 266:25
**fliers** 251:9
**flip** 182:19
**flipped** 182:23 314:19 317:16
**flipping** 29:13
**floor** 147:22
**flores** 44:3 127:12 271:8 346:7 353:8 353:10 377:4 390:9
**florida** 371:3
**flow** 79:2
**flowing** 350:6
**fluctuates** 48:12 72:6
**fluctuations** 64:10
**flying** 127:6 350:15
**focus** 58:19 64:2 64:25 156:13,14 156:16 213:8
**focuses** 64:25
**foggy** 122:18
**folder** 108:16 245:15 281:7,12
**follow** 60:14,23 61:4 96:21 125:25 266:2 289:11 324:17 332:2 335:20 339:11 386:8 388:4
**following** 11:6 57:16 58:2 160:17 211:23
**follows** 6:1 9:1

**font** 29:22
**foolishness** 131:25
**foot** 47:22
**forbid** 148:13
**ford** 64:1,25,25 65:3
**foregoing** 394:12 397:13 398:18
**forever** 158:18 159:12 217:5 241:19 253:13 334:8
**forged** 381:11,12
**forgery** 104:24 105:7,11,13 106:8
**forget** 252:9 350:7 369:9
**forgive** 373:13 390:7
**forgot** 96:23 139:16 143:24 205:18 318:22 377:11
**form** 31:15,16,21 31:21 32:19 33:19 35:22 36:12,13 37:7,8,17 38:6,7 65:13 83:13 125:13 163:19 223:23,25 231:7,8 236:13 277:23,24 277:25 278:3,4,6 278:16,19 284:11 324:24,25 378:18 386:21
**formal** 33:8 355:10
**formally** 155:2
**formatting** 258:8
**former** 334:25

**forms** 32:14,14 40:10 85:12 165:4 241:2 270:20 284:9
**forth** 5:16 127:6 224:9 240:7
**forward** 101:13 353:6 396:16
**forwarded** 310:9 374:17
**forwarding** 374:16
**found** 120:6 121:18 127:3 133:3,12 134:19 143:15 181:18 192:12 215:25 218:2,5 226:16 236:18 288:14 295:13 325:3 345:15 355:6 367:25 371:3 373:10 374:10 379:14
**four** 13:15 27:22 53:6 84:10 107:25 122:19 191:25 293:1 355:2,4,6
**frame** 50:20 142:5 209:11
**franchise** 18:12 21:1 147:15
**franchises** 16:6
**frank** 149:5 277:24 278:6
**frankly** 7:9 218:20
**fraud** 104:24 106:8 120:4,6,7 121:17,19,22 158:24 235:11 238:21 249:7

270:10,23 271:3 271:11 272:24 343:21,23
**fraudulent** 118:25 240:2
**free** 34:1 302:15 304:1,23 397:14 398:20
**fricano** 233:25 346:8 373:13,14 373:25
**fried** 379:16
**friend** 285:20 319:6
**friendly** 122:5
**friends** 73:19 341:20
**front** 67:15 102:21 108:15 109:8,25 194:24 198:16 199:5 225:22 247:25 291:13 302:14 313:9 317:2
**frontline** 70:5 383:5
**fulfillment** 287:22
**full** 13:16 112:1 273:20 274:22 278:25 308:6 341:18 367:20
**funds** 342:1
**funny** 131:13 135:18 283:2 365:11
**furlough** 336:4,17
**further** 33:18 124:16 147:23 196:10 309:2 336:14 340:7 355:5 387:25

392:19,24
**fyi** 263:6

**g**

**gabriela** 2:19
**gains** 207:8
**game** 158:17,21
**garage** 34:19
 41:20 62:7 192:7
**gardner** 200:16
 385:18
**gation** 379:2
**gauge** 59:1
**gears** 156:13,14
**geez** 69:9 86:7
 100:6 385:22
 392:3
**gem** 62:14
**general** 10:20
 14:11,15 17:17,19
 17:23 18:2,9,20
 21:19 22:8,9
 24:11,17 25:9,14
 25:15,23 26:2,6,8
 26:10,13 27:13
 28:1,3 29:13 35:1
 44:6 48:23 50:12
 50:12,20 55:4,6
 58:7,10,12 60:4,14
 64:12 67:2,2
 70:10 71:18 75:15
 87:19 88:22 96:5
 96:10,15 99:23
 101:16 105:9
 121:1 123:2
 128:22 139:10,12
 153:7 177:4
 229:11 231:7
 251:8 255:24
 260:13 286:6,6,7
 287:3 335:1 352:4
 352:5 356:16

370:13,16 376:7
**generally** 8:17 9:7
 12:15 23:14 32:5
 46:17 47:15,23
 48:6 51:11,22
 52:16 55:4,6 77:3
 77:7 86:25 95:7,8
 98:12 135:22
 136:2 145:18,19
 155:24 164:24
 166:19 181:7
 186:9 190:17
 231:19 233:17
 251:4 261:21
 282:3 284:5
 326:18 329:2
 347:18 373:20
**generated** 167:14
 339:25
**generates** 38:14
**generic** 92:18
 354:1
**gentleman** 292:12
**getting** 58:22
 70:19 106:10
 135:24,25 138:16
 172:25 215:16
 244:24 272:8
 276:5 303:20,20
 318:14 321:4,6
 328:4,5,21 338:13
 347:20 364:25
 365:10 368:23
 379:18 387:8,9,9
**gift** 325:8,18,19,24
 326:3 346:3
 354:13
**gimmick** 290:23
**gimmicky** 274:17
 283:14,15 287:16
 290:22

**give** 24:20 26:12
 26:22 27:13 28:20
 29:12 30:9 31:11
 37:7 38:7 45:3,25
 46:6 47:21 68:12
 82:17 95:1,22
 111:24 115:23
 119:9,9,10,11,12
 128:23 159:5
 175:14 178:18
 189:8 214:10
 217:9 247:25
 248:21,23 254:21
 278:10 286:14
 291:17,19 294:20
 325:19 332:1
 370:21 382:1
 383:14 388:20
**given** 18:23
 226:17 335:15
 369:21 394:17
**gives** 31:22 69:23
 194:6
**giving** 8:18 9:7,18
 130:18
**gm** 19:6,15,16
 27:22 53:8,25
 79:25 82:22,23
 86:15 148:18,20
 153:3,6 187:13,18
 237:22 250:22
 251:12,24 252:3
 275:8 282:25
 286:17 287:10
 289:7 364:23
 370:7 373:22
**gm's** 86:15
**gmail** 293:16,17
**gmc** 201:1
**go** 7:2,22 17:4,14
 18:21 22:19,20,21

25:13 33:17 36:9
 37:17 39:18,21
 40:25 51:10 55:20
 55:24,25 59:19
 63:12,14 67:21
 68:12,14 69:13,14
 69:23 71:2,25
 75:20,22 77:12
 83:21 90:19 91:20
 95:14,22 109:17
 110:12 117:23
 119:23 121:25
 126:7 129:2
 130:20 131:5
 132:8 143:19,19
 144:8 150:22
 152:15 155:22
 156:21 157:14
 161:14,14,14
 165:6 167:17,20
 169:12 170:23
 172:21 179:1,2
 190:20,21,25
 202:24 204:3,16
 210:17 214:17
 215:11 219:13
 220:5 221:8
 222:15 224:9
 225:5 243:14
 245:18 249:1,13
 251:25 260:21
 263:3 264:25
 269:24 276:1,2
 282:8,23 287:4,20
 291:15 293:13
 303:7 304:20,25
 304:25 305:1,1,1
 305:16 311:5
 313:18 319:21
 321:24 322:23
 326:2 334:9,9

**[go - guidance]**

336:9 341:23
342:8 351:7 359:9
372:13,19 379:6
385:2,5 386:3
390:22 391:19
**goal** 58:17 342:6
353:3
**god** 148:13 225:17
**godly** 230:1
**goes** 23:9 50:21
61:21,22 69:18,19
70:13,14 72:23
79:19 84:7,14
89:10 120:12,13
120:16 142:15
143:3,5,8 146:1
225:7 247:5
341:21 347:22
358:14,24
**going** 6:19 7:1,4
7:25 8:2 9:22 14:5
16:20 23:15 24:23
27:19 30:25 40:21
40:22 43:6 47:7
54:9 59:18,19,24
62:2,12,13 63:5
65:6 67:20 73:8,8
73:10,11,21,21
74:21 75:9,25
76:5 78:6,20
86:19,22,23,23
87:11 88:11 89:14
89:15,19 90:4
92:11,13,14,17
97:22 99:16 102:3
102:11,12,13,14
102:15,19 104:20
107:15 108:5,22
110:11 115:21
117:22 119:8
120:7 121:7

122:21,22 124:9
127:3 135:10
137:2 143:1
148:11 150:22
152:7,9,13 156:15
157:11 160:7
161:3,5,20 168:11
169:20 170:3
171:6,14 175:23
176:17 177:5
178:10,11 182:18
182:24 183:20
189:15 191:2
199:4 201:9
204:20 207:17,25
214:16 216:10
217:8 218:16
225:4,18 227:6
230:23 233:23
238:12 249:6
254:5,21 255:11
256:24 261:25,25
263:7 264:24
273:17 276:20
286:15 287:2,20
288:10,17 289:17
292:13 298:1,2
301:25 302:10,20
304:19,22 306:2
307:11 308:18
310:15,16,22
312:14,15 318:12
320:4 327:7
332:10,25 337:12
338:8,17 339:20
342:8 343:4 345:9
345:18 346:2
353:19 355:14
358:17 363:1
365:9 368:17
371:12,12,13

377:14,18 378:6,8
386:3 388:20
**good** 9:4 16:25
32:3 38:4 52:1
54:14,16 66:9
68:9 69:21,22
72:2,5 73:22
101:24 106:17,18
106:24 131:24
156:11,12 217:15
225:17 364:22
369:9 372:10
373:17
**goodyear** 204:8
**goofy** 157:12
**google** 78:7 81:22
89:20 90:3
**gosh** 159:13
**gossip** 390:4
**gotcha** 7:11
**gotten** 48:4 282:24
283:13 370:2
**grading** 170:17
171:8
**grand** 14:2,24
62:9,19,19 78:6,7
206:17,18 336:25
353:4 368:10
**grandfather** 17:21
**grandfather's**
13:24 14:8,18
17:16 18:2 19:15
**grandpa's** 17:15
**grant** 307:2,2
**graphic** 118:11
239:14 253:24
259:10 272:15
273:20 357:20
358:10 361:2
362:10

**graphics** 259:13
266:18 271:24
273:19 275:6
**great** 51:3 52:2
65:19 139:15
247:10,15,15
**grind** 322:25
**grisko** 285:2,2
292:11 293:2
294:2,4
**grommeted** 279:2
**grossinger** 391:4,7
391:8
**grossly** 384:21
**ground** 7:2
**group** 170:16
324:3 391:15,16
**groupons** 251:16
**grove** 395:4
**gsm** 153:5,7,11
**guess** 6:23 42:4
47:1 55:9 78:14
98:22 100:17
102:4 124:7
128:14 145:13
166:14 167:1,2,8
184:2 186:5 188:4
188:19 193:5
197:23 199:11,13
209:19,23 224:3
250:8 289:7
342:15 345:2
366:3 370:19
371:15 376:11
**guessing** 27:7
49:13 102:3
277:18 287:8
301:9
**guidance** 177:9
369:6

**guide** 60:13
101:11
**guideline** 64:12,15
**guidelines** 61:4
64:9 282:15
**guy** 41:20 122:4,4
123:6 128:22
130:14 135:24,24
139:3,23,25
140:22 141:1
147:13,14 148:12
148:20 193:19,21
285:6,6 286:15
357:15 377:19
**guys** 33:15 53:2
140:2,2 148:16

**h**

**h** 100:9,10
**half** 14:1,19 18:14
46:7,7 47:1 52:25
53:1 63:7 127:6
157:24 159:14
182:24 190:25
297:1 360:6
**halfway** 287:20
337:24
**hand** 6:12 25:15
44:17 128:19
143:22 144:5
156:17,17,18
286:15,22 288:10
382:11 395:4
**handbook** 154:3
154:21,24 236:23
**handle** 181:22,22
181:22
**handling** 357:17
**hands** 42:20
**handwriting**
201:22 202:7,8
308:3

**handwritten**
144:4 311:10
**hang** 91:9 275:8
309:23
**happen** 37:14
43:12 44:2 45:4
58:21 70:12 82:6
127:10 146:20
286:4 308:6
317:17 325:12
327:16 345:2
381:24
**happened** 32:18
40:8 78:9 79:2
120:8,25 122:25
137:10 141:15
158:15 159:16,18
204:9 232:18
238:1 247:8 248:7
250:4 289:6
317:18,19 320:11
333:21 353:16
357:7 359:20
361:11 362:13
367:14 380:9
381:22
**happening** 350:18
**happens** 12:11
33:25 38:17 52:11
71:12,20 81:19
189:5 286:21
**happy** 10:3 103:2
110:5 303:19
**hard** 27:5 191:13
196:5,7 213:8
273:18 287:12
289:17 350:15
351:5 352:16
353:5 391:22
**harder** 8:8,9,10
324:17

**hat** 75:15,16
**hated** 260:16
**haz** 100:6 166:12
166:24 173:7,8,10
173:11,14 176:9
176:14,21 256:9
261:18 342:22
343:3 346:8
391:24
**haz's** 167:3
**hazem** 350:10
**head** 36:24 37:19
39:21 56:13 92:4
141:4 181:3
336:25
**heading** 338:10
**heads** 27:21
**headway** 343:5
**hear** 29:24 336:14
338:23 366:18
**heard** 338:5 357:2
385:11 390:5,8
**hearing** 60:8
139:2,21 235:7
270:24 341:9
**heart** 139:23
140:8 391:24,25
**heck** 246:22
**held** 48:18 140:4
208:17 338:20
355:18 362:1
382:3,21
**help** 72:14 188:23
303:22 321:9,25
322:1 323:17
324:6
**helped** 18:11
**helpful** 102:23
**hereto** 394:25
**hereunto** 395:3

**hey** 37:16 39:18
81:23 121:2 177:9
193:12 227:20
292:18
**hidden** 130:1
**hide** 151:23
235:20
**high** 13:13 48:10
59:14 61:14
101:25 137:7
175:22 205:2
214:5 288:4,5
368:7
**higher** 19:7 22:12
49:23 129:25
138:20
**highest** 19:9
**highlighted**
224:15
**highly** 139:18
140:1
**hip** 233:21
**hire** 27:5 75:9 91:4
91:8 152:22,24
**hired** 37:19 75:10
155:1 193:2 335:4
390:12,16
**hiring** 152:21
**historically** 63:23
279:9,12
**history** 47:14
85:11 178:19
298:18
**hit** 16:18 61:15
84:9 110:18,18
134:15 138:22
322:15 339:13
**hmm** 8:16 19:2
23:3 27:18 29:11
30:17 33:6,9,11
41:4,6 45:11 49:8

**[hmm - image]**

52:12 62:25 72:25
77:14,17 82:7
85:14,24 96:12
98:11 101:2 111:3
111:7,10,15,15
125:1,3 136:16
137:1 138:10
145:17 146:3,24
146:24 147:24
151:7 162:13,21
163:3,5,10,15
166:13 169:9
171:10 172:7
184:18,21,25,25
185:4,23 186:13
186:16 189:23,23
190:6 192:15
200:10 201:2,8
206:9 207:10,14
209:14 232:15
233:3 239:7
240:25 241:5
251:21 256:14
258:10 259:24
265:11 267:14,18
267:21 273:9
275:14,24 276:23
277:1,3,9,21 284:4
284:4,13 285:9
289:21 305:11,13
309:17 315:23
318:3 337:23
343:10 347:12
348:25 350:19
366:5 375:11
378:25
**hold** 112:8 152:14
157:19 185:16
192:7 217:24,24
217:24 244:9
247:3 250:16

271:18 310:14
338:13 361:12
385:15
**hole** 320:13
**holiday** 289:20,25
**holidays** 290:14
**home** 322:15
**homeless** 247:3
**homemade** 71:17
147:7
**honda** 15:2 63:19
**honest** 160:7
173:14 370:20,21
383:18 391:23,24
**honestly** 101:25
**honor** 57:2
**honored** 265:21
**hood** 146:14,16,17
146:22 147:3
187:8
**hook** 87:12,21
160:14
**hoops** 37:18
**hooptie** 4:6 111:9
117:5,20 132:9,12
133:5 134:1
144:21 177:16,23
178:5,19 179:18
180:12,18,24
181:8,12,13,25
182:6,9 184:6
200:9,25 205:13
207:2,23 209:2
212:19 234:14
301:15 343:11
350:25 378:14
379:2 383:18
384:15,17,23
**hope** 318:15
**hopefully** 379:18

**hoping** 209:12
300:14 383:20
**horrible** 368:22
379:10
**hospital** 122:21
157:15,21
**hot** 25:6 138:4
**hour** 76:3 190:24
297:1,18,19
**hours** 150:7 152:8
190:25 258:23
263:5 296:8
297:17,21
**house** 145:2,8,10
145:12 146:8,23
164:5 188:13,15
188:20,21 189:4
189:19 233:2,6,19
236:7 247:4
272:14 357:5,8
371:3
**household** 80:13
**houston** 120:18
122:20 124:3
127:7 250:13
**hr** 346:11
**huge** 256:22
**huh** 204:24 266:22
303:18 305:7
317:8
**huhs** 7:9
**human** 346:11
**hundred** 26:25
27:5,16,17 39:17
39:19 40:20,23
179:4 221:19
**hundreds** 213:15
224:17,18
**hung** 127:14,16
332:3

**hurting** 324:9
**husband** 139:9
140:25
**hvac** 25:3
**hypothetical**
39:16
**hypothetically**
25:1,1 327:15

**i**

**i.e.** 282:15
**i64658** 305:15
**i80621** 203:17
**idea** 24:20 47:22
181:5 185:8 189:8
248:1 253:25
265:14 278:11
283:23 294:18
323:6 341:12
349:15
**ideally** 51:25 72:1
**identical** 182:22
206:1
**identification**
82:10
**identified** 99:4
301:14 389:13
**identify** 5:10
162:7 223:8
301:13
**ignore** 6:19
**illegal** 106:14,17
125:8,25 283:25
**illegally** 106:8
**illinois** 1:1,15,19
2:5,11 5:2 12:24
83:18 84:19
283:25 394:6
395:4
**image** 274:13
280:12 372:23

[images - interpretation]                                             Page 30

**images** 275:6
**imagine** 249:23
  291:12 367:11
**immediate** 270:20
**immediately**
  119:12 257:10
  259:11 292:8
  325:6,6
**impact** 85:8
**impalas** 322:12
**imports** 63:18
  327:3
**impossible** 229:16
**impression** 270:6
**improper** 243:22
**improve** 73:23
  261:5
**in's** 139:9
**inadequacies**
  366:3
**inadvertently**
  130:13 366:25
**inaudible** 331:5
**inbox** 222:6
**inch** 204:22
  273:20 274:22,22
**incident** 333:4
  363:23
**incidents** 194:15
  286:2 295:11
**include** 27:24
  234:13 316:14
**included** 218:14
  269:12 312:7,8
  316:13 396:14
**includes** 202:11
**including** 28:3
  105:17 202:10
**incorporated**
  398:12

**increase** 21:22
  196:8 261:5
  352:17
**incurred** 144:14
  144:17 205:6
  208:3 230:11
**independent** 376:3
**independently**
  169:8
**index** 3:9 4:1
**indiana** 13:25 19:1
**indicate** 5:11
**indicated** 130:9
  164:10 307:17
**indicating** 386:14
  396:14
**indication** 379:20
  381:23
**indirectly** 22:16
  24:7 395:1
**individual** 8:18
  9:19 10:9,24
  11:11 31:4 57:10
  174:4,6 248:5
  320:23 393:3
**industries** 42:5
**industry** 42:5
  60:10 88:21
  119:17 135:14
  154:18
**infer** 215:5
**inflated** 111:12
  144:11,15 149:18
  151:5 161:25
  176:3 206:21
  208:3 212:2
  222:17,24,25
  223:4 230:11
**influence** 64:11
  146:21

**information** 18:24
  20:12 82:17 83:22
  84:3 120:1 123:5
  145:24 163:6
  166:17 167:15
  244:24 248:18
  253:3 255:19
  258:1 272:9
  331:11 339:8,18
  341:22 342:24
  350:8 385:1
  387:12
**initial** 37:8 194:19
  194:20 197:24
**initially** 281:11
**initiate** 246:12
**inkling** 138:25
  300:1
**inner** 63:20
**ins** 46:13 49:18
  53:1 136:2,4
  165:22 190:12
**insane** 308:16
**inside** 69:6 353:23
**insight** 253:19
**insinuate** 261:6
**insisting** 288:9
**inspect** 190:20
**inspection** 187:13
  187:13 190:8,16
  191:3 192:1
  194:12 232:25
  233:15
**inspections** 190:11
  233:17
**installed** 273:23
  274:1,11,25 275:2
  275:5
**instance** 327:10
**instances** 148:1
  156:4

**instantly** 69:13
**instruct** 266:24
**instructed** 266:24
  289:10 350:24
  351:14
**instructions**
  118:16 239:19
**insurance** 1:7 3:11
  3:14,21 6:5,7,8
  29:16 102:15
  104:13,16,19,21
  115:3,12 196:6,11
  225:9 341:24
  344:10 371:4
  396:7 397:3 398:3
**insured** 105:9
  371:1
**intentional** 132:5
  136:8,10 141:22
  142:2 151:13
**intentionally**
  150:1
**interest** 154:11,14
  154:16 261:21
  295:7 383:16,23
  384:4,11,24
  385:25
**interested** 395:1
**interim** 135:7
**interior** 93:6
**internal** 33:20
  39:3 186:15
  188:19 202:17
  307:6,8 312:23
  313:1 369:10
**internally** 187:8
**internet** 16:2
  70:25 89:23 92:1
**interpretation**
  316:2

**interrupt** 241:22
**interviewed** 333:8
**introduced** 32:7
  32:10
**introduces** 326:7
**intuitive** 9:15
**inventory** 46:23
  47:24 48:23 50:18
  52:25 53:21 54:18
  63:10 86:24 322:1
  324:7 352:18
  380:19
**investi** 379:1
**investigate** 176:22
  293:14 357:3
**investigation**
  105:15 336:20
  338:9,10 339:21
  340:4,6 341:11
**invoice** 37:21
  38:18,21,21 41:9
  41:10 70:22
  186:13,15,18
  188:15 189:16,18
  193:22,23 194:9
  195:7 275:16,21
  276:5 278:24
  282:17 283:19,20
  287:19 304:22
  305:2,3,4,4,15
  306:12 329:25
  330:1,2 359:22,25
  360:7,9 373:2,3,5
**invoiced** 191:17
  193:19 228:23
**invoicer** 193:12,15
  194:2,4,7
**invoices** 41:15,22
  41:24 42:6,7,9,10
  118:17 124:18
  126:13 128:8

186:11 191:24
195:12 239:20
276:13 312:10
313:3
**involved** 25:4
  56:11 82:22,24
  84:11 92:15,20
  130:12 142:21
  143:13 158:25
  164:6 165:2,17
  166:24 238:23
  286:1 320:16
  359:6 369:24
  370:7,14
**involvement**
  389:14
**involving** 237:12
  295:6,12,15
  331:22
**ipad** 213:6
**ireland** 325:23
**irked** 370:19
**irks** 160:5
**irving** 12:23 20:19
  20:23,24 21:4
  137:25 271:16
  335:3
**ish** 68:20
**isolated** 308:7
**issue** 19:23,25
  22:23 43:25 82:3
  94:9 104:21 111:6
  112:22 117:1,19
  124:13 137:11
  149:13 156:8,17
  156:18 185:2
  199:3 246:3 283:5
  286:2 319:9,16,18
  320:15,22,24
  321:3,11 322:4
  323:3,20 324:11

344:11 350:14
360:5 361:3 370:7
370:8 389:15,23
**issued** 112:5
  254:19 269:14
**issues** 25:5 295:20
  300:13 318:18
  365:4
**item** 96:4 287:22
**items** 77:3,5

**j**

**j** 356:19,20
**j&n** 4:9,10,11,11
  4:13 32:15 110:24
  115:7 116:7 118:8
  118:12 120:1,11
  122:4 123:13
  234:14 238:24
  239:5,11,15 241:8
  241:24 242:19
  243:7 245:17,17
  245:24 246:2,9,15
  246:18 249:15,22
  250:1 253:8 254:6
  254:8,18,18
  255:12 256:3,25
  266:24 267:16
  268:25 271:6
  273:11,14 275:22
  278:24 280:10,23
  281:4,8,10,12
  287:6 289:16
  291:5,25 292:6
  294:11,16 295:6
  295:12,15,20
  328:12 342:17
  343:11,19,24
  349:17 356:17
  357:10 361:3,10
  383:17 386:9,13
  386:15,15 387:2

387:12,14,21
**j&n's** 253:19
  268:6 269:9 292:9
  360:13
**j57** 264:16
**jacobs** 14:2,24
  17:9 139:4,10
  347:1
**jacobson** 269:9
**jagoff** 160:24
  392:4
**jail** 69:10 344:8
**james** 325:23
**january** 129:23
  130:8 136:24
  142:5 163:22
  165:21 176:6
  208:11 216:20
  277:6 299:22
  310:11 334:4,6
  337:21 363:15
  364:8,20 367:3,15
  367:16 378:12
**jason** 4:5 35:9
  44:4 49:5 50:9
  55:8,10 56:7
  57:19 58:14 59:1
  68:4 75:3,13
  77:12 81:11 96:24
  97:16,17 99:22
  100:14 105:8
  116:5,6 133:20,20
  133:20,21 136:5
  137:4 152:21
  160:2 162:17,18
  167:5 173:8
  181:13,15,16
  182:1 193:2,16
  225:20,25 232:19
  234:13,23 235:23
  243:16 244:12

245:4,10 246:13
246:14 247:8
255:22,23,23
266:24 272:7
273:8 277:13,18
284:3 285:1,5,12
285:16 287:5
288:8 290:24
298:21 299:2
318:2,15 328:3,5
330:22 331:2
343:2 345:11
346:16,25 347:2,3
350:24 351:1,14
351:24 355:8
359:11 364:23
366:3,23,24
368:24 373:16
374:4,18 376:25
377:18 378:4,24
379:21,25 380:3
382:9,10 383:23
384:11 385:25
386:15,16,25
387:13,19 388:23
389:1
**jason's** 161:2
196:16,17 285:21
337:20 345:5
346:25 353:11
**jean** 2:10 5:15 6:4
76:7
**jenney** 193:18
232:14
**jersey** 67:23 68:1
68:3
**jess** 348:12,23
**jesse** 347:9,13,25
**jk** 4:5,16 161:11
**jliu** 2:12

**joan** 21:13
**job** 17:22 21:19
23:13 41:18 44:21
88:8 153:15 154:8
154:8 156:16,18
159:3 346:25
347:7
**jobs** 57:10
**joe** 149:5,10 346:8
373:13,14,25
**johanna** 348:11,23
**joliet** 139:5
**jones** 285:10,14
**joseph** 233:25,25
**jot** 350:8
**jr** 350:10
**judge** 227:12
**judgment** 54:7
67:1 74:4,6,15
**judy** 25:16 94:2,11
94:12 178:17
183:11 186:9
213:2 218:13
222:7 281:8
332:21,22 339:6
339:25 340:18
342:20 379:4
381:6,6,7 390:8,11
390:17,19 391:2
**judy's** 183:19,22
183:24 201:10
281:9 302:22
308:3 390:16
**july** 14:4 15:23
17:9 109:2 194:11
303:9
**jump** 89:14
**june** 15:24,25,25
17:10,12 138:3
**junk** 322:14
352:21 354:21

## k

**k** 111:22 112:3,6
116:17,18,24
144:14 218:8,9,10
218:22,23 220:7
220:12,14,16
221:10 222:15
223:19 228:16
229:7,13 230:25
231:23 234:24
237:13 345:11
346:25 364:23
**kalou** 196:17
**katie** 389:16,20
**katy** 21:12
**kaufman** 2:10,21
**kay** 347:1
**kdvlaw.com** 2:12
**keenen** 389:17
**keep** 76:5 102:13
145:8 152:13
189:6,15 191:14
247:2 250:11
284:19 295:9
298:1 306:2
308:18 318:12
325:10 350:6
369:13 371:5
**keeping** 284:15
297:6 392:6
**keeps** 288:9
**kennedy** 340:2,6,9
**kept** 62:7 273:12
339:2
**key** 147:9
**kickback** 130:11
150:2 324:20,22
325:4,15 328:4,5
335:10 386:22
387:2,15,21
388:10,13,16

**kickbacks** 321:5,7
328:22
**kid** 139:15 321:2
**kids** 86:10 90:7
284:15,19,21
**killed** 158:18
**killing** 323:19
**kind** 14:6 15:15,19
16:2 20:16 22:5
22:14 31:3 36:8
37:10 48:24 49:9
51:2 56:9 61:21
63:9 64:11 68:8
68:20 69:1 71:3,5
72:23 74:4 75:15
82:7 84:22 96:11
131:3,10,17,24
135:23 137:11
138:16 146:7
153:2 158:16,18
158:20 177:8
181:8 188:11
197:25 206:23
207:20 208:21
214:21 227:19
231:10 245:5
270:25 272:19
273:18 278:23
279:19,20 289:5
290:5,14 302:3
323:5 335:16
342:21 348:4
353:6 370:11
388:21
**kiwis** 16:17
**kleszyk** 1:13 5:2
394:5 395:8
**knew** 121:7 122:3
139:5,11 254:2
306:15 322:5
387:18

**know** 7:21 10:19
16:3,15,18,20
19:13 20:6 21:24
22:1,4,4 23:22,25
24:12,12,16 25:7
25:22 26:18,21
28:6,8,19 29:23
30:2,7 31:24
32:25 33:1,23
34:20 36:2 37:5,7
38:6,15,18,19,20
39:5 41:21 43:12
44:7,14,16 45:8,16
48:4,9,10,11 52:22
52:24 53:18,20
54:10,16,17 55:12
55:24 56:18,25
57:2 59:25 60:7
61:7,12,16,16 62:2
62:18 63:3 64:25
65:8,23 66:7,21
68:15,17 69:7,23
69:24 70:8,8,21
71:1,16,20 72:10
73:6,20 74:7,24
75:2 76:2 77:10
78:2,7,19,20 79:11
79:12,13 80:8,12
80:13 81:25 82:2
82:8,10 83:23
88:10,11 89:12,15
89:25 90:22 92:9
92:22 93:21,23
95:12 97:6,7,9,10
99:3,12 100:1,6
101:9 102:5,10
103:16 107:22
108:14 110:16
111:23 116:12,24
117:5,10,11
119:21,22 120:11

120:13,14,21
121:17,19 122:13
123:10,21 125:15
125:21 130:16,22
131:6 133:5
134:17 136:15
137:2,13,19 138:4
138:24 139:12,14
139:22 140:3,23
140:23 141:1
143:10,23 144:3,4
144:5,13 145:12
146:4,5 147:6,11
147:18,20 148:12
148:12,14,16,17
148:21,23 149:3
149:11,21 150:7
150:23 151:10,24
152:4 154:22
156:15 157:4,10
158:14,21 167:1
168:1,22,24
169:24 170:14
171:11,17,20
173:6,6 174:5
175:5 177:4,13
178:16 180:1,23
181:2,4,7,12
182:23,25 183:2
183:17,25 186:7
187:17 190:23
191:3 192:6,8,13
192:21 196:15
198:15 200:7,14
201:15,18,19,25
202:2 205:5,7,8
206:20 207:5,8
208:8,23 209:6,19
209:24 210:1
213:6 214:3,7,10
218:22 220:1,16

227:8 228:12
229:15,16,18,22
229:24,24 231:12
233:9,13 236:25
238:12,18 241:10
241:14 242:1
244:22 245:7
247:5 248:12
249:5 251:23
253:22,23 254:22
255:25 257:13
258:20 259:22
260:6,10 261:6
262:18,21 263:3
264:2 267:19
268:16 269:25
270:12,21 272:1
272:17,21,22,23
273:3,17 274:15
276:5 277:19
278:9 279:18
280:3,9,19 281:20
282:6,10 283:9,14
283:25 284:22,25
285:17 287:5,12
287:24 288:8
289:4,6,9,17
290:11 292:7,23
293:4,8,15,20,23
294:15,20,21
295:24 296:18
297:20 299:15
301:6,7,20 304:2
305:5 309:18
311:14,21,22
312:17 316:12,12
317:6,10,17
318:10,11 319:13
320:7 323:21
324:4,17 325:8
326:22,23 331:14

337:23 340:21
341:22,22 344:3
344:24,25 345:3,6
345:12 347:3,4,20
347:22 348:1,3
349:12 352:16,25
359:16 360:13,15
361:4,5,6,21
363:21 368:17
370:19 372:17
379:4,10 380:12
380:14,17,18
381:9,15,15,16,21
382:18 383:6,9,13
383:15 385:2,4
388:6,8 389:10,22
389:24 390:17
391:7,12

**knowing** 167:2,3
367:2

**knowledge** 8:19
9:20 60:4,10
118:19 124:20
125:5,9 175:11
206:14,25 226:13
226:16 235:25
236:4,25 237:12
239:22 295:14
308:19 331:21,22
331:23 387:1,14
389:25 390:1

**known** 44:14,16
140:1,22 254:2
255:7 387:19
390:14

**knows** 37:11 83:18
243:21 250:3,3
267:7,8 322:7

**kolodzinski** 4:5
35:9 81:11 97:17
105:8 112:16

115:7 116:6,7
118:7,13,24
124:17 126:9,14
128:8 129:21
130:4,9 132:10,13
144:12 148:25
151:4 152:21,22
153:12,21 155:2
156:5 161:24
164:8 173:8 200:8
208:2 226:1
234:13,23 239:10
239:16 240:1
243:16 244:13
285:1 329:2 332:5
380:3 382:9
385:25 386:16
388:23
**kolodzinski's**
153:15 164:14
**kustoms** 4:8
111:17,22 112:3,5
116:17 117:20
144:14 145:16
148:2 149:1,15
159:23,25 160:2
204:21 205:4,6
207:25 208:6,19
209:1,4,9 210:3
211:10,18 212:20
212:25 213:10,12
214:2 216:1,19
218:2,8,10,22
220:7,12,13
222:15 223:19
225:21 226:5,5,21
228:16,22 229:6
229:13,20 230:20
230:25 231:22,23
232:22 234:14,24
236:12,24 237:3

237:13 343:12,17
372:14 374:1
385:23 386:1
392:9,12

**l**

**l** 1:13 2:3 5:16
25:19,20 55:1,1
94:15,16,16 394:5
395:8
**labeled** 99:2
102:25 161:15
245:17
**lady** 120:4 121:4,5
214:24 241:13
242:6 254:1
288:18 346:11,12
391:16,18
**lady's** 123:5 339:9
**laminate** 273:21
274:23
**lamp** 192:8
**landing** 287:23
**lanes** 322:13,14
**language** 81:1
83:2 381:17
**large** 215:25
249:14,15 302:12
303:5
**largest** 179:3
261:13 266:4
**lasalle** 2:11
**lasted** 159:12
**late** 137:22
**lately** 357:18
**lateral** 16:1
**latest** 253:18
296:11
**launched** 366:12
**law** 2:19,20 3:24
4:3 94:3,11,13
109:21 116:15

126:4 129:12
177:22 223:17
344:2,4 381:2
**law's** 94:14
**laws** 83:18 84:20
84:21 283:9
**lawsuit** 6:6,8
19:25 20:15 22:24
29:1,15,20,20
32:16 34:23 43:25
45:12 59:7 82:3
84:15,17 104:22
369:25
**lawsuits** 83:4
**layman's** 168:17
**layout** 273:19
**lead** 57:7 80:17
**leading** 28:25
**learn** 176:2 236:11
238:6
**learned** 29:2
**lease** 53:25 135:21
**leases** 54:1
**leave** 17:7 24:10
113:21 114:1
153:11 285:16,24
391:3
**leaving** 263:4
**led** 130:1
**left** 14:1,20 123:7
164:1 187:6
193:17 202:11
207:4 208:10
264:6,13 277:16
278:13 285:16,17
290:21 296:18
299:5 328:24,25
339:12 347:1
391:4
**legal** 79:10 114:14
115:25 117:8

119:20 125:14
344:16 396:1
399:1
**length** 307:15
**lengthier** 8:9
**letter** 256:11
345:20 396:20
**letterhead** 214:2
**level** 114:15
**levels** 86:15,25
**lexus** 327:11
**license** 165:4
378:18 394:6
395:9
**lie** 57:1
**lienholder** 54:3
**life** 50:21 129:5
139:5 366:17
**light** 91:9 146:6
179:13
**lighting** 154:3
**lights** 74:9 192:8
**limited** 318:17
**line** 101:12 110:18
148:21 159:17
163:1 175:11
184:3 185:1
231:15,20 233:16
235:14 258:14
303:13 339:21
365:2 372:21
376:19 396:14
398:7 399:3
**lines** 274:6
**link** 102:22
**links** 293:22
**lipped** 343:19
**lisa** 260:15
**list** 41:24,24 79:17
80:18 116:25
117:3 135:5,5

[list - looking]

170:18,19 248:21
248:21,22 271:9
271:22 272:6
273:6,11 287:21
374:19
**listed** 109:15
183:5 184:17
204:21 232:16,25
234:2 257:20
398:7,17
**listen** 216:24
**listing** 398:7
**literally** 160:21
294:5
**litigation** 115:2
370:14 389:13
**little** 13:5 20:7,12
28:5,8 30:20 50:2
50:10 52:4 57:18
57:21 76:1,16,17
82:4 85:10 86:14
92:21 105:24
106:19 111:25
122:17 125:21
152:20 153:19
157:16 158:1
161:1 163:7
172:19 174:8
184:4 213:6
214:15 240:12
267:19 289:17
298:10 333:22
348:18 370:19
377:14
**liu** 2:10 3:5 5:15
5:15 6:3,4,24 9:5
10:3,12,17 11:4,18
12:10 25:21 33:7
33:10,12 48:21
76:8,14 81:13
97:21 98:4,18

100:12 103:18
107:20,25 108:5
108:10 109:17,24
113:9,17 114:3,6
114:10,11 115:21
116:1,3,10 117:9
125:17,19 133:23
151:2 152:14,19
161:10 178:3
179:7,15 180:9,15
210:14,16 211:17
212:13,15 214:20
215:6,10 216:12
216:15,24 217:11
217:15,19,24
219:3,9,13,19
220:1,6,21,25
221:3,12,21,25
222:10,13 223:24
224:2 226:9,19
230:7,14,18,23
231:4 236:15
239:3 242:20,23
243:5,12,18 244:3
244:9,14,16 254:5
254:11 263:22
268:2,6,13,20,24
269:4,8,15 280:17
280:24 281:5,10
281:15,16 292:17
294:12,14 296:16
296:23 297:2,6,10
297:17,23,25
298:4,12,14,16
300:16,20,24
301:1 302:24
303:4 304:13
308:24 309:6,9,12
310:16,21 311:7
318:21 319:1
326:1 328:14

329:19,22 331:14
331:20 333:3
337:16 338:22
344:19 355:22
356:4 362:3 363:8
363:12,21 364:1,2
371:17,20,23
382:6 383:1 388:3
392:1,23
**llc** 1:4 2:3,19 3:16
6:7 21:6,9 117:4
133:10 379:15
385:4 396:6 397:3
398:3
**llp** 2:10
**loaded** 47:25
231:23 232:2,5
**loaned** 380:13
**located** 1:18
262:11 335:3
**location** 170:21
171:3 327:3
**locations** 294:24
**lockwood** 137:25
**log** 287:23
**logged** 167:4
173:7
**logging** 112:10
**login** 166:15,18
**logistical** 95:18
**logistically** 149:1
**lol** 324:5
**long** 15:6 30:8,10
50:11 60:12,12
92:17 129:15
159:11 191:20
214:18 215:18
225:18 269:13
292:18 330:6
334:20 335:17
357:8 361:6 369:8

383:18 391:20,21
**longer** 51:9 72:16
152:7 214:16
299:21 313:3
349:20
**look** 21:21,21,22
21:23 24:15 33:23
35:21 52:8 54:17
59:20 60:20 61:12
64:13,20 72:22
112:9 121:3 149:6
170:15 182:22
185:16 187:11
188:6 207:13
213:20 217:2
224:15 231:8
233:23 235:20
237:22 245:15
247:23 248:3
254:20,22 262:16
262:16 264:3
265:4,18 283:2,19
286:20 287:14
290:16 302:13
305:3 312:14
314:17 317:4,12
339:7 341:5,21
375:2
**looked** 70:8
143:13 237:23
238:18,19 246:24
249:7 270:21
301:23 316:20
349:2,6
**looking** 23:15
28:23 29:9 37:24
49:17 52:10 68:8
104:8 122:23
136:22 138:1
141:19 142:22
152:1 162:4

163:18 166:5
168:10,12 171:14
176:6 178:4 183:1
183:17 185:10
191:23 196:16
200:22 209:5,11
209:15,21 213:15
213:24,24 215:17
218:17 231:5,12
233:15 239:8
267:15 269:16
274:17 280:18
281:6 287:18
289:16 292:21
293:4,6 303:8
306:8,22 307:1,3,5
307:7,8 311:23
314:15 316:8,10
316:19,25 317:2
327:8 329:15
332:7 334:21
369:5,6 370:16
374:20 387:6
**looks** 8:14 10:22
93:9 107:11
108:23 116:21
162:11,19 163:20
169:5 170:16
171:13 183:5
184:16 186:21
189:17 190:17
200:23 201:10
202:11,23 204:8
204:10,13,17,22
214:1 240:12,19
240:22 241:2
251:16 257:5
271:1,7 275:21
276:21 284:25
285:1 302:22
303:15,16 304:18

305:25 306:4
307:24 313:6,23
314:1,2,5,10,18
315:15 317:21
320:19 323:5,23
324:15 337:20
372:12 378:21
**loose** 139:15
**lose** 132:11 197:25
198:2,7,10,13,15
198:22,24 199:1
207:6 322:2
**losing** 351:10
365:3 377:1
**loss** 3:22 102:25
103:4,14,15 104:2
104:6 105:4,11,17
105:20 106:5,13
107:16 108:16
109:10 132:16,17
132:25 133:1
183:6 186:2
195:23 197:21,21
197:25 200:3
201:6 204:14
205:13 209:17
210:2 217:9
245:23 301:14,19
301:22 302:5
313:20 314:16,22
314:23 316:12,16
316:16 335:12
342:1 345:18,20
351:21 352:6,8,10
353:2 378:6
**losses** 4:6,14
110:14,17 130:2
178:5 179:18
180:18 207:9
216:8,10 222:23
237:5,7 351:24

352:22 365:19,24
**lost** 35:18 132:18
132:20,21,24
159:7 198:4 200:2
351:5,23 370:24
370:25
**lot** 18:23 30:20
32:18 50:3,6,13,22
51:10 53:24 55:21
59:15 60:5 61:3
62:1,3,4,17 63:3
68:11,21 69:4
71:7 73:10 74:7
78:25 84:13 92:23
95:9 122:22
133:11 134:6
135:15 145:25
168:11 170:9,10
175:18 192:6,8
201:25 204:9
237:19 256:21
280:1 287:2
290:14 315:19
345:17 370:3
380:17 381:9
**lots** 54:12 65:5
283:7
**loud** 267:22 314:4
**louis** 133:14
379:12
**love** 374:22
**low** 48:10 74:9
131:21 169:25
**lower** 6:22 65:1,1
102:12 257:24
**loyalty** 264:14
265:3
**lunch** 296:12,14
296:21

| **m** |
| --- |

**m** 100:10,10
116:18 218:8,9
**mac** 4:5,7,8,10,25
**macc** 3:19,21,23
3:24 4:4,14,16,17
4:19,22,23 99:2,3
102:19 108:1,6
161:11 177:20
208:20 213:13
231:1 245:17
279:9,18 302:25
303:9 356:1 363:9
371:24,25
**macc's** 158:2
243:16
**machine** 34:18
223:12
**madam** 396:10
**madigan** 260:15
**mail** 4:12 35:17
43:3,3,7 44:10
76:19 110:22
118:8,10 119:4,8
122:5 123:22,22
123:23,24 124:11
134:9 138:12
222:5 239:11,13
241:9,15,18 242:1
242:11,11 243:8
247:3,6 250:16
252:7 254:12
255:12 256:25
257:1 258:12
262:24 263:18,24
271:7,19,20
272:14 277:20
286:21 288:9,19
288:23 292:10,21
299:13,15 309:24
310:1,4,5 318:8,11

334:11 336:7
343:21,23 345:11
345:13,14 356:5
356:11,18,22,25
357:5,6,8 358:5,7
359:23 360:22
361:1,18,19 362:8
362:12,25 363:6
363:14,25 364:8
364:15,16,20
367:2 368:6,16
372:1,12 374:15
374:16,17,17
377:4,15 378:13
378:20,21 387:4
**mail.google**
293:16
**mailbox** 119:24
**mailed** 8:12,13
43:1 93:25 102:22
128:20 221:19
276:1 288:22,25
367:9
**mailer** 79:6,9,10
80:4,7,11,25 82:1
82:4,6,8,9,18,24
83:12,16,16,17
84:14 89:14 90:17
92:11 97:8 119:9
119:21,22 120:5,9
120:14,15 121:13
121:24 122:2
244:19 245:9
246:24 247:1
248:9 249:6,24
252:17 253:13
259:21 269:19
287:17 292:22
293:9 387:10
**mailers** 78:20,23
79:7 82:3 85:13

85:15,19 91:21
122:1 124:14
244:20 250:18,22
251:3 267:8
349:18 387:7
**mailing** 118:15
126:14 128:9
239:18 243:17
271:9,21 272:6,13
**mailings** 118:22
239:24 357:10,14
**mails** 4:21,23,24
227:19 254:7,17
310:9 345:5
377:15
**main** 58:17,19
316:10
**maintenance** 56:8
**major** 352:10
**making** 10:5 23:14
26:18 33:7 145:11
145:12 150:12
161:23 174:21
207:8 237:1
308:11 341:24
348:6 349:12
**malibu** 62:4,5
131:14 147:17
**malibus** 90:5
**man** 95:15 229:2
**managed** 34:6,6
**management**
14:14 21:6 66:8
**manager** 15:5,18
15:19,20,22 16:10
17:17,19,23 18:2
22:9,9,20 24:11
25:14,15 26:9,13
27:23 28:3 32:19
35:1 38:1,1 44:6
52:20 54:16 55:23

56:8,10 57:8,20,22
58:5,7,10,10,12,24
60:4 67:1,2,2
69:24 70:9 74:18
75:2,4,4,15,17,25
87:6,20 88:17
96:5,10,15 99:18
99:20,23 105:10
121:2 123:2
128:22 139:9,10
151:15 153:8,9
164:7,17 165:16
173:23 177:4
192:23,25 193:3,7
193:9 196:19
234:1 256:13
286:6,7,7 326:22
335:1 346:20,23
350:22 356:16
373:15,22,23
**manager's** 139:13
164:25
**managers** 22:10
24:11,18,18 55:4,6
55:25 60:14 88:21
88:22,22 99:22
100:4 359:1
**managing** 21:6,7
107:9 385:14
**manner** 5:14 7:18
221:6 301:15
**mannheim** 354:4
**manual** 44:12
177:12
**manufacturer**
71:14 91:3 92:24
93:2,15 265:3,5,23
275:11 283:4
290:2,7
**march** 13:11,22
15:13,15,23

107:12 129:22
136:24 181:25
298:23 299:3
337:21
**margin** 158:12,13
159:5 360:15
**margins** 360:13
**mark** 10:7,14
33:25 51:2 52:4
107:21 108:1,6
109:20 113:5
161:5 184:22
185:11 230:19,25
254:6 292:13
297:19 323:24
332:25 334:7
337:12,25
**marked** 3:10 4:2
10:11,16 98:3
102:18 107:19
108:4,9 109:23
113:8 161:9,11
178:2 230:24
231:3 239:2
254:10 268:1,5,10
281:7 292:16
303:3 309:11
318:22 329:21
333:2 337:15
345:19 355:20
356:3 363:11
371:22,24 386:10
**market** 48:12,14
50:11 51:21 54:11
54:14 61:22 64:9
64:21,22,24 72:17
74:23 81:18,22
91:23 102:7
129:25 169:19,21
170:5 185:7
198:14 352:24

**marketing** 4:9
24:5 30:21 76:2
76:18,18,23 77:1,3
77:5 78:5 89:10
90:14 115:7 116:7
242:19 245:17
250:25 251:13
266:1 275:22
294:16 343:12,19
343:24 349:17
387:2
**marking** 97:25
177:20 238:25
302:25 309:6
355:14,25 363:8
371:17
**marmor** 2:3,19
**marshall** 13:14
**maserati** 162:12
174:20 367:21
**massive** 365:18,24
**master** 353:24
**match** 178:12
283:22 308:22
**matches** 306:20
**mately** 13:22
277:6
**material** 258:19
**materials** 118:14
239:17 250:25
**math** 187:21
194:21 209:18
305:22 312:11
**mation** 159:6
**matter** 6:8,9 9:20
50:12 124:23
140:7 170:2
180:20 190:12
229:11 244:3
286:11,13 288:23
289:14 349:2

352:5 370:16
**matters** 11:24
12:7 16:24 394:11
**matteson** 322:13
**maury** 382:19
**max** 56:13
**me.com** 293:24
**mean** 9:12 11:17
15:10 26:18 28:25
32:5 33:14 34:9,9
34:12,19 44:20
53:3 54:7 60:3
63:23 65:18 66:3
66:8,15 69:5,9
72:16 73:3,24
76:18 78:8 79:15
83:8 84:25 88:1
92:3 93:3,4 95:12
101:22 110:17
112:23 116:12,24
119:13,13 121:23
125:14 129:4
132:6 135:7,16
138:4 145:11
148:7 149:2
151:12,17,18
152:25 156:11
162:16 166:24,25
167:25 168:14,17
169:16 170:13
172:15 174:12
176:13,25 177:1
177:13 179:20
181:20,21 195:11
197:2,21 202:4,8
206:22 211:15
213:16 214:20
221:18 223:10,23
225:13 226:25
236:6 238:9
241:22 245:6

246:5 251:5 253:8
253:14 255:9,21
260:16,16 261:9
261:19 265:1
268:3 273:5
276:18 280:12
282:2,13 287:8
288:16 289:10
293:18 295:4
300:5 306:21
308:2 311:1,17
320:18 321:6,18
322:18 328:20
341:19 343:23,24
344:1,4,7 348:3,5
353:14 355:4
360:16 368:19
378:8 380:11
381:18 382:11,23
383:6,8 388:17
389:4 390:3
391:22
**meaning** 50:17,25
51:14 54:2 57:6
59:14 66:23 69:21
70:6,19 73:6 78:5
80:25 125:25,25
164:5 191:6
198:16 320:8
321:14 322:5
352:25
**means** 99:3 117:14
153:23 168:15
171:11 210:7
297:18 321:4
323:21 359:16,17
360:11 365:15,16
375:12,12,13
**meant** 44:1 58:1
226:5,21 256:4
306:15 315:2,18

324:19 355:24
367:1
**mechanical**
146:11,12,12
208:22,23
**mechanics** 144:19
144:23 236:8,12
**media** 81:19
127:19 330:5,12
**medicated** 56:13
**meet** 30:18 190:21
282:14 291:21
**meeting** 227:25
228:1,2 345:21
346:1,4,14
**meetings** 227:23
**meets** 23:11
**mega** 85:4
**member** 21:7
107:9 385:14
**members** 21:8,11
21:15
**memo** 184:13
**memorial** 290:8,9
290:12
**memorialized**
44:11 123:16
227:24 358:5
**memories** 229:24
**memory** 100:18
182:3 377:13
**ment** 45:10
**mentioned** 52:24
54:19 159:9 207:5
252:6 340:11
357:23 368:21
369:3,4
**ments** 259:19
**mercedes** 59:17,18
59:20,22 62:2
327:8

merrillville 18:15
19:1 20:4 23:1
25:2 26:1 143:1
171:2 284:16
mesh 278:25
mess 50:4,6,7
message 123:7
130:9 318:6,13
319:2 320:17,18
320:23 322:22
324:1 327:24
367:1,4
messages 4:15
130:23 309:15,19
310:6 317:25,25
318:18,23 324:2
324:14 367:9
met 30:2,5 285:5,6
339:25 340:1,10
341:15
method 205:11,11
205:14 206:1
211:8 232:10
methodology
211:5 215:8 219:2
307:14 315:8,22
316:2,5
methods 205:24
mgr 99:19 100:24
101:3
michael 298:18
356:19,20
michigan 334:10
microsoftexchan...
293:25
mid 138:5 141:7
middle 40:9
170:16 226:11
middleman
134:17 138:23

midwest 396:17
399:1
mike 1:3,11 3:3,12
3:15 5:23 6:6 10:8
11:1,13 13:1
19:22,24 20:14
21:20 26:13,15
27:14 29:3 30:23
31:8,13 32:10
34:12 35:12 39:18
40:21 41:9,25
45:13 46:2,11,23
53:3 55:2 65:25
67:6 75:14 77:2
81:17 82:5 85:11
86:3 90:10 91:4
91:23 93:7 98:6
103:7 104:15
105:2,3 107:2,3
109:11 112:23
113:11 116:5
117:10,25 118:9
118:14,19 119:3
124:10,19 125:12
125:21 149:17
152:13,20 154:19
155:3,7 158:2,3,8
161:4,23 168:4
170:18 171:18
172:9 174:8
175:13 177:21
179:16 180:12,17
180:24 181:8,24
182:1,6 186:19
194:22 207:1
208:5 210:1 219:1
219:4,5 222:16
225:21 226:1,4,12
228:17,18,22,24
229:5,19 234:18
239:5,12,17,22

240:7 245:22,24
246:2,19 250:18
250:25 257:25
258:14 259:14,19
259:22 261:12
263:2,13 264:1,17
265:20 266:3
273:15 275:22
279:19 284:17
286:1 289:22
291:24 292:22
298:19 301:5,13
302:9 303:16
304:18 312:4,20
320:10,25 324:10
325:4 326:6
327:13 329:9
330:16,21,25
331:2,15 332:13
334:24 335:2,8
338:15 339:25
341:25 344:9,11
345:4,24 346:14
346:18 347:8
348:13 349:1,2,6
349:16,22,23
350:9,10,17,23
351:14 353:7,10
357:2,11 362:4
363:13 364:17,18
364:19 369:15
372:3 379:21
380:1 381:10
382:12 386:14,18
389:18 390:9
396:6,9 397:3,4,9
398:3,4,13 399:20
mikeanderson.c...
364:19
mikeandersonch...
257:23

mikeandersonch...
364:18
mikeandersonch...
259:23
mile 73:6
mileage 138:20
163:8
miles 62:6,15,18
131:14,22 169:25
169:25 171:12
millennial 15:9
16:11,12,14
milliliter 273:22
274:23
millimeter 73:15
million 159:8
mination 115:19
mind 11:5 109:19
122:22 124:4
mine 170:13
293:18 313:12
322:1 364:10
minimum 55:12
minor 66:17 67:11
68:7,20 69:8 71:3
71:4
minute 76:7 152:6
152:12 214:14
217:7,13 237:20
296:15 310:15,17
338:14 382:20
minutes 28:23
29:9 30:11 225:2
227:25 228:1,2
297:18,19 308:13
338:16 345:21
miracle 165:20
mischaracterize
222:11
mischaracterizing
114:23

**misconstrue**
　160:20,21 300:17
**misheard**　241:23
　390:7
**missed**　50:5 233:7
　247:12 253:6
　263:20,20
**missing**　337:6
**missouri**　379:12
**misspelling**　112:2
**misspoke**　296:7
**misstated**　176:24
**mistake**　132:6
　316:6
**mistaken**　85:23
　130:23 208:18
**misunder**　114:8
**misunderstood**
　89:17
**misusing**　197:6
**mm**　8:16 19:2 23:3
　27:18 29:11 30:17
　33:6,9,11 41:4,6
　45:11 49:8 52:12
　62:25 72:25 77:14
　77:17 82:7 85:14
　85:24 96:12 98:11
　101:2 111:3,7,10
　111:15,15 125:1,3
　136:16 137:1
　138:10 145:17
　146:3,24,24
　147:24 151:7
　162:13,21 163:3,5
　163:10,15 166:2,2
　166:13 169:9
　171:10 172:7
　183:3,3 184:18,21
　184:25,25 185:4
　185:23 186:13,16
　189:23,23 190:6

192:15 200:10,18
200:18 201:2,8
206:9 207:10,14
209:14 232:15
233:3 239:7
240:25 241:5
251:21 256:14
258:10 259:24
265:11 267:14,18
267:21 273:9
275:14,24 276:23
277:1,3,9,21 284:4
284:4,13 285:9
289:21 305:11,13
309:17 315:23
318:3 337:23
338:6,6,6,6 343:10
347:12 348:25
350:19 366:5
375:11 378:25
**mode**　69:20 347:4
**model**　90:1 167:15
**moment**　81:7
　224:14
**monday**　70:3
**money**　38:15
　42:20 64:19 81:23
　87:12,21 90:20
　95:12 102:1 105:4
　105:11 120:12
　122:6,8,14 130:11
　130:16,18,19
　131:3,8,10,24
　132:21,23 145:8
　145:11,12,13
　156:15,15 188:22
　189:11 191:22
　196:11 198:1,4,7
　198:13,15,22,24
　199:1 200:2
　206:23 207:6

208:16 225:21
226:1,17,20,20
242:8 246:1,3
249:15 282:6,11
282:25 300:7
319:12,15,20
321:8 322:3,11,24
323:17 324:19
348:6 349:13
354:21 357:8
360:23 365:3
371:6 377:2 380:8
380:13 382:10
383:12 388:21
**month**　14:1,19
　38:22 41:13,22,23
　48:6 49:16 51:2
　52:3,16,18,19 71:7
　71:9,10 72:8 78:1
　87:1,3 92:10 97:5
　97:8 137:9,16,17
　137:17 246:20,21
　248:14 322:25
　352:7,20 353:4
　359:23 360:8
　365:13 390:20
**monthly**　92:12
**months**　48:8 51:12
　70:5 159:15
　194:11,13 293:1
　353:1 371:4
**moon**　154:2
**moonlighting**
　154:2,4,21
**morning**　142:24
　253:18 334:2
　354:13 364:22
　372:10 373:17
**motion**　114:1
**motivation**　104:15
　272:1

**motors**　18:9,20
　71:18
**motorsports**　32:15
　117:4 295:25
　298:17,19,25
　299:2 351:1
　374:20 375:18
**move**　58:19 79:1
　89:13 90:4 101:13
　108:5 112:9
　129:19 177:16
　206:24 214:19
　238:24 274:21
　298:11,13 303:24
　304:2 310:6,13
　375:5
**moved**　258:7
　351:16 364:6
　382:16
**moving**　102:13
　222:14 317:24
**muddied**　158:19
**muddy**　232:24
　324:16
**multi**　20:16
**multiple**　41:21
　53:4 171:1 253:24
**mutawe**　100:6,10
　256:9 350:10
**mutawe's**　166:12

**n**

**n**　2:1 3:1 25:19,20
**nad**　36:4 375:17
**nada**　60:17,20
　61:6 167:18 168:2
　169:7
**nadnem**　216:23
**name**　5:1,15,16
　6:4 31:23 36:4
　54:20 59:6 80:23
　94:14,16 100:10

100:11 104:3
112:1 120:10,23
121:6,10 122:25
133:11 135:4
136:13,14 139:13
164:4,14 166:12
166:14 167:3
196:17 200:16
204:21 232:23
233:24 251:24
252:9 254:3
256:16 273:6,10
339:9 341:4
357:16,21 375:17
381:19 385:17,18
389:16 396:6
397:3,4,15 398:3,4
398:21
**named** 111:9
**names** 53:7 79:19
79:21,22,23 80:18
80:19,22 82:15
83:21,23,25 119:9
119:11 233:22
244:25 245:2
248:19,22,23
253:12,16 273:3,4
**narragansett**
271:16
**narrative** 334:22
**narrow** 320:23
**nassar** 193:24
**national** 82:16
84:1,1,2 92:16
241:16 253:11
**nature** 25:7 76:20
177:10
**ncoa** 119:23
**nearby** 126:18
**necessarily** 23:7
37:23 57:14 107:1

**need** 40:10 44:4
49:15,19,19 51:3
60:25 65:1 73:18
80:22 90:17 94:25
102:13 120:10
137:14,16,17,18
150:23 157:14
159:22 165:6
182:13 190:19
217:2 235:18
253:15 286:14
298:7,8 300:2
317:4 319:5,14,20
321:9,10 322:2
338:15 356:8
357:2
**needed** 67:18 94:3
124:24 130:10
135:8 147:8 165:2
192:10 380:8
**needs** 22:1 33:24
71:11,11 72:23
73:2 74:20 322:6
**negative** 302:17
303:21 307:17
313:7,17,19 315:2
**negotiate** 196:22
**negotiates** 99:19
**neighbor** 140:25
**net** 105:19 133:1
173:18 174:16,21
196:14,14,14,14
197:21 312:7
**netted** 206:10
**never** 13:17 35:6
47:22 67:20 70:10
71:20 75:20,22
84:24 119:6,6
120:3 121:14
122:11 123:23
128:17 129:5,5

131:23 149:17
151:19 160:14
193:2,2 199:1,1
227:2,20 228:8
229:12 230:5
238:20,20,21,22
241:21 244:22
246:4,5 250:1,8
254:25 255:19
260:24 261:10
266:11,15,19,20
267:4 270:15,16
273:12 287:3,17
292:3,3,3 293:18
299:25 326:21
327:21 330:12
331:6,10,11 332:1
335:5 338:4
343:15 352:9,9
355:10,10 357:7
358:12 359:20
361:21 362:13
363:7 371:10
373:8,8,10 381:21
383:5
**new** 16:17 25:3,3
26:1,4 27:25
42:13 45:9,17,18
45:24,25 46:3,7,10
49:21 50:16 51:15
52:20 62:23 87:17
88:17 92:9 116:22
136:1,1 174:9
189:1 228:11
237:23 265:8
274:1,8,11 277:4
280:11,15 282:16
283:10 290:11
318:14
**nice** 169:23

**nick** 255:13 257:2
258:13 262:25
263:12 271:8
272:2 292:18
356:17 357:9,13
357:21 358:14,17
359:8,13,24 360:9
360:22 363:1
387:2
**night** 28:24 40:9
**nine** 183:1 355:1,3
**nodding** 43:15
182:17 302:6
380:24
**non** 96:2 276:6
**nonsense** 298:9
**noon** 152:5
**normal** 160:13
**normally** 25:10
32:6,7 43:1 88:21
119:7 127:3,8
164:3 196:4 233:1
250:20 253:14
330:13
**north** 391:10
**northern** 1:1
**notarized** 396:15
**notary** 109:5,8
396:25 397:10,18
398:15,23 399:23
**notates** 129:10
**note** 35:24 115:17
133:5 178:24,25
210:12,13 211:14
215:4 300:9
396:13
**noted** 144:6
311:10
**notes** 144:5 346:6
**notice** 3:11,15
10:9,13 257:11

**noticed** 204:21
249:14,21 258:4
**noticing** 5:14
**notification** 336:7
**november** 18:17
20:3,9 130:6
351:21 365:6,19
366:12 374:18
**number** 7:5 27:1
33:1 36:4,5,6
38:16,16,16,17
49:22 72:2 99:7
101:15,17,19
107:22,24 150:3
150:13 164:2,3
166:4 167:14
168:6 169:7
171:15 183:25
184:23 185:11,24
186:10 187:20
192:14 194:22
195:2 198:21
201:3 203:4
209:20,20 211:12
211:13 240:10,10
240:11,23 256:8
256:18 257:3
258:3,5 261:3,13
266:13,13 268:15
268:23 269:3
273:17 303:6
305:3 312:14,16
312:21 313:4,18
315:6 320:10
321:1 329:15,16
352:15 365:16
372:21 375:9,10
375:16,17,18,18
386:10 396:8,14
**numbers** 46:25
47:21 49:9 61:5

68:13 168:23
194:23 201:7
212:22 214:23
240:9 245:17
302:17 307:16
312:18 313:24
314:11,15,19
315:1 316:1,3
317:15,16 329:7
349:3,7 374:19
383:11 398:7

**o**

**o** 25:19,20 54:24
94:16 116:18
218:8,9 343:10
**o'clock** 217:14
297:9
**o'keefe** 83:17
261:10
**oak** 14:3,22,24
**oath** 5:12 8:18
9:10,18
**object** 223:24
230:4
**objected** 117:14
**objection** 115:18
115:22,23 116:9
117:7,15,16
125:13,18 178:24
210:13,14 211:14
212:11,14 215:4
223:22,22 236:13
242:22,24 300:9
300:25 344:15
**objections** 5:12
224:1
**obligation** 127:23
**obtain** 46:23
267:10
**obtained** 191:18
335:24

**obtaining** 125:5,9
**obvious** 176:23
202:1
**obviously** 130:17
196:5 220:6 344:9
378:8 383:10
**occasionally** 59:11
**occupation** 23:9
**occurred** 335:6
342:13
**occurrence** 337:19
**october** 17:24 18:1
18:6,8 19:4,5
157:7 218:13
271:7 350:9,23
351:13,20 356:11
356:19 366:12
395:5 396:4
**odd** 134:12 285:23
385:6
**oddball** 147:6
**odessa** 53:9
**odometer** 167:15
171:16
**offended** 369:17
**offer** 264:18
**offered** 181:8
208:20
**office** 16:13 25:9
26:2,6,10 27:24
28:1 34:18 35:25
37:6 57:9 102:17
119:10 143:5,18
248:24,24 249:2,4
249:10 252:20,24
253:10 270:14,23
271:4,5,13,14,25
272:22 275:25
281:3 291:19
306:24 332:22
337:4 339:5 340:3

346:4
**officer** 337:25
**offices** 291:12
**official** 397:15
398:21
**officially** 296:18
299:4,5
**oh** 6:16 7:11 8:21
8:23 9:11,16
11:21 16:9,16
17:15,15 20:5
27:3 28:15 29:5
35:11 36:15 43:18
46:9,25 54:25
55:15 56:18 63:12
71:8 74:20 76:25
79:5,12,24 80:16
86:13 89:19 91:19
94:7 95:22 99:6
100:6 103:16
104:8,8 106:16
119:19 122:11
127:2 130:15
132:4 139:13
141:25 142:15
143:8,23 159:7,13
164:20 176:4,18
187:7 188:10
190:13,15 192:9
201:20 233:3
237:24 240:16
242:4 247:10,15
248:20 249:7
250:2,2 251:21
252:15 254:3
255:18 258:8
264:8 268:17
269:6 270:9 291:1
324:23 326:20
335:21 336:20,22
348:16,24 351:16

| | | | |
|---|---|---|---|
| 354:25 364:4 | 91:21 92:5 93:10 | 183:13,20,25 | 274:5 275:4 |
| 369:4 372:8 | 93:16 94:8 95:10 | 184:4,16 185:9,14 | 276:14 277:15,19 |
| 376:16 377:7,22 | 96:7,10,13 97:25 | 186:14,17,23 | 280:5,18 281:15 |
| 381:21 385:22 | 98:12,17,21 99:1,6 | 187:7,15,19 188:2 | 281:20 282:23 |
| **ohio** 396:2 | 99:16 100:3,20,21 | 188:14,18 189:15 | 284:1,24 290:3 |
| **oil** 265:21 | 102:14 103:19 | 189:24 190:15 | 293:11 298:23 |
| **okay** 6:15,19,25 | 104:10,18,25 | 191:1,23 192:19 | 299:15 301:21 |
| 7:12,23,24 8:4 9:3 | 105:23 106:2,18 | 193:13 194:19,25 | 303:19 304:3 |
| 9:6 10:23 13:3,18 | 106:22 107:6,15 | 195:13,14,22 | 305:1,5,14,16,16 |
| 14:5,17 15:3 | 108:22 109:17 | 196:13 197:11,16 | 305:20 308:24 |
| 16:13,25 17:11,15 | 110:8,11 113:3,24 | 197:19 199:8,21 | 310:11,13 312:3,9 |
| 17:18 18:7,19 | 116:1,2,14,19 | 201:9,20,25 202:4 | 313:13 314:24 |
| 19:12,19,21 20:2,6 | 117:22 118:4 | 202:9,14,19,21 | 316:7 317:7,13,20 |
| 20:11 21:8,18 | 121:12 123:16 | 203:4,11,12,18,19 | 317:24 319:2,11 |
| 22:17 23:4,13 | 124:1,6,16 126:5 | 203:20,23,24,25 | 320:4,9,11,14 |
| 24:9,14,24 26:1,12 | 128:7 129:1,19 | 204:1,1,19 205:3 | 321:9 322:22 |
| 26:17 27:1,11,25 | 134:4 136:3 139:7 | 205:10 206:6,13 | 323:16,22 324:25 |
| 28:5,13,16 29:8 | 141:12,14 142:8 | 207:15 208:15 | 325:11 327:4,6,19 |
| 30:14 31:9,10,20 | 142:18 145:14,18 | 209:7 210:1,15 | 328:8 329:6 |
| 32:9,13,22 34:5,22 | 145:22 146:17 | 212:13 216:12,15 | 330:25 332:10,20 |
| 35:2 36:3,18 | 147:12 148:5 | 217:11,15,20,23 | 332:24 333:20 |
| 37:11,19,22 39:23 | 149:9,24 150:16 | 218:16 219:13,15 | 334:3,6,17 338:16 |
| 40:2,3,17,21 41:12 | 150:19 151:3,21 | 221:22 224:16 | 340:14,15 341:24 |
| 42:18 45:8,19,22 | 153:3,11,14,19 | 227:4,17 228:3,9 | 342:7 344:6 |
| 46:11,15 49:4 | 154:4,23 155:1,24 | 229:11 231:10,12 | 345:23 349:6,16 |
| 50:2,19 51:3,8 | 156:4 157:7,18 | 231:15,19 232:4,4 | 350:2,4,9,17,23 |
| 52:3,9,13 53:7 | 158:1,8 159:16 | 232:8 234:6,10 | 351:9,11 352:12 |
| 54:25 55:2,18,22 | 160:8,18,22 161:1 | 236:5 238:10,24 | 353:14 355:22 |
| 56:6 57:25 58:9 | 162:4,11,16,25 | 241:6 242:4 | 356:9,22 357:1 |
| 59:10 60:18,20 | 163:6,11,16,18 | 243:17 244:11,20 | 358:3,9,21 359:12 |
| 62:4 63:5,15 | 164:1,7,16,20 | 245:1,7 246:8,25 | 362:20 364:1,13 |
| 64:17 68:9,19 | 165:21 166:3 | 248:3,6 249:13,21 | 370:17 372:10,15 |
| 69:2 70:18 71:8 | 167:7,9,19,21 | 251:22 252:5,15 | 373:16,24,24 |
| 72:23 74:19 75:1 | 168:10,12 169:16 | 252:18 253:23 | 374:5 375:8,8 |
| 75:7,13,19 76:1,8 | 169:18 170:15 | 254:15 255:2 | 376:2,9 377:3,17 |
| 76:20,24,25 78:16 | 172:1 173:13,16 | 256:2,9 258:8 | 377:22,24 378:23 |
| 79:1,7 81:5 82:12 | 174:12 175:1 | 260:14 262:9,13 | 378:25 379:18 |
| 83:16 85:10,25 | 176:5 177:15 | 264:22 265:17,20 | 380:5 382:7,15 |
| 86:9,14,21 87:18 | 178:18 179:16 | 269:2,16 270:17 | 384:6,18 391:1,7 |
| 88:18 89:8,22 | 180:22,22 181:7 | 270:24 271:5,15 | 391:13 |
| 90:2,21,21 91:4,10 | 181:23 182:18 | 272:11,16,25 | |

**old** 46:4,8 62:6,15
131:15 277:3,23
278:3,4 284:8,11
286:16 324:7
**older** 322:17
**once** 19:16 23:12
24:20 33:18 36:20
40:23 41:7 42:18
42:21 44:23 52:16
69:20 70:20 71:6
72:20 84:9 172:24
247:7 309:2
330:12
**ones** 78:8,17,18
84:3 159:20,21,23
213:10 255:17
258:22 265:24
277:4 295:16
373:10
**online** 55:21 56:1
269:24 385:4,5
**onward** 18:1
207:19
**oo0oo** 393:11
**op** 282:6,14 287:9
**open** 22:18 85:20
293:22 339:2
361:17 362:19
392:6
**opened** 316:21
338:24
**opening** 152:25
153:1
**operate** 189:5
**operating** 20:4
**operations** 26:17
**operative** 109:18
113:20 115:1
**opinion** 149:16,16
358:18 361:9
388:15,18

**opportunity** 18:10
215:13 220:14
254:22
**opposed** 11:16,17
**opposite** 315:4
**option** 264:16
**options** 202:10
**oral** 241:8,25
242:2,10,13,18
243:1,7,11,15,22
243:25 244:12,18
245:5,8 331:1
**order** 38:13,17,24
39:5 40:6 42:12
54:6 70:15,21
84:7 86:17 95:6
95:19 160:11
162:5,9 164:25
173:1 184:8
196:15 206:7
235:13 303:23
304:22 306:13
307:7,9 310:23
379:8
**ordered** 96:4
**orders** 214:1
**ordinary** 124:25
261:23
**original** 3:20 4:18
9:6 131:6 199:8
225:8 333:4
363:23
**originally** 17:3
**originate** 93:2
**outbid** 383:10
**outcome** 395:1
**outline** 386:3
**outright** 375:14
**outside** 137:24
157:14 184:9,11
279:1

**outsource** 271:23
**outsourced** 272:13
**overall** 23:20 42:5
55:11,16 361:15
**overcharge** 213:21
213:23
**overflow** 72:12
**overinflated** 150:1
198:17 210:25
**overinflation**
224:13
**overnight** 71:21
**overpaid** 200:5
301:24
**overpay** 384:21
**overpaying**
141:20
**override** 44:7
169:14 286:10
**overrode** 289:15
**overseeing** 26:9
**overstated** 197:23
**overwell** 61:2
**owe** 95:12 229:2
**owed** 208:16
**owned** 53:23
133:2,3 151:4
161:25 323:8
385:9,12
**owner** 19:10
118:11 120:13
133:12 200:12,13
239:14 264:14
335:8 366:24
379:15
**owners** 133:12
200:11 273:7
**ownership** 23:7
295:2 383:16,23
384:4,4,11,12,24
385:25

**p**

**p** 2:1,1 365:12,14
365:15,16 375:9
375:13
**p.m.** 152:9,18
217:18,18 263:4
310:20,20 374:18
393:9
**pack** 196:4,5,7
352:17 353:5
**packages** 377:20
**page** 3:4 10:1
114:7 162:4 166:4
178:4 183:1,17
185:18,19 188:11
189:16,25,25
190:7 191:25
193:23 200:22
202:5,17,20,22,25
203:16,18,19,22
204:5,23 231:5
240:11 257:5
258:11 262:7
264:3 265:17
267:16 268:4,22
272:20 276:21
281:18 287:13,18
287:23 303:8,23
304:21 305:8,17
312:25 313:1,18
333:24 334:21
337:25 338:9
345:19 367:20
374:15 375:7
377:3 396:14,16
398:7 399:3
**pages** 182:21,21
182:22 195:3
213:16 221:19
255:4 268:2,23
281:11 312:24

334:19 336:12,12
**paid** 32:24 38:24
  38:24,25 40:16
  44:24 93:24
  118:18 124:18
  142:1 198:1,17
  199:19 206:17
  211:1 212:4
  229:21,23 239:21
  245:24 246:2
  281:24 283:1,3,18
  284:3 322:6 328:7
  328:13,17,21
  347:20 364:25
  375:1,22 376:1,2
  386:15
**paint** 69:4 146:13
**pair** 370:24,24
  371:8
**paper** 41:1 222:2
  278:20
**paperwork** 165:2
  360:17,18 381:9
  381:13
**paragraph** 99:18
  110:12 118:5
  124:16 136:23
  144:8 209:1 230:5
  241:6,24 242:19
  243:3,5,15 353:7
  367:20 368:21
  369:2 386:12
**paralegal** 217:8
**parcels** 12:23
**parency** 308:7
**parentheses**
  105:14
**park** 12:23 14:3
  14:22,24 20:19,23
  20:24 21:4 335:4

**parker** 392:5
**part** 13:15 28:6
  29:20 71:10,15,20
  71:22,24 86:1
  88:6 102:17 103:7
  116:15 127:21
  130:24 133:2,12
  149:7 174:4
  200:12 205:7
  213:2 252:2 268:1
  268:6,14,18,21
  270:18 301:14
  304:22 324:25
  335:2 358:16
  360:19 379:1,19
  383:8 385:12
  391:16 398:9
**participating** 5:4
  11:20
**particular** 13:19
  36:6 60:13 74:11
  82:25 90:1,1,11
  101:19 106:11
  175:25 186:10
  314:13 376:25
**parties** 5:4 87:11
  117:2,2,19 342:16
  344:12 383:17
  394:23,25
**partner** 319:6
**partners** 25:4
**parts** 26:3,3,5,18
  28:1 34:17 88:15
  88:17 132:9
**party** 47:16 71:1
  275:13 375:14
**pass** 69:14 126:3
**passed** 17:21
**passive** 85:8 92:18
**password** 353:18
  353:21,24 354:1

**patricio** 234:7
**paul** 21:14
**pay** 42:1,6,7,7
  44:23 47:10,10
  53:20 77:23,25
  78:2,3,4 94:23
  95:16 119:7
  126:13 128:8
  142:13 174:6
  206:6,22 227:6,7
  229:3 235:13
  265:25 276:13,13
  311:20 316:15
  326:6 327:16
  371:5
**payable** 44:16
  276:2,4,16,16,21
  291:13
**payback** 386:22
**paycheck** 380:14
**payee** 380:1
**paying** 165:7
  175:20 189:4,13
  208:17 228:19,25
  347:22
**payment** 30:22,24
  286:25 287:10
  386:23
**payoff** 316:13
**payroll** 346:11
**pdf** 255:10 271:10
  271:22
**pending** 114:7
  340:7
**people** 25:13 27:5
  33:23 100:4,16
  139:21 142:13
  173:25 181:15
  234:18 238:8,23
  270:4,5 294:21
  325:19 335:17

350:7 364:24
  371:10 380:13
**people's** 54:1
**percent** 45:7
  169:22
**percentage** 45:4,6
  46:2,6,7,22 101:15
  198:9
**perfect** 359:2
**perfectly** 286:9
  323:22 359:3
**perforated** 273:25
  274:9
**perform** 37:20
  40:12 41:7 294:16
**performance**
  18:12 156:6,10
  189:19
**performed** 149:18
  228:17,19,21,23
  229:20 246:18,18
**performing** 366:4
**period** 27:12
  55:13,14 71:18
  83:12 84:10 87:18
  106:5 134:10
  150:14 198:7
  250:17 286:11,22
  288:23 352:5
  355:9 366:14
  388:21
**permitted** 160:2
**person** 7:13 30:5
  34:10,11 58:14
  79:21 86:15 88:25
  88:25 89:3 96:15
  153:16 160:7
  173:15 196:25
  234:4 277:12
  284:6 320:21
  333:11,14,17

**[person - position]** Page 46

370:20 381:4
391:23,25
**person's** 164:4
**personal** 8:19 9:19
175:10 206:14,24
236:25 295:14
331:22,23 345:13
386:17 394:14
**personally** 56:11
295:12,13 328:1,3
332:18 371:16
397:11 398:15
**personnel** 325:1
**pertain** 45:13 86:2
**pertained** 134:1
**pertaining** 177:23
**pertains** 45:24
**petty** 22:5
**philosophy** 49:15
**phone** 30:6 88:12
120:19 122:20
123:17,23 152:5
166:22 227:22
241:13 258:3,5
261:3 329:13
332:4 342:25
345:17 356:24
358:5 362:12
387:4,5 396:3
**phones** 16:21,22
**physically** 5:6
**pick** 43:13 278:1,2
288:11,18,19
290:4 291:11
300:2 334:10
337:5 354:19
**picked** 126:16
128:10
**picks** 48:1
**pickup** 277:22

**picture** 262:15
283:12
**piece** 41:1 241:15
253:16 361:18,19
362:8 363:7
**pieces** 251:6
**pileups** 48:3
**piling** 137:11
158:16
**pin** 83:25
**pinpointing**
106:20
**piqued** 295:6
**place** 7:22 16:17
42:16 56:24 59:19
96:14 99:10
117:15 126:9
233:20 272:15,15
277:5 279:22
326:4 345:1
351:19 378:9
394:21
**placed** 329:3
392:13
**plaintiff** 1:5 2:8
5:19 20:15 110:12
**plaintiff's** 392:19
**plan** 50:25 304:5
**planet** 275:19
**plate** 52:18
**play** 65:7 131:8
153:23
**played** 168:23
**playing** 82:25
158:16
**please** 9:13 10:19
12:17 17:6 33:4,5
36:11 54:21 67:5
90:9 107:20
115:23 160:23
182:25 203:13,24

203:24 204:1,2
211:20 215:4
219:14 222:11,15
223:25 226:3,11
244:14 255:4
263:21 297:3
300:14 302:14
304:1 306:6,7
311:8 320:5
321:10 322:1
361:12 369:17
380:2 396:12,12
**pled** 114:25
**plenty** 341:19
**plug** 148:22
**plus** 67:19 115:11
171:9 186:3
195:23 264:14
292:22
**pockets** 110:19
**point** 13:25 19:11
19:13,14 20:2
36:13 37:23 58:7
62:10,17 70:25
77:16 84:19 137:2
137:3,19 140:6,13
141:6,12,15
144:25 148:15
197:10 212:18
213:7 219:21
224:10 225:9,11
225:24 263:16
327:25 354:14
355:12 362:18
385:19
**pointed** 218:6
283:5
**pointing** 352:1
**poke** 136:19
**pol** 3:21,23 4:19
102:19 108:1,6

**pole** 246:6,7
**poles** 91:9 192:7
**police** 3:20 4:18,20
104:1 332:14
333:11 334:8
335:23 336:1
337:9,17 338:5
342:3 355:24
363:23,24
**policies** 386:18
**policy** 22:18 43:3
43:7 56:17,25
64:16 65:7 99:9
99:10,12 104:19
104:21,22,23
105:8 106:6
110:13,15 118:1
128:18,24 130:25
236:19 245:23
267:3,13 276:13
284:8 286:11,12
286:12,18 290:25
319:22 323:12
324:22 327:19
344:11 345:12
**polish** 68:17
**pontiac** 15:21 17:8
18:12
**pop** 68:14
**popped** 71:13
197:24 252:17
**pops** 67:12
**portion** 57:19
102:15 104:6
128:15 184:13
215:12 284:2
334:22 390:19
**portions** 172:6
**position** 21:3
149:16,19 155:4,6
214:10 223:17

[position - proceed]

229:4 230:9 267:2
291:5 314:14
368:13
**positive** 206:10
271:1 302:17
303:21 307:16
312:13
**possession** 191:18
223:18 309:5
**possible** 50:16,17
51:19 183:10
**possibly** 341:21
350:8
**post** 13:13 119:10
248:23,24 249:1,4
249:10 252:20,24
253:10 270:14,23
271:4,5,13,13
272:22
**postage** 267:15
360:17
**postal** 268:4,11
270:3
**posts** 38:20
**potential** 61:1
326:7 383:16
**potentially** 214:1
215:15 352:22
**practice** 35:14
42:15 119:17
131:24 132:1
177:12 328:23
**practices** 30:24,24
35:13 253:20
**prairie** 1:18
**prc** 38:13,19,20
39:1,3,20 40:5,22
42:17 68:12
231:11 232:1,6
234:5 235:12

**prc'd** 276:6
**prcs** 42:10 68:13
94:23 232:22
**pre** 260:19
**preamble** 263:20
**preapproved**
292:21 293:8
**prefacing** 300:11
**prefer** 47:17
**premium** 142:18
**preowned** 261:13
261:16
**prepare** 28:9,10
210:8
**prepared** 210:13
215:5,5 217:1
**preparing** 30:3
**preprint** 265:25
**preselected** 260:25
**present** 2:18 5:6
19:9 23:17 27:2
94:6
**presented** 220:13
**presently** 115:19
**president** 19:10
**pressure** 74:9
**pretty** 66:12
190:18 198:8
374:11
**previous** 97:14
259:19 324:14
363:25 394:8
**previously** 41:25
96:2 175:12 276:6
345:19 392:7
**price** 64:13,20
65:1,2 99:19
100:25 101:4
102:6 162:20,23
168:13,15,21,22
169:17 170:19,19

170:21 171:3,7
175:4 187:21
195:23 196:23
197:1,2,8 202:6,10
204:25 210:25
211:11,11 212:3
223:5 230:1 235:5
235:11 265:12
302:2,4 304:5,9,14
306:23 307:4,25
311:9,11,12 312:8
314:9 316:9,11
**priced** 59:14
168:24 185:6
373:17 374:2
**prices** 129:24
222:25
**pricing** 51:9 64:11
165:23 234:25
235:2,23 373:20
**primarily** 62:21
**primary** 12:20,25
82:20 338:1
**principal** 19:8
21:5,20 22:23
52:4
**print** 8:11 29:22
78:24 234:5
266:20
**printed** 143:21
273:24 274:9
278:25 307:9
**prior** 19:14 30:2
43:7,20,21 118:15
125:5,9 153:3,17
156:4 198:15
211:21 239:18
298:21 361:8
387:15
**priority** 75:24

**private** 361:7
**privy** 222:12
**prize** 287:22
**probably** 13:16
15:11 27:16 29:5
46:9 48:5 49:3,11
69:10 86:8 92:2
114:18 116:23
119:14 130:14
135:25 140:3
149:21 155:23
166:15 171:19
184:10 185:20
186:2,20 187:24
187:25 197:16,23
198:1 199:14
200:5 207:3
232:18 237:10
249:24 255:17
256:16 281:22,24
283:25 287:9
289:11 301:9,10
316:22 322:7
355:3,5 359:20
366:12 367:25
368:5 375:25
376:10,12,15,17
379:7,7 390:3,5
**procedure** 1:17
3:13,17 44:8
56:17 57:11,13
64:16 99:9,10
124:23 184:8,9
206:22 211:16
286:10,21 397:5
398:5
**procedures** 3:19
21:23 76:17 98:1
184:5 386:19
**proceed** 37:11
221:6

[proceeding - purchasing]                    Page 48

**proceeding** 5:13
221:8
**proceedings**
394:17
**process** 39:4 43:24
44:7 46:16 56:17
57:5,11,13,21
69:17 71:21 81:16
81:19 83:23 84:12
84:23 94:18 95:3
95:18,18 145:23
165:2,3 172:20
174:1 211:22
**procured** 77:3
**produce** 122:2
362:8,9 363:6
**produced** 129:24
254:18,18 257:4
273:15 317:1
386:13 387:13
**production** 215:25
267:16 268:7,7,8
280:8,20 281:3
286:24 287:18
396:16,17,22
**profit** 101:1,5,14
132:25 174:21
200:3 301:20
302:5 360:13,15
**profitability** 158:2
**profitable** 61:23
158:3,5,9 159:4
**program** 39:9
147:9 260:9
283:22,24 286:25
**programmed**
74:10
**programming**
71:15 147:10
**projected** 158:6

**promoted** 290:7
**promotion** 16:1
391:19
**promotions**
357:16
**proof** 3:22 102:25
103:4,14,15 104:2
104:6 107:16
108:16 126:12,23
126:24 127:20
128:1,5 129:4,8
209:17 219:19
222:4 241:17
270:25 271:1
327:25 328:7,20
329:10,14,23
340:10 341:14
345:18,20 347:21
348:1 362:8 363:5
387:9,16
**proofs** 269:19
**proper** 118:21
232:3 239:23
300:24 385:2
**properly** 60:5
**property** 105:5,12
**propose** 214:14
383:12
**proposed** 113:19
117:3,24 241:7
**proposes** 115:6
**prospective** 36:19
**protect** 225:10
326:4
**protocol** 55:3 60:2
60:9 96:22 124:24
125:4 126:1
**protocols** 58:25
96:14
**prove** 328:3

**provide** 12:17
33:5 41:8 58:25
65:15 119:21
120:1 127:18
128:3 129:13
165:8 216:4 243:7
243:17 248:22
253:9,10,11,12
261:18 272:9
282:3 301:4
330:12,13 331:16
336:1 339:17
349:19
**provided** 33:19
98:5 102:18 120:3
172:14 177:22
186:18 212:19
213:3 216:2,14
218:13 222:3,8
224:11 226:22
242:10,11 245:16
255:20 270:22,22
273:10 280:22
281:2,11 314:16
331:6 332:1 340:3
340:5 387:11
388:24 389:1
**providing** 241:9
241:25 368:24
**ps** 56:17
**public** 159:14
397:10,18 398:15
398:23 399:23
**puddle** 138:1
**puff** 131:22
**pull** 15:11 35:18
79:21 83:21 110:3
159:13 183:14
212:20 213:14
225:5 245:2 317:4
317:12 320:13,19

362:4 385:4
**pulled** 80:5 143:14
209:7
**pulling** 109:19
150:7 307:12
322:23 369:15
**puncture** 204:7
**purchase** 3:18
38:13 39:5 40:6
40:13 51:24 76:16
86:17 89:5,5 95:5
95:19 96:4 98:1
111:4,8,12 129:20
132:8 136:17,17
162:19,23 165:18
172:10 174:4
182:11,12 184:8
191:9 195:23
196:22 197:1,7
200:25 202:6,10
207:6 211:11
214:1 231:11
299:20 302:2
311:9,11,12 316:9
350:24 351:2,14
365:15 376:8
**purchased** 129:21
132:11 143:17
144:20 182:9,10
191:5,6,6 209:2,3
301:3 312:21
314:8 354:23
365:13,17 375:12
375:13,14
**purchaser** 232:14
232:17 234:2
**purchases** 347:11
354:22
**purchasing** 58:15
130:5 346:17

**purely** 15:7
**purported** 32:15
   115:15 118:23
   224:12 237:12
   238:6 240:1
**purportedly**
   112:15 226:22
   246:18
**purpose** 30:3
   231:19 376:25
**purposeful** 135:10
   151:20,22,23
   176:24
**purposely** 132:6
   136:19 142:25
   150:1 151:14
   158:24 167:2
   176:25 225:16
   299:17 309:23
   367:9
**purposes** 104:20
   127:12,25 150:23
   161:22 172:5
   392:5
**pursuant** 1:17
   3:12,16 11:1,14
   254:19 387:12
   392:20
**pursue** 342:16
**push** 237:22 275:9
**pushed** 361:15
**pushing** 362:7
   363:5
**put** 6:14 18:21
   21:1 31:24 35:24
   36:5 39:20 40:22
   44:21 45:5 61:9
   68:10 82:6 87:12
   87:20 90:5 101:6
   106:24 166:16
   168:19,21,22

   172:22 173:2,3,5
   173:18 198:2
   222:21 224:21
   235:16 242:22
   255:7 256:16
   266:11,14,15,25
   279:22 280:3
   291:4 309:23
   310:8 323:24
   326:4 367:23
   368:10 372:16
   374:1,9 383:5
**puts** 168:4 377:20
**putting** 78:17 81:1
   141:9 167:14
   263:17

**q**

**qbe** 1:7 3:11,14
   6:5,7 104:3
   110:13,15 115:3
   115:19 180:8
   218:19 344:9
   396:7 397:3 398:3
**qualified** 155:5
**qualify** 264:7,13
**quandt** 2:4 3:6
   5:17,17 6:21 8:25
   9:25 76:6,10 81:6
   81:7 97:11,17,20
   103:6,11,14
   107:17,24 113:11
   113:15,25 114:4,8
   115:17,24 116:2,9
   117:7 125:12
   133:18,21 152:10
   178:23 179:10
   180:3,5 210:12
   211:14,19 212:11
   215:1,7 216:6,13
   217:6,12,20,23
   218:4 219:6,11,15

   219:24 220:4,8
   221:7,14,18,22
   222:7 223:22
   226:8,12 230:3,10
   230:17 236:13
   242:16,21,25
   243:9,13,24 244:7
   244:10 263:19
   267:25 268:3,9,17
   268:22 269:2,6,10
   280:21 281:1,13
   294:9 296:11,20
   296:25 297:4,8,12
   297:20,24 298:11
   298:13 300:8,18
   300:21 308:17
   309:3,8 310:17
   328:10 344:15
   355:20 386:7
   392:17 393:7
   396:5
**question** 7:15 9:7
   9:17 11:6 31:6
   47:25 48:22 55:9
   66:11 81:9 98:21
   111:16 116:4,11
   117:18 125:14,22
   125:24 155:21
   176:1 179:11
   191:13 199:8
   204:19 206:5
   211:18 212:12,16
   219:16 224:23
   226:3,11,11,13
   230:15 235:22
   236:1,16 238:3
   241:23 243:13
   245:13 249:22
   263:11,15,24
   297:4 308:18
   309:2 311:8

   323:24 328:11
   331:14 335:22
   344:17,23 373:6
   384:10,14 385:23
   386:8
**questioned** 349:17
   387:7
**questioning** 152:1
   175:12 379:19
   392:19
**questions** 7:6
   12:15 31:7 135:12
   142:22 143:14
   156:2 160:19
   177:18 202:1
   211:6 215:14,19
   216:17 221:9
   255:3 266:18
   278:23 300:11,14
   302:8 332:11
   369:16 386:4
   388:1 392:16
**quick** 61:2 76:4
   111:16 175:23
   360:1,10
**quicker** 21:24
   50:14,14 110:7
**quickly** 182:19
   201:7 383:21
**quit** 127:14,16
   137:4 285:21
   332:4 343:6
   354:10 355:12
**quite** 158:11 200:1
   303:5
**quote** 128:1
   140:14 335:10
**quoting** 128:4

**[r - reconcile]**

**r**

**r** 2:1 25:19,20
54:24 94:15
243:16 339:23,25
340:1,11 343:10
343:10 375:12
**racing** 124:4
**racking** 52:5
**radio** 35:3 76:18
84:22,24 85:1,3
86:2,3,13 91:22
111:1 126:7,9
329:3
**radios** 77:6
**rained** 138:3
**rainy** 138:2
**raise** 139:14
**raised** 6:12 139:13
**ram** 184:19
197:12
**ran** 127:11,15,16
127:21,22 128:18
129:4,7,10,15
143:8 192:6
223:12 278:7,21
285:13 294:22,23
330:7,7 331:11
332:1 337:3
**range** 48:7 49:14
100:25 101:4,12
101:18,19 102:5
207:16 208:14
**rank** 168:13,15
169:17
**rare** 44:18 45:3,5
93:22
**rate** 91:16
**rated** 274:10
**rates** 261:21
**ratio** 46:10

**raved** 139:11
**rbook** 167:18,25
168:1,1 169:5
**reach** 383:2
**reached** 123:1
292:6 382:11
**read** 8:8,9,10 11:7
29:21 99:16
116:25 148:23
211:20,24 242:18
243:3 267:20,22
271:18 273:18
287:12 289:17
314:4 319:3
339:20,23 349:25
356:6 397:5,6,12
398:5,6,17
**reading** 11:5
99:17 104:25
243:6 254:17
264:10 320:14
339:21 345:23
396:20
**reads** 292:13
346:13 373:24
377:5
**ready** 70:6,16,16
70:17,20,24 71:2
336:8 375:13
**real** 111:16 133:15
161:21 169:23
175:23 341:5
350:15 383:21
**reality** 217:1,4
**realize** 107:21
140:13 237:10
370:25
**realized** 320:12,20
**really** 11:4 15:10
27:12 34:8 72:7
75:20 80:6 88:1

89:23 93:9 139:14
141:17 142:20
145:9 156:11,12
156:19 158:19
169:25 182:19,23
191:13 201:7
205:2 207:5
209:10 235:21
246:20 247:7
251:15 253:2,3,4,5
274:18 279:25
283:14 288:15
289:5 296:18
312:12 324:12
335:18 345:16
361:14 366:16
390:17
**realm** 92:12
**reason** 6:12 7:14
35:15 36:25 51:17
106:24 111:24,25
114:12 116:5
151:13 171:22
172:13,15 182:25
188:14 192:2
194:12,20 197:13
197:17,19,22
198:22 199:13
204:18 205:18,20
216:3 225:9
228:24 232:16
263:11,15,23
266:23 284:10
286:13,18 306:5
307:12 316:17
317:22 328:18
356:23 369:12
383:22 384:8
396:15 398:8
399:3

**reasons** 150:2
**rebate** 264:15
265:3
**rebuilt** 374:14
**recall** 71:12,16,19
93:13 250:19
290:6 327:22
347:13 378:17
380:4,15 383:19
385:13
**recap** 205:23
**receipt** 118:24
119:10 240:1
396:19
**receipts** 118:21
239:23
**receive** 264:15
**received** 13:13
40:13 161:4 172:9
182:21 209:8
213:1 229:5,9,12
229:19 239:5
270:9,25 271:2
292:9 293:20
294:11 302:8
306:24 307:19
325:24 337:18
376:12 392:11
**receiving** 387:1,20
**recognize** 183:4
277:16 356:22
**recollection**
265:13 333:7
**recommenda**
357:11
**recommended**
139:18
**reconcile** 38:22
41:14 42:8 188:8
188:23 209:12
308:14 368:2

reconciled  42:18
reconciliation
  38:25
recondition  66:19
  66:20 186:4
reconditioning
  67:4,9,10 101:10
  167:24 168:3,7,9
record  9:1,25 10:6
  10:8 33:8 48:19
  99:1 102:18 103:6
  113:11,25 115:18
  116:22 117:15
  133:18 148:24
  152:15 159:14
  161:5 178:24
  179:23,25 202:1
  205:22,24 210:13
  216:6 217:21
  219:14,22,25,25
  220:3,5 221:3
  230:3 242:22
  249:3 255:3
  267:25 271:19
  272:10 280:21,22
  294:10 296:20
  297:23 300:9,19
  300:21,23 302:24
  308:25 309:4
  310:16 314:5
  319:3 328:10
  338:21 355:19
  362:2 382:4,22
  392:6,8 394:16
  398:9
records  218:3,10
  219:17 220:15
  221:11,12,15,16
  221:24 309:1
  316:17,18,24
  317:1,2 332:7

392:10
recover  342:1,2
recoverable  106:5
recoveries  105:18
recreate  375:3
recruited  391:17
rectangle  246:6
red  352:11
redacted  334:12
  335:1 337:6
redescribe  40:18
redone  316:21
reduced  204:13
  394:14
refer  133:19 147:1
  147:3 268:15
  386:12
reference  32:2
  43:23 81:9 107:18
  108:14 184:23
  186:10 201:3
  208:24 261:17
  278:24 301:3
  324:19 332:21
  355:23 375:16
  396:8 397:2 398:2
referenced  132:17
  132:17 177:24
  256:3,10 272:17
  329:24 397:11
  398:15
references  31:17
  33:2,22 36:20
  38:4,8 146:19
  326:12
referral  326:6
  327:16,17
referrals  326:13
referred  149:10
  243:3 268:11
  269:12 388:6

referring  29:9
  50:8 53:22 68:3
  76:23 81:10 97:14
  97:15 104:21
  111:20 133:21
  163:12 166:3
  186:12 223:9
  241:10 242:17
  243:2 257:4,8
  258:9 268:25
  269:18 272:3
  277:2 318:1,11
  349:4,22,23
  354:23 359:12
  372:18
refers  244:12
  327:12
refinish  31:25
reflect  117:25
  118:1 308:25
  313:3
reflected  186:17
  206:7 272:19
  275:16 307:20
reflecting  105:5
  376:22
reflects  194:9
  245:20
reflexes  57:16
refresh  377:13
refresher  161:22
refund  95:1
refusal  126:24
refused  126:12,23
  329:10
refusing  221:16
regard  210:2
regarding  30:15
  110:22 133:25
  134:1 161:2
  162:12 216:17

237:1,2 239:5
  252:25 295:14
  331:21 332:16
  346:16 347:10
  349:1
regardless  219:21
  220:21,23 221:5
  310:13 376:20
regards  386:9
regular  89:5 184:7
rehash  14:6
reimbursed
  283:18
reimbursement
  282:19 287:10
related  34:16
  146:13 156:6
  165:5,12 200:13
  260:17 385:7
relates  6:8
relation  34:5
  246:8
relationship  34:6
  34:8,9 181:24
  208:5,8 246:10,11
  246:12 299:4
  330:21
relative  394:22,24
release  82:10
rely  169:6
remboski  350:11
  350:21
remember  16:12
  16:19,24 29:19
  45:1 67:23 80:1
  92:3 99:25 100:3
  100:13,15,20
  107:13 116:13
  120:17,19 121:6
  121:16 122:23
  123:25 124:8,8

133:10 137:23,24
138:1,4,22 142:24
149:4 150:11
153:5 154:20
157:12,13,13
173:11,11 176:5
188:3 210:4
214:18 227:3
233:12 237:18,25
238:3 246:21,25
248:9 250:10,24
251:2 257:13
259:4 260:3
261:20 265:15
270:20 275:4,7,7
275:17 276:7
278:14 279:4
284:19 299:9
328:6 344:25
347:18 348:24,25
351:25 354:8
364:14,14 376:14
376:21 377:7
378:19 385:13
**remotely** 1:15 5:8
5:13 394:20
**removed** 354:4,9
**renovation** 24:25
25:2
**reopen** 339:18
**reopened** 317:22
**repair** 38:16 42:12
69:13,14 70:15,15
70:21 111:13
132:12 144:11,16
144:20 148:12
160:16 202:15
208:20,25 222:18
228:7,8,10 230:12
235:13 373:18,21

**repaired** 204:7
**repairs** 69:11
146:13 147:3,3
149:17,22,25
189:21 192:2
202:20 208:4
228:6,6,7 302:3
**repeat** 17:5 18:22
263:21 300:14
**repeatedly** 49:14
63:18 127:13
336:16
**rephrase** 7:17
128:14 379:23
**replace** 37:25 40:6
91:20 228:10
**replaced** 149:8
235:17,18 237:21
373:11
**replacement** 37:15
373:18 374:3
**replacing** 73:24
91:13
**reply** 365:20
**report** 3:20 4:18
4:20 24:18,19
54:15,19,20,22,23
63:24 80:4 82:14
82:14 83:22 104:1
246:23 289:1,2
332:14 333:5
334:9,14,19,22
335:11,23 336:14
337:10,19 338:5
339:23 355:24
363:23,24,24
374:21
**reported** 289:3,3
334:25 335:6,10
394:13

**reporter** 1:14 5:1
5:3 9:13 11:4 12:8
25:17 48:20 54:21
98:15 100:7
107:25 109:20
191:14 211:20
217:22 230:19,21
280:13 296:16,23
297:11,13 298:1
304:11 311:3
318:21,24 331:7
331:12,18 355:16
361:23 363:19
394:3,6 395:9
397:7
**reporting** 5:7 22:7
337:25
**reports** 21:21 22:6
22:14 24:15 52:10
52:14,23 54:11
207:7 339:24
**represen** 11:12
**represent** 5:10
102:15 112:4
161:3 177:19
245:19 310:5
337:12
**representative**
10:25 28:7,9 29:4
31:1,5 180:11,17
210:7,8 243:19
**represented**
312:13
**represents** 184:1
209:25
**reprimanded**
156:6 250:9
**request** 33:8 40:14
94:21 95:2,6,21,24
95:25 271:10,22
272:2 276:22

380:1 398:9,11
**requested** 337:17
339:8
**requester** 96:14
**requesting** 277:12
**requests** 94:17
126:11,22 276:24
284:2 329:9
339:23 340:11
**require** 32:1 38:23
41:14 42:4
**required** 91:15,17
396:25
**requirement**
53:12 127:25
128:2
**requirements** 54:5
148:18
**requires** 258:24
**requisition** 40:14
231:11
**resell** 100:25
101:4
**reservation**
392:24
**reservations** 392:7
**reserve** 216:16
309:1 392:18,21
**reserved** 393:10
**reserving** 393:1
**resolution** 338:23
**resources** 346:12
**respect** 14:8 20:14
24:6,17 32:13,14
34:23 35:2,9
53:11 55:2 58:22
64:6 71:3 72:19
75:1 77:1 78:22
82:19 89:8 101:14
109:12 110:23
111:2,4 119:2

121:13 144:23
149:11,14 159:16
165:22,23 172:9
175:12 177:22
179:18 180:12,18
182:8,14 188:18
194:10 197:14
200:3 205:11,14
206:3 209:1,8
211:18 212:18
214:4 220:12
223:18 226:21
227:10,14,17
231:22 252:6
291:3 314:22
316:9,24 343:11
344:10 355:23
361:3,10 366:3
384:9 389:23
392:8,9,11
**respond** 264:11
297:11 324:5
342:18
**responded** 379:5
**responds** 377:16
**response** 219:17
238:14 254:7
258:15,18 281:3,3
328:12 373:12
374:2
**responses** 280:25
281:11
**responsi** 23:13
**responsibilities**
21:19 155:15
**responsible** 34:24
165:11,23 228:19
228:25
**responsive** 294:13
309:4

**rest** 344:24
**restaurant** 325:24
**result** 110:14
315:10
**resulting** 105:6,12
**retail** 49:16 73:14
199:7
**retaining** 246:15
**retire** 292:20
**return** 85:7 284:2
329:13 343:6
**returned** 284:6
396:19
**reuse** 278:19
**reversed** 313:23
314:7,10
**review** 21:24
33:21 82:11
118:15 182:13
215:13 239:18
392:21 396:13
397:1 398:1
**reviewed** 10:2
11:24 28:13
108:17 109:9
245:14
**reviewing** 28:22
98:14 261:8
**reynolds** 23:10,11
**rhyme** 151:13
**rid** 6:18 18:11
51:1,19,23 65:3
146:6 322:6
**right** 6:11 10:12
11:19 14:5 15:8
17:2 20:8 25:15
27:21 30:25 33:17
35:8,10,19 37:21
39:15 41:3,10
43:11 47:14 50:16
51:16,20,25 57:4

58:17 59:15,17,21
60:1,11 61:8,14,17
62:16 63:8 64:22
65:2 66:15,24
67:7,22 68:4,5
69:5,15,16 71:22
71:23 72:9,12,15
73:7,9,12 74:11,12
75:23 77:20 78:22
81:1 82:4,16,17
83:10,15 85:7,21
87:1,4,12 88:7,18
89:2 90:1,5,24
92:14,17 93:18
94:24 95:14,16,17
95:23,25 101:25
102:1 103:25
104:6,14 107:5
109:9 112:8,17,18
113:23 114:3
115:5,9,13 117:12
119:25 122:11
124:13 126:17
127:9 128:25
131:17,19 135:21
138:9 142:20
148:13,15,16
151:11,17 154:25
156:17 160:16
161:1 162:25
163:5,14,21
164:16 165:13,15
167:17 168:22
170:1 172:3,7
173:3,20 174:2,2
174:25 175:19,19
176:7,9 177:15,15
179:7,8,16,17
180:10 182:4
185:15,17 186:19
187:4 188:17

191:10,22 195:16
196:2 197:9,10,18
199:13 200:15
202:7 204:5
206:17,18 213:25
215:20 216:7,16
221:13,20 223:16
224:20,24,25
225:23 230:9
231:16 233:2
234:22 237:2
238:13 241:18
244:6 248:11
249:9 251:21
253:15 254:4,5
255:6 258:4
259:21 260:25
261:7 263:9 265:8
265:24 266:14
267:5,6,12 269:17
270:12 274:14
275:14 276:11,25
277:7,17 278:20
279:10 281:2,6
283:11 284:12,13
285:21 286:7
287:8 291:13,14
298:8 304:6
305:12 306:2,10
306:22 308:4,21
308:23 309:1
311:23 312:2,6
314:14,21 315:7
315:11,15 316:19
316:20 317:6,7,9
317:16 318:5
319:4 323:24
324:20 326:20
328:2,9,15 333:7
334:4 341:3
342:15 346:1,5,21

**[right - saying]**

347:5 348:6,21
351:9,15 352:20
352:21,25 367:13
371:18 376:5,7
377:22 379:16
381:13,24 385:1,8
389:6 391:4
392:18,21 393:1
**rims** 73:24
**ring** 177:14 234:7
281:19
**rip** 322:11
**ripped** 91:14
**rise** 106:12 175:14
**ro** 38:16 333:25
**road** 12:23 87:13
182:3 278:7 335:4
**roads** 280:11,15
283:10
**robust** 36:14
**roland** 164:17
**rolanda** 164:20
165:17
**rolando** 164:19,22
164:22,23 165:17
171:19 172:1,4
262:13 346:19
347:4
**role** 19:5 75:21,22
164:25 390:17
**rolls** 62:2 327:8
**roof** 25:3 192:7
**room** 5:6 174:9,19
**roosevelt** 13:8
**rory** 59:6 130:15
318:20 319:4
343:3,4,5,9 366:24
367:1 382:19
383:13
**rotate** 262:1

**roughly** 15:22
47:2 240:11
**rounds** 252:18
**routine** 159:2
**royce** 62:2 327:8
**rude** 9:13
**rule** 3:13,13,17 7:5
7:13 11:1,15
65:25 70:10 114:5
277:20 376:7
392:20
**rules** 1:17 7:2
56:25 57:3,4
87:19 397:5 398:5
**rumor** 347:5
349:7 385:6,8
**rumors** 139:21
346:15 350:13
385:11
**run** 7:4 26:20,20
39:12 52:15,21
60:4 79:5 82:14
118:4 119:1 127:1
129:3 134:23
186:6 201:6
213:17 302:18
312:18 330:3
337:5 383:20
**running** 23:15
58:18,23 96:17
126:12,23,24
128:5 329:10
**runs** 34:20 278:20
322:15

| s |
|---|

**s** 2:1 55:1,1,1
116:18,18 218:8,8
218:9,9 396:16
398:8,8 399:3
**safe** 70:7 73:21
284:15,20 293:23

**safeguards** 141:10
**safely** 367:3
**safeties** 175:21
**safety** 73:4 142:12
187:12,16 190:8
190:11,16 191:2
192:1 194:12
230:2 232:25
233:15,17 305:9
**safety'd** 232:21
**sake** 90:8 125:20
179:22,25 233:23
316:25 318:12
**sale** 51:6 57:5 61:1
76:16 89:6 163:24
187:21 198:7,24
211:11 255:25,25
259:13,14 290:8
304:9 314:9
**sales** 15:20 22:9
24:3 25:15 26:18
27:23 46:1 57:8
58:12,20 67:2
72:8 88:5 99:18
99:20,21,23 100:3
139:9 153:8,9
164:7 165:16
173:23 196:19
256:13 259:16
289:20,25 302:4
302:10 304:14
306:23 307:4,25
326:21 346:23
359:1
**salesman** 14:11,15
15:7 57:8 350:21
**salesman's** 346:4
354:14
**salesperson** 164:3
164:5 327:12

**salga** 262:17
**sample** 290:17
**sandra** 338:1
339:9,9,17 341:2,4
341:6
**sandwiches** 320:9
**sarah** 2:20 107:22
363:21 371:18
**sat** 174:15 297:22
**satisfy** 180:7
**save** 188:22
315:17,19
**saved** 189:11
**saving** 145:13
323:17
**saw** 120:23 122:25
187:24 218:6
233:22,24 247:7
259:13 307:14
311:12 331:24
346:2 385:18
**saying** 16:13 18:9
20:25 50:20 64:8
73:17 79:10 90:24
106:2,4,7,13,15
119:17 127:24
129:8 130:15
131:9 145:23
150:13 166:8
173:11,12 187:22
191:15 192:10
193:12 194:14
201:21 204:10
207:11 209:17
213:6 214:4
215:20 216:25,25
217:1 218:2
221:25 227:20
229:12,14 230:8
230:15 241:8
244:23 247:4

248:10 249:10
257:19 264:20
268:18 294:10,25
297:15 298:1
319:22 321:20
332:7 340:18
348:11,23 364:7
364:25 367:13
375:20,21 381:13
382:18
**says** 7:8 22:4
41:24 69:20 99:18
100:24 105:1,15
107:9,14 109:5
110:12 118:6
120:19 124:10
126:22 128:8
154:21 162:5
163:7 167:11,18
170:18 173:8
177:9 178:5,8
189:21 191:10,15
200:15 201:22
202:17 203:18
204:3 208:25
209:17 213:13
230:16 231:16,17
232:13 239:9
241:24 243:6
257:2 259:14
261:12 263:1
264:6,13 265:8
271:8,20 273:18
274:21 279:1
284:17 287:22
288:3 303:14
307:23 308:1
309:21 318:15
322:9,22 334:23
338:10 339:22
345:24 347:8

349:22,23 354:2
357:1 359:21,22
360:19 364:21
367:21 368:21
372:23 374:19
376:20 386:21
**scale** 65:2 170:17
**scaled** 97:6
**scapegoat** 122:23
**scenario** 200:3
**scharf** 2:3,19
**scharfbanks.com**
2:6,6
**school** 13:13
**scope** 320:24
**score** 292:22
**scott** 21:13
**scrapes** 71:4
**scratch** 66:15,16
67:13 290:18,20
**scratcher** 290:19
**screen** 7:25 8:3
103:2 104:5,9
201:17 215:23
239:6 281:2 313:9
316:10 375:5
**screw** 194:16,16
**screwed** 141:24
148:13 320:20
**scrivener's** 315:25
**scroll** 10:3 98:17
102:19,24 108:22
110:6 161:20
183:20 188:8
195:4,10,11 201:9
202:14 203:5,6,12
203:17,20,23,24
204:1,2,2 212:21
212:23 231:17
240:14 254:15,21
260:23 276:20

284:17 293:17
303:19 304:23
305:23 306:6,6,16
307:23 338:8
341:5
**scrolling** 10:18
107:6 188:10
189:15 305:6
332:24 337:24
**se** 290:12
**seal** 397:15 398:21
**seamed** 279:1
**searches** 134:20
**season** 138:2
**sec** 309:23
**second** 4:3 9:22
11:3 25:12 33:25
113:4 114:2,13,22
117:23,24 119:2
124:10 126:7,22
129:6,14,16,16,16
152:14 182:13
184:3 203:6
205:12,12 225:2
241:6,7 247:17,18
248:6 250:4,5,11
252:11,11,16
271:18 275:18
334:21 351:13
367:20 370:21,25
371:14 382:1
386:11
**secondhand**
233:18,20
**seconds** 143:10
330:7
**secretary** 258:23
336:23
**section** 163:7
303:14 323:5

**securities** 105:5,12
**see** 6:11,16 8:3,24
22:2 52:19 54:10
54:13 64:22 66:12
80:13 91:16 97:23
103:13 110:5
111:14 112:1,1
117:3 127:8
128:10,17 142:18
143:1 144:3
148:23 149:7
164:18 166:11
167:11 171:8,9
184:12,19,20,24
185:3 186:10
191:8,9 193:17
197:11 201:16
202:5,6,10 203:17
203:18,25 204:23
207:7 212:24
213:25 219:21
222:1 238:12
239:6 240:9,9,10
240:13,14,18,24
258:11,16,21
260:24 261:7,9
265:10 267:16,23
267:24 276:8
279:11 283:19
287:15 290:19,22
302:18 303:10
306:16 308:8,10
312:12,15 313:24
314:3 317:16
323:17 332:21
335:24 345:2
347:21 348:14
351:6 353:7,19
356:10 363:17
364:3,4,4 367:3
372:1,4 374:15

385:20 386:4
**seeing** 138:1
151:25 187:5
201:15,19,20
237:18 281:2
295:5 306:3
**seeking** 112:23
179:18 180:1,12
180:14,16
**seeks** 115:25 180:6
**seen** 8:5,21,23 9:2
9:3,23 10:1,1
108:11 110:20
111:17 112:3
176:19 254:12
257:5 266:18
281:17 284:1,14
286:24 293:18
337:9,22 388:12
388:14
**self** 355:13
**sell** 49:16,19,19
50:15 51:16 54:15
54:24,25 59:21
61:16 62:21,24
64:7 66:22 70:1,9
70:10,24 71:18
73:19 89:13 100:1
132:22 135:9,22
137:16,17 147:22
159:21,21 160:11
168:11 170:9
185:21 199:7
237:22 316:11
320:10 321:10
322:10,12 375:13
**seller** 99:19
**selling** 13:9,22,23
26:19 53:24 54:2
101:23 134:14
137:8 138:19

175:6 181:11
196:1 197:2 348:2
348:5
**sells** 53:13
**senator** 126:3
**send** 32:20 35:17
35:25 38:6 42:3
42:21 53:19 68:21
68:23 69:24 82:15
96:8 144:23 148:1
149:1 160:2,10,14
183:15 219:17
221:17 244:19
251:15 266:1
271:25 287:6
345:10 349:18
373:6 378:22
**sending** 326:12
347:4 364:14
378:19
**sends** 194:6,8
**sense** 7:18 50:18
54:8 60:1,5,6
61:12,18,23,25
62:1,3,4,11,11,17
62:20 66:7,8,9,20
66:24 106:11
136:6 139:25
142:15 151:18
175:22 215:12
286:19 308:11,12
308:15 365:25
**sensitivity** 334:11
**sent** 35:23 80:5
84:4 95:3,4,6
103:8 113:12
118:10 119:4
123:21,22 124:12
134:9 143:10
144:12 145:15
149:3,15 208:2

225:21 226:5
239:13 241:17
252:7 253:12
255:8 271:23
275:22 309:24
310:2,5 318:8
320:20 335:7
356:25 360:22
361:19 367:8
369:12 373:25
376:17,24 378:4
383:9
**sentence** 119:3
124:10 126:22
128:7 157:1
263:20 347:8
348:10,22 354:2
358:16 359:21
360:6,19,25
362:23 367:21
368:20
**sentences** 319:9
**separate** 78:4
280:24 294:22,23
294:24 305:18
**separately** 77:24
268:5 281:12
393:4
**september** 1:16
16:9 157:7,25
192:1 233:11
329:25 372:12
**series** 31:7 83:20
252:12 342:12
366:2
**served** 280:23
**serves** 182:4
**service** 24:5 26:3,5
26:18 28:1 34:16
38:1 47:13,20
56:23 57:6 58:20

69:25 70:2,11,14
70:19,20 72:13,22
74:17,20 90:17
146:4 147:19
153:9 159:17
186:4,11,13,15
189:5 193:25
194:2 229:9,19
234:1,8 257:17,18
266:2 268:4,12
273:19,23 274:25
275:1,5 291:14
304:4,22 312:8,23
312:23 313:2
373:2,15,21,23
374:7 377:21
**services** 24:4
78:13 87:10
124:12 146:1
181:8 194:10
208:19,21 226:22
228:19 229:6,13
246:15 275:15
329:24 330:2
331:6,16 335:5
388:24
**servicing** 26:19
190:14
**serving** 133:8
**set** 5:16 47:22 87:1
89:18,24,25 90:11
102:17 183:1
200:23 205:5
240:6 282:17
353:17,17 395:3
**sets** 204:25
**setting** 78:18
**setups** 101:6
**seven** 189:25
297:21 345:20

**sh** 4:7 177:20
**shake** 34:2
**shaking** 39:21
43:16
**share** 7:25 8:3
9:22 97:22 103:2
313:9
**she'd** 123:5 276:17
336:5
**she'll** 339:15
**sheet** 273:22
274:24 396:14
398:7,10,18 399:1
**shelf** 50:21
**shell** 158:17,21
**shifted** 156:13,14
**ship** 13:25 34:6
246:9
**shipped** 279:3
**ships** 266:8
**shocked** 292:8
337:4
**shoot** 72:2
**shooting** 233:21
**shop** 23:25 26:4,6
26:7 67:7,22 69:6
131:17 170:3
**short** 61:13,14
85:2 301:11 357:3
**shorten** 215:15
**shorthand** 1:14
5:3 394:3,5 395:9
**shortly** 271:23
**shot** 49:5,7,10
368:6,18
**show** 24:16 35:21
35:23,23 54:11
63:24,24 70:25
71:1 102:16
127:11,20 129:4
129:18 164:14

168:23 171:2,6
176:17 182:20
213:22 218:21
219:11,19 225:20
225:25 253:4
256:16 301:19
314:23 316:4
333:10 345:11
355:14 356:6
362:13 377:1
382:9
**showed** 10:7
176:10 218:9
270:4,5,8 301:20
301:22 313:17
333:8,12 336:20
354:11
**showing** 10:12
104:5 176:8
201:16 203:11
216:7 222:5 223:2
224:12 234:23
237:5,7 238:25
312:6 313:15,16
316:3 328:17
332:6 354:11
355:8,12 378:24
384:3,11 385:24
388:12
**shown** 396:16
**showroom** 25:10
93:1 274:2,8,11
**shows** 54:15
306:23 312:20
313:19 316:11,16
**shut** 342:24 343:5
353:11,15 354:17
354:18
**shy** 174:8 209:19
**sic** 57:16 129:24
130:6 205:17

216:23 233:5
331:2 337:13
363:9
**side** 77:10 164:16
193:17 200:15
264:6,13 323:13
347:21 351:10
386:22
**sides** 133:7
**sidewall** 204:7
**sign** 20:25 29:17
40:11 86:16 87:4
87:7,8,9,13,16,20
87:24,24,25 88:3
88:17,22 89:4
90:24 92:7,8 94:4
96:5 100:2 103:12
109:8 151:16
162:10 165:6
171:23,25 172:1,4
179:2,2,4,5 192:22
193:10 223:14,14
259:7,10 262:2,5
262:11,18 273:19
277:14 324:23
386:20 387:10
**signage** 92:22
**signals** 74:9
**signatory** 381:1
**signature** 107:7
171:17,21 192:16
192:19 231:13,16
277:16 393:10
395:8 396:15
**signed** 107:11
108:23 109:2
165:16 176:11,12
176:15,18 193:14
306:17,18 341:1
381:19 397:13
398:18

**significance**
128:13
**significantly** 51:10
129:24 131:4
**signing** 94:9
396:20
**signs** 76:19 86:17
90:21 92:23,24
93:3,5 94:1
176:16,16 193:8
246:7 258:20
**similar** 99:13
188:11 194:13
257:15,17 259:12
280:9
**simple** 60:3 61:5
73:17 379:19
**simply** 112:2
194:17
**simultaneous**
48:17 125:11
150:24 304:10
311:2 325:25
**sincerely** 396:21
**single** 20:16 49:17
49:18 87:3 88:16
213:17 214:17
227:5 229:15,16
283:20
**sir** 4:6 111:9 117:5
117:20 132:9,12
133:5 134:1
144:21 177:16,23
178:5,19 179:18
180:12,18,24
181:8,12,13,25
182:6,9 184:6
200:9,25 205:13
207:2,23 209:2
212:19 234:14
301:15 343:11

350:25 378:14 379:2 383:18 384:15,17,23 396:10

**sister** 21:12 94:3 94:11,13,14 381:1

**sit** 71:14 179:16 224:20 225:1,3,20 225:23 229:5 234:22 237:2 311:23 314:14,21 317:6,9 318:5 328:15 349:14 381:24

**site** 350:11

**sites** 71:1

**sits** 50:22 51:9 230:9 244:4

**sitting** 16:13,19,24 134:13 138:20 192:5 270:12

**situation** 20:17 44:18,25 154:5 160:10 174:3

**situations** 45:3 59:22

**six** 28:2 189:16 352:25 371:3

**sketchy** 133:15 253:3

**skewed** 62:13

**skip** 353:6

**slap** 135:11

**slapped** 136:21

**sleep** 120:20

**slightly** 158:12 183:21

**slip** 186:11

**slipped** 370:4

**slit** 93:19

**slogan** 280:12

**slot** 277:22

**slow** 10:20 137:12 137:12,12 254:23

**slsp** 164:1

**small** 68:25 103:4 183:21 267:19 351:6

**smaller** 357:18

**smart** 53:8 292:20

**smell** 68:15

**smiley** 324:6

**smoke** 141:18 175:18

**smoking** 258:24

**snap** 88:14

**software** 166:9 354:3

**sold** 14:10 15:4 53:19 64:20 175:8 195:20 198:4 238:1 311:25 312:4 318:16 375:1 391:5,15

**sole** 361:2,5

**solely** 152:22 181:13

**solicited** 32:6

**solutions** 396:1 399:1

**somebody** 16:13 33:16 37:24 44:21 59:19 75:8 77:20 91:8 123:9 141:4 176:4 183:5,14 189:14 192:4 229:3 249:4 261:4 285:12 294:20 326:14,16 337:2,3 339:7,14,17 342:9 342:9,9,10 371:11

371:12 379:13 390:15

**someplace** 133:14 379:13

**soon** 51:3

**sooner** 52:1

**sophisticated** 74:24

**sorry** 5:18 6:22 11:5 17:16 24:22 36:16 37:9 46:19 46:20 50:5 57:17 63:12 84:17 85:17 89:1,19 93:23 104:8 105:6 107:20 114:8 117:12,22 128:19 163:12 170:23 171:24 183:23 188:10 190:2 191:12 197:6 199:25 203:25 204:16 211:17 212:24 214:25 227:16 230:18 233:7 237:6 241:22 245:25 247:12 249:18 251:25 258:5 261:5 262:4 263:19 265:1 268:18 279:15 295:9 298:12 306:13 317:22 321:20 324:3,10 325:9 333:15 343:3 348:17 351:17 361:7 362:5 366:18 371:20 373:2 375:6,17 379:5,16

382:1,5,24 392:4 392:23

**sort** 127:19 287:9 303:22 386:22

**sorts** 78:11 285:8 291:3 339:8 364:24 385:11

**sotto** 98:14 261:8

**sought** 179:8

**sound** 121:10 333:7 334:4 385:19

**sounding** 142:20

**sounds** 17:1 22:5 39:3,13 49:22 76:10 84:12 85:13 88:24 165:10 209:10 217:15 252:5,18 334:5

**source** 82:20

**south** 1:18 2:11

**spanish** 256:17,18 256:20,22 263:2 263:10,13,17,25 285:3 294:6,7,7

**sparked** 247:22 288:6

**spaz** 347:4

**speak** 20:18 40:25 221:3 296:8 382:12

**speaking** 12:4 48:17 95:8 115:23 125:11 150:24 224:1 256:17,19 304:10 311:2 325:25

**special** 16:5 90:24 91:5,7 131:21 138:21 147:8,10 256:2 287:16

**specific** 114:20
170:23,25 210:18
210:20 211:12
212:17 273:2
302:7 392:13
**specifically** 35:9
38:9 55:10 110:21
111:5 177:24
225:25 227:3
231:7 243:10
383:19
**specifics** 9:1 251:5
373:4
**specified** 394:21
**specs** 160:17
187:17,18 190:22
**spectrum** 49:23
**speculate** 124:7
**spell** 54:20 279:10
**spelled** 218:7,16
**spend** 25:11 78:6
90:19 131:3,7,10
131:16,24 168:8
190:23 282:18
318:4 383:12
**spent** 28:21,23
150:7,8 223:11
306:14 335:17
**spike** 51:17
**spiraling** 17:22
**split** 122:14
302:11 357:7
360:23 363:2
**spoke** 171:24
**spoken** 207:22
**sporadic** 24:21,23
**sports** 365:1
**spot** 325:5 369:11
**spots** 163:20
**spotted** 192:12

**spread** 84:9 390:5
**spring** 41:21
255:24,25 259:13
**sr** 349:1,6,23
350:9 357:11
**st** 133:14 379:12
**staff** 144:19,23
291:12
**stage** 122:19
**stale** 52:11
**stalls** 72:11
**stamp** 109:5
310:10
**stamped** 35:17,20
95:3 144:3,6
166:4 171:15
177:20 230:25
254:8 268:15,25
290:18 303:8
310:25 329:15
356:1 378:13
**stamps** 32:21
**stand** 36:11
104:15 170:3
215:18 276:17
**standalone** 21:2
**standard** 286:20
**standing** 20:13
31:12 88:5 137:25
143:7 185:2
215:22 370:14
**starbucks** 143:8,9
**stare** 215:22 225:3
**staring** 214:13,13
**start** 13:9 52:8,9
55:18 87:8 89:14
147:23 156:22
182:2 187:19
208:5 217:19
223:25 236:24
256:24 274:7

356:5 372:11
386:21
**started** 13:24 55:8
56:7,10 59:5 68:5
75:3 106:17,18,24
137:6,10 138:15
139:16 140:16
141:19 142:22,23
151:25 156:11,12
157:5 158:15
182:1,3 237:5,7
238:8,16,17
244:23 248:17
253:2 285:22
297:8,16 299:2,7
323:15 328:24
332:6 339:21
346:14 347:3
365:3,9,10 387:6
**starting** 5:14
13:21 52:21 57:19
57:21 265:9
312:11
**starts** 134:10
365:16 374:15
**state** 1:14 5:10
7:15 165:4 200:19
212:13 258:23
336:24 394:6
397:10 398:15
**state's** 336:24
337:4 339:5,11
340:2 342:3
**stated** 105:19
340:9 349:2 392:7
**statement** 38:23
38:23 41:14 42:3
42:4,21,24,24
94:20 105:16
125:2 139:15
171:16 267:15

268:4,5 335:15
349:10 367:24
390:20 397:13,14
398:19,19
**statements** 21:25
42:7,8 276:14
**states** 1:1 230:11
261:16 268:11
384:20
**statistics** 48:24
**status** 69:18 70:16
287:22
**statuses** 69:19
**stay** 50:12 203:25
290:13 362:6
**steal** 57:2
**stealing** 140:9,22
141:14 158:23
364:24 380:16
**steam** 68:16
**steered** 359:5
**stenographically**
394:13
**step** 33:17 131:15
**stepped** 18:20
107:2,3
**stick** 68:6 120:20
**stickers** 258:21
**sticks** 322:20
**stint** 85:2
**stipulation** 5:11
5:20
**stock** 38:16 49:16
68:13 185:11
188:25 195:2
203:4 372:21
375:9 376:15
**stockholders**
110:19
**stocks** 54:18

**stomach** 120:21
**stood** 114:9
**stop** 7:22 14:5
  19:16 118:17
  124:17 130:4
  134:24 136:6
  137:4 138:11,13
  161:21 195:6
  203:14,15,23,24
  204:1 239:19
  244:14 292:8
  304:24,25 305:1,2
  306:7 355:8 360:4
  375:8
**stopped** 176:7
  332:6 378:24
**stopping** 377:21
  378:10
**storage** 192:7
**store** 15:21 17:8
  17:24,25 18:2,9,15
  18:18 19:1,17,22
  19:24 20:4 22:9
  23:17 26:16,21,23
  38:1 63:18,19,20
  76:19 77:2 94:4
  143:3 266:13
  284:21 322:23
  353:23 359:19,24
  360:1,5,8,10
  362:25
**stores** 120:10
  123:3 170:16
  294:21 357:18
**story** 63:6 357:3,9
  362:24
**straight** 275:10
**street** 2:11 59:6
  174:10 318:16
**stressed** 323:2

**stressful** 369:14
**strict** 84:20 279:25
  283:14
**strike** 70:4 128:14
  137:9 141:16,23
  142:4,5,6 158:17
  159:9,11,19
  175:19,20 192:18
  207:21 230:1
  233:13,14 368:23
**strikes** 146:19
  159:10
**striking** 233:9,9
**struck** 133:10
**structure** 56:15,16
**studied** 28:17
**studies** 85:4
**studio** 384:2
**study** 217:5
**stuff** 15:11 22:2
  23:19 28:19,24
  40:10 45:23 68:8
  69:1,3 73:11
  88:22 90:25 92:19
  95:9 141:17
  142:12 143:21
  147:16 150:25
  152:1 155:11,12
  155:13 158:15
  175:21 187:8,25
  188:21 213:2
  214:7 222:25
  225:5 228:11
  229:25 238:12
  246:5 247:2
  250:21,22 253:11
  280:1 285:22
  287:16 304:2
  322:12,17 324:8
  334:18 337:8
  341:19 354:20

**stumbled** 370:11 385:4
**stumbled** 237:18
**stupid** 135:7
  383:10
**subject** 258:13
  372:21 376:19
**sublet** 34:17
  186:21 187:2,4
  188:11,12,13,16
  189:20,20,21
  190:1,3,4 202:20
  234:11 235:12,14
**submit** 36:12
  118:14,17,20
  124:18 126:12,23
  126:24 239:16,20
  239:23 283:17
  329:10
**submitted** 57:7
  118:24 240:2
  338:2
**subpar** 390:13
**subparagraph**
  136:23
**subpoena** 254:6
  268:7,8 269:13
  280:23,24 281:4
  281:10 294:13
  387:12
**subpoenaed** 226:7
  328:20
**subpoenas** 112:4
  254:19
**subscribed** 109:6
  397:10 398:14
  399:21
**subscription** 87:9
**subsequent** 192:9
  312:10 377:15
**substance** 8:14

**substantiate** 340:8
  341:17
**substantiated**
  349:8
**subtract** 315:3
**subtracted** 205:17
  205:19
**successful** 343:13
**sucks** 322:10
**suddarth** 2:20
  329:18 363:22
  371:19
**sudden** 134:10
  238:18 354:11
**sue** 115:6 116:6
  117:6,18 344:12
  344:24 370:9
**sued** 115:16 344:9
  370:3,4,5,10
**suffered** 105:4
  110:14
**suffering** 207:8
**suffice** 157:23
**suggest** 228:24
**suggests** 130:11
  328:4
**suing** 116:5
**suit** 209:23
**suite** 2:4,11 396:2
**summarized**
  247:25
**summary** 167:18
**summer** 259:14,15
  346:15
**super** 147:19
  318:17
**superior** 396:1
**supersede** 286:10
**supervised** 27:20
**supervisor** 155:19
  207:9

**supplemental** 4:20
268:7 337:9
355:24 363:24
**supplementary**
337:18 338:5
**supply** 46:12
61:13,14 64:10
170:5,12
**support** 282:3,5
**suppose** 278:8
**supposed** 35:5
37:9 40:1 58:3,5
70:1 100:18 210:8
214:22 237:4
288:9 349:18
353:20 390:22
**supposedly** 96:19
149:15 176:3
223:1,4 230:2
235:17 272:14
274:10 354:13
357:4
**sure** 7:19 18:24
22:1 23:14,24
26:18 27:4,6 31:5
32:3 38:4 39:11
39:14 41:19 42:9
52:19 65:14 72:15
74:2 82:12 83:3
84:5 91:20 112:6
114:22 123:12
138:14 141:10
146:2 149:4
150:12 159:14
190:21,22 191:20
238:1 249:23
260:17 264:12
267:1,23 274:19
275:18 278:12
283:10 301:9
304:1 316:15

318:6 321:23
328:16 343:20
344:1 365:21
370:1 374:11
383:13 384:24
385:12 388:10
390:4
**surprise** 185:6
236:10,11,14,17
236:18 259:6
292:5 294:19
**surprised** 383:25
**surprising** 63:2
256:19
**surreptitiously**
130:7
**suspect** 285:25
286:3
**swap** 286:25
**switch** 74:13,21
93:23 102:14
353:24
**switched** 77:21
**switching** 38:9
88:10,12,13
273:13
**sworn** 3:22 5:22
5:25 104:2,6
109:6 394:10
397:10,13 398:14
398:18 399:21
**system** 25:3 32:21
35:16 36:8 38:14
39:9,18,20 40:22
40:23 79:22 80:12
84:5,6 95:2
100:23 116:20
144:1,2,6 171:8
173:4,4 183:7,8
232:1,6 245:3
307:6,8,20 308:23

323:6 353:13
374:23

**t**

**t** 100:10 116:18
218:8,9
**tacky** 93:11
**tag** 189:17
**tagline** 280:16
283:10
**tahoe** 184:19,23
185:5 195:1
197:20 206:17
227:1,10,18
**take** 7:23 8:21
36:2 50:17 59:16
63:21 65:20 69:17
71:6,10 73:1,3
76:4,6 83:23 84:4
90:4 151:10 152:5
152:7,10,11
156:21,23 165:16
188:24 190:9
195:18 202:12
214:14,16 217:7
217:12,13 225:18
259:25 260:1,2
276:15 283:4
296:14 310:15,17
320:15 329:12
338:16,19 343:7
352:19 371:15,16
380:13
**taken** 1:11,15
72:15 76:11 89:23
152:16 204:18
210:24 211:25
217:17 259:11
296:10 310:19
369:10 394:19
**takes** 59:23 72:22
170:9 190:24

260:3,4
**talk** 37:6 43:6
62:22 63:1,12
67:4 76:1,17 82:2
82:4 86:14 92:21
94:8 102:2 105:23
152:20 153:19
158:1 161:1
163:19 212:25
220:14 225:16
249:25 264:23,24
266:9 292:18
295:25 298:9,10
298:17 342:19
361:17 362:19
**talked** 30:5,6,15
31:23 76:15 93:24
102:6 120:4
130:22 167:23
184:4,8 203:2
249:25 276:24
278:3 295:5,17,19
307:15 344:14
346:7 356:24
363:3,5 368:3,11
376:6 383:15,20
**talking** 20:20
26:15 27:13 45:5
49:10 59:1 61:21
71:5 81:15 88:9
110:1 129:9
132:24 147:20
154:11 160:6
165:21 172:5
175:10,24 185:7
187:9 189:17
202:2 204:11
210:18,20 215:11
224:17 227:18,20
248:16 251:19
259:2 262:19

269:19 274:8
299:16 300:3
302:16 305:9
311:9 312:12
334:14 340:25
343:1 344:21
357:25 358:25
359:7,8 362:20
**talks** 7:13 124:17
136:23 338:2,9
358:12
**tammy** 391:17
**tangent** 157:11
**tape** 279:2
**targeted** 259:18
259:20
**targeting** 82:13
**tasks** 165:12
**tative** 11:13
**taught** 289:9
**tax** 31:16 33:19
378:18
**tbanks** 2:6
**teacher** 384:2
**tec** 186:22
**tech** 147:8 148:21
**technically** 95:13
299:23
**technician** 72:13
137:8 189:13
**technicians** 70:4
72:11 160:13
**technology** 74:25
**ted** 5:18,19 113:12
392:15
**tell** 6:20 7:17 13:5
16:8 21:3,18
35:23 37:18 40:19
43:25 46:15 50:2
50:10 55:16 61:6
64:12 67:20 69:11

77:2,22 98:12
99:17 112:8
120:11,24 123:6
123:12 124:2,3
136:9,9 137:3
138:11 144:24
155:9,13 161:21
172:19 177:17
186:24 188:14
191:16,17 195:6
203:14 208:7
218:4 225:24
246:14 248:1
260:14 261:4
270:5 285:19
288:7 298:18
304:23 311:24
319:18 324:8
330:6 331:21
336:19,22 339:15
341:25 364:15
374:20
**telling** 96:18 99:4
122:24 140:25
169:24 177:5
221:13,15 222:2
232:23 238:8
250:11 289:8
299:25 308:1
310:2,7 377:25
**tells** 101:7,9 166:6
**ten** 28:23 29:9
72:2 152:6 181:4
214:14 217:7,13
308:13
**tend** 290:12
**tent** 280:3
**term** 76:23 199:25
**terminal** 166:19
**terminated** 130:8
208:9 355:13

387:21
**termination** 355:9
355:11
**terminology** 29:6
**terms** 5:16 105:7
153:20 168:17
244:17 251:9
**terry** 346:18,20,22
346:23 347:2,3,9
347:13
**test** 100:18
**testified** 6:1 218:6
300:10,13 342:11
**testify** 210:9
394:10
**testifying** 210:6
219:4,5 243:20
244:15 270:1
**testimony** 106:23
109:10 179:17
300:12,22 312:3
394:17 397:6,7
398:6,9,12
**text** 4:15 130:8,15
130:23 140:20
143:2,11 155:23
250:16 309:14,15
309:18 310:6
317:24,25 318:6
318:13,22 320:20
324:14 327:24
335:7 366:22
367:4,8,9,14
**texted** 130:13
366:25
**texting** 318:20
324:3 366:24
**texts** 367:16
**thank** 97:20
133:22 217:15
245:12 269:3

321:10 387:25
388:1 392:3
**thanks** 292:24
**theft** 45:16 104:24
105:6,10,13 107:4
110:15 128:15
130:25 140:9,12
140:15 206:11
336:25 361:9
369:10 378:9
**theodore** 2:3 5:18
**theolakis** 5:18
**thief** 357:4
**thing** 7:8 16:2 25:8
27:4 30:6,7,25
39:8 44:23 49:13
54:13 56:19,21
61:25 63:22 70:12
75:24 97:9 118:3
119:23 133:14
136:15 141:24
147:9 169:17
173:19 174:2
179:21 180:19
185:25 211:7,9
212:23 213:17
219:8 224:4,6,7
225:8 228:13
234:9 248:24
250:12 252:17
253:10 260:7
281:23 283:13
306:1 310:14
315:21 325:7
326:5 339:12
343:21,23 348:1
356:17
**things** 21:22 23:14
23:22 24:2 25:6
38:24 40:10 48:15
50:24 52:8,10

56:24 64:10 65:24
71:4 73:4 74:10
74:13 76:20 83:5
83:20 86:24 87:10
102:8,13 111:11
139:21 143:14
146:4,20,22 147:1
155:8,9 157:12
167:10,15 169:2
172:11 192:14
196:10 214:2
227:2,3,23 229:9
235:18 252:6
274:17 278:13
283:5,7,15,16
290:23 291:1
295:19 319:25
350:6,7 352:15
376:6 382:16,17
387:9
**think** 8:6 15:24
17:3 20:9 22:11
27:20 35:19 44:20
44:22 48:22 49:25
50:1 54:23 59:19
59:24 61:1 66:19
66:21 67:24 68:1
72:19 75:9,11,12
79:25 81:15 84:18
85:22 86:10,16
88:14 89:12 100:9
103:8 107:24
114:7 119:19,20
121:11 122:12,14
129:18 134:8
135:24 136:7
141:14,16 144:10
150:10,15 152:8
154:2 157:22
158:15 159:7,7
176:9 180:13

182:19 190:24
199:9 200:7,12
208:16 216:8,9
218:20 222:7,24
225:17 227:22
231:15 237:8
238:6 240:15,17
241:23 242:18
247:19,20,21
248:11 251:13
254:4,6 256:9
258:25 269:8
270:5 271:13
274:8 278:3 279:1
285:3,6 290:13
293:25 294:3,3
296:25 299:15
300:1 305:21
307:23 315:2,3
316:6 318:10
320:11 321:15
324:13,18 327:14
328:16 335:16
336:6 338:17
339:9 341:4 346:8
347:1 353:23
356:8 358:3 359:4
367:3,25 373:9
374:12 380:6,11
384:12,16,22
385:18 386:2
389:25 390:6
392:1
**thinking** 25:5 93:5
154:5 237:19
251:8
**third** 47:16 71:1
87:11 117:2,19
250:11 252:11,16
275:13 342:16
344:12 353:7

375:14 383:17
**thirdly** 371:15
**thirty** 396:19
**thompson** 123:1
356:14,15,19
363:16 364:12
**thought** 9:14
16:20 44:5 89:18
115:11 116:23
134:16 141:17
142:25 143:11
151:23 214:5
216:13,21 237:20
284:20 285:22
296:13 314:8
318:20 328:18,18
333:22 342:20,23
343:4,17,20,22
344:1,7 350:13
356:24 358:4
381:21,25 384:7
385:16 387:5
390:8
**thousand** 179:4
196:9 240:13
351:23
**thread** 367:14
377:15
**three** 51:2,11 52:3
53:5 56:17 70:5
114:24 115:11,15
135:6 136:13
184:17 204:25
218:12,12,20
219:18,20 243:14
248:11 255:14
266:5 278:16
322:15 333:12,17
336:12 384:20
**throw** 128:21
177:3 286:5

**thumbs** 83:19,19
**tie** 370:22
**tied** 25:8 336:4
**tiffany** 346:8,10
**tight** 343:18
**till** 382:11 383:2
**tim** 357:16,19
358:12
**time** 5:9 7:13,20
10:19 13:16,16
19:13,14 20:2
23:16 25:8,11
27:12 28:21,21
30:15 31:5 32:21
35:16,20 36:10,13
37:8,14,14 38:11
41:16,18 43:5,24
44:4,20 45:1 48:1
48:25 50:20 51:18
52:18 55:10 56:9
57:7,7,8 58:24
60:12 67:22 68:2
68:3,5,25 69:13
70:9 72:3,4,5,18
74:22 75:13 77:4
77:16 79:14 80:3
81:25 82:22,23,24
85:1 90:1,6 91:2
94:8,10 95:3
101:20,21 104:4
105:10 106:5,13
121:17 122:22
123:9,11 124:4
125:20 127:5,8
129:14 136:25
137:19 141:15
142:5 144:2,6
145:13 149:4
152:25 153:15
154:13 155:14
157:16 160:8,12

160:13 175:9
176:7 193:1,4
195:10 198:4
207:2,12 209:11
210:4,5 214:24
215:15,22 217:2
223:11 233:23
236:8 246:17
247:11,14,16,17
247:18 248:6
249:1 250:5,11,12
252:17 263:16
285:18 292:18
296:17,18,24
297:7,22 298:2,24
299:1 300:4 301:4
306:14 310:10
312:19 315:19
318:5,12 323:18
324:9 328:25
330:6,22 332:21
335:11,17 337:22
341:9 346:6 348:2
348:8 350:16
352:5 355:6
357:13 361:6,13
366:14,16 368:18
369:8,13 370:22
378:23 379:10
380:15 386:14,25
387:15,19,22,24
388:20 390:24
394:20
**timeline** 18:22
69:11 71:5
**times** 29:23 45:4
48:4 71:9 74:2
77:21 129:6,9
146:25 147:2
159:10 222:18
229:8 243:14

331:10 335:25
380:12
**timing** 106:11
**timmer's** 323:18
**timothy** 193:18
232:14
**tints** 31:24
**tion** 357:12
**tipped** 272:12
285:20 361:16
**tire** 73:16 74:8,9
190:23 194:10,16
194:17,17 204:6
275:7
**tired** 213:7 362:5
**tires** 73:15 190:22
235:16,17 237:20
237:22 275:9
**title** 19:9 134:19
165:3 172:11
376:18 389:18
**titled** 98:1
**titles** 22:25 23:5,7
365:4
**tk** 97:9
**tkc** 4:17,17 111:2
115:7 116:7
126:10,11,13,22
128:8 234:14
329:1,3,10,15
330:15,20 331:3,5
331:15,22 343:12
383:23
**today** 28:10 35:14
51:13 63:1,5,10
106:23 109:10
225:20 229:5
244:4 245:16
253:7 307:15
308:7 309:21
312:3 315:9,22

352:24,24 357:2
357:15 368:4
385:20 392:2
**today's** 51:14,20
198:14 215:15
**told** 14:7 49:14
55:4 75:23 86:4
118:16,23 120:5
122:12,12 123:6
123:13 124:17
127:4 130:4
131:12,13 132:14
134:24 135:19
136:5,12 137:21
138:12,13 148:8
151:16 155:11
159:20 160:4,9
173:24 175:11
176:4,9,21 181:5
181:21 193:3
216:18 222:20
239:19,25 241:12
241:14 242:3,5
252:21 267:1
270:3,23 271:3
272:24 276:8
284:8 289:9 296:6
315:22 319:13,19
319:23 330:7
331:5,15 336:15
340:17,19 352:16
356:16 362:23
365:5,7,21 366:8
369:5 371:7
**tomorrow** 222:9
253:17 339:15
**ton** 52:23 72:9
207:21
**tons** 213:16
223:10,11 341:22

**top** 52:7 90:23
92:4 162:5 163:18
163:21 166:11
171:18 181:3
187:20 191:10
232:13 259:14
323:1 345:24
346:13
**total** 115:11 150:4
174:7 189:18
203:19 204:11
216:2,11 245:18
245:20 248:4
249:17,19 288:3
303:10
**totaling** 66:13
**totally** 114:16
159:1 358:22
**totals** 105:13
201:19,21 252:21
252:22,23 295:8,9
**touch** 40:4 121:4
**touchup** 186:20
192:10
**town** 366:15
**toyota** 63:3,20
303:15 306:9
307:1 311:25
327:11
**track** 189:7
191:14 297:6
**trackable** 144:2
**traction** 290:5
**trade** 46:13,24
47:4 49:18 53:1
59:13 63:22 66:3
67:19 69:18 70:13
72:3,21 112:16
136:2,4 145:19
162:24 163:1,6,11
163:12,13 165:22

165:24 166:1,25
172:20 173:5,16
173:17,22 174:6
175:24,25 176:3
190:10,12 198:16
324:7 367:23
375:15
**traded** 151:4
161:24 367:22
**trading** 47:12
172:20 174:5,7
**traditionally**
151:11 259:15
**trail** 222:3
**train** 75:10
**trainable** 390:15
**trained** 65:10
148:17 155:2
**training** 44:12
58:25
**trans** 199:5 308:6
315:13 372:16
373:17,21 374:1,2
374:9,14
**transaction** 18:14
112:19,20 177:14
227:6 229:15,17
229:18 305:18
315:12
**transactions**
180:23 206:10
210:19,21 224:18
307:13 315:21
342:12
**transcribed** 397:7
**transcript** 393:6
394:12 396:12,13
397:5,12 398:5,11
398:17
**transferred** 13:8
70:24

**transition** 18:11
**transmission**
198:19
**transparent**
307:12
**transpired** 142:10
296:17
**transport** 47:11
**trap** 224:22
**traumatic** 366:16
**traverse** 322:12
**tread** 190:22
**trend** 247:22
**tribune** 78:3
**trick** 7:16 160:20
211:3 212:8
242:14 245:12
**tried** 135:4 136:12
143:12 232:24
320:12,12 336:8
350:5,7 369:13
385:3 387:23
**trimmed** 273:25
274:10
**trouble** 133:7
140:3 260:12
282:10 287:2
289:12
**trp** 85:6
**trps** 127:11
**true** 105:19
141:18 281:5
394:16
**truly** 304:7
**trust** 313:14
337:21 338:4
390:15
**truth** 394:10
**try** 7:17 50:15
51:23 89:14,16
141:10 216:10

217:9 225:16
261:25 262:1
275:8 282:7
308:14 324:17
342:3,16 356:9
370:9,22
**trying** 7:16 49:25
57:18 88:14 89:13
100:19 106:10
121:23 124:7
141:13 142:9
160:20,24 179:9
188:7 211:3,12
212:8,21 224:21
227:13 238:5
242:14 245:12
258:25 270:6,7
282:5 298:14
320:19,23 321:18
321:25 322:25
324:6,16 339:16
346:19 352:2
354:17 356:6
359:4 368:2
379:11
**ts** 83:5
**turn** 31:15 50:18
61:2 147:21
282:25 286:23
302:10 353:22
355:9
**turnaround** 51:4
**turned** 84:16
262:8 281:23,24
282:2 370:6,8
371:2
**turning** 49:20
182:18 282:12
348:3,5 377:3
**tutoring** 310:14
338:13

**tv** 92:2,14 127:21
251:9,11
**twice** 46:21 243:25
305:5
**twin** 14:2,25 17:9
**two** 12:22 13:16
26:7 31:3 46:9,10
60:16 70:4 84:9
111:8,11 117:2,2
119:13 127:6
128:17,18 132:11
137:9 143:10
157:24 159:14
162:4 183:17
185:13 190:25
193:8 194:11,13
195:20 197:11,15
198:3 199:9
202:22 203:18
205:24,25 211:21
240:9 241:1
248:11,12 252:5
255:4 266:13
268:4,23 270:5
314:10,19 318:18
319:8 322:14
324:1 327:22
336:12 352:21
370:21,24,24
384:20
**type** 74:11 92:18
131:22 134:11
140:17 283:15
390:4
**typed** 191:8
**typewriting**
394:14
**typical** 56:19
81:21 88:19,20,20
164:13 204:25
206:19,22 274:15

325:21 326:12
**typically** 32:4,9
  34:5 50:12 64:13
  71:6,8 83:14 84:8
  90:15 92:10,18,23
  93:20 94:1 172:1
  172:10 192:22,24
  193:8,10 198:10
  198:13,25 199:1
  277:10 325:19
  326:24

**u**

**u** 5:16 94:16
  100:10 116:18
  218:8,9
**u.s.** 268:4
**uber** 120:18
**uh** 7:9,9 174:25,25
  204:24 262:20,20
  264:2,2 266:22
  279:8,8 287:15,15
  288:14,14 295:21
  295:21 303:18
  305:7 351:16
  380:22,22 381:3,3
  386:2,2
**uhs** 7:9
**ulloa** 94:15
**ultimate** 302:4
**ultimately** 196:25
**un** 230:1
**uncle** 17:19,20
  21:13,14
**uncovering** 285:22
**underneath** 24:7
  379:7
**understand** 7:16
  10:23 11:8 18:24
  22:22 26:8 27:12
  30:19 35:12 36:7
  50:19 51:20 52:22

57:12,14,15,18
62:21 64:7 67:6
85:25 96:24
103:22,24 104:11
113:18 114:12,14
115:10,14 116:15
117:17 122:16
124:6,22 125:18
125:22,24 127:24
146:18 149:9
155:18 169:3,6
172:20,22 180:1
188:20 189:3
193:7 206:4 210:6
211:12 212:22
214:4 215:18
221:16 222:16
223:15,21 224:19
225:8 227:13
238:5 266:17
268:13 296:4
300:12,13 304:17
307:18 350:18
381:25
**understanding**
  10:21 25:23 29:13
  30:23 33:20 36:11
  40:15,18 45:14,25
  51:22 58:13 60:22
  61:20 78:23 87:19
  90:9 92:5 93:18
  97:4 104:18,22
  106:3 119:16
  121:14 141:13
  142:9 148:6
  150:23 160:1
  188:21 221:10
  278:18 292:11
  302:2 330:20
  362:22 384:22
  389:17

**understood** 72:20
  150:12 233:1
**unfamiliarity**
  392:12
**unfortunately**
  47:22 216:16
  330:1 379:8
**unheard** 351:24
**union** 236:22,22
  368:23
**unique** 44:25
  155:12,13
**united** 1:1 261:16
  268:11
**university** 13:8
**unnecessary**
  144:15 208:3
  222:18 228:6,7
  230:12
**unraveled** 156:20
**unrelated** 154:17
  194:15 385:17
**untypical** 198:8
**unusual** 198:6
  207:6 352:4 373:6
**updated** 84:6
  278:7
**upload** 84:4
**ups** 388:4
**upset** 120:8
  122:24 140:2
**upsidedown**
  327:23
**upstairs** 96:8
  143:19,21 194:8
  389:21
**url** 288:1 293:17
**usa** 261:13
**usd** 105:15
**use** 33:23 37:10,12
  38:5,9 54:10,15

56:22 60:16,16,17
60:19 73:9 76:22
83:17 88:15,16
96:24 97:4,5
148:22 166:9
168:2 196:9
250:18,20 253:23
258:19 276:9
278:4 282:9,18
345:12 349:20
352:24 359:4
**user** 353:21
**uses** 357:12
**usps** 118:21,23
  119:21 239:24
  240:1 269:19
**usually** 24:15 25:4
  31:14,16 36:23
  37:5,25 41:10
  42:6 46:13 47:9
  56:19 60:16 71:19
  77:8,25 78:4,21
  80:10 87:3 119:15
  191:22 270:19
  276:9 290:10
  353:1

**v**

**v** 1:6 396:6 397:3
  398:3
**vacation** 336:4
**vaguely** 347:17
**valid** 259:23
**validity** 5:12
**valuation** 60:13
  199:23
**value** 61:6,15
  62:12 64:5 66:23
  101:10 131:1
  140:18 167:11,13
  168:16,18 169:4
  172:24,25 173:17

174:7 176:3 189:1
196:9 347:24
368:15
**values** 54:9 172:24
**vanished** 299:24
346:2
**varies** 50:23,23
**various** 109:12,12
146:20 163:20
289:19 335:4
376:6
**vauto** 64:23 65:9
99:11,13,14,14
100:25 101:3
166:6 172:23
173:7
**vazquez** 348:11
**vehicle** 3:18 40:12
42:13,13 57:6
64:4 70:22 98:1
99:19 101:7,8,15
148:24 165:4
168:8,9,25 174:5,9
186:4 190:20
191:4 200:4 256:2
287:16 301:12
303:17 304:14
312:21 313:3
314:13,22 316:15
347:10 372:13
373:7,25 376:13
**vehicles** 53:25
69:19 140:17
143:18 168:20
197:11,15 207:10
301:4,13 346:17
350:25 351:2,15
352:19 365:3,11
**vendor** 30:24
31:12,12,18,22
32:25 33:18 34:15

34:16 35:15,22
36:6,12,19,19,20
40:4,18,24 42:19
43:12 44:5 68:11
111:8 128:3,20
228:21 231:23
232:5 248:4 276:6
288:21 291:11,20
374:7
**vendors** 30:22
31:19 32:4,6,7,9
34:13 37:2 68:20
93:24 146:6
234:12 245:5
335:4
**ventilated** 69:6
**venting** 387:9
**verbalize** 7:6
**verbiage** 88:1
**verified** 355:4
**verify** 266:12,15
266:16,20
**veritext** 396:1,8
399:1
**veritext.com.**
396:17
**versa** 375:1
**versed** 135:13
**versus** 46:1,3,24
55:14 144:23
211:11 223:3,4
246:3 368:14
388:12
**vetted** 36:18
**vetting** 33:20
**vice** 375:1
**victor** 234:6
**videoconference**
1:15 2:7,13,18
394:20

**view** 197:10
258:19
**village** 395:4
**vin** 38:16 167:14
**vinyl** 93:5,19
258:19,20 273:21
274:22 275:2
278:25
**violate** 386:18
**violated** 290:25
291:1
**virtually** 6:17
**vivid** 229:24
**voce** 98:14 261:8
**voice** 130:14
**voicemail** 16:22
**volleyball** 338:19
**voluck** 2:10,21
**voluminous** 302:8
**vrank** 169:16
**vst** 353:10,12

---

**w**

**w** 15:11 31:15
100:10
**wacker** 2:4
**wait** 8:22,24 17:5
23:5 125:12,12,12
148:7,9,10 157:1
215:1,1,2,2,2,2,2,2
215:3,7,7,7 219:3
219:6,6,7 221:7
225:1 237:19
242:21,21,21,21
244:7,7,7 255:4
268:17,17 304:25
309:3 313:7
379:23,23
**waiting** 188:9
271:24 345:2
**waive** 5:11

**waived** 396:20
**wake** 40:8
**walgreens** 177:13
**walk** 21:25 42:19
73:18
**walked** 151:14
337:7
**walls** 22:3 323:10
**want** 10:20 16:7
18:22,24 22:19
25:23 29:24 30:2
30:19,22 33:23
38:5,9 39:11,14
43:13 47:15 49:12
51:18,23 52:22
55:12 61:8 64:19
65:3,17 67:21
72:14 76:4,4,22
81:18 82:9 83:5
83:15 100:17
101:8 106:3,19
109:17 110:3
112:6 119:1 121:3
122:16 126:20
131:5 134:2
137:15 144:8,9,22
145:1,1 147:20
152:5,10,11,20
153:19 157:20
160:19,21 161:21
163:19 169:21,22
172:17,21 175:13
182:20 186:7
187:20 191:22
202:14 206:13,24
214:18 215:21
218:1 219:16,25
221:19 224:25
225:3 230:4
236:25 244:24
245:21 254:20,23

**[want - wish]**

258:16 267:23
283:9 285:5
289:11 293:14
300:16 308:7,10
308:24 312:19
318:4 320:9,25
325:7,13 338:18
339:14 340:23
353:6 357:22
362:4 368:8,9,9
370:13 378:2
386:11
**wanted** 28:5,7
60:14 62:10 76:3
76:17 81:22 82:5
104:14 105:23
113:3 118:4
154:16 174:4
178:6 273:16
280:7 302:18
342:4,4,5 347:7
367:19 375:3
389:14 390:14
**wants** 120:13
**warm** 137:24
**warning** 74:9
**warranty** 70:7
**washing** 139:16
**washroom** 93:4
**waste** 215:21
298:2
**wasting** 215:15
**watch** 225:3
**watching** 215:22
**water** 138:2
323:10
**waters** 158:19
232:24 324:16
**way** 22:14 23:21
36:10 37:22 39:13
51:1 68:9 73:17

97:6 131:1 139:17
139:24 140:18
143:17 149:6
155:7 189:6
199:14,16 202:2
211:9 232:3,5,11
243:23 245:1,3
254:1 257:11
274:19 275:19
290:4 291:23
301:12,24 334:5
352:23 354:21,21
354:21,21 359:6
360:18 373:24
374:6 378:7,7,7,7
378:7,7,8,10
**ways** 21:23
**we've** 32:17 42:10
47:19 65:8,10
77:21 79:11 85:18
85:18 97:2 112:2
150:7 209:7 218:5
294:3,5 295:19
296:10,20 302:8
309:4 357:24
370:2 381:9
**wear** 157:13
**wearing** 75:15,16
**website** 166:22,23
257:11,20 260:1
287:23 388:24
389:1
**websites** 260:3
**week** 24:20 25:9
25:10 46:21 71:7
72:5,8 84:10
127:5 147:20
**weekend** 289:20
**weekends** 154:6
**weekly** 46:16,18
46:20

**weeks** 198:3
366:22 367:4,14
367:16
**weight** 128:21
177:3
**weird** 53:15
133:11 321:12,14
384:19
**welcome** 212:20
254:15
**went** 13:14 14:2
14:21,21 17:16
121:14 122:11
135:1 140:19
156:20 158:18
166:16 189:8
191:24 193:14
194:17,20 195:3
204:20 205:25
206:1 208:1
211:22 223:10
232:19 251:6,7
280:9 299:19
301:16 312:11
315:8,20 334:18
347:1 363:7
391:18
**west** 2:4 12:23
289:6 335:3
**wgn** 85:1 86:5
**whack** 348:9
**whacky** 22:5
**whatnot** 247:4
251:16 369:11
**whatsoever** 62:3
229:6
**wheel** 74:8,11
**wheels** 68:17
74:21 204:22
205:1 222:22
227:2,8,11,18

228:11 229:9
235:14 237:20
**whereof** 395:3
**white** 131:7
140:21 262:3,6,10
**whoever's** 34:20
**wholesale** 48:2
159:24 199:7
351:21,24 352:6,8
352:10,19 353:4
365:18,22
**wholesaled** 365:12
**wholesaler** 53:13
**wholesalers**
378:16
**wholesaling**
378:15
**wick** 363:15
364:11 369:8
**wife** 140:24
367:22 370:23
384:1
**wiggle** 174:9,19
**wild** 207:21 289:6
**willing** 123:5
174:6 206:6 339:7
367:7
**win** 290:20
**wind** 93:20
**window** 31:24
37:13,14,15,19
39:17,19 40:6,18
41:17 92:25
273:20,25 274:2,9
274:10,12,18
**windows** 37:25
90:25 93:6 258:14
**wise** 46:2 72:8
81:4 139:12 177:9
**wish** 180:6

| | | | x |
|---|---|---|---|

**witness** 1:18 3:3
5:7,19,21,24 6:22
9:3 11:16 25:19
33:9,11 81:12
97:16,19 98:17
100:9 103:10,12
103:16 113:14,16
133:20 150:25
177:18 180:4
214:24 216:21
217:4 220:18,23
221:1 226:15
230:15 244:6,8,15
269:11 280:15
281:9 296:13
297:15 300:10
308:20 309:2
311:5 331:9
332:11,12 369:17
382:5,23 392:3,14
393:4 394:9,9
395:3 396:9,12
397:1,4,11 398:1,4
398:15
**witness's** 211:21
**witnesses** 389:12
**witness'** 396:15
**won** 370:11
**wonder** 134:16
138:22 376:18
**wondering** 171:17
307:18
**word** 11:3 57:3
95:15 183:6 229:2
274:15 282:9
295:10 343:19
351:12 359:4
**worded** 89:1
**words** 37:10 196:8
199:19 200:2
220:24 272:5

301:18 362:17
**work** 21:16 22:21
24:13,16 34:1,10
37:20 40:12 41:3
41:7 47:20 56:21
66:2 67:18 68:20
71:4 75:12 89:12
94:18 118:12
121:13,24 123:13
135:8 146:5,7
153:25 154:6
156:6,10 165:3
176:8 177:13
186:17,25 188:20
189:14 190:4
191:25 195:23
208:20 222:21
228:17,21,23,25
231:21 237:14
239:15 246:19
253:4 270:3
288:18 294:16
299:25 332:6
337:2,3 342:23
345:13 346:24
355:8 358:11
360:11 361:2,8
378:24
**work's** 94:23
**worked** 13:14,15
79:3 80:14 106:21
139:4,6,17 151:18
197:18 234:13,17
234:18 236:12,18
236:20 285:20
293:2 346:25
361:6 390:23,25
**workers** 159:18
**working** 153:21
182:1 236:8 288:8
291:25 336:17

357:19
**works** 24:13 37:23
94:3 144:24
165:19 172:20
**world** 51:21 79:25
274:20 368:17
**worlds** 198:23
**worried** 52:5
**worry** 52:6
**worth** 54:10
112:15 151:6
161:16 162:1
166:7 227:8
367:24
**wrap** 141:3
**wrapped** 374:25
**write** 7:10 196:10
256:11 352:18
**writes** 194:4,6
**writing** 7:7 178:16
183:18,21,24
184:5 201:10
281:9 302:22
**written** 44:15
65:12 179:13
185:12 256:11
303:6 330:15
**wrong** 36:12 49:13
67:5 83:1 90:10
99:18 106:22
148:23 168:22
211:4 212:10
238:7 257:20
302:19 320:21
362:21 370:6
**wrongdoers** 32:16
**wrongdoing**
237:12 238:6
320:17 361:9
**wrongdoings**
237:2

**x** 3:1
**xyz** 276:18

| y |
|---|

**y** 2:10 343:10
**yeah** 8:25 11:22
13:2,4,4,7 14:15
15:25 16:4 17:7
22:8 23:1 27:3
28:15 30:17 34:3
35:11 36:15 38:5
43:21 45:15,15
48:8 52:19 55:15
58:2 61:17 62:17
64:15 65:8,10,14
65:21 66:17 73:14
78:14 85:24 86:13
87:23 94:7,19
95:13,21 96:12,16
97:2 98:7,7,9,9,11
102:2,10 103:11
103:16,16 104:1
104:13 106:9,10
109:7 112:14
121:11,11 124:15
125:3,17 127:2
128:6 130:13
138:7 140:21
141:23 142:8
145:1,5,21 153:1
153:10,18 154:7
158:14 162:9
167:12 171:12
172:3,12,12 177:2
181:10 185:19
187:1 188:9
190:13 192:4
193:6,13 195:6,12
196:24 198:8,12
200:5 203:17,23

204:13,17 207:10
207:18,20 210:11
214:20 223:13
232:11 233:3,12
234:8 237:10
238:8 240:17,20
240:22 241:12
242:11 247:10,19
249:23 250:2,2,2
251:8,11,11 252:4
254:25 255:6
256:21 258:2
259:21 261:22
264:25,25,25
265:22 268:21
269:6,23 271:11
275:12,14,17
277:3 278:22
281:10,25 284:10
290:22 291:6
293:10,20 295:1
295:18 297:8,12
301:23 303:12
305:4 306:14
307:2,3 308:2
316:5 320:7 321:4
321:12,22 322:5
324:23,24 325:2
328:6 329:7,8
332:15 334:1
335:16,21 336:15
339:1 341:7,16
342:14 344:5,22
347:15,17 348:16
348:16,24,24,24
348:25 351:20
354:25 356:10,23
360:7,11,11 363:3
363:22 364:6,11
367:18 370:1,1,13
372:24 374:10

375:22 376:12
377:1 379:3,6,25
382:2 385:21
386:20 391:14
**year** 16:8,18 17:2
18:13 23:12 35:19
43:6,21 48:1 49:1
63:6,6 65:9 86:6
157:25 216:9,10
217:10 232:20
233:7 253:17
290:11 324:9
365:23 367:23
368:22
**year's** 290:11
**years** 13:12,15,16
14:18 15:12 62:6
62:15 127:6
131:15 157:24
193:9 218:12,12
218:20 219:18,20
257:14 278:17
290:6 302:11
319:5 390:14
**yell** 382:23
**yep** 111:21 114:10
202:15 356:18
**yesterday** 29:7,8
30:6,7 103:8
113:13,15 157:10
366:19
**yukon** 201:1

**z**

**z** 100:9,10 277:24
278:6
**zealand** 16:17
**zero** 30:13
**zip** 54:15
**zoom** 6:11 30:7
163:19 171:14
273:17

**zr1** 318:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MIKE ANDERSON CHEVROLET OF CHICAGO, LLC, | ) ) ) | Case No. 1:20-cv-06161 |
| Plaintiff, | ) ) | Judge Franklin U. Valderrama |
| vs. | ) ) | Magistrate Judge Sunil R. Harjani |
| QBE INSURANCE CORPORATION, | ) ) | |
| Defendant. | ) | |

## DEFENDANT QBE INSURANCE CORPORATION'S
## NOTICE OF DEPOSITION OF MIKE ANDERSON
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE RULE 30

To:     Eric F. Quandt
        Scharf Banks Marmor LLC
        333 West Wacker Drive, Suite 450
        Chicago, IL 60606
        T: 312-726-6000
        F: 312-726-6045
        equandt@scharfbanks.com

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, on September 30, 2021 at 9:00 a.m., I shall take the deposition upon oral examination of Mike Anderson before an official court reporter duly authorized by law to take depositions by Zoom (details TBD), and for the purpose of discovery, or use at trial, or for such other purposes as are permitted under the Federal Rules of Civil Procedure. You are required to produce the deponent for examination at the time and place indicated.

**EXHIBIT**

Anderson Dep #1

Dated: September 16, 2021                    Respectfully submitted by:


/s/ Jean Y. Liu

Stefan R. Dandelles
Jean Y. Liu
KAUFMAN DOLOWICH & VOLUCK, LLP
135 S. LaSalle Street, Suite 2100
Chicago, IL 60603
T: 312-759-1400
F: 312-896-9403
sdandelles@kdvlaw.com
jliu@kdvlaw.com
Attorneys for Defendant, QBE Insurance
Corporation

## CERTIFICATE OF SERVICE

I, Jean Liu, hereby certify that on September 16, 2021, I caused a copy of the foregoing document to be served upon the below listed counsel of record via electronic mail.

Eric F. Quandt
Theodore Banks
Scharf Banks Marmor LLC
333 West Wacker Dr., Ste. 450
Chicago, Illinois 60606
equandt@scarfbanks.com
tbanks@scharfbanks.com


DATED:     September 16, 2021     By:    /s/ Jean Y. Liu_____

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MIKE ANDERSON CHEVROLET OF CHICAGO, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:20-cv-06161 |
| vs. | ) ) ) | Judge Franklin U. Valderrama |
| QBE INSURANCE CORPORATION, | ) ) | Magistrate Judge Sunil R. Harjani |
| Defendant. | ) ) | |

**DEFENDANT QBE INSURANCE CORPORATION'S**
**NOTICE OF DEPOSITION OF PLAINTIFF MIKE ANDERSON CHEVROLET OF**
**CHICAGO, LLC PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)**

To:    Eric F. Quandt
        Scharf Banks Marmor LLC
        333 West Wacker Drive, Suite 450
        Chicago, IL 60606
        T: 312-726-6000
        F: 312-726-6045
        equandt@scharfbanks.com

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant QBE Insurance Corporation ("QBE"), by and through its counsel, will take the subpoenaed deposition(s) of Plaintiff Mike Anderson Chevrolet of Chicago, LLC ("MACC") on October 7, 2021 at 1:00 p.m. by Zoom (details TBD).

PLEASE TAKE FURTHER NOTICE that MACC is not a natural person. Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, MACC must designate one or more officers, directors, managing agents, or other persons to testify on its behalf regarding the matters listed in Schedule "A" attached hereto and the matters on which MACC will be examined are the matters described in Schedule "A" attached hereto.

**EXHIBIT**

Anderson Dep #2

YOU ARE FURTHER NOTIFIED THAT the deposition will be taken by oral examination before an official court reporter duly authorized by law to take depositions, and for the purpose of discovery, or use at trial, or for such other purposes as are permitted under the Federal Rules of Civil Procedure. The testimony shall be recorded by real time stenographic means, by audio, by video, and/or other similar means. QBE reserves the right to amend or supplement this Notice of Deposition and corresponding Schedule "A". This reservation of rights survives any deposition taken pursuant to this Notice should any discovery sought by QBE not be produced in time to be addressed at any scheduled deposition. This deposition does not limit or prejudice QBE's rights under the Federal Rules of Civil Procedure to further depose MACC or any other witness.

Dated: September 16, 2021                    Respectfully submitted by:

                                             */s/* Jean Y. Liu

                                             Stefan R. Dandelles
                                             Jean Y. Liu
                                             Kaufman Dolowich & Voluck, LLP
                                             135 S. LaSalle Street, Suite 2100
                                             Chicago, IL 60603
                                             T: 312-759-1400
                                             F: 312-896-9403
                                             sdandelles@kdvlaw.com
                                             jliu@kdvlaw.com
                                             Attorneys for Defendant, QBE Insurance
                                             Corporation

## SCHEDULE A

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, MACC shall designate and produce as many representatives as are necessary to provide complete and substantive testimony on behalf of MACC. If MACC designates multiple witnesses, it shall set out the matters upon which each designee will testify.

## DEFINITIONS

1.      The "Transactions" shall mean the transactions purportedly resulting in MACC's purported loss as described in Paragraph 10 of the Amended Complaint filed in this Lawsuit.

2.      "Third Parties" shall mean AC Kustoms Corp., TKC Entertainment, Epic Sports, J&N Marketing, Inc., and Sir Hooptie, LLC.

3.      "Related to" or "relating to" shall mean directly or indirectly mentioning or describing, pertaining to in any way, being connected with, or reflecting upon a stated subject matter.

4.      "Communication" shall include, but not limited to, e-mails, text messages, notes or memoranda.

5.      The singular shall include the plural and the plural shall include the singular.

6.      A masculine, feminine, or neutral pronoun shall not exclude the other genders.

## MATTERS FOR EXAMINATION

1.      Jason Kolodzinski's employment, including his employment duties while employed with MACC.

2.      The alleged loss at issue in this litigation, including the purported acts alleged in the loss further set forth in Paragraph 10 of the Amended Complaint filed in this Lawsuit.

3.      The Transactions.

4.      Any communications related to the Transactions.

5.      Jason Kolodzinski's relationship to the Transactions and/or to the alleged loss at issue in this Lawsuit.

6.      Investigation(s) of the Transactions.

7.      MACC's policies, procedures and/or protocols for obtaining and paying for the types of services or items purportedly purchased in the Transactions.

8.      MACC's document retention or document destruction policies, practices, or procedures between 2015 to 2018.

9.      Jason Kolodzinski's MACC email account.

10.     MACC employees who worked with Jason Kolodzinski between 2015 and 2018, including supervisor(s) and individual(s) who reported to him.

*QBE reserves the right to supplement this list of matters for examination.*

**<u>CERTIFICATE OF SERVICE</u>**

I, Jean Liu, hereby certify that on September 16, 2021, I caused a copy of the foregoing

document to be served upon the below listed counsel of record via electronic mail.

Eric F. Quandt
Theodore Banks
Scharf Banks Marmor LLC
333 West Wacker Dr., Ste. 450
Chicago, Illinois 60606
equandt@scarfbanks.com
tbanks@scharfbanks.com

DATED:     September 16, 2021     By:   /s/ Jean Y. Liu_____

<u>Used Vehicle Purchase Procedures</u>

Sales Manager (MGR) negotiates with seller on price of vehicle.  MGR confirms on VAuto that price is within range to re-sell with a profit.

MGR prepares paperwork which includes:

- Hand written purchase order
- Odometer
- IL Power of Attorney
- Title
- Payoff information, if applicable
- Cyberdrive print screen of VIN inquiry
- Autocheck
- DL, if applicable

These documents are reviewed by Title Clerk.  She stocks in vehicle in VIN, and cuts check, if applicable. Title Clerk gives all documents, including check, to Controller to approve check written.



**EXHIBIT**

Anderson Dep  #3

MACC 000318

Police Report + Original Ins. Claim

**EXHIBIT**

Anderson Dep  #4

MACC:POL 000001

*3/6/18 Called Priya 212-805-1851*
*She will review what I had submitted + call*
*me by the end of the week. She didn't review*
*what I had sent thoroughly.*

**QBE**

## SWORN PROOF OF LOSS

**Parent Company:** *Mike Anderson Chevrolet of Chicago* (the "**Parent Company**")

**Insuring Company:** QBE Insurance Corporation

**Policy No.:** QPL0766816 (the "**Policy**")

**Policy Period:** October 1, 2017 to October 1, 2018

**Claim No.:** 565862N

**State of** *In*

**County of** *Lake* ss:

I, *Mike Anderson*,
(Name and Title of Authorized Representative of the Insured)

hereby certify that *Mike Anderson Chevrolet of Chicago* suffered direct loss of **Money**,
(Insured)

**Securities** or **Property** resulting from **Theft** or **Forgery** as those terms are defined by the Policy by

*Jason Kolodzinski* who was employed by the Insured as
(Name of Employee)

*General Manager* at the time of the **Theft** or **Forgery**.
(Title and/or Position)

The loss of **Money**, **Securities** or **Property** resulting from **Theft** or **Forgery** totals

$ *>250,000. (under investigation)* (USD). Attached is a detailed Statement of Loss (**Attachment A**),

including any recoveries and all other credits, and the balance stated is the true net loss from

*3 | 7 | 16* (Date) to *1 / 15 / 18* (Date).

Further, I, on behalf of the Insured, certify that the loss was discovered on

*approx  12-15*, 20*17* by *Mike Anderson, owner*
(Name(s) and Title(s))

Initials

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

   <u>Attachment B</u> provides a detailed statement of the known facts and circumstances surrounding the direct loss of **Money, Securities** or **Property** to the Named Insured resulting from **Theft** or **Forgery** by _Jason Koladzinski_ , including the circumstances surrounding **Discovery** of the loss.
   (Name of Employee)

   By signing below, I represent and warrant that I have the authority to execute this sworn proof of loss. I further attest that nothing has been withheld or misrepresented regarding said loss and that this statement along with any attachments, incorporated herein by reference, is a complete and truthful recital of the known facts. To my knowledge, the loss did not originate by any act or design on the part of the Insured, nothing has been done by or with the consent of the Insured to violate the conditions of the Policy, or render it void, and no attempt to deceive the said Insurer as to the extent of said loss, has in any manner been made. I also represent that no other potentially applicable insurance is available for the claimed loss.

   By providing this blank form, the Insurer does not waive and expressly reserves all rights and defenses, including the right to seek additional information and documentation in connection with its investigation and settlement of the claim. Any other information that may be required will be furnished and considered a part of this proof of loss.

Insured: _Mike Anderson Chevrolet of Chicago_

By: _[signature]_

Name: _Mike Anderson_

Title: _Managing Member_

Sworn to and subscribed before me this _1_ day of _MARCH_ , 20 _18_

_[signature]_

Notary Public
My Commission Expires: _6/19/2021_

Initials _[signature]_

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

MACC:POL 000003

**Attachment B**

## DETAILED STATEMENT OF LOSS

See attached

Initials

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

**CHICAGO POLICE DEPARTMENT**
# ORIGINAL CASE INCIDENT REPORT

3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11.388(6/03)-C)

RD #: **JB166932**

EVENT #: **1805803018**

Case ID: 11241824  CASR229

## ASSIGNED TO FIELD

**IUCR:** 1130 - Deceptive Practice - Fraud Or Confidence Game

| | | |
|---|---|---|
| **Occurrence Location:** 5333 W Irving Park Rd | **Beat:** 1634 | **Unit Assigned:** 5719 |
| Chicago IL 60641 | | **RO Arrival Date:** 27 February 2018 07:30 |
| 278 - Auto / Boat / Rv Dealership | | |

**Occurrence Date:** 07 March 2016 09:00 - 15 January 2018 21:00

## VICTIM

**Name:** MIKE ANDERSON
CHEVROLET

| | | |
|---|---|---|
| **Res:** 5333 W Irving Park Rd | **Beat:** 1634 | |
| Chicago IL 60641 | | |
| | **Beat:** 5100 | |

### Other Communications and Availability

**Business Phone:** 773-465-2000

## PERSON REPORTING OFFENSE

| | | Demographics |
|---|---|---|
| **Name:** ▉▉▉▉▉ | | |
| **Res:** ▉▉▉▉▉ | **Beat:** 4100 | ▉▉▉▉▉ |
| | **Beat:** 5100 | |

### Other Communications and Availability

**Business Phone:** ▉▉▉▉▉

## Suspect # 1

| | | Demographics | |
|---|---|---|---|
| **Name:** ▉▉▉▉▉ | | | **DOB:** ▉▉▉▉▉ |
| **Res:** ▉▉▉▉▉ | **Beat:** 1834 | ▉▉▉▉▉ | **Age:** |

### Other Communications and Availability

## DOMESTIC INFO

RD #: JB166932

| | | |
|---|---|---|
| Print Generated By: ▉▉▉▉▉ | Page 1 of 2 | 28-FEB-2018 10:51 |

CLEAR technology

MACC:POL 000005

**Chicago Police Department - Incident Report**                                   RD #:   JB166932

<table>
<tr><td rowspan="5">NARRATIVE</td><td>█████, Controller for Mike Anderson Chevrolet, reported that it was discovered the former General Manager, ██████ from the Mike Anderson Chevrolet located at 5333 W Irving Park Rd, hired various vendors for advertising and services which never occurred. ██████ reported that there was a text from ████████ that was sent to the owner of Mike Anderson Chevrolet in error asking for his "kickback". ██████ reported that at the time of the report there is approximately a loss in excess of $200,000.</td></tr>
</table>

| | | Star No | | Name | | Date | Unit | Beat |
|---|---|---|---|---|---|---|---|---|
| **PERSONNEL** | Approving Supervisor | 1170 | ████ | **BLASUCCI, Mark, A** | ████ | 27 Feb 2018 11:45 | 606 | |
| | Detective/Investigator | 20587 | | **BRYANT, Sandra, G** | | 27 Feb 2018 11:46 | 606 | |
| | Reporting Officer | 20587 | | **BRYANT, Sandra, G** | | 27 Feb 2018 08:09 | 606 | 5719 |

powered by CLEAR Technology

MACC:POL 000006

Mike Anderson Chevrolet of Chicago

Manager Meeting 1/18/2018 in Mike's office

Attendees: Mike Anderson, Hazem Mutawe, Tiffany Santiago, and Barbara Flores

Mike started the meeting.

He said that there were rumors in the summer of 2017 regarding Jason with the purchasing of used vehicles from Epic. Mike said that Terry Fakhoury was trying to get Rolando De Luna fired, so Terry can be the F&I Manager. Mike said that Terry Fakhoury and Jesse Fakhoury approached him regarding the used vehicle purchases. Johanna Vazquez and Jess Fakhoury also approached Mike Anderson SR regarding the matter. Mike stated that he looked into the numbers and did not find that the rumor was substantiated.

Fall of 2017, Mike questioned J & N Marketing bills. They are supposed to send out mailers from our database we provide them. We no longer use this company.

October of 2017, Mike Sr advised Mike JR to ask Hazem Mutawe and Dan Remboski, off site, what they thought about the rumors of the used car issue. Mike said that Dan said he did not understand how this is happening.

October of 2017, Mike instructed Jason to NOT purchase any more vehicles from Sir Hooptie and Epic Motor Sports. Rather, Jason was to purchase vehicles directly from the auction.

November Wholesale Loss was atrocious, with a loss of $59k. Mike approached Jason regarding the wholesale loss. Jason was defensive. According to Mike, Jason pointed fingers at everyone else.

Mike kept Jason in the hot seat. He kept pressure on Jason. Mike said that he felt Jason was growing more distant.

Mike Sr received several text messages from Jason that were meant to be sent to Rory from Epic. The conversation is attached to this memo.

Mike asked Hazem to investigate who Jason was purchasing the Manheim Auction vehicles from. Haz was able to prove that Epic was the seller of several vehicles Jason purchased through the auction.

Mike asked Barbara Flores to call VST to get the cameras shut down from Jason's access. He also asked for all accesses to software and Manheim Auction Access to be removed.

Jason was absent, no call, no show on Tuesday 1/16/2018, but purchased 9 vehicles under our name at Manheim Arena Auction, 4 from Epic.

Jason was absent, no call, no show on Thursday 1/18/2018, but purchased 1 vehicle under our name at Manheim Chicago Auction, the seller was Epic.

We will re-convene to address the plan going forward.

MACC:POL 000008

# LYMAN LAW FIRM
### Attorneys at Law



**Direct Contact:**
Mark M. Lyman
Partner
(312) 762-9524

mark@lymanlawus.com
www.lymanlawus.com

January 24, 2018

<u>Via Email and Regular Mail</u>
midwestcorvettes@yahoo.com

Jason Kolodzinski
600 N. Lakeshore Dr., Unit 3203
Chicago, Illinois 60611

Re: <u>Used Vehicle Purchases</u>
Our File: Drivin (Corporate)

Dear Mr. Kolodzinski:

My firm represents Mike Anderson Chevrolet. We have investigated your dealings with Epic Motorsports, J & N Marketing, and AC Customs. We have information to support our belief that there was impropriety with each third party. We are seeking additional information from them to confirm the same.

I strongly encourage you to contact me to arrange a meeting in my office with you, your attorney, and a representative from Mike Anderson Chevrolet. If I do not hear from you within 5 days, we have been directed to protect our client's interests.

Sincerely,

*Mark M. Lyman*

Mark M. Lyman

cc: Mike Anderson (via email only)

227 West Monroe Street, Suite 2650, Chicago, Illinois 60606
Fax: (312) 704-4500

MACC:POL 000009

# LYMAN LAW FIRM
## Attorneys at Law



**Direct Contact:**
Mark M. Lyman
Partner
(312) 762-9524

mark@lymanlawus.com
www.lymanlawus.com

January 30, 2018

<u>Via Email and Regular Mail</u>
nick@jnpromosdirect.com

Nick Cornfield
J&N Marketing
19139 S. Blackhawk Pkwy
Mokena, Illinois  60448

Re:    <u>Mike Anderson Chevrolet of Chicago – Mail Marketing</u>
        Our File: Mike Anderson Chevrolet (Corporate)

Dear Mr. Cornfield:

      My firm represents Mike Anderson Chevrolet of Chicago.  We are investigating certain marketing efforts performed or arranged by your company for my client.  Please forward to me all documentation related, directly or indirectly, to advertising work performed for my client within the last twelve (12) months, including but not limited to, all contracts, agreements, invoices, communications, cancelled checks, receipts related to such advertising services, and all payments made by your company to Jason Kolodzinski.

      You are hereby placed on notice to preserve all documents related to the above and not to destroy or dispose of any such documentation regardless of how it is stored or maintained by you.  Please contact me to discuss the above and arrange for the transfer and/or delivery of the above-mentioned information.

      Sincerely,

Mark M. Lyman

cc:    Mike Anderson (via email only)

---

227 West Monroe Street, Suite 2650, Chicago, Illinois 60606
Fax: (312) 704-4500

MACC:POL 000010

# LYMAN LAW FIRM
### Attorneys at Law



**Direct Contact:**
Mark M. Lyman
Partner
(312) 762-9524

mark@lymanlawus.com
www.lymanlawus.com

January 31, 2018

<u>Via Email and Regular Mail</u>
midwestcorvettes@yahoo.com

Jason Kolodzinski
600 N. Lakeshore Dr., Unit 3203
Chicago, Illinois 60611

Re:  <u>Mike Anderson Chevrolet of Chicago – Mail Marketing</u>
Our File: Mike Anderson Chevrolet (Corporate)

Dear Mr. Kolodzinski:

We are investigating marketing services provided to Mike Anderson of Chicago by J & N Marketing. Please forward to me all documentation related to and communications with J & N Marketing and/or Nick Cornfield within the last twelve (12) months, including but not limited to, all contracts, agreements, invoices, emails, receipts, and all payments made to you by J & N Marketing and/or Nick Cornfield.

We are also investigating business dealings between you, Epic Motorsports, Inc. and Rory Sperling that took place during your employment with my client. Please forward to me all communications between you, Epic Motorsports, Inc. and/or Rory Sperling as well as copies of any agreements, invoices, buyer's orders and copies of payments made to you by Epic Motorsports, Inc.

Further you are hereby placed on notice to preserve all documents related to the above and not to destroy or dispose of any such documentation regardless of how it is stored or maintained by you.

Please contact me to discuss the above and arrange for the transfer and/or delivery of the above-mentioned information.

Sincerely,

Mark M. Lyman

cc:  Mike Anderson (via email only)

227 West Monroe Street, Suite 2650, Chicago, Illinois 60606
Fax: (312) 704-4500

MACC:POL 000011

# CHICAGO POLICE DEPARTMENT
# VICTIM INFORMATION NOTICE

CPD-11.380, Part 3-English-(Rev. 2/98)

---

RD Number: **JB166932**　　　　　Occurrence Date: **07-MAR-2016 09:00**　　　　Beat of Assign: **5719**

Primary Class.: **DECEPTIVE PRACTICE**　　　　Secondary Class.: **FRAUD OR CONFIDENCE GAME**

Occurrence Address: **5333 W IRVING PARK RD**　　　　　　　　　　　　Occ. Beat: **1634**

Type of Location of premise where offense occurred (give name of location if applicable)

**278　　　AUTO / BOAT / RV DEALERSHIP**

## IMPORTANT: KEEP THIS NOTICE FOR YOUR PERSONAL RECORDS

CASE NAME - PEOPLE OF THE STATE OF ILLINOIS/CITY OF CHICAGO vs._____
If an arrest has taken place, the following is your court information:
Date:_____ Time:_____ Court branch:_____ Court Loc.:_____
If you need more help call the Victim/Witness Assistance Program of the Cook County State's Attorney's  Office at (773)869 - 7200

## VICTIM INFORMATION NOTICE/ CHICAGO POLICE DEPARTMENT
### THIS IS NOT AN OFFICIAL POLICE REPORT - IT IS FOR INFORMATION PURPOSES ONLY

Your case will be on file with the Chicago Police Department under the above listed R.D. Number. Refer to this number whenever you are communicating with the Chicago Police Department concerning this incident. Your case will be assigned for follow-up investigation based upon specific facts obtained during the initial investigation. The presence of these facts can predict whether a comprehensive follow-up investigation would likely result in the arrest and prosecution of the suspect(s) or the recovery of property. Your case will be reviewed and retained to determine if criminals active in the area can be identified. *A detective will not routinely contact you unless additional information is required or your further assistance is needed.*

## TO REPORT ADDITIONAL INFORMATION
If you have knowledge of specific facts which might assist in the investigation of your case, please contact the unit marked below:

|  | FOR PROPERTY CRIMES | FOR VIOLENT CRIMES | FOR YOUTH DIVISION |
|---|---|---|---|
| AREA 1 | 747-8384 | 747-8380 | 747-8385 |
| AREA 2 | 747-8273 | 747-8272 | 747-8276 |
| AREA 3 | 744-8263 | 744-8261 | 744-8266 |
| AREA 4 | 746-8253 | 746-8252 | 746-9259 |
| AREA 5 | 746-8362 | 746-8282 | 746-8365 |
| BOMB & ARSON(all Areas) | 746-7619 | AUTO THEFT(all Areas) | 746-5566 |

## COPY OF THE REPORT
The above listed R.D. Number may suffice for insurance purposes, however, there may be instances when a copy of the case report is desired. A copy of the case report which verifies that an incident of injury, loss or damage has been reported to the Chicago Police Department may be obtained after 14 working days from the date the incident was reported. To obtain a copy of the report, send a check or money order payable to the *"DEPARTMENT OF FINANCE - CITY OF CHICAGO"* in the amount of $.50 and a self-addressed stamped return envelope to:
　　　　　Chicago Police Department
　　　　　Records Inquiry Section, Room 1027
　　　　　3510 South Michigan Ave.
　　　　　Chicago, IL 60653
Include the following information with your request: 1) Victim's name and address (or person reporting crime), 2)Type of incident, 3)Address of occurrence, 4)R.D. Number.

## MAKE THE RIGHT CALL
To report a crime in progress or other emergency that requires immediate police response, call **9-1-1**.
To report non-emergency situations, call the Police Department at **3-1-1**.
## CHICAGO ALTERNATIVE POLICING STRATEGY(CAPS)
## SAFE NEIGHBORHOODS ARE EVERYBODY'S BUSINESS
The police alone cannot solve the problems of crime in our City. It takes an active and informed community working with the police and other City agencies to really make a difference. Join your neighbors and your neighborhood police officers as we work together to reduce crime and improve the quality of life in our City. Become part of the CAPS team in your community. To find out how, call:
　　　　　**CAPS HOTLINE**　　744-CAPS(744-2277)
More information about CAPS is availble on the **World Wide Web** at http://www.ci.chi.il.us

You live on Beat_____. You next Beat: Community Meeting will be held(date and time)
_____ at (location)_____

## TELECOMMUNICATIONS DEVICE FOR THE DEAF/TELETYPE (TDD/TTY)
Hearing-impaired persons who possess such equipment may communicate with the Chicago Police Department 24 hours a day by calling **746-9715**. Hearing-impaired persons in need of assistance during normal business hours may also

---

MACC:POL 000012

# CHICAGO POLICE DEPARTMENT
## VICTIM INFORMATION NOTICE

CPD-11.380, Part 3-English-(Rev. 2/98)

contact their local police district or the Preventive Programs and Neighborhood Relations Division at **745-5806.**

### RECOVERY OF PROPERTY - STOLEN VEHICLE RECOVERED
The Chicago Police  Department must be notified *IMMEDIATELY,* via the "9-1-1" emergency number, when property reported lost or stolen is recovered.

### CREDIT CARDS - CHECKS, LOST OR STOLEN
Immediately notify the concerned credit card issuer or bank by telephone to reduce the possibility of being liable for the unauthorized use of your lost or stolen credit card or check. It is suggested that you also inform the credit card issuer or bank in writing as a follow-up measure to ensure proper notification.

### ILLINOIS CRIME VICTIMS NOTIFICATION
Innocent victims of violent crime may be eligble to receive benefits from the Illinois Crime Victims Compensation Program for such costs as medical, funeral, loss of support and wage loss, *NO RECOVERY IS PROVIDED FOR PROPERTY LOSS OR DAMAGE, NOR FOR PAIN OR SUFFERING.* To apply or to determine whether one qualifies, the victim or, if deceased, a relative or dependent, must contact the Illinois Attorney General's Office.

Further information and claim forms can be obtained from:

        Crime Victims Compensation Program
        Office of the Attorney General of Illinois
        100 West Randolph Street, 13th Floor
        Chicago, IL   60601
        Telephone: 814-2581

MACC:POL 000013

FILED DATE: 9/15/2020 9:39 AM   2020L009850

## IN THE CIRCUIT COURT OF ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| Mike Anderson Auto Group, | ) | |
| Plaintiff | ) | Case No. |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| QBE Insurance Corporation | ) | |
| Defendants. | ) | |

### AMENDED SWORN PROOF OF LOSS

State of ___I N___

County of ___Lake___  ss

I, Mike Anderson, hereby certify that on March 1, 2018 I signed under oath the attached Sworn Proof of Loss Form for the direct loss of Money suffered by Mike Anderson Chevrolet of Chicago, the Insured, under the Policy of Insurance with QBE Insurance Corporation, the Insurer, which Sworn Proof of Loss Form is attached hereto and incorporated herein.

At that time investigation revealed that the direct loss of Money from Theft or Forgery was greater than $250,000.00 (USD) with the matter under continued investigation. Additional investigation discloses that up to the present time the amount of direct loss of Money from Theft or Forgery totals $588,800.00 (USD) and falls within the following categories of Theft or Forgery committed by Jason Kolodzinski, who was employed by the Insured as General Manager, at the time of the Theft or Forgery.

| | |
|---|---|
| (a). **Direct Mail Advertising.** Kolodzinski claimed to have used a company called J&N for mail advertising. Mike Anderson Chevy was billed $191,000, but no mail was sent. The owner of a graphic design firm used by J&N said that no work was actually done. Kolodzinski failed to submit the materials to Mike Anderson for review prior to mailing, contrary to his instructions. He was told to stop but continued to | $191,000 |

**EXHIBIT**

Anderson Dep #5

PLAINTIFF'S
EXHIBIT
"C"

MACC:POL 000014

FILED DATE: 9/15/2020 9:39 AM    2020L009850

| | |
|---|---|
| submit invoices that were paid by the dealership without Mike Anderson's knowledge or approval. He did not submit the proper receipts from the USPS for the alleged mailings. The dealership was told that the one purported USPS receipt Kolodzinski submitted was fraudulent. | |
| **(b.)** <u>Radio Advertising</u>. Kolodzinski claims to have placed radio ads through a company called TKC in the amount of $75,000. TKC, despite requests, refused to submit proof of running the ads. To pay TKC invoices, Kolodzinski, instead of mailing the checks, gave the checks to someone who picked them up at the dealership. The checks were cashed at a nearby currency exchange. | $75,000 |
| **(c.)** <u>Purchase of Used Cars from Epic</u>: Kolodzinski purchased 91 cars from a company called Epic from March 2016 through January 2018. These cars were purchased at prices significantly higher than market, and many had hidden damages that led to and caused many customer complaints. Losses are estimated at approximately $131,000. Kolodzinski was told to stop purchasing cars from Epic in October 2017 but continued to do so surreptitiously until he was terminated in January 2018. A text message from Kolodzinski | $131,000 |

FILED DATE: 9/15/2020 9:39 AM   2020L009850

| | |
|---|---|
| indicated that he did it because he needed money, which suggests that a kickback was involved. | |
| (d). **Purchase of Cars from Sir Hooptie.** Kolodzinski caused the dealership to lose $5800 for two cars purchased from Sir Hooptie, and associated repair and accessory charges. Kolodzinski had been told not to deal with this company. | $5,800 |
| (e). **Inflated Repair Charges.** Kolodzinski sent cars to a company called AC and incurred inflated and sometimes unnecessary repair charges of approximately $176,000. These charges were incurred even though the dealership has its own mechanics on staff. Some of those repair charges were for cars purchased from AC and Sir Hooptie. | $176,000 |
| (f). **Personal Trade-In.** Kolodzinski traded-in a Corvette he owned, and give himself an inflated appraisal of the car, at approximately $10,000 more than it was worth. | $10,000 |

Insured:     Mike Anderson Chevrolet of Chicago

Signed by:     Mike Anderson

Signed:     _____

Sworn and subscribed before me this 20 day of July 2020

Notary Public     _____

My Commission Expires:     11/7/27



FILED DATE: 9/15/2020 9:39 AM   2020L009850

*need to evaluate*
*3/6/18 Called Priya 212-805-9859*
*She will review what I had submitted & call*
*me by the end of the week. She didn't review*
*what I had sent thoroughly.*

*Emailed 3-1-18*

## QBE.

### SWORN PROOF OF LOSS

**Parent Company:** _Mike Anderson Chevrolet of Chicago_ (the "Parent Company")

**Insuring Company:** QBE Insurance Corporation

**Policy No.:** QPL0766816 (the "Policy")

**Policy Period:** October 1, 2017 to October 1, 2018

**Claim No.:** 565862N

State of _In_

County of _Lake_ ss:

I, _Mike Anderson_
(Name and Title of Authorized Representative of the Insured)

hereby certify that _Mike Anderson Chevrolet of Chicago_ suffered direct loss of Money,
(Insured)

Securities or Property resulting from Theft or Forgery as those terms are defined by the Policy by

_Jason Kolodzinski_ who was employed by the Insured as
(Name of Employee)

_General Manager_ at the time of the Theft or Forgery.
(Title and/or Position)

The loss of Money, Securities or Property resulting from Theft or Forgery totals

$ _>250,000.- (under investigation)_ (USD). Attached is a detailed Statement of Loss (Attachment A),

including any recoveries and all other credits, and the balance stated is the true net loss from

_3/7/16_ (Date) to _1/15/18_ (Date).

Further, I, on behalf of the Insured, certify that the loss was discovered on

_approx 12-15_, 20_17_ by _Mike Anderson, owner_
(Name(s) and Title(s))

Initials

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

**PLAINTIFF'S EXHIBIT "B"**

MACC:POL 000017

FILED DATE: 9/15/2020 9:39 AM    2020L009850

**Attachment B** provides a detailed statement of the known facts and circumstances surrounding the direct loss of **Money, Securities or Property** to the Named Insured resulting from **Theft or Forgery** by

_Jason Kolotzinski_, including the circumstances surrounding **Discovery** of the loss.
(Name of Employee)

By signing below, I represent and warrant that I have the authority to execute this sworn proof of loss. I further attest that nothing has been withheld or misrepresented regarding said loss and that this statement along with any attachments, incorporated herein by reference, is a complete and truthful recital of the known facts. To my knowledge, the loss did not originate by any act or design on the part of the insured, nothing has been done by or with the consent of the insured to violate the conditions of the Policy, or render it void, and no attempt to deceive the said insurer as to the extent of said loss, has in any manner been made. I also represent that no other potentially applicable insurance is available for the claimed loss.

By providing this blank form, the insurer does not waive and expressly reserves all rights and defenses, including the right to seek additional information and documentation in connection with its investigation and settlement of the claim. Any other information that may be required will be furnished and considered a part of this proof of loss.

Insured: Mike Anderson Chevrolet of Chicago

By: _[signature]_

Name: Mike Anderson

Title: Managing Member

Sworn to and subscribed before me this _1_ day of _MARCH_, 20_18_

Notary Public _[signature]_
My Commission Expires: 6/19/2021

Initials _[initials]_

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

MACC:POL 000018

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MIKE ANDERSON CHEVROLET OF      )
CHICAGO, LLC,      )
     )
         Plaintiff      )      Case No. 1:20-cv-06161
     )
v.      )      Judge Franklin U. Valderrama
     )
     )      Magistrate Judge Sunil R. Harjani
QBE INSURANCE CORPORATION      )
     )
         Defendant.      )

**AMENDED COMPLAINT AT LAW**

Now Comes Plaintiff Mike Anderson Chevrolet of Chicago, LLC, by and through counsel, and for its Amended Complaint At Law against Defendant QBE Insurance Corporation states as follows:

**FACTS**

1. Plaintiff Mike Anderson Chevrolet of Chicago, LLC (hereinafter "MACC") was at all relevant times an Illinois limited liability company under the parent company Mike Anderson Auto Group insured under a Policy of Insurance issued by Defendant QBE Insurance Corporation, doing business in Cook County, Illinois (hereinafter "QBE Policy") attached to this Amended Complaint as Exhibit "A" and incorporated herein, and Mike Anderson Auto Group payed the premium under the QBE Policy. Under the "ADDITIONAL INSURED COMPANY ENDORSEMENT" to the QBE Policy attached hereto as Exhibit "A", Plaintiff Mike Anderson Chevrolet of Chicago, LLC is an additional insured company under the QBE Policy.

2. Defendant QBE Insurance Company, 55 Water Street, New York, New York 10041 was at all relevant times an insurance company providing insurance coverage and doing business in Cook County, Illinois.

3. Jason Kolodzinski was at all relevant times the former general manager and employee of MACC.

4. During the Policy Period under the QBE Policy Jason Kolodzinski as an employee of MACC committed "Employee theft" under the QBE Policy, acting alone or in collusion with others, resulting in substantial direct financial loss to MACC.

5. A QBE Sworn Proof of Loss Claim (No. 565862N) was executed by the owner of Plaintiff MACC on or about March 1, 2018, attached to this Amended Complaint as Exhibit "B",

1

**EXHIBIT**

Anderson Dep #6

Blstocker.com

MACC:Complaint 000001

and incorporated herein, and submitted to Defendant QBE. The loss of Money, Securities or Property resulting from Theft or Forgery stated in the Proof of Loss Claim was "greater than $250,000 – (under investigation))." Since executing the Proof Claim Form investigation has revealed direct financial loss to Plaintiff in the amount of $588,800.00. An Amended Sworn Proof of Loss is attached to this Amended Complaint as Exhibit "C" and incorporated herein.

6. Plaintiff has made demand for coverage under the QBE Policy for the direct financial losses suffered as a result of the Employee theft covered under the QBE Policy.

## FEDERAL JURISDICTION – DIVERSITY OF CITIZENSHIP

7. Mike Anderson Chevrolet of Chicago, LLC is an Illinois limited liability company, whose members and their domiciles are listed below:

| MEMBER | DOMICILE |
|--------|----------|
| Michael J. Anderson | Illinois |
| Chris Anderson | Florida |
| Katy Props | Indiana |
| Paul Anderson | Indiana |
| Joan Scott | Indiana |
| Daniel C. Anderson | Minnesota |

QBE Insurance Corporation is a Pennsylvania corporation with its principal place of business in New York. Complete diversity jurisdiction exists.

## AMOUNT IN CONTROVERSY EXCEEDS $75,000

8. MACC seeks to recover damages from QBE for the alleged Loss totaling $558,800.00 exclusive of interest and costs. Federal jurisdiction exists under 28 U.S.C. § 1332.

## COUNT I

9. Plaintiff incorporates the paragraphs alleged above as if fully restated and re-alleged.

10. The specific acts of Employee theft committed by Jason Kolodzinski during the relevant times of employment and the direct financial loss suffered by Plaintiff are as follows:

| | |
|--|--|
| (a). **Direct Mail Advertising.** Kolodzinski claimed to have used a company called J&N for mail advertising. Mike Anderson Chevy was billed $191,000, but no mail was sent. The owner of a graphic design firm used by J&N said that no | $191,000 |

2

| | |
|---|---|
| work was actually done. Kolodzinski failed to submit the materials to Mike Anderson for review prior to mailing, contrary to his instructions. He was told to stop but continued to submit invoices that were paid by the dealership without Mike Anderson's knowledge or approval. He did not submit the proper receipts from the USPS for the alleged mailings. The dealership was told that the one purported USPS receipt Kolodzinski submitted was fraudulent. | |
| (b.) **Radio Advertising**. Kolodzinski claims to have placed radio ads through a company called TKC in the amount of $75,000. TKC, despite requests, refused to submit proof of running the ads. To pay TKC invoices, Kolodzinski, instead of mailing the checks, gave the checks to someone who picked them up at the dealership. The checks were cashed at a nearby currency exchange. | $75,000 |
| (c). **Purchase of Used Cars from Epic**. Kolodzinski purchased 91 cars from a company called Epic from March 2016 through January 2018. These cars were purchased at prices significantly higher than market, and many had hidden damages the led to and caused many customer complaints. Losses are estimated at approximately $131,000. Kolodzinski was told | $131,000 |

3

| | |
|---|---|
| to stop purchasing cars from Epic in October 2017 but continued to do so surreptitiously until he was terminated in January 2018. A text message from Kolodzinski indicated that he did it because he needed money, which suggests that a kickback was involved. | |
| (d). **Purchase of Cars from Sir Hooptie.** Kolodzinski caused the dealership to lose $5800 for two cars purchased from Sir Hooptie, and associated repair and accessory charges. Kolodzinski had been told not to deal with this company. | $5,800 |
| (e). **Inflated Repair Charges.** Kolodzinski sent cars to a company called AC and incurred inflated and sometimes unnecessary repair charges of approximately $176,000. These charges were incurred even though the dealership has its own mechanics on staff. Some of those repair charges were for cars purchased from AC and Sir Hooptie. | $176,000 |
| (f). **Personal Trade-In.** Kolodzinski traded-in a Corvette he owned, and give himself an inflated appraisal of the car, at approximately $10,000 more than it was worth. | $10,000 |

11.    Demand has been made on Defendant QBE for coverage under the QBE Policy for the direct financial losses stated above in paragraph 10.

12.    Defendant has not compensated Plaintiff for the losses suffered by Plaintiff covered under the QBE Policy which is a breach the contractual and fiduciary obligations by Defendant QBE Insurance Corporation under the QBE Policy.

4

MACC:Complaint 000004

13. WHERFORE, Plaintiff Mike Anderson Chevrolet of Chicago, LLC prays for judgment against Defendant QBE Insurance Corporation in the amount of $588,800.00 plus costs of this action.

14. Plaintiff demands trial by jury.

MIKE ANDERSON CHEVROLET OF CHICAGO, LLC

By: /s/ Eric F. Quandt
One of Its Attorneys

Eric F. Quandt
Theodore L. Banks
Scharf Banks Marmor LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606
(312) 726-6000
equandt@scharfbanks.com
tbanks@scharfbanks.com

5

MACC:Complaint 000005

FILED DATE: 9/15/2020 8:39 AM    2020L008650

# QBE® Insurance Corporation
A Stock Company



*The Solution for Management Liability*

**Home Office:**

c/o CT Corporation System
116 Pine Street, Suite 320
Harrisburg, Pennsylvania 17101

**Administrative Office:**

Wall Street Plaza
88 Pine Street
New York, New York 10005
1-877-772-6771

QBE and the links logo are registered service marks of QBE Insurance Group Limited.

QBEP-3033 (05-14)



Page 1 of 2

MACC:Complaint 000006

FILED DATE: 9/15/2020 8:39 AM   2020L008850

This policy consists of:

Declarations
One or more coverage parts.
A coverage part consists of:
— One or more coverage forms
— Applicable forms and endorsements

QBE Insurance Corporation

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Robert V. James
President

Jose Ramon Gonzalez, Jr.
Secretary

QBBP-3033 (05-14)

Page 2 of 2

MACC:Complaint 000007

POLICY NUMBER: QPL0756816

 QBE

QBBP-3010 (09-14)

**The Solution**
General Terms and Conditions Declarations

QBE Insurance Corporation
55 Water Street, New York, New York 10041
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.

Item 1: Parent Company: Mike Anderson Auto Group

Mailing Address: 4301 E. Market St.
Logansport, IN 46947

Item 2: Policy Period From: October 1, 2017 To: October 1, 2018
At 12:01 A.M. Standard Time at the mailing address stated in Item 1

Item 3: Limit of Liability $6,000,000 Combined Maximum Aggregate of Liability for Liability Coverage Parts

Item 4: Coverage Parts: Directors & Officers Liability
Employment Practices Liability
Fiduciary Liability
Crime

Item 5: A. Notice to Insurer of a Claim or circumstance:

QBE Insurance Corporation
Attn: The Claims Manager
55 Water Street
New York, New York 10041
Telephone: (877) 772-6771
Email: professional.liability.claims@us.qbe.com

B. All Other Notices to Insurer:

QBE Insurance Corporation
Attn: Underwriting
55 Water Street
New York, New York 10041
Telephone: (877) 772-6771
Email: MLPLadmin@us.qbe.com

Item 6: Extended Reporting Period
Premium; 100% of Annual Premium
Length: One Year

Item 7: Premium: $39,953

In witness whereof, the Insurer has caused this Policy to be executed, but it shall not be valid unless also signed by a duly authorized representative of the Insurer.

MACC:Complaint 000008

FILED DATE: 9/15/2020 8:39 AM   2020L009850



**The Solution**
**General Terms and Conditions**

In consideration of the payment of the premium, the insurer and the insureds agree as follows:

**I.   PREAMBLE**

The insurance coverages offered in this Policy are part of a portfolio of insurance coverages, consisting of this General Terms and Conditions ("GTC") and any Individual Liability Coverage Parts and Non-Liability Coverage Parts purchased, as stated in Item 4 of the Declarations of this GTC. The type of coverage provided by each of the Liability Coverage Parts and Non-Liability Coverage Parts are identified in each particular Coverage Part. Unless expressly stated to the contrary, the terms, conditions and limitations in this GTC apply to the entire Policy, whereas the terms, conditions and limitations of each Individual Coverage Part only apply to that particular Coverage Part. In the event of a conflict between any terms, conditions or limitations of the GTC and any terms, conditions and limitations of any Individual Coverage Part, the terms, conditions and limitations of the Individual Coverage Part shall control.

**II.   EXCLUSIONS**

No coverage shall be provided under any Liability Coverage Part for Loss on account of that portion of a Claim:

A.   **Bodily Injury/Property Damage** – for bodily injury, mental anguish, emotional distress, humiliation, sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is damaged or destroyed;

B.   **Conduct** - based upon, arising out of or resulting from any deliberate fraud, deliberate criminal act or deliberate violation of any statute or regulation, or any illegal profit or remuneration, by an insured, established by a final, non-appealable adjudication adverse to such insured in any underlying action, and the insurer shall not utilize a declaratory action or proceeding brought by or against the insurer to establish such final, non-appealable adjudication;

C.   **ERISA** - for any violation of the responsibilities, obligations or duties imposed by ERISA or for any functions identified in ERISA Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions;

D.   **Pending or Prior Proceedings** - based upon, arising out of or resulting from an action, proceeding or Claim commenced against an insured pending on or prior to the Pending or Prior Proceedings Date stated in the Declarations of each applicable Liability Coverage Part;

E.   **Pollution** - based upon, arising out of or resulting from any:

   1.   discharge, emission, release, dispersal or escape of any Pollutants or any threat thereof;

   2.   treatment, removal or disposal of any Pollutants; or

   3.   regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any Pollutants,

   including any Claim for financial loss to a Company, its securityholders or its creditors based upon, arising from or in consequence of any matter described in paragraphs 1, 2, or 3 above;

F.   **Prior Notice** - based upon, arising out of or resulting from any claim reported, or any circumstance reported and accepted, under the insurance policy (including any policies of which such policy is a renewal policy) replaced by this Policy; and

G.   **Wage and Hour** - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by any law governing wage, hour or payroll, including the Fair Labor Standards Act;

Exclusions D and F above shall not apply where this Policy is a renewal of a policy issued by the insurer to the Parent Company.

With respect to all Policy exclusions, no conduct or knowledge of any insured shall be imputed to any other insured Person, and solely with respect to Exclusion B, only the conduct or knowledge of any past, present or future chief executive officer or chief financial officer of a Company shall be imputed to such Company and its Subsidiaries.

**III.   RETENTION OR DEDUCTIBLE**

A.   Any Retention or Deductible applicable to any Coverage Part shall apply as set forth in each Coverage Part and in the amount(s) stated in the Declarations of each Coverage Part. If different parts of a single Claim are

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000009

subject to different Retentions or Deductibles, then the total amount of Loss applied to the applicable Retentions or Deductibles shall not exceed the largest applicable Retention or Deductible.

B. No Retention shall apply to any Loss for which an Insured Person is not indemnified by a Company because of such Company's Financial Impairment.

## IV. LIMIT OF LIABILITY

A. The Combined Maximum Aggregate Limit of Liability, stated in Item 3 of the Declarations of this GTC, represents the maximum amount payable under all Liability Coverage Parts during the Policy Period for all Liability Coverage Parts combined.

B. The Limit of Liability, stated in Item 2 of the Declarations of each Liability Coverage Part, represents the maximum amount payable under each Liability Coverage Part during the Policy Period for any one Claim and in the aggregate as set forth in each such Liability Coverage Part.

C. Defense Costs are part of, and not in addition to, the Limit of Liability of each Liability Coverage Part.

D. The remaining portion of each of the limits of liability described above shall be the limits of liability available during any Extended Reporting Period applicable to any Coverage Part.

## V. REPORTING

A. Notice of any Claim under any Liability Coverage Part is considered timely when reported to the Insurer as soon as practicable after the Parent Company's chief executive officer or chief financial officer first becomes aware of such Claim. The Insurer shall not assert that notice of a Claim was untimely unless the Insurer is materially prejudiced by the untimely notice. However, in no event shall any notice be provided later than:

1. if the applicable Liability Coverage Part expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of such expiration or termination; or

2. the expiration date of the Extended Reporting Period, if applicable.

B. Notice requirements involving any Non-Liability Coverage Part shall be in accordance with the reporting requirements set forth in such Non-Liability Coverage Part.

C. Notice of any circumstance which could give rise to a Claim under any Liability Coverage Part is optional. If an Insured elects to report any circumstance which could give rise to a Claim:

1. such notice shall include information regarding the nature of any Wrongful Acts or alleged or potential damages and the names of any actual or potential defendants; and

2. any Claim that may subsequently arise out of a reported circumstance shall be deemed to have been first made during the Policy Period in which such circumstance was first reported.

## VI. DEFENSE AND SETTLEMENT

A. With respect to any Claim under any Liability Coverage Part, the Insurer shall have the right and duty to defend any Claim, unless otherwise specifically stated in a particular Liability Coverage Part. The Insurer shall have such right and duty to defend even if any of the allegations in such Claim are groundless, false or fraudulent. Any such duty to defend shall cease upon exhaustion of the applicable Limit of Liability.

B. With respect to any Claim under any Liability Coverage Part:

1. the Insured shall:

(a) not agree to any settlement, stipulate to any judgment, incur any Defense Costs, admit any liability or assume any contractual obligation, without the Insurer's prior written consent, provided that, unless otherwise stated in a particular Liability Coverage Part, the Insured may settle any Claim, without the Insurer's prior written consent, where the amount of such settlement, including Defense Costs, does not exceed the applicable Retention or Deductible;

(b) not do anything that could prejudice the Insurer's position or its potential or actual rights of recovery; and

(c) agree to provide the Insurer with all information, assistance and cooperation which the Insurer may reasonably require,

provided that the failure of any Insured to comply with any of the requirements in paragraphs (a) - (c) above, shall not impair the rights of any Insured Person under this Policy; and

2. the Insurer:

QBSP-1004 (11-14)

Page 2 of 8

FILED DATE: 9/15/2020 9:39 AM   2020L008850

(a) may make any investigation it deems reasonably necessary and may, with the consent of the insureds, make any settlement of any Claim it deems appropriate; and

(b) shall not be liable for any such settlement, stipulation, incurred Defense Costs, admission or assumed obligation to which it has not given its prior written consent, and the Insurer shall not unreasonably withhold such consent.

## VII. ALLOCATION

If in any Claim, the insureds who are afforded coverage for a Claim incur Loss that is covered by this Policy and loss that is not covered by this Policy because such Claim includes both covered and uncovered matters, 100% of Defense Costs incurred by such insured shall be covered Loss, and all loss other than Defense Costs shall be allocated between covered Loss and uncovered loss based upon the relative legal exposures of the parties to such matters.

## VIII. TREATMENT OF RELATED CLAIMS

All Related Claims shall be deemed a single Claim first made during the policy period in which the earliest of such Related Claims was either first made or deemed to have been first made in accordance with Section V. REPORTING above.

## IX. SUBROGATION

A. In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the insureds' rights of recovery, and the insureds shall take all reasonable actions to secure and preserve the Insurer's subrogation rights.

B. In no event shall the Insurer exercise any subrogation right against an Insured Person. In any subrogation action against a Company, it is agreed that each Company agrees to fulfill any indemnification obligations to the fullest extent permitted by law and any contract or agreement providing an indemnification obligation exceeding any such law.

C. If the Insurer recovers, either through subrogation or recoupment, any portion of an amount paid under this Policy, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## X. EXTENDED REPORTING PERIOD

With respect to all Liability Coverage Parts:

A. If this Policy does not renew, or terminates other than for non-payment of premium, the insureds shall have the right to purchase an ERP for the premium and time period stated in item 6 of the Declarations. In the event of the non-renewal or termination of one or more Liability Coverage Parts of this Policy, the insureds may purchase an ERP solely as respects the Liability Coverage Part(s) that has been non-renewed or terminated.

B. The right to an ERP shall lapse unless written notice of election to purchase such ERP, together with payment of the specified premium, is received by the Insurer within 30 days after the effective date of non-renewal or termination of the Policy. In the event the Parent Company elects not to purchase an ERP and an individual insured or group of insureds elects to purchase such ERP, such ERP shall only apply to Claims against such insured or group of insureds.

C. The premium for the ERP shall be deemed fully earned at the inception of the ERP.

D. Any ERP purchased shall become part of the Policy Period, extending such Policy Period to the expiration of the time period stated in item 6 of the Declarations, but only with respect to Loss on account of a Claim for a Wrongful Act taking place before the effective date of non-renewal or termination.

## XI. CHANGES IN EXPOSURE

A. New Companies and Old Companies

This Policy's treatment of Subsidiaries shall be as stated below and as supplemented by any individual Coverage Part.

Any insured of a Subsidiary:

1. acquired before or during the Policy Period is eligible for coverage under any:

(a) Liability Coverage Part, but only for Loss on account of a Claim for a Wrongful Act which occurs after the date of such acquisition; and

QBBP-1004 (11-14)

Page 3 of 6

MACC:Complaint 000011

FILED DATE: 9/15/2020 9:39 AM    2020L008850

    (b) Non-Liability Coverage Part, but only after the effective date of such acquisition, and with respect to the Crime Coverage Part, subject to Section VIII. Other insurance of such Coverage Part.

2. ceasing to be a Subsidiary before or during the Policy Period is eligible for coverage under any:

    (a) Liability Coverage Part, but only for Loss on account of a Claim for a Wrongful Act which occurs while such entity was a Subsidiary; and

    (b) Non-Liability Coverage Part, as provided in such Non-Liability Coverage Part, but such Subsidiary and its insureds shall cease to be insureds under such Non-Liability Coverage Part as of the date of such cessation.

B. **Acquisition of the Parent Company**

In the event of a Change in Control of the Parent Company during the Policy Period:

1. any Liability Coverage Part shall remain in force until the expiration of the Policy Period, but only for any Claim for a Wrongful Act which occurs prior to such acquisition;

2. the entire premium for this Policy shall be deemed fully earned as of the effective date of such Change in Control; and

3. the Parent Company shall be entitled to receive a quote for an extension of the Liability Coverage Parts ("Run-Off Coverage") solely for Claims for Wrongful Acts which occurred prior to a Change in Control. Coverage offered pursuant to such quote shall be subject to additional or different terms and conditions and payment of additional premium. Any Run-Off Coverage purchased shall replace any Extended Reporting Period provided under Section X. EXTENDED REPORTING PERIOD.

XII. **NOTICE**

A. All notices to the Insurer under this Policy of any event, loss, Claim or circumstances which could give rise to a Claim shall be given in writing to the address listed in Item 5A of the Declarations, and any such notice shall be deemed notice under the Policy in its entirety.

B. All other notices to the Insurer under this Policy shall be given in writing to the address listed in Item 5B of the Declarations.

C. Any notice under this Policy shall be effective on the date of mailing or receipt by the Insurer, whichever is earlier.

XIII. **TERMINATION OF POLICY**

This Policy shall terminate at the earliest of:

A. 20 days after receipt by the Parent Company of written notice from the Insurer of termination for non-payment of premium;

B. expiration of the Policy Period; or

C. surrender of the Policy to the Insurer by the Parent Company or notice to the Insurer by the Parent Company stating when such cancellation will take effect, and in either case any returned premium shall be computed on a pro rata basis.

XIV. **REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGE**

A. In issuing this Policy, the Insurer has relied upon the information and representations in the Application as being true and accurate, and the Application is the basis for, and considered incorporated into, this Policy.

B. The Application shall be construed as a separate request for coverage by each Insured, without any knowledge possessed by an Insured being imputed to any other Insured Person.

C. If the Application contains any misrepresentation made with the actual intent to deceive or which, for reasons other than simple negligence or oversight, materially affect the Insurer's acceptance of the risk or the hazard assumed, the Insurer shall not be liable for Loss on account of any Claim based upon, arising out of or resulting from either of such misrepresentations:

1. with respect to any Insured Person who had actual knowledge of any misrepresentation described in paragraph C above, and the Insurer can demonstrate that with such actual knowledge, such Insured Person reasonably believed that a Claim would arise from such misrepresentation;

2. with respect to any Company, if the Insured Person described in paragraph 1 above is a past or present chief executive officer or chief financial officer of the Parent Company.

MACC:Complaint 000012

FILED DATE: 9/15/2020 9:39 AM    2020L008850

D. The insurer shall not be entitled under any circumstances to void or rescind this Policy with respect to any insured.

### XV. EFFECT OF BANKRUPTCY

Bankruptcy or insolvency of any insured shall not relieve the insurer of its obligations nor deprive the insurer of its rights or defenses under this Policy.

### XVI. WORLDWIDE TERRITORY

This Policy shall apply anywhere in the world, and any reference to laws, however described, shall include all U.S. federal, state and local statutory laws, all amendments to and rules and regulations promulgated under any such laws, common law, and any equivalent body of law anywhere in the world, unless specifically stated to the contrary.

### XVII. ROLE OF THE PARENT COMPANY

The Parent Company shall act on behalf of each insured with respect to paying premiums, receiving any return premiums, agreeing to endorsements to this Policy and the giving or receiving of any notice provided for in this Policy (except notices of a Claim or circumstance which could give rise to a Claim or notice to apply for an ERP).

### XVIII. VALUATION AND FOREIGN CURRENCY

All premiums, limits, retentions, Loss and other amounts under this Policy are expressed and payable in the currency of the United States of America. If any element of Loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the exchange rate published in The Wall Street Journal on the date the element of Loss is due.

### XIX. ALTERATION, ASSIGNMENT AND HEADINGS

A. Any change in or modification of this Policy or assignment of interest under this Policy must be agreed to in writing by the insurer.

B. The descriptions and headings and sub-headings of this Policy are solely for convenience, and form no part of the terms, conditions and limitations of coverage.

### XX. ESTATES, HEIRS, LEGAL REPRESENTATIVES, ASSIGNS, SPOUSES AND DOMESTIC PARTNERS

With respect to any Liability Coverage Part, Insured Person shall include:

A. the estate, heirs, legal representatives or assigns of any Executive, if such Executive is deceased, legally incompetent, insolvent or bankrupt; and

B. the lawful spouse or domestic partner of any Executive solely by reason of such spouse's or domestic partner's: 1. status as such; or 2. ownership interest in property which a claimant seeks as recovery for an alleged Wrongful Act of such Executive,

provided that no coverage shall apply with respect to loss arising from an act, error or omission by any estate, heir, legal representative, assign, spouse or domestic partner of an Insured Person.

### XXI. TRADE SANCTIONS

This insurance coverage does not apply to the extent that trade or economic sanctions of any country prohibit the insurer or any member of the insurer's group from providing insurance coverage.

### XXII. GLOSSARY

The following terms shall have the meaning ascribed to such terms in each applicable Coverage Part: Claim, Defense Costs, Insured, Insured Person, Loss and Wrongful Act.

A. Application means where provided to the insurer, the application and any accompanying documentation submitted to the insurer for this Policy or any documentation submitted to the insurer in connection with the underwriting of this Policy.

B. Change in Control means:

1. the Parent Company's merger with, or acquisition by, another entity or the acquisition of all or substantially all of its assets by another entity, such that the Parent Company is not the surviving entity; or

2. when a person or entity or group of persons or entities acting in concert, acquires securities or voting rights which result in ownership or voting control by such person(s) or entity(ies) of more than 50% of the

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000013

FILED DATE: 9/15/2020 9:39 AM  2020L009850

outstanding securities or voting rights representing the present right to vote for or appoint directors or Managers of the Parent Company.

C. **Company** means the Parent Company and any Subsidiary, any foundation, political action committee or charitable trust controlled or sponsored by the Parent Company or any Subsidiary, and the Parent Company or any Subsidiary in its capacity as a debtor in possession under United States bankruptcy law.

D. **Employee** means any natural person whose labor or service was, is or will be engaged and directed by a Company, including a part-time, seasonal, leased and temporary employee, intern or volunteer. Employee does not include an independent contractor.

E. **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")).

F. **Executive** means any natural person who was, now is or shall become:

1. a duly elected or appointed director, officer, Manager, trustee, regent, governor, risk manager, comptroller or in-house general counsel of any Company organized in the United States of America, or in a functionally equivalent or comparable role to any of the foregoing; or

2. a holder of a functionally equivalent position or comparable role to those described in paragraph 1 above in a Company that is organized in a jurisdiction other than the United States of America, including any position on an advisory board or committee.

G. **Extradition** means any formal process by which an Insured located in any country is or is sought to be surrendered to any other country for trial or otherwise to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

H. **Financial Impairment** means the status of a Company resulting from: 1. the appointment by a state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate such Company; or 2. such Company becoming a debtor in possession under United States bankruptcy law.

I. **Liability Coverage Part** means any Coverage Part identified in this Policy as a "Liability Coverage Part" within the heading to such Coverage Part or providing third party liability coverage in such Coverage Part.

J. **Manager** means any natural person, who was, now is, or shall become, a manager, member of the Board of Managers or equivalent executive of a Company that is a limited liability company.

K. **Non-Liability Coverage Part** means any Coverage Part or insuring clause in this Policy that does not provide any third party liability coverage.

L. **Parent Company** means the entity named in Item 1 of the Declarations.

M. **Policy Period** means the period of time stated in Item 2 of the Declarations of this GTC (subject to any termination in accordance with Section XIII. TERMINATION OF POLICY) and the ERP, if applicable.

N. **Pollutants** means any solid, liquid, gaseous or thermal irritants or contaminants, including smoke, soot, vapor, fumes, acids, chemicals, alkalis, asbestos, asbestos products or waste. Waste includes materials to be reconditioned, recycled or reclaimed.

O. **Related Claims** means all Claims based upon, arising out of or resulting from the same or related, or having a common nexus of, facts, circumstances or Wrongful Acts.

P. **Subsidiary** means:

1. any entity while more than 50% of the outstanding securities or other equity ownership, representing the present right to vote for election of, or to appoint, directors, Managers, or the foreign equivalent of any such directors or Managers of such entity, are owned or controlled by the Parent Company directly or indirectly through one or more Subsidiaries; or

2. any entity while the Parent Company has the right, pursuant to either written contract or the bylaws, charter, operating agreement or similar documents of a Company, to elect or appoint a majority of the Board of Directors of a corporation or Managers.

MACC:Complaint 000014

POLICY NUMBER: QPL0766816

 **QBE.**

QBBP-3006 (05-14)

*The Solution* for Directors & Officers and Entity Liability
Coverage Part Declarations

QBE Insurance Corporation
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.

**Item 1:** Parent Company:   Mike Anderson Auto Group

**Item 2:** A. Limit of Liability

$2,000,000 per Claim
$2,000,000 in the aggregate

B. Securityholder Derivative Demand Investigation Limit: $250,000

**Item 3:** Additional Limit for Non-Indemnifiable Loss: $1,000,000

**Item 4:** Retention:

A. Insuring Clause B: $25,000 per Claim
B. Insuring Clause C: $25,000 per Claim

**Item 5:** Pending or Prior Proceedings Date: October 1, 2009

QBBP-3006 (05-14)

Page 1 of 1

MACC:Complaint 000015



**The Solution** for Private Company
Directors & Officers and Entity Liability
Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

**I.  INSURING CLAUSE**

**A.  Side A - Non-Indemnifiable Loss Coverage for Insured Persons**

The Insurer shall pay, on behalf of an Insured Person, Loss on account of a Claim first made during the Policy Period, to the extent that such Loss has not been paid or indemnified by any Company.

**B.  Side B - Corporate Reimbursement Coverage for Indemnification of Insured Persons**

The Insurer shall pay, on behalf of a Company, Loss on account of a Claim first made during the Policy Period to the extent the Company pays or indemnifies an Insured Person for such Loss.

**C.  Side C - Entity Coverages**

The Insurer shall pay, on behalf of a Company, Loss on account of a Claim, and Defense Costs on account of a Securityholder Derivative Demand Investigation, first made during the Policy Period.

**II.  EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim:

**A.  Insured v. Insured -** brought by, or on behalf of:

1.  a Company against another Company;

2.  a Company or Outside Entity against an Insured Person;

3.  an Insured Person, in any capacity, against an Insured,

provided that:

(a)  Exclusion A2 above shall not apply to a Claim brought: (i) outside the United States of America, Canada or their territories or possessions; (ii) while the Parent Company or Outside Entity is in Financial Impairment; (iii) as a securityholder derivative action; or (iv) while an Insured Person is no longer serving in his capacity as such; and

(b)  Exclusion A3 above shall not apply to any Claim: (i) for employment-related Wrongful Acts against an Insured Person; (ii) for contribution or indemnity; (iii) brought by an Insured Person who has ceased serving in his capacity as such for at least 1 year; or (iv) brought by, on behalf of or with the participation of a whistleblower;

**B.  Publicly Traded Securities -** based upon, arising out of or resulting from any public offering of, or purchase or sale of, equity or debt securities issued by any Company or Outside Entity, provided that this Exclusion B shall not apply to any Claim based upon, arising out of or resulting from the Company's: 1. securities that are not required to be registered; 2. failure to undertake or complete an initial public offering or sale of its securities; or 3. preparation for any public offering, including any "road show" presentation to potential investors or other similar presentation;

Exclusions C - I below shall only apply to Insuring Clause C, Side C - Entity Coverages:

**C.  Antitrust -** based upon, arising out of or resulting from anti-trust, price fixing or discrimination, restraint of trade, monopolization, unfair trade practices, predatory pricing or false advertising;

**D.  Contract -** based upon, arising out of or resulting from any liability in connection with any contract or agreement to which a Company is a party, provided that this Exclusion D shall not apply to the extent that such Company would have been liable in the absence of such contract or agreement;

**E.  Employment Practices -** based upon, arising out of or resulting from any employment-related Wrongful Act;

**F.  Intellectual Property -** based upon, arising out of or resulting from any infringement of copyright, patent, trademark, trade dress, trade name or service mark or any misappropriation of ideas, trade secrets or other intellectual property rights;

QBEP-1000 (05-14)                                                                                        Page 1 of 4

MACC:Complaint 000016

G. **Personal Injury** - based upon, arising out of or resulting from any defamation (including libel and slander), disparagement, wrongful entry or eviction, invasion of privacy, false arrest, false imprisonment, assault, battery, loss of consortium, malicious use or abuse of process or malicious prosecution.

H. **Professional Services** - based upon, arising out of or resulting from the performance of or failure to perform Professional Services; and

I. **Third Party Discrimination or Harassment** - based upon, arising out of or resulting from any discrimination against, or harassment of, any third party.

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1. Exclusion A. Bodily Injury/Property Damage shall not apply to any Claim under Insuring Clause A; and

2. Exclusion E. Pollution shall not apply to any Claim: (a) under Insuring Clause A; or (b) brought by a securityholder of a Company against an Insured Person.

## III. RETENTION

No retention shall apply to any Claim under Insuring Clause A or to any Securityholder Derivative Demand Investigation.

## IV. LIMIT OF LIABILITY

A. The Securityholder Derivative Demand Investigation Limit stated in Item 2B of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for Defense Costs on account of all Securityholder Derivative Demand Investigations, which amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2A of such Declarations.

B. The Additional Limit for Non-Indemnifiable Loss stated in Item 3 of the Declarations of this Coverage Part represents an additional limit of liability available solely to an Executive or natural person General Partner for Loss on account of a Claim covered under Insuring Clause A. This additional limit of liability shall be in addition to and not part of, and excess of any other insurance written specifically as excess of, the Limit of Liability stated in Item 2A of such Declarations.

## V. ADVANCEMENT

A. If a Company fails to respond to an Insured Person's request for indemnification within 60 days of the Insured Person's request to the Company for such indemnification, then upon the reporting of the Claim, the Insurer shall advance Defense Costs and any other incurred Loss until such time that the Company accepts the Insured's request for indemnification or the Limit of Liability set forth in Item 2A of the Declarations of this Coverage Part has been exhausted, whichever occurs first. In any other Claim, the Insurer shall advance Defense Costs on a current basis, but no later than 60 days after receipt of the legal bills and any supporting documentation.

B. If it is determined by a final adjudication that any advanced Defense Costs are not covered under this Coverage Part, the Insureds, severally according to their respective interests, shall repay such uncovered Defense Costs to the Insurer, provided that nothing in this paragraph B shall limit the final non-appealable adjudication requirement in Exclusion B: Conduct of Section II. EXCLUSIONS of the GTC. If the Insurer recovers any portion of an amount paid under this Coverage Part, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## VI. REPORTING

Notice of a Securityholder Derivative Demand Investigation is optional, but only Loss incurred after such Securityholder Derivative Demand Investigation is reported is eligible for coverage under this Coverage Part. If an Insured elects to report any Securityholder Derivative Demand Investigation, any Claim that may been first made during the Policy Period in which such investigation was first reported.

## VII. OTHER INSURANCE

A. With the exception of insurance written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for Loss for which this Coverage Part also provides coverage, provided that any payment by an Insured of a retention or deductible under any such other insurance shall reduce the applicable Retention under this Coverage Part by the amount of such payment which would otherwise have been Loss under this Coverage Part.

MACC:Complaint 000017

FILED DATE: 9/15/2020 9:39 AM   2020L009850

B. This Coverage Part shall also be excess of and shall not contribute with any indemnity provided, and any valid and collectible insurance maintained, by an Outside Entity for an Insured Person serving in his capacity as such for the Outside Entity.

C. Any personal umbrella excess liability insurance, independent directors liability insurance or any other similar personal liability insurance available to an Insured shall be specifically excess of this Coverage Part.

## VIII. PRIORITY OF PAYMENTS

A. In the event that Loss under Insuring Clause A and any other Loss are concurrently due under this Coverage Part, then the Loss under Insuring Clause A shall be paid first. In all other instances, the Insurer may pay Loss as it becomes due under this Coverage Part without regard to the potential for other future payment obligations under this Coverage Part.

B. The coverage provided by this Coverage Part is intended first and foremost for the benefit and protection of Insured Persons. In the event a liquidation or reorganization proceeding is commenced by or against a Company pursuant to United States bankruptcy law:

1. the Insureds hereby agree not to oppose or object to any efforts by the Insurer, the Company or an Insured to obtain relief from any stay or injunction issued in such proceeding; and

2. the Insurer shall first pay Loss on account of a Claim for a Wrongful Act occurring prior to the date such liquidation or reorganization proceeding commences, and then pay Loss in connection with a Claim for a Wrongful Act occurring after the date such liquidation or reorganization proceeding commences.

## IX. SECURITIES OFFERING

If during the Policy Period, a Company intends a public offering of securities under the Securities Act of 1933 and gives written notice to the Insurer within 30 days of the effective date of the Registration Statement for such offering, together with any additional information requested by the Insurer, the Insurer shall provide the Company with a quote for coverage with respect to such offering. Coverage offered pursuant to this quote shall include coverage for Wrongful Acts occurring in the course of any "road show" presentation to potential investors or other similar presentation and shall be subject to additional or different terms and conditions and payment of additional premium.

## X. GLOSSARY

A. Claim means:

1. with respect to Insuring Clauses A and B, any investigation, evidenced by any written document, including a subpoena, target letter or search warrant, against an Insured Person for a Wrongful Act; and

2. with respect to Insuring Clauses A, B and C:

   (a) a written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation, waiving or tolling of a statute of limitations or Extradition;

   (b) a civil or criminal proceeding, evidenced by: (i) the service of a complaint or similar pleading in a civil proceeding; or (ii) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

   (c) a formal administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

   against an Insured for a Wrongful Act, including any appeal therefrom.

The time when a Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Claim is first made against, served upon or received by the Insured or the applicable notice or order is filed or entered.

B. Defense Costs means that part of Loss consisting of:

1. reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any Insured) incurred in: (a) investigating, defending, opposing or appealing any Claim or (b) any Securityholder Derivative Demand Investigation; and

2. the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

C. Insured means any Company or Insured Person.

D. Insured Person means:

1. an Executive;

QBBP-1000 (05-14)

MACC:Complaint 000018

2. an Employee, but only with respect to a Claim: (a) brought by a securityholder of a Company in his capacity as such; or (b) that is also brought and maintained against an Insured Person included in paragraph 1 above; or

3. a holder of an equivalent position to those included in paragraph 1 above in an Outside Entity, while serving at the specific request or direction of the Company.

E. **Loss** means the amount that an Insured becomes legally obligated to pay on account of any Claim including:

1. compensatory damages;

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorneys fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. Defense Costs;

5. solely with respect to Insuring Clause A, taxes imposed by law upon an Insured Person in his capacity as such in connection with any bankruptcy, receivership, conservatorship or liquidation of a Company, to the extent such taxes are insurable by law; and

6. punitive, exemplary or multiplied damages, fines or penalties, if and to the extent that any such damages, fines or penalties are insurable under the law of the jurisdiction most favorable to the insurability of such damages, fines or penalties.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant Insureds or to the Claim giving rise to such damages, fines or penalties, and the Insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the Insurer and the Insured) that such damages, fines or penalties are insurable under applicable law.

Loss does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) amount that represents or is substantially equivalent to an increase in consideration paid (or proposed to be paid) by a Company in connection with its purchase of any securities and assets;

(d) tax, other than taxes described in paragraph 5 above; or

(e) cost incurred to clean up, remove, contain, treat, detoxify or neutralize Pollutants.

F. **Outside Entity** means:

1. any non-profit entity, community chest, fund or foundation; or

2. any other entity specifically added as an Outside Entity by endorsement to this Coverage Part,

that is not a Company.

G. **Professional Services** means services which are performed for others for a fee.

H. **Securityholder Derivative Demand Investigation** means an investigation by a Company to determine whether it is in the best interest of such Company to prosecute the claims alleged in a securityholder derivative demand or lawsuit. Where a Securityholder Derivative Demand Investigation is initiated because of a lawsuit rather than a demand, any coverage provided for Defense Costs on account of such Securityholder Derivative Demand Investigation shall in no way limit the coverage otherwise afforded under this Coverage Part to an Insured for Loss on account of a Claim.

J. **Wrongful Act** means:

1. any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by: (a) an Insured Person in his capacity as such; or (b) by a Company; or

2. any other matter claimed against an Insured Person solely by reason of serving in his capacity as such.

MACC:Complaint 000019

FILED DATE: 9/15/2020 9:39 AM   2020L008850

POLICY NUMBER: QPL0766816



QBBP-3007 (05-14)

*The Solution* for Employment Practices Liability
Coverage Part Declarations

**QBE Insurance Corporation**
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

Item 1:     Parent Company:     Mike Anderson Auto Group

Item 2:     Limit of Liability

         $2,000,000 per Claim
         $2,000,000 in the aggregate

Item 3:     Retention: $50,000 per Claim

Item 4:     Pending or Prior Proceedings Date: October 1, 1998

QBBP-3007 (05-14)

Page 1 of 1

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000020



**The Solution** for Employment Practices Liability Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

**I.    INSURING CLAUSE**

The Insurer shall pay, on behalf of an Insured, Loss on account of a Claim first made during the Policy Period.

**II.   EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim:

**A.** Breach of Written Employment Contract - based upon, arising out of or resulting from any breach of any written employment contract or agreement, provided that this Exclusion A shall not apply to: 1. Loss to the extent an Insured would have been liable for such Loss in the absence of such written employment contract or agreement; or 2. Defense Costs;

**B.** OSHA, Workforce Notification and Labor Relations - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by the Occupational Safety and Health Act, the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act or any similar law; and

**C.** Workers Compensation, Disability Benefits, Social Security, Unemployment - based upon, arising out of or resulting from any failure to comply with any obligation under any workers compensation, disability benefits, social security or unemployment insurance law;

Exclusions A - C above shall not apply to any Claim for Retaliation.

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

**1.** Exclusion A. Bodily Injury/Property Damage shall not apply to Loss for any mental anguish, emotional distress or humiliation when alleged as part of a Claim otherwise covered under this Coverage Part; and

**2.** Exclusion C. ERISA and E. Pollution shall not apply to any Claim for Retaliation.

**III.  OTHER INSURANCE**

**A.** With respect to any Claim for an Employment Practices Wrongful Act, other than that portion of a Claim made against a leased or temporary employee or Independent Contractor, this Coverage Part shall be primary insurance.

**B.** With respect to:

**1.** that portion of any Claim made against any leased or temporary employee or Independent Contractor; or

**2.** any Claim for a Third Party Wrongful Act, where Loss is covered under this Coverage Part and other valid and collective insurance,

this Coverage Part shall be specifically excess of and shall not contribute with any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by the Coverage Part), regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

**IV.   COORDINATION OF COVERAGE**

Any Loss covered under this Coverage Part and one or more other Liability Coverage Parts shall first be covered under this Coverage Part, subject to its terms, conditions and limitations. Any remaining portion of such Loss shall be covered under such other Liability Coverage Part(s), subject to its terms, conditions and limitations.

**V.    GLOSSARY**

**A.** Benefits means any payments (including insurance premiums), deferred compensation, perquisites or fringe benefits, in connection with an employee benefit plan and any other payment to or for the benefit of an employee arising out of the employment relationship. However, Benefits shall not include salary, wages, bonuses, commissions, Stock Benefits or non-deferred cash incentive compensation.

MACC:Complaint 000021

FILED DATE: 9/15/2020 9:39 AM   2020L008650

B. **Claim** means any:

1. written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, waiving or tolling of a statute of limitations, reinstatement, reemployment or re-engagement;

2. civil or criminal proceeding, evidenced by: (a) the service of a complaint or similar pleading in a civil proceeding; or (b) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

3. arbitration proceeding pursuant to an employment contract or agreement, policy or practice of a Company;

4. administrative, regulatory or tribunal proceeding, other than a labor, grievance or other proceeding under a collective bargaining agreement, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation; or

5. any audit of an insured conducted by the United States of America Office of Federal Contract Compliance Programs ("OFCCP"),

against an insured for a Wrongful Act, including any appeal therefrom.

The time when a Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Claim is first made against, served upon or received by the insured or the applicable notice or order is filed or entered.

C. **Defense Costs** means that part of Loss consisting of:

1. reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any Insured) incurred in investigating, defending, opposing or appealing any Claim; or

2. the premium for appeal, attachment or similar bonds (but the insurer shall be under no obligation to furnish any bond).

D. **Discrimination** means any violation of any employment discrimination law.

E. **Employment Practice Wrongful Act** means any:

1. breach of any employment contract or agreement or contractual obligation, including any contract or agreement or contractual obligation arising out of any employee handbook, personnel manual, policy statement or other representation;

2. Discrimination;

3. Harassment;

4. Retaliation;

5. Workplace Tort; or

6. Wrongful Employment Decision,

committed, attempted, or allegedly committed or attempted by an insured while acting in his or its capacity as such.

F. **Harassment** means any:

1. sexual harassment that is made a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating, hostile or offensive working environment within, a Company; or

2. workplace harassment, including bullying that interferes with performance or creates an intimidating, hostile or offensive working environment within a Company.

G. **Independent Contractor** means any natural person working for a Company pursuant to a written contract or agreement between such natural person and the Company which specifies the terms of the Company's engagement of such natural person.

H. **Insured** means any Company or Insured Person.

I. **Insured Person** means any:

1. Executive or Employee; or

2. Independent Contractor, but only if the Company agrees to indemnify the Independent Contractor in the same manner as Employees for liability arising out of a Claim.

FILED DATE: 9/15/2020 9:39 AM   2020L009850

MACC:Complaint 000022

FILED DATE: 9/15/2020 9:39 AM   2020L008850

J.   **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1.   compensatory damages (including back pay and front pay);

2.   judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorney fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3.   pre and post-judgment interest;

4.   liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Family Medical Leave Act or Equal Pay Act;

5.   **Defense Costs**; and

6.   punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds**, to the **Company**, or to the **Claim** giving rise to such damages, and the **Insurer** shall not challenge any opinion of independent legal counsel (mutually agreed to by the **Insurer** and the **Insured**) that such damages are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a)   amount not insurable under the law pursuant to which this Coverage Part is construed;

(b)   cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c)   future salary, wages, commissions, or **Benefits** or other monetary payments of a claimant who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order or other resolution of any **Claim**;

(d)   salary, wages, commissions, **Benefits** or other monetary payments which constitute severance payments or payments pursuant to a notice period;

(e)   **Benefits** due or to become due or the equivalent value of such **Benefits**;

(f)   cost associated with providing any accommodation for persons with disabilities or any other status which is protected under any law, including the Americans with Disabilities Act and the Civil Rights Act of 1964;

(g)   tax, fine or penalty imposed by law; or

(h)   cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

K.   **Retaliation** means retaliatory treatment against an **Employee** of a **Company** on account of such individual:

1.   exercising his or her rights under law, refusing to violate any law or opposing any unlawful practice;

2.   having assisted or testified in or cooperated with a proceeding or investigation (including any internal investigation conducted by the **Company's** human resources or legal department) regarding alleged violations of law by the **Insured**;

3.   disclosing or threatening to disclose to a superior or any governmental agency any alleged violations of law; or

4.   filing any claim against the **Company** under the Federal False Claims Act, Section 806 of the Sarbanes Oxley Act or any other whistleblower law.

L.   **Stock Benefits** means any:

1.   offering, plan or agreement between a **Company** and any **Employee** which grants stock, warrants, shares or stock options of the **Company** to such **Employee**, including grants of restricted stock, performance stock shares, membership shares or any other compensation or incentive granted in the form of securities of the **Company**; or

2.   payment or instrument, the amount or value of which is derived from the value of securities of the **Company**, including stock appreciation rights or phantom stock plans or arrangements,

provided that **Stock Benefits** shall not include amounts claimed under any employee stock ownership plans or employee stock purchase plans.

QBBP-1002 (06-14)

MACC:Complaint 000023

FILED DATE: 9/15/2020 9:39 AM 2020L009850

M. **Third Party** means any natural person who is not an Insured Person.

N. **Third Party Wrongful Act** means any sexual harassment, or discrimination based upon status protected under any anti-discrimination law, against a Third Party committed, attempted, or allegedly committed or attempted by any Insured while acting in his or its capacity as such.

O. **Workplace Tort** means any employment-related:

1. misrepresentation, defamation (including libel and slander), invasion of privacy, wrongful infliction of emotional distress, mental anguish or humiliation; or

2. negligent retention, supervision, hiring or training, failure to provide or enforce consistent employment-related corporate policies and procedures, false imprisonment, negligent evaluation, wrongful discipline or wrongful deprivation of career opportunity,

but only when alleged as part of a Claim for any Wrongful Employment Decision, breach of employment contract, Discrimination, Harassment or Retaliation.

P. **Wrongful Act** means an Employment Practices Wrongful Act or Third Party Wrongful Act.

Q. **Wrongful Employment Decision** means any wrongful termination, discharge of employment, demotion, denial of tenure, failure or refusal to employ or promote, or wrongful or negligent employee reference.

QBBP-1002 (05-14)

MACC:Complaint 000024

POLICY NUMBER: QPL0766816

 **QBE.**

QBBP-3006 (05-14)

*The Solution* for Fiduciary Liability
Coverage Part Declarations

**QBE Insurance Corporation**
55 Water Street, New York, New York 10041
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

Item 1:   Parent Company:   Mike Anderson Auto Group

Item 2:   A.  Limit of Liability

$2,000,000 per Claim
$2,000,000 in the aggregate

B.  Voluntary Compliance Program Loss Limit: $150,000

C.  ERISA Civil Penalties Limit: $100,000

D.  HIPAA Privacy Civil Penalties Limit: $50,000

Item 3:   Insuring Clause A Retention: $0 per Claim

Item 4:   Pending or Prior Proceedings Date: May 1, 2005

QBBP-3006 (05-14)

Page 1 of 1

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000025



**The Solution for Fiduciary Liability Coverage Part**

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

**I.   INSURING CLAUSE**

   A.   The Insurer shall pay, on behalf of an Insured, Loss on account of a Claim first made during the Policy Period.

   B.   The Insurer shall pay, on behalf of an Insured, Voluntary Compliance Program Loss first ascertained by or assessed against an Insured during the Policy Period, provided that the payment of any Voluntary Compliance Program Loss under this Coverage Part shall not waive any of the Insurer's rights under this Policy.

**II.   EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim:

   A.   **Liability Assumed Under Contract** – based upon, arising out of or resulting from any liability of others assumed by an Insured under any contract or agreement, provided that this Exclusion A shall not apply to Loss to the extent that: 1. an Insured would have been liable for such Loss in the absence of such contract or agreement; or 2. the liability assumed was under the agreement or declaration trust pursuant to which a Plan was established; and

   B.   **Workers Compensation, Disability Benefits, Social Security, Unemployment** – based upon, arising out of or resulting from any failure to comply with any obligation under any workers compensation, disability benefits, social security or unemployment insurance law, provided that this Exclusion B shall not apply to any Wrongful Act based upon, arising out of or resulting from: 1. COBRA; or 2. HIPAA;

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

   1.   Exclusion C. ERISA shall not apply to this Coverage Part; and

   2.   Exclusion E. Pollution shall not apply to any Claim:

      (a)   brought by or on behalf of a participant in, or beneficiary of, any Sponsored Plan based upon, arising out of or resulting from the diminution in value of any securities owned by such Sponsored Plan in any organization, where such diminution in value is allegedly the result of the matters described in Exclusion E; and

      (b)   for which an Insured Person is not indemnified by a Company because of such Company's Financial Impairment.

**III.   RETENTION**

No retention shall apply to any Voluntary Compliance Program Loss or Loss constituting civil penalties as described in paragraphs 7(b)(iii) and (iv) of the definition of Loss.

**IV.   LIMIT OF LIABILITY**

   A.   The Voluntary Compliance Program Loss Limit stated in Item 2B of the Declarations of this Coverage Part represents the Insurer's maximum liability for all Voluntary Compliance Program Loss, including Defense Costs related to the assessment or correction of a Plan's non-compliance with any Voluntary Compliance Program, payable under the Coverage Part during the Policy Period.

   B.   The ERISA Civil Penalties Limit stated in Item 2C of the Declarations of this Coverage Part represents the Insurer's maximum liability for all civil penalties described in paragraph 7(b)(iii) of the definition of Loss ("ERISA Civil Penalties") payable under this Coverage Part during the Policy Period.

   C.   The HIPAA Privacy Civil Penalties Limit stated in Item 2D of the Declarations of this Coverage Part represents the Insurer's maximum liability for all civil penalties described in paragraph 7(b)(iv) of the definition of Loss ("HIPAA Privacy Civil Penalties") payable under this Coverage Part during the Policy Period.

All amounts set forth above shall be part of, and not in addition to, the Limit of Liability set forth in Item 2A of the Declarations of this Coverage Part.

QBEP-1003 (05-14)

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000026

## V.    REPORTING

The insured shall notify the Insurer of Voluntary Compliance Program Loss as soon as practicable after such Voluntary Compliance Program Loss is first ascertained by or assessed against an Insured. However, in no event shall any notice be provided later than:

A.    If the Coverage Part expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of expiration or termination of this Coverage Part; or

B.    the expiration date of the ERP, if applicable.

## VI.   OTHER INSURANCE

With the exception of insurance which is written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for Loss for which this Coverage Part provides coverage, provided that any payment by an Insured of a retention or deductible under any such other insurance shall reduce the Retention under this Coverage Part by the amount of such payment which would otherwise have been Loss under this Coverage Part.

## VII.  PRIORITY OF PAYMENTS

In the event a liquidation or reorganization proceeding is commenced by or against a Company pursuant to United States bankruptcy law, the Insurer shall first pay Loss incurred by an Insured Person and the Plans and then pay Loss incurred by any Company.

## VIII. CHANGES IN A PLAN

A.    If the Pension Benefit Guaranty Corporation ("PBGC") becomes the trustee of a Plan before or after the inception date of this Coverage Part, coverage for such Plan shall continue until termination of this Coverage Part for those who were insureds at the time the PBGC became the trustee, but only with respect to Wrongful Acts which occurred prior to the effective date the PBGC became the trustee; or

B.    If a Company terminates a Plan before or after the inception date of this Coverage Part, coverage for such Plan shall continue until termination of this Coverage Part for those who were insureds at the time of such Plan termination or who would have been an insured at the time of such termination if this Coverage Part had been in effect, but only with respect to Wrongful Acts which occurred prior to or after the date the Plan was terminated.

## IX.   GLOSSARY

A.    Administration means advising, counseling, interpreting, providing notice to or handling of records, enrollment, termination or cancellation of, any Plan for Employees, Executives, participants or beneficiaries.

B.    Claim means any:

1.    written notice of commencement of a fact finding investigation by the U.S. Department of Labor ("DOL"), the PBGC or any similar governmental authority located outside of the United States;

2.    written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation or waiving or tolling of a statute of limitations or Extradition;

3.    civil or criminal proceeding, evidenced by: (a) the service of a complaint or similar pleading in a civil proceeding; or (b) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; or .

4.    formal administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

against an insured for a Wrongful Act, including any appeal therefrom.

The time when a Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Claim is first made against, served upon or received by the Insured.

C.    Defense Costs means that part of Loss consisting of:

1.    reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any Insured) incurred in investigating, defending, opposing or appealing any Claim or Voluntary Compliance Program Loss; or

FILED DATE: 9/15/2020 9:39 AM  2020L008850

MACC:Complaint 000027

FILED DATE: 9/15/2020 9:39 AM  2020L008850

2. the premium for appeal, attachment or similar bonds (but the insurer shall be under no obligation to furnish any bond).

D. **Insured** means any **Company**, **Plan** or **Insured Person**.

E. **Insured Person** means any:

1. **Executive** of a **Company**;

2. **Employee** of a **Company** or **Sponsored Plan**; and

3. past, present or future natural person trustee of a **Sponsored Plan**.

F. **Loss** means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim** including:

1. compensatory damages;

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorneys fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. **Defense Costs**;

5. **Voluntary Compliance Program Loss**;

6. punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages; and

7. the following civil penalties:

   (a) the 5% or less, or 20% or less, civil penalties imposed upon an **Insured** as a fiduciary under § 502(i) or (l) of **ERISA**;

   (b) civil penalties imposed:

   (i) by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions, the United Kingdom Occupational Pensions Regulatory Authority or the Pensions Regulator, pursuant to the Pension Scheme Act of 1993, the Pensions Act of 1995 and the Pensions Act of 2004; or

   (ii) by Ireland's Pensions Board or Pensions Ombudsman;

   provided that any coverage for such civil penalties applies only if the funds or assets of the pension scheme are not used to fund, pay or reimburse the premium for this Coverage Part;

   (iii) upon an **Insured** as a fiduciary under Section 502(c) of **ERISA**; or

   (iv) upon an **Insured** for violation of the privacy provisions of HIPAA.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant **Insureds** or to the **Claim** giving rise to such damages, and the insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the insurer and the insured) that such damages are insurable under applicable law.

**Loss** does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) tax imposed by law;

(d) fine or penalty imposed by law, other than as described in paragraph 7 above;

(e) benefits due or would become due under any **Plan**, including the payment of plaintiffs' attorneys fees as a percentage of such benefits or from a common fund established to pay such benefits, unless:

   (i) such benefits are payable as an **Insured Person's** personal obligation based upon, arising out of or

QBBP-1003 (05-14)

MACC:Complaint 000028

resulting from a **Wrongful Act**; or

(ii) a **Claim** alleges a loss to the **Plan** or to the accounts of such **Plan's** participants resulting from a change in the value of **Plan** investments, even where the amounts sought or recovered by the plaintiffs in such **Claim** are described in any way as "benefits"; or

(f) cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

G. **Plan** means:

1. any **Sponsored Plan**; and

2. any government mandated workers compensation, disability benefits, social security or unemployment insurance for **Employees** and **Executives**.

H. **Sponsored Plan** means:

1. any employee benefit plan, pension benefit plan or welfare benefit plan, as defined in and subject to **ERISA**, including any **VEBA**, which is operated by a **Company** or a **Company** and a labor organization solely for the benefit of **Employees** or **Executives** of a **Company**; or

2. any other employee benefit plan or program similar to those described in paragraph 1, but which is not subject to **ERISA**, including any fringe benefit or excess benefit plan,

provided that **Sponsored Plan** shall not include any employee stock ownership plan created after inception of the **Policy Period**.

I. **VEBA** means any Voluntary Employees' Beneficiary Associations as defined in Section 501(c)(9) of the Internal Revenue Code of 1986.

J. **Voluntary Compliance Program** means any voluntary compliance resolution program or similar voluntary settlement program administered by the Internal Revenue Service or DOL or any other domestic or foreign governmental authority. Such programs include the Employee Plans Compliance Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Walk-In Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correspondence Program, Delinquent Filer Voluntary Compliance Program and Voluntary Fiduciary Correction Program.

K. **Voluntary Compliance Program Loss** means fees, fines, penalties or sanctions paid by an **Insured** to a governmental authority under a **Voluntary Compliance Program** for a **Plan's** inadvertent non-compliance with any law. However, **Voluntary Compliance Program Loss** shall not include any costs to correct any non-compliance.

L. **Wrongful Act** means any:

1. actual or alleged breach of the responsibilities, obligations or duties imposed by **ERISA** upon fiduciaries of the **Sponsored Plan**;

2. negligent act, error or omission in the **Administration** of any **Plan** committed, attempted or allegedly committed or attempted by an **Insured** in his or its capacity as such;

3. other matter claimed against an **Insured Person** solely by reason of the **Insured Person's** serving as a fiduciary of a **Sponsored Plan**; or

4. negligent act, error or omission committed, attempted or allegedly committed or attempted by an **Insured Person** in performing any functions identified in **ERISA** Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions

FILED DATE: 9/15/2020 9:39 AM  2020L008850

MACC:Complaint 000029

POLICY NUMBER: QPL0766818



QBBP-3012 (05-14)

**The Solution** for Crime
Coverage Part Declarations

QBE Insurance Corporation
55 Water Street, New York, New York 10041
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

Item 1:   Parent Company:   Mike Anderson Auto Group

Item 2:   Limits of Liability and Retentions

| Insuring Clause | Limit of Liability | Retention |
|---|---|---|
| A. Employee Theft | $1,000,000 | $25,000 |
| B. In Transit | $1,000,000 | $25,000 |
| C. Inside the Premises | $1,000,000 | $25,000 |
| D. Forgery and Alteration | $1,000,000 | $25,000 |
| E. Computer Fraud | $1,000,000 | $25,000 |
| F. Funds Transfer Fraud Coverage | $1,000,000 | $25,000 |
| G. Credit Card Fraud | $1,000,000 | $25,000 |
| H. Money Orders and Counterfeit Currency Fraud | $1,000,000 | $25,000 |
| I. Client Coverage | $1,000,000 | $25,000 |

Item 3:   Expense Limit   $25,000

Item 4:   Computer Fraud Expense Limit   $25,000

Item 5:   Information Reproduction Limit   $25,000

QBBP-3012 (05-14)

Page 1 of 1

MACC:Complaint 000030

FILED DATE: 9/15/2020 9:39 AM   2020L009850

FILED DATE: 9/15/2020 9:39 AM    2020L009850



**The Solution** for Crime
Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

I.    **INSURING CLAUSES**

The Insurer shall pay the Insured for direct loss:

A.    **Employee Theft**

of Money, Securities or Property sustained by an Insured resulting from Theft or Forgery by an Employee, whether acting alone or in collusion with others.

B.    **In Transit**

sustained by an Insured resulting from:

1.    a Third Party's:

(a)    Robbery or other unlawful taking of Money, Securities or Property

(b)    damage to Property resulting from Robbery; and

2.    actual destruction or disappearance of Money or Securities,

while in Transit or temporarily in an Employee's or a partner of the Company's home.

C.    **Inside the Premises**

sustained by an Insured resulting from:

1.    a Third Party's

(a)    Robbery or Safe Burglary, including damage to Property, or Premises or its exterior, resulting from such Robbery or Safe Burglary;

(b)    unlawful taking of Money, Securities or Property; and

2.    actual destruction or disappearance of Money or Securities,

within or from the Premises.

D.    **Forgery or Alteration**

resulting from Forgery or alteration of any Financial Instrument by a Third Party, including any reasonable legal expenses that the Insured pays, with the Insurer's prior written consent, in defending any action brought against an Insured for refusing to pay such Financial Instrument, which any such amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2 of the Declarations of this Coverage Part for this Insuring Clause D.

E.    **Computer Fraud**

of Money, Securities or Property resulting from  a Third Party's Computer Fraud, including any Computer Fraud Expenses.

F.    **Funds Transfer Fraud Coverage**

of Money or Securities resulting from a Third Party's Funds Transfer Fraud.

G.    **Credit Card Fraud**

resulting from a Third Party's Credit Card Fraud .

H.    **Money Orders and Counterfeit Currency Fraud**

resulting from a Company's good faith acceptance: 1. in exchange for merchandise, Money or services, of any post office or express money order, issued or purporting to have been issued by any post office or express company, if such money order is not paid upon presentation; or 2. in the regular course of business, of counterfeit paper currency.

QBBP-1006 (05-14)

MACC:Complaint 000031

I. **Client Coverage**

of Money, Securities or Property sustained by a Client resulting from an Employee's Theft or Forgery committed without collusion with a Client's employee.

II. **EXCLUSIONS**

No coverage shall be available for:

A. Acts Committed by a Partner – loss based upon, arising out of or resulting from Theft or Forgery committed by a partner of a Company, whether acting alone or in collusion with others, provided that this Exclusion A shall not apply where the Theft or Forgery would otherwise be covered under Insuring Clauses A or I, and the coverage provided is excess of the amount of such partner's ownership percentage of such Company on the day immediately preceding the date of Discovery, multiplied by such Company's total assets as reflected in such Company's most recent financial statements; provided such statements have been audited or prepared by an independent Certified Public Accountant.

B. Advantage – loss sustained by one Insured to the advantage of another Insured;

C. Authorized Representative – loss or damage based on, arising out of or resulting from Theft, Forgery, Funds Transfer Fraud, Computer Fraud, Credit Card Fraud or other fraudulent, dishonest or criminal act (other than Robbery and Safe Burglary) committed by any authorized representative, except an Independent Contractor, of an Insured, acting alone or in collusion with others, provided that this Exclusion C shall not apply to loss under Insuring Clauses A or I where the Theft or Forgery is committed by an Employee acting in collusion with such authorized representative;

D. Custodial – loss of or damage to Money, Securities or Property in the custody of any bank, trust company or similar place of safe deposit, armored vehicle company, or any person duly organized by a Company to have custody of such Money, Securities or Property, provided that this Exclusion D shall not apply where coverage provided is excess of: 1. any amount recovered or received by the Company under any contract with, or any insurance available to, any of the foregoing; or 2. any other insurance or indemnity covering the loss, in whole or in part;

E. Data Costs, Fees, or Expenses – costs, fees or expenses incurred:

1. as a result of: (a) the reconstitution of Data where a Company knowingly used illegal copies of programs; (b) an alteration in Data held on magnetic media due to the effect of magnetic fields, their incorrect use or the obsolescence of the computer or its facilities; or (c) any effort to render the Data usable by replacement processing equipment; or

2. to design, improve or update software or programs or perfect their operation or performance;

F. Fire – loss based upon, arising out of or resulting from fire, provided that this Exclusion F shall not apply to: 1. loss of Money or Securities; or 2. damage to any safe or vault caused by fire for the purposes of Safe Burglary;

G. Income – loss of income, whether or not earned or accrued or potential income, not realized as the result of any loss covered under this Coverage Part;

H. Indirect or Consequential Loss – indirect or consequential loss of any kind, provided that this Exclusion H shall not apply to Expenses;

I. Intellectual Property – loss of trade secrets, confidential processing methods or other confidential information of any kind;

J. Inventory Shortage – loss, the proof of which is dependent solely on 1. a profit and loss computation or comparison; or 2. comparison of inventory records with an actual physical count, provided that where an Employee is involved and has been identified, inventory records and actual physical count of inventory can be submitted as supporting documentation of loss;

K. Legal Costs, Fees or Expenses – costs, fees or expenses incurred or paid in defending or prosecuting any legal proceeding or claim, provided that this Exclusion K shall not apply to Expenses;

L. Nuclear – loss or damage based upon, arising out of or resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any act or condition related to any of the foregoing;

M. Trading Losses – loss based upon, arising out of or resulting from any trading of Money, Securities or Property, provided that this Exclusion M shall not apply to direct loss caused by Theft or Forgery resulting in improper personal financial gains to an Employee. Improper personal financial gains does not include salaries, bonuses, commissions, fees, bonuses, promotions, awards, profit sharing or pensions;

QBBP-1006 (05-14)

MACC:Complaint 000032

FILED DATE: 9/15/2020 9:39 AM   2020L008850

FILED DATE: 9/15/2020 9:39 AM  2020.008850

N.  Voluntary Purchase or Exchange – loss based upon, arising out of, or resulting from an Insured knowingly giving or surrendering Money, Securities or Property in any purchase or exchange with a Third Party without collusion with an Employee, provided that this Exclusion N shall not apply to Insuring Clauses A, H or I;

O.  War and similar actions – loss or damage based upon, arising out of or resulting from war, whether or not declared, civil war, insurrection, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization or any act or condition related to any of the foregoing;

Exclusions P – Q below shall only apply to Insuring Clauses A. Employee Theft and I. Client Coverage:

P.  Broker/Independent Contractor – loss caused by any broker, commission, merchant, factor, consignee, contractor, independent contractor (other than an Independent Contractor) or other similar agent or representative;

Q.  Prior Dishonesty – loss caused by an Employee, which is sustained by an Insured:

    1. after an Executive or Insurance Representative becomes aware of a Theft, Forgery or other fraudulent, dishonest or criminal act:

        (a) valued at $1,000 or more and committed while in the employ or service of an Insured;

        (b) involving Money, Securities or other property, valued at $25,000 or more and committed prior to the employ or service of an Insured; or

    2. more than 90 days following termination of such Employee;

Exclusions R - S below shall only apply to Insuring Clauses B. In Transit and C. Inside the Premises:

R.  Mail/Carrier for Hire – loss of or damage to Money, Securities or Property while in the mail or in the custody of any carrier for hire other than an armored motor vehicle company

S.  Other Insuring Clauses - loss or damage based on, arising out of or resulting from Forgery, Funds Transfer Fraud, Computer Fraud or Credit Card Fraud;

Exclusion T. below shall only apply to Insuring Clauses B. In Transit, C. Inside the Premises, E. Computer Fraud and F. Funds Transfer Fraud Coverage:

T.  Kidnap, Ransom or Extortion – loss or damage based upon, arising out of or resulting from any kidnap, ransom or extortion payment;

Exclusion U. below shall only apply to Insuring Clause D. Forgery or Alteration:

U.  Forgery or Alteration – loss based upon, arising out of or resulting from a Third Party's Forgery or alteration of: 1. any Financial Instrument committed in collusion with any Employee; or 2. any registered or coupon obligations of the Insured, or any coupons whether attached or detached; and

Exclusion V. below shall only apply to Insuring Clause G. Credit Card Fraud:

V.  Forgery or Alteration – loss based upon, arising out of or resulting from any forgery or alteration of, on or in any written instrument, provided that this Exclusion V shall not apply: 1. where there was full compliance with the provisions, conditions and other terms under which the involved credit card was issued; and 2. the Company is legally liable for the loss to the issuer of such credit card.

**III.  RETENTION**

The Insurer shall not pay for any loss until that part of each loss exceeds the applicable Retention stated in Item 2 of the Declarations of this Coverage Part. No Retention shall apply to loss sustained by an ERISA Plan.

**IV.  LIMIT OF LIABILITY**

A.  The Limits of Liability, stated in Item 2 of the Declarations of this Coverage Part, represent the maximum amount payable under each Insuring Clause for each loss Discovered during the Policy Period.

B.  The Expense Limit stated in Item 3 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for Expenses, which amount shall be part of, and not in addition to, the Limits of Liability stated in Item 2 of such Declarations.

C.  The Computer Fraud Expense Limit stated in Item 4 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for Computer Fraud Expenses, which amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2 of such Declarations for Insuring Clause E. Computer Fraud.

D.  The Information Reproduction Limit stated in Item 5 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for the cost of reproducing information contained in any lost or damaged manuscripts, records, accounts, microfilms, tapes or other

MACC:Complaint 000033

FILED DATE: 9/15/2020 9:39 AM   2020L008850

records resulting from a covered loss, which amount shall be part of, and not in addition to, the Limits of Liability stated in Item 2 of such Declarations.

E. The insurer shall not pay the Insured more for loss or losses sustained by more than one Insured then the amount the insurer would pay if all loss or losses had been sustained by one insured.

F. All loss resulting from a single act or series of related acts of the same Employee or Third Party, and all loss whether such act or acts occurred before or during the Policy Period, shall be treated as a single loss subject to the Limits of Liability stated in Item 2 of the Declarations.

G. If a loss is covered under more than one Insuring Clause, the maximum amount payable under this Coverage Part shall not exceed the largest applicable Limit of Liability of any such Insuring Clause.

## V. DISCOVERY

A. This Coverage Part provides coverage for loss sustained by an insured at any time but Discovered during the Policy Period.

B. The insurer shall pay for loss that an insured sustained prior to the effective date of expiration or termination of this Coverage Part, which is Discovered by the insured:

1. no later than 60 days after the effective date of such expiration or termination; and

2. with respect to any ERISA Plan, no later than 1 year from the effective date of such expiration or termination.

This extended period to Discover loss terminates immediately upon the effective date of any other insurance obtained by the insured to replace, in whole or in part, the insurance provided by this Coverage Part, regardless of whether such insurance provides coverage for loss sustained prior to its effective date.

## VI. DUTIES IN THE EVENT OF LOSS

A. An insured's knowledge of any information relevant to this Coverage Part or Discovery shall be deemed knowledge possessed by all insureds.

B. Upon Discovery, the insured shall:

1. give written notice to the insurer as soon as practicable, but in no event later than 90 days after such Discovery;

2. provide the insurer with a detailed, sworn proof of loss within 120 days after such Discovery;

3. submit to an examination under oath at the insurer's request;

4. cooperate with the insurer in the investigation and settlement of any claim.

## VII. OWNERSHIP

Solely with respect to:

A. Insuring Clauses A – H, this Coverage Part shall only apply:
1. to Money, Securities or Property owned by a Company, for which the Company is legally liable, or held by the Company in any capacity; and
2. no coverage shall be provided under this Coverage Part for any damage to the Premises unless the Company is the owner of such Premises or is legally liable for such damage;

provided that with respect to Insuring Clause A, the insurer's liability shall not apply to Money, Securities or Property of a Client.

B. Insuring Clause I, this Coverage Part shall only apply to Money, Securities or Property owned by a Client, which is held by a Company in any capacity or for which the Company is legally liable.

## VIII. OTHER INSURANCE

With the exception of insurance which is written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for loss for which this Coverage Part provides coverage (including any prior insurance replaced by this Coverage Part, which provided a period of time to discover loss occurring prior to the termination or cancellation of such replaced policy), provided that any payment by an insured of a retention or deductible under any such other insurance shall reduce the Retention under this Coverage Part by the amount of such payment which would otherwise have been loss under this Coverage Part.

QBBP-1006 (05-14)

MACC:Complaint 000034

FILED DATE: 9/15/2020 9:39 AM 2020L000850

**IX. ERISA PROVISION**

A. Any payment made by the Insurer under this Coverage Part for loss sustained by an **ERISA Plan** shall be paid to such **ERISA Plan**. If such loss payment is in excess of the amount of coverage required by **ERISA**, any such excess amount shall be held for the use and benefit of any other **ERISA Plan**, should such **ERISA Plan** also Discover loss covered under this Coverage Part.

B. With respect to each **ERISA Plan**, if covered loss is sustained by any **ERISA Plan**:

    1. which does not have any employer securities, the Limit of Liability applicable to such covered loss shall be the greater of $1,000; or 10% of the **ERISA Plan's** funds handled as of the beginning of such **ERISA Plan's** fiscal year, up to a maximum limit of $500,000;

    2. which does have any employer securities, the limit of liability applicable to such covered loss shall be the greater of $1,000; 10% of the **ERISA Plan's** funds handled as of the beginning of such **ERISA Plan's** fiscal year, up to a maximum limit of $1,000,000.

C. If the Limits of Liability stated in item 2 of the Declarations of this Coverage Part are:

    1. less than or equal to the amounts set forth in B1. and 2. above, then the applicable Limit of Liability shall be amended to such respective amounts; or

    2. greater than the amounts set forth in B1. and 2. above, then the limit of liability for each **ERISA Plan** shall be the amounts stated above with the remaining limit allocated equally between all **ERISA Plans** sustaining loss.

**X. VALUATION**

The Insurer shall pay:

A. the actual market value of lost, damaged or destroyed Securities at the closing price of such Securities on the business day immediately preceding the day on which a loss is Discovered; or the cost of replacing Securities, whichever is less, plus the cost to post a Lost Instrument Bond;

B. the least of:
1. the actual cash value of the Property; or
2. the cost to repair or replace Property, other than precious metals, with that of similar quality and value,

at the time Parent Company complies with Section VI. DUTIES IN THE EVENT OF LOSS, regarding the furnishing of a proof of loss;

C. the United States of America dollar value of:
1. foreign currency based on the rate of exchange published in The Wall Street Journal on the day loss involving foreign currency is Discovered; or
2. any precious metals based on the amount published in The Wall Street Journal Cash Prices, Precious Metals, on the day loss involving such precious metals is Discovered.

**XI. GLOSSARY**

A. **Client** means a customer of a Company to whom a Company provides goods or services for a fee or with whom the Company has a written contract or agreement.

B. **Computer Fraud** means the unlawful taking of Money, Securities or Property resulting from an unauthorized:

    1. entry into, change to or deletion of Data from a Computer System; or

    2. introduction of instructions propagating through a Computer System,

directed solely against a Company.

C. **Computer Fraud Expenses** means reasonable costs, charges, fees and expenses (other than regular or overtime wages, salaries, fees or benefits of any Company) incurred by the Company to reproduce damaged or destroyed electronic Data computer programs or enable the Company to restore the Company's Computer System to the level of operational capability that existed immediately preceding the covered loss under Insuring Clause E.

D. **Computer System** means a computer or network of computers, including off-line media libraries.

E. **Credit Card Fraud** means the Forgery or alteration of, on or in, any written instrument required in connection with any credit card issued to a Company or at the request of a Company, to any Executive or Employee of a Company.

QBSP-1006 (05-14)

MACC:Complaint 000035

FILED DATE: 9/15/2020 9:39 AM   2020L008850

F.  **Data** means information contained in any records, manuscripts, accounts, microfilms or tapes processed and stored in a Computer System.

G.  **Discover, Discovered or Discovery** means knowledge acquired by an Executive or Insurance Representative which would cause a reasonable person to believe that that a covered loss or occurrence which could give rise to a covered loss has occurred, regardless of when the act(s) causing or contributing to such loss occurred or whether the exact amount or details of such loss are known.

    **Discover, Discovered or Discovery** shall not include knowledge acquired by an Executive or Insurance Representative acting alone or in collusion with an Employee, or knowledge possessed by any Executive or Insurance Representative who is a participant in the Theft or Forgery.

H.  **Employee** means any:

    1.  natural person who labor or service was, is or will be engaged and directed by a Company, including a part-time, seasonal, leased and temporary employee, intern or volunteer;

    2.  Executive while performing acts within the scope of the usual duties of an Employee;

    3.  Independent Contractor;

    4.  natural person fiduciary, trustee, administrator, employee as defined in paragraph 1 above or Executive of an ERISA Plan and any other natural person, who any of which handle ERISA Plan assets and are required by ERISA to be bonded by the Company in connection with such ERISA Plan;

    5.  former or retired employee described in paragraph 1 above or Executive retained as a consultant to the Company; or

    6.  employee described in paragraph 1 above or Executive, while on leave for military services.

I.  **ERISA Plan** means any welfare or pension plan as defined by ERISA and which is operated solely by a Company or jointly by a Company and a labor organization for the benefit of Employees and which existed on or before the inception of this Coverage Part or which is created or acquired after the inception of this Coverage Part. ERISA Plan shall not include any multi-employer plan.

J.  **Expenses** means reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any insured): 1. incurred by the Insured to determine the amount and extent of loss covered under this Coverage Part; or 2. incurred and paid by the Insured to establish the existence, amount and preparation of the Insured's proof of loss in support of a covered loss under Insuring Clauses A – I.

K.  **Financial Instruments** means checks, drafts, promissory notices or similar written promises, orders or directions to pay a certain sum of Money that are:

    1.  made or drawn upon a Company; or

    2.  made or drawn by one acting as an Insured's agent and drawn on an Insured's account or that are purported to have been so made or drawn.

L.  **Forgery** means the signing, whether by hand, mechanically or electronically, of another natural person's name with intent to deceive.

M.  **Funds Transfer Fraud** means fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions (other than instructions which bear a Forgery), purportedly issued by a Company, to a financial institution directing the transfer, payment or delivery of Money or Securities from any of the Company's accounts at such institution, without such Company's knowledge or consent.

N.  **Independent Contractor** means any natural person working for a Company pursuant to a written contract or agreement between such natural person and the Company which specifies the terms of the Company's engagement of such natural person.

O.  **Insurance Representative** means an Employee, designated to represent an insured for the purpose of effecting and maintaining insurance.

P.  **Insured** means any Company or Sponsored Plan.

Q.  **In Transit** means being conveyed by the Company outside the Premises, from one person or place to another, under the custody of an Employee, partner of a Company or another person duly authorized by such Company to have custody of Money, Securities or Property. The conveyance described in this paragraph begins immediately upon receipt of Money, Securities or Property by the person described herein and ceases immediately upon delivery to the designated recipient or its agent.

R.  **Money** means currency, coins, bank notes and bullion.

QBBP-1006 (05-14)

MACC:Complaint 000036

FILED DATE: 9/15/2020 9:39 AM   2020L009850

S.  **Premises** means the interior of that portion of: 1. any building that a Company occupies in conducting its business; or 2. that part of any building occupied by a bank, trust company or similar financial institution.

T.  **Property** means tangible property, other than Money or Securities, that has intrinsic value.

U.  **Robbery** means actual or attempted unlawful taking of Money, Securities or Property from the custody of an Employee or other person (except a person acting as a watchman, janitor or porter) duly authorized by a Company to have custody of Money, Securities or Property, by violence or threat of violence, committed in the presence and cognizance of such Employee or other person.

V.  **Safe Burglary** means: 1. the actual or attempted unlawful taking of Money, Securities or Property by forcible or violent entry evidenced by visible marks, from a locked vault or safe located within the Premises and any resultant damage to the safe or vault from such entry; or 2. damage to a locked safe, cash drawer, cash box or cash register by actual or attempted felonious entry or abstraction of such container.

W.  **Securities** means negotiable or non-negotiable instruments or contracts representing either Money or Property. Securities shall not include Money.

X.  **Sponsored Plan** means any ERISA Plan and any plan similar to an ERISA Plan that is not governed by ERISA.

Y.  **Theft** means the unlawful taking of Money, Securities or Property to the deprivation of an Insured, solely for the purposes of Insuring Clause A, or a Client, solely for the purposes of Insuring Clause I.

Z.  **Third Party** means any natural person who is not an Employee.

MACC:Complaint 000037

POLICY NUMBER: QPL0766016
Endorsement Effective Date: October 1, 2017

QBBP-5056 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### INDIANA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that:

I. Section XII. NOTICE is amended by the addition of the following:

Notwithstanding anything to the contrary in the Declarations, any Coverage Part, or any endorsements attached to this Policy, notice of any Claim or circumstances that could give rise to a Claim may also be provided to an authorized agent of the Insurer.

II. This Policy is amended by the addition of the following:

NON-RENEWAL

If the Insurer decides not to renew this Policy, the Insurer will deliver or mail written notice of non-renewal to the Parent Company at the address set forth in the Declarations of the GTC at least forty-five (45) days before the expiration date of the Policy. Proof of mailing of any notice shall be sufficient proof of notice.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L009850

QBBP-5056 (05-14)

Page 1 of 1

MACC:Complaint 000038

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBEPP-2045 (06-15)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## ILLEGAL ALIEN INVESTIGATIVE DEFENSE COSTS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that:

I.    The definition of Claim in paragraph B. of Section V. GLOSSARY is amended by the addition of the following:

Claim shall also mean a criminal investigation of the Company by any governmental agency for allegedly hiring or harboring illegal aliens.

II.   This Coverage Part is amended by the addition of the following:

All Defense Costs arising out of all Claims made against the Insured with respect to the coverage provided by this endorsement shall be subject to a sublimit of liability of $25,000, which shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations of this Coverage Part.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

QBEPP-2045 (06-15)

MACC:Complaint 000039

POLICY NUMBER: QPL0766616
Endorsement Effective Date: October 1, 2017

QBEPP-2156 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PPACA AND PPA CIVIL PENALTIES ENDORSEMENT

This endorsement modifies insurance provided under the following:

FIDUCIARY LIABILITY COVERAGE PART

It is hereby agreed that:

I.   Section III. RETENTION is amended by the addition of the following:

No retention shall apply to Loss constituting civil penalties imposed upon an insured for inadvertent violation of the Patient Protection and Affordable Care Act ("PPACA") or the Pension Protection Act of 2006 ("PPA").

II.   Section IV. LIMIT OF LIABILITY is amended by the addition of the following:

All Loss arising from Claims alleging inadvertent violations of PPACA or the PPA shall be subject to a sublimit of liability of $60,000, which amount shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of this Coverage Part.

III.   The definition of Loss in paragraph F.7. of Section IX. GLOSSARY is amended by the addition of the following:

any civil penalties imposed upon an insured for inadvertent violation of PPACA or the PPA.

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000040

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBEPP-2200 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF CLAIM TO INCLUDE MEDIATION

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that Section V. GLOSSARY, paragraph B. Claim 1. is amended by the addition of the word "mediation," after the word "arbitration,".

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 8:39 AM 2020L008850

MACC:Complaint 000041

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2218 (10-14)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EQUAL PAY ACT CARVEBACK ENDORSEMENT**

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that Exclusion G. Wage and Hour in Section II. EXCLUSIONS of the GTC shall not apply to any Claim for any violation of the responsibilities, obligations or duties imposed by the Equal Pay Act.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000042

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBPP-2220 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WAGE AND HOUR CLAIM DEFENSE COSTS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that:

I.  Section I. INSURING CLAUSE is amended by the addition of the following:

    The Insurer shall pay, on behalf of an insured, **Defense Costs** on account of a **Wage and Hour Claim** first made during the **Policy Period**.

II. Section V. GLOSSARY is amended by the addition of the following:

    **Wage and Hour Claim** means any:

    1.  written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, waiving or tolling of a statute of limitations, reinstatement, reemployment or re-engagement;

    2.  civil proceeding, evidenced by the service of a complaint or similar pleading;

    3.  arbitration proceeding, evidenced by the receipt of a demand for arbitration; or

    4.  administrative, regulatory or tribunal proceeding, other than a labor, grievance or other proceeding under a collective bargaining agreement, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

    which is brought by an **Employee** against an insured and is based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act) or any similar law governing wage, hour or payroll.

    The time when a **Wage and Hour Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Wage and Hour Claim** is first made against, served upon or received by the insured or the applicable notice or order is filed or entered.

III. This Coverage Part is amended by the addition of the following:

    LIMIT OF LIABILITY

    All **Defense Costs** arising from a **Wage and Hour Claim** shall be subject to a Wage and Hour Sublimit of Liability of $100,000, which shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations of this Coverage Part and shall be excess of a Wage and Hour Retention of $50,000.

IV. Exclusion G. Wage and Hour in Section II. EXCLUSIONS of the GTC shall not apply to **Defense Costs** for a **Wage and Hour Claim**.

All other terms and conditions of this Policy remain unchanged.

QBPP-2220 (10-14)

Page 1 of 1

MACC:Complaint 000043

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2225 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF RETALIATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that the definition of Retaliation in paragraph K. of Section V. GLOSSARY is amended by deleting the word "Employee" and replacing it with the word "Insured Person".

All other terms and conditions of this Policy remain unchanged.

QBBPP-2225 (10-14)

Page 1 of 1

MACC:Complaint 000044

POLICY NUMBER: QPL0768816
Endorsement Effective Date: October 1, 2017

QBBPP-2277 (07-15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FRAUDULENT PAYMENT INSTRUCTION COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

CRIME COVERAGE PART

It is hereby agreed that:

I.  Item 2 of the Crime Coverage Part Declarations is amended by the addition of the following:

| Insuring Clause | Limit of Liability | Retention |
|---|---|---|
| Fraudulent Payment Instruction | $100,000 | $25,000 |

II.  Section I. INSURING CLAUSES is amended by the addition of the following:

Fraudulent Payment Instruction

resulting from a Company having paid, transferred or delivered any Money or Securities resulting from Fraudulent Payment Instruction.

III.  Section II. EXCLUSIONS, paragraph C. is amended by the addition of the words "Fraudulent Payment Instruction" after the words "Credit Card Fraud".

IV.  Solely with respect to the coverage provided by this endorsement, Section II. EXCLUSIONS, paragraph N. is deleted.

V.  Section II. EXCLUSIONS, paragraph P. shall also apply to the Fraudulent Payment Instruction Insuring Clause.

VI.  Section II. EXCLUSIONS, paragraphs R. through T. shall also apply to the Fraudulent Payment Instruction Insuring Clause.

VII.  Section II. EXCLUSIONS is amended by the addition of the following:

The Exclusions below shall only apply to the Fraudulent Payment Instruction Insuring Clause:
Credit Card Loss - based upon, arising out of or resulting from any party's use of or acceptance of any debit card, credit card or similar instrument;

Games of Chance - based upon, arising out of or resulting from any gambling, contest, lottery, sweepstake, coupon, promotional game, or other game of chance, including any redemption in connection therewith;

Investments – based upon, arising out of or resulting from any investment in Securities, or ownership in, any corporation, partnership, real property or similar investment;

Loans and Credit - based upon, arising out of or resulting from any extension of any credit, loan or similar promise to pay;

Performance Under Contract - based upon, arising out of or resulting from any party to perform under any contract;

Products or Services - based upon, arising out of or resulting from any failure, malfunction, illegitimacy or inadequacy of any product or service; and

Property - based upon, arising out of or resulting from any damage to Property.

QBBPP-2277 (07-15)

Page 1 of 2

MACC:Complaint 000045

FILED DATE: 9/15/2020 9:39 AM   2020L009850

VIII. Section XI. **GLOSSARY** is amended by the addition of the following:

**Service Provider** means a business the Insured does not own, operate or control, but that an Insured hires for a fee pursuant to an agreement or a written contract to perform services or provide goods related to an Insured's business. Service Provider does not include any broker-dealer, financial institution, asset manager, armored motor vehicle company or similar entity.

**Fraudulent Payment Instruction** means the intentional misleading of an Employee through a misrepresentation of a material fact which is: (a) relied upon by an Employee; and (b) committed by a person purporting to be a Client, Service Provider or Employee who was authorized by the Company to instruct other Employees to transfer Money or Securities.

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000046

POLICY NUMBER: QPL0788818
Endorsement Effective Date: October 1, 2017

QBBPP-2147 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED COMPANY ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that the definition of Company in paragraph C. of Section XXII. GLOSSARY is amended by the addition of the following:

Company also means any Entity listed below.

Anderson Kane County Properties, LLC
Anderson Lake County Properties Ltd., LLC
Anderson Management Group Inc.
Anderson Management Group II Inc.
Anderson Thompson Cass County Properties LLC
Anderson Thompson Elkhart County Properties LLC
Anderson Thompson Fulton County Properties, Ltd., LLC
Anderson Thompson Gas City Properties LLC
Anderson Thompson Grant County Properties, Ltd., LLC
Anderson Thompson Wells County Properties LLC
Bob Anderson Pontiac, Inc. dba Mike Anderson Chevrolet of Merrillville
Drive Now Auto Credit Company, Inc.
Midwest Warranty Associates, Inc.
Mike Anderson Cass County Properties Inc.
Mike Anderson Chevrolet Enterprises, LLC
Mike Anderson Chevrolet of Chicago, LLC
Mike Anderson Chevrolet of Ossian
Mike Anderson Chevrolet, Buick, GMC Truck
Mike Anderson Chevrolet, Inc.
Mike Anderson Chrysler Dodge SuperCenter of Logansport, Inc.
Mike Anderson Chrysler, Dodge, Jeep Inc.
Mike Anderson Dodge, Inc.
Mike Anderson Howard County Properties Inc.
Mike Anderson Logansport Properties, Ltd., LLC
Mike Anderson Used Car Super Store LLC
Mike Anderson Used Car Supercenter Inc.
Mike Anderson Used Cars, Inc.

All other terms and conditions of this Policy remain unchanged.

QBBPP-2147 (05-14)

Page 1 of 1

MACC:Complaint 000047

FILED DATE: 9/15/2020 9:39 AM 2020L009850

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2149 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND REPORTING AND NOTICE PROVISION ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that Section V. REPORTING, A.1. is replaced by the following:

1.  If the applicable Liability Coverage Part expires (or is otherwise terminated) without being renewed with the insurer, 90 days after the effective date of such expiration or termination; or

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM 2020L008850

MACC:Complaint 000048

POLICY NUMBER: QPL0768816
Endorsement Effective Date: October 1, 2017

QBBPP-2223 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF INSURED PERSON ENDORSEMENT

This endorsement modifies insurance provided under the following:
**DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART**

It is hereby agreed that the definition of **Insured Person** in paragraph D. of Section X. **GLOSSARY** is replaced by the following:

D.  **Insured Person** means:

  1.  an **Executive**;

  2.  an **Employee**; or

  3.  a holder of an equivalent position to those included in paragraph 1 above in an **Outside Entity**, while serving at the specific request or direction of the **Company**.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 8:39 AM   2020L008850

MACC:Complaint 000049

POLICY NUMBER: QPL0766916
Endorsement Effective Date: October 1, 2017

QBBPP-2227 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies insurance provided under the following:
**DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART**

It is hereby agreed that Exclusion I. Professional Services in Section II. EXCLUSIONS is replaced by the following:

H.   Professional Services - for the performance of or failure to perform Professional Services, provided that this Exclusion H shall not apply to any Claim brought by a securityholder or limited partner of a Company against an insured; and

All other terms and conditions of this Policy remain unchanged.

QBBPP-2227 (10-14)

Page 1 of 1

MACC:Complaint 000050

FILED DATE: 9/15/2020 9:39 AM   2020L008850

POLICY NUMBER: QPL0766916
Endorsement Effective Date: October 1, 2017

QBBPP-2235 (11-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND INSURED VERSUS INSURED CARVEBACK FOR EMPLOYEE AND FINANCIAL IMPAIRMENT ENDORSEMENT

This endorsement modifies insurance provided under the following:
DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that:

I.    Paragraph (b) of Exclusion A. Insured v. Insured in Section II. EXCLUSIONS is replaced by the following:

(b) Exclusion A3 above shall not apply to any Claim: (i) for employment-related Wrongful Acts against an Insured Person; (ii) for contribution or indemnity; (iii) brought by an Insured Person who has ceased serving in his capacity as such for at least 1 year; (iv) brought by an Employee; (v) brought while the Parent Company is in Financial Impairment; or (vi) brought by, on behalf of or with the participation of a whistleblower;

II.   The definition of Insured Person in paragraph D. of Section X. GLOSSARY is replaced by the following:

D.   Insured Person means:

1.   an Executive;

2.   an Employee; or

3.   a holder of an equivalent position to those included in paragraph 1 above in an Outside Entity, while serving at the specific request or direction of the Company.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 8:39 AM   2020L008850

MACC:Complaint 000051

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBSPP-2117 (04-15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## INSURED PERSON AMENDED TO INCLUDE ANY ADVISORY BOARD MEMBER ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that:

I.   The definition of Insured Person in paragraph D. of Section X. GLOSSARY is amended by the addition of the following:

An Insured Person shall include any natural person who was, now is or shall be a board observer or duly elected member of an advisory board including a Scientific Advisory Board.

II.  Section X. GLOSSARY is amended by the addition of the following:

Scientific Advisory Board means a group of scientists, independent from management, created by or requested by the Company to provide objective feedback and guidance on the Company's progress and goals.

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000052

FILED DATE: 9/15/2020 9:39 AM   2020L008650

FILED DATE: 9/15/2020 9:39 AM   2020L008850

**POLICY NUMBER: QPL0788816**
**Endorsement Effective Date: October 1, 2017**

QBEPP-2120 (08-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## ANTITRUST EXCLUSION DELETED ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Exclusion C. Antitrust in Section II. EXCLUSIONS is deleted.

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000053

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2210 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND REPORTING PROVISION ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that Section V. REPORTING, paragraph A. is replaced by the following:

A. Notice of any Claim under any Liability Coverage Part is considered timely when reported to the Insurer as soon as practicable after the Parent Company's chief executive officer or chief financial officer first becomes aware of such Claim. However, the Insurer shall not assert that notice of a Claim is untimely unless the Insurer is materially prejudiced by the untimely notice, as determined by a final adjudication rendered only after the Insurer has exhausted all other reasonable means of determining whether it has been materially prejudiced.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000054

POLICY NUMBER: QPL0788818
Effective Date of Endorsement: October 1, 2017

QBBPP-2065 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### SPECIFIED EVENT EXCLUSION

This endorsement modifies insurance provided under the following:
DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
FIDUCIARY LIABILITY COVERAGE PART

It is hereby agreed that Section II. EXCLUSIONS is amended by the addition of the following:

No coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim based upon, arising out of or resulting from any Event listed below.

Chris Kletter, Claim #: T1318827

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM  2020L008850

MACC:Complaint 000055

POLICY NUMBER: QPL0768816
Endorsement Effective Date: October 1, 2017

QBBPP-2268 (04-15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND IVI – OUTSIDE ENTITY EXCLUSION

This endorsement modifies insurance provided under the following:
DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Section III. EXCLUSIONS, paragraph A.2. is replaced by the following:

2. a Company against an Insured Person or Outside Entity against an Insured Person described in paragraph 3 of the definition of Insured Person;

All other terms and conditions of this Policy remain unchanged.

QBBPP-2268 (04-15)

Page 1 of 1

MACC:Complaint 000056

FILED DATE: 9/15/2020 9:39 AM   2020L008850

POLICY NUMBER: QPL0708816
Endorsement Effective Date: October 1, 2017

QBPD-6000 (02-15)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

It is hereby agreed that:

I.   This Policy is amended by the addition of the following:

If aggregate insured losses attributable to a Certified Act of Terrorism under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

II.   Solely for the purposes of this endorsement, this Policy is amended by the addition of the following:

Certified Act of Terrorism means an act that is certified by the Secretary of Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act,, to be an act of terrorism.  The criteria contained in the Terrorism Risk Insurance Act for a Certified Act of Terrorism include the following:

1.   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

III.   The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any Loss that is otherwise excluded under this Policy.

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000057

FILED DATE: 9/15/2020 9:39 AM  2020L008850

*Cancelled 3/1/18* need to examine.
3/6/18 Called Priya 212-805-9859
She will review what I had submitted + call
me by the end of the week. She didn't review
what I had sent thoroughly.

**QBE.**

### SWORN PROOF OF LOSS

**Parent Company:** Mike Anderson Chevrolet of Chicago (the "Parent Company")

**Insuring Company:** QBE Insurance Corporation

**Policy No.:** QPL0780016 (the "Policy")

**Policy Period:** October 1, 2017 to October 1, 2018

**Claim No.:** 586062N

State of **In**

County of **Lake** ss:

I, **Mike Anderson**
(Name and Title of Authorized Representative of the Insured)

hereby certify that **Mike Anderson Chevrolet of Chicago** suffered direct loss of Money,
(Insured)

Securities or Property resulting from Theft or Forgery as those terms are defined by the Policy by

**Jason Kolodzinski** who was employed by the insured as
(Name of Employee)

**General Manager** at the time of the Theft or Forgery.
(Title and/or Position)

The loss of Money, Securities or Property resulting from Theft or Forgery totals

$ **>250,000.- (under investigation)** (USD). Attached is a detailed Statement of Loss (Attachment A).

including any recoveries and all other credits, and the balance stated is the true net loss from

**3/7/16** (Date) to **1/15/18** (Date).

Further, I, on behalf of the insured, certify that the loss was discovered on

approx. **12-15, 2017** by **Mike Anderson, owner**
(Name(s) and Title(s))

Please be advised that QBE America, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is
handling the above captioned matter on its behalf.

**PLAINTIFF'S EXHIBIT "B"**

MACC:Complaint 000058

FILED DATE: 9/15/2020 9:39 AM   2020L009850

**Attachment 2** provides a detailed statement of the known facts and circumstances surrounding the direct loss of Money, Securities or Property to the Named Insured resulting from Theft or Forgery by

Jason Kolodzinski , including the circumstances surrounding Discovery of the loss.
(Name of Employee)

By signing below, I represent and warrant that I have the authority to execute this sworn proof of loss. I further attest that nothing has been withheld or misrepresented regarding said loss and that this statement along with any attachments, incorporated herein by reference, is a complete and truthful recital of the known facts. To my knowledge, the loss did not originate by any act or design on the part of the insured, nothing has been done by or with the consent of the insured to violate the conditions of the Policy, or render it void, and no attempt to deceive the said insurer as to the extent of said loss, has in any manner been made. I also represent that no other potentially applicable insurance is available for the claimed loss.

By providing this blank form, the Insurer does not waive and expressly reserves all rights and defenses, including the right to seek additional information and documentation in connection with its investigation and settlement of the claim. Any other information that may be required will be furnished and considered a part of this proof of loss.

Insured: Mike Anderson Chevrolet of Chicago

By: _(signature)_

Name: Mike Anderson

Title: Managing Member

Sworn to and subscribed before me this 1 day of MARCH, 2018

_(signature)_

Notary Public
My Commission Expires: 6/19/2021

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

MACC:Complaint 000059

FILED DATE: 9/15/2020 8:39 AM   2020L008850

IN THE CIRCUIT COURT OF ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

Mike Anderson Auto Group,

     Plaintiff

v.

QBE Insurance Corporation

     Defendants.

Case No.

JURY TRIAL DEMANDED

AMENDED SWORN PROOF OF LOSS

State of _I N_

County of _Lake_

    I, Mike Anderson, hereby certify that on March 1, 2018 I signed under oath the attached Sworn Proof of Loss Form for the direct loss of Money suffered by Mike Anderson Chevrolet of Chicago, the Insured, under the Policy of Insurance with QBE Insurance Corporation, the Insurer, which Sworn Proof of Loss Form is attached hereto and incorporated herein.

    At that time investigation revealed that the direct loss of Money from Theft or Forgery was greater than $250,000.00 (USD) with the matter under continued investigation. Additional investigation discloses that up to the present time the amount of direct loss of Money from Theft or Forgery totals $988,800.00 (USD) and falls within the following categories of Theft or Forgery committed by Jason Kolodziejski, who was employed by the Insured as General Manager, at the time of the Theft or Forgery.

| | |
|---|---|
| (c). **Direct Mail Advertising.** Kolodziejski claimed to have used a company called J&N for mail advertising. Mike Anderson Chevy was billed $191,000, but no mail was sent. The owner of a graphic design firm used by J&N said that no work was actually done. Kolodziejski failed to submit the materials to Mike Anderson for review prior to mailing, contrary to his instructions. He was told to stop but continued to | $191,000 |



PLAINTIFF'S
EXHIBIT
"C"

FILED DATE: 9/15/2020 9:39 AM  2020L008850

| | |
|---|---|
| submit invoices that were paid by the dealership without Mike Anderson's knowledge or approval. He did not submit the proper receipts from the USPS for the alleged mailings. The dealership was told that the one, purported USPS receipt Kolodziejski submitted was fraudulent. | |
| (b.) **Radio Advertising.** Kolodziejski claims to have placed radio ads through a company called TKC in the amount of $75,000. TKC, despite requests, refused to submit proof of running the ads. To pay TKC invoices, Kolodziejski, instead of mailing the checks, gave the checks to someone who picked them up at the dealership. The checks were cashed at a nearby currency exchange. | $75,000 |
| (c). **Purchase of Used Cars from Epic.** Kolodziejski purchased 91 cars from a company called Epic from March 2016 through January 2018. These cars were purchased at prices significantly higher than market, and many had hidden damage, the bid in and caused many customer complaints. Losses are estimated at approximately $121,000. Kolodziejski was told to stop purchasing cars from Epic in October 2017 but continued to do so until he was terminated in January 2018. A text message from Kolodziejski | $121,000 |

FILED DATE: 9/15/2020 8:39 AM   2020L008850

| | |
|---|---|
| indicated that he did it because he needed money, which suggests that a kickback was involved. | |
| (f). **Purchase of Cars from Mr. Hooptie.** Kolodziejski caused the dealership to lose $5800 for two cars purchased from Mr. Hooptie, and associated repair and accessory charges. Kolodziejski had been told not to deal with this company. | $5,800 |
| (g). **Inflated Repair Charges.** Kolodziejski sent cars to a company called AC and invoiced inflated and sometimes unnecessary repair charges of approximately $176,000. These charges were incurred even though the dealership has its own mechanics on staff. Some of those repair charges were for cars purchased from AC and Mr. Hooptie. | $176,000 |
| (h). **Personal Trade-in.** Kolodziejski traded in a Corvette his owned, and give himself an inflated appraisal of the car, at approximately $10,000 more than it was worth. | $10,000 |

Insured:      Mike Anderson Chevrolet of Chicago

Signed by:    Mike Anderson

Signed:

Sworn and subscribed before me this 20 day of July 2020

Notary Public

My Commission Expires:   11/2/87



*Disputed 3/7/18* need to evaluate
3/6/18 Called Priya 212-805-9859
She will review what I had submitted. + call me by the end of the week. She didn't review what I had sent thoroughly.

**QBE**

## SWORN PROOF OF LOSS

Parent Company: _Mike Anderson Chevrolet of Chicago_ (the "Parent Company")

Insuring Company: QBE Insurance Corporation

Policy No.: QPL0708816 (the "Policy")

Policy Period: October 1, 2017 to October 1, 2018

Claim No.: 525552N

State of _In_

County of _Lake_ ss:

I, _Mike Anderson_
(Name and Title of Authorized Representative of the Insured)

hereby certify that _Mike Anderson Chevrolet of Chicago_ suffered direct loss of Money,
(Insured)

Securities or Property resulting from Theft or Forgery as those terms are defined by the Policy by

_Jason Kolodzinski_ who was employed by the insured as
(Name of Employee)

_General Manager_ at the time of the Theft or Forgery.
(Title and/or Position)

The loss of Money, Securities or Property resulting from Theft or Forgery totals

$ _>250,000.- (under investigation)_ (USD). Attached is a detailed Statement of Loss (Attachment A),

including any recoveries and all other credits, and the balance stated is the true net loss from

_3/7/16_ (Date) to _1/15/18_ (Date).

Further, I, on behalf of the insured, certify that the loss was discovered on

_apprx    12-15, 2017_ by _Mike Anderson, owner_
(Name(s) and Title(s))

Initials

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

PLAINTIFF'S
EXHIBIT
"B"

MACC:Complaint 000063

FILED DATE: 9/15/2020 9:39 AM   2020L008650

Attachment B provides a detailed statement of the known facts and circumstances surrounding the direct loss of Money, Securities or Property to the Named Insured resulting from Theft or Forgery by Jason Kolmzinski, including the circumstance surrounding Discovery of the loss.

(Name of Employee)

By signing below, I represent and warrant that I have the authority to execute this sworn proof of loss. I further attest that nothing has been withheld or misrepresented regarding said loss and that this statement along with any attachments, incorporated herein by reference, is a complete and truthful recital of the known facts. To my knowledge, the loss did not originate by any act or design on the part of the Insured, nothing has been done by or with the consent of the Insured to violate the conditions of the Policy, or render it void, and no attempt to deceive the said Insurer as to the extent of said loss, has in any manner been made. I also represent that no other potentially applicable insurance is available for the claimed loss.

By providing this blank form, the Insurer does not waive and expressly reserves all rights and defenses, including the right to seek additional information and documentation in connection with its investigation and settlement of the claim. Any other information that may be required will be furnished and considered a part of this proof of loss.

Insured: Mike Anderson Chevrolet of Chicago

By: _____

Name: Mike Anderson

Title: Managing Member

Sworn to and subscribed before me this 1 day of MARCH, 2018

_____
Notary Public
My Commission Expires: 6/19/2021

Please be advised that QBE Americas, Inc. ("QBEA") is a claims administrator for the above listed insurance company and QBEAI is handling the above mentioned matter on its behalf.

MACC:Complaint 000064

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MIKE ANDERSON CHEVROLET OF )
CHICAGO, LLC, )
                                   )
          Plaintiff )     Case No. 1:20-cv-06161
                                   )
v.                                     )     Judge Franklin U. Valderrama
                                   )     Magistrate Judge Sunil R. Harjani
QBE INSURANCE CORPORATION, )
 JASON R. KOLODZINSKI, J & N )
MARKETING, INC., AND TKC )
ENTERTAINMENT, INC. )
                                   )
          Defendants. )

## SECOND AMENDED COMPLAINT AT LAW

      Now Comes Plaintiff Mike Anderson Chevrolet of Chicago, LLC, by and through counsel, and for its Second Amended Complaint At Law against Defendant QBE Insurance Corporation, Jason R. Kolodzinski, J & N Marketing, Inc., and TKC Entertainment, Inc., states as follows:

### FACTS

      1.    Plaintiff Mike Anderson Chevrolet of Chicago, LLC (hereinafter "MACC") was at all relevant times an Illinois limited liability company under the parent company Mike Anderson Auto Group, the insured under a Policy of Insurance issued by Defendant QBE Insurance Corporation, doing business in Cook County, Illinois (hereinafter "QBE Policy") attached to this Amended Complaint as Exhibit "A" and incorporated herein, and Mike Anderson Auto Group paid the premium under the QBE Policy. Under the "ADDITIONAL INSURED COMPANY ENDORSEMENT" to the QBE Policy attached hereto as Exhibit "A", Plaintiff Mike Anderson Chevrolet of Chicago, LLC is an additional insured company under the QBE Policy.

      2.    Defendant QBE Insurance Company, 55 Water Street, New York, New York 10041 was at all relevant times an insurance company providing insurance coverage and doing business in Cook County, Illinois.

      3.    Jason Kolodzinski was at all relevant times the former general manager and employee of MACC, and is a citizen of the State of Illinois.

      4.    During the Policy Period under the QBE Policy Jason Kolodzinski as an employee of MACC committed "Employee theft" under the QBE Policy, acting alone or in collusion with others, resulting in substantial direct financial loss to MACC.

1



**EXHIBIT**

**Anderson Dep #7**

MACC:Complaint 000065

5.     A QBE Sworn Proof of Loss Claim (No. 565862N) was executed by the owner of Plaintiff MACC on or about March 1, 2018, attached to this Amended Complaint as Exhibit "B", and incorporated herein, and submitted to Defendant QBE.  The loss of Money, Securities or Property resulting from Theft or Forgery stated in the Proof of Loss Claim was "greater than $250,000 – (under investigation))."  Since executing the Proof Claim Form investigation has revealed direct financial loss to Plaintiff in the amount of $588,800.00.  An Amended Sworn Proof of Loss is attached to this Amended Complaint as Exhibit "C" and incorporated herein.

6.     Plaintiff has made demand for coverage under the QBE Policy for the direct financial losses suffered as a result of the Employee theft covered under the QBE Policy.

7.     Defendant J & N Marketing, Inc. is an Illinois Corporation and during the relevant time stated above had an oral contract to provide direct mail advertising for Plaintiff and was paid $191,000.00 by Plaintiff.

8.     Defendant TKC Entertainment, Inc. is an Illinois Corporation and during the relevant time stated above had an oral contract to provide radio advertising for Plaintiff and was paid $75,000.00 by Plaintiff.

## FEDERAL JURISDICTION – DIVERSITY OF CITIZENSHIP AND SUPPLEMENTAL JURISDICTION

9.     Mike Anderson Chevrolet of Chicago, LLC is an Illinois limited liability company, whose members and their domiciles are listed below:

| MEMBER | DOMICILE |
| --- | --- |
| Michael J. Anderson | Illinois |
| Chris Anderson | Florida |
| Katy Props | Indiana |
| Paul Anderson | Indiana |
| Joan Scott | Indiana |
| Daniel C. Anderson | Minnesota |

QBE Insurance Corporation is a Pennsylvania corporation with its principal place of business in New York. Complete diversity jurisdiction exists between Plaintiff Mike Anderson Chevrolet of Chicago, LLC and Defendant QBE Insurance Corporation. The Court has Supplemental Jurisdiction over Plaintiff's claims against Defendants Jason R. Kolodzinski, J & N Marketing, Inc., and TKC Entertainment, Inc.

## AMOUNT IN CONTROVERSY EXCEEDS $75,000

10.    MACC seeks to recover damages from QBE for the alleged Loss totaling $588,800.00 exclusive of interest and costs. MACC seeks to recover damages from Jason R. Kolodzinski for the alleged Loss totaling $588,800.00, exclusive of interests and costs.  MACC seeks to recover damages from J & N Marketing, Inc. for the alleged Loss totaling $191,000.00,

2

MACC:Complaint 000066

exclusive of interest and costs. MACC seeks to recover damages from TKC Entertainment, Inc. for the alleged Loss totaling $75,000.00, exclusive of interest and costs. Federal jurisdiction exists under 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

## COUNT I

11.    Plaintiff incorporates the paragraphs alleged above as if fully restated and re-alleged.

12.    The specific acts of Employee theft committed by Jason Kolodzinski during the relevant times of employment and the direct financial loss suffered by Plaintiff are as follows:

| (a). **Direct Mail Advertising**. Kolodzinski claimed to have used a company called J&N for mail advertising. Mike Anderson Chevy was billed $191,000, but no mail was sent. The owner of a graphic design firm used by J&N said that no work was actually done. Kolodzinski failed to submit the materials to Mike Anderson for review prior to mailing, contrary to his instructions. He was told to stop but continued to submit invoices that were paid by the dealership without Mike Anderson's knowledge or approval. He did not submit the proper receipts from the USPS for the alleged mailings. The dealership was told that the one purported USPS receipt Kolodzinski submitted was fraudulent. | $191,000 |
|---|---|
| (b.) **Radio Advertising**. Kolodzinski claims to have placed radio ads through a company called TKC in the amount of $75,000. TKC, despite requests, refused to submit proof of running the ads. To pay TKC invoices, Kolodzinski, instead of mailing the checks, gave the checks to someone who picked them up at the dealership. The | $75,000 |

3

MACC:Complaint 000067

| | |
|---|---|
| checks were cashed at a nearby currency exchange. | |
| (c). **Purchase of Used Cars from Epic**. Kolodzinski purchased 91 cars from a company called Epic from March 2016 through January 2018. These cars were purchased at prices significantly higher than market, and many had hidden damages the led to and caused many customer complaints. Losses are estimated at approximately $131,000. Kolodzinski was told to stop purchasing cars from Epic in October 2017 but continued to do so surreptitiously until he was terminated in January 2018. A text message from Kolodzinski indicated that he did it because he needed money, which suggests that a kickback was involved. | $131,000 |
| (d). **Purchase of Cars from Sir Hooptie**. Kolodzinski caused the dealership to lose $5800 for two cars purchased from Sir Hooptie, and associated repair and accessory charges. Kolodzinski had been told not to deal with this company. | $5,800 |
| (e). **Inflated Repair Charges.** Kolodzinski sent cars to a company called AC and incurred inflated and sometimes unnecessary repair charges of approximately $176,000. These charges were incurred even though the dealership has its own mechanics on staff. Some of those repair charges were for cars purchased from AC and Sir Hooptie. | $176,000 |
| (f). **Personal Trade-In.** Kolodzinski traded-in a Corvette he owned, and give himself an inflated | $10,000 |

4

| appraisal of the car, at approximately $10,000 more than it was worth. | |

13.    Demand has been made on Defendant QBE for coverage under the QBE Policy for the direct financial losses stated above in paragraph 12.

14..    Defendant has not compensated Plaintiff for the losses suffered by Plaintiff covered under the QBE Policy which is a breach the contractual and fiduciary obligations by Defendant QBE Insurance Corporation under the QBE Policy.

15.    WHERFORE, Plaintiff Mike Anderson Chevrolet of Chicago, LLC prays for judgment against Defendant QBE Insurance Corporation in the amount of $588,800.00 plus costs of this action.

## COUNT II

16.    Plaintiff incorporates the paragraphs alleged above as if fully restated and re-alleged.

17.    During the relevant time stated above Defendant Jason R. Kolodzinski had a fiduciary duty to his employer Plaintiff MACC including an undivided duty of loyalty and fidelity while acting solely in the interest of his employer Plaintiff MACC.

18.    Defendant Jason R. Kolodzinski breached his fiduciary duty owed to Plaintiff MACC as set forth above in paragraph 12.

19.    Defendant Jason R. Kolodzinski's breach of his fiduciary duty proximately caused plaintiff MACC to suffer damages and losses totaling $588,800.00.

20.    WHERFORE, Plaintiff Mike Anderson Chevrolet of Chicago, LLC prays for judgment against Defendant Jason R. Kolodzinski in the amount of $588,800.00 plus costs of this action.

## COUNT III

21.    Plaintiff incorporates the paragraphs alleged above as if fully restated and re-alleged.

22.    Defendant J & N Marketing, Inc. during the relevant time stated above had an oral contract with Plaintiff MACC communicated through MACC's employee Jason R. Kolodzinski to provide direct mail advertising for Plaintiff.

23.    Defendant J & N Marketing, Inc. was paid consideration by Plaintiff MACC in the amount of $191,000.00.

24.    Defendant J & N Marketing, Inc. breached the oral contract and did not provide the direct mail advertising.

5

25.   During the time period that Plaintiff MACC was paying Defendant J & N Marketing, $191,000.00, documents recently produced by Defendant J & N Marketing, Inc. in Response to Federal Subpoena disclose that Defendant J & N Marketing, Inc. cut checks to Defendant Jason R. Kolodzinski in the amount of $54,055.00 which sums were deposited by Defendant Jason R. Kolodzinski in his personal bank account.

26.   Defendant J & N Marketing. Inc.'s breach of oral contract proximately caused Plaintiff MACC to suffer damages and losses totaling $191,000.00.

27.   WHEREFORE, Plaintiff Mike Anderson Chevrolet of Chicago, LLC prays for judgment against Defendant J & N Marketing, Inc. in the amount of $191,000.00 plus costs of this action.

## COUNT IV

28.   Plaintiff incorporates the paragraphs alleged above as if fully restated and re-alleged.

29.   Defendant TKC Entertainment, Inc. during the relevant time stated above had an oral contract with Plaintiff MACC communicated through MACC's employee Jason R. Kolodzinski to provide radio advertising for Plaintiff.

30.   Defendant TKC Entertainment, Inc. was paid consideration by Plaintiff MACC in the amount of $75,000.00.

31.   Defendant TKC Entertainment, Inc. breached the oral contract and did not provide the radio advertising.

32.   In Response to Federal Subpoena Defendant TKC Entertainment, Inc. recently produced documents that it invoiced Plaintiff MACC $30,000.00 for radio advertising.   However, Plaintiff MACC paid the total sum of $75,000.00 to Defendant TKC Entertainment, Inc., which payments were made by Plaintiff MACC to Defendant TKC Entertainment, Inc. through Defendant Jason R. Kolodzinski.

33.   Defendant TKC Entertainment Inc.'s breach of oral contract proximately caused Plaintiff MACC to suffer damages and losses totaling $75,000.00.

34.   WHEREFORE, Plaintiff Mike Anderson Chevrolet of Chicago, LLC prays for judgment against Defendant TKC Entertainment, Inc. in the amount of $75,000.00 plus costs of this action.

MACC:Complaint 000070

35.  Plaintiff demands trial by jury on all COUNTS.

                              MIKE ANDERSON CHEVROLET OF CHICAGO, LLC

                         By:    /s/ Eric F. Quandt
                                One of Its Attorneys


Eric F. Quandt
Theodore L. Banks
Scharf Banks Marmor LLC
333 West Wacker Drive
Suite 450
Chicago, Illinois 60606
(312) 726-6000
equandt@scharfbanks.com
tbanks@scharfbanks.com

MACC:Complaint 000071

**CERTIFICATE OF SERVICE**

I, Eric Quandt, certify that on July 22, 2021, I caused to be filed the foregoing SECOND AMENDED COMPLAINT AT LAW using the Court's CM/ECF system, which will send e-mail notification of the filing to all parties of record. These documents are available for viewing and downloading via the CM/ECF system.

/s/ Eric F. Quandt

MACC:Complaint 000072

FILED DATE: 9/15/2020 8:39 AM   2020L009850

# QBE® Insurance Corporation
A Stock Company



*The Solution for Management Liability*

**Home Office:**

c/o CT Corporation System
116 Pine Street, Suite 320
Harrisburg, Pennsylvania  17101

**Administrative Office:**

Wall Street Plaza
88 Pine Street
New York, New York  10005
1-877-772-6771

QBE and the links logo are registered service marks of QBE Insurance Group Limited.

QBEP-3033 (05-14)



PLAINTIFF'S
EXHIBIT
" A "

Page 1 of 2

MACC:Complaint 000073

FILED DATE: 9/15/2020 9:39 AM 2020L008850

This policy consists of:

Declarations
One or more coverage parts.
A coverage part consists of:
— One or more coverage forms
— Applicable forms and endorsements

QBE Insurance Corporation

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Robert V. James
President

Jose Ramon Gonzalez, Jr.
Secretary

QBBP-3033 (05-14)

Page 2 of 2

MACC:Complaint 000074

POLICY NUMBER: QPL0756816

 QBE

QBBP-3010 (09-14)

**The Solution**
General Terms and Conditions Declarations

QBE Insurance Corporation
55 Water Street, New York, New York 10041
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.

Item 1: Parent Company: Mike Anderson Auto Group

Mailing Address: 4301 E. Market St.
Logansport, IN 46947

Item 2: Policy Period From: October 1, 2017 To: October 1, 2018
At 12:01 A.M. Standard Time at the mailing address stated in Item 1

Item 3: Limit of Liability $6,000,000 Combined Maximum Aggregate of Liability for Liability Coverage Parts

Item 4: Coverage Parts: Directors & Officers Liability
Employment Practices Liability
Fiduciary Liability
Crime

Item 5: A. Notice to insurer of a Claim or circumstance:     B. All Other Notices to Insurer:

QBE Insurance Corporation        QBE Insurance Corporation
Attn: The Claims Manager         Attn: Underwriting
55 Water Street                   55 Water Street
New York, New York 10041       New York, New York 10041
Telephone: (877) 772-6771        Telephone: (877) 772-6771
Email: professional.liability.claims@us.qbe.com    Email: MLPLadmin@us.qbe.com

Item 6: Extended Reporting Period
Premium: 100% of Annual Premium
Length: One Year

Item 7: Premium: $39,953

In witness whereof, the Insurer has caused this Policy to be executed, but it shall not be valid unless also signed by a duly authorized representative of the Insurer.

QBBP-3010 (09-14)

Page 1 of 1

MACC:Complaint 000075

FILED DATE: 9/15/2020 9:39 AM   2020L009850



*The Solution*
**General Terms and Conditions**

FILED DATE: 9/15/2020 9:39 AM   2020L008850

In consideration of the payment of the premium, the Insurer and the Insureds agree as follows:

**I.   PREAMBLE**

The insurance coverages offered in this Policy are part of a portfolio of insurance coverages, consisting of this General Terms and Conditions ("GTC") and any Individual Liability Coverage Parts and Non-Liability Coverage Parts purchased, as stated in Item 4 of the Declarations of this GTC. The type of coverage provided by each of the Liability Coverage Parts and Non-Liability Coverage Parts are identified in each particular Coverage Part. Unless expressly stated to the contrary, the terms, conditions and limitations in this GTC apply to the entire Policy, whereas the terms, conditions and limitations of each Individual Coverage Part only apply to that particular Coverage Part. In the event of a conflict between any terms, conditions or limitations of the GTC and any terms, conditions and limitations of any Individual Coverage Part, the terms, conditions and limitations of the Individual Coverage Part shall control.

**II.   EXCLUSIONS**

No coverage shall be provided under any Liability Coverage Part for Loss on account of that portion of a Claim:

A.   **Bodily Injury/Property Damage** - for bodily injury, mental anguish, emotional distress, humiliation, sickness, disease or death of any person or damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is damaged or destroyed;

B.   **Conduct** - based upon, arising out of or resulting from any deliberate fraud, deliberate criminal act or deliberate violation of any statute or regulation, or any illegal profit or remuneration, by an Insured, established by a final, non-appealable adjudication adverse to such Insured in any underlying action, and the Insurer shall not utilize a declaratory action or proceeding brought by or against the Insurer to establish such final, non-appealable adjudication;

C.   **ERISA** - for any violation of the responsibilities, obligations or duties imposed by ERISA or for any functions identified in ERISA Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions;

D.   **Pending or Prior Proceedings** - based upon, arising out of or resulting from an action, proceeding or Claim commenced against an Insured pending on or prior to the Pending or Prior Proceedings Date stated in the Declarations of each applicable Liability Coverage Part;

E.   **Pollution** - based upon, arising out of or resulting from any:

   1.   discharge, emission, release, dispersal or escape of any Pollutants or any threat thereof;

   2.   treatment, removal or disposal of any Pollutants; or

   3.   regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any Pollutants,

including any Claim for financial loss to a Company, its securityholders or its creditors based upon, arising from or in consequence of any matter described in paragraphs 1, 2, or 3 above;

F.   **Prior Notice** - based upon, arising out of or resulting from any claim reported, or any circumstance reported and accepted, under the insurance policy (including any policies of which such policy is a renewal policy) replaced by this Policy; and

G.   **Wage and Hour** - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by any law governing wage, hour or payroll, including the Fair Labor Standards Act;

Exclusions D and F above shall not apply where this Policy is a renewal of a policy issued by the Insurer to the Parent Company.

With respect to all Policy exclusions, no conduct or knowledge of any Insured shall be imputed to any other Insured Person, and solely with respect to Exclusion B, only the conduct or knowledge of any past, present or future chief executive officer or chief financial officer of a Company shall be imputed to such Company and its Subsidiaries.

**III.   RETENTION OR DEDUCTIBLE**

A.   Any Retention or Deductible applicable to any Coverage Part shall apply as set forth in each Coverage Part and in the amount(s) stated in the Declarations of each Coverage Part. If different parts of a single Claim are

QBBP-1004 (11-14)

MACC:Complaint 000076

FILED DATE: 9/15/2020 9:39 AM    2020L008850

subject to different Retentions or Deductibles, then the total amount of Loss applied to the applicable Retentions or Deductibles shall not exceed the largest applicable Retention or Deductible.

B. No Retention shall apply to any Loss for which an Insured Person is not indemnified by a Company because of such Company's Financial Impairment.

## IV. LIMIT OF LIABILITY

A. The Combined Maximum Aggregate Limit of Liability, stated in Item 3 of the Declarations of this GTC, represents the maximum amount payable under all Liability Coverage Parts during the Policy Period for all Liability Coverage Parts combined.

B. The Limit of Liability, stated in Item 2 of the Declarations of each Liability Coverage Part, represents the maximum amount payable under each Liability Coverage Part during the Policy Period for any one Claim and in the aggregate as set forth in each such Liability Coverage Part.

C. Defense Costs are part of, and not in addition to, the Limit of Liability of each Liability Coverage Part.

D. The remaining portion of each of the limits of liability described above shall be the limits of liability available during any Extended Reporting Period applicable to any Coverage Part.

## V. REPORTING

A. Notice of any Claim under any Liability Coverage Part is considered timely when reported to the Insurer as soon as practicable after the Parent Company's chief executive officer or chief financial officer first becomes aware of such Claim. The Insurer shall not assert that notice of a Claim was untimely unless the Insurer is materially prejudiced by the untimely notice. However, in no event shall any notice be provided later than:

1. if the applicable Liability Coverage Part expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of such expiration or termination; or

2. the expiration date of the Extended Reporting Period, if applicable.

B. Notice requirements involving any Non-Liability Coverage Part shall be in accordance with the reporting requirements set forth in such Non-Liability Coverage Part.

C. Notice of any circumstance which could give rise to a Claim under any Liability Coverage Part is optional. If an Insured elects to report any circumstance which could give rise to a Claim:

1. such notice shall include information regarding the nature of any Wrongful Acts or alleged or potential damages and the names of any actual or potential defendants; and

2. any Claim that may subsequently arise out of a reported circumstance shall be deemed to have been first made during the Policy Period in which such circumstance was first reported.

## VI. DEFENSE AND SETTLEMENT

A. With respect to any Claim under any Liability Coverage Part, the Insurer shall have the right and duty to defend any Claim, unless otherwise specifically stated in a particular Liability Coverage Part. The Insurer shall have such right and duty to defend even if any of the allegations in such Claim are groundless, false or fraudulent. Any such duty to defend shall cease upon exhaustion of the applicable Limit of Liability.

B. With respect to any Claim under any Liability Coverage Part:

1. the Insured shall:

(a) not agree to any settlement, stipulate to any judgment, incur any Defense Costs, admit any liability or assume any contractual obligation, without the Insurer's prior written consent, provided that, unless otherwise stated in a particular Liability Coverage Part, the Insured may settle any Claim, without the Insurer's prior written consent, where the amount of such settlement, including Defense Costs, does not exceed the applicable Retention or Deductible;

(b) not do anything that could prejudice the Insurer's position or its potential or actual rights of recovery; and

(c) agree to provide the Insurer with all information, assistance and cooperation which the Insurer may reasonably require,

provided that the failure of any Insured to comply with any of the requirements in paragraphs (a) - (c) above, shall not impair the rights of any Insured Person under this Policy; and

2. the Insurer:

MACC:Complaint 000077

(a) may make any investigation it deems reasonably necessary and may, with the consent of the insureds, make any settlement of any Claim it deems appropriate; and

(b) shall not be liable for any such settlement, stipulation, incurred Defense Costs, admission or assumed obligation to which it has not given its prior written consent, and the Insurer shall not unreasonably withhold such consent.

## VII. ALLOCATION

If in any Claim, the insureds who are afforded coverage for a Claim incur Loss that is covered by this Policy and loss that is not covered by this Policy because such Claim includes both covered and uncovered matters, 100% of Defense Costs incurred by such insured shall be covered Loss, and all loss other than Defense Costs shall be allocated between covered Loss and uncovered loss based upon the relative legal exposures of the parties to such matters.

## VIII. TREATMENT OF RELATED CLAIMS

All Related Claims shall be deemed a single Claim first made during the policy period in which the earliest of such Related Claims was either first made or deemed to have been first made in accordance with Section V. REPORTING above.

## IX. SUBROGATION

A. In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the insureds' rights of recovery, and the insureds shall take all reasonable actions to secure and preserve the Insurer's subrogation rights.

B. In no event shall the Insurer exercise any subrogation right against an Insured Person. In any subrogation action against a Company, it is agreed that each Company agrees to fulfill any indemnification obligations to the fullest extent permitted by law and any contract or agreement providing an indemnification obligation exceeding any such law.

C. If the Insurer recovers, either through subrogation or recoupment, any portion of an amount paid under this Policy, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## X. EXTENDED REPORTING PERIOD

With respect to all Liability Coverage Parts:

A. If this Policy does not renew, or terminates other than for non-payment of premium, the insureds shall have the right to purchase an ERP for the premium and time period stated in Item 6 of the Declarations. In the event of the non-renewal or termination of one or more Liability Coverage Parts of this Policy, the insureds may purchase an ERP solely as respects the Liability Coverage Part(s) that has been non-renewed or terminated.

B. The right to an ERP shall lapse unless written notice of election to purchase such ERP, together with payment of the specified premium, is received by the Insurer within 30 days after the effective date of non-renewal or termination of the Policy. In the event the Parent Company elects not to purchase an ERP and an individual insured or group of insureds elects to purchase such ERP, such ERP shall only apply to Claims against such insured or group of insureds.

C. The premium for the ERP shall be deemed fully earned at the inception of the ERP.

D. Any ERP purchased shall become part of the Policy Period, extending such Policy Period to the expiration of the time period stated in Item 6 of the Declarations, but only with respect to Loss on account of a Claim for a Wrongful Act taking place before the effective date of non-renewal or termination.

## XI. CHANGES IN EXPOSURE

A. New Companies and Old Companies

This Policy's treatment of Subsidiaries shall be as stated below and as supplemented by any individual Coverage Part.

Any insured of a Subsidiary:

1. acquired before or during the Policy Period is eligible for coverage under any:

(a) Liability Coverage Part, but only for Loss on account of a Claim for a Wrongful Act which occurs after the date of such acquisition; and

FILED DATE: 9/15/2020 9:39 AM  2020L009850

MACC:Complaint 000078

(b) Non-Liability Coverage Part, but only after the effective date of such acquisition, and with respect to the Crime Coverage Part, subject to Section VIII. Other insurance of such Coverage Part.

2. ceasing to be a Subsidiary before or during the Policy Period is eligible for coverage under any:

(a) Liability Coverage Part, but only for Loss on account of a Claim for a Wrongful Act which occurs while such entity was a Subsidiary; and

(b) Non-Liability Coverage Part, as provided in such Non-Liability Coverage Part, but such Subsidiary and its insureds shall cease to be insureds under such Non-Liability Coverage Part as of the date of such cessation.

B. Acquisition of the Parent Company

In the event of a Change in Control of the Parent Company during the Policy Period:

1. any Liability Coverage Part shall remain in force until the expiration of the Policy Period, but only for any Claim for a Wrongful Act which occurs prior to such acquisition;

2. the entire premium for this Policy shall be deemed fully earned as of the effective date of such Change in Control; and

3. the Parent Company shall be entitled to receive a quote for an extension of the Liability Coverage Parts ("Run-Off Coverage") solely for Claims for Wrongful Acts which occurred prior to a Change in Control. Coverage offered pursuant to such quote shall be subject to additional or different terms and conditions and payment of additional premium. Any Run-Off Coverage purchased shall replace any Extended Reporting Period provided under Section X. EXTENDED REPORTING PERIOD.

## XII.  NOTICE

A. All notices to the Insurer under this Policy of any event, loss, Claim or circumstances which could give rise to a Claim must be given in writing to the address listed in Item 5A of the Declarations, and any such notice shall be deemed notice under the Policy in its entirety.

B. All other notices to the Insurer under this Policy shall be given in writing to the address listed in Item 5B of the Declarations.

C. Any notice under this Policy shall be effective on the date of mailing or receipt by the Insurer, whichever is earlier.

## XIII.  TERMINATION OF POLICY

This Policy shall terminate at the earliest of:

A. 20 days after receipt by the Parent Company of written notice from the Insurer of termination for non-payment of premium;

B. expiration of the Policy Period; or

C. surrender of the Policy to the Insurer by the Parent Company or notice to the Insurer by the Parent Company stating when such cancellation will take effect, and in either case any returned premium shall be computed on a pro rata basis.

## XIV.  REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGE

A. In issuing this Policy, the Insurer has relied upon the information and representations in the Application as being true and accurate, and the Application is the basis for, and considered incorporated into, this Policy.

B. The Application shall be construed as a separate request for coverage by each Insured, without any knowledge possessed by an Insured being imputed to any other Insured Person.

C. If the Application contains any misrepresentation made with the actual intent to deceive or which, for reasons other than simple negligence or oversight, materially affect the Insurer's acceptance of the risk or the hazard assumed, the Insurer shall not be liable for Loss on account of any Claim based upon, arising out of or resulting from either of such misrepresentations:

1. with respect to any Insured Person who had actual knowledge of any misrepresentation described in paragraph C above, and the Insurer can demonstrate that with such actual knowledge, such Insured Person reasonably believed that a Claim would arise from such misrepresentation;

2. with respect to any Company, if the Insured Person described in paragraph 1 above is a past or present chief executive officer or chief financial officer of the Parent Company.

QBDP-1004 (11-14)

MACC:Complaint 000079

FILED DATE: 9/15/2020 9:39 AM  2020L008850

FILED DATE: 9/15/2020 9:39 AM 2020L008850

D. The insurer shall not be entitled under any circumstances to void or rescind this Policy with respect to any insured.

## XV. EFFECT OF BANKRUPTCY

Bankruptcy or insolvency of any insured shall not relieve the insurer of its obligations nor deprive the insurer of its rights or defenses under this Policy.

## XVI. WORLDWIDE TERRITORY

This Policy shall apply anywhere in the world, and any reference to laws, however described, shall include all U.S. federal, state and local statutory laws, all amendments to and rules and regulations promulgated under any such laws, common law, and any equivalent body of law anywhere in the world, unless specifically stated to the contrary.

## XVII. ROLE OF THE PARENT COMPANY

The Parent Company shall act on behalf of each insured with respect to paying premiums, receiving any return premiums, agreeing to endorsements to this Policy and the giving or receiving of any notice provided for in this Policy (except notices of a Claim or circumstance which could give rise to a Claim or notice to apply for an ERP).

## XVIII. VALUATION AND FOREIGN CURRENCY

All premiums, limits, retentions, Loss and other amounts under this Policy are expressed and payable in the currency of the United States of America. If any element of Loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the exchange rate published in The Wall Street Journal on the date the element of Loss is due.

## XIX. ALTERATION, ASSIGNMENT AND HEADINGS

A. Any change in or modification of this Policy or assignment of interest under this Policy must be agreed to in writing by the insurer.

B. The descriptions and headings and sub-headings of this Policy are solely for convenience, and form no part of the terms, conditions and limitations of coverage.

## XX. ESTATES, HEIRS, LEGAL REPRESENTATIVES, ASSIGNS, SPOUSES AND DOMESTIC PARTNERS

With respect to any Liability Coverage Part, Insured Person shall include:

A. the estate, heirs, legal representatives or assigns of any Executive, if such Executive is deceased, legally incompetent, insolvent or bankrupt; and

B. the lawful spouse or domestic partner of any Executive solely by reason of such spouse's or domestic partner's: 1. status as such; or 2. ownership interest in property which a claimant seeks as recovery for an alleged Wrongful Act of such Executive,

provided that no coverage shall apply with respect to loss arising from an act, error or omission by any estate, heir, legal representative, assign, spouse or domestic partner of an Insured Person.

## XXI. TRADE SANCTIONS

This insurance coverage does not apply to the extent that trade or economic sanctions of any country prohibit the insurer or any member of the insurer's group from providing insurance coverage.

## XXII. GLOSSARY

The following terms shall have the meaning ascribed to such terms in each applicable Coverage Part: Claim, Defence Costs, Insured, Insured Person, Loss and Wrongful Act.

A. Application means where provided to the insurer, the application and any accompanying documentation submitted to the insurer for this Policy or any documentation submitted to the insurer in connection with the underwriting of this Policy.

B. Change in Control means:

1. the Parent Company's merger with, or acquisition by, another entity or the acquisition of all or substantially all of its assets by another entity, such that the Parent Company is not the surviving entity; or

2. when a person or entity or group of persons or entities acting in concert, acquires securities or voting rights which result in ownership or voting control by such person(s) or entity(ies) of more than 50% of the

MACC:Complaint 000080

outstanding securities or voting rights representing the present right to vote for or appoint directors or Managers of the Parent Company.

C. **Company** means the Parent Company and any Subsidiary, any foundation, political action committee or charitable trust controlled or sponsored by the Parent Company or any Subsidiary, and the Parent Company or any Subsidiary in its capacity as a debtor in possession under United States bankruptcy law.

D. **Employee** means any natural person whose labor or service was, is or will be engaged and directed by a Company, including a part-time, seasonal, leased and temporary employee, intern or volunteer. Employee does not include an independent contractor.

E. **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")).

F. **Executive** means any natural person who was, now is or shall become:

1. a duly elected or appointed director, officer, Manager, trustee, regent, governor, risk manager, comptroller or in-house general counsel of any Company organized in the United States of America, or in a functionally equivalent or comparable role to any of the foregoing; or

2. a holder of a functionally equivalent position or comparable role to those described in paragraph 1 above in a Company that is organized in a jurisdiction other than the United States of America, including any position on an advisory board or committee.

G. **Extradition** means any formal process by which an Insured located in any country is or is sought to be surrendered to any other country for trial or otherwise to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

H. **Financial Impairment** means the status of a Company resulting from: 1. the appointment by a state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate such Company; or 2. such Company becoming a debtor in possession under United States bankruptcy law.

I. **Liability Coverage Part** means any Coverage Part identified in this Policy as a "Liability Coverage Part" within the heading to such Coverage Part or providing third party liability coverage in such Coverage Part.

J. **Manager** means any natural person, who was, now is, or shall become, a manager, member of the Board of Managers or equivalent executive of a Company that is a limited liability company.

K. **Non-Liability Coverage Part** means any Coverage Part or insuring clause in this Policy that does not provide any third party liability coverage.

L. **Parent Company** means the entity named in Item 1 of the Declarations.

M. **Policy Period** means the period of time stated in Item 2 of the Declarations of this GTC (subject to any termination in accordance with Section XIII. TERMINATION OF POLICY) and the ERP, if applicable.

N. **Pollutants** means any solid, liquid, gaseous or thermal irritants or contaminants, including smoke, soot, vapor, fumes, acids, chemicals, alkalis, asbestos, asbestos products or waste. Waste includes materials to be reconditioned, recycled or reclaimed.

O. **Related Claims** means all Claims based upon, arising out of or resulting from the same or related, or having a common nexus of, facts, circumstances or Wrongful Acts.

P. **Subsidiary** means:

1. any entity while more than 50% of the outstanding securities or other equity ownership, representing the present right to vote for election of, or to appoint, directors, Managers, or the foreign equivalent of any such directors or Managers of such entity, are owned or controlled by the Parent Company directly or indirectly through one or more Subsidiaries; or

2. any entity while the Parent Company has the right, pursuant to either written contract or the bylaws, charter, operating agreement or similar documents of a Company, to elect or appoint a majority of the Board of Directors of a corporation or Managers.

FILED DATE: 9/15/2020 9:39 AM   2020L009850

MACC:Complaint 000081

POLICY NUMBER: QPL0766816

 **QBE.**

QBBP-3006 (05-14)

*The Solution* for Directors & Officers and Entity Liability
Coverage Part Declarations

QBE Insurance Corporation
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE
AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR
SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.
PLEASE READ THIS POLICY CAREFULLY.

**Item 1:** Parent Company:     Mike Anderson Auto Group

**Item 2:** A. Limit of Liability

     $2,000,000 per Claim
     $2,000,000 in the aggregate

     B. Securityholder Derivative Demand Investigation Limit: $250,000

**Item 3:** Additional Limit for Non-Indemnifiable Loss: $1,000,000

**Item 4:** Retention:

     A. Insuring Clause B: $25,000 per Claim
     B. Insuring Clause C: $25,000 per Claim

**Item 5:** Pending or Prior Proceedings Date: October 1, 2009

FILED DATE: 9/15/2020 9:39 AM   2020L008850

QBBP-3006 (05-14)

Page 1 of 1

MACC:Complaint 000082



**The Solution** for Private Company
**Directors & Officers and Entity Liability**
**Coverage Part**

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

## I. INSURING CLAUSE

### A. Side A - Non-Indemnifiable Loss Coverage for Insured Persons

The Insurer shall pay, on behalf of an Insured Person, Loss on account of a Claim first made during the Policy Period, to the extent that such Loss has not been paid or indemnified by any Company.

### B. Side B - Corporate Reimbursement Coverage for Indemnification of Insured Persons

The Insurer shall pay, on behalf of a Company, Loss on account of a Claim first made during the Policy Period to the extent the Company pays or indemnifies an Insured Person for such Loss.

### C. Side C - Entity Coverages

The Insurer shall pay, on behalf of a Company, Loss on account of a Claim, and Defense Costs on account of a Securityholder Derivative Demand Investigation, first made during the Policy Period.

## II. EXCLUSIONS

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim:

### A. Insured v. Insured - brought by, or on behalf of:

1. a Company against another Company;

2. a Company or Outside Entity against an Insured Person;

3. an Insured Person, in any capacity, against an Insured,

provided that:

(a) Exclusion A2 above shall not apply to a Claim brought: (i) outside the United States of America, Canada or their territories or possessions; (ii) while the Parent Company or Outside Entity is in Financial Impairment; (iii) as a securityholder derivative action; or (iv) while an Insured Person is no longer serving in his capacity as such; and

(b) Exclusion A3 above shall not apply to any Claim: (i) for employment-related Wrongful Acts against an Insured Person; (ii) for contribution or indemnity; (iii) brought by an Insured Person who has ceased serving in his capacity as such for at least 1 year; or (iv) brought by, on behalf of or with the participation of a whistleblower.

### B. Publicly Traded Securities - based upon, arising out of or resulting from any public offering of, or purchase or sale of, equity or debt securities issued by any Company or Outside Entity, provided that this Exclusion B shall not apply to any Claim based upon, arising out of or resulting from the Company's: 1. securities that are not required to be registered; 2. failure to undertake or complete an initial public offering or sale of its securities; or 3. preparation for any public offering, including any "road show" presentation to potential investors or other similar presentation;

Exclusions C - I below shall only apply to Insuring Clause C, Side C - Entity Coverages:

### C. Antitrust - based upon, arising out of or resulting from anti-trust, price fixing or discrimination, restraint of trade, monopolization, unfair trade practices, predatory pricing or false advertising;

### D. Contract - based upon, arising out of or resulting from any liability in connection with any contract or agreement to which a Company is a party, provided that this Exclusion D shall not apply to the extent that such Company would have been liable in the absence of such contract or agreement;

### E. Employment Practices - based upon, arising out of or resulting from any employment-related Wrongful Act;

### F. Intellectual Property - based upon, arising out of or resulting from any infringement of copyright, patent, trademark, trade dress, trade name or service mark or any misappropriation of ideas, trade secrets or other intellectual property rights;

MACC:Complaint 000083

FILED DATE: 9/15/2020 9:39 AM    2020L008850

G.  **Personal Injury** - based upon, arising out of or resulting from any defamation (including libel and slander), disparagement, wrongful entry or eviction, invasion of privacy, false arrest, false imprisonment, assault, battery, loss of consortium, malicious use or abuse of process or malicious prosecution.

H.  **Professional Services** - based upon, arising out of or resulting from the performance of or failure to perform Professional Services; and

I.  **Third Party Discrimination or Harassment** - based upon, arising out of or resulting from any discrimination against, or harassment of, any third party.

With respect to this Coverage Part, the following exceptions shall apply to Section II. **EXCLUSIONS** of the GTC:

1.  Exclusion A. Bodily Injury/Property Damage shall not apply to any Claim under Insuring Clause A; and

2.  Exclusion E. Pollution shall not apply to any Claim: (a) under Insuring Clause A; or (b) brought by a securityholder of a Company against an Insured Person.

## III.  RETENTION

No retention shall apply to any Claim under Insuring Clause A or to any Securityholder Derivative Demand Investigation.

## IV.  LIMIT OF LIABILITY

A.  The Securityholder Derivative Demand Investigation Limit stated in Item 2B of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for Defense Costs on account of all Securityholder Derivative Demand Investigations, which amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2A of such Declarations.

B.  The Additional Limit for Non-Indemnifiable Loss stated in Item 3 of the Declarations of this Coverage Part represents an additional limit of liability available solely to an Executive or natural person General Partner for Loss on account of a Claim covered under Insuring Clause A. This additional limit of liability shall be in addition to and not part of, and excess of any other insurance written specifically as excess of, the Limit of Liability stated in Item 2A of such Declarations.

## V.  ADVANCEMENT

A.  If a Company fails to respond to an Insured Person's request for indemnification within 60 days of the Insured Person's request to the Company for such indemnification, then upon the reporting of the Claim, the Insurer shall advance Defense Costs and any other incurred Loss until such time that the Company accepts the Insured's request for indemnification or the Limit of Liability set forth in Item 2A of the Declarations of this Coverage Part has been exhausted, whichever occurs first. In any other Claim, the Insurer shall advance Defense Costs on a current basis, but no later than 60 days after receipt of the legal bills and any supporting documentation.

B.  If it is determined by a final adjudication that any advanced Defense Costs are not covered under this Coverage Part, the Insureds, severally according to their respective interests, shall repay such uncovered Defense Costs to the Insurer, provided that nothing in this paragraph B shall limit the final non-appealable adjudication requirement in Exclusion B: Conduct of Section II. EXCLUSIONS of the GTC.  If the Insurer recovers any portion of an amount paid under this Coverage Part, the Insurer shall reinstate the applicable limit of liability with any amounts recovered up to such amount paid, less any costs incurred by the Insurer in its recovery efforts.

## VI.  REPORTING

Notice of a Securityholder Derivative Demand Investigation is optional, but only Loss incurred after such Securityholder Derivative Demand Investigation is reported is eligible for coverage under this Coverage Part. If an Insured elects to report any Securityholder Derivative Demand Investigation, any Claim that may subsequently arise out of any reported Securityholder Derivative Demand Investigation shall be deemed to have been first made during the Policy Period in which such investigation was first reported.

## VII.  OTHER INSURANCE

A.  With the exception of insurance written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for Loss for which this Coverage Part also provides coverage, provided that any payment by an Insured of a retention or deductible under any such other insurance shall reduce the applicable Retention under this Coverage Part by the amount of such payment which would otherwise have been Loss under this Coverage Part.

QBDP-1000 (05-14)

MACC:Complaint 000084

FILED DATE: 9/15/2020 9:39 AM    2020L009850

B. This Coverage Part shall also be excess of and shall not contribute with any indemnity provided, and any valid and collectible insurance maintained, by an Outside Entity for an Insured Person serving in his capacity as such for the Outside Entity.

C. Any personal umbrella excess liability insurance, independent directors liability insurance or any other similar personal liability insurance available to an Insured shall be specifically excess of this Coverage Part.

## VIII. PRIORITY OF PAYMENTS

A. In the event that Loss under Insuring Clause A and any other Loss are concurrently due under this Coverage Part, then the Loss under Insuring Clause A shall be paid first. In all other instances, the Insurer may pay Loss as it becomes due under this Coverage Part without regard to the potential for other future payment obligations under this Coverage Part.

B. The coverage provided by this Coverage Part is intended first and foremost for the benefit and protection of Insured Persons. In the event a liquidation or reorganization proceeding is commenced by or against a Company pursuant to United States bankruptcy law:

1. the Insureds hereby agree not to oppose or object to any efforts by the Insurer, the Company or an Insured to obtain relief from any stay or injunction issued in such proceeding; and

2. the Insurer shall first pay Loss on account of a Claim for a Wrongful Act occurring prior to the date such liquidation or reorganization proceeding commences, and then pay Loss in connection with a Claim for a Wrongful Act occurring after the date such liquidation or reorganization proceeding commences.

## IX. SECURITIES OFFERING

If during the Policy Period, a Company intends a public offering of securities under the Securities Act of 1933 and gives written notice to the Insurer within 30 days of the effective date of the Registration Statement for such offering, together with any additional information requested by the Insurer, the Insurer shall provide the Company with a quote for coverage with respect to such offering. Coverage offered pursuant to this quote shall include coverage for Wrongful Acts occurring in the course of any "road show" presentation to potential investors or other similar presentation and shall be subject to additional or different terms and conditions and payment of additional premium.

## X. GLOSSARY

A. Claim means:

1. with respect to Insuring Clauses A and B, any investigation, evidenced by any written document, including a subpoena, target letter or search warrant, against an Insured Person for a Wrongful Act; and

2. with respect to Insuring Clauses A, B and C:

    (a) a written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation, waiving or tolling of a statute of limitations or Extradition;

    (b) a civil or criminal proceeding, evidenced by: (i) the service of a complaint or similar pleading in a civil proceeding; or (ii) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

    (c) a formal administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

    against an Insured for a Wrongful Act, including any appeal therefrom.

The time when a Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Claim is first made against, served upon or received by the Insured or the applicable notice or order is filed or entered.

B. Defense Costs means that part of Loss consisting of:

1. reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any Insured) incurred in: (a) investigating, defending, opposing or appealing any Claim or (b) any Securityholder Derivative Demand Investigation; and

2. the premium for appeal, attachment or similar bonds (but the Insurer shall be under no obligation to furnish any bond).

C. Insured means any Company or Insured Person.

D. Insured Person means:

1. an Executive;

QBBP-1000 (08-14)

Page 3 of 4

MACC:Complaint 000085

2. an Employee, but only with respect to a Claim: (a) brought by a securityholder of a Company in his capacity as such; or (b) that is also brought and maintained against an Insured Person included in paragraph 1 above; or

3. a holder of an equivalent position to those included in paragraph 1 above in an Outside Entity, while serving at the specific request or direction of the Company.

E. **Loss** means the amount that an Insured becomes legally obligated to pay on account of any Claim including:

1. compensatory damages;

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorneys fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. Defense Costs;

5. solely with respect to Insuring Clause A, taxes imposed by law upon an Insured Person in his capacity as such in connection with any bankruptcy, receivership, conservatorship or liquidation of a Company, to the extent such taxes are insurable by law; and

6. punitive, exemplary or multiplied damages, fines or penalties, if and to the extent that any such damages, fines or penalties are insurable under the law of the jurisdiction most favorable to the insurability of such damages, fines or penalties.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant insureds or to the Claim giving rise to such damages, fines or penalties, and the insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the insurer and the insured) that such damages, fines or penalties are insurable under applicable law.

Loss does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) amount that represents or is substantially equivalent to an increase in consideration paid (or proposed to be paid) by a Company in connection with its purchase of any securities and assets;

(d) tax, other than taxes described in paragraph 5 above; or

(e) cost incurred to clean up, remove, contain, treat, detoxify or neutralize Pollutants.

F. **Outside Entity** means:

1. any non-profit entity, community chest, fund or foundation; or

2. any other entity specifically added as an Outside Entity by endorsement to this Coverage Part,

that is not a Company.

G. **Professional Services** means services which are performed for others for a fee.

H. **Securityholder Derivative Demand Investigation** means an investigation by a Company to determine whether it is in the best interest of such Company to prosecute the claims alleged in a securityholder derivative demand or lawsuit. Where a Securityholder Derivative Demand Investigation is initiated because of a lawsuit rather than a demand, any coverage provided for Defense Costs on account of such Securityholder Derivative Demand Investigation shall in no way limit the coverage otherwise afforded under this Coverage Part to an Insured for Loss on account of a Claim.

J. **Wrongful Act** means:

1. any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by: (a) an Insured Person in his capacity as such; or (b) by a Company; or

2. any other matter claimed against an Insured Person solely by reason of serving in his capacity as such.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000086

FILED DATE: 9/15/2020 9:39 AM    2020L009850

POLICY NUMBER: QPL0766816

 QBE.

QBBP-3007 (05-14)

*The Solution* for Employment Practices Liability
Coverage Part Declarations

**QBE Insurance Corporation**
Wall Street Plaza, 88 Pine Street, New York, New York 10005
Home Office: c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

Item 1:    Parent Company:    Mike Anderson Auto Group

Item 2:    Limit of Liability

$2,000,000 per Claim
$2,000,000 in the aggregate

Item 3:    Retention: $50,000 per Claim

Item 4:    Pending or Prior Proceedings Date: October 1, 1998

MACC:Complaint 000087



*The Solution* for Employment Practices Liability
Coverage Part

FILED DATE: 9/15/2020 9:39 AM 2020L008850

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

**I.   INSURING CLAUSE**

The Insurer shall pay, on behalf of an Insured, Loss on account of a Claim first made during the Policy Period.

**II.   EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim:

A.   **Breach of Written Employment Contract** - based upon, arising out of or resulting from any breach of any written employment contract or agreement, provided that this Exclusion A shall not apply to: 1. Loss to the extent an Insured would have been liable for such Loss in the absence of such written employment contract or agreement; or 2. Defense Costs;

B.   **OSHA, Workforce Notification and Labor Relations** - based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by the Occupational Safety and Health Act, the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act or any similar law;

C.   **Workers Compensation, Disability Benefits, Social Security, Unemployment** - based upon, arising out of or resulting from any failure to comply with any obligation under any workers compensation, disability benefits, social security or unemployment insurance law;

Exclusions A - C above shall not apply to any Claim for Retaliation.

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1.   Exclusion A. Bodily Injury/Property Damage shall not apply to Loss for any mental anguish, emotional distress or humiliation when alleged as part of a Claim otherwise covered under this Coverage Part; and

2.   Exclusion C. ERISA and E. Pollution shall not apply to any Claim for Retaliation.

**III.   OTHER INSURANCE**

A.   With respect to any Claim for an Employment Practices Wrongful Act, other than that portion of a Claim made against a leased or temporary employee or Independent Contractor, this Coverage Part shall be primary insurance.

B.   With respect to:

1.   that portion of any Claim made against any leased or temporary employee or Independent Contractor; or

2.   any Claim for a Third Party Wrongful Act, where Loss is covered under this Coverage Part and other valid and collective insurance,

this Coverage Part shall be specifically excess of and shall not contribute with any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by the Coverage Part), regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

**IV.   COORDINATION OF COVERAGE**

Any Loss covered under this Coverage Part and one or more other Liability Coverage Parts shall first be covered under this Coverage Part, subject to its terms, conditions and limitations. Any remaining portion of such Loss shall be covered under such other Liability Coverage Part(s), subject to its terms, conditions and limitations.

**V.   GLOSSARY**

A.   **Benefits** means any payments (including insurance premiums), deferred compensation, perquisites or fringe benefits, in connection with an employee benefit plan and any other payment to or for the benefit of an employee arising out of the employment relationship. However, Benefits shall not include salary, wages, bonuses, commissions, Stock Benefits or non-deferred cash incentive compensation.

QBEP-1002 (05-14)

Page 1 of 4

MACC:Complaint 000088

B. **Claim** means any:

1. written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, waiving or tolling of a statute of limitations, reinstatement, reemployment or re-engagement;

2. civil or criminal proceeding, evidenced by: (a) the service of a complaint or similar pleading in a civil proceeding; or (b) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; and

3. arbitration proceeding pursuant to an employment contract or agreement, policy or practice of a Company;

4. administrative, regulatory or tribunal proceeding, other than a labor, grievance or other proceeding under a collective bargaining agreement, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation; or

5. any audit of an insured conducted by the United States of America Office of Federal Contract Compliance Programs ("OFCCP"),

against an insured for a Wrongful Act, including any appeal therefrom.

The time when a Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Claim is first made against, served upon or received by the insured or the applicable notice or order is filed or entered.

C. **Defense Costs** means that part of Loss consisting of:

1. reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any insured) incurred in investigating, defending, opposing or appealing any Claim; or

2. the premium for appeal, attachment or similar bonds (but the insurer shall be under no obligation to furnish any bond).

D. **Discrimination** means any violation of any employment discrimination law.

E. **Employment Practice Wrongful Act** means any:

1. breach of any employment contract or agreement or contractual obligation, including any contract or agreement or contractual obligation arising out of any employee handbook, personnel manual, policy statement or other representation;

2. **Discrimination;**

3. **Harassment;**

4. **Retaliation;**

5. **Workplace Tort;** or

6. **Wrongful Employment Decision,**

committed, attempted, or allegedly committed or attempted by an insured while acting in his or its capacity as such.

F. **Harassment** means any:

1. sexual harassment that is made a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating, hostile or offensive working environment within, a Company; or

2. workplace harassment, including bullying that interferes with performance or creates an intimidating, hostile or offensive working environment within a Company.

G. **Independent Contractor** means any natural person working for a Company pursuant to a written contract or agreement between such natural person and the Company which specifies the terms of the Company's engagement of such natural person.

H. **Insured** means any Company or Insured Person.

I. **Insured Person** means any:

1. Executive or Employee; or

2. Independent Contractor, but only if the Company agrees to indemnify the Independent Contractor in the same manner as Employees for liability arising out of a Claim.

QBEP-1002 (05-14)

Page 2 of 4

MACC:Complaint 000089

FILED DATE: 9/15/2020 9:39 AM   2020L009850

J.   **Loss** means the amount that an Insured becomes legally obligated to pay on account of any Claim including:

   1.   compensatory damages (including back pay and front pay);

   2.   judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorney fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

   3.   pre and post-judgment interest;

   4.   liquidated damages awarded pursuant to the Age Discrimination in Employment Act, Family Medical Leave Act or Equal Pay Act;

   5.   **Defense Costs**; and

   6.   punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages.

   In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant Insureds, to the Company, or to the Claim giving rise to such damages, and the Insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the Insurer and the Insured) that such damages are insurable under applicable law.

   **Loss** does not include any portion of such amount that constitutes any:

   (a)   amount not insurable under the law pursuant to which this Coverage Part is construed;

   (b)   cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

   (c)   future salary, wages, commissions, or **Benefits** or other monetary payments of a claimant who has been or shall be hired, promoted or reinstated to employment pursuant to a settlement, order or other resolution of any Claim;

   (d)   salary, wages, commissions, **Benefits** or other monetary payments which constitute severance payments or payments pursuant to a notice period;

   (e)   **Benefits** due or to become due or the equivalent value of such **Benefits**;

   (f)   cost associated with providing any accommodation for persons with disabilities or any other status which is protected under any law, including the Americans with Disabilities Act and the Civil Rights Act of 1964;

   (g)   tax, fine or penalty imposed by law; or

   (h)   cost incurred to clean up, remove, contain, treat, detoxify or neutralize Pollutants.

K.   **Retaliation** means retaliatory treatment against an **Employee** of a **Company** on account of such individual:

   1.   exercising his or her rights under law, refusing to violate any law or opposing any unlawful practice;

   2.   having assisted or testified in or cooperated with a proceeding or investigation (including any internal investigation conducted by the Company's human resources or legal department) regarding alleged violations of law by the Insured;

   3.   disclosing or threatening to disclose to a superior or any governmental agency any alleged violations of law; or

   4.   filing any claim against the Company under the Federal False Claims Act, Section 806 of the Sarbanes Oxley Act or any other whistleblower law.

L.   **Stock Benefits** means any:

   1.   offering, plan or agreement between a Company and any Employee which grants stock, warrants, shares or stock options of the Company to such Employee, including grants of restricted stock, performance stock shares, membership shares or any other compensation or incentive granted in the form of securities of the Company; or

   2.   payment or instrument, the amount or value of which is derived from the value of securities of the Company, including stock appreciation rights or phantom stock plans or arrangements,

   provided that Stock Benefits shall not include amounts claimed under any employee stock ownership plans or employee stock purchase plans.

QBBP-1002 (05-14)                                                                                                         Page 3 of 4

FILED DATE: 9/15/2020 9:39 AM  2020L008850

MACC:Complaint 000090

FILED DATE: 9/15/2020 9:39 AM   2020L008850

M.  **Third Party** means any natural person who is not an Insured Person.

N.  **Third Party Wrongful Act** means any sexual harassment, or discrimination based upon status protected under any anti-discrimination law, against a Third Party committed, attempted, or allegedly committed or attempted by any Insured while acting in his or its capacity as such.

O.  **Workplace Tort** means any employment-related:

1.  misrepresentation, defamation (including libel and slander), invasion of privacy, wrongful infliction of emotional distress, mental anguish or humiliation; or

2.  negligent retention, supervision, hiring or training, failure to provide or enforce consistent employment-related corporate policies and procedures, false imprisonment, negligent evaluation, wrongful discipline or wrongful deprivation of career opportunity,

but only when alleged as part of a Claim for any Wrongful Employment Decision, breach of employment contract, Discrimination, Harassment or Retaliation.

P.  **Wrongful Act** means an Employment Practices Wrongful Act or Third Party Wrongful Act.

Q.  **Wrongful Employment Decision** means any wrongful termination, discharge of employment, demotion, denial of tenure, failure or refusal to employ or promote, or wrongful or negligent employee reference.

MACC:Complaint 000091

POLICY NUMBER: QPL0765816

 **QBE**

QBBP-3008 (05-14)

*The Solution* for Fiduciary Liability
Coverage Part Declarations

**QBE Insurance Corporation**
55 Water Street, New York, New York 10041
Home Office: c/o CT Corporation System,116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

**THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY TO PAY JUDGMENTS OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

Item 1:   Parent Company:   Mike Anderson Auto Group

Item 2:   A.  Limit of Liability

            $2,000,000 per Claim
            $2,000,000 in the aggregate

          B.  Voluntary Compliance Program Loss Limit: $150,000

          C.  ERISA Civil Penalties Limit: $100,000

          D.  HIPAA Privacy Civil Penalties Limit: $50,000

Item 3:   Insuring Clause A Retention: $0 per Claim

Item 4:   Pending or Prior Proceedings Date: May 1, 2005

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000092



FILED DATE: 9/15/2020 9:39 AM   2020L000850

**The Solution** for Fiduciary Liability Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

**I. INSURING CLAUSE**

    A. The Insurer shall pay, on behalf of an Insured, Loss on account of a Claim first made during the Policy Period.

    B. The Insurer shall pay, on behalf of an Insured, Voluntary Compliance Program Loss first ascertained by or assessed against an Insured during the Policy Period, provided that the payment of any Voluntary Compliance Program Loss under this Coverage Part shall not waive any of the Insurer's rights under this Policy.

**II. EXCLUSIONS**

In addition to the Exclusions set forth in Section II. EXCLUSIONS of the GTC, no coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim:

    A. **Liability Assumed Under Contract** - based upon, arising out of or resulting from any liability of others assumed by an Insured under any contract or agreement, provided that this Exclusion A shall not apply to Loss to the extent that: 1. an Insured would have been liable for such Loss in the absence of such contract or agreement; or 2. the liability assumed was under the agreement or declaration trust pursuant to which a Plan was established; and

    B. **Workers Compensation, Disability Benefits, Social Security, Unemployment** - based upon, arising out of or resulting from any failure to comply with any obligation under any workers compensation, disability benefits, social security or unemployment insurance law, provided that this Exclusion B shall not apply to any Wrongful Act based upon, arising out of or resulting from: 1. COBRA; or 2. HIPAA;

With respect to this Coverage Part, the following exceptions shall apply to Section II. EXCLUSIONS of the GTC:

1. Exclusion C. ERISA shall not apply to this Coverage Part; and

2. Exclusion E. Pollution shall not apply to any Claim:

    (a) brought by or on behalf of a participant in, or beneficiary of, any Sponsored Plan based upon, arising out of or resulting from the diminution in value of any securities owned by such Sponsored Plan in any organization, where such diminution in value is allegedly the result of the matters described in Exclusion E; and

    (b) for which an Insured Person is not indemnified by a Company because of such Company's Financial Impairment.

**III. RETENTION**

No retention shall apply to any Voluntary Compliance Program Loss or Loss constituting civil penalties as described in paragraphs 7(b)(iii) and (iv) of the definition of Loss.

**IV. LIMIT OF LIABILITY**

    A. The Voluntary Compliance Program Loss Limit stated in Item 2B of the Declarations of this Coverage Part represents the Insurer's maximum liability for all Voluntary Compliance Program Loss, including Defense Costs related to the assessment or correction of a Plan's non-compliance with any Voluntary Compliance Program, payable under the Coverage Part during the Policy Period.

    B. The ERISA Civil Penalties Limit stated in Item 2C of the Declarations of this Coverage Part represents the Insurer's maximum liability for all civil penalties described in paragraph 7(b)(iii) of the definition of Loss ("ERISA Civil Penalties") payable under this Coverage Part during the Policy Period.

    C. The HIPAA Privacy Civil Penalties Limit stated in Item 2D of the Declarations of this Coverage Part represents the Insurer's maximum liability for all civil penalties described in paragraph 7(b)(iv) of the definition of Loss ("HIPAA Privacy Civil Penalties") payable under this Coverage Part during the Policy Period.

All amounts set forth above shall be part of, and not in addition to, the Limit of Liability set forth in Item 2A of the Declarations of this Coverage Part.

QBEP-1003 (05-14)

MACC:Complaint 000093

**V.  REPORTING**

The Insured shall notify the Insurer of Voluntary Compliance Program Loss as soon as practicable after such Voluntary Compliance Program Loss is first ascertained by or assessed against an Insured.  However, in no event shall any notice be provided later than:

    A.  If this Coverage Part expires (or is otherwise terminated) without being renewed with the Insurer, 60 days after the effective date of expiration or termination of this Coverage Part; or

    B.  the expiration date of the ERP, if applicable.

**VI.  OTHER INSURANCE**

With the exception of insurance which is written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for Loss for which this Coverage Part provides coverage, provided that any payment by an Insured of a retention or deductible under any such other insurance shall reduce the Retention under this Coverage Part by the amount of such payment which would otherwise have been Loss under this Coverage Part.

**VII.  PRIORITY OF PAYMENTS**

In the event a liquidation or reorganization proceeding is commenced by or against a Company pursuant to United States bankruptcy law, the Insurer shall first pay Loss incurred by an Insured Person and the Plans and then pay Loss incurred by any Company.

**VIII.  CHANGES IN A PLAN**

    A.  If the Pension Benefit Guaranty Corporation ("PBGC") becomes the trustee of a Plan before or after the inception date of this Coverage Part, coverage for such Plan shall continue until termination of this Coverage Part for those who were Insureds at the time the PBGC became the trustee, but only with respect to Wrongful Acts which occurred prior to the effective date the PBGC became the trustee; or

    B.  If a Company terminates a Plan before or after the inception date of this Coverage Part, coverage for such Plan shall continue until termination of this Coverage Part for those who were Insureds at the time of such Plan termination or who would have been an Insured at the time of such termination if this Coverage Part had been in effect, but only with respect to Wrongful Acts which occurred prior to or after the date the Plan was terminated.

**IX.  GLOSSARY**

    A.  **Administration** means advising, counseling, interpreting, providing notice to or handling of records, enrollment, termination or cancellation of, any Plan for Employees, Executives, participants or beneficiaries.

    B.  **Claim** means any:

        1.  written notice of commencement of a fact finding investigation by the U.S. Department of Labor ("DOL"), the PBGC or any similar governmental authority located outside of the United States;

        2.  written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, mediation or waiving or tolling of a statute of limitations or Extradition;

        3.  civil or criminal proceeding, evidenced by: (a) the service of a complaint or similar pleading in a civil proceeding; or (b) the filing of an indictment, information or similar document or an arrest in a criminal proceeding; or

        4.  formal administrative or regulatory proceeding, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

    against an Insured for a Wrongful Act, including any appeal therefrom.

    The time when a Claim shall be deemed first made for the purposes of this Coverage Part shall be the date on which the Claim is first made against, served upon or received by the Insured.

    C.  **Defense Costs** means that part of Loss consisting of:

        1.  reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any Insured) incurred in investigating, defending, opposing or appealing any Claim or Voluntary Compliance Program Loss; or

QBBP-1003 (06-14)

FILED DATE: 9/15/2020 9:39 AM  2020L008850

MACC:Complaint 000094

2. the premium for appeal, attachment or similar bonds (but the insurer shall be under no obligation to furnish any bond).

D. Insured means any Company, Plan or Insured Person.

E. Insured Person means any:

1. Executive of a Company;

2. Employee of a Company or Sponsored Plan; and

3. past, present or future natural person trustee of a Sponsored Plan.

F. Loss means the amount that an insured becomes legally obligated to pay on account of any Claim including:

1. compensatory damages;

2. judgments and settlements, including a judgment or settlement awarding plaintiffs' attorneys fees, provided that with respect to any settlement including plaintiffs' attorneys fees, that portion of the settlement can be demonstrated to be reasonable, taking into consideration the nature of legal action, time and expense involved in prosecuting such action, and the likelihood of a court awarding a similar amount as part of a judgment;

3. pre and post-judgment interest;

4. Defense Costs;

5. Voluntary Compliance Program Loss;

6. punitive, exemplary or multiplied damages, if and to the extent that any such damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages; and

7. the following civil penalties:

(a) the 5% or less, or 20% or less, civil penalties imposed upon an insured as a fiduciary under § 502(i) or (l) of ERISA;

(b) civil penalties imposed:

(i) by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions, the United Kingdom Occupational Pensions Regulatory Authority or the Pensions Regulator, pursuant to the Pension Scheme Act of 1993, the Pensions Act of 1995 and the Pensions Act of 2004; or

(ii) by Ireland's Pensions Board or Pensions Ombudsman,

provided that any coverage for such civil penalties applies only if the funds or assets of the pension scheme are not used to fund, pay or reimburse the premium for this Coverage Part;

(iii) upon an insured as a fiduciary under Section 502(c) of ERISA; or

(iv) upon an insured for violation of the privacy provisions of HIPAA.

In determining the most favorable jurisdiction as set forth in paragraph 6 above, due consideration shall be given to the jurisdiction with a substantial relationship to the relevant insureds or to the Claim giving rise to such damages, and the insurer shall not challenge any opinion of independent legal counsel (mutually agreed to by the insurer and the insured) that such damages are insurable under applicable law.

Loss does not include any portion of such amount that constitutes any:

(a) amount not insurable under the law pursuant to which this Coverage Part is construed;

(b) cost incurred to comply with any order for injunctive or other non-monetary relief, or to comply with an agreement to provide such relief;

(c) tax imposed by law;

(d) fine or penalty imposed by law, other than as described in paragraph 7 above;

(e) benefits due or would become due under any Plan, including the payment of plaintiffs' attorneys fees as a percentage of such benefits or from a common fund established to pay such benefits, unless:

(i) such benefits are payable as an Insured Person's personal obligation based upon, arising out of or

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000095

resulting from a **Wrongful Act**; or

(ii) a **Claim** alleges a loss to the **Plan** or to the accounts of such **Plan's** participants resulting from a change in the value of **Plan** investments, even where the amounts sought or recovered by the plaintiffs in such **Claim** are described in any way as "benefits"; or

(f) cost incurred to clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

G. **Plan** means:

1. any **Sponsored Plan**; and

2. any government mandated workers compensation, disability benefits, social security or unemployment insurance for **Employees** and **Executives**.

H. **Sponsored Plan** means:

1. any employee benefit plan, pension benefit plan or welfare benefit plan, as defined in and subject to **ERISA**, including any **VEBA**, which is operated by a **Company** or a **Company** and a labor organization solely for the benefit of **Employees** or **Executives** of a **Company**; or

2. any other employee benefit plan or program similar to those described in paragraph 1, but which is not subject to **ERISA**, including any fringe benefit or excess benefit plan,

provided that **Sponsored Plan** shall not include any employee stock ownership plan created after inception of the **Policy Period**.

I. **VEBA** means any Voluntary Employees' Beneficiary Associations as defined in Section 501(c)(9) of the Internal Revenue Code of 1986.

J. **Voluntary Compliance Program** means any voluntary compliance resolution program or similar voluntary settlement program administered by the Internal Revenue Service or DOL or any other domestic or foreign governmental authority. Such programs include the Employee Plans Compliance Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Walk-in Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correspondence Program, Delinquent Filer Voluntary Compliance Program and Voluntary Fiduciary Correction Program.

K. **Voluntary Compliance Program Loss** means fees, fines, penalties or sanctions paid by an **Insured** to a governmental authority under a **Voluntary Compliance Program** for a **Plan's** inadvertent non-compliance with any law. However, **Voluntary Compliance Program Loss** shall not include any costs to correct any non-compliance.

L. **Wrongful Act** means any:

1. actual or alleged breach of the responsibilities, obligations or duties imposed by **ERISA** upon fiduciaries of the **Sponsored Plan**;

2. negligent act, error or omission in the **Administration** of any **Plan** committed, attempted or allegedly committed or attempted by an **Insured** in his or its capacity as such;

3. other matter claimed against an **Insured Person** solely by reason of the **Insured Person's** serving as a fiduciary of a **Sponsored Plan**; or

4. negligent act, error or omission committed, attempted or allegedly committed or attempted by an **Insured Person** in performing any functions identified in ERISA Section 3(21)(A) as not being the functions of a fiduciary, and commonly referred to as "settlor" functions

MACC:Complaint 000096

FILED DATE: 9/15/2020 9:39 AM   2020L008850

POLICY NUMBER: QPL0766816

 **QBE.**

QBBP-3012 (05-14)

*The Solution* for Crime
Coverage Part Declarations

**QBE Insurance Corporation**
55 Water Street, New York, New York 10041
Home Office: c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101

**Item 1:** Parent Company: Mike Anderson Auto Group

**Item 2:** Limits of Liability and Retentions

| Insuring Clause | Limit of Liability | Retention |
|---|---|---|
| A. Employee Theft | $1,000,000 | $25,000 |
| B. In Transit | $1,000,000 | $25,000 |
| C. Inside the Premises | $1,000,000 | $25,000 |
| D. Forgery and Alteration | $1,000,000 | $25,000 |
| E. Computer Fraud | $1,000,000 | $25,000 |
| F. Funds Transfer Fraud Coverage | $1,000,000 | $25,000 |
| G. Credit Card Fraud | $1,000,000 | $25,000 |
| H. Money Orders and Counterfeit Currency Fraud | $1,000,000 | $25,000 |
| I. Client Coverage | $1,000,000 | $25,000 |

**Item 3:** Expense Limit $25,000

**Item 4:** Computer Fraud Expense Limit $25,000

**Item 5:** Information Reproduction Limit $25,000

MACC:Complaint 000097

FILED DATE: 9/15/2020 9:39 AM 2020L009850



FILED DATE: 9/15/2020 9:39 AM 2020L009850

**The Solution** for Crime
Coverage Part

In consideration of the payment of the premium and subject to the General Terms and Conditions, the Insurer and the Insureds agree as follows:

**I.   INSURING CLAUSES**

The Insurer shall pay the Insured for direct loss:

**A.   Employee Theft**

of Money, Securities or Property sustained by an Insured resulting from Theft or Forgery by an Employee, whether acting alone or in collusion with others.

**B.   In Transit**

sustained by an Insured resulting from:

1.   a Third Party's:

   (a)   Robbery or other unlawful taking of Money, Securities or Property

   (b)   damage to Property resulting from Robbery; and

2.   actual destruction or disappearance of Money or Securities,

while in Transit or temporarily in an Employee's or a partner of the Company's home.

**C.   Inside the Premises**

sustained by an Insured resulting from:

1.   a Third Party's

   (a)   Robbery or Safe Burglary, including damage to Property, or Premises or its exterior, resulting from such Robbery or Safe Burglary;

   (b)   unlawful taking of Money, Securities or Property; and

2.   actual destruction or disappearance of Money or Securities,

within or from the Premises.

**D.   Forgery or Alteration**

resulting from Forgery or alteration of any Financial Instrument by a Third Party, including any reasonable legal expenses that the Insured pays, with the Insurer's prior written consent, in defending any action brought against an Insured for refusing to pay such Financial Instrument, which any such amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2 of the Declarations of this Coverage Part for this Insuring Clause D.

**E.   Computer Fraud**

of Money, Securities or Property resulting from  a Third Party's Computer Fraud, including any Computer Fraud Expenses.

**F.   Funds Transfer Fraud Coverage**

of Money or Securities resulting from a Third Party's Funds Transfer Fraud.

**G.   Credit Card Fraud**

resulting from a Third Party's Credit Card Fraud .

**H.   Money Orders and Counterfeit Currency Fraud**

resulting from a Company's good faith acceptance: 1. in exchange for merchandise, Money or services, of any post office or express money order, issued or purporting to have been issued by any post office or express company, if such money order is not paid upon presentation; or 2. in the regular course of business, of counterfeit paper currency.

QBBP-1006 (05-14)

MACC:Complaint 000098

FILED DATE: 9/15/2020 9:39 AM  2020L009850

I.   **Client Coverage**

of Money, Securities or Property sustained by a Client resulting from an Employee's Theft or Forgery committed without collusion with a Client's employee.

II.  **EXCLUSIONS**

No coverage shall be available for:

A.   **Acts Committed by a Partner** – loss based upon, arising out of or resulting from Theft or Forgery committed by a partner of a Company, whether acting alone or in collusion with others, provided that this Exclusion A shall not apply where the Theft or Forgery would otherwise be covered under Insuring Clauses A or I, and the coverage provided is excess of the amount of such partner's ownership percentage of such Company on the day immediately preceding the date of Discovery, multiplied by such Company's total assets as reflected in such Company's most recent financial statements; provided such statements have been audited or prepared by an Independent Certified Public Accountant;

B.   **Advantage** – loss sustained by one Insured to the advantage of another Insured;

C.   **Authorized Representative** – loss or damage based on, arising out of or resulting from Theft, Forgery, Funds Transfer Fraud, Computer Fraud, Credit Card Fraud or other fraudulent, dishonest or criminal act (other than Robbery and Safe Burglary) committed by any authorized representative, except an Independent Contractor, of an Insured, acting alone or in collusion with others, provided that this Exclusion C shall not apply to loss under Insuring Clauses A or I where the Theft or Forgery is committed by an Employee acting in collusion with such authorized representative;

D.   **Custodial** – loss of or damage to Money, Securities or Property in the custody of any bank, trust company or similar place of safe deposit, armored vehicle company, or any person duly organized by a Company to have custody of such Money, Securities or Property, provided that this Exclusion D shall not apply where coverage provided is excess of: 1. any amount recovered or received by the Company under any contract with, or any insurance available to, any of the foregoing; or 2. any other insurance or indemnity covering the loss, in whole or in part;

E.   **Data Costs, Fees, or Expenses** – costs, fees or expenses incurred:

1. as a result of: (a) the reconstitution of Data where a Company knowingly used illegal copies of programs; (b) an alteration in Data held on magnetic media due to the effect of magnetic fields, their incorrect use or the obsolescence of the computer or its facilities; or (c) any effort to render the Data usable by replacement processing equipment; or

2. to design, improve or update software or programs or perfect their operation or performance;

F.   **Fire** – loss based upon, arising out of or resulting from fire, provided that this Exclusion F shall not apply to: 1. loss of Money or Securities; or 2. damage to any safe or vault caused by fire for the purposes of Safe Burglary;

G.   **Income** – loss of income, whether or not earned or accrued or potential income, not realized as the result of any loss covered under this Coverage Part;

H.   **Indirect or Consequential Loss** – indirect or consequential loss of any kind, provided that this Exclusion H shall not apply to Expenses;

I.   **Intellectual Property** – loss of trade secrets, confidential processing methods or other confidential information of any kind;

J.   **Inventory Shortage** – loss, the proof of which is dependent solely on 1. a profit and loss computation or comparison; or 2. comparison of inventory records with an actual physical count, provided that where an Employee is involved and has been identified, inventory records and actual physical count of inventory can be submitted as supporting documentation of loss;

K.   **Legal Costs, Fees or Expenses** – costs, fees or expenses incurred or paid in defending or prosecuting any legal proceeding or claim, provided that this Exclusion K shall not apply to Expenses;

L.   **Nuclear** – loss or damage based upon, arising out of or resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any act or condition related to any of the foregoing;

M.   **Trading Losses** – loss based upon, arising out of or resulting from any trading of Money, Securities or Property, provided that this Exclusion M shall not apply to direct loss caused by Theft or Forgery resulting in improper personal financial gains to an Employee.  Improper personal financial gains does not include salaries, bonuses, commissions, fees, bonuses, promotions, awards, profit sharing or pensions;

QBBP-1006 (05-14)

MACC:Complaint 000099

FILED DATE: 9/15/2020 9:39 AM 2020L008850

N. **Voluntary Purchase or Exchange** – loss based upon, arising out of, or resulting from an Insured knowingly giving or surrendering Money, Securities or Property in any purchase or exchange with a Third Party without collusion with an Employee, provided that this Exclusion N shall not apply to Insuring Clauses A, H or I;

O. **War and similar actions** – loss or damage based upon, arising out of or resulting from war, whether or not declared, civil war, insurrection, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization or any act or condition related to any of the foregoing;

Exclusions P – Q below shall only apply to Insuring Clauses A. Employee Theft and I. Client Coverage:

P. **Broker/Independent Contractor** – loss caused by any broker, commission, merchant, factor, consignee, contractor, independent contractor (other than an Independent Contractor) or other similar agent or representative;

Q. **Prior Dishonesty** – loss caused by an Employee, which is sustained by an Insured:

  1. after an Executive or Insurance Representative becomes aware of a Theft, Forgery or other fraudulent, dishonest or criminal act:

   (a) valued at $1,000 or more and committed while in the employ or service of an Insured;

   (b) involving Money, Securities or other property, valued at $25,000 or more and committed prior to the employ or service of an Insured; or

  2. more than 90 days following termination of such Employee;

Exclusions R - S below shall only apply to Insuring Clauses B. In Transit and C. Inside the Premises:

R. **Mail/Carrier for Hire** – loss of or damage to Money, Securities or Property while in the mail or in the custody of any carrier for hire other than an armored motor vehicle company

S. **Other Insuring Clauses** - loss or damage based on, arising out of or resulting from Forgery, Funds Transfer Fraud, Computer Fraud or Credit Card Fraud;

Exclusion T. below shall only apply to Insuring Clauses B. In Transit, C. Inside the Premises, E. Computer Fraud and F. Funds Transfer Fraud Coverage:

T. **Kidnap, Ransom or Extortion** – loss or damage based upon, arising out of or resulting from any kidnap, ransom or extortion payment;

Exclusion U. below shall only apply to Insuring Clause D. Forgery or Alteration:

U. **Forgery or Alteration** – loss based upon, arising out of or resulting from a Third Party's Forgery or alteration of: 1. any Financial Instrument committed in collusion with any Employee; or 2. any registered or coupon obligations of the Insured, or any coupons whether attached or detached; and

Exclusion V. below shall only apply to Insuring Clause G. Credit Card Fraud:

V. **Forgery or Alteration** – loss based upon, arising out of or resulting from any forgery or alteration of, on or in any written instrument, provided that this Exclusion V shall not apply: 1. where there was full compliance with the provisions, conditions and other terms under which the involved credit card was issued; and 2. the Company is legally liable for the loss to the issuer of such credit card.

### III. RETENTION

The Insurer shall not pay for any loss until that part of each loss exceeds the applicable Retention stated in Item 2 of the Declarations of this Coverage Part. No Retention shall apply to loss sustained by an ERISA Plan.

### IV. LIMIT OF LIABILITY

A. The Limits of Liability, stated in Item 2 of the Declarations of this Coverage Part, represent the maximum amount payable under each Insuring Clause for each loss Discovered during the Policy Period.

B. The Expense Limit stated in Item 3 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for Expenses, which amount shall be part of, and not in addition to, the Limits of Liability stated in Item 2 of such Declarations.

C. The Computer Fraud Expense Limit stated in Item 4 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for Computer Fraud Expenses, which amount shall be part of, and not in addition to, the Limit of Liability stated in Item 2 of such Declarations for Insuring Clause E. Computer Fraud.

D. The Information Reproduction Limit stated in Item 5 of the Declarations of this Coverage Part represents the maximum amount payable under this Coverage Part during the Policy Period for the cost of reproducing information contained in any lost or damaged manuscripts, records, accounts, microfilms, tapes or other

MACC:Complaint 000100

FILED DATE: 9/15/2020 9:39 AM 2020L008850

records resulting from a covered loss, which amount shall be part of, and not in addition to, the Limits of Liability stated in Item 2 of such Declarations.

E.  The Insurer shall not pay the Insured more for loss or losses sustained by more than one Insured then the amount the Insurer would pay if all loss or losses had been sustained by one Insured.

F.  All loss resulting from a single act or series of related acts of the same Employee or Third Party, and all loss whether such act or acts occurred before or during the Policy Period, shall be treated as a single loss subject to the Limits of Liability stated in Item 2 of the Declarations.

G.  If a loss is covered under more than one Insuring Clause, the maximum amount payable under this Coverage Part shall not exceed the largest applicable Limit of Liability of any such Insuring Clause.

## V.  DISCOVERY

A.  This Coverage Part provides coverage for loss sustained by an Insured at any time but Discovered during the Policy Period.

B.  The Insurer shall pay for loss that an Insured sustained prior to the effective date of expiration or termination of this Coverage Part, which is Discovered by the Insured:

1.  no later than 60 days after the effective date of such expiration or termination; and

2.  with respect to any ERISA Plan, no later than 1 year from the effective date of such expiration or termination.

This extended period to Discover loss terminates immediately upon the effective date of any other insurance obtained by the Insured to replace, in whole or in part, the insurance provided by this Coverage Part, regardless of whether such insurance provides coverage for loss sustained prior to its effective date.

## VI.  DUTIES IN THE EVENT OF LOSS

A.  An Insured's knowledge of any information relevant to this Coverage Part or Discovery shall be deemed knowledge possessed by all Insureds.

B.  Upon Discovery, the Insured shall:

1.  give written notice to the Insurer as soon as practicable, but in no event later than 90 days after such Discovery;

2.  provide the Insurer with a detailed, sworn proof of loss within 120 days after such Discovery;

3.  submit to an examination under oath at the Insurer's request;

4.  cooperate with the Insurer in the investigation and settlement of any claim.

## VII.  OWNERSHIP

Solely with respect to:

A.  Insuring Clauses A – H, this Coverage Part shall only apply:
1.  to Money, Securities or Property owned by a Company, for which the Company is legally liable, or held by the Company in any capacity; and
2.  no coverage shall be provided under this Coverage Part for any damage to the Premises unless the Company is the owner of such Premises or is legally liable for such damage;

provided that with respect to Insuring Clause A, the Insurer's liability shall not apply to Money, Securities or Property of a Client.

B.  Insuring Clause I, this Coverage Part shall only apply to Money, Securities or Property owned by a Client, which is held by a Company in any capacity or for which the Company is legally liable.

## VIII.  OTHER INSURANCE

With the exception of insurance which is written specifically as excess of the Limit of Liability of this Coverage Part, this Coverage Part shall be excess of and shall not contribute with any valid and collectible insurance providing coverage for loss for which this Coverage Part provides coverage (including any prior insurance replaced by this Coverage Part, which provided a period of time to discover loss occurring prior to the termination or cancellation of such replaced policy), provided that any payment by an Insured of a retention or deductible under any such other insurance shall reduce the Retention under this Coverage Part by the amount of such payment which would otherwise have been loss under this Coverage Part.

QBBP-1006 (05-14)

MACC:Complaint 000101

FILED DATE: 9/15/2020 9:39 AM 2020L000850

**IX.  ERISA PROVISION**

A.  Any payment made by the Insurer under this Coverage Part for loss sustained by an ERISA Plan shall be paid to such ERISA Plan. If such loss payment is in excess of the amount of coverage required by ERISA, any such excess amount shall be held for the use and benefit of any other ERISA Plan, should such ERISA Plan also Discover loss covered under this Coverage Part.

B.  With respect to each ERISA Plan, if covered loss is sustained by any ERISA Plan:

1.  which does not have any employer securities, the Limit of Liability applicable to such covered loss shall be the greater of $1,000; or 10% of the ERISA Plan's funds handled as of the beginning of such ERISA Plan's fiscal year, up to a maximum limit of $500,000;

2.  which does have any employer securities, the limit of liability applicable to such covered loss shall be the greater of $1,000; 10% of the ERISA Plan's funds handled as of the beginning of such ERISA Plan's fiscal year, up to a maximum limit of $1,000,000.

C.  If the Limits of Liability stated in item 2 of the Declarations of this Coverage Part are:

1.  less than or equal to the amounts set forth in B1. and 2. above, then the applicable Limit of Liability shall be amended to such respective amounts; or

2.  greater than the amounts set forth in B1. and 2. above, then the limit of liability for each ERISA Plan shall be the amounts stated above with the remaining limit allocated equally between all ERISA Plans sustaining loss.

**X.  VALUATION**

The Insurer shall pay:

A.  the actual market value of lost, damaged or destroyed Securities at the closing price of such Securities on the business day immediately preceding the day on which a loss is Discovered; or the cost of replacing Securities, whichever is less, plus the cost to post a Lost Instrument Bond;

B.  the least of:
1.  the actual cash value of the Property; or
2.  the cost to repair or replace Property, other than precious metals, with that of similar quality and value,

at the time Parent Company complies with Section VI. DUTIES IN THE EVENT OF LOSS, regarding the furnishing of a proof of loss;

C.  the United States of America dollar value of:
1.  foreign currency based on the rate of exchange published in The Wall Street Journal on the day loss involving foreign currency is Discovered; or
2.  any precious metals based on the amount published in The Wall Street Journal Cash Prices, Precious Metals, on the day loss involving such precious metals is Discovered.

**XI.  GLOSSARY**

A.  Client means a customer of a Company to whom a Company provides goods or services for a fee or with whom the Company has a written contract or agreement.

B.  Computer Fraud means the unlawful taking of Money, Securities or Property resulting from an unauthorized:

1.  entry into, change to or deletion of Data from a Computer System; or

2.  introduction of instructions propagating through a Computer System,

directed solely against a Company.

C.  Computer Fraud Expenses means reasonable costs, charges, fees and expenses (other than regular or overtime wages, salaries, fees or benefits of any Company) incurred by the Company to reproduce damaged or destroyed electronic Data computer programs or enable the Company to restore the Company's Computer System to the level of operational capability that existed immediately preceding the covered loss under Insuring Clause E.

D.  Computer System means a computer or network of computers, including off-line media libraries.

E.  Credit Card Fraud means the Forgery or alteration of, on or in, any written instrument required in connection with any credit card issued to a Company or at the request of a Company, to any Executive or Employee of a Company.

MACC:Complaint 000102

FILED DATE: 9/15/2020 9:39 AM   2020L008850

F.   **Data** means information contained in any records, manuscripts, accounts, microfilms or tapes processed and stored in a Computer System.

G.   **Discover, Discovered** or **Discovery** means knowledge acquired by an Executive or Insurance Representative which would cause a reasonable person to believe that that a covered loss or occurrence which could give rise to a covered loss has occurred, regardless of when the act(s) causing or contributing to such loss occurred or whether the exact amount or details of such loss are known.

**Discover, Discovered** or **Discovery** shall not include knowledge acquired by an Executive or Insurance Representative acting alone or in collusion with an Employee, or knowledge possessed by any Executive or Insurance Representative who is a participant in the Theft or Forgery.

H.   **Employee** means any:

1.   natural person who labor or service was, is or will be engaged and directed by a Company, including a part-time, seasonal, leased and temporary employee, intern or volunteer;

2.   Executive while performing acts within the scope of the usual duties of an Employee;

3.   Independent Contractor;

4.   natural person fiduciary, trustee, administrator, employee as defined in paragraph 1 above or Executive of an ERISA Plan and any other natural person, who any of which handle ERISA Plan assets and are required by ERISA to be bonded by the Company in connection with such ERISA Plan;

5.   former or retired employee described in paragraph 1 above or Executive retained as a consultant to the Company; or

6.   employee described in paragraph 1 above or Executive, while on leave for military services.

I.   **ERISA Plan** means any welfare or pension plan as defined by ERISA and which is operated solely by a Company or jointly by a Company and a labor organization for the benefit of Employees and which existed on or before the inception of this Coverage Part or which is created or acquired after the inception of this Coverage Part. ERISA Plan shall not include any multi-employer plan.

J.   **Expenses** means reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any Insured): 1. incurred by the Insured to determine the amount and extent of loss covered under this Coverage Part; or 2. incurred and paid by the Insured to establish the existence, amount and preparation of the Insured's proof of loss in support of a covered loss under Insuring Clauses A – I.

K.   **Financial Instruments** means checks, drafts, promissory notices or similar written promises, orders or directions to pay a certain sum of Money that are:

1.   made or drawn upon a Company; or

2.   made or drawn by one acting as an Insured's agent and drawn on an Insured's account or that are purported to have been so made or drawn.

L.   **Forgery** means the signing, whether by hand, mechanically or electronically, of another natural person's name with intent to deceive.

M.   **Funds Transfer Fraud** means fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions (other than instructions which bear a Forgery), purportedly issued by a Company, to a financial institution directing the transfer, payment or delivery of Money or Securities from any of the Company's accounts at such institution, without such Company's knowledge or consent.

N.   **Independent Contractor** means any natural person working for a Company pursuant to a written contract or agreement between such natural person and the Company which specifies the terms of the Company's engagement of such natural person.

O.   **Insurance Representative** means an Employee, designated to represent an Insured for the purpose of effecting and maintaining insurance.

P.   **Insured** means any Company or Sponsored Plan.

Q.   **In Transit** means being conveyed by the Company outside the Premises, from one person or place to another, under the custody of an Employee, partner of a Company or another person duly authorized by such Company to have custody of Money, Securities or Property. The conveyance described in this paragraph begins immediately upon receipt of Money, Securities or Property by the person described herein and ceases immediately upon delivery to the designated recipient or its agent.

R.   **Money** means currency, coins, bank notes and bullion.

MACC:Complaint 000103

FILED DATE: 9/15/2020 9:39 AM  2020L008850

S. **Premises** means the interior of that portion of: 1. any building that a Company occupies in conducting its business; or 2. that part of any building occupied by a bank, trust company or similar financial institution.

T. **Property** means tangible property, other than Money or Securities, that has intrinsic value.

U. **Robbery** means actual or attempted unlawful taking of Money, Securities or Property from the custody of an Employee or other person (except a person acting as a watchman, janitor or porter) duly authorized by a Company to have custody of Money, Securities or Property, by violence or threat of violence, committed in the presence and cognizance of such Employee or other person.

V. **Safe Burglary** means: 1. the actual or attempted unlawful taking of Money, Securities or Property by forcible or violent entry evidenced by visible marks, from a locked vault or safe located within the Premises and any resultant damage to the safe or vault from such entry; or 2. damage to a locked safe, cash drawer, cash box or cash register by actual or attempted felonious entry or abstraction of such container.

W. **Securities** means negotiable or non-negotiable instruments or contracts representing either Money or Property. Securities shall not include Money.

X. **Sponsored Plan** means any ERISA Plan and any plan similar to an ERISA Plan that is not governed by ERISA.

Y. **Theft** means the unlawful taking of Money, Securities or Property to the deprivation of an Insured, solely for the purposes of Insuring Clause A, or a Client, solely for the purposes of Insuring Clause I.

Z. **Third Party** means any natural person who is not an Employee.

MACC:Complaint 000104

POLICY NUMBER: QPL0766916
Endorsement Effective Date: October 1, 2017

QBBP-5056 (05-14)

FILED DATE: 9/15/2020 9:39 AM   2020L009850

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## INDIANA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:
GENERAL TERMS AND CONDITIONS

It is hereby agreed that:

I.   Section XII. NOTICE is amended by the addition of the following:

Notwithstanding anything to the contrary in the Declarations, any Coverage Part, or any endorsements attached to this Policy, notice of any Claim or circumstances that could give rise to a Claim may also be provided to an authorized agent of the Insurer.

II.  This Policy is amended by the addition of the following:

NON-RENEWAL

If the Insurer decides not to renew this Policy, the Insurer will deliver or mail written notice of non-renewal to the Parent Company at the address set forth in the Declarations of the GTC at least forty-five (45) days before the expiration date of the Policy.  Proof of mailing of any notice shall be sufficient proof of notice.

All other terms and conditions of this Policy remain unchanged.

QBBP-5056 (05-14)

Page 1 of 1

MACC:Complaint 000105

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBEPP-2045 (06-15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ILLEGAL ALIEN INVESTIGATIVE DEFENSE COSTS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that:

I.   The definition of Claim in paragraph B. of Section V. GLOSSARY is amended by the addition of the following:

Claim shall also mean a criminal investigation of the Company by any governmental agency for allegedly hiring or harboring illegal aliens.

II.  This Coverage Part is amended by the addition of the following:

All Defense Costs arising out of all Claims made against the Insured with respect to the coverage provided by this endorsement shall be subject to a sublimit of liability of $25,000, which shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations of this Coverage Part.

All other terms and conditions of this Policy remain unchanged.

QBEPP-2045 (06-15)

Page 1 of 1

MACC:Complaint 000106

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBEPP-2156 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PPACA AND PPA CIVIL PENALTIES ENDORSEMENT

This endorsement modifies insurance provided under the following:

FIDUCIARY LIABILITY COVERAGE PART

It is hereby agreed that:

I.   Section III. RETENTION is amended by the addition of the following:

No retention shall apply to Loss constituting civil penalties imposed upon an Insured for inadvertent violation of the Patient Protection and Affordable Care Act ("PPACA") or the Pension Protection Act of 2006 ("PPA").

II.   Section IV. LIMIT OF LIABILITY is amended by the addition of the following:

All Loss arising from Claims alleging inadvertent violations of PPACA or the PPA shall be subject to a sublimit of liability of $50,000, which amount shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of this Coverage Part.

III.   The definition of Loss in paragraph F.7. of Section IX. GLOSSARY is amended by the addition of the following:

any civil penalties imposed upon an Insured for inadvertent violation of PPACA or the PPA.

All other terms and conditions of this Policy remain unchanged.

QBEPP-2156 (05-14)

Page 1 of 1

MACC:Complaint 000107

FILED DATE: 9/15/2020 8:39 AM 2020L008850

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBEPP-2200 (05-14)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMEND DEFINITION OF CLAIM TO INCLUDE MEDIATION**

This endorsement modifies insurance provided under the following:
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that Section V. GLOSSARY, paragraph B. Claim 1. is amended by the addition of the word "mediation," after the word "arbitration,".

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000108

POLICY NUMBER: QPL0766818
Endorsement Effective Date: October 1, 2017

QBEPP-2218 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EQUAL PAY ACT CARVEBACK ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that Exclusion G. Wage and Hour in Section II. EXCLUSIONS of the GTC shall not apply to any Claim for any violation of the responsibilities, obligations or duties imposed by the Equal Pay Act.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000109

**POLICY NUMBER: QPL0766816**
Endorsement Effective Date: October 1, 2017

QBPP-2220 (10-14)

FILED DATE: 9/15/2020 9:39 AM 2020L008850

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WAGE AND HOUR CLAIM DEFENSE COSTS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that:

I.  Section I. **INSURING CLAUSE** is amended by the addition of the following:

The Insurer shall pay, on behalf of an insured, **Defense Costs** on account of a Wage and Hour Claim first made during the Policy Period.

II. Section V. **GLOSSARY** is amended by the addition of the following:

**Wage and Hour Claim** means any:

1.  written demand for monetary or non-monetary (including injunctive) relief, including demands for arbitration, waiving or tolling of a statute of limitations, reinstatement, reemployment or re-engagement;

2.  civil proceeding, evidenced by the service of a complaint or similar pleading;

3.  arbitration proceeding, evidenced by the receipt of a demand for arbitration; or

4.  administrative, regulatory or tribunal proceeding, other than a labor, grievance or other proceeding under a collective bargaining agreement, evidenced by the filing of a formal notice of charges or the entry of a formal order of investigation,

which is brought by an **Employee** against an insured and is based upon, arising out of or resulting from any violation of the responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act) or any similar law governing wage, hour or payroll.

The time when a **Wage and Hour Claim** shall be deemed first made for the purposes of this Coverage Part shall be the date on which the **Wage and Hour Claim** is first made against, served upon or received by the insured or the applicable notice or order is filed or entered.

III. This Coverage Part is amended by the addition of the following:

**LIMIT OF LIABILITY**

All **Defense Costs** arising from a **Wage and Hour Claim** shall be subject to a Wage and Hour Sublimit of Liability of $100,000, which shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations of this Coverage Part and shall be excess of a Wage and Hour Retention of $50,000.

IV. Exclusion G. Wage and Hour in Section II. **EXCLUSIONS** of the GTC shall not apply to Defense Costs for a Wage and Hour Claim.

All other terms and conditions of this Policy remain unchanged.

QBPP-2220 (10-14)

Page 1 of 1

MACC:Complaint 000110

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2225 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF RETALIATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

It is hereby agreed that the definition of Retaliation in paragraph K. of Section V. GLOSSARY is amended by deleting the word "Employee" and replacing it with the word "Insured Person".

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM 2020L008850

MACC:Complaint 000111

POLICY NUMBER: QPL0768816
Endorsement Effective Date: October 1, 2017

QBBPP-2277 (07-15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## FRAUDULENT PAYMENT INSTRUCTION COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

CRIME COVERAGE PART

It is hereby agreed that:

I.  Item 2 of the Crime Coverage Part Declarations is amended by the addition of the following:

| Insuring Clause | Limit of Liability | Retention |
|---|---|---|
| Fraudulent Payment Instruction | $100,000 | $25,000 |

II.  Section I. INSURING CLAUSES is amended by the addition of the following:

Fraudulent Payment Instruction

resulting from a Company having paid, transferred or delivered any Money or Securities resulting from Fraudulent Payment Instruction.

III.  Section II. EXCLUSIONS, paragraph C. is amended by the addition of the words "Fraudulent Payment Instruction" after the words "Credit Card Fraud".

IV.  Solely with respect to the coverage provided by this endorsement, Section II. EXCLUSIONS, paragraph N. is deleted.

V.  Section II. EXCLUSIONS, paragraph P. shall also apply to the Fraudulent Payment Instruction Insuring Clause.

VI.  Section II. EXCLUSIONS, paragraphs R. through T. shall also apply to the Fraudulent Payment Instruction Insuring Clause.

VII.  Section II. EXCLUSIONS is amended by the addition of the following:

The Exclusions below shall only apply to the Fraudulent Payment Instruction Insuring Clause:
Credit Card Loss - based upon, arising out of or resulting from any party's use of or acceptance of any debit card, credit card or similar instrument;

Games of Chance - based upon, arising out of or resulting from any gambling, contest, lottery, sweepstake, coupon, promotional game, or other game of chance, including any redemption in connection therewith;

Investments – based upon, arising out of or resulting from any investment in Securities, or ownership in, any corporation, partnership, real property or similar investment;

Loans and Credit - based upon, arising out of or resulting from any extension of any credit, loan or similar promise to pay;

Performance Under Contract - based upon, arising out of or resulting from any party to perform under any contract;

Products or Services - based upon, arising out of or resulting from any failure, malfunction, illegitimacy or inadequacy of any product or service; and

Property - based upon, arising out of or resulting from any damage to Property.

QBBPP-2277 (07-15)

Page 1 of 2

MACC:Complaint 000112

**VIII.Section XI. GLOSSARY is amended by the addition of the following:**

**Service Provider** means a business the Insured does not own, operate or control, but that an Insured hires for a fee pursuant to an agreement or a written contract to perform services or provide goods related to an Insured's business. Service Provider does not include any broker-dealer, financial institution, asset manager, armored motor vehicle company or similar entity.

**Fraudulent Payment Instruction** means the intentional misleading of an Employee through a misrepresentation of a material fact which is: (a) relied upon by an Employee; and (b) committed by a person purporting to be a Client, Service Provider or Employee who was authorized by the Company to instruct other Employees to transfer Money or Securities.

All other terms and conditions of this Policy remain unchanged.

QBB.PP-2277 (07-15)

MACC:Complaint 000113

FILED DATE: 9/15/2020 9:39 AM   2020L009850

POLICY NUMBER: QPL0768916
Endorsement Effective Date: October 1, 2017

QBBPP-2147 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL INSURED COMPANY ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that the definition of Company in paragraph C. of Section XXII. GLOSSARY is amended by the addition of the following:

Company also means any Entity listed below.

Anderson Kane County Properties, LLC
Anderson Lake County Properties Ltd., LLC
Anderson Management Group Inc.
Anderson Management Group II Inc.
Anderson Thompson Cass County Properties LLC
Anderson Thompson Elkhart County Properties LLC
Anderson Thompson Fulton County Properties, Ltd., LLC
Anderson Thompson Gas City Properties LLC
Anderson Thompson Grant County Properties, Ltd., LLC
Anderson Thompson Wells County Properties LLC
Bob Anderson Pontiac, Inc. dba Mike Anderson Chevrolet of Merrillville
Drive Now Auto Credit Company, Inc.
Midwest Warranty Associates, Inc.
Mike Anderson Cass County Properties Inc.
Mike Anderson Chevrolet Enterprises, LLC
Mike Anderson Chevrolet of Chicago, LLC
Mike Anderson Chevrolet of Ossian
Mike Anderson Chevrolet, Buick, GMC Truck
Mike Anderson Chevrolet, Inc.
Mike Anderson Chrysler Dodge SuperCenter of Logansport, Inc.
Mike Anderson Chrysler, Dodge, Jeep Inc.
Mike Anderson Dodge, Inc.
Mike Anderson Howard County Properties Inc.
Mike Anderson Logansport Properties, Ltd., LLC
Mike Anderson Used Car Super Store LLC
Mike Anderson Used Car Supercenter Inc.
Mike Anderson Used Cars, Inc.

All other terms and conditions of this Policy remain unchanged.

QBBPP-2147 (05-14)

Page 1 of 1

MACC:Complaint 000114

FILED DATE: 9/15/2020 9:39 AM 2020L008650

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2149 (05-14)

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMEND REPORTING AND NOTICE PROVISION ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that Section V. REPORTING, A.1. is replaced by the following:

1.  If the applicable Liability Coverage Part expires (or is otherwise terminated) without being renewed with the Insurer, 90 days after the effective date of such expiration or termination; or

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000115

FILED DATE: 9/15/2020 9:39 AM   2020L008850

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2223 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF INSURED PERSON ENDORSEMENT

This endorsement modifies insurance provided under the following:
**DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART**

It is hereby agreed that the definition of **Insured Person** in paragraph D. of Section X. **GLOSSARY** is replaced by the following:

D.  **Insured Person** means:

    1.  an **Executive**;

    2.  an **Employee**; or

    3.  a holder of an equivalent position to those included in paragraph 1 above in an **Outside Entity**, while serving at the specific request or direction of the **Company**.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 8:39 AM   2020L008850

MACC:Complaint 000116

**POLICY NUMBER:** QPL0766916
Endorsement Effective Date: October 1, 2017

QBBPP-2227 (10-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies insurance provided under the following:

**DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART**

It is hereby agreed that Exclusion I. Professional Services in Section II. EXCLUSIONS is replaced by the following:

H.   Professional Services – for the performance of or failure to perform Professional Services, provided that this Exclusion H shall not apply to any Claim brought by a securityholder or limited partner of a Company against an Insured; and

All other terms and conditions of this Policy remain unchanged.

QBBPP-2227 (10-14)

Page 1 of 1

MACC:Complaint 000117

FILED DATE: 9/15/2020 9:39 AM   2020L008650

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2235 (11-14)

FILED DATE: 9/15/2020 8:39 AM   2020L008850

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND INSURED VERSUS INSURED CARVEBACK FOR EMPLOYEE AND FINANCIAL IMPAIRMENT ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that:

I.   Paragraph (b) of Exclusion A. Insured v. Insured in Section II. EXCLUSIONS is replaced by the following:

(b)   Exclusion A3 above shall not apply to any Claim: (i) for employment-related Wrongful Acts against an Insured Person; (ii) for contribution or indemnity; (iii) brought by an Insured Person who has ceased serving in his capacity as such for at least 1 year; (iv) brought by an Employee; (v) brought while the Parent Company is in Financial Impairment; or (vi) brought by, on behalf of or with the participation of a whistleblower;

II.   The definition of Insured Person in paragraph D. of Section X. GLOSSARY is replaced by the following:

D.   Insured Person means:

1.   an Executive;

2.   an Employee; or

3.   a holder of an equivalent position to those included in paragraph 1 above in an Outside Entity, while serving at the specific request or direction of the Company.

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000118

FILED DATE: 9/15/2020 9:39 AM   2020L008650

POLICY NUMBER: QPL0768816
Endorsement Effective Date: October 1, 2017

QBBPP-2117 (04-15)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## INSURED PERSON AMENDED TO INCLUDE ANY ADVISORY BOARD MEMBER ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that:

I.   The definition of Insured Person in paragraph D. of Section X. GLOSSARY is amended by the addition of the following:

An Insured Person shall include any natural person who was, now is or shall be a board observer or duly elected member of an advisory board including a Scientific Advisory Board.

II.  Section X. GLOSSARY is amended by the addition of the following:

Scientific Advisory Board means a group of scientists, independent from management, created by or requested by the Company to provide objective feedback and guidance on the Company's progress and goals.

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000119

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2120 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ANTITRUST EXCLUSION DELETED ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Exclusion C. Antitrust in Section II. EXCLUSIONS is deleted.

All other terms and conditions of this Policy remain unchanged.

FILED DATE: 9/15/2020 9:39 AM   2020L008850

MACC:Complaint 000120

POLICY NUMBER: QPL0788816
Endorsement Effective Date: October 1, 2017

QBBPP-2210 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND REPORTING PROVISION ENDORSEMENT

This endorsement modifies insurance provided under the following:

GENERAL TERMS AND CONDITIONS

It is hereby agreed that Section V. REPORTING, paragraph A.  is replaced by the following:

A.  Notice of any Claim under any Liability Coverage Part is considered timely when reported to the Insurer as soon as practicable after the Parent Company's chief executive officer or chief financial officer first becomes aware of such Claim.   However, the Insurer shall not assert that notice of a Claim is untimely unless the Insurer is materially prejudiced by the untimely notice, as determined by a final adjudication rendered only after the Insurer has exhausted all other reasonable means of determining whether it has been materially prejudiced.

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000121

FILED DATE: 9/15/2020 9:39 AM   2020L008650

POLICY NUMBER: QPL0788816
Effective Date of Endorsement: October 1, 2017

QBBPP-2066 (05-14)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SPECIFIED EVENT EXCLUSION

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
FIDUCIARY LIABILITY COVERAGE PART

It is hereby agreed that Section II. EXCLUSIONS is amended by the addition of the following:

No coverage shall be provided under this Coverage Part for Loss on account of that portion of a Claim based upon, arising out of or resulting from any Event listed below.

Chris Klatter, Claim #: T1318827

All other terms and conditions of this Policy remain unchanged.

QBBPP-2066 (05-14)

Page 1 of 1

MACC:Complaint 000122

POLICY NUMBER: QPL0766816
Endorsement Effective Date: October 1, 2017

QBBPP-2286 (04-15)

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### AMEND IVI – OUTSIDE ENTITY EXCLUSION

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE PART

It is hereby agreed that Section II. EXCLUSIONS, paragraph A.2. is replaced by the following:

2. a Company against an Insured Person or Outside Entity against an Insured Person described in paragraph 3 of the definition of Insured Person;

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000123

FILED DATE: 9/15/2020 9:39 AM   2020L008850

POLICY NUMBER: QPL0766916
Endorsement Effective Date: October 1, 2017

QBPD-6000 (02-15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

It is hereby agreed that:

I.   This Policy is amended by the addition of the following:

If aggregate insured losses attributable to a Certified Act of Terrorism under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

II.  Solely for the purposes of this endorsement, this Policy is amended by the addition of the following:

Certified Act of Terrorism means an act that is certified by the Secretary of Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act,, to be an act of terrorism.  The criteria contained in the Terrorism Risk Insurance Act for a Certified Act of Terrorism include the following:

1.   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

III. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any Loss that is otherwise excluded under this Policy.

All other terms and conditions of this Policy remain unchanged.

MACC:Complaint 000124

FILED DATE: 9/15/2020 9:39 AM   2020L008850

FILED DATE: 9/15/2020 9:39 AM   2020L009850

*cancelled 3/1/18   need to examine.*

*3/6/18 Called Priya 212-805-9859*
*She will review what I had submitted + call.*
*me by the end of the week. She didn't review*
*what I had sent thoroughly.*

## QBE.

### SWORN PROOF OF LOSS

Parent Company: **Mike Anderson Chevrolet of Chicago** (the "Parent Company")

Insuring Company:   **QBE Insurance Corporation**

Policy No.:   **QPL0780016 (the "Policy")**

Policy Period:   **October 1, 2017 to October 1, 2018**

Claim No.:   **880082N**

State of ___**In**___

County of ___**Lake**___   ss:

I, ___**Mike Anderson**___

(Name and Title of Authorized Representative of the Insured)

hereby certify that ___**Mike Anderson Chevrolet of Chicago**___ suffered direct loss of Money,

(Insured)

Securities or Property resulting from Theft or Forgery as those terms are defined by the Policy by

___**Jason Kolodzinski**___ who was employed by the Insured as

(Name of Employee)

___**General Manager**___ at the time of the Theft or Forgery.

(Title and/or Position)

The loss of Money, Securities or Property resulting from Theft or Forgery totals

$___**250,000.— (under investigation)**___ (USD). Attached is a detailed Statement of Loss (Attachment A),

including any recoveries and all other credits, and the balance stated is the true net loss from

___**3/7/16**___ (Date) to ___**1/15/18**___ (Date).

Further, I, on behalf of the Insured, certify that the loss was discovered on

___**approx 12-15**___, 20___**17**___ by ___**Mike Anderson, owner**___

(Name(s) and Title(s))

Initials: _____

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed Insurance company and QBEAI is handling the above captioned matter on its behalf.

**PLAINTIFF'S EXHIBIT "B"**

MACC:Complaint 000125

FILED DATE: 9/15/2020 9:39 AM   2020L008850

**Attachment B** provides a detailed statement of the known facts and circumstances surrounding the direct loss of Money, Securities or Property to the Named Insured resulting from Theft or Forgery by

Jason Kolodzinski , including the circumstances surrounding Discovery of the loss.

(Name of Employee)

By signing below, I represent and warrant that I have the authority to execute this sworn proof of loss. I further attest that nothing has been withheld or misrepresented regarding said loss and that this statement along with any attachments, incorporated herein by reference, is a complete and truthful recital of the known facts. To my knowledge, the loss did not originate by any act or design on the part of the insured, nothing has been done by or with the consent of the insured to violate the conditions of the Policy, or render it void, and no attempt to deceive the said insurer as to the extent of said loss, has in any manner been made. I also represent that no other potentially applicable insurance is available for the claimed loss.

By providing this blank form, the insurer does not waive and expressly reserves all rights and defenses, including the right to seek additional information and documentation in connection with its investigation and settlement of the claim. Any other information that may be required will be furnished and considered a part of this proof of loss.

Insured:   Mike Anderson Chevrolet of Chicago

By:        _[signature]_

Name:      Mike Anderson

Title:     Managing Member

Sworn to and subscribed before me this 1 day of MARCH , 20 18

_[signature]_

Notary Public

My Commission Expires: 6/19/2021

Please be advised that QBE America, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

FILED DATE: 9/15/2020 9:39 AM 2020L009850

IN THE CIRCUIT COURT OF ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

Mike Anderson Auto Group,                    )
                                             )
            Plaintiff                        )        Case No.
                                             )
v.                                           )
                                             )        JURY TRIAL DEMANDED
QBE Insurance Corporation                    )
                                             )
            Defendants.                      )

AMENDED SWORN PROOF OF LOSS

State of ___I N___
                        ss
County of ___Lake___

        I, Mike Anderson, hereby certify that on March 1, 2018 I signed under oath the attached
Sworn Proof of Loss Form for the direct loss of Money suffered by Mike Anderson Chevrolet of
Chicago, the Insured, under the Policy of Insurance with QBE Insurance Corporation, the
Insurer, which Sworn Proof of Loss Form is attached hereto and incorporated herein.

        At that time investigation revealed that the direct loss of Money from Theft or Forgery
was greater than $250,000.00 (USD) with the matter under continued investigation. Additional
investigation discloses that up to the present time the amount of direct loss of Money from Theft
or Forgery totals $988,500.00 (USD) and falls within the following categories of Theft or
Forgery committed by Jason Kolodzialski, who was employed by the Insured as General
Manager, at the time of the Theft or Forgery.

                    (e). **Direct Mail Advertising.**        $191,000
                    Kolodzialski claimed to have
                    used a company called J&N for
                    mail advertising.  Mike
                    Anderson Chevy was billed
                    $191,000, but no mail was sent.
                    The owner of a graphic design
                    firm used by J&N said that no
                    work was actually done.
                    Kolodzialski failed to submit the
                    materials to Mike Anderson for
                    review prior to mailing,
                    contrary to his instructions.  He
                    was told to stop but continued to



FILED DATE: 9/15/2020 9:39 AM   2020L008850

| | |
|---|---|
| submit invoices that were paid by the dealership without Mike Andersch's knowledge or approval. He did not submit the proper receipts from the USPS for the alleged mailings. The dealership was told that the one purported USPS receipt Kolodziejski submitted was fraudulent. | |
| (b.) Radio Advertising. Kolodziejski claims to have placed radio ads through a company called TKC in the amount of $75,000. TKC, despite requests, refused to submit proof of running the ads. To pay TKC invoices, Kolodziejski, instead of mailing the checks, gave the checks to someone who picked them up at the dealership. The checks were cashed at a nearby currency exchange. | $75,000 |
| (c). Purchase of Used Cars from Epic. Kolodziejski purchased 91 cars from a company called Epic from March 2016 through January 2018. These cars were purchased at prices significantly higher than market, and many had hidden damage, the lot in and caused many customer complaints. Losses are estimated at approximately $121,000. Kolodziejski was told to stop purchasing cars from Epic in October 2017 but continued to do so competitions but until he was terminated in January 2018. A text message from Kolodziejski | $121,000 |

FILED DATE: 9/15/2020 8:39 AM   2020L009850

| | |
|---|---|
| indicated that he did it because he needed money, which suggests that a kickback was involved. | |
| (i).   Purchase of Cars from Mr Hooptie.  Kolodziejski caused the dealership to lose $5800 for two cars purchased from Mr Hooptie, and associated repair and accessory charges. Kolodziejski had been told not to deal with this company. | $5,800 |
| (j).   Inflated Repair Charges. Kolodziejski sent cars to a company called AC and incurred inflated and sometimes unnecessary repair charges of approximately $175,000.  These charges were incurred even though the dealership has its own mechanics on staff. Some of these repair charges were for cars purchased from AC and Mr Hooptie. | $175,000 |
| (k).   Personal Trade-in. Kolodziejski traded-in a Corvette he owned, and gave himself an inflated appraisal of the car, at approximately $10,000 more than it was worth. | $10,000 |

Insured:      Mike Anderson Chevrolet of Chicago

Signed by:   Mike Anderson

Signed:

Sworn and subscribed before me this 20 day of July 2020

Notary Public

My Commission Expires:   11/2/87



*Invalid* *3-1-18* *need to evaluate*

3/6/18 Called Priya 212-805-9859
She will review what I had submitted. + call.
me by the end of the week. She didn't review
what I had sent thoroughly.

**QBE.**

### SWORN PROOF OF LOSS

**Parent Company:** Mike Anderson Chevrolet of Chicago (the "Parent Company")

**Insuring Company:** QBE Insurance Corporation

**Policy No.:** QPL0788916 (the "Policy")

**Policy Period:** October 1, 2017 to October 1, 2018

**Claim No.:** 586592N

State of **In**

County of **Lake** ss:

I, **Mike Anderson**
(Name and Title of Authorized Representative of the Insured)

hereby certify that **Mike Anderson Chevrolet of Chicago** suffered direct loss of Money,
(Insured)

Securities or Property resulting from Theft or Forgery as those terms are defined by the Policy by

**Jason Kolodzinski** who was employed by the insured as
(Name of Employee)

**General Manager** at the time of the Theft or Forgery.
(Title and/or Position)

The loss of Money, Securities or Property resulting from Theft or Forgery totals

$ **250,000. ~(under investigation)** (USD). Attached is a detailed Statement of Loss (**Attachment A**),

including any recoveries and all other credits, and the balance stated is the true net loss from

**3/7/16** (Date) to **1/15/18** (Date).

Further, I, on behalf of the insured, certify that the loss was discovered on

apprx **12-15,** 20**17** by **Mike Anderson, owner**
(Name(s) and Title(s))

Initials [signature]

Please be advised that QBE Americas, Inc. ("QBEAI") is a claims administrator for the above listed insurance company and QBEAI is handling the above explained matter on its behalf.

FILED DATE: 9/15/2020 9:39 AM 2020L008850



PLAINTIFF'S
EXHIBIT
"B"

MACC:Complaint 000130

FILED DATE: 9/15/2020 9:39 AM  2020L008650

Attachment B provides a detailed statement of the known facts and circumstances surrounding the direct loss of Money, Securities or Property to the Named Insured resulting from Theft or Forgery by Jason Kolmzinski, including the circumstance surrounding Discovery of the loss.
(Name of Employee)

By signing below, I represent and warrant that I have the authority to execute this sworn proof of loss. I further attest that nothing has been withheld or misrepresented regarding said loss and that this statement along with any attachments, incorporated herein by reference, is a complete and truthful recital of the known facts. To my knowledge, the loss did not originate by any act or design on the part of the insured, nothing has been done by or with the consent of the insured to violate the conditions of the Policy, or render it void, and no attempt to deceive the said insurer as to the extent of said loss, has in any manner been made. I also represent that no other potentially applicable insurance is available for the claimed loss.

By providing this blank form, the insurer does not waive and expressly reserves all rights and defenses, including the right to seek additional information and documentation in connection with its investigation and settlement of the claim. Any other information that may be required will be furnished and considered a part of this proof of loss.

Insured: **Mike Anderson Chevrolet of Chicago**

By: _[signature]_

Name: **Mike Anderson**

Title: **Managing Member**

Sworn to and subscribed before me this _1_ day of **MARCH**, 20 1 8

_[signature]_
Notary Public
My Commission Expires: **6/19/2021**

Please be advised that QBE Americas, Inc. ("QBEA") is a claims administrator for the above listed insurance company and QBEAI is handling the above captioned matter on its behalf.

MACC:Complaint 000131

Jason Kolodzinski Corvette

**EXHIBIT**

Anderson Dep #8

MACC:JK 000001

# CUSTOMER ORDER

**Mike ANDERSON CHEVROLET**

HOUSE, SALES     01/12/2018
SLSP # 1     DATE 380333

Mike Anderson Chevrolet of Merrillville, Inc.
1550 East 61st Avenue • Merrillville, IN 46410
Phone (219) 947-4151 • Toll Free (888) 947-4151
Fax (219) 942-0499

Mike Anderson Chevrolet of Chicago, LLC
5333 W. Irving Park Road • Chicago, IL 60641
Phone (773) 465-2000
Fax (773) 508-4122

SLSP # 2
KOLODZINSKI, JA
SALES MANAGER

CUSTOMER NO.
DE LUNA, ROLAND
BUSINESS MANAGER

| CUSTOMER NAME | CO-CUSTOMER'S NAME |
|---|---|
| JASON KOLODZINSKI | |
| ADDRESS | ADDRESS |
| 2593 CANYON DR | |
| CITY STATE ZIP | CITY STATE ZIP |
| PLAINFIELD    IL 60586-5922 | |
| HOME PHONE (815) 545-4943 | WORK PHONE (773) 465-2000 | HOME PHONE | WORK PHONE |
| CELL PHONE | CELL PHONE |

| NEW/USED | YEAR | MAKE | MODEL | SERIES |
|---|---|---|---|---|
| USED | 2017 | MASERATI | LEVANTE | |
| STOCK NO. CP3979 | COLOR WHITE | BODY 4DR SUV | VIN NO. ZN661XUAXHX226986 | MILEAGE 6801 |

| OPTIONS INCLUDED IN PRICE | | |
|---|---|---|
| | PURCHASE PRICE (INCLUDING OPTIONS) | $ 61,401.93 |
| | TRADE IN ALLOWANCE | $ 60,901.93 |
| | SALES TAX | $ 51.00 |
| | STATE TITLE FEE | $ 95.00 |
| | ~~THE TAX~~ PLATE/TRANSFER | $ 50.00 |
| ⎣ 10,000.⎤ | DOCUMENT FEE | $ 175.94 |
| | ~~XXXXXXXX~~ COOK CO FEE | $ N/A |
| | ESTIMATED PAYOFF ON TRADE | $ 60,901.93 |
| | GOOD UNTIL __/__/__ TO: US BANK | |
| CONDITIONS | TOTAL DUE | $ 61,773.87 |
| | REBATE _____ | $ N/A |
| | REBATE _____ | $ N/A |
| | REBATE _____ | $ N/A |
| | DEPOSIT | $ N/A |
| | TOTAL OF CASH TO BE PAID | $ N/A |
| | BALANCE TO FINANCE | $ 61,773.87 |

| TRADE IN INFORMATION | | | | |
|---|---|---|---|---|
| YEAR 2017 | MAKE CHEVROLET | MODEL CORVETTE | SERIAL NO. 1G1YK3D70H5103027 | MILEAGE 8992 |

_____/_____ (initials) ARBITRATION AND NO ORAL REPRESENTATIONS: Customer agrees to be bound by the Arbitration Agreement referenced on the reverse side of this Order. Employees, salespersons and managers are not authorized to make any oral representations, agreements or promises about your Vehicle that are not in writing. Any oral representation, agreement or promise not in writing is not binding on Dealer.

_____/_____ (initials) FINANCING. Dealer intends to assign to a third party lender the retail installment contract executed by Customer for the purchase of the Vehicle. Customer understands and agrees that Dealer SHALL NOT BE OBLIGATED TO SELL the Vehicle to him/her/it unless a third party lender accepts the retail installment contract signed by the Customer. The Order and retail installment contract may be cancelled at any time by Dealer, if Dealer determines in its sole discretion that it cannot obtain third party lender approval and may be cancelled by either party within twenty one (21) days hereafter if such approval is not obtained on the agreed terms within such time. Additional terms may apply as set out in the retail installment contract and/or a finance rider. Customer agrees to provide Dealer with a true, correct and complete credit application and cooperate fully in obtaining financing, including providing supporting documentation and Customer acknowledges that Dealer is solely relying on the accuracy of such information. In the event the Order is terminated as provided herein, Customer agrees to return the Vehicle to Dealer within twenty four (24) hours of such request. Without waiving any other rights herein or under applicable law, upon termination of this Order pursuant to this section, Dealer shall return any deposit to Customer. In the event that Customer does not return the Vehicle as required herein, the Dealer may repossess the Vehicle and Customer shall be liable for all costs, expenses and reasonable attorneys' fees incurred by Dealer related thereto, and such repossession.

NEW VEHICLE WARRANTY AND DISCLAIMERS. Customer acknowledges receiving a copy of the manufacturer's warranty applicable to the Vehicle. Dealer is not a party to any such warranty and only the manufacturer has any duties or liabilities thereunder. DEALER EXPRESSLY DISCLAIMS AND EXCLUDES ANY AND ALL WARRANTIES, WHETHER EXPRESSED OR IMPLIED, WITH RESPECT TO THE VEHICLE SOLD HEREUNDER, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

MACC:JK 000002

Finance

| Bank | 10 🔍 | U.S. BANK | APR | 3.43 | Term | 75 | Monthly |

Comment

128791X11394943408-LIEN 🔍

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SELL | 01 | 61401.93 | CASH DWN | 12 | | | | PAYMENT | 34 | 917.55 |
| ADD TTL | 02 | | PICK UP | 13 | | | | BANK FEE | 35 | |
| | | | REBATES | 14 | | GAP (F2) | 25 | | | |
| CVR FEE | 04 | 25.00 | | | | | | BALLOON | 38 | |
| DOC FEE | 05 | 175.94 | TRADE 1 | 16 | 60901.93 | | | DUE CUST | 39 | |
| TITLE | 06 | 95.00 | PAY OFF | 17 | 60901.93 | | | | | |
| REGISTER | 07 | | ACV #1 | 18 | 59000.00 | VEH ONE | 29 | | | |
| TITLE XF | 08 | 25.00 | TRADE 2 | 19 | | ALLY VSC | 30 | OUT LIEN | 41 | |
| COOK CTY | 09 | | PAY OFF | 20 | | TIRE/WHL | 31 | AMT FIN | 42 | 61773.87 |
| **T&LFEE | 10 | 320.94 | ACV #2 | 21 | | ** E/W | 32 | FIN CHG | 43 | 7042.38 |
| ** TAX | 11 | 51.00 | COD/NPAY | 22 | | TAX BASE | 33 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DEAL ADJ** | | | TOTL DOWN | | | S/G | -1246.61 | BUYER NET | 500.00 |
| TOTL PRICE | | 61773.87 | B/RAT | 3.43 | B/G | 618.49 | TG | -946.61 |

---

00380333 **KOLODZINSKI, JASON**    Deal Finance    Status Posted    Stock#▸ 00CP3979
2017 MASERATI LEVANTE    ZN661XUAXH0226386 Stock# **00CP3979**    Vehicle Posted

| | | | |
|---|---|---|---|
| Buyer Main | | | |
| Buyer Additional | | | |

**Co-Buyer**
- Co-Buyer Main
- Co-Buyer Additional

**Vehicle**
- Sold Vehicle
- Sold Vehicle Additional
- Sold Vehicle Value

**Trade-Ins**
- Trade-In 1 Value
- Trade-In 1
- Trade-In 1 Additional
- Trade-In 1 BPM Values
- Trade-In 2 Value
- Trade-In 2
- Trade-In 2 Additional
- Trade-In 2 BPM Values

**Optional Sales**
- Options
- Dealer Equipment
- We Owes
- User Data

**Down Payment**

Rebates and Discounts

**Service Contracts**

Taxes

Official Fees

Insurances

Insurable Programs

**Finance Information**
- Finance

Stock# OCP3979A

VIN ☑ 1G1YK3D70H5103027

Cyl/Truck Car

Year 2017
Make CHEVROLET
Model CORVETTE
Series 2LT
Body 2DR CNV
Body Group
Manufacturer

Engine 8CY   Transmission 6SP
Cylinders 08   Auto 2   Seats 2

Fuel
Location
Gross Vehicle Weight
Gross Vehicle Weight Rating
MFG/Caline GC   Genesis Model CO
Vehicle Style
2dr Stingray Z51 Conv w/2LT

**Integration Codes**
Appraiser# 263
Appr. Name JASON K

Code G8G
Group WHITE

**Identification Numbers**
Motor
Title
Chassis

Trim 704

**Odometer**

Reading 8992   Warning Odometer Mileage is True and Accurate   ☑ Verified

00380333 **KOLODZINSKI, JASON**   Deal Finance   Status Posted   Stock#= 00CP3979
2017 MASERATI LEVANTE   ZN661XUA0HX226986 Stock#  00CP3979   Vehicle Posted

MACC:JK 000004

Sign in once, everywhere.    Sign Up for Bridge ID    What is Bridge ID?

HAZ MUTAWE
MIKE ANDERSON CHEVROLET OF CHICAGO · MP8958

Provisioning | Appraising | Pricing | Merchandising | Wholesaling | Reporting                    🔍    Recent

**+ New Appraisal**    **🔍 Quick Lookup**

## Vehicle Information

| | |
|---|---|
| VIN: | 1G1YK3D70H5103027 |
| Odometer: | 9275 |
| Year: | 2017 |
| Make: | Chevrolet |
| Model: | Corvette |
| Series: | Stingray Z51 |
| Body Type: | Convertible |
| # Cylinders: | 8 |
| Trans: | Automatic |
| Color: | White |

## Vehicle Additional

Notes: FRONT AND REAR DAMAGE

## Vehicle Photos

## Salesperson/Appraiser Information

| | |
|---|---|
| Salesperson: | |
| Appraiser: | Mutawe, Haz |
| Purchase: ☐ | |

## Customer Information

| | |
|---|---|
| First Name: | |
| Last Name: | |
| Home Phone: | |
| Email: | |
| Address: | |
| Postal Code: | |

## Vehicle of Interest

## Summary

Tags

rBook: $62,875
**Black Book:** $47,650
NADA: $53,850

Disposition: ⦿ Retail    ◯ Wholesale
Reconditioning: 1000 ✎
Certification:
Other:

**Appraised Value**    **Profit**
50000                  3000

**Price Rank**         **Adj % of Market**
1 of 8                 88
                       0%-105%

**vRank**              **Asking Price**
1 of 8                 54000 ✎

Market Days Supply: **67**    Like Mine: **53**
Adj % Cost to Market: **83**

Reports        Links

Actions        Cancel

## Group Stores

| Store | Avg List Price | MDS | Avg. Odometer | Grade | Strategy |
|---|---|---|---|---|---|
| Mike Anderson Chevrolet of Chicago | | | | C | |
| Mike Anderson Chevrolet | $57,888 | | 9,275 | D+ | |

## Provision rBook - Live Retail Market View

| Series: | Series Detail: | Certified: | Body Type: | Roof: | Transmission: | Interior Material: |
|---|---|---|---|---|---|---|
| Grand Sport 291 | (Unspecified) 1 | Yes 1 | Convertible 8 | Convertible 8 | Automatic 7 | --- 1 |
| Stingray 265 | 1LT 32 | No 6 | Coupe 8 | | Manual 1 | Cloth 1 |
| Stingray Z51 124 | 2LT 40 | | | | | Leather 5 |
| Z06 155 | 3LT 51 | | | | | |

**Exterior Color:**
Black 3
Blue 1
Gray 1
Silver 1
White 1

More

| Distance | Competitive Criteria | Market Profile |
|---|---|---|
| (All)  Miles | *2017 Chevrolet Corvette* 835 vehicles | # Vehicles: 7 |
| | Series: Stingray 124 ☒ | Avg. Age: 1,709 |
| **Odometer** | Z51 | Avg. Odometer: 1,709 |
| to | Series Detail: 2LT 40 ☒ | Avg. Market Price: $62,875 |
| **Market mode** | Body Type: Convertible 8 ☒ | Odometer Adj: $-1,182 |
| ⦿ Recent ◯ Active | Roof: Convertible 8 ☒ | |
| | Transmission: Automatic 7 ☒ | |

## Historical Data for Similar Inventory

| Disposition | Metrics | In Stock | Sold |
|---|---|---|---|
| ☑ Retail | ◯ Like Mine | **# Vehicles:** 1 | **# Vehicles:** -- |
| ☑ Wholesale | ⦿ Year/Make/Model | Avg. Age: 167 | Avg. DTS: -- |
| | ◯ Make/Model | Avg. Price: $57,888 | Avg. Price: -- |
| | | Avg. Odo.: 9,275 | Avg. Odo.: -- |

## Black Book

| Condition: | Trim: | Equipment: |
|---|---|---|
| Extra Clean | Z51 - 2D Convertible - 6.2L V8 DI OHV VVT HO | Chrome Wheels |
| Clean | | Navigation System |

MACC:JK 000005



# ILLINOIS

Jesse White • Secretary of State

## DRIVER'S LICENSE

USA

4d LIC NO: K432-4368-3057

3 DOB: 02/26/1983

4b EXP: 02/26/2021          4a ISS: 02/22/2017

1 KOLODZINSKI
2 JASON R
8 600 N LAKE SHORE DR
   APT 3203
   CHICAGO, IL 60611

9 CLASS: D          9a END: NONE

12 REST: B

15 SEX: M          16 HGT: 6'-00"

17 WGT: 200 lbs    18 EYES: BLUE     TYPE: ORG

5 DD 20170222176JL6119





MACC:JK 000006

JASON KOLODZINSKI

CP3979

CUSTOMER'S NAME — STOCK NO.

## ODOMETER DISCLOSURE STATEMENT

*Federal law (and State law, if applicable) requires that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.*

I, MIKE ANDERSON CHEVROLET _____ (transferor's name, Print)

6801

state that the odometer now reads _____ (no tenths) miles and to the best of my knowledge that it reflects the actual mileage of the vehicle described below, unless one of the following statements is checked.

☐ (1) I hereby certify that to the best of my knowledge the odometer reading reflects the amount of mileage in excess of its mechanical limits.

☐ (2) I hereby certify that the odometer reading is NOT the actual mileage. WARNING - ODOMETER DISCREPANCY.

| MAKE | MODEL | BODY TYPE |
|------|-------|-----------|
| MASERATI | LEVANTE | 4DR SUV |

| VEHICLE IDENTIFICATION NUMBER | YEAR |
|-------------------------------|------|
| ZN661XUAXHX226986 | 2017 |

X _____
TRANSFEROR'S SIGNATURE

MIKE ANDERSON CHEVROLET
PRINTED NAME

5333 W IRVING PARK RD
TRANSFEROR'S ADDRESS (STREET)

| CHICAGO | IL | 60641-2587 |
|---------|-----|-----------|
| CITY | STATE | ZIP CODE |

January 12, 2018
DATE OF STATEMENT

X _____
TRANSFEREE'S SIGNATURE

JASON KOLODZINSKI
PRINTED NAME

JASON KOLODZINSKI
TRANSFEREE'S NAME

2593 CANYON DR
TRANSFEREE'S ADDRESS (STREET)

| PLAINFIELD | IL | 60586-5922 |
|------------|-----|-----------|
| CITY | STATE | ZIP CODE |

ILAW FORM NO. ODOM-103-N (REV. 3/13)
©2013 The Reynolds and Reynolds Company   CC723925 Q (11/14)
THE PRINTER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR
FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

MACC:JK 000007



MACC:JK 000008



MACC:JK 000009



MACC:JK 000010



MACC:JK 000011



MACC:JK 000012





MACC:JK 000013



MACC:JK 000014



MACC:JK 000015



MACC:JK 000016

CP3741
⟨2338.31⟩

CP3724
⟨3468.66⟩

Sir Haoptic Losses # 5806.99

EXHIBIT

Anderson Dep #9

MACC:SH 000001



**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**
5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank N.A.

VOID AFTER 120 DAYS

| 310227 | 053497 | 05/19/2017 | KK | 202B | $90,000.00 |

*** Ninety thousand and 00/100 dollars

SIR HOOPTIE LLC
21393 TAMPA DR # 185
LEBANON, MO  65536

⑈053497⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)        Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

|  | Created: KK  05/19/17 16:13 |
|---|---|
| G/L: **202B** | Check Number: **053497**    Check Date: **05/19/17** |

| Amount | Description | Discount | G/L Account | Control / Reference |
|---|---|---|---|---|
| $21,500.00 | 00CP3723 1C6RR6GT5FS638670 15 RAM      1500 |  | 300U | CP3723 |
| $46,000.00 | 00CP3724 1GNSKBKC3HR200004 17 CHEVROLET  TAHOE |  | 300U | CP3724 |
| $22,500.00 | 00CP3725 1GYUCDEF4AR148186 10 CADILLAC  ESCALADE |  | 300U | CP3725 |

| NOTE: USED CAR PURCHASES |  | TOTAL | **$90,000.00** |
|---|---|---|---|

3468.66

CUSTOMER

@F00008W
26.004

MACC:SH 000002

# CUSTOMER ORDER

### ANDERSON CHEVROLET

Mike Anderson Chevrolet of Merrillville, Inc.
1550 East 61st Avenue • Merrillville, IN 46410
Phone (219) 947-4151 • Toll Free (888) 947-4151
Fax (219) 942-0499

Mike Anderson Chevrolet of Chicago, Inc.
5333 W. Irving Park Road • Chicago, IL 60641
Phone (773) 465-2000
Fax (773) 508-4122

| | |
|---|---|
| PERALTA, EDGAR | 10/30/2017 DATE |
| SLSP # 1 | 37721 STK |
| KALOU, EMMANUEL SLSM# | REMBOSKI, DANIE |
| SALES MANAGER | BUSINESS MANAGER |

| CUSTOMER NAME | CO-CUSTOMER'S NAME |
|---|---|
| JONATHON OETTING | |
| ADDRESS | ADDRESS |
| 8721 CRYSTAL CREEK DR | |
| CITY STATE ZIP | CITY STATE ZIP |
| ORLAND PARK    IL 60462 | |
| HOME PHONE     WORK PHONE | HOME PHONE     WORK PHONE |
| (224) 406-9824 | |
| CELL PHONE | CELL PHONE |
| (224) 330-8315 | |

| NEW/USED | YEAR | MAKE | MODEL | SERIES |
|---|---|---|---|---|
| USED | 2017 | CHEVROLET | TAHOE | |

| STOCK NO | COLOR | BODY | VIN NO. | MILEAGE |
|---|---|---|---|---|
| CP3724 | BLUE | 4DR SUV | 1GNSKBKC3HR200004 | 7281 |

| OPTIONS INCLUDED IN PRICE | | |
|---|---|---|
| PURCHASE PRICE (INCLUDING OPTIONS) | $ | 43,250.00 |
| TRADE IN ALLOWANCE | $ | N/A |
| SALES TAX | $ | 3,584.47 |
| STATE TITLE FEE | $ | 95.00 |
| XXXXXX PLATE/TRANSFER TIME TAX | $ | 126.00 |
| DOCUMENT FEE | $ | 172.15 |
| XXXXXXXX COOK CO FEE TITLE PROCESSING FEE | $ | N/A |
| ESTIMATED PAYOFF ON TRADE | $ | N/A |
| GOOD UNTIL ___/___/___ TO: | | |
| TOTAL DUE | $ | 47,227.62 |
| REBATE | $ | N/A |
| REBATE | $ | N/A |
| REBATE | $ | N/A |
| DEPOSIT | $ | 1,000.00 |
| TOTAL OF CASH TO BE PAID | $ | 1,000.00 |
| BALANCE TO FINANCE | $ | 46,227.62 |

CONDITIONS

| TRADE IN INFORMATION | | | | |
|---|---|---|---|---|
| YEAR | MAKE | MODEL | SERIAL NO | MILEAGE |
| | | | | |

_____/_____ (initials) ARBITRATION AND NO ORAL REPRESENTATIONS: Customer agrees to be bound by the Arbitration Agreement referenced on the reverse side of this Order. Employees, salespersons and managers are not authorized to make any oral representations, agreements or promises about your Vehicle that are not in writing. Any oral representation, agreement or promise not in writing is not binding on Dealer.

___/___ (initials) FINANCING. Dealer intends to assign to a third party financial institution contract executed by Customer for the purchase of the Vehicle. Customer understands and agrees that Dealer SHALL NOT BE OBLIGATED TO SELL the Vehicle to him/her/it unless a third party lender accepts the retail installment contract signed by the Customer. The Order and retail installment contract may be cancelled at any time by Dealer, if Dealer determines in its sole discretion that it cannot obtain third party lender approval and may be cancelled by either party within twenty one (21) days hereafter if such approval is not obtained on the agreed terms within such time. Additional terms may apply as set out in this retail installment contract and/or a finance Adder. Customer agrees to provide Dealer with a true, correct and complete credit application and cooperate fully in obtaining financing, including providing supporting documentation and Customer acknowledges that Dealer is solely relying on the accuracy of such information. In the event the Order is terminated as provided herein, Customer agrees to return the Vehicle to Dealer within twenty four (24) hours of such request. Without waiving any other rights herein or under applicable law, upon termination of this Order pursuant to this section, Dealer shall return any deposit to Customer. In the event that Customer does not return the Vehicle as required herein, the Dealer may repossess the Vehicle and Customer shall be liable for all costs, expenses and reasonable attorneys' fees incurred by Dealer related thereto, and such repossession.

NEW VEHICLE WARRANTY AND DISCLAIMERS. Customer acknowledges receiving a copy of the manufacturer's warranty applicable to the Vehicle. Dealer is not a party to any such warranty and only the manufacturer has any duties or liabilities thereunder. DEALER EXPRESSLY DISCLAIMS AND EXCLUDES ANY AND ALL WARRANTIES, WHETHER EXPRESSED OR IMPLIED, WITH RESPECT TO THE VEHICLE SOLD HEREUNDER, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

USED VEHICLE "AS IS". The Customer has not made Dealer aware of any special or particular purpose for which his/her/it intends to use the Vehicle and is not relying on Dealer's skill or judgment to furnish the Vehicle for any such purpose. Customer has had or was given the opportunity to have the used Vehicle inspected and the condition of the used Vehicle meets with Customers approval and is being accepted by the Customer in its "AS IS" condition.

LIMITATION AND DURATION OF IMPLIED WARRANTIES. To the extent that implied warranties cannot be disclaimed by applicable law, Dealer hereby limits the period of any implied warranties, including warranties of merchantability and/or fitness for a particular purpose for the duration of the service contract and/or warranty that is provided with the Vehicle.

FTC WINDOWS STICKER. The information on the window form ("Buyers Guide") for the Vehicle is a part of this Order. If there is an inconsistency between the Buyers Guide and this Order, the terms and conditions of the Buyers Guide shall control.

TRADE IN PAYOFF. Customer agrees that the trade-in information is true and accurate. If the payoff balance on the trade-in vehicle is greater than the amount shown above, Customer agrees to pay the difference to Dealer upon demand. If the payoff is balance is less, Dealer shall pay the difference to Customer.

NON-CANCELLABLE. This transaction is non-cancellable after the Dealer and Customer sign this Order except as otherwise provided herein.

THIS ORDER IS SUBJECT TO CORRECTION OF ANY MATHEMATICAL ERRORS BY SALES OR OFFICE PERSONNEL. I CERTIFY THAT I AM 18 YEARS OF AGE OR OLDER. I ACKNOWLEDGE THAT I HAVE READ THE TERMS ON BOTH SIDES OF THIS ORDER AND THAT I HAVE RECEIVED A COPY OF THIS ORDER. I ACKNOWLEDGE THAT THIS ORDER CONTAINS NO BLANK SPACES AT THE TIME OF SIGNING

| | |
|---|---|
| DEALERSHIP AUTHORIZED MANAGER | CUSTOMER SIGNATURE |
| | CUSTOMER SIGNATURE |



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 3724 | License | | 1GNSKBKC3 HR200004 | Page 1 (Last) | Invoice I 83835 |
|---|---|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 6515    Out: 6515    Dist: GMP INT I        Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE |
| | Stock#:  00CP3724 |
| Begin: 09/13/17   Done: 09/13/17   Invoiced: 09/13/17 09:24 T1 | Inservice: 12/23/16 |

**Customer Concern**

| Concern    51 | AUTOTEC--FRONT BUMPER AND TOUCH UP | | | Operation | Tech | Amount |
|---|---|---|---|---|---|---|
| Cause | AUTOTEC--FRONT BUMPER AND TOUCH UP | | | MISC | 999 | 0.00 |
| Correction | AUTOTEC--FRONT BUMPER AND TOUCH UP | | | | | |
| Parts | Part Number          PO#      Note    Description | | | Qty | Sell | |
| | 061312 | | AUTOTEC--FRONT BUMPE | 1 | 216.00 | 216.00 |
| Type: I | Line Flags:  NOS | | | Total Charge for Concern | | 216.00 |

| Summary of Charges for Invoice I 83835 | | Payment Distribution for Invoice    I 83835 | |
|---|---|---|---|
| Sublet Repairs | 216.00 | TOTAL CHARGE | 216.00 |
| TOTAL CHARGE | 216.00 | | |
| | | **INTERNAL** | **216.00** |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS©2004

CUSTOMER



**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**

5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 431 NASSAR W FAKHOURY | Tag **5221** | License XX | 1GNSKBKC3 **HR200004** | Page 1 (Last) | Invoice **I82047** |
|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 6169    Out: 6170    Dist: GMP INT I         Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE |
| | Stock#: 00CP3724 |
| Begin: 07/05/17   Done: 07/05/17   Invoiced: 07/05/17 16:18 KV | Inservice: 12/23/16 |

**\*\*\*Customer Waiting\*\*\***

| Concern +01 | REPAIR TIRE | | | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|---|---|
| Cause | SCREW IN TIRE | | | | FLAT | 448 | | 0.00 |
| Correction | REPAIRED TIRE REMOVE FROM RIM CLEAN AREA INSTALL PATCH PLUG | | | | | | | |
| Tech Notes | SCREW IN TIRE | | | | | | | |
| Parts | Part Number | PO# | Note | Description | Qty | | Sell | |
| | 000   0000PATCH | | | tire patch | 1 | | 1.95 | 1.95 |
| Type: I | | | | | Total Charge for Concern | | | 1.95 |

| Concern 51 | CUSTOMER STATES THAT THE PASSENGER FRONT TIRE HAS A NAIL PLEASE ADVISE | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|
| Cause | SCREW IN TIRE | | MISCEXT | 448 | S | 25.00 |
| Correction | REPAIR TIRE | | | | | |
| Tech Notes | SCREW IN TIRE | | | | | |
| Type: I | | | Total Charge for Concern | | | 25.00 |

| **Summary of Charges for Invoice I82047** | | **Payment Distribution for Invoice   I82047** | |
|---|---|---|---|
| Parts | 1.95 | TOTAL CHARGE | 31.26 |
| Supplies | 4.31 | | |
| Labor-Mechanical | 25.00 | **INTERNAL** | **31.26** |
| TOTAL CHARGE | 31.26 | | |
| | | **\*\*\*Customer Waiting\*\*\*** | |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X 

UCS©2004

CUSTOMER

MACC:SH 000005



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 3724 | License | | 1GNSKBKC3 HR200004 | Page 1 (Last) | Invoice I 80984 |
|---|---|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 6145   Out: 6145   Dist: GMP INT I        Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE |
| | Stock#: 00CP3724 |
| Begin: 06/13/17   Done: 06/13/17   Invoiced: 06/13/17 17:54 T1 | Inservice: 12/23/16 |

**Customer Concern**

| Concern    51 | SUBURBAN WHEEL--FOUR WHEEL SKINS | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|
| Cause | SUBURBAN WHEEL--FOUR WHEEL SKINS | | MISC | 999 | | 0.00 |
| Correction | SUBURBAN WHEEL--FOUR WHEEL SKINS | | | | | |
| Parts | Part Number       PO#      Note | Description | Qty | | Sell | |
| | 060008 | SUBURBAN WHEEL--FOUR | 1 | | 138.00 | 138.00 |
| Type: I | Line Flags: NOS | | Total Charge for Concern | | | 138.00 |

| Summary of Charges for Invoice I 80984 | | Payment Distribution for Invoice I 80984 | |
|---|---|---|---|
| Sublet Repairs | 138.00 | TOTAL CHARGE | 138.00 |
| TOTAL CHARGE | 138.00 | | |
| | | **INTERNAL** | **138.00** |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X 

UCS©2004

CUSTOMER

MACC:SH 000006



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 3724 | License | 1GNSKBKC3 HR200004 | Page 1 (Last) | Invoice I 80542 |
|---|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 6145    Out: 6145    Dist: GMP INT I    Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE |
| | Stock#:  00CP3724 |
| Begin: 06/05/17   Done: 06/05/17   Invoiced: 06/05/17 08:44 T1 | Inservice: 12/23/16 |

**Customer Concern**

| Concern 24 | COMPLETE DETAIL | | | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|---|---|
| Cause | COMPLETE DETAIL | | | | AUTOSKY | 999 | * | 0.00 |
| Correction | COMPLETE DETAIL | | | | | | | |
| Parts | Part Number | PO# | Note | Description | Qty | | Sell | |
| | | 059866 | | AUTOSKY--COMPLETE DE | 1 | | 102.00 | 102.00 |
| Type: I | Line Flags:  NOS | | | | Total Charge for Concern | | | 102.00 |

| Summary of Charges for Invoice I 80542 | | Payment Distribution for Invoice  I 80542 | |
|---|---|---|---|
| Sublet Repairs | 102.00 | TOTAL CHARGE | 102.00 |
| TOTAL CHARGE | 102.00 | | |
| | | INTERNAL | **102.00** |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS©2004

CUSTOMER



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 403 FRANCISCO SEGARRA | Tag 8423 | License | 1GNSKBKC3 HR200004 | Page 1 (Last) | Invoice I79970 |
|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 6143    Out: 6145    Dist: GMP INT W I    Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE |
| | Stock#: 00CP3724 |
| Begin: 05/23/17   Done: 05/23/17   Invoiced: 05/25/17 11:07 T1 | Inservice: 12/23/16 |

**\*\*\*Customer Waiting\*\*\***

| Concern 24 | SAFETY INSPECTION | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|
| | MAKE SURE VEHICLE HAS FRONT LICENSE PLATE BRACKET | | GMSAFETY | 487 | * | 119.98 |
| Cause | SAFETY INSPECTION | | | | | |
| Correction | INSPECTION | | | | | |
| Parts | Part Number | PO# | Note | Description | | |
| | 000  019330001 | | | FILTER | Qty | Sell | |
| | 000  088865701 | | | OIL | 1 | 4.95 | 4.95 |
| | | | | | 8 | 3.95 | 31.60 |
| Type: I | | | | Total Charge for Concern | | | 156.53 |

| Concern 51 | INSTALL FRONT PLATE BRACKET--MISSING | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|
| Cause | INSTALL MISSING FRONT LICENSE PLATE BRACKET | | MISC | 487 | S | 22.00 |
| Correction | COMPLETE INSTALLATION OF FRONT LICENSE PLATE BRACKET | | | | | |
| Tech Notes | CUSTOMER STATES MISSING FRONT LICENSE PLATE BRACKET | | | | | |
| Parts | Part Number | PO# | Note | Description | Qty | Sell | |
| | 000  023235997 | | | ATTACHMENT KIT | 1 | 20.95 | 20.95 |
| Type: I | | | | Total Charge for Concern | | | 42.95 |

| Summary of Charges for Invoice I79970 | Payment Distribution for Invoice I79970 |
|---|---|

| | | |
|---|---|---|
| Parts | 25.90 | TOTAL CHARGE | 231.40 |
| Gas-Oil-Grease | 31.60 | | |
| Supplies | 31.92 | INTERNAL | 231.40 |
| Labor-Mechanical | 141.98 | | |
| TOTAL CHARGE | 231.40 | \*\*\*Customer Waiting\*\*\* |

Attention: The following Invoices also exist
    WAR - WARRANTY
    Estimate      232.00

### EXCLUSION OF WARRANTIES

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS©2004

CUSTOMER

MACC:SH 000008

2017 SIR HOOPTIE

| STOCK # | TOTAL LOSS |
|---------|------------|
| CP3741  | 2338.31    |
| CP3724  | 3468.66    |

MACC:SH 000009



# *Missouri*
## DEPARTMENT OF REVENUE

Dealer Licensing Section • P.O. Box 43 • Jefferson City, MO 65105-0043 • (573) 526-3669

I85
21393 TAMPA DR STE I85
LEBANON, MO 65536

Dealer Number:

W616

Effective: January 22, 2018
Expiration: December 31, 2018

## WHOLESALE MOTOR VEHICLE DEALER LICENSE

To Whom It May Concern:
The State of Missouri resolves that the dealer, manufacturer, wholesaler, or auction shown below is licensed within the applicable requirements of Sections 301.550 through 301.573, RSMo.

Business:
SIR HOOPTIE LLC
I85
21393 TAMPA DR STE I85
LEBANON, MO 65536

Owner(s) / Corporate Officer(s):
BRIAN GARDNER

Type Of Operation:
USED MOTOR VEHICLE
USED POWERSPORT

*Steven E. Haskins*
Administrator, Motor Vehicle Bureau

License shall be prominently displayed in the office at the business address shown above.

License must be renewed and paid for annually.

MACC:SH 000010



Mike ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

**VOID AFTER 120 DAYS**

| 310227 | 053618 | 06/01/2017 | KK | 202B | $45,500.00 |

*** Forty-five thousand five hundred and 00/100 dollars

SIR HOOPTIE LLC
21393 TAMPA DR # 185
LEBANON, MO 65536

⑈053618⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)                Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

|  | Created: **KK** 06/01/17 13:40 |
| G/L: **202B** | Check Number: **053618**   Check Date: **06/01/17** |

| Amount | Description | Discount | G/L Account | Control / Reference |
|---|---|---|---|---|
| $45,500.00 | 00CP3741 1GKS2BKCXGR451064 16 GMC     YUKON |  | 300U | CP3741 |

| NOTE: USED CAR PURCHASE | | TOTAL | **$45,500.00** |

2338.33

CUSTOMER

@F00008W
26.004

MACC:SH 000011

# *Mike* ANDERSON CHEVROLET

**CUSTOMER ORDER**

Mike Anderson Chevrolet of Merrillville, Inc.
1550 East 61st Avenue • Merrillville, IN 46410
Phone (219) 947-4151 • Toll Free (888) 947-4151
Fax (219) 942-0499

Mike Anderson Chevrolet of Chicago, Inc.
5333 W. Irving Park Road • Chicago, IL 60641
Phone (773) 465-2000
Fax (773) 508-4122

DELGADO, RUBEN    03/28/2018
SLSP # 1    DATE
383389
CUSTOMER NO.
KALOU, EMMANUEL    REMBOSKI, DA
SALES MANAGER    BUSINESS MANAGER

| CUSTOMER NAME | CO-CUSTOMER'S NAME |
|---|---|
| CHRISTOS T TOTTAS | |
| ADDRESS  5829 N SAINT LOUIS AVE | ADDRESS |
| CITY STATE ZIP  CHICAGO    IL 60659-4407 | CITY STATE ZIP |
| HOME PHONE  (847) 980-1437    WORK PHONE | HOME PHONE    WORK PHONE |
| CELL PHONE  (847) 980-1432 | CELL PHONE |

| NEW/USED | YEAR | MAKE | MODEL | SERIES |
|---|---|---|---|---|
| USED | 2016 | GMC | YUKON | |
| STOCK NO. CP3741 | COLOR WHITE | BODY 4DR SUV | VIN NO. 1GKS2BKCXGR451064 | MILEAGE 22304 |

| OPTIONS INCLUDED IN PRICE | | |
|---|---|---|
| | PURCHASE PRICE (INCLUDING OPTIONS) | $47,965.00 +530 = |
| | TRADE IN ALLOWANCE | $35,000.00  $47435. |
| | SALES TAX | $ 1,200.36 |
| GAP PROTECTION/NOT-TAXED    530.00 | STATE TITLE FEE | 95.00 |
| | ~~PLATE~~XXXX PLATE/TRANSFER | $ 50.00 |
| | DOCUMENT FEE | $ 175.94 |
| | ~~PROCESSING~~ COOK CO FEE | N/A |
| | ESTIMATED PAYOFF ON TRADE | $35,083.96 |
| | GOOD UNTIL ___/___/___ TO: CITIZENS BANK | |
| CONDITIONS | TOTAL DUE | $49,570.26 |
| | REBATE _____ | $ N/A |
| | REBATE _____ | $ N/A |
| | REBATE _____ | $ N/A |
| | DEPOSIT | $ N/A |
| | TOTAL OF CASH TO BE PAID | $ N/A |
| | BALANCE TO FINANCE | $49,570.26 |

| TRADE IN INFORMATION | | | | |
|---|---|---|---|---|
| YEAR 2015 | MAKE DODGE | MODEL DURANGO | SERIAL NO. 1C4SDJCT6FC786791 | MILEAGE 23864 |

_____/_____ (initials) ARBITRATION AND NO ORAL REPRESENTATIONS: Customer agrees to be bound by the Arbitration Agreement referenced on the reverse side of this Order. Employees, salespersons and managers are not authorized to make any oral representations, agreements or promises about your Vehicle that are not in writing. Any oral representation, agreement or promise not in writing is not binding on Dealer.

_____/_____ (initials) FINANCING. Dealer intends to assign to a third party lender the retail installment contract executed by Customer for the purchase of the Vehicle. Customer understands and agrees that Dealer SHALL NOT BE OBLIGATED TO SELL the Vehicle to him/her/it unless a third party lender accepts the retail installment contract signed by the Customer. The Order and retail installment contract may be cancelled at any time by Dealer, if Dealer determines in its sole discretion that it cannot obtain third party lender approval and may be cancelled by either party within twenty one (21) days hereafter if such approval is not obtained on the agreed terms within such time. Additional terms may apply as set out in the retail installment contract and/or a finance form. Customer agrees to provide Dealer with a true, correct and complete credit application and cooperate fully in obtaining financing, including providing supporting documentation and Customer acknowledges that Dealer is solely relying on the accuracy of such information. In the event the Order is terminated as provided herein, Customer agrees to return the Vehicle to Dealer within twenty four (24) hours of such request. Without waiving any other rights herein or under applicable law, upon termination of this Order pursuant to this section, Dealer shall return any deposit to Customer. In the event that Customer does not return the Vehicle as required herein, the Dealer may repossess the Vehicle and Customer shall be liable for all costs, expenses and reasonable attorneys' fees incurred by Dealer related thereto, and such repossession.

NEW VEHICLE WARRANTY AND DISCLAIMERS. Customer acknowledges receiving a copy of the manufacturer's warranty applicable to the Vehicle. Dealer is not a party to any such warranty and only the manufacturer has any duties or liabilities thereunder. DEALER EXPRESSLY DISCLAIMS AND EXCLUDES ANY AND ALL WARRANTIES, WHETHER EXPRESSED OR IMPLIED, WITH RESPECT TO THE VEHICLE SOLD HEREUNDER, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

USED VEHICLE "AS IS". The Customer has not made Dealer aware of any special or particular purpose for which he/she/it intends to use the Vehicle and is not relying on Dealer's skill or judgment to furnish the Vehicle for any such purpose. Customer has had or was given the opportunity to have the used Vehicle inspected and the condition of the used Vehicle meets with Customers approval and is being accepted by the Customer in its "AS IS" condition.

LIMITATION AND DURATION OR IMPLIED WARRANTIES. To the extent that implied warranties cannot be disclaimed by applicable law, Dealer hereby limits the period of any implied warranties, including warranties of merchantability and/or fitness for a particular purpose for the duration of the service contract and/or warranty that is provided with the Vehicle.

FTC WINDOWS STICKER. The information on the window form ("Buyers Guide") is a part of this Order. If there is an inconsistency between the Buyers Guide and this Order, the terms and conditions of the Buyers Guide shall control.

TRADE IN PAYOFF. Customer agrees that the trade-in information is true and accurate. If the payoff balance on the trade-in vehicle is greater than the amount shown above, Customer agrees to pay the difference to Dealer upon demand. If the payoff is balance is less, Dealer shall pay the difference to Customer.

NON-CANCELLABLE. This transaction is non-cancelable after the Dealer and Customer sign this Order except as otherwise provided herein.

THIS ORDER IS SUBJECT TO CORRECTION OF ANY MATHEMATICAL ERRORS BY SALES OR OFFICE PERSONNEL. I CERTIFY THAT I AM 18 YEARS OF AGE OR OLDER. I ACKNOWLEDGE THAT I HAVE READ THE TERMS ON BOTH SIDES OF THIS ORDER AND THAT I HAVE RECEIVED A COPY OF THIS ORDER. I ACKNOWLEDGE THAT THIS ORDER CONTAINS NO BLANK SPACES AT THE TIME OF SIGNING

_____    _____
DEALERSHIP AUTHORIZED MANAGER    CUSTOMER SIGNATURE

_____
CUSTOMER SIGNATURE

MACC:SH 000012



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to, the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | Tag 5799 | License AD | 1GKS2BKCX **GR451064** | Page 1 (Last) | Invoice **I 92749** |
|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3741 | 00CP3741 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 22304   Out: 22304   Dist: GMP INT I        Final | 16 GMC YUKON K1500 SLT 4DR SUV WHITE |
| | Stock#:  00CP3741 |
| Begin: 03/28/18   Done: 03/29/18   Invoiced: 03/29/18 08:58 T1 | Inservice: 08/05/16                          Sold: 03/28/18 |

Customer Concern

| Concern  +01 | TIRE CANNOT BE REPAIRED.   PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | Operation | Tech | | Amount |
|---|---|---|---|---|---|
| Cause | TIRE CANNOT BE REPAIRED.   PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | SUT01 | 539 | S | 25.00 |
| Correction | REPLACE TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | | | | |
| Tech Notes | TIRE CANNOT BE REPAIRED.   PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | | | | |

| Parts | Part Number | PO# | Note | Description | Qty | | Sell | |
|---|---|---|---|---|---|---|---|---|
| | 000 | 019185719 | | | *GY2854522 | 1 | | 227.95 | 227.95 |
| | 000 | 0000000WW | | | WHEEL WEIGHT | 2 | | 0.95 | 1.90 |
| | 000 | 00TIRETAX | | | TIRE USER FEE | 1 | | 2.50 | 2.50 |
| | 000 | 0TIREDISP | | | DISPOSAL FEE | 1 | | 1.00 | 1.00 |
| | 000 | 009596070 | | | NUT | 4 | | 5.95 | 23.80 |
| Type: I | | | | | Total Charge for Concern | | | 282.15 |

| Concern   24 | REPAIR TIRE--RIGHT FRONT TIRE IS LOSING AIR | Operation | Tech | | Amount |
|---|---|---|---|---|---|
| Cause | TIRE PUNCTURED TOO CLOSE TO SIDEWALL TO BE REPAIRED. | FLAT | 539 | | 0.00 |
| Correction | TIRE REPLACED. | | | | |
| Tech Notes | REPAIR TIRE--RIGHT FRONT TIRE IS LOSING AIR | | | | |
| Type: I | | Total Charge for Concern | | | 0.00 |

| Summary of Charges for Invoice I 92749 | Payment Distribution for Invoice I 92749 | |
|---|---|---|
| Parts | 253.65 | TOTAL CHARGE | 317.10 |
| Supplies | 34.95 | | |
| Labor-Mechanical | 25.00 | INTERNAL | 317.10 |
| Tire Tax | 3.50 | | |
| TOTAL CHARGE | 317.10 | | |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X 

UCS©2004

CUSTOMER

MACC:SH 000013



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to, the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 5799 | License AD | 1GKS2BKCX GR451064 | Page 1 | Invoice I92749 |
|---|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3741 | 00CP3741 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 22304   Out: 22304   Dist: GMP INT I        Final | 16 GMC YUKON K1500 SLT 4DR SUV WHITE |
| | Stock#: 00CP3741 |

| Begin: 03/28/18 | Done: 03/29/18 | Invoiced: 03/29/18 14:04 T1 | Inservice: 08/05/16 | | Sold: 03/28/18 |
|---|---|---|---|---|---|

| Customer Concern | | | | | Reprinted 1 times |
|---|---|---|---|---|---|

| Concern +01 | TIRE CANNOT BE REPAIRED.   PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | Operation | Tech | | Amount |
|---|---|---|---|---|---|
| Cause | TIRE CANNOT BE REPAIRED.   PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | SUT01 | 539 | S | 25.00 |
| Correction | REPLACE TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | | | | |
| Tech Notes | TIRE CANNOT BE REPAIRED.   PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | | | | |
| Parts | Part Number          PO#      Note    Description | Qty | | Sell | |
| | 064059                         ARANDAS TIRES--FOUR | 1 | | 4.80 | 4.80 |
| | 000  019185719                 *GY2854522 | 1 | | 227.95 | 227.95 |
| | 000  0000000WW                 WHEEL WEIGHT | 2 | | 0.95 | 1.90 |
| | 000  00TIRETAX                 TIRE USER FEE | 1 | | 2.50 | 2.50 |
| | 000  0TIREDISP                 DISPOSAL FEE | 1 | | 1.00 | 1.00 |
| | 000  009596070                 NUT | 4 | | 5.95 | 23.80 |
| Type: I | | Total Charge for Concern | | | 286.95 |

| Concern  24 | REPAIR TIRE--RIGHT FRONT TIRE IS LOSING AIR | Operation | Tech | | Amount |
|---|---|---|---|---|---|
| Cause | TIRE PUNCTURED TOO CLOSE TO SIDEWALL TO BE REPAIRED. | FLAT | 539 | | 0.00 |
| Correction | TIRE REPLACED. | | | | |
| Tech Notes | REPAIR TIRE--RIGHT FRONT TIRE IS LOSING AIR | | | | |
| Type: I | | Total Charge for Concern | | | 0.00 |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS©2004

CUSTOMER

MACC:SH 000014



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 5799 | License AD | 1GKS2BKCX GR451064 | Page 2 (Last) | Invoice I92749 |
|---|---|---|---|---|---|---|
| Invoice to: 00CP3741 | | | | Driver/Owner: 00CP3741 | | |
| Invoiced: 03/29/18 14:04:03 T1 | | | | 16 GMC YUKON K1500 SLT 4DR SUV WHITE | | |

| Summary of Charges for Invoice I92749 | | Payment Distribution for Invoice I92749 | |
|---|---|---|---|
| Parts | 253.65 | TOTAL CHARGE | 321.90 |
| Sublet Repairs | 4.80 | | |
| Supplies | 34.95 | INTERNAL | 321.90 |
| Labor-Mechanical | 25.00 | | |
| Tire Tax | 3.50 | | |
| TOTAL CHARGE | 321.90 | | |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X 

UCS©2004

CUSTOMER

MACC:SH 000015



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | Tag 3741 | License | 1GKS2BKCX GR451064 | Page 1 (Last) | Invoice I83176 |
|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3741 | 00CP3741 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 16858   Out: 16858 | Dist: GMP INT I       Final | 16 GMC YUKON K1500 SLT 4DR SUV WHITE |

Stock#:  00CP3741

| Begin: 07/27/17 | Done: 07/27/17 | Invoiced: 07/27/17 10:57 T1 | Inservice: 08/05/16 |
|---|---|---|---|

**Customer Concern**

| Concern 24 | COMPLETE DETAIL | | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|---|
| Cause | COMPLETE DETAIL | | | AUTOSKY | 999 | * | 0.00 |
| Correction | COMPLETE DETAIL | | | | | | |
| Parts | Part Number | PO# | Note | Description | Qty | | Sell |
| | | 060734 | | AUTOSKY--COMPLETE DE | 1 | 102.00 | 102.00 |
| Type: I | Line Flags:  NOS | | | | Total Charge for Concern | | 102.00 |

| Summary of Charges for Invoice I83176 | Payment Distribution for Invoice I83176 |
|---|---|
| Sublet Repairs                    102.00 | TOTAL CHARGE                        102.00 |
| TOTAL CHARGE                       102.00 | |
| | INTERNAL                           **102.00** |

**EXCLUSION OF WARRANTIES**
Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS02004

CUSTOMER

MACC:SH 000016



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 7052 | License | 1GKS2BKCX GR451064 | | Page 1 | Invoice I80621 |
|---|---|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3741 | 00CP3741 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 16835   Out: 16858   Dist: GMP INT I      Final | 16 GMC YUKON K1500 SLT 4DR SUV WHITE |
| | Stock#:  00CP3741 |
| Begin: 06/06/17   Done: 06/16/17   Invoiced: 06/16/17 12:09 T1 | Inservice: 08/05/16 |

**Customer Concern**

| Concern +01 | SPARE KEY WITH INTEGRATED REMOTE TRANSMITTER (MISSING) | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|
| Cause | SPARE KEY WITH INTEGRATED REMOTE TRANSMITTER (MISSING) | | MISC | 415 | | 69.00 |
| Correction | CUT AND PROGRAMMED SPARE KEY WITH INTEGRATED REMOTE TRANSMITTER | | | | | |
| Parts | Part Number      PO#      Note     Description | | Qty | | Sell | |
| | 000  022984995                         KEY | | 1 | | 33.95 | 33.95 |
| | SPO  013508280                         TRANSMITTER | | 1 | | 120.95 | 120.95 |
| Type: I | | | Total Charge for Concern | | | 223.90 |

| Concern +02 | "SERVICE PARK ASSIST" DISPLAYED ON INSTRUMENT PANEL--DIAGNOSE CAUSE--NON WARRANTY--VEHICLE IN REAR END ACCIDENT--PHYSICAL DAMAGE | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|
| Cause | REAR BUMPER HARNESS IS BROKEN AND RIGHT REAR OUTER SENSOR IS INOPERATIVE | | SUT02 | 415 | | 115.00 |
| Correction | NEED TO REPLACE REAR BUMPER HARNESS AND RIGHT REAR OUTER SENSOR--DIAGNOSIS ONLY | | | | | |
| Tech Notes | FOUND DTC B0959 04, B0960 04, B0958 04, P0961 18, B0961 04, B0961 3B, AND B0961 3A IN PARK ASSIST MODULE..REFERENCED SERVICE INFORMATION AND WIRING SCHEMATICS..TESTED CIRCUITS..FOUND NO POWER & GROUND AT LEFT OUTER SENSOR..BACK TRACKED TO CONNECTOR..FOUND BROKEN CONNECTOR AND WATER INTRUSION..CHECKED INTEGRITY OF RIGHT OUTER SENSOR..FOUND INTERNAL OPEN..NEED TO REPLACE REAR BUMPER HARNESS AND RIGHT REAR OUTER SENSOR | | | | | |
| Comment | ok added operation verify service park assist light on, Manager Approval 1: 06/15/17 12:45  SEGARRFR | | | | | |
| Type: I | | | Total Charge for Concern | | | 115.00 |

| Concern +03 | ***NOTE***LOW FUEL DISPLAYED IN INSTRUMENT PANEL | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|
| Cause | ***NOTE***LOW FUEL DISPLAYED IN INSTRUMENT PANEL | | SUT03 | 415 | | 0.00 |
| Correction | ***NOTE***LOW FUEL DISPLAYED IN INSTRUMENT PANEL | | | | | |

**EXCLUSION OF WARRANTIES**
Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X _____

UCS©2004

CUSTOMER

MACC:SH 000017



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | Tag 7052 | License | 1GKS2BKCX GR451064 | Page 2 (Last) | Invoice I 80621 |
|---|---|---|---|---|---|

| Invoice to: 00CP3741 | Driver/Owner: 00CP3741 |
|---|---|

| Invoiced: 06/16/17 12:09:29 T1 | 16 GMC YUKON K1500 SLT 4DR SUV WHITE |
|---|---|

| Type: I | | Total Charge for Concern | 0.00 |
|---|---|---|---|

| Concern 24 | SAFETY INSPECTION | Operation | Tech | | Amount |
|---|---|---|---|---|---|
| | MAKE SURE VEHICLE HAS FRONT LICENSE PLATE BRACKET | GMSAFETY | 415 | * | 119.98 |
| Cause | UCI AND LOF | | | | |
| Correction | INSPECTION*TIRES 11/32 11/32 11/32 11/32*BRAKES F:9mm R:9mm | | | | |
| Parts | Part Number | PO# | Note | Description | Qty | Sell | |
| | 000 019330001 | | | FILTER | 1 | 4.95 | 4.95 |
| | 000 088865639 | | | OIL | 8 | 3.95 | 31.60 |
| | 000 0000000WS | | | WASHER SOLVENT | 1 | 1.95 | 1.95 |
| Type: I | | | | | Total Charge for Concern | 158.48 |

| Concern 25 | MAKE SURE IN AND OUT MILES ARE CORRECT !!!!!!!!!!!! | Operation | Tech | | Amount |
|---|---|---|---|---|---|
| Cause | 16856 | MILES | 415 | * | 0.00 |
| Correction | 16856 | | | | |
| Type: I | | | Total Charge for Concern | 0.00 |

| Concern +51 | AC KUSTOMS--22" DUB WHEELS--GOODYEAR TIRES | Operation | Tech | | Amount |
|---|---|---|---|---|---|
| Cause | AC KUSTOMS--22" DUB WHEELS--GOODYEAR TIRES | MISC | 999 | | 0.00 |
| Correction | AC KUSTOMS--22" DUB WHEELS--GOODYEAR TIRES | | | | |
| Parts | Part Number | PO# | Note | Description | Qty | Sell | |
| | | 059957 | | AC KUSTOM--22" DUB W | 1 | 3000.00 | 3000.00 |
| Type: I | Line Flags: NOS | | | | Total Charge for Concern | 3000.00 |

| Summary of Charges for Invoice I 80621 | | Payment Distribution for Invoice I 80621 | |
|---|---|---|---|
| Parts | 161.80 | TOTAL CHARGE | 3532.33 |
| Sublet Repairs | 3000.00 | | |
| Gas-Oil-Grease | 31.60 | INTERNAL | **3532.33** |
| Supplies | 34.95 | | |
| Labor-Mechanical | 303.98 | | |
| TOTAL CHARGE | 3532.33 | | |
| Estimate 3535.00 | | | |

### EXCLUSION OF WARRANTIES

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS©2004

CUSTOMER

MACC:SH 000018

Sir Hooptie Losses    # 5806.99

C P 3741  / C P 3724
⟨2338.31⟩/ ⟨3468.66⟩

MACC:SH 000019



8333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

| 310227 | 053497 | 05/19/2017 | KK | 202B | |
|---|---|---|---|---|---|

VOID AFTER 120 DAYS

$90,000.00

*** Ninety thousand and 00/100 dollars

SIR HOOPTIE LLC
21393 TAMPA DR # 185
LEBANON, MO 65536

⑈053497⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)          Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: KK  05/19/17 16:13

G/L 202B          Check Number: 053497    Check Date: 05/19/17

| Amount | Description | Discount | G/L Account | Control / Reference |
|---|---|---|---|---|
| $21,500.00 | 00CP3723 1C6RR6GT5FS638670 15 RAM     1500 | | 300U | CP3723 |
| $46,000.00 | 00CP3724 1GNSKBKC3HR200004 17 CHEVROLET  TAHOE | | 300U | CP3724 |
| $22,500.00 | 00CP3725 1GYUCDEF4AR148186 10 CADILLAC   ESCALADE | | 300U | CP3725 |

| NOTE: USED CAR PURCHASES | | TOTAL | $90,000.00 |
|---|---|---|---|

3468.66

CUSTOMER

SF00008W
26.004

MACC:SH 000020

# Mike ANDERSON CHEVROLET

Mike Anderson Chevrolet of Merrillville, Inc.
1550 East 61st Avenue • Merrillville, IN 46410
Phone (219) 947-4151 • Toll Free (888) 947-4151
Fax (219) 945-0499

Mike Anderson Chevrolet of Chicago, LLC
5333 W. Irving Park Road • Chicago, IL 60641
Phone (773) 465-2000
Fax (773) 588-4133

## CUSTOMER ORDER

PERALTA, EDGAR                    10/30/2017

SLSP #1                           377215

KALOU, EMMANUEL                   RENKOSKI, DANIE

SALES MANAGER                     BUSINESS MANAGER

| CUSTOMER NAME | CO-CUSTOMER'S NAME |
|---|---|
| JONATHON OETTING | |
| ADDRESS | ADDRESS |
| 8721 CRYSTAL CREEK DR | |
| CITY STATE ZIP | CITY STATE ZIP |
| ORLAND PARK          IL 60462 | |
| HOME PHONE     WORK PHONE | HOME PHONE     WORK PHONE |
| (224) 406-9824 | |
| CELL PHONE | CELL PHONE |
| (224) 330-8315 | |

| NEW/USED | YEAR | MAKE | MODEL | WERKS |
|---|---|---|---|---|
| USED | 2017 | CHEVROLET | TAHOE | |
| STOCK NO. | COLOR | BODY | VIN NO. | MILEAGE |
| CP3724 | BLUE | 4DR SUV | 1GNSKBEC3HR200004 | 7281 |

| OPTIONS INCLUDED IN PRICE | | |
|---|---|---|
| | PURCHASE PRICE (INCLUDING OPTIONS) | $ 43,250.00 |
| | TRADE IN ALLOWANCE | $ N/A |
| | SALES TAX | $ 3,584.47 |
| | STATE TITLE FEE | 95.00 |
| | XXXXXX PLATE/TRANSFER TAG FEE | 126.00 |
| | DOCUMENT FEE | $ 172.15 |
| | TITLE PROCESSING FEE COOK CO FEE | $ N/A |
| | ESTIMATED PAYOFF ON TRADE | $ N/A |
| | GOOD UNTIL __/__/__ TO: | |
| CONDITIONS | TOTAL DUE | $ 47,227.62 |
| | REBATE | $ N/A |
| | REBATE | $ N/A |
| | REBATE | $ N/A |
| | DEPOSIT | $ 1,000.00 |
| | TOTAL OF CASH TO BE PAID | $ 1,000.00 |
| | BALANCE TO FINANCE | $ 46,227.62 |

| TRADE IN INFORMATION | | | | |
|---|---|---|---|---|
| YEAR | MAKE | MODEL | SERIAL NO. | MILEAGE |
| | | | | |

___/___/___ (Initials) ARBITRATION AND NO ORAL REPRESENTATIONS: Customer agrees to be bound by the Arbitration Agreement referenced on the reverse side of this Order. Employees, salespersons and managers are not authorized to make any oral representations, agreements or promises about your Vehicle that are not in writing. Any oral representation, agreement or promise not in writing is not binding on Dealer.

___/___ (Initial) FINANCING. Dealer intends to assign to a third party lender the retail installment contract executed by Customer for the purchase of the Vehicle. Customer understands and agrees that Dealer SHALL NOT BE OBLIGATED TO SELL the Vehicle to him/her/it unless a third party lender accepts the retail installment contract signed by the Customer. The Order and retail installment contract may be cancelled at any time by Dealer, if Dealer determines in its sole discretion that it cannot obtain total party lender approval and may be cancelled by either party within twenty one (21) days hereafter if such approval is not obtained on the agreed terms within such time. Additional terms may apply as set out in the retail installment contract and/or a finance rider. Customer agrees to provide Dealer with a true, correct and complete credit application and accurate fully in disclosing financing, including providing supporting documentation and Customer acknowledges that Dealer is solely relying on the accuracy of such information. In the event the Order is terminated as provided herein, Customer agrees to return the Vehicle to Dealer within twenty four (24) hours of such request. Without assuring any other rights herein or under applicable law, upon termination of this Order pursuant to this section, Dealer shall retain any deposit to Customer. In the event that Customer does not return the Vehicle as required herein, the Dealer may repossess the Vehicle and Customer shall be liable for all costs, expenses and reasonable attorneys' fees incurred by Dealer related thereto, and such repossession.

NEW VEHICLE WARRANTY AND DISCLAIMERS. Customer acknowledges receiving a copy of the manufacturer's warranty applicable to the Vehicle. Dealer is not a party to any such warranty and only the manufacturer has any duties or liabilities thereunder. DEALER EXPRESSLY DISCLAIMS AND EXCLUDES ANY AND ALL WARRANTIES, WHETHER EXPRESSED OR IMPLIED, WITH RESPECT TO THE VEHICLE SOLD HEREUNDER, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

USED VEHICLE "AS IS". The Customer has not made Dealer aware of any special or particular purpose for which he/she/it intends to use the Vehicle and is not relying on Dealer's skill or judgment to furnish the Vehicle for any such purpose. Customer has had or was given the opportunity to have the used Vehicle inspected and the condition of the used Vehicle meets with Customer's approval and is being accepted by the Customer in an "AS IS" condition.

LIMITATION AND DURATION OR IMPLIED WARRANTIES. To the extent that implied warranties cannot be disclaimed by applicable law, Dealer hereby limits the period of any implied warranties, including warranties of merchantability and/or fitness for a particular purpose for the duration of the service contract and/or warranty that is provided with the Vehicle.

FTC WINDOWS STICKER. The information on the window form ("Buyers Guide") for the Vehicle is a part of this Order. If there is an inconsistency between the Buyers Guide and this Order, the terms and conditions of the Buyers Guide shall control.

TRADE IN PAYOFF. Customer agrees that the trade-in information is true and accurate. If the payoff balance on the trade-in vehicle is greater than the amount shown above, Customer agrees to pay the difference to Dealer upon demand. If the payoff is balance is less, Dealer shall pay the difference to Customer.

NON-CANCELLABLE. This transaction is non-cancelable after the Dealer and Customer sign this Order except as otherwise provided herein.

THIS ORDER IS SUBJECT TO CORRECTION OF ANY MATHEMATICAL ERRORS BY SALES OR OFFICE PERSONNEL. I CERTIFY THAT I AM 18 YEARS OF AGE OR OLDER. I ACKNOWLEDGE THAT I HAVE READ THE TERMS ON BOTH SIDES OF THIS ORDER AND THAT I HAVE RECEIVED A COPY OF THIS ORDER. I ACKNOWLEDGE THAT THIS ORDER CONTAINS NO BLANK SPACES AT THE TIME OF SIGNING

DEALERSHIP AUTHORIZED MANAGER

CUSTOMER SIGNATURE

CUSTOMER SIGNATURE

MACC:SH 000021



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | Tag 3724 | License | 1GNSKBKC3 HR200004 | Page 1 (Last) | Invoice I 83835 |
|---|---|---|---|---|---|

| Invoice to: | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use: | Vehicle Information |
|---|---|
| Odometer in: 6515   Out: 6515   Dist: GMP INT I   Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE |
| | Stock#: 00CP3724 |
| Begin: 09/13/17   Done: 09/13/17   Invoiced: 09/13/17 09:24 T1 | Inservice: 12/23/16 |

Customer Concern

| Concern     51 | AUTOTEC--FRONT BUMPER AND TOUCH UP | | | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|---|---|
| Cause | AUTOTEC--FRONT BUMPER AND TOUCH UP | | | | MISC | 999 | | 0.00 |
| Correction | AUTOTEC--FRONT BUMPER AND TOUCH UP | | | | | | | |
| Parts | Part Number | PO# | Note | Description | Qty | | Sell | |
| | | 061312 | | AUTOTEC--FRONT BUMPE | 1 | | 216.00 | 216.00 |
| Type: I | Line Flags:  NOS | | | | Total Charge for Concern | | | 216.00 |

| Summary of Charges for Invoice I 83835 | | Payment Distribution for Invoice  I 83835 | |
|---|---|---|---|
| Sublet Repairs | 216.00 | TOTAL CHARGE | 216.00 |
| TOTAL CHARGE | 216.00 | | |
| | | INTERNAL | 216.00 |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS82004

CUSTOMER



**5301 W. Irving Park Rd. • Chicago, IL 60641**
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 431 NASSAR W FAKHOURY | Tag 8221 | License XX | 1GNSKBKC3 HR200004 | Page 1 (Last) | Invoice I82047 |
|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 6169   Out: 6170 | Dist: GMP INT I   Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE |
| | Stock#: 00CP3724 |
| Begin: 07/05/17   Done: 07/05/17   Invoiced: 07/05/17 16:18 KV | Inservice: 12/23/16 |

***Customer Waiting***

| Concern +01 | REPAIR TIRE | Operation | Tech | Amount |
|---|---|---|---|---|
| Cause | SCREW IN TIRE | FLAT | 448 | 0.00 |
| Correction | REPAIRED TIRE REMOVE FROM RIM CLEAN AREA INSTALL PATCH PLUG | | | |
| Tech Notes | SCREW IN TIRE | | | |
| Parts | Part Number   PO#   Note   Description | Qty | Sell | |
| | 000   0000PATCH          tire patch | 1 | 1.95 | 1.95 |
| Type: I | | Total Charge for Concern | | 1.95 |

| Concern 51 | CUSTOMER STATES THAT THE PASSENGER FRONT TIRE HAS A NAIL PLEASE ADVISE | Operation | Tech | Amount |
|---|---|---|---|---|
| Cause | SCREW IN TIRE | MISCEXT | 448   S | 25.00 |
| Correction | REPAIR TIRE | | | |
| Tech Notes | SCREW IN TIRE | | | |
| Type: I | | Total Charge for Concern | | 25.00 |

| Summary of Charges for Invoice I82047 | | Payment Distribution for Invoice I82047 | |
|---|---|---|---|
| Parts | 1.95 | TOTAL CHARGE | 31.26 |
| Supplies | 4.31 | | |
| Labor-Mechanical | 25.00 | INTERNAL | 31.26 |
| TOTAL CHARGE | 31.26 | | |
| | | ***Customer Waiting*** | |

**EXCLUSION OF WARRANTIES**
Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.



X

UCS02004

CUSTOMER

MACC:SH 000023



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | Tag 3724 | License | 1GNSKBKC3 HR200004 | Page 1 (Last) | Invoice I80984 |
|---|---|---|---|---|---|

| Invoice to: | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use: | | | | | Vehicle Information | | |
|---|---|---|---|---|---|---|---|
| Odometer in: 6145 | Out: 6145 | Dist: GMP INT I | | Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE | | |
| | | | | | Stock#: 00CP3724 | | |
| Begin: 06/13/17 | Done: 06/13/17 | Invoiced: 06/13/17 17:54 T1 | | | Inservice: 12/23/16 | | |

Customer Concern

| Concern 51 | SUBURBAN WHEEL--FOUR WHEEL SKINS | | | | Operation | Tech | Amount |
|---|---|---|---|---|---|---|---|
| Cause | SUBURBAN WHEEL--FOUR WHEEL SKINS | | | | MISC | 999 | 0.00 |
| Correction | SUBURBAN WHEEL--FOUR WHEEL SKINS | | | | | | |
| Parts | Part Number | PO# | Note | Description | Qty | Sell | |
| | | 060008 | | SUBURBAN WHEEL--FOUR | 1 | 138.00 | 138.00 |
| Type: I | Line Flags: NOS | | | | Total Charge for Concern | | 138.00 |

| Summary of Charges for Invoice I80984 | | Payment Distribution for Invoice I80984 | |
|---|---|---|---|
| Sublet Repairs | 138.00 | TOTAL CHARGE | 138.00 |
| TOTAL CHARGE | 138.00 | | |
| | | INTERNAL | 138.00 |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UC962004                                                                                                          CUSTOMER



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorm, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 3724 | License | | 1GNSKBKC3 HR200004 | Page 1 (Last) | Invoice I80542 |
|---|---|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 6145   Out: 6145   Dist: GMP INT I      Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE |
| | Stock#: 00CP3724 |
| Begin: 06/05/17   Done: 06/05/17   Invoiced: 06/05/17 08:44 T1 | Inservice: 12/23/16 |

**Customer Concern**

| Concern    24 | COMPLETE DETAIL | | | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|---|---|
| Cause | COMPLETE DETAIL | | | | AUTOSKY | 999 | * | 0.00 |
| Correction | COMPLETE DETAIL | | | | | | | |
| Parts | Part Number | PO#     059866 | Note | Description   AUTOSKY--COMPLETE DE | Qty | | Sell | |
| | | | | | 1 | | 102.00 | 102.00 |
| Type: I | Line Flags:  NOS | | | | Total Charge for Concern | | | 102.00 |

| Summary of Charges for Invoice I80542 | | Payment Distribution for Invoice I80542 | |
|---|---|---|---|
| Sublet Repairs | 102.00 | TOTAL CHARGE | 102.00 |
| TOTAL CHARGE | 102.00 | | |
| | | INTERNAL | **102.00** |

**EXCLUSION OF WARRANTIES**
Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X 

UC992004

CUSTOMER

MACC:SH 000025



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 403 FRANCISCO SEGARRA | Tag 8423 | License | 1GNSKBKC3HR200004 | Page 1 (Last) | Invoice I79970 |
|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3724 | 00CP3724 |

| For Office Use | Vehicle Information |
|---|---|
| Odometer in: 6143   Out: 6145 | Dist: GMP INT W I   Final | 17 CHEVROLET TAHOE LT 4WD 4DR SUV BLUE |
| | Stock#: 00CP3724 |
| Begin: 05/23/17   Done: 05/23/17   Invoiced: 05/25/17 11:07 T1 | Inservice: 12/23/16 |

***Customer Waiting***

| Concern | 24 | SAFETY INSPECTION | | | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|---|---|---|
| | | MAKE SURE VEHICLE HAS FRONT LICENSE PLATE BRACKET | | | | GMSAFETY | 487 | * | 119.98 |
| Cause | | SAFETY INSPECTION | | | | | | | |
| Correction | | INSPECTION | | | | | | | |
| Parts | | Part Number | PO# | Note | Description | Qty | | Sell | |
| | | 000  019330001 | | | FILTER | 1 | | 4.95 | 4.95 |
| | | 000  088865701 | | | OIL | 8 | | 3.95 | 31.60 |
| Type: I | | | | | | Total Charge for Concern | | | 156.53 |

| Concern | 51 | INSTALL FRONT PLATE BRACKET--MISSING | | | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|---|---|---|
| Cause | | INSTALL MISSING FRONT LICENSE PLATE BRACKET | | | | MISC | 487 | 9 | 22.00 |
| Correction | | COMPLETE INSTALLATION OF FRONT LICENSE PLATE BRACKET | | | | | | | |
| Tech Notes | | CUSTOMER STATES MISSING FRONT LICENSE PLATE BRACKET | | | | | | | |
| Parts | | Part Number | PO# | Note | Description | Qty | | Sell | |
| | | 000  023235997 | | | ATTACHMENT KIT | 1 | | 20.95 | 20.95 |
| Type: I | | | | | | Total Charge for Concern | | | 42.95 |

| Summary of Charges for Invoice I79970 | | Payment Distribution for Invoice I79970 | |
|---|---|---|---|
| Parts | 25.90 | TOTAL CHARGE | 231.40 |
| Gas-Oil-Grease | 31.60 | | |
| Supplies | 31.92 | INTERNAL | 231.40 |
| Labor-Mechanical | 141.98 | | |
| TOTAL CHARGE | 231.40 | ***Customer Waiting*** | |

Attention: The following Invoices also exist
WAR - WARRANTY
    Estimate    232.00

**EXCLUSION OF WARRANTIES**
Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS62004

CUSTOMER

MACC:SH 000026

## 2017 SIR HOOPTIE

| STOCK # | TOTAL LOSS |
|---------|------------|
| CP3741  | 2338.31    |
| CP3724  | 3468.66    |

MACC:SH 000027



# *Missouri*
## DEPARTMENT OF REVENUE

Dealer Licensing Section • P.O. Box 43 • Jefferson City, MO 65105-0043 • (573) 526-3669

185
21393 TAMPA DR STE 185
LEBANON, MO 65536

Dealer Number:

W616

Effective: January 22, 2018
Expiration: December 31, 2018

## WHOLESALE MOTOR VEHICLE DEALER LICENSE

To Whom It May Concern:
The State of Missouri resolves that the dealer, manufacturer, wholesaler, or auction shown below is licensed within the applicable requirements of Sections 301.550 through 301.573, RSMo.

Business:
SIR HOOPTIE LLC
185
21393 TAMPA DR STE 185
LEBANON, MO 65536

Owner(s)/Corporate Officer(s):
BRIAN GARDNER

Type Of Operation:
USED MOTOR VEHICLE
USED POWERSPORT

*Steven E. Hoskins*
Administrator, Motor Vehicle Bureau

License shall be prominently displayed in the office at the business address shown above.

License must be renewed and paid for annually.

MACC:SH 000028



5333 W. Irving Park Rd.
Chicago, IL 60841
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

| 310227 | 053618 | 06/01/2017 | KK | 202B | | $45,500.00 |

**VOID AFTER 120 DAYS**

*** Forty-five thousand five hundred and 00/100 dollars

SIR HOOPTIE LLC
21393 TAMPA DR # 185
LEBANON, MO 65536

⑆053618⑆ ⑉071000013⑉ 423864789⑈

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SP869822 Q (01/13) | | Mike Anderson Chevrolet of Chicago, LLC • Chicago, IL 60641 | | | Created: KK 06/01/17 13:40 | | |
| | | G/L: 2028 | | | Check Number: 053618 | Check Date: 06/01/17 | |
| Amount | | Description | Discount | G/L Account | | Control /:Reference | |
| $45,500.00 | 00CP3741 1GKS2BKCXGR451064 16 GMC | YUKON | | 300U | | CP3741 | |

| NOTE: USED CAR PURCHASE | | TOTAL | $45,500.00 |

2338.33

CUSTOMER

SP0000BW
26.004

MACC:SH 000029

**Mike ANDERSON CHEVROLET**

Mike Anderson Chevrolet of Merrillville, Inc.
1550 East 61st Avenue • Merrillville, IN 46410
Phone (219) 947-4151 • Toll Free (888) 947-4151
Fax (219) 945-0480

Mike Anderson Chevrolet of Chicago, LLC
5333 W. Irving Park Road • Chicago, IL 60641
Phone (773) 465-2080
Fax (773) 588-7188

## CUSTOMER ORDER

| | | |
|---|---|---|
| DELGADO, RUBEN | | 03/28/2018 |
| SLIP # 1 | | DATE |
| | | 383389 |
| | | CUSTOMER NO. |
| KALOU, EMMANUEL | | REMBOSKI, DA |
| SALES MANAGER | | BUSINESS MANAGER |

| CUSTOMER/NAME | CO-CUSTOMER'S NAME |
|---|---|
| CHRISTOS T TOTTAS | |
| **ADDRESS** | **ADDRESS** |
| 5829 N SAINT LOUIS AVE | |
| **CITY STATE ZIP** | **CITY STATE ZIP** |
| CHICAGO      IL 60659-4407 | |
| **HOME PHONE**   WORK PHONE | **HOME PHONE**   WORK PHONE |
| (847) 980-1437 | |
| **CELL PHONE** | **CELL PHONE** |
| (847) 980-1432 | |

| NEW/USED | YEAR | MAKE | MODEL | SERIES |
|---|---|---|---|---|
| USED | 2016 | GMC | YUKON | |
| **STOCK NO.** | **COLOR** | **BODY** | **VIN NO.** | **MILEAGE** |
| CF3741 | WHITE | 4DR SUV | 1GKS2BKCXGR451064 | 22304 |

| OPTIONS INCLUDED IN PRICE | | |
|---|---|---|
| | | |
| GAP PROTECTION/NOT-TAXED      530.00 | | |

| | |
|---|---|
| PURCHASE PRICE (INCLUDING OPTIONS) | $ 47,965.00 |
| TRADE IN ALLOWANCE | $ 35,000.00 |
| SALES TAX | $ 1,200.36 |
| STATE TITLE FEE | $ 95.00 |
| XXXXXX PLATE/TRANSFER | $ 50.00 |
| DOCUMENT FEE | $ 175.94 |
| XXXXXXX BOOK CO FEE | $ N/A |
| ESTIMATED PAYOFF ON TRADE | $ 35,083.96 |
| GOOD UNTIL ___/___/___ TO: CITIZENS BANK | |
| TOTAL DUE | $ 49,570.26 |
| REBATE | $ N/A |
| REBATE | $ N/A |
| REBATE | $ N/A |
| DEPOSIT | $ N/A |
| TOTAL OF CASH TO BE PAID | $ N/A |
| BALANCE TO FINANCE | $ 49,570.26 |

*(handwritten: 530.- = 47435.-)*

### CONDITIONS

| TRADE IN INFORMATION | | | | |
|---|---|---|---|---|
| **YEAR** | **MAKE** | **MODEL** | **SERIAL NO.** | **MILEAGE** |
| 2015 | DODGE | DURANGO | 1C4SDJCT6FC786791 | 23864 |

____/____ (Initials) ARBITRATION AND NO ORAL REPRESENTATIONS: Customer agrees to be bound by the Arbitration Agreement referenced on the reverse side of this Order. Employees, salespersons and managers are not authorized to make any oral representations, agreements or promises about your Vehicle that are not in writing. Any oral representation, agreement or promise not in writing is not binding on Dealer.

*(body paragraphs of terms — partially illegible)*

NEW VEHICLE WARRANTY AND DISCLAIMER. *(illegible)*

USED VEHICLE "AS IS". *(illegible)*

LIMITATION AND DURATION OR IMPLIED WARRANTIES. *(illegible)*

FTC WINDOW STICKER. *(illegible)*

TRADE IN PAYOFF. *(illegible)*

NON-CANCELLABLE. *(illegible)*

THIS ORDER IS SUBJECT TO CORRECTION OF ANY MATHEMATICAL ERRORS BY SALES OR OFFICE PERSONNEL. I CERTIFY THAT I AM 18 YEARS OF AGE OR OLDER. I ACKNOWLEDGE THAT I HAVE READ THE TERMS ON BOTH SIDES OF THIS ORDER AND THAT I HAVE RECEIVED A COPY OF THIS ORDER. I ACKNOWLEDGE THAT THIS ORDER CONTAINS NO BLANK SPACES AT THE TIME OF SIGNING

DEALERSHIP AUTHORIZED MANAGER          CUSTOMER SIGNATURE

CUSTOMER SIGNATURE

MACC:SH 000030



**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**

5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | Tag 5799 | License AD | | 1GKS2BKCXGR451064 | Page 1 (Last) | Invoice I92749 |
|---|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3741 | 00CP3741 |

| For Office Use | Vehicle Information |
|---|---|

| Odometer in: 22304 | Out: 22304 | Dist: GMP INT I | Final | 16 GMC YUKON K1500 SLT 4DR SUV WHITE |
|---|---|---|---|---|
| | | | | Stock#: 00CP3741 |

| Begin: 03/28/18 | Done: 03/29/18 | Invoiced: 03/29/18 08:58 T1 | Inservice: 08/05/16 | Sold: 03/28/18 |
|---|---|---|---|---|

**Customer Concern**

| Concern +01 | TIRE CANNOT BE REPAIRED. PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | Operation | Tech | | Amount |
|---|---|---|---|---|---|
| Cause | TIRE CANNOT BE REPAIRED. PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | SUT01 | 539 | S | 25.00 |
| Correction | REPLACE TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | | | | |
| Tech Notes | TIRE CANNOT BE REPAIRED. PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | | | | |

| Parts | Part Number | PO# | Note | Description | Qty | Sell | |
|---|---|---|---|---|---|---|---|
| | 000 | 019185719 | | | *GY2854522 | 1 | 227.95 | 227.95 |
| | 000 | 0000000WW | | | WHEEL WEIGHT | 2 | 0.95 | 1.90 |
| | 000 | 00TIRETAX | | | TIRE USER FEE | 1 | 2.50 | 2.50 |
| | 000 | 0TIREDISP | | | DISPOSAL FEE | 1 | 1.00 | 1.00 |
| | 000 | 008596070 | | | NUT | 4 | 5.95 | 23.80 |

| Type: I | Total Charge for Concern | 282.15 |
|---|---|---|

| Concern 24 | REPAIR TIRE--RIGHT FRONT TIRE IS LOSING AIR | Operation | Tech | Amount |
|---|---|---|---|---|
| Cause | TIRE PUNCTURED TOO CLOSE TO SIDEWALL TO BE REPAIRED. | FLAT | 539 | 0.00 |
| Correction | TIRE REPLACED. | | | |
| Tech Notes | REPAIR TIRE--RIGHT FRONT TIRE IS LOSING AIR | | | |
| Type: I | | Total Charge for Concern | | 0.00 |

| Summary of Charges for Invoice I92749 | | Payment Distribution for Invoice I92749 | |
|---|---|---|---|
| Parts | 253.65 | TOTAL CHARGE | 317.10 |
| Supplies | 34.95 | | |
| Labor-Mechanical | 25.00 | INTERNAL | 317.10 |
| Tire Tax | 3.50 | | |
| TOTAL CHARGE | 317.10 | | |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X 

CUSTOMER

UCS©2004

MACC:SH 000031



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 5799 | License AD | | 1GKS2BKCX GR451064 | | Page 1 | Invoice I92749 |
|---|---|---|---|---|---|---|---|---|

| Invoice to | Driver/Owner Information |
|---|---|
| 00CP3741 | 00CP3741 |

| For Office Use | Vehicle Information |
|---|---|

| Odometer In: 22304   Out: 22304 | Dist: GMP INT I   Final | 16 GMC YUKON K1500 SLT 4DR SUV WHITE |
|---|---|---|
| | | Stock#:  00CP3741 |

| Begin: 03/28/18 | Done: 03/29/18 | Invoiced: 03/29/18 14:04 T1 | Inservice: 08/05/16 | | Sold: 03/28/18 |
|---|---|---|---|---|---|

| Customer Concern | | Reprinted 1 times |
|---|---|---|

| Concern +01 | TIRE CANNOT BE REPAIRED.   PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | Operation | Tech | | Amount |
|---|---|---|---|---|---|
| Cause | TIRE CANNOT BE REPAIRED.   PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | SUT01 | 539 | S | 25.00 |
| Correction | REPLACE TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | | | | |
| Tech Notes | TIRE CANNOT BE REPAIRED.   PUNCTURE IS TOO CLOSE TO SIDEWALL OF TIRE. GOODYEAR FORTERA SL EDITION 295/45R22 M+S | | | | |

| Parts | Part Number | PO# | Note | Description | Qty | | Sell | |
|---|---|---|---|---|---|---|---|---|
| | | 064059 | | ARANDAS TIRES--FOUR | 1 | | 4.80 | 4.80 |
| | 000  019185719 | | | *GY2854522 | 1 | | 227.95 | 227.95 |
| | 000  0000000mW | | | WHEEL WEIGHT | 2 | | 0.95 | 1.90 |
| | 000  00TIRETAX | | | TIRE USER FEE | 1 | | 2.50 | 2.50 |
| | 000  0TIREDISP | | | DISPOSAL FEE | 1 | | 1.00 | 1.00 |
| | 000  009596070 | | | NUT | 4 | | 5.95 | 23.80 |
| Type: I | | | | | Total Charge for Concern | | | 286.95 |

| Concern 24 | REPAIR TIRE--RIGHT FRONT TIRE IS LOSING AIR | Operation | Tech | Amount |
|---|---|---|---|---|
| Cause | TIRE PUNCTURED TOO CLOSE TO SIDEWALL TO BE REPAIRED. | FLAT | 539 | 0.00 |
| Correction | TIRE REPLACED. | | | |
| Tech Notes | REPAIR TIRE--RIGHT FRONT TIRE IS LOSING AIR | | | |
| Type: I | | Total Charge for Concern | | 0.00 |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS©2004

CUSTOMER



**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**

5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | Tag 5799 | License AD | 1GKS2BKCX GR451064 | Page 2 (Last) | Invoice I92749 |
|---|---|---|---|---|---|

| Invoice to: 06CP3741 | Driver/Owner: 00CP3741 |
|---|---|
| Invoiced: 03/29/18 14:04:03 T1 | 16 GMC YUKON K1500 SLT 4DR SUV WHITE |

| Summary of Charges for Invoice I92749 | | Payment Distribution for Invoice I92749 | |
|---|---|---|---|
| Parts | 253.65 | TOTAL CHARGE | 321.90 |
| Sublet Repairs | 4.80 | | |
| Supplies | 34.95 | INTERNAL | 321.90 |
| Labor-Mechanical | 25.00 | | |
| Tire Tax | 3.50 | | |
| TOTAL CHARGE | 321.90 | | |

**EXCLUSION OF WARRANTIES**
Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X 

UCS82004

CUSTOMER

MACC:SH 000033



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 3741 | License | | 1GKS2BKCX GR451064 | | Page 1 (Last) | Invoice I83176 |
|---|---|---|---|---|---|---|---|---|
| **Invoice to** | | | | **Driver/Owner Information** | | | | |
| 00CP3741 | | | | 00CP3741 | | | | |
| **For Office Use** | | | | **Vehicle Information** | | | | |
| Odometer in: 16858   Out: 16858 | | Dist: GMP INT I     Final | | 16 GMC YUKON K1500 SLT 4DR SUV WHITE | | | | |
| | | | | Stock#: 00CP3741 | | | | |
| Begin: 07/27/17 | Done: 07/27/17 | Invoiced: 07/27/17 10:57 T1 | | Inservice: 08/05/16 | | | | |

**Customer Concern:**

| Concern    24 | COMPLETE DETAIL | | | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|---|---|
| Cause | COMPLETE DETAIL | | | | AUTOSKY | 999 | * | 0.00 |
| Correction | COMPLETE DETAIL | | | | | | | |
| Parts | Part Number | PO#     Note | Description | | Qty | | Sell | |
| | | 060734 | AUTOSKY--COMPLETE DE | | 1 | | 102.00 | 102.00 |
| Type: I | Line Flags: NOS | | | | Total Charge for Concern | | | 102.00 |

| **Summary of Charges for Invoice I83176** | | **Payment Distribution for Invoice I83176** | |
|---|---|---|---|
| Sublet Repairs | 102.00 | TOTAL CHARGE | 102.00 |
| TOTAL CHARGE | 102.00 | | |
| | | INTERNAL | **102.00** |

**EXCLUSION OF WARRANTIES**
Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X 

UC902004

CUSTOMER

MACC:SH 000034



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 70B2 | License | | 1GKS2BKCX GR451064 | Page 1 | Invoice I80621 |
|---|---|---|---|---|---|---|---|

| Invoice to :- | Driver/Owner Information :- |
|---|---|
| 00CP3741 | 00CP3741 |

| For Offine Use:- | Vehicle Information :- |
|---|---|
| Odometer in: 16835   Out: 16858   Dist: GMP INT I      Final | 16 GMC YUKON K1500 SLT 4DR SUV WHITE |
| | Stock#: 00CP3741 |
| Begin: 06/06/17   Done: 06/16/17   Invoiced: 06/16/17 12:09 T1 | Inservice: 08/05/16 |

Customer Concern

| Concern  +01 | SPARE KEY WITH INTEGRATED REMOTE TRANSMITTER (MISSING) | | | | Operation | Tech | | Amount |
|---|---|---|---|---|---|---|---|---|
| Cause | SPARE KEY WITH INTEGRATED REMOTE TRANSMITTER (MISSING) | | | | MISC | 415 | | 69.00 |
| Correction | CUT AND PROGRAMMED SPARE KEY WITH INTEGRATED REMOTE TRANSMITTER | | | | | | | |
| Parts | Part Number | PO# | Note | Description | Qty | | Sell | |
| | 000  022984995 | | | KEY | 1 | | 33.95 | 33.95 |
| | SPO  013508280 | | | TRANSMITTER | 1 | | 120.95 | 120.95 |
| Type: I | | | | | Total Charge for Concern | | | 223.90 |

| Concern  +02 | "SERVICE PARK ASSIST" DISPLAYED ON INSTRUMENT PANEL--DIAGNOSE CAUSE--NON WARRANTY--VEHICLE IN REAR END ACCIDENT--PHYSICAL DAMAGE | Operation | Tech | Amount |
|---|---|---|---|---|
| Cause | REAR BUMPER HARNESS IS BROKEN AND RIGHT REAR OUTER SENSOR IS INOPERATIVE | SUT02 | 415 | 115.00 |
| Correction | NEED TO REPLACE REAR BUMPER HARNESS AND RIGHT REAR OUTER SENSOR--DIAGNOSIS ONLY | | | |
| Tech Notes | FOUND DTC B0959 04, B0960 04, B0958 04, P0961 10, B0961 04, B0961 3B, AND B0961 3A IN PARK ASSIST MODULE..REFERENCED SERVICE INFORMATION AND WIRING SCHEMATICS..TESTED CIRCUITS..FOUND NO POWER & GROUND AT LEFT OUTER SENSOR..BACK TRACKED TO CONNECTOR..FOUND BROKEN CONNECTOR AND WATER INTRUSION..CHECKED INTEGRITY OF RIGHT OUTER SENSOR..FOUND INTERNAL OPEN..NEED TO REPLACE REAR BUMPER HARNESS AND RIGHT REAR OUTER SENSOR | | | |
| Comment | ok added operation verify service park assist light on, | | | |
| | Manager Approval 1: 06/15/17 12:45 SEGARRFR | | | |
| Type: I | | Total Charge for Concern | | 115.00 |

| Concern  +03 | ***NOTE***LOW FUEL DISPLAYED IN INSTRUMENT PANEL | Operation | Tech | Amount |
|---|---|---|---|---|
| Cause | ***NOTE***LOW FUEL DISPLAYED IN INSTRUMENT PANEL | SUT03 | 415 | 0.00 |
| Correction | ***NOTE***LOW FUEL DISPLAYED IN INSTRUMENT PANEL | | | |

EXCLUSION OF WARRANTIES

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties are excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UC9©2004

CUSTOMER

MACC:SH 000035



5301 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
Service Direct Line: (773) 508-4100
www.mikeandersonchevy.com
LIC# 339714

All new or remanufactured GM Parts and Accessories installed by Service Agent are covered, parts and labor, for any remaining unused portion of the Vehicle or Emissions Warranty or 12 months regardless of mileage, whichever is greater. The original Job Card or sales slip is required for warranty eligibility. The Limited Warranty does not cover damage caused as the result of any of the following: collision, fire, theft, freezing, vandalism, riot, explosion, or from objects striking the vehicle, misuse of the vehicle such as driving over curbs, overloading, racing, or other competition. Proper vehicle use is discussed in the Owner's Manual. Alteration, modification or tampering to the vehicle including, but not limited to the body, chassis, powertrain, driveline, or components after final assembly by GM, coverage's do not apply if the odometer has been disconnected, its reading has been altered, or mileage cannot be determined. Water or fluid contamination, damage resulting from hail, floods, windstorms, lightning and other environmental conditions, alteration of glass parts by application of tinting films.

| Adv: 405 TIMOTHY JENNEY | | Tag 7082 | License | | 1GKS2BKCX GR451064 | Page 2 (Last) | Invoice I 80621 |
|---|---|---|---|---|---|---|---|
| Invoice to: 00CF3741 | | | Driver/Owner: 00CF3741 | | | | |
| Invoiced: 06/16/17 12:09:29 T1 | | | 16 GMC YUKON K1500 SLT 4DR SUV WHITE | | | | |

| | | | | | | Total Charge for Concern | | 0.00 |
|---|---|---|---|---|---|---|---|---|
| Type: I | | | | | | | | |
| Concern 24 | SAFETY INSPECTION | | | | | Operation | Tech | Amount |
| | MAKE SURE VEHICLE HAS FRONT LICENSE PLATE BRACKET | | | | | GMSAFETY | 415 | * | 119.98 |
| Cause | UCI AND LOF | | | | | | | |
| Correction | INSPECTION*TIRES 11/32 11/32 11/32 11/32*BRAKES F:9mm R:9mm | | | | | | | |
| Parts | Part Number | PO# | Note | Description | | Qty | Sell | |
| | 000 019330001 | | | FILTER | | 1 | 4.95 | 4.95 |
| | 000 088865639 | | | OIL | | 8 | 3.95 | 31.60 |
| | 000 0000000WS | | | WASHER SOLVENT | | 1 | 1.95 | 1.95 |
| Type: I | | | | | | Total Charge for Concern | | 158.48 |
| Concern 25 | MAKE SURE IN AND OUT MILES ARE CORRECT !!!!!!!!!!!!! | | | | | Operation | Tech | Amount |
| Cause | 16856 | | | | | MILES | 415 | * | 0.00 |
| Correction | 16856 | | | | | | | |
| Type: I | | | | | | Total Charge for Concern | | 0.00 |
| Concern +51 | AC KUSTOMS--22" DUB WHEELS--GOODYEAR TIRES | | | | | Operation | Tech | Amount |
| Cause | AC KUSTOMS--22" DUB WHEELS--GOODYEAR TIRES | | | | | MISC | 999 | | 0.00 |
| Correction | AC KUSTOMS--22" DUB WHEELS--GOODYEAR TIRES | | | | | | | |
| Parts | Part Number | PO# | Note | Description | | Qty | Sell | |
| | | 059957 | | AC KUSTOM--22" DUB W | | 1 | 3000.00 | 3000.00 |
| Type: I | Line Flags: NOS | | | | | Total Charge for Concern | | 3000.00 |

| Summary of Charges for Invoice I 80621 | | Payment Distribution for Invoice I 80621 | |
|---|---|---|---|
| Parts | 161.80 | TOTAL CHARGE | 3532.33 |
| Sublet Repairs | 3000.00 | | |
| Gas-Oil-Grease | 31.60 | INTERNAL | 3532.33 |
| Supplies | 34.95 | | |
| Labor-Mechanical | 303.98 | | |
| TOTAL CHARGE | 3532.33 | | |
| Estimate 3535.00 | | | |

**EXCLUSION OF WARRANTIES**

Any warranties on the parts and accessories sold hereby are made by the manufacturer. The undersigned purchaser understands and agrees that dealer makes no warranties of any kind, express or implied, and disclaims all warranties, including warranties of merchantability or fitness for a particular purpose, with regard to the parts and/or accessories purchased; and that in no event shall dealer be liable for incidental or consequential damages or commercial losses arising out of such purchase. The undersigned purchaser further agrees that the warranties excluded by dealer, include, but are not limited to any warranties that such parts and/or accessories are of merchantable quality or that they will enable any vehicle or any of its systems to perform with reasonable safety, efficiency, or comfort.

X

UCS02004

CUSTOMER

AC Kustoms Corp.

2017- 125,562.76

**EXHIBIT**

Anderson Dep #10

MACC:ACKustoms 000001

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

AC KUSTOMS Corp.

**2** Business name/disregarded entity name, if different from above

1120 N 31st Ave Melrose PARK IL 60160

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC   ☑ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

1120 N 31st Ave

**6** City, state, and ZIP code

Melrose PARK IL 60160

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type
See Specific Instructions on page 2.*

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

| | | | - | | | - | | | | |

**or**

Employer identification number

| 8 | 1 | - | 5 | 2 | 3 | 6 | 2 | 5 | 9 |

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**   Signature of U.S. person ▶

Date ▶   2-6-17

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9.*

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)

- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

MACC:ACKustoms 000002



## CORPORATION FILE DETAIL REPORT

| | | | |
|---|---|---|---|
| **File Number** | 71117391 | | |
| **Entity Name** | AC KUSTOMS CORP. | | |
| **Status** | ACTIVE | | |
| **Entity Type** | CORPORATION | **Type of Corp** | DOMESTIC BCA |
| **Incorporation Date (Domestic)** | 02/03/2017 | **State** | ILLINOIS |
| **Agent Name** | ALEJANDRO CISNEROS | **Agent Change Date** | 02/03/2017 |
| **Agent Street Address** | 1120 N 31ST AVE | **President Name & Address** | ALEJANDRO CISNEROS 708 N 5TH AVE MAYWOOD IL 60153 |
| **Agent City** | MELROSE PARK | **Secretary Name & Address** | NONE |
| **Agent Zip** | 60160 | **Duration Date** | PERPETUAL |
| **Annual Report Filing Date** | 02/02/2018 | **For Year** | 2018 |

Return to the Search Screen

Purchase Certificate of Good Standing

**(One Certificate per Transaction)**

## OTHER SERVICES

File Annual Report

Adopting Assumed Name

Articles of Amendment Effecting A Name Change

Change of Registered Agent and/or Registered Office Address

MACC:ACKustoms 000003

**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**
5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JPMorgan Chase Bank, N.A.

| 001188 | 054751 | 09/14/2017 | MS | 202B | VOID AFTER 120 DAYS | $14,674.02 |

*** Fourteen thousand six hundred seventy-four and 02/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈054751⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)          Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

**Created: MS  09/14/17 15:33**

**G/L: 202B**   **Check Number: 054751**   **Check Date: 09/14/17**

| G/L Account | Control | | Reference | Amount | Discount/Memo |
|---|---|---|---|---|---|
| 300A | 1188 | | 1233 | $544.03 | 00001233 |
| 300A | 1188 | | 1234 | $150.00 | 00001234 |
| 300A | 1188 | | 1235 | $150.00 | 00001235 |
| 300A | 1188 | | 1236 | $780.00 | 00001236 |
| 300A | 1188 | | 1237 | $300.49 | 00001237 |
| 300A | 1188 | | 1238 | $150.00 | 00001238 |
| 300A | 1188 | | 1239 | $610.00 | 00001239 |
| 300A | 1188 | | 1240 | $1,365.00 | 00001240 |
| 300A | 1188 | | 1241 | $330.00 | 00001241 |
| 300A | 1188 | | 1242 | $150.00 | 00001242 |
| 300A | 1188 | | 1243 | $612.50 | 00001243 |
| 300A | 1188 | | 1244 | $1,080.00 | 00001244 |
| 300A | 1188 | | 1245 | $150.00 | 00001245 |
| 300A | 1188 | | 1246 | $923.00 | 00001246 |
| 300A | 1188 | | 1247 | $150.00 | 00001247 |
| 300A | 1188 | | 1248 | $150.00 | 00001248 |
| 300A | 1188 | | 1249 | $360.00 | 00001249 |
| 300A | 1188 | | 1250 | $150.00 | 00001250 |
| 300A | 1188 | | 1251 | $1,790.00 | 00001251 |
| 300A | 1188 | | 1252 | $800.00 | 00001252 |
| 300A | 1188 | | 1253 | $405.00 | 00001253 |
| 300A | 1188 | | 1254 | $150.00 | 00001254 |
| 300A | 1188 | | 1255 | $158.00 | 00001255 |
| 300A | 1188 | | 1256 | $150.00 | 00001256 |
| 300A | 1188 | | 1257 | $2,516.00 | 00001257 |
| 300A | 1188 | | 1258 | $600.00 | 00001258 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $14,674.02 |

CUSTOMER

@F00008W
26.004

MACC:ACKustoms 000004

**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

| | | | | | VOID AFTER 120 DAYS | |
|---|---|---|---|---|---|---|
| 001188 | 054751 | 09/14/2017 | MS | 202B | | $14,674.02 |

*** Fourteen thousand six hundred seventy-four and 02/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

⑈054751⑈ ⑆071000013⑆ 423864789⑈

SF806822 Q (01/13)          Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS  09/14/17 15:33**

G/L: **202B**          Check Number: **054751**          Check Date: **09/14/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1233 | $544.03 | 00001233 |
| 300A | 1188 | 1234 | $150.00 | 00001234 |
| 300A | 1188 | 1235 | $150.00 | 00001235 |
| 300A | 1188 | 1236 | $780.00 | 00001236 |
| 300A | 1188 | 1237 | $300.49 | 00001237 |
| 300A | 1188 | 1238 | $150.00 | 00001238 |
| 300A | 1188 | 1239 | $610.00 | 00001239 |
| 300A | 1188 | 1240 | $1,365.00 | 00001240 |
| 300A | 1188 | 1241 | $330.00 | 00001241 |
| 300A | 1188 | 1242 | $150.00 | 00001242 |
| 300A | 1188 | 1243 | $612.50 | 00001243 |
| 300A | 1188 | 1244 | $1,080.00 | 00001244 |
| 300A | 1188 | 1245 | $150.00 | 00001245 |
| 300A | 1188 | 1246 | $923.00 | 00001246 |
| 300A | 1188 | 1247 | $150.00 | 00001247 |
| 300A | 1188 | 1248 | $150.00 | 00001248 |
| 300A | 1188 | 1249 | $360.00 | 00001249 |
| 300A | 1188 | 1250 | $150.00 | 00001250 |
| 300A | 1188 | 1251 | $1,790.00 | 00001251 |
| 300A | 1188 | 1252 | $800.00 | 00001252 |
| 300A | 1188 | 1253 | $405.00 | 00001253 |
| 300A | 1188 | 1254 | $150.00 | 00001254 |
| 300A | 1188 | 1255 | $158.00 | 00001255 |
| 300A | 1188 | 1256 | $150.00 | 00001256 |
| 300A | 1188 | 1257 | $2,516.00 | 00001257 |
| 300A | 1188 | 1258 | $600.00 | 00001258 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $14,674.02 |
|---|---|---|

FILE

@F00008W
26.004

MACC:ACKustoms 000005

9/14/2017

# Customer Sales Report
# Ac Kustoms Corp.

Page: 1

### 1120 N 31st Ave
### Melrose Park, IL  60160

---

Mike Anderson Chevy
5333 W Irvingpark Rd
Chicago IL  60641

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

### Date range: 09/06/2017 to 09/14/2017

---

**2012 DODGE R 1500 4x4 PICKUP**
**VIN: 1C6RD7KT9CS188142**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1233 | 09/06/2017 | SAFETY INSPECTION | $244.03 | $300.00 | $0.00 | $0.00 | $544.03 | N/A |
| | | | $244.03 | $300.00 | $0.00 | $0.00 | $544.03 | |

**2015 CHEVY EQUINOX**
**VIN: 2GNALAEK8F6439322**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1234 | 09/06/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2014 FORD CMAX**
**VIN: 1FADP5CU8DL518196**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1235 | 09/06/2017 | UCI | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2010 HONDA   ACCORD**
**VIN: 1HGCP2F89AA109703**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1236 | 09/06/2017 | UCI | $180.00 | $600.00 | $0.00 | $0.00 | $780.00 | N/A |
| | | | $180.00 | $600.00 | $0.00 | $0.00 | $780.00 | |

**2012 CHEVROLET EQUINOX 4x4   2.4L DOHC DIS-SFI**
**VIN: 2GNALBEK7C1180434**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1237 | 09/07/2017 | DIAGNOSE WIRING PROBLEM | $142.99 | $157.50 | $0.00 | $0.00 | $300.49 | N/A |
| | | | $142.99 | $157.50 | $0.00 | $0.00 | $300.49 | |

**2017 CHEVY EQUINOX**
**VIN: 2GNALBEK1H1518160**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1238 | 09/07/2017 | UCI | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

MACC:ACKustoms 000006

# Customer Sales Report

## Ac Kustoms Corp.

### 1120 N 31st Ave
### Melrose Park, IL  60160

---

**Mike Anderson Chevy**              **Ph# 1:** (773) 465-2000
**5333 W Irvingpark Rd**             **Ph# 2:** (___) ___-____
**Chicago  IL  60641**                    **Cell:**

### Date range: 09/06/2017 to 09/14/2017

---

**2014  FORD FOCUS**
**VIN: 1FADP3N22EL205903**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1239 | 09/07/2017 | UCI | $460.00 | $150.00 | $0.00 | $0.00 | $610.00 | N/A |
| | | | $460.00 | $150.00 | $0.00 | $0.00 | $610.00 | |

**2011  NISSAN JUKE**
**VIN: JN8AF5MR4BT009072**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1240 | 09/07/2017 | UCI | $1,065.00 | $300.00 | $0.00 | $0.00 | $1,365.00 | N/A |
| | | | $1,065.00 | $300.00 | $0.00 | $0.00 | $1,365.00 | |

**2015  JEEP COMPASS**
**VIN: 1C4NJDBB2FD135037**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1241 | 09/07/2017 | UCI | $30.00 | $300.00 | $0.00 | $0.00 | $330.00 | N/A |
| | | | $30.00 | $300.00 | $0.00 | $0.00 | $330.00 | |

**2014  IS250 AWD LEXUS**
**VIN: JTHCF1D29E5005140**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1242 | 09/08/2017 | UCI | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2015  CHEVY SONIC**
**VIN: 1G1JC5SH7F4172046**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1243 | 09/08/2017 | UCI | $0.00 | $612.50 | $0.00 | $0.00 | $612.50 | N/A |
| | | | $0.00 | $612.50 | $0.00 | $0.00 | $612.50 | |

**2013  CHEVY IMPALA**
**VIN: 2G1WD5E3X01366494**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1244 | 09/08/2017 | UCI | $930.00 | $150.00 | $0.00 | $0.00 | $1,080.00 | N/A |
| | | | $930.00 | $150.00 | $0.00 | $0.00 | $1,080.00 | |

MACC:ACKustoms 000007

# Customer Sales Report
## Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL 60160

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago IL 60641**

Ph# 1: **(773) 465-2000**
Ph# 2: (____) ____-____
Cell:

### Date range: 09/06/2017 to 09/14/2017

---

**2016 CHEVY TRAX**
**VIN: 3GNCJNSBXGL455875**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1245 | 09/11/2017 | CCI | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
|  |  |  | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 |  |

**13 BUICK ENCLAVE**
**VIN: 5GAKVCKD8DG218832**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1246 | 09/11/2017 | CCI | $5.00.00 | $113.00 | $0.00 | $0.00 | $923.00 | N/A |
|  |  |  | $5.00.00 | $413.00 | $0.00 | $0.00 | $923.00 |  |

**2015 CHEVY COLORADO**
**VIN: 1GCGTBE37E1196946**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1247 | 09/11/2017 | CCI | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
|  |  |  | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 |  |

**2014 CHEVROLET MALIBU**
**VIN: 1G11C5SLXEF02750**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1248 | 09/13/2017 | CCI | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
|  |  |  | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 |  |

**2014 CHEVROLET MALIBU**
**VIN: 1G11B5SL4EF255866**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1249 | 09/13/2017 | CCI | $0.00 | $360.00 | $0.00 | $0.00 | $360.00 | N/A |
|  |  |  | $0.00 | $360.00 | $0.00 | $0.00 | $360.00 |  |

**2016 JEEP PATRIOT**
**VIN: 1C4NJPBAXGD775338**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1250 | 09/13/2017 | CCI | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
|  |  |  | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 |  |

MACC:ACKustoms 000008

# Customer Sales Report

## Ac Kustoms Corp.

### 1120 N 31st Ave
### Melrose Park, IL 60160

Mike Anderson Chevy
5333 W Irvingpark Rd
Chicago IL 60641

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

**Date range: 09/06/2017 to 09/14/2017**

---

**2014 TOYOTA 4RUNNER**
**VIN: JTEBU5JP2E5U79432**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1251 | 09/13/2017 | VG | $310.00 | $1,480.00 | $0.00 | $0.00 | $1,790.00 | N/A |
| | | | $310.00 | $1,480.00 | $0.00 | $0.00 | $1,790.00 | |

**2017 CHEVROLET TRAX**
**VIN: 3GNCJLSB2HL224122**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1252 | 09/13/2017 | VG | $0.00 | $950.00 | $0.00 | $0.00 | $950.00 | N/A |
| | | | $0.00 | $950.00 | $0.00 | $0.00 | $950.00 | 800 |

**2014 CHEVROLET CORVETTE**
**VIN: 1G1YL3D71E5123899**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1253 | 09/13/2017 | VG | $105.00 | $300.00 | $0.00 | $0.00 | $405.00 | N/A |
| | | | $105.00 | $300.00 | $0.00 | $0.00 | $405.00 | |

**2014 GMC ACADI**
**VIN: 1GKKVTKD7EJ352a5**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1254 | 09/14/2017 | VG | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2013 CHEVROLET VOLT**
**VIN: 1G1RA6E45DU336232**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1255 | 09/14/2017 | VG | $8.00 | $150.00 | $0.00 | $0.00 | $158.00 | N/A |
| | | | $8.00 | $150.00 | $0.00 | $0.00 | $158.00 | |

**2017 HYUNDAI SANTA FE**
**VIN: KM8SM4HF9HU77429**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1256 | 09/14/2017 | VG | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

MACC:ACKustoms 000009

# Customer Sales Report

## Ac Kustoms Corp.

### 1120 N 31st Ave
### Melrose Park, IL 60160

| | |
|---|---|
| **Mike Anderson Chevy** | **Ph# 1:** (773) 465-2000 |
| **5333 W Irvingpark Rd** | **Ph# 2:** (___) ___-____ |
| **Chicago IL 60641** | **Cell:** |

**Date range: 09/06/2017 to 09/14/2017**

---

**2007 JEEP CHEROKEE SRT-8**
**VIN: 1J8HR78367C656396**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1257 | 09/14/2017 | ... | $1,712.50 | $803.50 | $0.00 | $0.00 | $2,516.00 | N/A |
| | | | $1,712.50 | $803.50 | $0.00 | $0.00 | $2,516.00 | |

**2012 GMC TERRAIN**
**VIN: 2GKALMEK0C6373292**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1258 | 09/14/2017 | ... | $0.00 | $600.00 | $0.00 | $0.00 | $600.00 | N/A |
| | | | $0.00 | $600.00 | $0.00 | $0.00 | $600.00 | |

| | Parts | Labor | Misc. | Tax | Total |
|---|-------|-------|-------|-----|-------|
| **Grand Totals** | $5,697.50 | $9,126.50 | $0.00 | $0.00 | $14,824.02 |

*14674.08*



**ANDERSON**
**CHEVROLET**
**OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061336 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  09/14/17  14:51    Added on: W92    Printed at: Z43<br>RO#:    63864                              VIN: 1G11C5SLXEF002759<br>Vehicle: 14 CHEVROLET MALIBU LMT 4DR SDN JENNEY, |

**Additional Information**

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

UC002004

**FILE**

MACC:ACKustoms 000011

# Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

09/13/2017

Invoice #1248

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000    (___) ___-____

2014  CHEVROLET MALIBU

Tag:                                                   Mileage 43,488
ID:  1G11C5SLXEF202759

| | | | Amount |
|---|---|---|---|
| **Labor** | | | |
| UCI | | | $150.00 |
| | | | $150.00 |

| Part No. | Parts | Quantity | Each | |
|---|---|---|---|---|
| | OIL 5QTS | | | $0.00 |
| | OIL FILTER | | | $0.00 |
| | | | | $0.00 |

SEP 14 2017

| | |
|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| Total | $150.00 |

**STOCK NUMBER H1959A**

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

# ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061335 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/14/17 14:49  Added on: X92  Printed at: 243<br>RO#: 83818  VIN: 1G11B5SL4EF285866<br>Vehicle: 14 CHEVROLET MALIBU 1LS 4DR SDN RODRIGUE |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | LABOR | 210.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | ROCKER ARM SOLENOID | .00 |
| 246 | 51 | FRONT BUMPER SHUDDER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 360.00 |

Authorized:

UCMO2004

CUSTOMER

MACC:ACKustoms 000013

# Ac Kustoms Corp.

09/13/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1249

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (___) ___-____

2014 CHEVROLET MALIBU

Tag:
ID: 1G11B5SL4EF285866

Mileage 38,725

| | **Labor** | | **Amount** |
|---|---|---|---|
| | UCI | | $150.00 |
| | FRONT BUMPIER SHUTTER | | $150.00 |
| | ROCKER ARM SOLENOID | | $60.00 |
| | | | $360.00 |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | OIL 5QTS | | | $0.00 |
| | OIL FILTER | | | $0.00 |
| | | | | $0.00 |

| | |
|---|---|
| Subtotal | $360.00 |
| Tax | $0.00 |
| Total | $360.00 |

STOCK NUMBER CP3775

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____   SIGNED_____



# ANDERSON
## CHEVROLET
### OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061334 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|

AC KUSTOMS CORP
1129 N 31ST AVE
MELROSE PARK, IL 60160

G/L:
Printed: JENNEYT1  09/14/17  14:46    Added on: W90    Printed at: 243
RO#:  83863                              VIN: 1C4NJPBAXGD775328
Vehicle: 16 JEEP PATRIOT SPORT FWD 4DR SUV JENNEY,

**Additional Information**

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

UCS©2004



# ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061333 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|

AC KUSTOMS CORP
1125 N 31ST AVE
MELROSE PARK, IL 60160

G/L:
Printed: JENNEYT: 09/14/17 14:45    Added on: W92    Printed St: 243
RO#: 83362                           VIN: 1G1YL3D71E5123850
Vehicle: 14 CHEVROLET CORVETTE Z51 3LT 2DR CNV JENNEY,

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|-----|-----|-------------|----------------|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | LABOR | 150.00 |
| 246 | 51 | FRONT AND REAR BRAKE PADS | 105.00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 405.00 |

Authorized:

UC3002004

CUSTOMER

MACC:ACKustoms 000016

# Ac Kustoms Corp.

09/13/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1250

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2016 JEEP PATRIOT

Tag:
ID: 1C4NJPBAXGD775328

Mileage 10,517

| | **Labor** | | | | **Amount** |
|---|---|---|---|---|---|
| | UCI | | | | $150.00 |
| | | | | | $150.00 |

| **Part No.** | **Parts** | | **Quantity** | **Each** | |
|---|---|---|---|---|---|
| | OIL 5QTS | | | | $0.00 |
| | OIL FILTER | | | | $0.00 |
| | | | | | $0.00 |

| | |
|---|---|
| **Subtotal** | $150.00 |
| **Tax** | $0.00 |
| **Total** | $150.00 |

STOCK NUMBER XJ1027A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

Page: 1

# Ac Kustoms Corp.

09/13/2017

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1253

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (__) ___-____

2014 CHEVROLET CORVETTE

Tag:
ID:  1G1YL3D71E5123800

Mileage  15,392

| Labor | | | | Amount |
|---|---|---|---|---|
| UCI | | | | $150.00 |
| FRONT BRAKE PAD SERVICE | | | | $75.00 |
| REAR BRAKE PAD SERVICE | | | | $75.00 |
| | | | | **$300.00** |

| Part No. | Parts | | Quantity | Each | Amount |
|---|---|---|---|---|---|
| | FRONT BRAKE PAD | | 1.00 | $55.00 | $55.00 |
| | REAR BRAKE PAD | | 1.00 | $50.00 | $50.00 |
| | | | | | **$105.00** |

| | | |
|---|---|---|
| **Subtotal** | | **$405.00** |
| **Tax** | | **$0.00** |
| **Total** | | **$405.00** |

STOCK NUMBER H1502A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____



**5333 W. Irving Park Rd.** • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061332 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1320 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/14/17 14:43    Added on: W92    Printed at: Z43<br>PO#:   83861                         VIN: 1GKKVTKD7EJ2533e5<br>Vehicle: 14 GMC ACADIA DENALI AWD 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized:

CUSTOMER

MACC:ACKustoms 000019

09/14/2017

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
## 7088902376
## Thanks For The Business

Invoice #1254

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2014 GMC ACADI

Tag:
ID: 1GKKVTKD7EJ253365

Mileage 9,403

| | Labor | | | | Amount |
|---|---|---|---|---|---|
| | UCI | | | | $150.00 |
| | | | | | $150.00 |

| Part No. | Parts | | Quantity | Each | |
|---|---|---|---|---|---|
| | OIL 6QTS | | | | $0.00 |
| | OIL FILTER | | | | $0.00 |
| | | | | | $0.00 |

| | | |
|---|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| Total | $150.00 |

STOCK NUMBER CP3840

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____



**5333 W. Irving Park Rd. • Chicago, IL 60641**
**Telephone: (773) 465-2000**
**www.mikeandersonchevy.com**

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061331 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| **AC KUSTOMS CORP**<br>1125 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/14/17 14:40  Added on: W92  Printed at: Z43<br>RO#: 83860  VIN: 1G1RA6E45DU136232<br>Vehicle: 13 CHEVROLET VOLT 5DR HBK JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INPECTION | 150.00 |
| 246 | 51 | BATTERY FOR KEY FOB | 8.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 158.00 |

Authorized:

MCS40004

**CUSTOMER**

09/14/2017

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1255

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (__)  ___-____

2013 CHEVROTLET VOLT

Tag:
ID: 1G1RA6E45DU136232

Mileage 44,973

| **Labor** | | | | | **Amount** |
|---|---|---|---|---|---|
| UCI | | | | | $150.00 |
| | | | | | $150.00 |

| **Part No.** | **Parts** | | | **Quantity** | **Each** | |
|---|---|---|---|---|---|---|
| | OIL 4QTS | | | | | $0.00 |
| | OIL FILTER | | | | | $0.00 |
| | BATTERY FOR KEY FOB | | | 1.00 | $8.00 | $8.00 |
| | | | | | | $8.00 |

| | | |
|---|---|---|
| Subtotal | $158.00 |
| Tax | $0.00 |
| Total | $158.00 |

STOCK NUMBER CP3829

NEED TO ORDER HOME CHARGER FOR HYBRID BATTERY

```
An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.
```

DATE_____       SIGNED_____

MACC:ACKustoms 000022



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061329 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/14/17 14:37 Added on: W9P Printed at: E43<br>RO#: B3859 VIN: KM8SM4HF5HU177429<br>Vehicle: 17 HYUNDAI SANTA FE 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|------|------|-------------|----------------|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 150.00 |

Authorized:

CUSTOMER

MACC:ACKustoms 000023

Page: 1

**09/14/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1256

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000    (___) ___-____

2017  HYUNDAI SANTA FE

Tag:
ID:  KM8SM4HFSHU177429

Mileage 17,030

| **Labor** | | | | | **Amount** |
|---|---|---|---|---|---|
| UCI | | | | | $150.00 |
| | | | | | $150.00 |

| Part No. | **Parts** | | **Quantity** | **Each** | |
|---|---|---|---|---|---|
| | OIL 6QTS | | | | $0.00 |
| | OIL FILTER | | | | $0.00 |
| | | | | | $0.00 |

| | | |
|---|---|---|
| **Subtotal** | $150.00 |
| **Tax** | $0.00 |
| **Total** | $150.00 |

STOCK NUMBER CP3844

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____



### ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061324 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO  09/14/17  14:47    Added on: W94    Printed at: Z43<br>RO#:    83855                                VIN: 1C8HR78367C656398<br>Vehicle: 07 JEEP G CHEROKEE SRT-8 4DR SUV JENNEY, |

**Additional Information**

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 803.50 |
| 246 | 51 | AND LABOR | .00 |
| 246 | 51 | PARTS | 1,712.50 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 2,516.00 |

Authorized: _____

UCS©2004

CUSTOMER

MACC:ACKustoms 000025

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
## 7088902376
## Thanks For The Business

09/14/2017

Invoice #1257

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2007 JEEP CHEROKEE SRT-8

Tag:
ID: 1J8HR78367C656396

Mileage 120,347

| Labor | Amount |
|---|---|
| UCI | $150.00 |
| REAR BRAKE SERVICE | $140.00 |
| REPLACE TURN SIGNALS AND FOG LIGHTS | $21.00 |
| REPLACE COOLANT CONTAINER | $22.50 |
| LIFT GATE LATCH AND WINDOW SWITCH REMOVAL | $60.00 |
| LEFT REAR DOOR TRIM AND WEATHER STRIP REMC | $60.00 |
| REFINISHED FRONT BUMPER AND PAINTED | $350.00 |
| | $803.50 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | OIL 7QTS | | | $0.00 |
| | OIL FILTER | | | $0.00 |
| | REAR PADS | 1.00 | $55.00 | $55.00 |
| | REAR ROTORS | 2.00 | $47.50 | $95.00 |
| | TWO TURN SIGNALS BULBS | 2.00 | $10.00 | $20.00 |
| | TWO FOG LIGHTS BULBS | 2.00 | $10.00 | $20.00 |
| | FRONT PLATE BRACKET | 1.00 | $55.00 | $55.00 |
| | COOLANT CONTAINER | 1.00 | $77.50 | $77.50 |
| | LIFT GATE LATCH | 1.00 | $100.00 | $100.00 |
| | TAILGATE WINDOW POPPER SWITCH | 1.00 | $54.00 | $54.00 |
| | LEFT REAR DOOR TRIM | 1.00 | $425.00 | $425.00 |
| | LEFT REAR DOOR INNER WEATHER STRIP | 1.00 | $71.00 | $71.00 |
| | FRONT BUMPIER | 1.00 | $600.00 | $600.00 |
| | BUMPIER BRACKET | 1.00 | $140.00 | $140.00 |
| | | | | $1,712.50 |

| | |
|---|---|
| Subtotal | $2,516.00 |
| Tax | $0.00 |
| Total | $2,516.00 |

STOCK NUMBER CP3732A

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061325 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL  60160 | G/L:<br>Printed: FRICANJO  09/14/17 14:47    Added on: W94    Printed at: Z43<br>RO#:  03056                          VIN: 2CKALMEK7C6173302<br>Vehicle: 12 GMC TERRAIN 4DR CROSS JENNEY, |

**Additional Information**

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | REPAIRED REAR BUMPER | 450.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 600.00 |

Authorized:

UCS00-004

CUSTOMER

MACC:ACKustoms 000027

Page: 1

**09/14/2017**

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
## 7088902376
## Thanks For The Business

Invoice #1258

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2012 GMC TERRAIN

Tag:
ID: 2GKALMEK706173382

Mileage 130,804

| Labor | Amount |
|---|---|
| UCI | $150.00 |
| REPAIRED REAR BUMPIER REFINISHED AND PAINTE | $450.00 |
| | $600.00 |

| Part No. | Parts | Quantity | Each | |
|---|---|---|---|---|
| | OIL 5QTS | | | $0.00 |
| | OIL FILTER | | | $0.00 |
| | | | | $0.00 |

| | |
|---|---|
| Subtotal | $600.00 |
| Tax | $0.00 |
| Total | $600.00 |

STOCK NUMBER H1935A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____       SIGNED_____

MACC:ACKustoms 000028



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061326 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 09/14/17 14:48   Added on: W94   Printed at: Z43<br>RO#: 04357                           VIN: JTEBU5JR2E5176437<br>Vehicle: 14 TOYOTA 4RUNNER 4DR SUV JENNEY, |

**Additional Information**

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | .00 |
| 246 | 51 | AND LABOR | 1,480.00 |
| 246 | 51 | PARTS | 310.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,790.00 |

Authorized:

UCS©2004

CUSTOMER

MACC:ACKustoms 000029

**09/13/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1251

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (__) ___-____

2014 TOYOTA 4RUNNER

Tag:
ID: JTEBU5JR2E5170437

Mileage 27,281

| Labor | Amount |
|---|---|
| UCl | $150.00 |
| FRONT BRAKE SERVICE | $140.00 |
| REAR BRAKE SERCIE | $140.00 |
| REFINISHED AND PAINTED REAR BUMPIER | $350.00 |
| REFINISHED AND PAINTED FRONT BUMPER | $350.00 |
| REFINISHED AND PAINTED RIGHT REAR DOOR | $350.00 |
| | **$1,480.00** |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | OIL 7QTS | | | $0.00 |
| | OIL FILTER | | | $0.00 |
| | FRONT PADS | 1.00 | $45.00 | $45.00 |
| | FRONT ROTORS | 2.00 | $52.50 | $105.00 |
| | REAR PADS | 1.00 | $40.00 | $40.00 |
| | REAR ROTORS | 2.00 | $45.00 | $90.00 |
| | FRONT WIPER BLADES | 2.00 | $15.00 | $30.00 |
| | | | | **$310.00** |

| | |
|---|---|
| Subtotal | $1,790.00 |
| Tax | $0.00 |
| Total | $1,790.00 |

STOCK NUMBER CP3832

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____    SIGNED_____

MACC:ACKustoms 000030



**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061328 | 09/14/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO  09/14/17  14:43   Added on: R94   Printed at: Z43<br>RO#:    03858              VIN: 3GNCJLSB2HL226122<br>Vehicle: 17 CHEVROLET TRAX LT FWD 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | REPAIRED FRONT BUMPER | 450.00 |
| 246 | 51 | REPAIRED RIGHT FENDER | 350.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 800.00 |

Authorized: _____

CUSTOMER

MACC:ACKustoms 000031

**09/13/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1252

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (___) ___-____

2017 CHEVROLET TRAX

Tag:
ID: 3GNCJLSB2HL226122

Mileage 4,629

| Labor | Amount |
|---|---|
| UCI | $150.00 |
| FRONT BUMPIER REAIRED AND PAINTED | $450.00 |
| FRONT RIGHT FENDER REFINISHED AND PAINTED | $350.00 |
| | $950.00 |

| Part No. | Parts | Quantity | Each | |
|---|---|---|---|---|
| | OIL 4QTS | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | | | | $0.00 |

| | |
|---|---|
| Subtotal | $950.00 |
| Tax | $0.00 |
| Total | $950.00 |

**STOCK NUMBER H1988A**

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061271 | 09/11/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1100 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/11/17 10:27  Added on: W92  Printed at: 243<br>PO#: 83786  VIN: JTHCF1C29E3005140<br>Vehicle: 14 LEXUS IS250 AWD 4DR SDN JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

MACC:ACKustoms 000033

Page: 1

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
## 7088902376
## Thanks For The Business

09/08/2017

Invoice #1242

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (__) __-____

2014 IS250 AWD LEXUS

Tag:
ID: JTHCF1D29E5005140

Mileage 16,340

| Labor | | | | | Amount |
|---|---|---|---|---|---|
| UCI | | | | | $150.00 |
| | | | | | $150.00 |

| Part No. | Parts | | | Quantity | Each | Amount |
|---|---|---|---|---|---|---|
| | 7 QUARTS OIL | | | 1.00 | | $0.00 |
| | OIL FILTER | | | 1.00 | | $0.00 |
| | | | | | | $0.00 |

| | | |
|---|---|---|
| Subtotal | | $150.00 |
| Tax | | $0.00 |
| Total | | $150.00 |

STK# CP3843

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____      SIGNED_____

MACC:ACKustoms 000034



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061272 | 09/11/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/11/17 10:29   Added on: W92   Printed at: Z43<br>RO#: 83787   VIN: 1C4NJDBB2FD135037<br>Vehicle: 15 JEEP COMPASS 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | RELAY | 180.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 330.00 |

Authorized:

UCS©2004

**FILE**

MACC:ACKustoms 000035

# Ac Kustoms Corp.

09/07/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1241

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2015  JEEP COMPASS

Tag:                          Mileage 28,246
ID:   1C4NJDBB2FD135037

| **Labor** | **Amount** |
|-----------|-----------:|
| UCI | $150.00 |
| DIAGNOSE WONT START | $150.00 |
| | $300.00 |

| **Part No.** | **Parts** | **Quantity** | **Each** | **Amount** |
|--------------|-----------|-------------:|---------:|-----------:|
| | 5 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | RELAY | 1.00 | $30.00 | $30.00 |
| | | | | $30.00 |

| | |
|---|---:|
| **Subtotal** | $330.00 |
| **Tax** | $0.00 |
| **Total** | $330.00 |

STK# H2122A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

MACC:ACKustoms 000036



**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

R # 83788

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061273 | 09/11/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>:120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 09/11/17 10:59    Added on: W94    Printed at: Z43<br>RO#: 83788                              VIN: 2G1WD5E3XD1166494<br>Vehicle: 13 CHEVROLET IMPALA POLICE PKG 4DR SDN JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | FRONT BRAKES | 280.00 |
| 246 | 51 | REAR BRAKES | 280.00 |
| 246 | 51 | POWER STEERING PUMP | 320.00 |
| 246 | 51 | HOOD SHOCKS | 50.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,080.00 |

Authorized: _____

UCS©2004

CUSTOMER

MACC:ACKustoms 000037

Page: 1

# Ac Kustoms Corp.

09/08/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1244

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (___) ___-____

2013 CHEVY IMPALA

Tag:
ID: 2G1WD5E3XD1166494

Mileage 36,426

| | **Labor** | | | **Amount** |
|---|---|---|---|---|
| | UCI | | | $150.00 |
| | | | | $150.00 |

| Part No. | **Parts** | **Quantity** | **Each** | **Amount** |
|---|---|---|---|---|
| | 6 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | FRONT BRAKES & LABOR | 1.00 | | $280.00 |
| | REAR BRAKES & LABOR | 1.00 | | $280.00 |
| | POWERSTEERING PUMP & LABOR | 1.00 | | $320.00 |
| | HOOD SHOCKS | 1.00 | | $50.00 |
| | | | | $930.00 |

| | | |
|---|---|---|
| Subtotal | $1,080.00 |
| Tax | $0.00 |
| Total | $1,080.00 |

STK# J1010A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____    SIGNED_____

MACC:ACKustoms 000038



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061274 | 09/11/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 09/11/17 10:58    Added on: W94    Printed at: Z43<br>RO#:    83795                    VIN: JN8AF5MR4BT009070<br>Vehicle: 11 NISSAN JUKE 4DR CROSS JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | MOTOR MOUNTS | 465.00 |
| 246 | 51 | SWAYBAR LINKS | 250.00 |
| 246 | 51 | SONY RADIO | 350.00 |
| 246 | 51 | DIAGNOSE RADIO | 150.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,365.00 |

Authorized:

HCS©2004

CUSTOMER

MACC:ACKustoms 000039

Page: 1

09/07/2017

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1240

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (__)  ___ - ____

2011 NISSAN JUKE

Tag:
ID:  JN8AF5MR4BT009072

Mileage 90,328

| | **Labor** | | | **Amount** |
|---|---|---|---|---|
| | UCI | | | $150.00 |
| | DIAGNOSE AUDIO NO AUDIO | | | $150.00 |
| | | | | $300.00 |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 5 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | MOTOR MOUNTS & LABOR | 1.00 | | $465.00 |
| | SWAYBAR LINKS & LABOR | 1.00 | | $250.00 |
| | SONY RADIO, PARTS, LABOR | 1.00 | | $350.00 |
| | | | | $1,065.00 |

| | | |
|---|---|---|
| **Subtotal** | | $1,365.00 |
| **Tax** | | $0.00 |
| **Total** | | $1,365.00 |

STK# H2115A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____      SIGNED_____

MACC:ACKustoms 000040



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061252 | 09/08/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| **AC KUSTOMS CORP**<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  09/08/17 09:19    Added on: W92    Printed at: 243<br>RO#:    83767                              VIN: 2GNALBEK7C1180434<br>Vehicle: 12 CHEVROLET EQUINOX LS 4DR SUV JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 34 | AC KUSTOMS | .00 |
| 246 | 34 | DIAGNOSIS | 120.00 |
| 246 | 34 | LABOR | 37.50 |
| 246 | 34 | BATTERY | 142.99 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 300.49 |

Authorized:

FILE

MACC:ACKustoms 000041

Page:

# Ac Kustoms Corp.

**09/07/2017**

1120 N 31st Ave
Melrose Park, IL 60160
7088902376
**Thanks For The Business**

Invoice #1237

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  ( ) ___-____

2012 CHEVROLET EQUINOX 4x4
2.4L DOHC DIS-SFI
Tag:
ID: 2GNALBEK7C1180434

Mileage 91,608

| **Labor** | **Amount** |
| --- | --- |
| DIAGNOSE WIRING PROBLEM | $120.00 |
| LABOR | $37.50 |
| | **$157.50** |

| Part No. | Parts | Quantity | Each | |
| --- | --- | --- | --- | --- |
| MT-47/H5 | INTERSTATE BATTERY | 1.00 | $142.99 | $142.99 |
| | | | | **$142.99** |

| | |
| --- | --- |
| **Subtotal** | $300.49 |
| **Tax** | $0.00 |
| **Total** | $300.49 |

STK# XH1957A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____  SIGNED_____

MACC:ACKustoms 000042



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061251 | 09/08/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/08/17 09:02  Added on: W92  Printed at: 243<br>RO#: 83766  VIN: 2GNALBEK1H1518160<br>Vehicle: 17 CHEVROLET EQUINOX LS FWD 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized:

UCSC2004

FILE

MACC:ACKustoms 000043

Page 1

# Ac Kustoms Corp.

09/07/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1238

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2017 CHEVY EQUINOX

Tag:
ID: 2GNALBEK1H1518160

Mileage 14,994

| **Labor** | **Amount** |
|---|---|
| UCI | $150.00 |
| | $150.00 |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 5 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | | | | $0.00 |

SEP 14 2017

| **Subtotal** | $150.00 |
|---|---|
| **Tax** | $0.00 |
| **Total** | $150.00 |

STK# J1046A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

MACC:ACKustoms 000044



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061250 | 09/08/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FR1CANJO 09/08/17 09:51   Added on: W94   Printed at: Z43<br>RO#: 83183   VIN: 1FADP3N22EL205000<br>Vehicle: 14 FORD FOCUS TITANIUM 5DR HBK JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 24 | AC KUSTOMS | .00 |
| 246 | 24 | SAFETY INSPECTION | 193.70 |
| 246 | 24 | OIL AND FILTER | .00 |
| 246 | 24 | ENGINE MOUNTS AND LABOR | 240.00 |
| 246 | 24 | INTAKE SYSTEM | 220.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 653.70 |

Authorized: _____

UCSP2004

FILE

MACC:ACKustoms 000045

**09/07/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1239

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000   (___) ___-____

2014  FORD FOCUS

Tag:                              Mileage 49,610
ID:  1FADP3N22EL205002

| | | | Amount |
|---|---|---|---|
| **Labor** | | | |
| UCI | | | $150.00 |
| | | | **$150.00** |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 5 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | ENGINE MOUNTS & LABOR | 1.00 | $240.00 | $240.00 |
| | INTAKE SYSTEM | 1.00 | $220.00 | $220.00 |
| | | | | **$460.00** |

| | |
|---|---|
| **Subtotal** | $610.00 |
| **Tax** | $43.70 |
| **Total** | $653.70 |

STK# CP3796A

ALL FOUR TIRES ARE FEATHERED ON THE INSIDE, NOISE GOING DOWN THE
ROAD. NEED FOUR TIRES

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

MACC:ACKustoms 000046



*Mike*
# ANDERSON
## CHEVROLET
### OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

RO #83738

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061231 | 09/07/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/07/17 11:45 Added on: W92 Printed at: Z43<br>RO#: 83738 VIN: 2GNALAEK0F6439322<br>Vehicle: 15 CHEVROLET EQUINOX LS FWD 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

UCS02004

FILE

MACC:ACKustoms 000047

# Ac Kustoms Corp.

09/06/2017

## 1120 N 31st Ave
## Melrose Park, IL 60160
## 7088902376
## Thanks For The Business

Invoice #1234

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000    (__) ___-____

2015 CHEVY EQUINOX

Tag:                          Mileage 19,118
ID: 2GNALAEK8F6439322

| | **Labor** | | | **Amount** |
|---|---|---|---|---|
| | SAFETY INSPECTION | | | $150.00 |
| | | | | $150.00 |

| **Part No.** | **Parts** | | **Quantity** | **Each** | **Amount** |
|---|---|---|---|---|---|
| | 5 QUARTS OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | | | | | $0.00 |

| | | |
|---|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| Total | $150.00 |

STK# H2157A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

MACC:ACKustoms 000048



**5333 W. Irving Park Rd. • Chicago, IL 60641**
**Telephone: (773) 465-2000**
**www.mikeandersonchevy.com**

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061232 | 09/07/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  09/07/17 11:55   Added on: W92   Printed at: 243<br>RO#:  93739                           VIN: 1FADP5CU8DL516160<br>Vehicle: 13 FORD C-MAX ENERGI SEL 5DR HEK JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: 

FILE

MACC:ACKustoms 000049

# Ac Kustoms Corp.

**09/06/2017**

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1235

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000  (__) ___-____

2014  FORD CMAX

Tag:                              Mileage 51,536
ID:  1FADP5CU8DL518196

| | **Labor** | | | | **Amount** |
|---|---|---|---|---|---|
| | UCI | | | | $150.00 |
| | | | | | $150.00 |

| **Part No.** | **Parts** | | **Quantity** | **Each** | |
|---|---|---|---|---|---|
| | 5QUARTS OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | | | | | $0.00 |

SEP 1 4 2017

| | |
|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| Total | $150.00 |

H2254A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____    SIGNED_____



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061294 | 09/12/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/12/17 12:07 Added on: W92 Printed at: 243<br>RO#: 83799 VIN: 1GCGTBE37F1196946<br>Vehicle: 15 CHEVROLET COLORADO 4WD CREW CAB JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized:

UC9002001

FILE

MACC:ACKustoms 000051

# Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

09/11/2017

Invoice #1247

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (___) ___-____

2015 CHEVY COLORADO

Tag:
ID: 1GCGTBE37F1196946

Mileage 8,991

| **Labor** | **Amount** |
|-----------|-----------|
| UCI | $150.00 |
| | $150.00 |

SEP 14 2017

| | |
|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| **Total** | **$150.00** |

STK# CP3837

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

MACC:ACKustoms 000052



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061295 | 09/12/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENKEYTI 09/12/17 12:07 Added on: W92 Printed at: Z43<br>RO#: 83800 VIN: 3GNCJNSB7GL155875<br>Vehicle: 16 CHEVROLET TRAX LS AWD 4DR SUV JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

UCS©2004

CUSTOMER

MACC:ACKustoms 000053

# Ac Kustoms Corp.

**09/11/2017**

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

**Invoice #1245**

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (___) ___-____

2016 CHEVY TRAX

Tag:                              Mileage 24,201
ID: 3GNCJNSBXGL155875

| | **Labor** | | | **Amount** |
|---|---|---|---|---|
| | UCI | | | $150.00 |
| | | | | $150.00 |

| Part No. | **Parts** | | **Quantity** | **Each** | |
|---|---|---|---|---|---|
| | 5 QUARTS OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | | | | | $0.00 |

| | | |
|---|---|---|
| **Subtotal** | $150.00 |
| **Tax** | $0.00 |
| **Total** | $150.00 |

STK# CP3828

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061296 | 09/12/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 09/13/17 12:08 Added on: W94 Printed at: 243<br>RO#: 02681 VIN: 5GAKVCKD8DJ210832<br>Vehicle: 13 BUICK ENCLAVE LEATHR AND 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 24 | AC KUSTOMS | .00 |
| 246 | 24 | SAFETY INSPECTION | 150.00 |
| 246 | 24 | SEAT TRACK | 140.00 |
| 246 | 24 | REPAIR PASSENGER MIRROR | 123.00 |
| 246 | 24 | ENGINE MOUNT AND LABOR | 205.00 |
| 246 | 24 | CENTER CONSOLE WITH LABOR | 305.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 923.00 |

Authorized:

CUSTOMER

MACC:ACKustoms 000055

# Ac Kustoms Corp.

09/11/2017

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1246

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000   (___) ___-____

Tag:
ID:  5GAKVCKD8DJ218832

13  BUICK ENCLAVE

Mileage 26,126

| Labor | Amount |
|---|---|
| UCI | $150.00 |
| R&R SEAT TRACK | $140.00 |
| REPAIR PASSANGER MIRROR | $123.00 |
| | $413.00 |

| Part No. | Parts | Quantity | Each | |
|---|---|---|---|---|
| | ENGINE MOUNT AND LABOR | 1.00 | | $205.00 |
| | CENTER CONSOLE WITH LABOR | 1.00 | | $305.00 |
| | | | | $510.00 |

SEP 14 2017

| | |
|---|---|
| Subtotal | $923.00 |
| Tax | $0.00 |
| Total | $923.00 |

STOCK# CP3795

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

MACC:ACKustoms 000056



**ANDERSON CHEVROLET OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061297 | 09/12/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJC 09/13/17 12:11 Added on: W94 Printed at: 243<br>RO#: 93776 VIN: 1G1JC5SH7F4172046<br>Vehicle: 15 CHEVROLET SONIC LT 4DR SDN JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 52 | AC KUSTOMS | .00 |
| 246 | 52 | SAFETY INSPECTION | 150.00 |
| 246 | 52 | INSTALL FRONT LOWER GRILLE | 112.50 |
| 246 | 52 | REPAIR AND REFINISH REAR BUMPER | 350.00 |
| 246 | 52 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 612.50 |

Authorized:

UCS©2004

FILE

MACC:ACKustoms 000057

**09/08/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  **#1243**

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (___) ___-____

2015  CHEVY SONIC

Tag:
ID:  1G1JC5SH7F4172046

Mileage  8,215

| Labor | Amount |
|---|---|
| UCI | $150.00 |
| R&R FRONT LOWER GRILLE | $112.50 |
| REPAIR & REFINISH REAR BUMPER | $350.00 |
| | $612.50 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | 5 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | | | | $0.00 |

| | |
|---|---|
| Subtotal | $612.50 |
| Tax | $0.00 |
| Total | $612.50 |

| STK# J1050A |
|---|

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

MACC:ACKustoms 000058



5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 054665 | 09/07/2017 | MS | 202B | | $13,136.35 |
|---|---|---|---|---|---|---|

*** Thirteen thousand one hundred thirty-six and 35/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈054665⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)                    Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS** 09/07/17 15:10

| | | G/L: **202B** | | Check Number: **054665** | Check Date: **09/07/17** |
|---|---|---|---|---|---|

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1212 | $769.29 | 00001212 |
| 300A | 1188 | 1213 | $164.78 | 00001213 |
| 300A | 1188 | 1214 | $1,150.00 | 00001214 |
| 300A | 1188 | 1215 | $1,159.61 | 00001215 |
| 300A | 1188 | 1216 | $600.00 | 00001216 |
| 300A | 1188 | 1218 | $162.00 | 00001218 |
| 300A | 1188 | 1219 | $225.00 | 00001219 |
| 300A | 1188 | 1220 | $650.00 | 00001220 |
| 300A | 1188 | 1221 | $1,768.00 | 00001221 |
| 300A | 1188 | 1222 | $150.00 | 00001222 |
| 300A | 1188 | 1223 | $150.00 | 00001223 |
| 300A | 1188 | 1224 | $435.00 | 00001224 |
| 300A | 1188 | 1226 | $1,012.72 | 00001226 |
| 300A | 1188 | 1227 | $425.00 | 00001227 |
| 300A | 1188 | 1228 | $610.95 | 00001228 |
| 300A | 1188 | 1229 | $150.00 | 00001229 |
| 300A | 1188 | 1230 | $150.00 | 00001230 |
| 300A | 1188 | 1231 | $1,136.00 | 00001231 |
| 300A | 1188 | 1232 | $2,268.00 | 00001232 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $13,136.35 |
|---|---|---|

CUSTOMER

@F00008W
26.004

MACC:ACKustoms 000059



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| C01188 | 054665 | 09/07/2017 | MS | 202B | $13,136.35 |

*** Thirteen thousand one hundred thirty-six and 35/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

⑆054665⑆ ⑆071000013⑆ 423864789⑈

SF069322 Q (01/13)     Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS** 09/07/17 15:10

G/L: **202B**     Check Number: **054665**     Check Date: **09/07/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1212 | $769.29 | 00001212 |
| 300A | 1188 | 1213 | $164.78 | 00001213 |
| 300A | 1188 | 1214 | $1,150.00 | 00001214 |
| 300A | 1188 | 1215 | $1,159.61 | 00001215 |
| 300A | 1188 | 1216 | $600.00 | 00001216 |
| 300A | 1188 | 1218 | $162.00 | 00001218 |
| 300A | 1188 | 1219 | $225.00 | 00001219 |
| 300A | 1188 | 1220 | $650.00 | 00001220 |
| 300A | 1188 | 1221 | $1,768.00 | 00001221 |
| 300A | 1188 | 1222 | $150.00 | 00001222 |
| 300A | 1188 | 1223 | $150.00 | 00001223 |
| 300A | 1188 | 1224 | $435.00 | 00001224 |
| 300A | 1188 | 1226 | $1,012.72 | 00001226 |
| 300A | 1188 | 1227 | $425.00 | 00001227 |
| 300A | 1188 | 1228 | $610.95 | 00001228 |
| 300A | 1188 | 1229 | $150.00 | 00001229 |
| 300A | 1188 | 1230 | $150.00 | 00001230 |
| 300A | 1188 | 1231 | $1,136.00 | 00001231 |
| 300A | 1188 | 1232 | $2,268.00 | 00001232 |

*(handwritten: 3843.68 For Eun aug)*

NOTE: PAYMENT TO ACCOUNT

| TOTAL | $13,136.35 |

FILE

@bF00008W
26.001

MACC:ACKustoms 000060

9/ 5/2017

# Customer Sales Report
## Ac Kustoms Corp.

Page: 1

**1120 N 31st Ave**
**Melrose Park, IL  60160**

---

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago  IL  60641**

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

**Date range: 08/29/2017 to 09/05/2017**

---

**2005 CHEVROLET  AVEO**
**VIN: KL1TG52615B452145**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1212 | 08/29/2017 | SAFETY INSPECTION | $349.29 | $420.00 | $0.00 | $0.00 | $769.29 | N/A |
| | | | $349.29 | $420.00 | $0.00 | $0.00 | $769.29 | |

**2015  CHEVY MALIBU**
**VIN: 1G11B5SL9FF320841**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1213 | 08/29/2017 | SAFETY INSPECTION | $14.78 | $150.00 | $0.00 | $0.00 | $164.78 | N/A |
| | | | $14.78 | $150.00 | $0.00 | $0.00 | $164.78 | |

**2017  CHEVY IMPALA**
**VIN: 2G11Z5SA9H9147795**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1214 | 08/29/2017 | REPAIR& REFINISH HOOD | $0.00 | $1,150.00 | $0.00 | $0.00 | $1,150.00 | N/A |
| | | | $0.00 | $1,150.00 | $0.00 | $0.00 | $1,150.00 | |

**2015  JEEP PATRIOT**
**VIN: 1C4NJRBB4FD214464**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1215 | 08/30/2017 | SAFETY INSPECTION | $1,009.61 | $150.00 | $0.00 | $0.00 | $1,159.61 | N/A |
| | | | $1,009.61 | $150.00 | $0.00 | $0.00 | $1,159.61 | |

**2015  FORD EDGE**
**VIN: 2FMTK4J89FBB17095**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1216 | 08/31/2017 | SAFETY INSPECTION | $0.00 | $600.00 | $0.00 | $0.00 | $600.00 | N/A |
| | | | $0.00 | $600.00 | $0.00 | $0.00 | $600.00 | |

**2015  SUBARU FORESTR**
**VIN: JF2SJAUC0FH538094**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1217 | 08/31/2017 | REPAIR & REFINISH FRONT BUMPER | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | N/A |
| | | | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | |

9/ 5/2017

# Customer Sales Report
# Ac Kustoms Corp.

Page:    2

### 1120 N 31st Ave
### Melrose Park, IL  60160

**Mike Anderson Chevy**          Ph# 1: (773) 465-2000
**5333 W Irvingpark Rd**         Ph# 2: (___) ___-____
**Chicago  IL  60641**                    Cell:
### Date range: 08/29/2017 to 09/05/2017

**2014  FORD ESCAPE SE**
**VIN: 1FMCU0GX1EUB85482**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1218 | 09/01/2017 | SAFETY INSPECTION | $12.00 | $150.00 | $0.00 | $0.00 | $162.00 | N/A |
|  |  |  | $12.00 | $150.00 | $0.00 | $0.00 | $162.00 |  |

**2014  DODGE CARVAN**
**VIN: 2C4RDGBGSER278873**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1219 | 09/01/2017 | SAFETY INSPECTION | $0.00 | $225.00 | $0.00 | $0.00 | $225.00 | N/A |
|  |  |  | $0.00 | $225.00 | $0.00 | $0.00 | $225.00 |  |

**2012  CHEVROLET C SERIES P-U C10-C1500**
**VIN: 3GCPCSEOXCG286739**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1220 | 09/01/2017 | SAFETY INSPECTION | $150.00 | $500.00 | $0.00 | $0.00 | $650.00 | N/A |
|  |  |  | $150.00 | $500.00 | $0.00 | $0.00 | $650.00 |  |

**13  CHEVY EQUINOX**
**VIN: 2GNALBEK1D6161723**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1221 | 09/01/2017 | FRONT LH FENDER | $68.00 | $1,700.00 | $0.00 | $0.00 | $1,768.00 | N/A |
|  |  |  | $68.00 | $1,700.00 | $0.00 | $0.00 | $1,768.00 |  |

**2015  CHEVY EQUINOX**
**VIN: 2GNALCEK1F6175940**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1222 | 09/02/2017 | SAFETY INSPECTION | $0.00 | $172.50 | $1.75 | $0.00 | $174.25 | N/A |
|  |  |  | $0.00 | $172.50 | $1.75 | $0.00 | $174.25 |  |

**2017  CHEVY TRAX**
**VIN: 3GNC5LSB2HL226122**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1223 | 09/02/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
|  |  |  | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 |  |

9/ 5/2017

# Customer Sales Report
## Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL 60160

Page: 3

---

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago IL 60641**

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

**Date range: 08/29/2017 to 09/05/2017**

---

**2012 CHEVY FIESTA**
**VIN: 3FADP4AJ0CM150032**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1224 | 09/02/2017 | SAFETY INSPECTION | $135.00 | $300.00 | $0.00 | $0.00 | $435.00 | N/A |
| | | | $135.00 | $300.00 | $0.00 | $0.00 | $435.00 | |

**2014 TOYOTA 4RUNNER**
**VIN: JTEBU5JR4E5180404**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1226 | 09/02/2017 | SAFETY INSPECTION | $300.22 | $712.50 | $0.00 | $0.00 | $1,012.72 | N/A |
| | | | $300.22 | $712.50 | $0.00 | $0.00 | $1,012.72 | |

**2017 CHEVY TAHOE**
**VIN: 1GNSKCKC3HR181816**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1227 | 09/02/2017 | REPAIR & REFINISH FRONT BUMPER | $0.00 | $425.00 | $0.00 | $0.00 | $425.00 | N/A |
| | | | $0.00 | $425.00 | $0.00 | $0.00 | $425.00 | |

**2014 GMC TERRAIN**
**VIN: 2GKFLZEK5E6190297**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1228 | 09/02/2017 | SAFETY INSPECTION2 | $310.95 | $300.00 | $0.00 | $0.00 | $610.95 | N/A |
| | | | $310.95 | $300.00 | $0.00 | $0.00 | $610.95 | |

**2013 NISSAN MAXIMA**
**VIN: 1N4AA5AP1DC835433**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1229 | 09/05/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2015 DODGE CHALLENGER**
**VIN: 2C2CDZAGXFH804655**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1230 | 09/05/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

MACC:ACKustoms 000063

9/ 5/2017

# Customer Sales Report
## Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL 60160

Page:     4

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago IL 60641**

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

### Date range: 08/29/2017 to 09/05/2017

**2008 CHEVROLET EQUINOX**
**VIN: 2CNDL13F786029671**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1231 | 09/05/2017 | SAFETY INSPECTION | $0.00 | $1,136.00 | $0.00 | $0.00 | $1,136.00 | N/A |
| | | | $0.00 | $1,136.00 | $0.00 | $0.00 | $1,136.00 | |

**2012 JEEP WRANGLER 4x4**
**VIN: 1C4BJWEG4CL255283**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1232 | 09/05/2017 | SAFETY INSPECTION | $1,768.00 | $500.00 | $0.00 | $0.00 | $2,268.00 | N/A |
| | | | $1,768.00 | $500.00 | $0.00 | $0.00 | $2,268.00 | |

| | Parts | Labor | Misc. | Tax | Total | |
|---|---|---|---|---|---|---|
| **Grand Totals** | $4,117.85 | $9,491.00 | $1.75 | $0.00 | $13,610.60 | |

13136.35



PO # 83680

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061183 | 09/01/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/01/17 10:48 Added on: W92 Printed at: 243<br>RO#: 83680 VIN: 1G11B5SL9FF520841<br>Vehicle: 15 CHEVROLET MALIBU 1LS 4DR SDN JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | WIPERS | 14.78 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 164.78 |

Authorized:

UCS02604

FILE

MACC:ACKustoms 000065

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
## 7088902376
## Thanks For The Business

08/29/2017

Invoice #1213

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (____) ____-____

2015 CHEVY MALIBU

Tag:                          Mileage 10,196
ID: 1G11B5SL9FF320841

| | Labor | | | | Amount |
|---|---|---|---|---|---|
| | SAFETY INSPECTION | | | | $150.00 |
| | | | | | **$150.00** |

| Part No. | Parts | | Quantity | Each | Amount |
|---|---|---|---|---|---|
| | 5 QUARTS OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | WIPERS | | 2.00 | $7.39 | $14.78 |
| | | | | | **$14.78** |

| | | |
|---|---|---|
| Subtotal | | $164.78 |
| Tax | | $0.00 |
| Total | | $164.78 |

STK# H2249A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____    SIGNED_____



### Mike ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061213 | 09/06/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | | For Office Use | |
|--------------------|--|----------------|--|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | | G/L:<br>Printed: JENNEYTI 09/06/17 19:00 Added on: 990 Printed at: 243<br>RO#: 83711 VIN: 1N4AA5AP1DC835433<br>Vehicle: 13 NISSAN MAXIMA 4DR SDN JENNEY, | |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|----------------|--|-------------|----------------|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER CHANGE | .00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 150.00 |

Authorized:

UCSGC004

FILE

MACC:ACKustoms 000067

# Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

09/05/2017

Invoice #1229

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (   )   ___-___

2013 NISSAN MAXIMA

Tag:                                                    Mileage 64,453
ID:  1N4AA5AP1DC835433

| | **Labor** | | | | **Amount** |
|---|---|---|---|---|---|
| | SAFETY INSPECTION | | | | $150.00 |
| | | | | | $150.00 |

| **Part No.** | **Parts** | | **Quantity** | **Each** | |
|---|---|---|---|---|---|
| | 5 QUARTS OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | | | | | $0.00 |

| | | |
|---|---|---|
| **Subtotal** | | $150.00 |
| **Tax** | | $0.00 |
| **Total** | | $150.00 |

STK# H2199A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

MACC:ACKustoms 000068





Ro # 83709

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061214 | 09/06/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 09/06/17 11:12   Added on: W94   Printed at: Z43<br>RO#: 83709   VIN: 1GNDL13F786029671<br>Vehicle: 08 CHEVROLET EQUINOX LS 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|------|-----|-------------|----------------|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | REAR WIPER TRANSMISSION | 216.00 |
| 246 | 51 | REAR LID SHOCKS | 95.00 |
| 246 | 51 | TWO FRONT MARKE BULBS | 55.00 |
| 246 | 51 | RIGHT HEADLAMP REPAIR | 190.00 |
| 246 | 51 | MAS AIR FLOW SENSOR/PURGE SOLENOID | 210.00 |
| 246 | 51 | RIGHT WINDOW MOTOR | 210.00 |
| 246 | 51 | WASHER JETS | 10.00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 1,136.00 |

Authorized:

UCS#02004

FILE

MACC:ACKustoms 000069

**09/05/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Page: 1

Invoice #1231

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2008 CHEVROLET EQUINOX

Tag:                            Mileage 67,540
ID: 2CNDL13F786029671

| Labor | Amount |
|---|---|
| SAFETY INSPECTION | $150.00 |
| REAR WIPER TRANSMISSON | $216.00 |
| REAR LID SHOCKS | $95.00 |
| TWO FRONT MARKER BULBS | $55.00 |
| RH HEAD LAMPS REPAIR | $190.00 |
| MASS AIR FLOW SENSOR AND PURGE | $210.00 |
| RIGHT WINDOW MOTOR | $210.00 |
| WASHER JETS | $10.00 |
| | **$1,136.00** |

| | |
|---|---|
| Subtotal | **$1,136.00** |
| Tax | $0.00 |
| Total | **$1,136.00** |

AUG 1 - 2017

STK# J1112A
NEEDS PASSENGER RECLINER HANDLE FROM PARTS DEPT.

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE _____        SIGNED _____

MACC:ACKustoms 000070



ℕ #83690

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061198 | 09/05/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC KUSTOMS CORP<br>1130 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO  09/05/17  15:03    Added on: W94    Printed at: Z43<br>PO#:     83690                          VIN: 2GKFLZEK5E6190297<br>Vehicle: 14 GMC TERRAIN DENALI 4DR CROSS RODRIGUE |

**Additional Information**

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|----------|------|-------------|----------------|
| 246 | 52 | AC KUSTOMS | .00 |
| 246 | 52 | SAFETY INSPECTION | 150.00 |
| 246 | 52 | LABOR | 150.00 |
| 246 | 52 | OIL AND FILTER | .00 |
| 246 | 52 | REAR PADS | 84.99 |
| 246 | 52 | REAR ROTORS | 97.98 |
| 246 | 52 | VARB VALVE | 127.98 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 610.95 |

Authorized:

UCS©2004

FILE

MACC:ACKustoms 000071

Page 1

09/02/2017

## Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1228

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2014 GMC TERRAIN

Tag:                           Mileage 42,201
ID: 2GKFLZEK5E6190297

| Labor | Amount |
|---|---|
| SAFETY INSPECTION2 | $150.00 |
| LABOR | $75.00 |
| LABOR | $75.00 |
| | **$300.00** |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | 6 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | REAR PADS | 1.00 | $84.99 | $84.99 |
| | REAR ROTOS | 2.00 | $48.99 | $97.98 |
| | VARB VALVE | 2.00 | $63.99 | $127.98 |
| | | | | **$310.95** |

| | |
|---|---|
| Subtotal | $610.95 |
| Tax | $0.00 |
| Total | $610.95 |

STK# CP3825

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

*R #83692*

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061192 | 09/05/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1100 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  09/05/17  08:11   Added on: W92   Printed at: 243<br>RO#: 83692              VIN: 2C4RDGBG3ER279073<br>Vehicle: 14 DODGE GR CARAVAN 4DR MVAN JENNEY, |

| Additional Information |
|---|
| Note:  AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS-- | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | DIAGNOSTIC OF COLLISION | 75.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 225.00 |

Authorized:

HCS92004

FILE

MACC:ACKustoms 000073

Page: 1

## Ac Kustoms Corp.

09/01/2017

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1219

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000   (___) ___-____

2014  DODGE CARVAN

Tag:
ID:  2C4RDGBGSER278873

Mileage 43,595

| Labor | | | | | **Amount** |
|---|---|---|---|---|---|
| SAFETY INSPECTION | | | | | $150.00 |
| DIAGNOSTIC OF COLLISON | | | | | $75.00 |
| | | | | | $225.00 |

| Part No. | Parts | | | Quantity | Each | |
|---|---|---|---|---|---|---|
| | 6 QUARTS OIL | | | 1.00 | | $0.00 |
| | OIL FILTER | | | 1.00 | | $0.00 |
| | | | | | | $0.00 |

| | |
|---|---|
| Subtotal | $225.00 |
| Tax | $0.00 |
| Total | $225.00 |

STK# CP3821

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

AUG 2  2017



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061194 | 09/05/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP | G/L: |
| 1130 N 31ST AVE | Printed: JENNEYT1  09/05/17  08:35    Added on: W92    Printed At: Z49 |
| MELROSE PARK, IL  60160 | RO#:    83693              VIN: 1FMCU9GX1EUB05402 |
| | Vehicle: 14 FORD ESCAPE SE FWD 4DR SUV JENNEY, |

| Additional Information |
|---|
| Note:  AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC CUSTOMS | .00 |
| 246 | 51 | SAFETY | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | WIPER | 12.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 162.00 |

Authorized:

CUSTOMER

MACC:ACKustoms 000075

**09/01/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1218

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2014 FORD ESCAPE SE

Tag:                              Mileage 48,282
ID:  1FMCU0GX1EUB85482

| Labor | Amount |
|---|---|
| SAFETY INSPECTION | $150.00 |
| | **$150.00** |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | 5 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | WIPER | 1.00 | $12.00 | $12.00 |
| | | | | **$12.00** |

AUG 2017

| | |
|---|---|
| Subtotal | $162.00 |
| Tax | $0.00 |
| Total | $162.00 |

J1047A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

MACC:ACKustoms 000076



**5333 W. Irving Park Rd. • Chicago, IL 60641**
**Telephone: (773) 465-2000**
**www.mikeandersonchevy.com**

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061195 | 09/05/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | | For Office Use | |
|---|---|---|---|
| **AC KUSTOMS CORP**<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/05/17 08:50    Added on: W92    Printed at: Z43<br>RO#: 83658             VIN: 1GNSKCKC3HR191816<br>Vehicle: 17 CHEVROLET TAHOE PREM 4WD 4DR SUV JENNEY, | | |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 34 | AC KUSTOMS | .00 |
| 246 | 34 | REPAIR AND REFINISH FRONT BUMPER | 350.00 |
| 246 | 34 | TOUCH UP HOOD | 75.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 425.00 |

Authorized: _____

MACC:ACKustoms 000077

# Ac Kustoms Corp.
## 1120 N 31st Ave
### Melrose Park, IL  60160
## 7088902376
### Thanks For The Business

09/02/2017

Invoice  #1227

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000  (__) __-___

2017  CHEVY TAHOE

Tag:                         Mileage 4,300
ID:  1GNSKCKC3HR181816

| Labor | Amount |
|-------|--------|
| REPAIR & REFINISH FRONT BUMPER | $350.00 |
| TOUCH UP HOOD | $75.00 |
| | $425.00 |

| | |
|---|---|
| Subtotal | $425.00 |
| Tax | $0.00 |
| Total | $425.00 |

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

AUG     2017



KS # 83695

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061196 | 09/05/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| **AC KUSTOMS CORP**<br>1100 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  09/05/17 08:59    Added on: W92    Printed at: 243<br>RO#:    83695                          VIN: 3GNCJLSBXHL226622<br>Vehicle: 17 CHEVROLET TRAX LT FWD 4DR SUV JENNEY, |

| Additional Information |
|---|
| Note:  AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

UCS©2004

FILE

MACC:ACKustoms 000079

Page: 1

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

09/02/2017

Invoice #1223

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (__) ___-____

2017 CHEVY TRAX

Tag:                          Mileage 4,610
ID: 3GNC5LSB2HL226122

| Labor | | Amount |
|---|---|---|
| SAFETY INSPECTION | | $150.00 |
| | | $150.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | 4 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | | | | $0.00 |

AUG 2 - 2017

| | |
|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| Total | $150.00 |

STK# H1988A

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____



**ANDERSON**
CHEVROLET
OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061199 | 09/05/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 51ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJD  09/05/17 13:42    Added on: W94    Printed at: Z43<br>RO#:  83697                              VIN: JTEBU5JR4E5101404<br>Vehicle: 14 TOYOTA 4RUNNER 4DR SUV JENNEY, |

**Additional Information**

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | LABOR | 112.50 |
| 246 | 51 | REPAIR AND REFINISH BOTH BUMPERS | 450.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | FRONT PADS | 39.99 |
| 246 | 51 | FRONT ROTORS | 127.98 |
| 246 | 51 | REAR PADS | 39.99 |
| 246 | 51 | REAR ROTORS | 92.26 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,012.72 |

Authorized: 

UCS02004

FILE

MACC:ACKustoms 000081

**09/02/2017**

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
### 7088902376
### Thanks For The Business

**Invoice #1226**

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2014 TOYOTA 4RUNNER

Tag:                          Mileage 25,413
ID:  JTEBU5JR4E5180404

| Labor | Amount |
|---|---|
| SAFETY INSPECTION | $150.00 |
| LABOR | $112.50 |
| REPAIR & REFINISH BOTH BUMPERS | $450.00 |
| | $712.50 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | 7 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | FRONT PADS | 1.00 | $39.99 | $39.99 |
| | FRONT ROTOS | 2.00 | $63.99 | $127.98 |
| | REAR PADS | 1.00 | $39.99 | $39.99 |
| | REAR ROTOS | 2.00 | $46.13 | $92.26 |
| | | | | $300.22 |

| | |
|---|---|
| Subtotal | $1,012.72 |
| Tax | $0.00 |
| Total | $1,012.72 |

STK# CP3833

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        'SIGNED_____

MACC:ACKustoms 000082



PO # 62722

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061200 | 09/05/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| **AC KUSTOMS CORP**<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 09/25/17 13:42 Added on: W94 Printed at: 243<br>RO#: 82722 VIN: 3GCPCSEXXCG296739<br>Vehicle: 12 CHEVROLET SILVERADO C1500 LT CREW CAB JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 53 | AC KUSTOMS | .00 |
| 246 | 53 | SAFETY INSPECTION | 150.00 |
| 246 | 53 | LABOR | 350.00 |
| 246 | 53 | OIL AND FILTER | .00 |
| 246 | 53 | LEFT FENDER | 150.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 650.00 |

Authorized

CUSTOMER

MACC:ACKustoms 000083

Page: 1

**09/01/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1220

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (__) ___-____

2012 CHEVROLET C SERIES P-U C10-C1500

Tag:                                          Mileage 77,773
ID:  3GCPCSEOXCG286739

| **Labor** | **Amount** |
|---|---|
| SAFETY INSPECTION | $150.00 |
| REFINISH LH FENDER | $350.00 |
| | **$500.00** |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 6 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | LH FENDER | 1.00 | | $150.00 |
| | | | | **$150.00** |

| | |
|---|---|
| **Subtotal** | **$650.00** |
| **Tax** | $0.00 |
| **Total** | **$650.00** |

STK# H1566A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

AUG     2017

MACC:ACKustoms 000084



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061201 | 09/05/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO  09/05/17 13:43      Added on: W94    Printed at: Z43<br>RO#:    83698                              VIN: 2FMTK4J85FBB17095<br>Vehicle: 15 FORD EDGE SEL AND 4DR SUV JENNEY, |

| Additional Information |
|---|
| Note:  AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | REPAIR AND REFINISH REAR LID | 450.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 600.00 |

Authorized: _____

MACC:ACKustoms 000085

FILE

08/31/2017

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL  60160
## 7088902376
## Thanks For The Business

Invoice  #1216

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (___) ___-____

2015  FORD EDGE

Tag:                          Mileage 84,503
ID:  2FMTK4J89FBB17095

| **Labor** | | | | **Amount** |
|---|---|---|---|---|
| SAFETY INSPECTION | | | | $150.00 |
| repair and refinish rear lid | | | | $450.00 |
| | | | | $600.00 |

| **Part No.** | **Parts** | | **Quantity** | **Each** | |
|---|---|---|---|---|---|
| | 6 QUARTS OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | | | | | $0.00 |

| | |
|---|---|
| **Subtotal** | $600.00 |
| **Tax** | $0.00 |
| **Total** | $600.00 |

STK# CP3820

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

MACC:ACKustoms 000086



# ANDERSON
## CHEVROLET
### OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061202 | 09/05/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| **AC KUSTOMS CORP** <br> 1120 N 31ST AVE <br> MELROSE PARK, IL 60160 | G/L: <br> Printed: FRICANJO 09/05/17 13:43  Added on: W94  Printed by: Z43 <br> RO#: 33686  VIN: 2GNALBEK158161723 <br> Vehicle: 13 CHEVROLET EQUINOX LS 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 52 | AC KUSTOMS | .00 |
| 246 | 52 | REFINSIH LEFT FENDER | 300.00 |
| 246 | 52 | REPAIR AND REFINISH BOTH BUMPERS | 700.00 |
| 246 | 52 | REPAIR AND REFINISH LEFT FRONT DOOR | 350.00 |
| 246 | 52 | REPAIR AND REFINISH TAILGATE | 350.00 |
| 246 | 52 | LEFT FENDER | 68.00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 1,768.00 |

Authorized:

UCS©2004

**CUSTOMER**

MACC:ACKustoms 000087

**09/01/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1221

*Mike Anderson Chevy*
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (    ) ___-____

13  CHEVY EQUINOX

Tag:                                    Mileage
ID:  2GNALBEK1D6161723

| Labor | Amount |
|---|---|
| REFINISH FENDER | $300.00 |
| REPAIR & REFINISH BOTH BUMPERS | $700.00 |
| REPAIR & REFINISH LH FRONT DOOR | $350.00 |
| REPAIR & REFINISH TAILGATE | $350.00 |
|  | $1,700.00 |

| Part No. | Parts | Quantity | Each |  |
|---|---|---|---|---|
|  | FRONT LH FENDER | 1.00 | $68.00 | $68.00 |
|  |  |  |  | $68.00 |

| | |
|---|---|
| Subtotal | $1,768.00 |
| Tax | $0.00 |
| Total | $1,768.00 |

STK# H2093A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

AUG 2017



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061184 | 09/01/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1121 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 09/05/17 13:45    Added on: W94   Printed at: Z43<br>RO#:  04519                     VIN: 2G11Z5SA9H9147792<br>Vehicle: 17 CHEVROLET IMPALA 1LS 4DR SDN RODRIGUE |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | REPAIR AND REFINISH HOOD | 350.00 |
| 246 | 51 | REPAIR AND REFINISH REAR BUMPER | 450.00 |
| 246 | 51 | REPAIR AND REFINISH PASSENGER SIDE DOOR | 350.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,150.00 |

Authorized: _____

CCS02004

**FILE**

MACC:ACKustoms 000089

Page: 1

**08/29/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice #1214

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (__) ___-____

2017  CHEVY IMPALA

Tag:                              Mileage 2,667
ID:  2G11Z5SA9H9147795

| Labor | Amount |
|---|---|
| REPAIR& REFINISH HOOD | $350.00 |
| REPAIR & REFINISH REAR BUMPER | $450.00 |
| REPAIR & REFINISH P/S REAR DOOR | $350.00 |
| | $1,150.00 |

|  |  |
|---|---|
| Subtotal | $1,150.00 |
| Tax | $0.00 |
| Total | $1,150.00 |

H1640

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

MACC:ACKustoms 000090



R # 83684

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061186 | 09/01/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FMICANJO 09/25/17 13:46 Added on: W04 Printed at: Z43<br>RO#: 93684 VIN: KL1TG26159452145<br>Vehicle: 05 CHEVROLET AVEO LT 4DR SDN JENNEY, |

**Additional Information**

Note: C KUSTOMS

| For Office Use | | Description | Extended Price |
|------|----|-------------|----------------|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 769.29 |
| 246 | 51 | FRONT PADS AND ROTORS | .00 |
| 246 | 51 | WINDOW REGULATOR | .00 |
| 246 | 51 | WINDOW SWITCH | .00 |
| 246 | 51 | TWO PLATE BULBS | .00 |
| 246 | 51 | ADJUST REAR BRAKES | .00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 769.29 |

Authorized: _____

BC902004

FILE

MACC:ACKustoms 000091

Page: 1

**08/29/2017**

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
## 7088902376
## Thanks For The Business

**Invoice #1212**

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (__) ___-____

2005 CHEVROLET  AVEO

Tag:                                    Mileage 37,350
ID:  KL1TG52615B452145

| Labor | Amount |
|---|---|
| SAFETY INSPECTION | $150.00 |
| R&R ROTOS & PADS | $140.00 |
| ADJUST REAR BRAKES | $55.00 |
| R&R REGULATOR & SWITCH | $75.00 |
| | $420.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | 4 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | FRONT ROTOS | 2.00 | $28.37 | $56.74 |
| | FRONT PADS | 1.00 | $41.48 | $41.48 |
| | WINDOW REGULATOR | 1.00 | $135.00 | $135.00 |
| | WINDOW SWITCH | 1.00 | $96.07 | $96.07 |
| | TWO PLATE BULBS2 | 2.00 | $10.00 | $20.00 |
| | | | | $349.29 |

| | |
|---|---|
| Subtotal | $769.29 |
| Tax | $0.00 |
| Total | $769.29 |

STK# H1235A

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____  SIGNED_____

AUG 2 9 2017

MACC:ACKustoms 000092



**ANDERSON**
CHEVROLET
OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061185 | 09/01/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC KUSTOMS CORP<br>1100 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO  09/05/17 13:40    Added on: W94    Printed at: 243<br>PO#:            93683                      VIN: 1C4NJREB4FD214464<br>Vehicle: 15 JEEP PATRIOT 4DR SUV JENNEY, |

| Additional Information |
|------------------------|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|------|----|-------------|----------------|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 1,159.61 |
| 246 | 51 | BATTERY--TRAY--AIR DUCT | .00 |
| 246 | 51 | LEFT HIGH BEAM | .00 |
| 246 | 51 | WIPERS | .00 |
| 246 | 51 | TRANS MOUNT | .00 |
| 246 | 51 | ENGINE MOUNT | .00 |
| 246 | 51 | TPMS AND AIR VENT | .00 |
| 246 | 51 | ANTENNA TIE DOWN--GAS--TRANS FLUID | .00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 1,159.61 |

Authorized:

CUSTOMER

MACC:ACKustoms 000093

Page: 1

**08/30/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1215

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000  (___) ___-____

2015  JEEP PATRIOT

Tag:
ID:  1C4NJRBB4FD214464

Mileage 16,926

| Labor | | | **Amount** |
|---|---|---|---|
| SAFETY INSPECTION | | | $150.00 |
| | | | **$150.00** |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | BATTERY, TRAY, AIR DUCK | 1.00 | | $316.00 |
| | LEFT HIGH BEAM | 1.00 | | $40.00 |
| | WIPERS | 1.00 | $20.00 | $20.00 |
| | TRANS MOUNT | 1.00 | $170.00 | $170.00 |
| | ENGINE MOUNT | 1.00 | $135.00 | $135.00 |
| | TPMS | 2.00 | $110.00 | $150.00 |
| | AIR VENT | 1.00 | $120.00 | $120.00 |
| | ANTENNA TIE DOWN | 1.00 | $25.00 | $25.00 |
| | GAS | 1.00 | | $10.00 |
| | TRANS FUILDS | 3.00 | $7.87 | $23.61 |
| | | | | **$1,009.61** |

| | |
|---|---|
| Subtotal | $1,159.61 |
| Tax | $0.00 |
| Total | $1,159.61 |

CP3739A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____



CO #8368

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061229 | 09/07/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | C/L:<br>Printed: JENNEYTI 09/07/17 11:33   Added on: W93   Printed at: 243<br>RO#: 83689                      VIN: 2GNALCEK1F6175940<br>Vehicle: 15 CHEVROLET EQUINOX FWD LT 4DR SUV RODRIGUE |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 52 | AC CUSTOMS | .00 |
| 246 | 52 | SAFETY INSPECTION | 150.00 |
| 246 | 52 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

CUSTOMER

UCHS2864

MACC:ACKustoms 000095

Page: 1

**09/02/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1222

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000   (__) ___-___

2015  CHEVY EQUINOX

Tag:                          Mileage 78,789
ID:  2GNALCEK1F6175940

| | **Labor** | | | **Amount** |
|---|---|---|---|---|
| | SAFETY INSPECTION | | | $150.00 |
| | | | | $150.00 |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 5 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | | | | $0.00 |

| | | |
|---|---|---|
| **Subtotal** | | $150.00 |
| **Tax** | | $0.00 |
| **Total** | | $150.00 |

STK# CP3841

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

MACC:ACKustoms 000096



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061230 | 09/07/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1130 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  09/07/17 11:40    Added on: M92    Printed at: 243<br>RO#:    83737    VIN: 3FADP4AJ0CM150032<br>Vehicle: 12 FORD FIESTA S 4DR SDN JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | LABOR | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | FRONT PADS | 45.00 |
| 246 | 51 | FRONT ROTORS | 90.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 435.00 |

Authorized:

MACC:ACKustoms 000097

**09/02/2017**

# Ac Kustoms Corp.
## 1120 N 31st Ave
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice #1224

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000  (___) ___-____

2012 CHEVY FIESTA

Tag:
ID:  3FADP4AJ0CM150032

Mileage 57,017

| **Labor** | | **Amount** |
|---|---|---|
| SAFETY INSPECTION | | $150.00 |
| LABOR FOR BRAKES | | $150.00 |
| | | **$300.00** |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 4 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | FRONT ROTOS | 2.00 | $45.00 | $90.00 |
| | FRONT PADS | 1.00 | | $45.00 |
| | | | | **$135.00** |

|  | |
|---|---|
| **Subtotal** | $435.00 |
| **Tax** | $0.00 |
| **Total** | **$435.00** |

STK# H1999A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____      SIGNED_____



**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

Ro # 93710

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061228 | 09/07/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1129 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 09/07/17 11:23 Added on: W92 Printed at: 243<br>RO#: 93710 VIN: 2C3CDYAGXFH804655<br>Vehicle: 15 DODGE CHALLENGER 2DR CPE JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS-- | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

UCS©2004

**FILE**

MACC:ACKustoms 000099

# Ac Kustoms Corp.

**09/05/2017**

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1230

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (__) ___-___

2015 DODGE CHALLENGER

Tag:
ID: 2C2CDZAGXFH804655

Mileage 47,538

| | | | **Amount** |
|---|---|---|---|
| **Labor** | | | |
| SAFETY INSPECTION | | | $150.00 |
| | | | $150.00 |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 6 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | | | | $0.00 |

| | |
|---|---|
| **Subtotal** | $150.00 |
| **Tax** | $0.00 |
| **Total** | $150.00 |

STK# CP3755

NEEDS WINDSHIELD REPAIR (SAFELITE)

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

MACC:ACKustoms 000100



RO #83743

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061235 | 09/07/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1100 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO  09/07/17 12:19    Added on: W94    Printed at: Z43<br>RO#:    83743                          VIN: 1C4BJWEG4CL255203<br>Vehicle: 12 JEEP WRANGLER UNL1M 4WD 4DR SUV JENNEY, |

| Additional Information |
|---|

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | REFINISH QUARTER PANEL | 350.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | RUNNING BOARDS--THERMOSTAT HOUSING-- | 1,768.00 |
| 246 | 51 | BATTERY--5 TPMS SENSORS--LEFT SIDE FENDER | .00 |
| 246 | 51 | FLARES--BRAKE LEVEL SWITCH--RIGHT HEADLAMP | .00 |
| 246 | 51 | BULB | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 2,268.00 |

Authorized: _____

GCS©2004

FILE

MACC:ACKustoms 000101

Page: 1

**09/05/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**



Invoice #1232

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (__) ___-____

2012 JEEP WRANGLER 4x4

Tag:                                    Mileage 110,941
ID: 1C4BJWEG4CL255283

|  | **Amount** |
|---|---|
| **Labor** | |
| SAFETY INSPECTION | $150.00 |
| REFINISH QUATER | $350.00 |
|  | **$500.00** |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
|  | 6 QUARTS OIL | 1.00 |  | $0.00 |
|  | OIL FILTER | 1.00 |  | $0.00 |
|  | RUNNING BOARDS & LABOR | 1.00 |  | $450.00 |
|  | THERMOSTAT HOUSING & LABOR | 1.00 |  | $150.00 |
|  | BATTERY INTERSTATE | 1.00 |  | $188.00 |
|  | 5 TPMS & LABOR | 1.00 |  | $425.00 |
|  | LEFT SIDE FENDER FLARES | 1.00 |  | $440.00 |
|  | BRAKE LEVEL SWITCH & LABOR | 1.00 |  | $60.00 |
|  | RH HEADLAMP BULB | 1.00 |  | $55.00 |
|  |  |  |  | **$1,768.00** |

| | |
|---|---|
| Subtotal | $2,268.00 |
| Tax | $0.00 |
| Total | $2,268.00 |

**STK# H1997A**

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____       SIGNED_____

MACC:ACKustoms 000102



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 054620 | 08/31/2017 | MS | 202B | $10,093.96 |

*** Ten thousand ninety-three and 96/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈054620⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)                    Mike Anderson Chevrolet of Chicago, LLC   •   Chicago, IL 60641

Created: **MS**  08/31/17 14:59

G/L: **202B**          Check Number: **054620**     Check Date: **08/31/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1190 | $180.75 | 00001190 |
| 300A | 1188 | 1191 | $377.98 | 00001191 |
| 300A | 1188 | 1192 | $150.00 | 00001192 |
| 300A | 1188 | 1193 | $458.80 | 00001193 |
| 300A | 1188 | 1194 | $335.05 | 00001194 |
| 300A | 1188 | 1195 | $729.99 | 00001195 |
| 300A | 1188 | 1196 | $150.00 | 00001196 |
| 300A | 1188 | 1197 | $150.00 | 00001197 |
| 300A | 1188 | 1198 | $415.14 | 00001198 |
| 300A | 1188 | 1199 | $222.63 | 00001199 |
| 300A | 1188 | 1200 | $826.00 | 00001200 |
| 300A | 1188 | 1201 | $150.00 | 00001201 |
| 300A | 1188 | 1202 | $170.00 | 00001202 |
| 300A | 1188 | 1203 | $150.00 | 00001203 |
| 300A | 1188 | 1204 | $150.00 | 00001204 |
| 300A | 1188 | 1205 | $150.00 | 00001205 |
| 300A | 1188 | 1207 | $4,187.99 | 00001207 |
| 300A | 1188 | 1208 | $450.00 | 00001208 |
| 300A | 1188 | 1209 | $389.63 | 00001209 |
| 300A | 1188 | 1210 | $150.00 | 00001210 |
| 300A | 1188 | 1211 | $150.00 | 00001211 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | **$10,093.96** |

CUSTOMER

@F00008W
26.004

MACC:ACKustoms 000103



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

**VOID AFTER 120 DAYS**

| 001188 | 054620 | 08/31/2017 | MS | 202B | $10,093.96 |

*** Ten thousand ninety-three and 96/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈054620⑈ ⑈071000013⑈ 423864789⑈

SF669822 Q (01/13)    Mike Anderson Chevrolet of Chicago, LLC • Chicago, IL 60641

Created: **MS** 08/31/17 14:59

G/L: **202B**    Check Number: **054620**    Check Date: **08/31/17**

| G/L Account | Control | | Reference | Amount | Discount/Memo |
|---|---|---|---|---|---|
| 300A | 1188 | | 1190 | $180.75 | 00001190 |
| 300A | 1188 | | 1191 | $377.98 | 00001191 |
| 300A | 1188 | | 1192 | $150.00 | 00001192 |
| 300A | 1188 | | 1193 | $458.80 | 00001193 |
| 300A | 1188 | | 1194 | $335.05 | 00001194 |
| 300A | 1188 | | 1195 | $729.99 | 00001195 |
| 300A | 1188 | | 1196 | $150.00 | 00001196 |
| 300A | 1188 | | 1197 | $150.00 | 00001197 |
| 300A | 1188 | | 1198 | $415.14 | 00001198 |
| 300A | 1188 | | 1199 | $222.63 | 00001199 |
| 300A | 1188 | | 1200 | $826.00 | 00001200 |
| 300A | 1188 | | 1201 | $150.00 | 00001201 |
| 300A | 1188 | | 1202 | $170.00 | 00001202 |
| 300A | 1188 | | 1203 | $150.00 | 00001203 |
| 300A | 1188 | | 1204 | $150.00 | 00001204 |
| 300A | 1188 | | 1205 | $150.00 | 00001205 |
| 300A | 1188 | | 1207 | $4,187.99 | 00001207 |
| 300A | 1188 | | 1208 | $450.00 | 00001208 |
| 300A | 1188 | | 1209 | $389.63 | 00001209 |
| 300A | 1188 | | 1210 | $150.00 | 00001210 |
| 300A | 1188 | | 1211 | $150.00 | 00001211 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $10,093.96 |

CUSTOMER

⑈F0008W
26.004

MACC:ACKustoms 000104

# Customer Sales Report
## Ac Kustoms Corp.
1120 N 31st Ave
Melrose Park, IL 60160

Page: 1

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

### Date range: 08/18/2017 to 08/28/2017

---

**14 CHRYSLER TOWN & COUNTRY**
VIN: 2C4RC1CGSLR147599

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1199 | 08/18/2017 | SAFETY INSPECTION | $12.00 | $168.75 | $0.00 | $0.00 | $180.75 | N/A |
| | | | $12.00 | $168.75 | $0.00 | $0.00 | $180.75 | |

**2014 CHEVY MALIBU**
VIN: 1G11C5SL2EF236212

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1203 | 08/21/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2014 GMC ACADIA**
VIN: 1GKKVTKDXFJ135974

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1191 | 08/18/2017 | SAFETY INSPECTION | $77.98 | $300.00 | $0.00 | $0.00 | $377.98 | N/A |
| | | | $77.98 | $300.00 | $0.00 | $0.00 | $377.98 | |

**2013 CHEVY TRAVERSE**
VIN: 1GNKRGKDXDJ227114

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1192 | 08/18/2017 | DIAGNOSTIC CHARGES | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2004 CHEVROLET K SERIES 1500-3500 4x4**
VIN: 1GCHK29GX4E293598

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1193 | 08/18/2017 | SAFETY INSPECTION | $196.30 | $262.50 | $0.00 | $0.00 | $458.80 | N/A |
| | | | $196.30 | $262.50 | $0.00 | $0.00 | $458.80 | |

**2015 TOYOTA RAV4**
VIN: 2T3WFREV8FW213722

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1194 | 08/19/2017 | SAFETY INSPECTION | | $262.50 | $0.00 | $0.00 | $335.05 | N/A |
| | | | | $262.50 | $0.00 | $0.00 | $335.05 | |

MACC:ACKustoms 000105

# Customer Sales Report
## Ac Kustoms Corp.
1120 N 31st Ave
Melrose Park, IL 60160

Page: 2

Mike Anderson Chevy
5333 W Irvingpark Rd
Chicago IL 60641

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

**Date range: 08/18/2017 to 08/28/2017**

---

**14 CHEVY RAV4**
VIN: 2T3RFREV3EW139265

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1195 | 08/21/2017 | SONY RADIO | $529.99 | $200.00 | $0.00 | $0.00 | $729.99 | N/A |
| | | | $529.99 | $200.00 | $0.00 | $0.00 | $729.99 | |

**2012 CHEVROLET MALIBU**
VIN: 1G1ZA5EUXCF242608

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1196 | 08/21/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2016 CHEVY SONIC**
VIN: 1G1JC5SB7G4129260

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1197 | 08/22/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2014 CHEVY CAMARO**
VIN: 2G1FB1E30E9269084

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1198 | 08/23/2017 | SAFETY INSPECTION | $133.14 | $282.00 | $0.00 | $0.00 | $415.14 | N/A |
| | | | $133.14 | $282.00 | $0.00 | $0.00 | $415.14 | |

**2008 CHEVROLET CORVETTE**
VIN: 1G1YY25W585108612

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1199 | 08/23/2017 | SAFETY INSPECTION | $12.63 | $210.00 | $0.00 | $0.00 | $222.63 | N/A |
| | | | $12.63 | $210.00 | $0.00 | $0.00 | $222.63 | |

**2012 CHRYSLER 300**
VIN: 2C3CCACG0CH129718

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1200 | 08/24/2017 | SAFETY INSPECTION | $338.00 | $487.23 | $0.00 | $0.00 | $826.00 | N/A |
| | | | | | $0.00 | $0.00 | $826.00 | |

MACC:ACKustoms 000106

9/12/2017

# Customer Sales Report
## Ac Kustoms Corp.
1120 N 31st Ave
Melrose Park, IL 60160

Page: 3

Mike Anderson Chevy
5333 W Irvingpark Rd
Chicago IL 60641

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

**Date range: 08/18/2017 to 08/28/2017**

**2016 CHEVY IMPALA**
VIN: 2G1WC5E31G1132662

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1201 | 08-24-2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2013 CHEVY MALIBU**
VIN: 1G11B5SA1DF307122

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1202 | 08-24-2017 | SAFETY INSPECTION | $20.00 | $150.00 | $0.00 | $0.00 | $170.00 | N/A |
| | | | $20.00 | $150.00 | $0.00 | $0.00 | $170.00 | |

**2014 CHEVY TARVERSE**
VIN: 1GNKRGKDXEJ26773

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1204 | 08-25-2017 | COOLANT TEMP SENSOR AND LABOR | $110.00 | $40.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $110.00 | $40.00 | $0.00 | $0.00 | $150.00 | |

**2016 CHEVY MALIBU**
VIN: 1G11B5SA8GF167000

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1205 | 08-25-2017 | SAFETY INSPECTION2 | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2011 BUICK REGAL FWD 2.4L DOHC DIS-SFI 4 CYL**
VIN: W04GN5EC3B1094754

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1207 | 08-25-2017 | TRANSMISSION | $2,937.99 | $1,250.00 | $0.00 | $0.00 | $4,187.99 | N/A |
| | | | $2,937.99 | $1,250.00 | $0.00 | $0.00 | $4,187.99 | |

**2017 CHEVY EXPRESS VAN**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1208 | 08-28-2017 | REPAIR AND REFINISH REAR BUMPER | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | N/A |
| | | | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | |



https://mail.google.com/mail/u/0//inbox/15e722869e0ceacf?projector=1

1/1

MACC:ACKustoms 000107

# Customer Sales Report
## Ac Kustoms Corp.
1120 N 31st Ave
Melrose Park, IL. 60160

Page:    4

Mike Anderson Chevy
5333 W Irvingpark Rd
Chicago IL 60641

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

Date range: 08/18/2017 to 08/28/2017

**2013 CHEVY EQUINOX**
VIN: 2GNALBEK1D6161723

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1207 | 08/28/2017 | SAFETY INSPECTION | $149.63 | $240.00 | $0.00 | $0.00 | $389.63 | N/A |
| | | | $149.63 | $240.00 | $0.00 | $0.00 | $389.63 | |

**2016 CHEVY IMPALA**
VIN: 2G1105SA9G9197539

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1210 | 08/28/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2015 CHEVY CITY EXPRESS**
VIN: 3N63M0YN4FK703486

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1211 | 08/28/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

| | Grand Totals | $4,590.98 | $5,502.98 | $0.00 | $0.00 | $10,093.96 | |
|---|---|---|---|---|---|---|---|

MACC:ACKustoms 000108



**ANDERSON**
**CHEVROLET**
**OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061098 | 08/23/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC KUSTOMS CORP<br>1125 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 08/23/17 17:55  Added on: W92  Printed at: Z43<br>RO#:  83589  VIN: 2G1FB1E30E9269004<br>Vehicle: 14 CHEVROLET CAMARO 1LT 2DR CPE JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|------|-----|-------------|----------------|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | LABOR | 132.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | REAR ROTORS | 91.66 |
| 246 | 51 | REAR BRAKE PADS | 41.48 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 415.14 |

Authorized:

JCS©2004

CUSTOMER

MACC:ACKustoms 000109

Page: **1**

## Ac Kustoms Corp.

08/23/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1198

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (___) ___-____

2014 CHEVY CAMARO

Tag:
ID: 2G1FB1E30E9269084

Mileage 57,997

| | **Labor** | | | **Amount** |
|---|---|---|---|---|
| | SAFETY INSPECTION | | | $150.00 |
| | LABOR | | | $132.00 |
| | | | | **$282.00** |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 6 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | REAR BRAKE ROTOS | 2.00 | $45.83 | $91.66 |
| | REAR PADS | 1.00 | $41.48 | $41.48 |
| | | | | **$133.14** |

| | | |
|---|---|---|
| **Subtotal** | | $415.14 |
| **Tax** | | $0.00 |
| **Total** | | $415.14 |

STK# CP3822

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____



**ANDERSON**
**CHEVROLET**
OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061087 | 08/23/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| **AC KUSTOMS CORP**<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  08/23/17  06:34    Added on: X90    Printed at: 243<br>RO#:   83501              VIN: 1G1JC5SB7G4129060<br>Vehicle: 16 CHEVROLET SONIC LT 4DR SDN JENNEY, |

| Additional Information |
|---|
| Note:  AC KUSTOMS--STK #H1942A--2016 SONIC |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

FILE

MACC:ACKustoms 000111

08/22/2017

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1197

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (___) ___-____

2016 CHEVY SONIC

Tag:                                         Mileage 11,175
ID:  1G1JC5SB7G4129260

| Labor | | | | | Amount |
|---|---|---|---|---|---|
| safety inspection | | | | | $150.00 |
| | | | | | $150.00 |

| Part No. | Parts | | Quantity | Each | |
|---|---|---|---|---|---|
| | 5 quarts oil | | 1.00 | | $0.00 |
| | oil filter | | 1.00 | | $0.00 |
| | | | | | $0.00 |

| | | |
|---|---|---|
| Subtotal | | $150.00 |
| Tax | | $0.00 |
| Total | | $150.00 |

STK# H1942A

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

2017

MACC:ACKustoms 000112



**ANDERSON**
CHEVROLET
OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061097 | 08/23/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| **AC KUSTOMS CORP**<br>1120 N 51ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYT: 08/23/17 17:54    Added on: W92   Printed at: 243<br>RO#:    93500                      VIN: 1G1YY25W585108612<br>Vehicle: 08 CHEVROLET CORVETTE 2DR CPE JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | LABOR | 60.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | CABIN AIR FILTER | 12.63 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 222.63 |

Authorized:

MACC:ACKustoms 000113

**08/23/2017**

## Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1199

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2008 CHEVROLET CORVETTE

Tag:
ID: 1G1YY25W585108612

Mileage 63,918

| **Labor** | | | | **Amount** |
|---|---|---|---|---|
| SAFETY INSPECTION | | | | $150.00 |
| CLEAN & ADJUST REAR EMERGENCY BRAKES | | | | $60.00 |
| | | | | $210.00 |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 6 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | CABIN FILTER | 1.00 | $12.63 | $12.63 |
| | | | | $12.63 |

| | |
|---|---|
| **Subtotal** | $222.63 |
| **Tax** | $0.00 |
| **Total** | $222.63 |

STK#

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

MACC:ACKustoms 000114



**5333 W. Irving Park Rd. • Chicago, IL 60641**
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061104 | 08/25/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 08/25/17 0:31   Added to: A92   Printed at: Z43<br>PO#: 82815   VIN: 2G1WC5E31G1132662<br>Vehicle: 16 CHEVROLET IMPALA LTZ 4DR SDN JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | | Description | Extended Price |
|---|---|---|---|---|
| 246 | 24 | | AC KUSTOMS | .00 |
| 246 | 24 | | SAFETY INSPECTION | 150.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

UCS#02004

**FILE**

MACC:ACKustoms 000115

# Ac Kustoms Corp.

08/24/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1201

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (___) ___-____

2016 CHEVY IMPALA

Tag:                                          Mileage 35,248
ID: 2G1WC5E31G1132662

**Labor**
SAFETY INSPECTION

| | Amount |
|---|---|
| | $150.00 |
| | $150.00 |

| | |
|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| **Total** | **$150.00** |

STK# CP3800

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

MACC:ACKustoms 000116

# ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061053 | 08/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | | For Office Use | |
|---|---|---|---|
| **AC KUSTOMS CORP**<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | | G/L:<br>Printed: JENNEYTJ  08/21/17  09:48    Added on: W92    Printed at: Z43<br>RO#:    03532                    VIN: 1G11C5SL2EF236212<br>Vehicle: 14 CHEVROLET MALIBU 1LT 4DR SDN JENNEY, | |

| Additional Information |
|---|
| Note:  AC KUSTOMS--STK #H1882A--2014 MALIBU--RO #93532 |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 24 | AC KUSTOMS | .00 |
| 246 | 24 | SAFETY INSPECTION | 150.00 |
| 246 | 24 | AND AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

UCS©2004

FILE

MACC:ACKustoms 000117

# Ac Kustoms Corp.

08/18/2017

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Estimate

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (___) ___-____

2014  CHEVY MALIBU

Tag:
ID:  1G11C5SL2EF236212

Mileage 41,114

| **Labor** | | | | **Amount** |
|---|---|---|---|---|
| SAFETY INSPECTION | | | | $150.00 |
| | | | | $150.00 |

| **Part No.** | **Parts** | | **Quantity** | **Each** | Amount |
|---|---|---|---|---|---|
| | OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | | | | | $0.00 |

| | |
|---|---|
| **Subtotal** | $150.00 |
| **Tax** | $0.00 |
| **Total** | $150.00 |

STK# H1882A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____



## ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061103 | 08/25/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1100 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYT1  08/25/17  07:11     Added on: W92     Printed at: 243<br>RO#:     83597                                    VIN: 1G11B5SA1DF517122<br>Vehicle: 13 CHEVROLET MALIBU 1LS 4DR SDN JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | WIPER BLADES | 20.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 170.00 |

Authorized: _____

UCS92?0C4

CUSTOMER

MACC:ACKustoms 000119

**Ac Kustoms Corp.**

08/24/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1202

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2013 CHEVY MALIBU

Tag:                    Mileage 44,665
ID: 1G11B5SA1DF317122

| Labor | | | | | Amount |
|---|---|---|---|---|---|
| SAFETY INSPECTION | | | | | $150.00 |
| | | | | | $150.00 |

| Part No. | Parts | | Quantity | Each | Amount |
|---|---|---|---|---|---|
| | 5 QUARTS OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | WIPERS | | 2.00 | $10.00 | $20.00 |
| | | | | | $20.00 |

| | |
|---|---|
| Subtotal | $170.00 |
| Tax | $0.00 |
| Total | $170.00 |

STK# H2211A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

MACC:ACKustoms 000120



**ANDERSON**
**CHEVROLET**
OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061051 | 08/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

G/L:
Printed: JENNEYTI 08/21/17 08:31    Added on: W9C    Printed at: 243
RO#: 83529    VIN: 2C4RC1CG5ER147599
Vehicle: 14 CHRYSLER TOWN&CNTRY TOURNG-L 4DR MVAN JENNEY,

**Additional Information**

Note: AC KUSTOMS--STK #H2149B--2014 TOWN ANND COUNTRY--RO #83529

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | LABOR | 18.75 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | WIPER BLADES | 12 00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | ~~168.75~~ 180.75 |

Authorized:

MACC:ACKustoms 000121

# Ac Kustoms Corp.

08/18/2017

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1190

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (___) ___-____

14  CHRYSLER TOWN & COUNTRY

Tag:                              Mileage  47,150
ID:  2C4RC1CGSER147599

| | **Labor** | | | **Amount** |
|---|---|---|---|---|
| | safety inspection | | | $150.00 |
| | LABOR | | | $18.75 |
| | | | | $168.75 |

| **Part No.** | **Parts** | | **Quantity** | **Each** | |
|---|---|---|---|---|---|
| | oil | | 1.00 | | $0.00 |
| | oil filter | | 1.00 | | $0.00 |
| | WIPERS | | 1.00 | $12.00 | $12.00 |
| | | | | | $12.00 |

AUG 21 2017

| | |
|---|---|
| **Subtotal** | $180.75 |
| **Tax** | $0.00 |
| **Total** | $180.75 |

STK# H2149B

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | | NAD |
|-----|------|-----------|--------|--|-----|
| 061048 | 08/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC KUSTOMS CORP<br>1520 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYT1  08/21/17 09:20    Added by: W92   Printed at: X92 |

**Additional Information**

Note:  AC KUSTOMS--STK #CP3808--2013 TRAVERSE--RO #83513

| For Office Use | | Description | | Extended Price |
|----------------|--|-------------|--|----------------|
| 246 | | AC KUSTOMS | | .00 |
| 246 | | DIAGNOSTICS | | 112.50 |
| 246 | | REMOVE AND REPLACE BATTERY | | 37.50 |

| Freight | Tax | Total |
|---------|-----|-------|
| 00 | .00 | 150.00 |

Authorized:

UCS02004

CUSTOMER

MACC:ACKustoms 000123

Page: 1

# Ac Kustoms Corp.

08/18/2017

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1192

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000   (___) ___-____

2013  CHEVY TRAVERSE

Tag:
ID:  1GNKRGKDXDJ227114

Mileage

| **Labor** | **Amount** |
|---|---|
| DIAGNOSTIC CHARGES | $112.50 |
| R&R BATTERY | $37.50 |
| | $150.00 |

AUG 31 2017

| | |
|---|---|
| **Subtotal** | **$150.00** |
| **Tax** | **$0.00** |
| **Total** | **$150.00** |

STK# CP3808

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____       SIGNED_____



RO # 43527

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061049 | 08/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  08/21/17  07:35    Added by: X92    Printed at: X92 |

**Additional Information**

Note:  AC KUSTOMS--STK #CP3801N--2004 SILVERADO--RO #83527

| For Office Use | Description | | Extended Price |
|---|---|---|---|
| 246 | AC KUSTOMS | | .00 |
| 246 | SAFETY INSPECTION | | 150.00 |
| 246 | LABOR | | 112.50 |
| 246 | OIL AND FILTER | | .00 |
| 246 | O2 SENSORS | | 196.30 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 458.80 |

Authorized:

UC9C2004

CUSTOMER

MACC:ACKustoms 000125

Page: 1

# Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

08/18/2017

Invoice #1193

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2004 CHEVROLET K SERIES 1500-3500 4x4

Tag:
ID:  1GCHK29GX4E293598

Mileage 86,601

| | **Amount** |
|---|---|
| **Labor** | |
| SAFTEY INSPECTION | $150.00 |
| LABOR | $112.50 |
| | $262.50 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | O2 SENSORS | 2.00 | $98.15 | $196.30 |
| | | | | $196.30 |

AUG 2017

| | |
|---|---|
| **Subtotal** | $458.80 |
| **Tax** | $0.00 |
| **Total** | $458.80 |

STK# CP380

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

MACC:ACKustoms 000126



R.O # 83528

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061050 | 08/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 08/21/17 08:07  Added on: W3P  Printed at: Z43<br>RO#: 83528  VIN: 1GKKVTKD5EJ135974<br>Vehicle: 15 GMC ACADIA DENALI AWD 4DR SUV JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS--STK #CP7839--2014 ACADIA--RO #83528 |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 24 | AC KUSTOMS | .00 |
| 246 | 24 | SAFETY INSPECTION | 150.00 |
| 246 | 24 | LABOR | 150.00 |
| 246 | 24 | OIL AND FILTER | .00 |
| 246 | 24 | FRONT BRAKE PADS | 38.99 |
| 246 | 24 | REAR BRAKE PADS | 38.99 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 377.98 |

Authorized:

CUSTOMER

MACC:ACKustoms 000127

Page 1

# Ac Kustoms Corp.

08/18/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1191

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2014 GMC ACADIA

Tag:                                     Mileage 49,104
ID: 1GKKVTKDXFJ135974

| Labor | | | | | **Amount** |
|---|---|---|---|---|---|
| SAFETY INSPECTION | | | | | $150.00 |
| LABOR | | | | | $150.00 |
| | | | | | $300.00 |

| Part No. | Parts | | Quantity | Each | Amount |
|---|---|---|---|---|---|
| | OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | FRONT BRAKE PADS | | 1.00 | $38.99 | $38.99 |
| | REAR BRAKE PADS | | 1.00 | $38.99 | $38.99 |
| | | | | | $77.98 |

|  | |
|---|---|
| Subtotal | $377.98 |
| Tax | $0.00 |
| Total | $377.98 |

STK# CP3809

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____      SIGNED_____

MACC:ACKustoms 000128



*B #83543*

**Mike ANDERSON CHEVROLET OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061063 | 08/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 08/21/17 16:25  Added on: W92  Printed at: Z43<br>PO#: 83543  VIN: 1G1ZA5EUXCF242608<br>Vehicle: 12 CHEVROLET MALIBU 1LS 4DR SDN JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

MACC:ACKustoms 000129

Page:

# Ac Kustoms Corp.

08/21/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

RO #
63543

Invoice #1196

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (__) __-__

2012 CHEVROLET  MALIBU

Tag:                                              Mileage 84,444
ID:  1G1ZA5EUXCF242608

| Labor | Amount |
|---|---|
| SAFETY INSPECTION | $150.00 |
|  | $150.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
|  | 5 QUARTS OIL | 1.00 |  | $0.00 |
|  | OIL FILTER | 1.00 |  | $0.00 |
|  |  |  |  | $0.00 |

|  |  |
|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| Total | $150.00 |

STK# H1302A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____      SIGNED_____



R # 03541

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061060 | 08/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1109 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 08/22/17 07:51   Added on: W94   Printed at: 243<br>RO#: 03541                              VIN: 2T3RFREV3EW130265<br>Vehicle: 14 TOYOTA RAV4 XLE AWD 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | | Description | Extended Price |
|---|---|---|---|---|
| 246 | 51 | | AC KUSTOMS | .00 |
| 246 | 51 | | LABOR AND PROGRAMMING INTERFACE | 200.00 |
| 246 | 51 | | SONY RADIO | 279.99 |
| 246 | 51 | | DASH KIT-HARNESS-STERRING-CAMERA | 250.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 729.99 |

Authorized: _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

CUSTOMER

MACC:ACKustoms 000131

Page: 1

08/21/2017

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1195

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (___) ___-____

14 CHEVY RAV4

Tag:
ID: 2T3RFREV3EW139265

Mileage 106204

| **Labor** | | | | **Amount** |
|---|---|---|---|---|
| LABOR AND PROGRAMIMG INTERFACE | | | | $200.00 |
| | | | | $200.00 |

| Part No. | **Parts** | | **Quantity** | **Each** | |
|---|---|---|---|---|---|
| | SONY RADIO | | 1.00 | | $279.99 |
| | DASH KIT, HARNESS, STEERING,CAMERA | | 1.00 | | $250.00 |
| | | | | | $529.99 |

| | |
|---|---|
| **Subtotal** | $729.99 |
| **Tax** | $0.00 |
| **Total** | $729.99 |

STK# CP3781

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____ SIGNED_____



**5333 W. Irving Park Rd.** • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061062 | 08/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|

**AC KUSTOMS CORP**
1120 N 31ST AVE
MELROSE PARK, IL  60160

G/L:
Printed: JENNEYTI  08/21/17 16:25    Added on: W90    Printed at: Z43
PO#: 93542                           VIN: 2T3WFREV8HW213722
Vehicle: 15 TOYOTA RAV4 XLE 4DR SUV JENNEY,

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | LABOR | 112.50 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | REAR PADS | 41.48 |
| 246 | 51 | RIGHT REAR ROTOR | 31.07 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 335.05 |

Authorized:

MACC:ACKustoms 000133

Page: 1

08/19/2017

**Ac Kustoms Corp.**
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1194

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (___) ___-___

2015 TOYOTA RAV4

Tag:                          Mileage 41,526
ID: 2T3WFREV8FW213722

| Labor | | | | | Amount |
|---|---|---|---|---|---|
| SAFETY INSPECTION | | | | | $150.00 |
| LABOR | | | | | $112.50 |
| | | | | | $262.50 |

| Part No. | Parts | | Quantity | Each | Amount |
|---|---|---|---|---|---|
| | 5 QUARTS OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | REAR PADS | | 1.00 | $41.48 | $41.48 |
| | ROTO REAR RIGHT | | 1.00 | $31.07 | $31.07 |
| | | | | | $72.55 |

| | | |
|---|---|---|
| Subtotal | | $335.05 |
| Tax | | $0.00 |
| Total | | $335.05 |

STK# CP3823

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

# Mike ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

001188     054620     08/31/2017     MS     202B     VOID AFTER 120 DAYS     $10,093.96

*** Ten thousand ninety-three and 96/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈054620⑈ ⑈071000013⑈ 423864789⑈

Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS** 08/31/17 14:59

G/L: **202B**     Check Number: **054620**     Check Date: **08/31/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1190 | $180.75 | 00001190 |
| 300A | 1188 | 1191 | $377.98 | 00001191 |
| 300A | 1188 | 1192 | $150.00 | 00001192 |
| 300A | 1188 | 1193 | $458.80 | 00001193 |
| 300A | 1188 | 1194 | $335.05 | 00001194 |
| 300A | 1188 | 1195 | $729.99 | 00001195 |
| 300A | 1188 | 1196 | $150.00 | 00001196 |
| 300A | 1188 | 1197 | $150.00 | 00001197 |
| 300A | 1188 | 1198 | $415.14 | 00001198 |
| 300A | 1188 | 1199 | $222.63 | 00001199 |
| 300A | 1188 | 1200 | $826.00 | 00001200 |
| 300A | 1188 | 1201 | $150.00 | 00001201 |
| 300A | 1188 | 1202 | $170.00 | 00001202 |
| 300A | 1188 | 1203 | $150.00 | 00001203 |
| 300A | 1188 | 1204 | $150.00 | 00001204 |
| 300A | 1188 | 1205 | $150.00 | 00001205 |
| 300A | 1188 | 1207 | $4,187.99 | 00001207 |
| 300A | 1188 | 1208 | $450.00 | 00001208 |
| 300A | 1188 | 1209 | $389.63 | 00001209 |
| 300A | 1188 | 1210 | $150.00 | 00001210 |
| 300A | 1188 | 1211 | $150.00 | 00001211 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $10,093.96 |
|---|---|---|

FILE

MACC:ACKustoms 000135

8/28/2017

# Customer Sales Report
## Ac Kustoms Corp.

Page: 1

### 1120 N 31st Ave
### Melrose Park, IL 60160

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago IL 60641**

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

**Date range: 08/18/2017 to 08/28/2017**

---

**14 CHRYSLER TOWN & COUNTRY**
**VIN: 2C4RC1CGSER147599**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1190 | 08/18/2017 | SAFETY INSPECTION | $12.00 | $168.75 | $0.00 | $0.00 | $180.75 | N/A |
| | | | $12.00 | $168.75 | $0.00 | $0.00 | $180.75 | |

**2014 CHEVY MALIBU**
**VIN: 1G11C5SL2EF236212**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1203 | 08/24/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2014 GMC ACADIA**
**VIN: 1GKKVTKDXFJ135974**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1191 | 08/18/2017 | SAFETY INSPECTION | $77.98 | $300.00 | $0.00 | $0.00 | $377.98 | N/A |
| | | | $77.98 | $300.00 | $0.00 | $0.00 | $377.98 | |

**2013 CHEVY TRAVERSE**
**VIN: 1GNKRGKDXDJ227114**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1192 | 08/18/2017 | DIAGNOSTIC CHARGES | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2004 CHEVROLET K SERIES 1500-3500 4x4**
**VIN: 1GCHK29GX4E293598**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1193 | 08/18/2017 | SAFTEY INSPECTION | $196.30 | $262.50 | $0.00 | $0.00 | $458.80 | N/A |
| | | | $196.30 | $262.50 | $0.00 | $0.00 | $458.80 | |

**2015 TOYOTA RAV4**
**VIN: 2T3WFREV8FW213722**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1194 | 08/19/2017 | SAFETY INSPECTION | $72.55 | $262.50 | $0.00 | $0.00 | $335.05 | N/A |
| | | | $72.55 | $262.50 | $0.00 | $0.00 | $335.05 | |

MACC:ACKustoms 000136

8/28/2017

# Customer Sales Report
# Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL 60160

Page: 2

---

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago IL 60641**

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:
**Date range: 08/18/2017 to 08/28/2017**

---

**14 CHEVY RAV4**
**VIN: 2T3RFREV3EW139265**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1195 | 08/21/2017 | SONY RADIO | $529.99 | $200.00 | $0.00 | $0.00 | $729.99 | N/A |
| | | | $529.99 | $200.00 | $0.00 | $0.00 | $729.99 | |

**2012 CHEVROLET MALIBU**
**VIN: 1G1ZA5EUXCF242608**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1196 | 08/21/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2016 CHEVY SONIC**
**VIN: 1G1JC5SB7G4129260**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1197 | 08/22/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2014 CHEVY CAMARO**
**VIN: 2G1FB1E30E9269084**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1198 | 08/23/2017 | SAFETY INSPECTION | $133.14 | $282.00 | $0.00 | $0.00 | $415.14 | N/A |
| | | | $133.14 | $282.00 | $0.00 | $0.00 | $415.14 | |

**2008 CHEVROLET CORVETTE**
**VIN: 1G1YY25W585108612**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1199 | 08/23/2017 | SAFETY INSPECTION | $12.63 | $210.00 | $0.00 | $0.00 | $222.63 | N/A |
| | | | $12.63 | $210.00 | $0.00 | $0.00 | $222.63 | |

**2012 CHRYSLER 300**
**VIN: 2C3CCACG0CH129718**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1200 | 08/24/2017 | SAFETY INSPECTION | $338.77 | $487.23 | $0.00 | $0.00 | $826.00 | N/A |
| | | | $338.77 | $487.23 | $0.00 | $0.00 | $826.00 | |

8/28/2017

# Customer Sales Report
## Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL 60160

Page: 3

---

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago IL 60641**

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

**Date range: 08/18/2017 to 08/28/2017**

---

**2016 CHEVY IMPALA**
**VIN: 2G1WC5E31G1132662**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1201 | 08/24/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
|  |  |  | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 |  |

**2013 CHEVY MALIBU**
**VIN: 1G11B5SA1DF317122**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1202 | 08/24/2017 | SAFETY INSPECTION | $20.00 | $150.00 | $0.00 | $0.00 | $170.00 | N/A |
|  |  |  | $20.00 | $150.00 | $0.00 | $0.00 | $170.00 |  |

**2014 CHEVY TARVERSE**
**VIN: 1GNKRGKDXEJ26773**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1204 | 08/25/2017 | COOLANT TEMP SENSOR AND LABOR | $110.00 | $40.00 | $0.00 | $0.00 | $150.00 | N/A |
|  |  |  | $110.00 | $40.00 | $0.00 | $0.00 | $150.00 |  |

**2016 CHEVY MALIBU**
**VIN: 1G11B5SA8GF167000**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1205 | 08/25/2017 | SAFETY INSPECTION2 | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
|  |  |  | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 |  |

**2011 BUICK REGAL FWD 2.4L DOHC DIS-SFI 4 CYL**
**VIN: W04GN5EC3B1094754**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1207 | 08/25/2017 | TRANSMISSION | $2,937.99 | $1,250.00 | $0.00 | $0.00 | $4,187.99 | N/A |
|  |  |  | $2,937.99 | $1,250.00 | $0.00 | $0.00 | $4,187.99 |  |

**2017 CHEVY EXPRESS VAN**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1208 | 08/28/2017 | REPAIR AND REFINSH REAR BUMPER | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | N/A |
|  |  |  | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 |  |

8/28/2017

# Customer Sales Report
# Ac Kustoms Corp.

Page:    4

### 1120 N 31st Ave
### Melrose Park, IL  60160

| | |
|---|---|
| **Mike Anderson Chevy** | Ph# 1:  (773) 465-2000 |
| **5333 W Irvingpark Rd** | Ph# 2:  (__) ___-____ |
| **Chicago  IL  60641** | Cell: |

### Date range: 08/18/2017 to 08/28/2017

**2013  CHEVY EQUINOX**
**VIN: 2GNALBEK1D6161723**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1209 | 08/28/2017 | SAFETY INSPECTION | $149.63 | $240.00 | $0.00 | $0.00 | $389.63 | N/A |
| | | | $149.63 | $240.00 | $0.00 | $0.00 | $389.63 | |

**2016  CHEVY IMPALA**
**VIN: 2G1105SA9G9197539**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1210 | 08/28/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

**2015  CHEVY CITY EXPRESS**
**VIN: 3N63M0YN4FK703486**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1211 | 08/28/2017 | SAFETY INSPECTION | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | N/A |
| | | | $0.00 | $150.00 | $0.00 | $0.00 | $150.00 | |

| | Parts | Labor | Misc. | Tax | Total |
|---|---|---|---|---|---|
| **Grand Totals** | $4,590.98 | $5,502.98 | $0.00 | $0.00 | $10,093.96 |

MACC:ACKustoms 000139



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061151 | 08/30/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| **AC KUSTOMS CORP**<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 08/30/17 12:24   Added on: W92   Printed at: 243<br>RO#: 83591   VIN: 1GCWGBFF6H1134501<br>Vehicle: 17 CHEVROLET EXPRESS G2500 CGO VAN PATRICIO |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | REPAIRED AND REFINSH REAR BUMPER | 450.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 450.00 |

Authorized:

FILE

MACC:ACKustoms 000140

**08/28/2017**

## Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL  60160
### 7088902376
### Thanks For The Business

Invoice  #1208

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (__) __-__

2017  CHEVY EXPRESS VAN

Tag:                                    Mileage
ID:

| Labor | Amount |
|---|---|
| REPAIR AND REFINSH REAR BUMPER | $450.00 |
| | $450.00 |

AUG 3 0 2017

| | |
|---|---|
| Subtotal | $450.00 |
| Tax | $0.00 |
| Total | $450.00 |

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

MACC:ACKustoms 000141



R# 82817

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061105 | 08/25/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1113 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 08/25/17 12:32  Added on: W94  Printed at: Z43<br>RO#: 82817  VIN: 2C3CCACG0CH129718<br>Vehicle: 12 CHRYSLER 300 LIMITED 4DR SDN JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 24 | AC KUSTOMS | .00 |
| 246 | 24 | SAFETY INSPECTION | 150.00 |
| 246 | 24 | LABOR | 337.23 |
| 246 | 24 | OIL AND FILTER | .00 |
| 246 | 24 | FRON PADS AND ROTORS | 116.18 |
| 246 | 24 | REAR PADS AND ROTORS | 104.45 |
| 246 | 24 | BRAKE HARDWARE | 20.14 |
| 246 | 24 | WINDOW SWITCH | 98.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 826.00 |

Authorized

FILE

MACC:ACKustoms 000142

Page: 1

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL  60160
## 7088902376
## Thanks For The Business

08/24/2017

Invoice  #1200

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000    (___) ___-____

2012 CHRYSLER  300

Tag:
ID:  2C3CCACG0CH129718

Mileage 53,161

| Labor | | | | Amount |
|-------|--|--|--|-------:|
| safety inspection | | | | $150.00 |
| | | | | $337.23 |
| | | | | **$487.23** |

| Part No. | Parts | Quantity | Each | Amount |
|----------|-------|---------:|-----:|-------:|
| | 6 quarts oil | 1.00 | | $0.00 |
| | oil filter | 1.00 | | $0.00 |
| | front rotos | 2.00 | $37.35 | $74.70 |
| | front pads | 1.00 | $41.48 | $41.48 |
| | rear rotos | 2.00 | $31.78 | $63.56 |
| | rear pads | 1.00 | $40.89 | $40.89 |
| | brake hardware | 1.00 | $20.14 | $20.14 |
| | window switch | 1.00 | $98.00 | $98.00 |
| | | | | **$338.77** |

| | |
|---|---:|
| Subtotal | $826.00 |
| Tax | $0.00 |
| Total | **$826.00** |

stk# cp3790

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

MACC:ACKustoms 000143



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061144 | 08/29/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 08/29/17 11:09   Added on: W9C   Printed at: Z43<br>RO#: 83629   VIN: 2G11C5SA9G9197539<br>Vehicle: 16 CHEVROLET IMPALA 1LT 4DR SDN JENNEY, |

**Additional Information**

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized:

MACC:ACKustoms 000144

Page: 1

# Ac Kustoms Corp.

**08/28/2017**

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1210

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2016  CHEVY IMPALA

Tag:
ID: 2G1105SA9G9197539

Mileage 6,769

| **Labor** | | | | **Amount** |
|---|---|---|---|---|
| SAFETY INSPECTION | | | | $150.00 |
| | | | | $150.00 |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | 5 QUARTS OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | | | | $0.00 |

Aug 2017

| | |
|---|---|
| **Subtotal** | $150.00 |
| **Tax** | $0.00 |
| **Total** | $150.00 |

STK# J1034A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____       SIGNED_____



**ANDERSON**
*Mike*
CHEVROLET
OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061145 | 08/29/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1100 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 08/29/17 11:22  Added on: W90  Printed at: 243<br>RO#: 83630  VIN: 2GNALEEK0D6161723<br>Vehicle: 13 CHEVROLET EQUINOX LS FWD 4DR SUV JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | LABOR | 90.00 |
| 246 | 51 | OIL AND FILTER | .00 |
| 246 | 51 | LEFT CONTROL ARM | 139.63 |
| 246 | 51 | REAR WIPER BLADE | 10.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 389.63 |

Authorized: _____

UCS&2004

FILE

MACC:ACKustoms 000146

Page: 1

08/28/2017

# Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1209

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2013 CHEVY EQUINOX

Tag:
ID: 2GNALBEK1D6161723

Mileage 55,708

| Labor | Amount |
|---|---|
| SAFETY INSPECTION | $150.00 |
| LABOR | $90.00 |
| | $240.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | 5 QUARTS OF OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | LH FRONT CONTROL ARM | 1.00 | $139.63 | $139.63 |
| | REAR WIPER | 1.00 | $10.00 | $10.00 |
| | | | | $149.63 |

| | |
|---|---|
| Subtotal | $389.63 |
| Tax | $0.00 |
| Total | $389.63 |

**STOCK# H2093A**

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____



**CHEVROLET**
OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061146 | 08/29/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYT1  08/29/17 11:34   Added on: W92   Printed at: 24·<br>RO#:   83632                          VIN: 1G11B5SA8GF167000<br>Vehicle: 16 CHEVROLET MALIBU 1LS 4DR SDN JENNEY, |

| Additional Information |
|---|
| Note:  AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized:

UCS©2004

MACC:ACKustoms 000148

# Ac Kustoms Corp.

08/25/2017

1120 N 31st Ave
Melrose Park, IL  60160
7088902376
**Thanks For The Business**

Invoice  #1205

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000    (___) ___-____

2016  CHEVY MALIBU

Tag:
ID:  1G11B5SA8GF167000

Mileage 17,115

| **Labor** | **Amount** |
|---|---|
| SAFETY INSPECTION2 | $150.00 |
| | $150.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | 5 QUARTS SYNTHETIC OIL | 1.00 | | $0.00 |
| | OIL FILTER | 1.00 | | $0.00 |
| | | | | $0.00 |

| | |
|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| Total | $150.00 |

| H1884A | AUG ... 2017 |
|---|---|

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____



TO # 03034

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061147 | 08/29/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  08/29/17 12:08    Added on: W92    Printed at: Z43<br>ROH: 83034                              VIN: 3N63MCYN4FK703486<br>Vehicle: 15 CHEVROLET CITY EXPRS CGO VAN JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS | .00 |
| 246 | 51 | SAFETY INSPECTION | 150.00 |
| 246 | 51 | OIL AND FILTER | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized:

UCS@2004

FILE

MACC:ACKustoms 000150

Page: 1

# Ac Kustoms Corp.

08/28/2017

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1211

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000    (___) ___-____

2015  CHEVY CITY EXPRESS

Tag:                                      Mileage 31,224
ID:  3N63M0YN4FK703486

| | **Labor** | | | **Amount** |
|---|---|---|---|---|
| | SAFETY INSPECTION | | | $150.00 |
| | | | | $150.00 |

| Part No. | Parts | | Quantity | Each | Amount |
|---|---|---|---|---|---|
| | 5 QUARTS OIL | | 1.00 | | $0.00 |
| | OIL FILTER | | 1.00 | | $0.00 |
| | | | | | $0.00 |

| | | |
|---|---|---|
| **Subtotal** | | $150.00 |
| **Tax** | | $0.00 |
| **Total** | | $150.00 |

STK# H1534A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 061150 | 08/29/17 | RODRIGUEZ, EDGAR | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: RODRIGED 08/29/17 16:55  Added on: Y24  Printed at: Z43<br>RO#: 83524  VIN: 1GNKRGKDXEJ267735<br>Vehicle: 14 CHEVROLET TRAVERSE 1LT FWD 4DR CROSS RODRIGUE |

**Additional Information**

Note: AC KUSTOMS REPLACED COOLANT TEMP SENSOR AND PROGRAMMED KEY

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | PROGRAMMED KEY | 40.00 |
| 246 | 51 | CHANGED COOLANT TEMP SENSOR | 110.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 150.00 |

Authorized: _____

MACC:ACKustoms 000152

Page: 1

08/25/2017

**Ac Ku toms Corp.**
120 N 31st Ave
Melrose Park, IL 60160
/083902376
Thanks For The Business

Invoice #1204

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (__) ___-____

2014 CHEVY TARVERSE

Tag:                               Mileage
ID: 1GNKRGKDXEJ267730

| Labor | | Amount |
|---|---|---|
| PROGRAM KEY | | $40.00 |
| | | $40.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | COOLANT TEMP SENSOR AND LABOR | 1.00 | $110.00 | $110.00 |
| | | | | $110.00 |

| | |
|---|---|
| Subtotal | $150.00 |
| Tax | $0.00 |
| Total | $150.00 |

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle

DATE_____ _____      SIGNED_____

MACC:ACKustoms 000153



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 061168 | 08/31/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: KOLODZJA 08/31/17 14:28  Added on: Y02  Printed at: Z43<br>RO#:  8J582  VIN: WO4CN5EC3B1094754<br>Vehicle: 11 BUICK REGAL CXL 4DR SDN JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|------|------|-------------|----------------|
| 246 | 52 | AC KUSTOMS | .00 |
| 246 | 52 | SAFETY | 150.00 |
| 246 | 52 | LABOR (TRANSMISSION) | 750.00 |
| 246 | 52 | LABOR (REPAIR AND REFINISH REAR BUMPER | 350.00 |
| 246 | 52 | PARTS | .00 |
| 246 | 52 | TRANS--TIMING CHAIN--TRANS MOUNT- | 2,937.99 |
| 246 | 52 | CAM SOLENOID | .00 |
| 246 | 52 | SPROCKET BOLTS (CHARGED OUT ON RO) | .00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 4,187.99 |

Authorized:

MACC:ACKustoms 000154

# Ac Kustoms Corp.

08/25/2017

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1207

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2011 BUICK  REGAL FWD
2.4L DOHC DIS-SFI 4 CYL
Tag:
ID:  W04GN5EC3B1094754

Mileage 78,585

| Labor | Amount |
|---|---|
| R&R TRANS & FLIUDS | $750.00 |
| SAFETY INPECTION | $150.00 |
| REAPAIR & REFINISH REAR BUMPER | $350.00 |
| | $1,250.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | TRANSMISSION | 1.00 | $1,950.00 | $1,950.00 |
| | TIMING CHAIN | 1.00 | | $870.00 |
| | CAM SOLENOID AND LABOR | | | $116.00 |
| | TRANS MOUNT & LABOR | 1.00 | | $1.99 |
| DEALER RO | SPROCKET BOLTS | 1.00 | | $0.00 |
| DEALER RO | SPROCKET BOLTS | 1.00 | | $0.00 |
| | | | | $2,937.99 |

AUG 2017

| | |
|---|---|
| Subtotal | $4,187.99 |
| Tax | $0.00 |
| Total | $4,187.99 |

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____    SIGNED_____

MACC:ACKustoms 000155

# Mike ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 054316 | 08/03/2017 | MS | 202B | $4,985.02 |

*** Four thousand nine hundred eighty-five and 02/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈054316⑈ ⑆071000013⑆ 423864789⑈

---

SF669822 Q (01/13)

Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS  08/03/17 14:18**

G/L: **202B**                Check Number: **054316**        Check Date: **08/03/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1140 | $350.00 | 00001140 |
| 300A | 1188 | 1144 | $350.00 | 00001144 |
| 300A | 1188 | 1146 | $1,797.64 | 00001146 |
| 300A | 1188 | 1147 | $2,487.38 | 00001147 |

| NOTE: PAYMENT TO ACCOUNT | | TOTAL | **$4,985.02** |

CUSTOMER



@F00008W
26.004

MACC:ACKustoms 000156

**ANDERSON** *Mike* CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 054316 | 08/03/2017 | MS | 202B | | $4,985.02 |

*** Four thousand nine hundred eighty-five and 02/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

⑆054316⑆ ⑈071000013⑈ 423864784⑆

SF669822 Q (01/13)       Mike Anderson Chevrolet of Chicago, LLC • Chicago, IL 60641

Created: **MS  08/03/17 14:18**

G/L: **202B**          Check Number: **054316**     Check Date: **08/03/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1140 | $350.00 | 00001140 |
| 300A | 1188 | 1144 | $350.00 | 00001144 |
| 300A | 1188 | 1146 | $1,797.64 | 00001146 |
| 300A | 1188 | 1147 | $2,487.38 | 00001147 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $4,985.02 |

FILE

@F00006W
26.004

MACC:ACKustoms 000157

Case: 1:20-cv-06161 Document #: 51-5 Filed: 11/10/21 Page 542 of 618 PageID #:1071

8/1/2017

# Customer Sales Report
# Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL 60160

Page: 1

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago IL 60641**

Ph# 1: (773) 465-2000
Ph# 2: (__) ___-____
Cell:

**Date range: 07/26/2017 to 08/01/2017**

---

**2017 CHEVY TRAVERSE**
**VIN: 1GNKVFKD7HJ352826**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1140 | 07/27/2017 | REPAIR AND REFINISH REAR BUMPER | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | N/A |
| | | | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | |

**2018 CHEVY EQUINOX**
**VIN: 3GNAXHEV9JL104758**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1144 | 07/29/2017 | REPAIR & REFINISH FRONT BUMPER | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | N/A |
| | | | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | |

**2007 CHRYSLER 300C**
**VIN: 2C3LA63H07H841163**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1146 | 08/01/2017 | RIGHT FRONT CONTROL ARMS UPPER & LO | $1,257.64 | $540.00 | $0.00 | $0.00 | $1,797.64 | N/A |
| | | | $1,257.64 | $540.00 | $0.00 | $0.00 | $1,797.64 | |

**2011 CADILLAC DTS**
**VIN: 1G6KH5E64BU125125**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1147 | 08/01/2017 | RECONSTRUCT FRONT &REAR BUMPERS | $187.38 | $2,300.00 | $0.00 | $0.00 | $2,487.38 | N/A |
| | | | $187.38 | $2,300.00 | $0.00 | $0.00 | $2,487.38 | |

| | | **Grand Totals** | **$1,445.02** | **$3,540.00** | **$0.00** | **$0.00** | **$4,985.02** | |

MACC:ACKustoms 000158



PO # 63355

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 060827 | 08/02/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJC  08/02/17 12:28    Added on: W94    Printed at: 344<br>RO#: 83355                                    VIN: 1G6KH5E64BU125175<br>Vehicle: 11 CADILLAC DTS 1SD 4DR SDN JENNEY, |

| Additional Information | |
|---|---|

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS--RECONTRUCT FRONT AND REAR BUMPER | 950.00 |
| 246 | 51 | REPAIR RIGHT QUARTER AND DOOR | 700.00 |
| 246 | 51 | REFINISH ALL PARTS | 650.00 |
| 246 | 51 | PARK SENSOR | 187.38 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 2,487.38 |

Authorized:

UCS@0004

FILE

MACC:ACKustoms 000159

08/01/2017

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
## 7088902376
## Thanks For The Business

Invoice #1147

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  ( __ ) ___-____

2011 CADILLAC DTS

Tag:                              Mileage
ID: 1G6KH5E64BU125125

| Labor | Amount |
|---|---|
| RECONSTRUCT FRONT &REAR BUMPERS | $950.00 |
| REPAIR RH QUATER & DOOR | $700.00 |
| REFINISH ALL PARTS | $650.00 |
| | $2,300.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | PARK SENSOR | 1.00 | $187.38 | $187.38 |
| | | | | $187.38 |

| | |
|---|---|
| Subtotal | $2,487.38 |
| Tax | $0.00 |
| Total | $2,487.38 |

TAG # 6088

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

# ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 060828 | 08/02/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: ERICANJO 08/02/17 12:29   Added on: W94   Printed at: 244<br>RO#: 83357   VIN: 2C3LA63H97H841164<br>Vehicle: 07 CHRYSLER 300C HEMI 4DR SDN JENNEY, |

| Additional Information |
|---|
| Note:  AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS--RIGHT FRONT UPPER AND LOWER CONTR | 320.09 |
| 246 | 51 | LABOR | 540.00 |
| 246 | 51 | R/F OUTER TIEROD | 43.17 |
| 246 | 51 | BOTH FRONT LOWER BALL JOINTS | 192.00 |
| 246 | 51 | FRONT BRAKE PADS | 60.00 |
| 246 | 51 | BOTH FRONT STRUT ASSEMBLIES | 420.00 |
| 246 | 51 | STABILIZER LINKS | 87.52 |
| 246 | 51 | BOTH LOWER MOTOR MOUNTS | 134.86 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,797.64 |

Authorized:

FILE

MACC:ACKustoms 000161

**08/01/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1146

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2007 CHRYSLER 300C

Tag:
ID: 2C3LA63H07H841163

Mileage

| **Labor** | **Amount** |
|---|---|
| labor | $540.00 |
| | $540.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | right front control arms upper & lower | 2.00 | | $320.09 |
| | right front outer tierod | 1.00 | $43.17 | $43.17 |
| | front lower ball joints both sides | 2.00 | $96.00 | $192.00 |
| | brake pads front | 1.00 | $60.00 | $60.00 |
| | both front strut assmbly | 2.00 | $210.00 | $420.00 |
| | stablelizer links | 2.00 | $43.76 | $87.52 |
| | both lower motor mounts | 2.00 | $67.43 | $134.86 |
| | | | | $1,257.64 |

| | | |
|---|---|---|
| Subtotal | $1,797.64 |
| Tax | $0.00 |
| Total | $1,797.64 |

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

001188          054202          07/26/2017          MS          202B                    $5,544.79

*** Five thousand five hundred forty-four and 79/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈054202⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)          Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

| | | | | Created: **MS  07/26/17** 15:40 | |
|---|---|---|---|---|---|
| | | G/L: **202B** | Check Number: **054202** | Check Date: **07/26/17** | |
| **G/L Account** | Control | | Reference | Amount | Discount/Memo |
| 300A | 1188 | | 1134 | $490.79 | 00001134 |
| 300A | 1188 | | 1135 | $1,150.00 | 00001135 |
| 300A | 1188 | | 1136 | $500.00 | 00001136 |
| 300A | 1188 | | 1137 | $900.00 | 00001137 |
| 300A | 1188 | | 1138 | $350.00 | 00001138 |
| 300A | 1188 | | 1139A | $1,950.00 | 0001139A |
| 300A | 1188 | | 1139B | $204.00 | 0001139B |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $5,544.79 |
|---|---|---|

CUSTOMER

@F00008W
26.004

MACC:ACKustoms 000163



5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

001188          054202          07/26/2017          MS          202B          $5,544.79

*** Five thousand five hundred forty-four and 79/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈054202⑈ ⑈071000013⑈ 423864789⑈

SF669822 Q (01/13)          Mike Anderson Chevrolet of Chicago, LLC • Chicago, IL 60641

Created: **MS  07/26/17 15:40**

G/L: **202B**          Check Number: **054202**          Check Date: **07/26/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1134 | $490.79 | 00001134 |
| 300A | 1188 | 1135 | $1,150.00 | 00001135 |
| 300A | 1188 | 1136 | $500.00 | 00001136 |
| 300A | 1188 | 1137 | $900.00 | 00001137 |
| 300A | 1188 | 1138 | $350.00 | 00001138 |
| 300A | 1188 | 1139A | $1,950.00 | 0001139A |
| 300A | 1188 | 1139B | $204.00 | 0001139B |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $5,544.79 |
|---|---|---|

FILE

@F00008W
26.004

MACC:ACKustoms 000164

SOUTH CHICAGO AUTO AUCTION

7/25/2017

# Customer Sales Report
# Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL 60160

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago IL 60641**

Ph# 1:
Ph# 2:
Cell:
**Date range: 07/18/2017 to 07/25/2017**

396 E 147th ST, Harvey, IL 60426
Tel:708-225-2277 Fax 708-331-4225

**15 CHEVY SLVERADO**
**VIN: 1GCVKREC4FZ364563**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1134 | 07/21/2017 | REPAIR LH SIDE BED & REFINISH | $40.79 | $450.00 | $0.00 | $0.00 | $490.79 | N/A |
| | | | $40.79 | $450.00 | $0.00 | $0.00 | $490.79 | |

**2012 CHEVROLET EQUINOX**
**VIN: 2GNALBEK7C1180434**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1135 | 07/21/2017 | REPAIR & REFINISH LH QUARTER | $0.00 | $1,150.00 | $0.00 | $0.00 | $1,150.00 | N/A |
| | | | $0.00 | $1,150.00 | $0.00 | $0.00 | $1,150.00 | |

**2013 CHEVY MALIBU**
**VIN: 1G11C5SA8DF289817**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1136 | 07/21/2017 | RECONSTRUCT,REPAIR & REFINISH FR BUM | $0.00 | $500.00 | $0.00 | $0.00 | $500.00 | N/A |
| | | | $0.00 | $500.00 | $0.00 | $0.00 | $500.00 | |

**2016 CHEVY SONIC**
**VIN: 1G1JC5SH1G4128108**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1137 | 07/21/2017 | REPAIR & REFINISH LH SIDE DOOR | $0.00 | $900.00 | $0.00 | $0.00 | $900.00 | N/A |
| | | | $0.00 | $900.00 | $0.00 | $0.00 | $900.00 | |

**2015 CHEVY TAHOE**
**VIN: 1GNSKBKC2FR146403**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1138 | 07/24/2017 | A/C CONDENSER | $200.00 | $150.00 | $0.00 | $0.00 | $350.00 | N/A |
| | | | $200.00 | $150.00 | $0.00 | $0.00 | $350.00 | |

**2011 CHEVROLET CRUZE**
**VIN: 1G1PC5SHXB7269535**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1139 | 07/24/2017 | REPAIR REAR BUMPER | $204.00 | $1,950.00 | $0.00 | $0.00 | $2,154.00 | N/A |
| | | | $204.00 | $1,950.00 | $0.00 | $0.00 | $2,154.00 | |
| | | **Grand Totals** | $444.79 | $5,100.00 | $0.00 | $0.00 | $5,544.79 | |

MACC:ACKustoms 000165

07/24/2017

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1139

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000    (___)___-____

2011 CHEVROLET  CRUZE

Tag:                                    Mileage
ID:  1G1PC5SHXB7269535

| Labor | Amount |
|-------|--------|
| REPAIR REAR BUMPER | $200.00 |
| REPAIR RH ROCKER & DOOR | $500.00 |
| REPAIR LH QUATER | $300.00 |
| REFINISH ALL PARTS AFTER REPAIR | $600.00 |
| REFINISH FRONT BUMPER | $350.00 |
| | **$1,950.00** |

| Part No. | Parts | Quantity | Each | |
|----------|-------|----------|------|--|
| | LOWER GRILL | 1.00 | | $45.00 |
| | UPPER GRILL | 1.00 | | $33.00 |
| | RH MARKER LAMP | 1.00 | | $11.00 |
| | FOG LAMP | 1.00 | | $55.00 |
| | FRONT BUMPER | 1.00 | | $60.00 |
| | | | | **$204.00** |

JUL 2 4 2017

| | |
|---|---|
| Subtotal | $2,154.00 |
| Tax | $0.00 |
| **Total** | **$2,154.00** |

STK# H1641A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

MACC:ACKustoms 000166



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 060690 | 07/25/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 07/25/17 13:54    Added on: W04    Printed at: 243<br>PO#:    02020    VIN: 1G1PC5SH8B7269585<br>Vehicle: 11 CHEVROLET CRUZE LS 4DR SDN JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS--REPAIR REAR BUMPER | 200.00 |
| 246 | 51 | AC KUSTOMS--REPAIR RIGHT ROCKER AND DOOR | 500.00 |
| 246 | 51 | AC KUSTOMS--REPAIR LEFT QUARTER | 300.00 |
| 246 | 51 | AC KUSTOMS--REFINISH ALL PARTS AFTER REPAIR | 600.00 |
| 246 | 51 | AC KUSTOMS--REFINISH FRONT BUMPER | 350.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,950.00 |

Authorized:

MACC:ACKustoms 000167



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 060692 | 07/25/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 07/25/17 13:59    Added on: W92    Printed at: Z43<br>RO#: 82820    VIN: 1G1PC5SHXB7269535<br>Vehicle: 11 CHEVROLET CRUZE LS 4DR SDN JENNEY, |

**Additional Information**

No e: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS--LOWER GRILLE | 45.00 |
| 246 | 51 | UPPER GRILLE | 33.00 |
| 246 | 51 | RIGHT MARKER LAMP | 11.00 |
| 246 | 51 | FOG LAMP | 55.00 |
| 246 | 51 | FRONT BUMPER | 60.00 |

1139B

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 204.00 |

Authorized:

CUSTOMER

MACC:ACKustoms 000168



RO # 83085

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 060691 | 07/25/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 07/25/17 13:49   Added on: W92   Printed at: 243<br>RO#: 83085                      VIN: 1GNSKBKC2FR146403<br>Vehicle: 15 CHEVROLET TAHOE LT 4WD 4DR SUV JENNEY, |

| Additional Information |
|---|

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS--A/C PRESSURE TEST/RECHARGE | 150.00 |
| 246 | 51 | AC KUSTOMS--REPLACE A/C CONDENSER | 200.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 350.00 |

Authorized: _____

UCS02004

FILE

MACC:ACKustoms 000169

Page: 1

07/24/2017

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
## 7088902376
## Thanks For The Business

Invoice #1138

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (___) ___-____

2015 CHEVY TAHOE

Tag:                          Mileage
ID: 1GNSKBKC2FR146403

| **Labor** | | **Amount** |
|---|---|---|
| A/C PRESSURE TEST& RECHARGER | | $150.00 |
| | | $150.00 |

| **Part No.** | **Parts** | **Quantity** | **Each** | |
|---|---|---|---|---|
| | A/C CONDENSER | 1.00 | | $200.00 |
| | | | | $200.00 |

JUL __ 2017

|  |  |
|---|---|
| Subtotal | $350.00 |
| Tax | $0.00 |
| Total | $350.00 |

SEVRICE # 5930

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____



RO# 82541

5333 W. Irving Park Rd. · Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 060647 | 07/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | | | For Office Use |
|---|---|---|---|

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

G/L:
Printed: PRICANJO  07/21/17  11:10    Added on: W94    Printed at: Z43
RO#:  82541                           VIN: 2GNALBEK7C1180434
Vehicle: 12 CHEVROLET EQUINOX LS 4DR SUV JENNEY,

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 52 | AC KUSTOMS--REPAIR/REFINISH LEFT QUARTER | 450.00 |
| 246 | 52 | AC KUSTOMS--REPAIR/REFINISH HOOD | 350.00 |
| 246 | 52 | AC KUSTOMS--REPAIR/REFINISH FRONT BUMPER | 350.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,150.00 |

Authorized:

UCS#2004

CUSTOMER

MACC:ACKustoms 000171

# Ac Kustoms Corp.

Page: 1

07/21/2017

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1135

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000  (__)__-__ _

2012 CHEVROLET EQUINOX

Tag:                                         Mileage
ID:  2GNALBEK7C1180434

| Labor | Amount |
|---|---|
| REPAIR & REFINISH LH QUARTER | $450.00 |
| REPAIR & REFINISH HOOD | $350.00 |
| REPAIR & REFINISH FRONT BUMPER | $350.00 |
| | **$1,150.00** |

| | |
|---|---|
| **Subtotal** | $1,150.00 |
| **Tax** | $0.00 |
| **Total** | **$1,150.00** |

XH1957A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

2017



PO # 82534

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 060646 | 07/21/17 | JENNEY TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 07/21/17 11:10  Added on: W94  Printed at: Z43<br>RO#: 82534  VIN: 1G11C5SA9DF289817<br>Vehicle: 13 CHEVROLET MALIBU 1LT 4DR SLN JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 52 | AC KUSTOMS--REPAIR FRONT BUMPER | 500.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 500.00 |

| Authorized: |
|---|

KLS©2004

FILE

MACC:ACKustoms 000173

Page.

**07/21/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1136

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (__) ___-____

2013  CHEVY MALIBU

Tag:                              Mileage
ID:  1G11C5SA8DF289817

| **Labor** | **Amount** |
|---|---|
| RECONSTRUCT,REPAIR & REFINISH FR BUM | $500.00 |
|  | $500.00 |

|  |  |
|---|---|
| Subtotal | $500.00 |
| Tax | $0.00 |
| Total | $500.00 |

H2223A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

2017

MACC:ACKustoms 000174



### ANDERSON
#### CHEVROLET
##### OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 060648 | 07/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 07/21/17 11:11   Added on: W94   Printed at: Z43<br>RO#: 82839                        VIN: 1G1JC5SH1G4128139<br>Vehicle: 16 CHEVROLET SONIC LT 4DR SDN JENNEY, |

| Additional Information |
|---|
| Note:  AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS-REPAIR/REFINISH LEFT SIDE DOOR | 450.00 |
| 246 | 51 | AC KUSTOMS-REPAIR/REFINISH LEFT SIDE ROCKER | 450.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 900.00 |

Authorized:

UCS02004

CUSTOMER

MACC:ACKustoms 000175

Page: 1

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
### 7088902376
## Thanks For The Business

07/21/2017

Invoice #1137

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

*2016 CHEVY SONIC*

Tag:                                    Mileage
ID:  1G1JC5SH1G4128108

| Labor | Amount |
|---|---|
| REPAIR & REFINISH LH SIDE DOOR | $450.00 |
| REPAIR & REFINISH LH SIDE ROCKER | $450.00 |
| | $900.00 |

| | |
|---|---|
| Subtotal | $900.00 |
| Tax | $0.00 |
| Total | $900.00 |

H2176A

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

MACC:ACKustoms 000176



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 060643 | 07/21/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI 07/21/17 10:29    Added on: W92    Printed at: Z43<br>RO#:    82191    VIN: 1GCVKREC4FZ364563<br>Vehicle: 15 CHEVROLET SILVERADO K1500 LT DOUBLE CAB JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 36 | AC KUSTOMS--REPAIR DRIVER SIDE 1/4 PANEL | 450.00 |
| 246 | 36 | AC KUSTOMS--REPLACE 4X4 DECAL | 40.79 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 490.79 |

Authorized:

UCSO07004

**FILE**

MACC:ACKustoms 000177

Page: 1

**Ac Kustoms Corp.**
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

07/21/2017

Invoice #1134

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

15 CHEVY SLVERADO

Tag:                          Mileage
ID:  1GCVKREC4FZ364563

| Labor | | Amount |
|---|---|---|
| REPAIR LH SIDE BED & REFINISH | | $450.00 |
| | | $450.00 |

| Part No. | Parts | Quantity | Each | |
|---|---|---|---|---|
| 23269921 | DECAL 4x4 | 1.00 | | $40.79 |
| | | | | $40.79 |

| | | |
|---|---|---|
| Subtotal | | $490.79 |
| Tax | | $0.00 |
| Total | | $490.79 |

| SERVICE TAG 5782 |
|---|

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

JUL 2  2017

MACC:ACKustoms 000178

**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 054108 | 07/18/2017 | MS | 202B | $5,600.00 |

*** Five thousand six hundred and 00/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

⑈054108⑈ ⑆071000013⑆ 423864789⑈

---

SF669822 Q (01/13)          Mike Anderson Chevrolet of Chicago, LLC • Chicago, IL 60641

Created: **MS** **07/18/17 14:21**

G/L: **202B**          Check Number: **054108**          Check Date: **07/18/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1126 | $2,800.00 | 00001126 |
| 300A | 1188 | 1127 | $2,800.00 | 00001127 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $5,600.00 |

CUSTOMER

@F00008W
26.004

MACC:ACKustoms 000179

**ANDERSON CHEVROLET** OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 054108 | 07/18/2017 | MS | 202B | $5,600.00 |

*** Five thousand six hundred and 00/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈054108⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)

Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS  07/18/17 14:21**

G/L: **202B**          Check Number: **054108**          Check Date: **07/18/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1126 | $2,800.00 | 00001126 |
| 300A | 1188 | 1127 | $2,800.00 | 00001127 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $5,600.00 |

FILE

@F00008W
26.004

MACC:ACKustoms 000180

7/15/2017

# Customer Sales Report

Page:     1

## Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL  60160**

| | |
|---|---|
| **Mike Anderson Chevy**<br>**5333 W Irvingpark Rd**<br>**Chicago  IL  60641** | **Ph# 1:  (773) 465-2000**<br>**Ph# 2:  (___) ___-____**<br>**Cell:** |
| | **Date range: 07/09/2017 to 07/15/2017** |

**2017  TAHOE TAHOE**
**VIN: HR126049**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1126 | 07/14/2017 | 22IN REPLECA GM WHEELS W/ TOYO TIRES | $2,800.00 | $0.00 | $0.00 | $0.00 | $2,800.00 | N/A |
| | | | $2,800.00 | $0.00 | $0.00 | $0.00 | $2,800.00 | |

**2017  GMC YUKON**
**VIN: HR145519**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1127 | 07/14/2017 | 22IN FACTORY WHEELS W/TIRES | $2,800.00 | $0.00 | $0.00 | $0.00 | $2,800.00 | N/A |
| | | | $2,800.00 | $0.00 | $0.00 | $0.00 | $2,800.00 | |
| | | **Grand Totals** | $5,600.00 | $0.00 | $0.00 | $0.00 | $5,600.00 | |



07/14/2017

## Ac Kustoms Corp.
1120 N 31st Ave
Melrose Park, IL  60160
7088902376
### Thanks For The Business

Invoice  #1126

**Mike Anderson Chevy**
*5333 W Irvingpark Rd*
Chicago  IL  60641
(773) 465-2000   (___) ___-____

2017  *TAHOE TAHOE*

Tag:                              Mileage
ID:  HR126049

| Part No. | Parts | Quantity | Each | |
|----------|-------|----------|------|---|
| | 22IN REPLECA GM WHHELS W/ TOYO TIRES | 4.00 | | $2,800.00 |
| | | | | $2,800.00 |

|  | |
|--|--|
| **Subtotal** | $2,800.00 |
| **Tax** | $0.00 |
| **Total** | $2,800.00 |

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

MACC:ACKustoms 000182

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL 60160
### 7088902376
### Thanks For The Business

Invoice #1127

I/2017

nderson Chevy
Irvingpark Rd
IL 60641
5-2000 (___) ___-____

2017 GMC YUKON

Tag:
ID: HR145519

Mileage

| Parts | Quantity | Each |
|---|---|---|
| 22IN FACTORY WHEELS W/TIRES | 1.00 | $2,800.00 |
| | | $2,800.00 |

| | |
|---|---|
| Subtotal | $2,800.00 |
| Tax | $0.00 |
| Total | $2,800.00 |

express mechanics lien is acknowledged on the above vehicle to secure the
unt of repairs thereto, until such time as cash payment has been made in
l. It is understood that you will not be held responsible for loss or damage
cars or articles left in cars in case of fire, theft or any other cause
ond your control. Upon signing this repair order it is accepted as a complete
l comprehensive description of the repair work done on this vehicle.

E_____          SIGNED_____

MACC:ACKustoms 000183



5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 054027 | 07/10/2017 | MS | 202B | | $4,912.00 |

*** Four thousand nine hundred twelve and 00/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

⑆054027⑆ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)                    Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS  07/10/17 13:06**

G/L: **202B**        Check Number: **054027**        Check Date: **07/10/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1111 | $1,050.00 | 00001111 |
| 300A | 1188 | 1115 | $700.00 | 00001115 |
| 300A | 1188 | 1116 | $1,162.00 | 00001116 |
| 300A | 1188 | 1125 | $2,000.00 | 00001125 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | **$4,912.00** |

CUSTOMER

@F00008W
26.004

MACC:ACKustoms 000184

**ANDERSON CHEVROLET OF CHICAGO, LLC.**

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

| 001188 | 054027 | 07/10/2017 | MS | 202B | VOID AFTER 120 DAYS | $4,912.00 |

*** Four thousand nine hundred twelve and 00/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

⑈054027⑈ ⑆071000013⑆ 423864789⑈

SE669822 Q (01/13)                Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS 07/10/17 13:06**

G/L: **202B**          Check Number: **054027**          Check Date: **07/10/17**

| G/L Account | | Control | | Reference | | Amount | Discount/Memo |
|---|---|---|---|---|---|---|---|
| 300A | 1188 | | | 1111 | | $1,050.00 | 00001111 |
| 300A | 1188 | | | 1115 | | $700.00 | 00001115 |
| 300A | 1188 | | | 1116 | | $1,162.00 | 00001116 |
| 300A | 1188 | | | 1125 | | $2,000.00 | 00001125 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | **$4,912.00** |

FILE

@F00008W
26.004

MACC:ACKustoms 000185

7/7/2017

# Customer Sales Report

Page: 1

## Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL 60160**

Mike Anderson Chevy
5333 W Irvingpark Rd
Chicago IL 60641

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

**Date range: 06/09/2017 to 07/07/2017**

---

**2011 DODGE CARAVAN -GRAND CARAVAN**
**VIN: 2D4RN3DG3BR636215**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1111 | 06/12/2017 | REPAIR & REFINISH REAR BUMPER | $0.00 | $1,050.00 | $0.00 | $0.00 | $1,050.00 | N/A |
|  |  |  | $0.00 | $1,050.00 | $0.00 | $0.00 | $1,050.00 |  |

**13 CHEVY CRUZE**
**VIN: 1G1PA5SHXD7117974**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1115 | 06/17/2017 | REFINISH LH FENDER | $0.00 | $700.00 | $0.00 | $0.00 | $700.00 | N/A |
|  |  |  | $0.00 | $700.00 | $0.00 | $0.00 | $700.00 |  |

**2015 CHEVY TAHOE**
**VIN: 1GNSKBKC2FR1464403**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1116 | 06/19/2017 | REFINISH REAR BUMPER | $727.00 | $435.00 | $0.00 | $0.00 | $1,162.00 | N/A |
|  |  |  | $727.00 | $435.00 | $0.00 | $0.00 | $1,162.00 |  |

**2008 GMC - LIGHT TRUCK   ACADIA AWD**
**VIN: 1GKEV33718J116058**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---------|------|-------------|-------|-------|-------|-----|-------|----------|
| 1125 | 07/07/2017 | REPAIR & REFINISH BOTH BUMPERS | $0.00 | $2,000.00 | $0.00 | $0.00 | $2,000.00 | N/A |
|  |  |  | $0.00 | $2,000.00 | $0.00 | $0.00 | $2,000.00 |  |

| | | Grand Totals | $727.00 | $4,185.00 | $0.00 | $0.00 | $4,912.00 | |

MACC:ACKustoms 000186

Page: 1

**07/07/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1125

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (___) ___-____

2008 GMC - LIGHT TRUCK  ACADIA AWD

Tag:                           Mileage
ID:  1GKEV33718J116058

| Labor | Amount |
|---|---|
| REPAIR & REFINISH BOTH BUMPERS | $700.00 |
| REPAIR & FINISH BOTH FENDERS | $700.00 |
| REPAIR REAR QUATER | $200.00 |
| REPAIR REAR SIDE DOOR | $200.00 |
| PERSSURE TEST AC, FIX O RINGS,RECHARGE | $200.00 |
| | $2,000.00 |

| | |
|---|---|
| Subtotal | $2,000.00 |
| Tax | $0.00 |
| Total | $2,000.00 |

STK# H1323B

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____



**5333 W. Irving Park Rd. • Chicago, IL 60641**
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 060429 | 07/10/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP | G/L: |
| 1100 N 31ST AVE | Printed: FRICANJO 07/10/17 12:29    Added on: W94    Printed at: 243 |
| MELROSE PARK, IL  60160 | RO#:  82246    VIN: 1GKEV33718J116056 |
| | Vehicle: 08 GMC ACADIA SLT AWD 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOM

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS--REPAIR AND REFINISH BOTH BUMEPRS | 700.00 |
| 246 | 51 | REPAIR AND REFINISH BOTH FENDERS | 700.00 |
| 246 | 51 | REPAIR REAR QUARTER | 200.00 |
| 246 | 51 | REPAIR REAR SIDE DOOR | 200.00 |
| 246 | 51 | PRESSURE TEST AC--FIX O-RING--RECHARGE | 200.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 2,000.00 |

Authorized:

FILE

MACC:ACKustoms 000188

**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 053752 | 06/12/2017 | MS | 202B | $4,770.00 |

*** Four thousand seven hundred seventy and 00/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

⑈"053752"⑈ ⑈:071000013⑈: 423864789⑈"

SF669822 Q (01/13)                Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

| | | | Created: **MS** 06/12/17 11:30 |
| | G/L: **202B** | Check Number: **053752** | Check Date: **06/12/17** |

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1099 | $350.00 | 00001099 |
| 300A | 1188 | 1100 | $450.00 | 00001100 |
| 300A | 1188 | 1101 | $500.00 | 00001101 |
| 300A | 1188 | 1103 | $700.00 | 00001103 |
| 300A | 1188 | 1104 | $270.00 | 00001104 |
| 300A | 1188 | 1105 | $2,500.00 | 00001105 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | **$4,770.00** |

CUSTOMER

@F00008W
26.004

MACC:ACKustoms 000189

**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 053752 | 06/12/2017 | MS | 202B | $4,770.00 |

*** Four thousand seven hundred seventy and 00/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

⑈053752⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)     Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS** 06/12/17 11:30

G/L: **202B**   Check Number: **053752**   Check Date: **06/12/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1099 | $350.00 | 00001099 |
| 300A | 1188 | 1100 | $450.00 | 00001100 |
| 300A | 1188 | 1101 | $500.00 | 00001101 |
| 300A | 1188 | 1103 | $700.00 | 00001103 |
| 300A | 1188 | 1104 | $270.00 | 00001104 |
| 300A | 1188 | 1105 | $2,500.00 | 00001105 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | $4,770.00 |

FILE

@F00008W
26.004

MACC:ACKustoms 000190

6/ 8/2017

# Customer Sales Report
# Ac Kustoms Corp.

Page: 1

### 1120 N 31st Ave
### Melrose Park, IL 60160

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago IL 60641**

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

### Date range: 06/02/2017 to 06/08/2017

**CHEVY TERVERSE**
VIN: 1GNKVHKD5HJ112086

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1099 | 06/02/2017 | REPAIR AND REFINISH REAR BUMPER | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | N/A |
| | | | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | |

**2017 CHEVY CORVETTE**
VIN: 1G1YK3D76H5107485

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1100 | 06/02/2017 | REPAIR & REFINISH FRONT BUMPER | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | N/A |
| | | | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | |

**2008 CHEVROLET CORVETTE**
VIN: 1GNFK13588R241658

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1101 | 06/02/2017 | REPAIR & REFINISH LOWER ROCKER SIDE | $0.00 | $500.00 | $0.00 | $0.00 | $500.00 | N/A |
| | | | $0.00 | $500.00 | $0.00 | $0.00 | $500.00 | |

**2011 CHEVROLET EQUINOX**
VIN: 2GNALBECXB1187451

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1103 | 06/06/2017 | REPAIR & REFINISH FRONT BUMPER | $0.00 | $700.00 | $0.00 | $0.00 | $700.00 | N/A |
| | | | $0.00 | $700.00 | $0.00 | $0.00 | $700.00 | |

**2006 CHEVROLET TRAILBLAZER 4x4**
VIN: 1GNET13H162202211

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1104 | 06/08/2017 | DIAGNOSE RADIO & REPAIR | $0.00 | $270.00 | $0.00 | $0.00 | $270.00 | N/A |
| | | | $0.00 | $270.00 | $0.00 | $0.00 | $270.00 | |

**2016 GMC YUKON**
VIN: 1GKS2BKCXGR451064

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1105 | 06/08/2017 | 22IN DUB WHEELS AND GOODYEAR TIRES | $2,500.00 | $0.00 | $0.00 | $0.00 | $2,500.00 | N/A |
| | | | $2,500.00 | $0.00 | $0.00 | $0.00 | $2,500.00 | |
| | | **Grand Totals** | $2,500.00 | $2,270.00 | $0.00 | $0.00 | $4,770.00 | |

MACC:ACKustoms 000191



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059957 | 06/09/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1105 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 06/09/17 14:44  Added on: X94  Printed at: Z43<br>RO#: 80621  VIN: 1GKS2BKC8GR451064<br>Vehicle: 16 GMC YUKON X1500 SLT 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOM

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOM--22" DUB WHEELS/GOODTEAR TIRES | 2,500.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 2,500.00 |

Authorized:

MACC:ACKustoms 000192

Page: 1

# Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

06/08/2017

Invoice #1105

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2016 GMC YUKON

Tag:                          Mileage
ID: 1GKS2BKCXGR451064

| Part No. | Parts | Quantity | Each |
|---|---|---|---|
| | 22IN DUB WHEELS AND GOODYEAR TIRES | 4.00 | $2,500.00 |
| | | | $2,500.00 |

| | |
|---|---|
| Subtotal | $2,500.00 |
| Tax | $0.00 |
| Total | $2,500.00 |

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

JUN 9 2017

MACC:ACKustoms 000193



**ANDERSON CHEVROLET OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059844 | 06/02/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1122 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  06/02/17  10:31    Added on: W92    Printed at: K4J<br>RO#:   90293                                VIN: 1GNKVHKD9HJ112086<br>Vehicle: 17 CHEVROLET TRAVERSE 2LT AWD 4DR CROSS PATRICIO |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | Description | Extended Price |
|---|---|---|
| 246    53 | AC KUSTOMS--REPAIR/REFINISH REAR BUMPER | 350.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 350.00 |

Authorized: _____

MACC:ACKustoms 000194

# Ac Kustoms Corp.

**06/02/2017**

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1099

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (   )___-____

CHEVY TERVERSE
Tag:                                        Mileage
ID:  1GNKVHKD5HJ112086

| Labor | Amount |
|---|---|
| repair and refinish rear bumper | $350.00 |
| | $350.00 |

| | |
|---|---|
| Subtotal | $350.00 |
| Tax | $0.00 |
| Total | $350.00 |

| SERVICE TICKET 8740 |
|---|

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 059845 | 06/02/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYT! 06/02/17 10:40   Added on: W92   Printed at: 743<br>RO#: 65465   VIN: 1G1YK3D76H5107465<br>Vehicle: 17 CHEVROLET CORVETTE 2LT 2DR CNV JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | Description | Extended Price |
|---|---|---|
| 246    24 | AC KUSTOMS--REPAIR/REFINISH FRONT BUMPER | 450.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 450.00 |

Authorized: _____

FILE

Page: 1

**06/02/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1100

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000    (___) ___-____

2017  CHEVY CORVETTE

Tag:
ID:  1G1YK3D76H5107485

Mileage

| Labor | Amount |
|---|---|
| REPAIR & REFINISH FRONT BUMPER | $450.00 |
| | $450.00 |

| | |
|---|---|
| Subtotal | $450.00 |
| Tax | $0.00 |
| Total | $450.00 |

STK# H1272

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____



**5333 W. Irving Park Rd. • Chicago, IL 60641**
**Telephone: (773) 465-2000**
**www.mikeandersonchevy.com**

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059855 | 06/02/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 51ST AVE<br>MELROSE PARK, IL 00160 | G/L:<br>Printed: FRICANJC 06/02/17 16:30   Added on: N94   Printed at: 243<br>R.#: 06480    VIN: 1GNFK13508R241650<br>Vehicle: 08 CHEVROLET TAHOE 4WD 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOM

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS--REPAIR/REFINISH LOWER ROCKER SIDE | 250.00 |
| 246 | 51 | AC KUSTOMS--REPAIR/REFINISH LEFT FRONT ROCKER | 250.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 500.00 |

Authorized: _____

UCPG0004           **FILE**

MACC:ACKustoms 000198

Page: i

**06/02/2017**

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1101

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000    (__)  ___-____

2008 CHEVROLET ~~CORVETTE~~ *TAHOE*

Tag:                                Mileage
ID:  1GNFK13588R241658

| **Labor** | **Amount** |
|---|---|
| repair & refinish lower rocker side | $250.00 |
| repair & refinish rocker LH front | $250.00 |
|  | $500.00 |

|  |  |
|---|---|
| Subtotal | $500.00 |
| Tax | $0.00 |
| Total | $500.00 |

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

JUN  9 2017

MACC:ACKustoms 000199



R #80079

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059942 | 06/08/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1170 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: KOLODZJA  06/08/17 14:03    Added on: Y02    Printed at: X43<br>PO#: 05c89                      VIN: 2CNALBECX81137451<br>Vehicle: 11 CHEVROLET EQUINOX LS 4DR SUV JENNEY, |

**Additional Information**

Note: AC KUSTOM

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 26 | AC KUSTOM--REPAIR/REFINISH FRONT BUMPER | 350.00 |
| 246 | 26 | AC KUSTOM--REPAIR/REFINISH LEFT FENDER | 350.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 700.00 |

Authorized: _____

CUSTOMER

Page: 1

06/06/2017

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

Invoice #1103

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000 (___) ___-____

2011 CHEVROLET EQUINOX

Tag:
ID: 2GNALBECXB1187451

Mileage

| Labor | Amount |
|---|---|
| REPAIR & REFINISH FRONT BUMPER | $350.00 |
| REPAIR & REFINISH LH FENDER | $350.00 |
| | $700.00 |

| | |
|---|---|
| Subtotal | $700.00 |
| Tax | $0.00 |
| Total | $700.00 |

STK# XH1489A

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

JUN 09 2017

MACC:ACKustoms 000201

Page: 1

# Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

06/08/2017

Invoice #1104

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

2006 CHEVROLET TRAILBLAZER 4x4

Tag:                          Mileage
ID:  1GNET13H162202211

| Labor | Amount |
|---|---|
| DIAGNOSE RADIO & REPAIR | $270.00 |
| | $270.00 |

| | |
|---|---|
| Subtotal | $270.00 |
| Tax | $0.00 |
| Total | $270.00 |

STK# H1902A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

JUN 1 9 2017

MACC:ACKustoms 000202



**CHEVROLET**
OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059941 | 06/08/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP | D/R: |
| 1120 N 31ST AVE | Printed: JENNEYT 06/08/17 13:52 Added on: W92 Printed at: 343 |
| MELROSE PARK, IL 60160 | RO#: 60748 VIN: 1GNET13M262292211 |
| | Vehicle: 06 CHEVROLET TRAILBLAZER 4WD 4DR SUV JENNEY, |

| Additional Information |
|---|
| Note: AC KUSTOMS |

| For Office Use | Description | Extended Price |
|---|---|---|
| 246   51 | AC KUSTOMS--DIAG AND REPAIRED RADIO | 270.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 270.00 |

Authorized:

UC9XP004

CUSTOMER

MACC:ACKustoms 000203



JP Morgan Chase Bank, N.A.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

VOID AFTER 120 DAYS

| 001188 | 053622 | 06/01/2017 | MS | 202B | | $3,781.49 |

*** Three thousand seven hundred eighty-one and 49/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL 60160

⑆053622⑆ ⑈071000013⑈ 423864789⑈

SF669822 Q (01/13)  Mike Anderson Chevrolet of Chicago, LLC • Chicago, IL 60641

Created: **MS** 06/01/17 15:23

G/L: **202B**  Check Number: **053622**  Check Date: **06/01/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1090 | $350.00 | 00001090 |
| 300A | 1188 | 1091 | $700.00 | 00001091 |
| 300A | 1188 | 1093 | $1,581.49 | 00001093 |
| 300A | 1188 | 1094 | $350.00 | 00001094 |
| 300A | 1188 | 1095 | $350.00 | 00001095 |
| 300A | 1188 | 1098 | $450.00 | 00001098 |

NOTE: PAYMENT TO ACCOUNT

| TOTAL | **$3,781.49** |

CUSTOMER

@F00008W
26.004

MACC:ACKustoms 000204



5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 053622 | 06/01/2017 | MS | 202B | | $3,781.49 |

*** Three thousand seven hundred eighty-one and 49/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈"053622"⑈ ⑆071000013⑆ 423864789"⑈

SF669822 Q (01/13)                Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL, 60641

**Created: MS 06/01/17 15:23**

**G/L: 202B**          Check Number: **053622**          Check Date: **06/01/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1090 | $350.00 | 00001090 |
| 300A | 1188 | 1091 | $700.00 | 00001091 |
| 300A | 1188 | 1093 | $1,581.49 | 00001093 |
| 300A | 1188 | 1094 | $350.00 | 00001094 |
| 300A | 1188 | 1095 | $350.00 | 00001095 |
| 300A | 1188 | 1098 | $450.00 | 00001098 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | **$3,781.49** |

FILE

©F00008W
26.004

MACC:ACKustoms 000205

5/30/2017

# Customer Sales Report
## Ac Kustoms Corp.

Page: 1

### 1120 N 31st Ave
### Melrose Park, IL  60160

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago  IL  60641**

Ph# 1: (773) 465-2000
Ph# 2: (___) ___-____
Cell:

### Date range: 05/18/2017 to 05/30/2017

**15  CHEVY SUBURBAN**
VIN: 1GNSKJKC3FR686322

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1090 | 05/18/2017 | REPAIR & REFINISH FRONT BUMPER | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | N/A |
| | | | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | |

**14  CHEVY EQUINOX**
VIN: 2GNALBEK0E6204157

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1091 | 05/18/2017 | REPAIR RT REAR DOOR & QUARTER | $0.00 | $700.00 | $0.00 | $0.00 | $700.00 | N/A |
| | | | $0.00 | $700.00 | $0.00 | $0.00 | $700.00 | |

**2015  MUSTANG FORD**
VIN: 1FA6P8CF0F5304998

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1093 | 05/22/2017 | MIRROR ASSY | $1,131.49 | $450.00 | $0.00 | $0.00 | $1,581.49 | N/A |
| | | | $1,131.49 | $450.00 | $0.00 | $0.00 | $1,581.49 | |

**2017  CHEVY CRUZE**
VIN: 1G1BE5SM0H7158387

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1094 | 05/24/2017 | REPAIR AND REFINISH LH FRONT DOOR | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | N/A |
| | | | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | |

**2017  CHEVY CRUZE**
VIN: 1G1BE5SMXH7165881

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1095 | 05/24/2017 | REPAIR & REFINISH FRONT BUMPER | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | N/A |
| | | | $0.00 | $350.00 | $0.00 | $0.00 | $350.00 | |

**2015  CHEVY SONIC**
VIN: 1G1JC5SH9F4101737

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1098 | 05/30/2017 | R&R REAR BUMPER | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | N/A |
| | | | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | |

**Grand Totals** | $1,131.49 | $2,650.00 | $0.00 | $0.00 | $3,781.49

MACC:ACKustoms 000206



**ANDERSON CHEVROLET OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 059625 | 05/19/17 | FRICANO, JOSEPH | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1123 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO  05/19/17  07:57    Added on: X94    Printed at: 243<br>RO#:  72794                    VIN: 1GNSKJKC3FR686322<br>Vehicle: 15 CHEVROLET SUBURBAN K1500 LT 4DR SUV FRICANO, |

| Additional Information |
|---|
| Note: REPAIR FRONT BUMPER PER JASON |

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | REPAIR FRONT BUMPER PER JASON | 350.00 |
| | | | |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 350.00 |

Authorized:

MACC:ACKustoms 000207

Page: 1

# Ac Kustoms Corp.

05/18/2017

**1120 N 31st Ave**

**Melrose Park, IL 60160**

Invoice #1091

**7088902376**

**Thanks For The Business**

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000  (___) ___-____

14  CHEVY EQUINOX

Tag:          Mileage
ID: 2GNALBEK0E6204157

| Labor | Amount |
|---|---|
| REPAIR RT REAR DOOR & QUARTER | $350.00 |
| REFINISH RT DOOR & QUARTER | $350.00 |
|  | $700.00 |

|  |  |
|---|---|
| Subtotal | $700.00 |
| Tax | $0.00 |
| Total | $700.00 |

PER MANNY

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____      SIGNED_____



05/18/2017

# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1090

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000   (___) ___-____

15 CHEVY SUBURBAN

Tag:                                    Mileage
ID:  1GNSKJKC3FR686322

| | Amount |
|---|---|
| **Labor** | |
| repair & refinish front bumper | $350.00 |
| | **$350.00** |

| | |
|---|---|
| Subtotal | $350.00 |
| Tax | $0.00 |
| Total | **$350.00** |

STK# H1992A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

*Need Stock #*
*H1992A*

*S1488*



*Mike*
# ANDERSON
### CHEVROLET
#### OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059630 | 05/19/17 | FRICANO, JOSEPH | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| **AC KUSTOMS CORP**<br>1121 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 05/19/17 11:20 Added on: X94 Printed at: 243<br>RO#: 79006 VIN: 2GNALCEK8H1590341<br>Vehicle: 17 CHEVROLET EQUINOX FWL LT 4DR SUV FRICANO, |

| Additional Information |
|---|

Note: repairs approved by manny- we owe

| For Office Use | Description | Extended Price |
|---|---|---|
| 246  34 | REPAIR RT REAR DOOR AND QUARTER | 700.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 700.00 |

MACC:ACKustoms 000210

Page: 1

05/22/2017



# Ac Kustoms Corp.
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**



Invoice  #1093

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000    (___) ___-____

2015  MUSTANG FORD

Tag:                                       Mileage
ID:  1FA6P8CF0F5304998

| Labor | Amount |
|---|---|
| REFINISH BUMPER | $350.00 |
| REFINISH MIRROR LENS | $100.00 |
| | $450.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| FR3Z17682L | MIRROR ASSY | 1.00 | $466.80 | $466.80 |
| FR3Z17D957BA | BUMPER ASSY | 1.00 | $519.57 | $519.57 |
| FR3Z17D957AAPTM | LOWER BUMPER ASSY | 1.00 | $145.12 | $145.12 |
| | | | | $1,131.49 |

| | |
|---|---|
| Subtotal | $1,581.49 |
| Tax | $0.00 |
| Total | $1,581.49 |

STK# H1253A

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____




# ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059733 | 05/25/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANJO 05/25/17 15:01 Added on: W54 Printed at: Z43<br>RO#: 60109 VIN: 1FAGP8CF0F5304990<br>Vehicle: 15 FORD MUSTANG GT 2DR CPE JENNEY, |

**Additional Information**

Note: AC KUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC KUSTOMS--REPLACE AND REFINISH BUMPER | 1,581.49 |
| 246 | 51 | AND MIRROR | .00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,581.49 |

Authorized:

MACC:ACKustoms 000212

Page 1

05/30/2017

# Ac Kustoms Corp.
## 1120 N 31st Ave
## Melrose Park, IL  60160
## 7088902376
## Thanks For The Business

Invoice  #1098

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000   (__) ___-____

2015  CHEVY SONIC

Tag:                                    Mileage
ID:  1G1JC5SH9F4101737

| Labor | Amount |
|---|---|
| R&R REAR BUMPER | $0.00 |
| REPAIR &REFINISH BUMPER | $450.00 |
| | $450.00 |

| | |
|---|---|
| Subtotal | $450.00 |
| Tax | $0.00 |
| Total | $450.00 |

STK# H1852A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____     SIGNED_____

MAY 2 3 2017

MACC:ACKustoms 000213



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 059795 | 05/30/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC KUSTOMS CORP<br>1120 N 31ST AVE<br>MELROSE PARK, IL  60160 | G/L:<br>Printed: JENNEYTI  05/30/17 16:40   Added on: W92   Printed at: 243<br>RO#:     80296                       VIN: 1G1JC5SH9F4101737<br>Vehicle: 15 CHEVROLET SONIC LT 4DR SDN JENNEY, |

**Additional Information**

Note:  AC KUSTOMS

| For Office Use | | Description | Extended Price |
|----------------|--|-------------|----------------|
| 246 | 24 | AC KUSTOMS--REPAIR AND REFINISH REAR BUMPER | 450.00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 450.00 |

Authorized:

FILE

MACC:ACKustoms 000214



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059832 | 05/31/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1120 N 41ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYTI  06/01/17 14:05    Added on: W92    Printed at: Z43<br>PO#:    85415              VIN: 1G1BE5SM0H7150367<br>Vehicle: 17 CHEVROLET CRUZE LT 4DR SDN JENNEY, |

**Additional Information**

Note:  AC CUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 24 | AC CUSTOMS--REPAIR/REFINISH LEFT FRONT DOOR | 350.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 350.00 |

Authorized:

**FILE**

MACC:ACKustoms 000215

**Ac Kustoms Corp.**
**1120 N 31st Ave**
**Melrose Park, IL 60160**
**7088902376**
**Thanks For The Business**

05/24/2017

Invoice #1094

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (___) ___-____

2017  CHEVY CRUZE

Tag:
ID:  1G1BE5SM0H7158387

Mileage

| Labor | Amount |
|---|---|
| REPAIR AND REFINISH LH FRONT DOOR | $350.00 |
| | $350.00 |

| | |
|---|---|
| Subtotal | $350.00 |
| Tax | $0.00 |
| Total | $350.00 |

STK# H1444

```
An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____
```



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059833 | 05/31/17 | JENNEY, TIMOTHY | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1103 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: JENNEYT1 05/31/17 14:05 Added on: W32 Printed at: 243<br>RO#: 80416 VIN: 1G1BE5SMXH7163081<br>Vehicle: 17 CHEVROLET CRUZE LT 4DR SDN JENNEY, |

| Additional Information |
|---|
| Note: AC CUSTOMS |

| For Office Use | Description | Extended Price |
|---|---|---|
| 246    24 | AC CUSTOMS--REPAIR/REFINISH FRONT BUMPERQ | 350.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 350.00 |

Authorized:

**CUSTOMER**

MACC:ACKustoms 000217

05/24/2017

# Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1095

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000   (__)  ___-____

2017  CHEVY CRUZE

Tag:                          Mileage
ID:  1G1BE5SMXH7165881

| **Labor** | **Amount** |
|---|---|
| REPAIR & REFINISH FRONT BUMPER | $350.00 |
| | $350.00 |

| | |
|---|---|
| Subtotal | $350.00 |
| Tax | $0.00 |
| Total | $350.00 |

STK# H1494

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

**ANDERSON CHEVROLET** OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 053619 | 06/01/2017 | MS | 202B | | $3,081.49 |

*** Three thousand eighty-one and 49/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈053619⑈ ⑆071000013⑆ 423864789⑈

---

SF669822 Q (01/13)                Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

Created: **MS**  06/01/17 13:53

G/L: **202B**          Check Number: **053619**          Check Date: **06/01/17**

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1090 | $350.00 | 00001090 |
| 300A | 1188 | 1091 | $700.00 | 00001091 |
| 300A | 1188 | 1093 | $1,581.49 | 00001093 |
| 300A | 1188 | 1098 | $450.00 | 00001098 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | **$3,081.49** |

CUSTOMER

@F00008W
26.004



MACC:ACKustoms 000219

**Mike**
**ANDERSON**
**CHEVROLET**
OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

**VOID AFTER 120 DAYS**

| 001188 | 053328 | 05/06/2017 | MS | 202B | $12,600.00 |

*** Twelve thousand six hundred and 00/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈"053328"  ⑆071000013⑆  423864789"⑈

SF669822 Q (01/13)                    Mike Anderson Chevrolet of Chicago, LLC  •  Chicago, IL 60641

| | | | Created: **MS** 05/06/17 10:31 |
|---|---|---|---|
| | G/L: **202B** | Check Number: **053328** | Check Date: **05/06/17** |

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1077 | $850.00 | 00001077 |
| 300A | 1442<br>AC.CUSTOMS INC | 1078 | $2,500.00 | 00001078 |
| 300A | 1442<br>AC CUSTOMS INC | 1080 | $450.00 | 00001080 |
| 300A | 1442<br>AC CUSTOMS INC | 1081 | $6,000.00 | 00001081 |
| 300A | 1442<br>AC CUSTOMS INC | 1082 | $1,500.00 | 00001082 |
| 300A | 1442<br>AC CUSTOMS INC | 1083 | $1,300.00 | 00001083 |

| NOTE: PAYMENT TO ACCOUNT | | TOTAL | **$12,600.00** |
|---|---|---|---|

CUSTOMER

@F00008W
26.004

MACC:ACKustoms 000220



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd.
Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

JP Morgan Chase Bank, N.A.

VOID AFTER 120 DAYS

| 001188 | 053328 | 05/06/2017 | MS | 202B | | $12,600.00 |

*** Twelve thousand six hundred and 00/100 dollars

AC KUSTOMS CORP
1120 N 31ST AVE
MELROSE PARK, IL  60160

⑈053328⑈ ⑆071000013⑆ 423864789⑈

SF669822 Q (01/13)          Mike Anderson Chevrolet of Chicago, LLC   •   Chicago, IL 60641

| | | Created: **MS**  05/06/17 10:31 |
|---|---|---|
| | G/L: **202B** | Check Number: **053328**   Check Date: **05/06/17** |

| G/L Account | Control | Reference | Amount | Discount/Memo |
|---|---|---|---|---|
| 300A | 1188 | 1077 | $850.00 | 00001077 |
| 300A | 1442<br>AC CUSTOMS INC | 1078 | $2,500.00 | 00001078 |
| 300A | 1442<br>AC CUSTOMS INC | 1080 | $450.00 | 00001080 |
| 300A | 1442<br>AC CUSTOMS INC | 1081 | $6,000.00 | 00001081 |
| 300A | 1442<br>AC CUSTOMS INC | 1082 | $1,500.00 | 00001082 |
| 300A | 1442<br>AC CUSTOMS INC | 1083 | $1,300.00 | 00001083 |

| NOTE: PAYMENT TO ACCOUNT | TOTAL | **$12,600.00** |
|---|---|---|

FILE

@F00008W
26.004

MACC:ACKustoms 000221

5/ 4/2017

# Customer Sales Report
## Ac Kustoms Corp.

Page:  1

### 1120 N 31st Ave
### Melrose Park, IL  60160

---

**Mike Anderson Chevy**
**5333 W Irvingpark Rd**
**Chicago  IL  60641**

Ph# 1:  (773) 465-2000
Ph# 2:  (___) ___-____
Cell:

**Date range: 04/15/2017 to 05/04/2017**

---

**2017  CHEVY CAMARO**
**VIN: 1G1FH1R73H0101868**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1077 | 04/20/2017 | REPAIR AND REFINISH HOOD | $0.00 | $850.00 | $0.00 | $0.00 | $850.00 | N/A |
| | | | $0.00 | $850.00 | $0.00 | $0.00 | $850.00 | |

**2012 CHEVROLET  CRUZE**
**VIN: 1G1PC5SH6C7376602**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1078 | 04/28/2017 | R&R REAR BUMPER AND FRONT | $0.00 | $2,500.00 | $0.00 | $0.00 | $2,500.00 | N/A |
| | | | $0.00 | $2,500.00 | $0.00 | $0.00 | $2,500.00 | |

**2011 CHEVROLET  CRUZE**
**VIN: 1G1PC5SH1B7308657**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1080 | 05/04/2017 | R&R REAR BUMPER | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | N/A |
| | | | $0.00 | $450.00 | $0.00 | $0.00 | $450.00 | |

**2010 CHEVROLET EQUINOX**

| Invoice | Date | Description | Parts | Labor | Misc. | Tax | Total | Pay-Type |
|---|---|---|---|---|---|---|---|---|
| 1081 | 05/04/2017 | REPAIR  RIGHT SIDE | $0.00 | $6,000.00 | $0.00 | $0.00 | $6,000.00 | N/A |
| | | | $0.00 | $6,000.00 | $0.00 | $0.00 | $6,000.00 | |
| | | **Grand Totals** | $0.00 | $9,800.00 | $0.00 | $0.00 | $9,800.00 | |



MACC:ACKustoms 000223

04/28/2017

**Ac Kustoms Corp**
**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1078

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000   (____) ____-____

2012 CHEVROLET  CRUZE

Tag:                                    Mileage
ID:  1G1PC5SH6C7376602

| Labor | Amount |
|---|---|
| R&R REAR BUMPER AND FRONT | $0.00 |
| REPAIR FRONT AND REAR BUMPER | $0.00 |
| REFINISH FT AND REAR BUMPER | $0.00 |
| REPAIR LH SIDE | $0.00 |
| REFINISH LH SIDE | $0.00 |
| R&R FENDERS | $0.00 |
| REFINISH FENDERS | $0.00 |
| TOTAL | $2,500.00 |
| | $2,500.00 |

| Part No. | Parts | Quantity | Each | Amount |
|---|---|---|---|---|
| | LH & RH FENDER NEW | 1.00 | | $0.00 |
| | | | | $0.00 |

APR 2 2017

|  | |
|---|---|
| Subtotal | $2,500.00 |
| Tax | $0.00 |
| Total | $2,500.00 |

STK# H1680A

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____



5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 059378 | 05/01/17 | JENNEY, TIMOTHY | AC CUSTOMS INC | 001442 |

| Vendor Information | For Office Use |
|--------------------|----------------|
| AC CUSTOMS INC<br>523 N OGDEN AVE<br>CHICAGO, IL 60642 | G/L:<br>Printed: FRICANJO 05/01/17 16:53    Added on: W94    Printed at: 243<br>RO#:   79602        VIN: 1G1PC5SH6G7376602<br>Vehicle: 1C CHEVROLET CRUZE LS 4DR SDN JENNEY, |

**Additional Information**

Note: AC CUSTOMS

| For Office Use | | Description | Extended Price |
|------|------|-------------|----------------|
| 246 | 52 | AC CUSTOMS--REPAIR AND REFINISH FRONT AND | 2,500.00 |
| 246 | 52 | REAR BUMPERS--REPAIR AND REFINISH LEFT HAND | .00 |
| 246 | 52 | SIDE--REPAIR AND REFINISH FENDERS | .00 |

| Freight | Tax | Total |
|---------|-----|-------|
| .00 | .00 | 2,500.00 |

Authorized:

FILE

MACC:ACKustoms 000225

**04/20/2017**

# Ac Kustoms Corp.

**1120 N 31st Ave**

**Melrose Park, IL 60160**

**7088902376**

**Thanks For The Business**

Invoice #1077

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL 60641
(773) 465-2000    (__) ___-____

2017 CHEVY CAMARO

Tag:                                   Mileage
ID:  1G1FH1R73H0101868

|  | **Amount** |
|---|---|
| **Labor** | $0.00 |
| repair and refinish hood | |
| repair and refinish front bumper | $850.00 |
| | $850.00 |

| | |
|---|---|
| **Subtotal** | $850.00 |
| **Tax** | $0.00 |
| **Total** | $850.00 |

| STK# H1020 |
|---|

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____    SIGNED_____

APR 2 2017

MACC:ACKustoms 000226



# ANDERSON
## CHEVROLET
### OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 059312 | 04/27/17 | FRICANO, JOSEPH | AC KUSTOMS CORP | 001188 |

| Vendor Information | For Office Use |
|---|---|
| AC KUSTOMS CORP<br>1170 N 31ST AVE<br>MELROSE PARK, IL 60160 | G/L:<br>Printed: FRICANO 04/27/17 16:34   Added on: W94   Printed At: 243<br>RO#: 78181   VIN: 1G1FH1R73H10196B<br>Vehicle: 17 CHEVROLET CAMARO 2SS 2DR CPE LESINSKI |

**Additional Information**

Note:  repair hood and bumper

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | REPIAR FRONT BUMPER AND HOOD | 850.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 850.00 |

Authorized:

MACC:ACKustoms 000227

05/04/2017

# Ac Kustoms Corp.

**1120 N 31st Ave**
**Melrose Park, IL  60160**
**7088902376**
**Thanks For The Business**

Invoice  #1081

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago IL  60641
(773) 465-2000    (__) ___-____

2010 CHEVROLET EQUINOX

Tag:                                    Mileage
ID:

| Labor | Amount |
|---|---|
| REPAIR  RIGHT SIDE | $0.00 |
| REPAIR BOTH BUMPERS | $0.00 |
| REPAIR LH FENDER AND DOOR | $0.00 |
| REFINISH ALL REPAIRS | $0.00 |
| R&R TRANSMISSON | $0.00 |
| TRANSMISSON AND FLUIDS | $0.00 |
| TOTAL | $6,000.00 |
| | $6,000.00 |

| | |
|---|---|
| Subtotal | $6,000.00 |
| Tax | $0.00 |
| Total | $6,000.00 |

STK# CP3649

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____



**ANDERSON CHEVROLET OF CHICAGO, LLC.**

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 059432 | 05/05/17 | JENNEY, TIMOTHY | AC CUSTOMS INC | 001442 |

| Vendor Information | For Office Use |
|---|---|
| AC CUSTOMS INC<br>123 N OGDEN AVE<br>CHICAGO, IL 60642 | G/L:<br>Printed: PRICANJO 05/08/17 09:58 Added on: W94 Printed at: X43<br>ROI: 79035 VIN: 2CNALDEW5A6329507<br>Vehicle: 10 CHEVROLET EQUINOX LT 4DR SUV JENNEY, |

**Additional Information**

Note: AC CUSTOMS

| For Office Use | | Description | Extended Price |
|---|---|---|---|
| 246 | 51 | AC CUSTOMS--REPAIR RIGHT SIDE | .00 |
| 246 | 51 | AC CUSTOMS--REPAIR BOTH BUMPERS | .00 |
| 246 | 51 | AC CUSTOMS--REPAIR LEFT FENDER AND DOOR | .00 |
| 246 | 51 | AC CUSTOMS--REFINISH ALL REPAIRS | .00 |
| 246 | 51 | AC CUSTOMS--REPLACE TRANSMISSION AND FLUIDS | 6,000.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 6,000.00 |

Authorized:

UC:ACC004

FILE

MACC:ACKustoms 000229



MACC:ACKustoms 000230



**ANDERSON** CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|---|---|---|---|---|
| 059440 | 05/05/17 | JENNEY, TIMOTHY | AC CUSTOMS INC | 001442 |

| Vendor Information | For Office Use |
|---|---|
| AC CUSTOMS INC<br>523 N OGDEN AVE<br>CHICAGO, IL 60642 | G/L:<br>Printed: FRI-AN-JO 05/06/17 09:30  Added on: W54  Printed at: 343<br>RO#: 79057  VIN: JN1CV6AP6CM933558<br>Vehicle: 12 INFINITI G37 4DR SDN JENNEY, |

**Additional Information**

Note: AC CUSTOMS

| For Office Use | Description | Extended Price |
|---|---|---|
| 246    51 | AC CUSTOMS--4 AME WHEELS AND TIRES | 1,300.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,300.00 |

Authorized: _____

MACC:ACKustoms 000231

05/05/2017

# Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL  60160
### 7088902376
### Thanks For The Business

Invoice  #1082

**Mike Anderson Chevy**
*5333 W Irvingpark Rd*
*Chicago IL  60641*
*(773) 465-2000  (__) ___-___*

2016  NISSAN ALTIMA

Tag:                         Mileage
ID:  1N4AL3AP4GC257153

| Part No. | Parts | Quantity | Each | |
|----------|-------|----------|------|---|
| | 4 SAVINI  WHEELS AND TIRES | 1.00 | | $1,500.00 |
| | | | | $1,500.00 |

| | | |
|---|---|---|
| | Subtotal | $1,500.00 |
| | Tax | $0.00 |
| | Total | $1,500.00 |

STK# CP3699

An express mechanics lien is acknowledged on the above vehicle to secure the
amount of repairs thereto, until such time as cash payment has been made in
full. It is understood that you will not be held responsible for loss or damage
to cars or articles left in cars in case of fire, theft or any other cause
beyond your control. Upon signing this repair order it is accepted as a complete
and comprehensive description of the repair work done on this vehicle.

DATE_____          SIGNED_____

APR 2017

MACC:ACKustoms 000232

# ANDERSON CHEVROLET OF CHICAGO, LLC.

5333 W. Irving Park Rd. • Chicago, IL 60641
Telephone: (773) 465-2000
www.mikeandersonchevy.com

| PO# | Date | Purchaser | Vendor | NAD |
|-----|------|-----------|--------|-----|
| 059439 | 05/05/17 | JENNEY, TIMOTHY | AC CUSTOMS INC | 001442 |

| Vendor Information | For Office Use |
|---|---|
| AC CUSTOMS INC<br>533 N OGDEN AVE<br>CHICAGO, IL 60642 | S/L:<br>Printed: FRI MAY06 05/06/17 09:17a  Added on: X94  Printed at: 04a<br>RO#:  79056  VIN: 1N4AL3AP43C257153<br>Vehicle: 16 NISSAN ALTIMA 4DR SDN JENNEY, |

**Additional Information**

Note:  AC CUSTOMS

| For Office Use | Description | Extended Price |
|---|---|---|
| 246  51 | AC CUSTOMS--4 SAVINI WHEELS AND TIRES | 1,500.00 |

| Freight | Tax | Total |
|---|---|---|
| .00 | .00 | 1,500.00 |

Authorized:

UCS©2004

FILE

MACC:ACKustoms 000233

**05/04/2017**

# Ac Kustoms Corp.
### 1120 N 31st Ave
### Melrose Park, IL  60160
### 7088902376
### Thanks For The Business

Invoice  #1080

**Mike Anderson Chevy**
5333 W Irvingpark Rd
Chicago  IL  60641
(773) 465-2000  (___)  ___-____

2011 CHEVROLET  CRUZE

Tag:                                    Mileage
ID:  1G1PC5SH1B7308657

| Labor | Amount |
|---|---|
| R&R REAR BUMPER | $0.00 |
| REPAIR AND REFINISH BUMPER | $450.00 |
| | $450.00 |

| | |
|---|---|
| Subtotal | $450.00 |
| Tax | $0.00 |
| Total | $450.00 |

STK# CP3667

An express mechanics lien is acknowledged on the above vehicle to secure the amount of repairs thereto, until such time as cash payment has been made in full. It is understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control. Upon signing this repair order it is accepted as a complete and comprehensive description of the repair work done on this vehicle.

DATE_____        SIGNED_____

APR 2 6 2017

MACC:ACKustoms 000234