# EXHIBIT F

Page 1

1             IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION
3

MIKE ANDERSON CHEVROLET OF         )
4   CHICAGO, LLC,                      )
                                       )
5                     Plaintiff,       )
                                       )
6   vs.                                )1:20 cv 06161
                                       )
7   QBE INSURANCE CORPORATION,         )
                                       )
8                     Defendant.       )
9

10               The Remote Deposition of BARBARA
11   FLORES, called by the Defendant for examination,
12   pursuant to Notice and pursuant to the Federal Rules
13   of Civil Procedure for the United States District
14   Courts, taken before Victoria D. Rocks, CSR, and
15   Notary Public in and for the County of Cook, State
16   of Illinois, commencing at 5:00 o'clock p.m., on the
17   21st day of October 2021, A.D.
18
19
20
21
22
23
24

Page 2

1 APPEARANCES:
2
      SCHARF BANKS MARMOR, LLC
3     MR. ERIC F. QUANDT
      MR. THEODORE BANKS
4     333 W. Wacker Drive
      Suite 450
5     Chicago, Illinois  60606
      equandt@scharfbanks.com
6     tbanks@scharfbanks.com
7
      appeared on behalf of the Plaintiff;
8
9     KAUFMAN DOLOWICH & VOLUCK, LLP
      MR. STEFAN R. DANDELLES
10    135 S. LaSalle Street
      Suite 2100
11    Chicago, Illinois  60603
      sdandelles@kdvlaw.com
12
      appeared on behalf of the Defendant.
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1            I-N-D-E-X
2
3  WITNESS: BARBARA FLORES
4
    Direct Examination by MR. DANDELLES:   6 - 112
5
    EXHIBITS                    PAGE
6
7  Exhibit 1   subpoena              23
    Exhibit 2   W-9 form              23
    Exhibit 3   document              25
8  Exhibit 4   J and N W-9 form          29
    Exhibit 5   TKC W-9 form           30
9  Exhibit 6   invoices, check request    32
    Exhibit 7   email                39
10  Exhibit 8   mailer               43
    Exhibit 9   6-1-17 invoice          45
11  Exhibit 10  J and N subpoena response   51
    Exhibit 11  USPS postage statement    64
12  Exhibit 12  repair order           75
    Exhibit 13  customer order         102
13  Exhibit 14  email               107
14
15
16
17
18
19
20
21
22
23
24

Page 4

1           (Witness sworn.)
2      MR. DANDELLES:  Ms. Flores, will you state and
3  spell your name for the record, please.
4      THE WITNESS:  Barbara, B-a-r-b-a-r-a Flores,
5  F-l-o-r-e-s.
6      MR. DANDELLES:  And we are on the record, and
7  you have taken your oath, correct?
8      THE WITNESS:  Yes.
9      MR. DANDELLES:  Have you ever given deposition
10 testimony before?
11     THE WITNESS:  Yes.
12     MR. DANDELLES:  In what context?
13     THE WITNESS:  In a business context for another
14 organization I worked for.
15     MR. DANDELLES:  When was that deposition?
16     THE WITNESS:  Twenty years ago.
17     MR. DANDELLES:  Is that the only time you had
18 deposition testimony?
19     THE WITNESS:  Yes.
20     MR. DANDELLES:  What was the nature of that
21 either dispute or what was the reason that gave rise
22 to you giving deposition testimony?
23     THE WITNESS:  It was at Gateway Chevrolet,
24 which has been closed for years now.  And there was

Page 5

1  a client of ours who sued the organization.  It was
2  a car deal gone bad.
3      MR. DANDELLES:  Any other testimony other than
4  deposition as a witness under oath?
5      THE WITNESS:  No.
6      MR. DANDELLES:  So you may recall from 20 years
7  ago, but I will refresh your recollection regarding
8  the process.  Is that okay?
9      THE WITNESS:  Of course.
10     MR. DANDELLES:  Great.  So obviously, we have a
11 court reporter here.  We are in a unique remote
12 environment, and counsel for the plaintiff, Mike
13 Anderson Chevrolet of Chicago is participating
14 remotely as well.
15     The court reporter takes down everything that
16 is said by any party while we're on the record.  For
17 that reason, it's important that we not talk over
18 each other, meaning I will let you finish your
19 answer before I ask my next question.  You let me
20 finish my question before you start your answer even
21 if you know or anticipate what I'm going to say.  Is
22 that okay?
23     THE WITNESS:  Of course.
24     MR. DANDELLES:  So far so good with the verbal

2 (Pages 2 - 5)

Page 6

1  and audible answers rather than shakes or nods of
2  the head or uh-huh or uh-uh because that is very
3  difficult for the court reporter to take down.  Is
4  that all right?
5       THE WITNESS:  Yes.
6            BARBARA FLORES,
7  called as a witness herein, having been first duly
8  sworn, was examined upon oral interrogatories and
9  testified as follows:
10           DIRECT EXAMINATION
11           BY MR. DANDELLES:
12      Q.  Where are you currently employed,
13  Ms. Flores?
14      A.  Al Piemonte Buick GMC in Elmhurst,
15  Illinois.
16      Q.  What's your position there?
17      A.  Controller.
18      Q.  Were you at one point employed by Mike
19  Anderson Chevrolet of Chicago?
20      A.  Yes, sir.
21      Q.  What were the dates of your employment at
22  Mike Anderson Chevrolet in Chicago?
23      A.  I should have reviewed my resume.  I
24  believe it was July of, let's see.  I left there in

Page 7

1  July of 2020 -- wait, no.  Oh my gosh, I'm sorry.
2  I'm not prepared with that question.
3           If you don't mind I'm going to look for
4  my resume quickly.
5       Q.  Sure.
6       A.  That will give me the exact dates.  We
7  don't have to worry if I'm incorrect.  September of
8  2014 to July of 2019.
9       Q.  So just to reiterate so I have it clear,
10  you began your employment with Mike Anderson
11  Chevrolet of Chicago in September of 2014, correct?
12      A.  Yes.
13      Q.  And your employment ended with Mike
14  Anderson Chevrolet of Chicago in July of 2019,
15  correct?
16      A.  Yes.
17      Q.  What positions did you hold during that
18  nearly five year period starting from the oldest to
19  the most recent?
20      A.  Only controller.
21      Q.  You were hired as controller in September
22  of 2014?
23      A.  Yes.
24      Q.  And you maintained that position

Page 8

1  throughout until you left in July of 2019?
2       A.  Yes.
3       Q.  Do you know the name of the person you
4  succeeded as controller?
5       A.  It was Amanda Grayson.
6       Q.  Do you know who succeeded you as
7  controller?
8       A.  I believe Tiffany Santiago.
9       Q.  Was Tiffany employed at Mike Anderson
10  Chevrolet of Chicago before taking the role of
11  controller?
12      A.  Yes, she was the office manager.
13      Q.  Do you know approximately how long she was
14  employed in the role of office manager prior to
15  becoming controller sometime in or after July of
16  2019?
17      A.  No.
18      Q.  Had you been colleagues for a few years at
19  that point?
20      A.  Yes, but I'm not sure when she officially
21  took the title.  I don't know that information.
22      Q.  Regardless of title, do you know how long
23  she was employed at Mike Anderson Chevrolet of
24  Chicago?

Page 9

1       A.  She came probably March or April of '20.
2  Shortly after I started working there.  I'm sorry,
3  '15.
4       Q.  To be clear, to the best of your
5  recollection Tiffany Santiago started with the
6  company in or around March of 2015?
7       A.  Yes, sir.
8       Q.  And do you recall whether she came in as
9  an office manager or was it a different role?
10      A.  She did come in as office manager.  She
11  was hired as an office manager.
12      Q.  She would have maintained that role until
13  she took over the role of controller, is that right?
14      A.  Yes.
15      Q.  What did you do in preparation for your
16  deposition today?
17      A.  I didn't know I had to prepare anything.
18  That was not made clear to me.  So I apologize if
19  I'm unprepared.
20      Q.  I am not suggesting you had to.  I'm
21  asking if you did anything to prepare.  And if so,
22  what you did?
23      A.  Nothing.
24      Q.  Did you have any conversations, either

3 (Pages 6 - 9)

Page 10

1 e-mail communications, phone conversations, Zoom
2 communications with counsel for Mike Anderson
3 Chevrolet of Chicago prior to 5:00 o'clock today?
4    A.  I had a conversation a couple of months
5 ago with Mike Anderson's attorney.  I believe I
6 spoke with one of the gentlemen there.  And he just
7 asked what happened, but that was it.  It was a very
8 brief conversation.
9    Q.  Do you remember who you spoke with?  Was
10 it Mr. Quandt or Mr. Banks?
11    A.  I believe it was Mr. Quandt.
12    Q.  How many times did you speak with
13 Mr. Quandt?
14    A.  Once.
15    Q.  Did you ever speak with Mr. Banks?
16    A.  I don't believe so.  And I apologize if I
17 have them backwards.  I believe it was Quandt.
18    Q.  Can you describe in more detail the nature
19 of that discussion?
20    A.  He asked if, of course, I worked there,
21 and Jason Kay, the general manager at that time, if
22 I knew anything or if I had anything to add to a
23 lawsuit that they were bringing.
24    Q.  What is your best estimate of the time

Page 11

1 frame of this conversation?
2    A.  Meaning like half an hour or how long I
3 spoke?
4    Q.  Sorry for that.  What is your best
5 estimate as to when this conversation took place?
6    A.  I would say probably -- it's October.  It
7 was during the summer.  So July maybe.
8    Q.  Of this year, of 2021?
9    A.  Yes, sir, of this year.
10    Q.  About how long did that conversation last?
11    A.  I think it was about 25 minutes.  Not more
12 than that for sure.
13    Q.  When he asked you what you know about it
14 or if you had anything to add, what did you tell
15 him?
16    A.  He actually asked more particularly about
17 the mailer.  Mike Anderson had asked me to
18 investigate a mailer that was sent out.  We cut a
19 check for some mailers to be sent out, mailed on our
20 behalf to obviously get clients in the door.
21        So he asked me, Mike Anderson, to
22 investigate, check out, find out what the mailer
23 looks like, where is the mailing list coming from.
24 And I want like proof of delivery.  And so I asked

Page 12

1 the gentleman for the vendor, I needed all of that
2 information.
3        He came back to me and said, was a
4 little like why do you need this.  And I thought it
5 was unusual, but okay.  Mike Anderson is asking
6 about it.  I need to get this documentation for him.
7 He's the owner.  He's asking me to do something and
8 that's what I got to do.
9        So he is like okay, I'll see what I can
10 do.  He ended up giving me an e-mail back.  Of
11 course, I don't have it in front of me, but to my
12 best recollection it was like a certification that
13 he had sent out, a bulk mailer from the post office.
14        And then I explained to Mr. Quandt that
15 that is what I did at that time.  And in my
16 investigation of that I called the post office and
17 asked the validity, is this a real document that you
18 would send out.  And so that phone call kind of
19 prompted on bulk mail is this report valid for bulk
20 mail, like when you send it out.
21        And that prompted a bulk mail person,
22 salesperson, I'm not really sure, to come to
23 actually Mike Anderson Chevrolet's facility in
24 Chicago from the post office.  And I think she

Page 13

1 wanted to really sell me like bulk mail.  Like okay,
2 I hear you're interested in bulk mail.  And her and
3 her colleague came.
4        And I was like, well, actually I am not
5 interested in bulk mail, but I have a document.  I'm
6 wondering is this a bulk mail -- is this the letter
7 or certification that you would send out for bulk
8 mail.  And so she looked at it, and she gave me a
9 couple of things.
10        I don't have the document in front of
11 me, but she said that this looked a little strange
12 because if I remember correctly it went to Iowa and
13 then it came back to Illinois.  So I explained that
14 to the gentleman, Mr. Quandt.  And then that was
15 basically it.  That was the gist of the
16 conversation.
17    Q.  Did you discuss anything else relating to
18 the employment of Jason Kolodzinski with Mr. Quandt?
19    A.  In regards to employment?
20    Q.  Just anything relating to Jason
21 Kolodzinski and his role as general manager, former
22 general manager at Mike Anderson?
23    A.  No.
24    Q.  Did you discuss with Mr. Quandt anything

4 (Pages 10 - 13)

Page 14

1 relating to any role that Jason Kolodzinski may or
2 may not have played with respect to these mailers?
3     A.  He told me that they were able to discover
4 from pulling some bank records that there were
5 checks made payable to Jason Kolodzinski from that
6 vendor.
7     Q.  And anything else about that?
8     A.  I don't believe so, no.
9     Q.  So other than the mailer, the postal
10 service receipt and that they were able to discover
11 checks paid to Jason Kolodzinski, was there anything
12 else that you discussed with Mr. Quandt?
13     A.  No, I don't believe so.
14     Q.  Anything about a company called AC
15 Kustoms?
16     A.  No.
17     Q.  Anything about a company called Epic Motor
18 Sports?
19     A.  No.
20     Q.  Anything about a company called Sir
21 Hooptie?
22     A.  No.
23     Q.  Anything about TKC Entertainment?
24     A.  No.  Is that the Polish radio, TKC?

Page 15

1     Q.  I don't know.
2     A.  I thought you had it.
3     Q.  Anything about radio advertising
4 generally?
5     A.  No.
6     Q.  Can you describe for me your duties and
7 responsibilities as controller during the time you
8 were at Mike Anderson Chevrolet of Chicago?
9     A.  I was responsible for every general ledger
10 account.  As Mike Anderson would say, that was my
11 role.
12         I was responsible for every single item
13 that went in and out of the general ledger.
14     Q.  Would that include vendor payments?
15     A.  Yes, sir.
16     Q.  Did vendors have to be approved before
17 payments could be made to vendors?
18     A.  Yes, sir.
19     Q.  What was the process of vendor approval?
20     A.  Mike and himself would approve that
21 vendor.  We were not allowed to add any vendor
22 without his authorization.
23     Q.  How did that process work?
24     A.  He is not necessarily on site.  So it was

Page 16

1 either a phone call, a text, an e-mail, something of
2 that nature.
3         There was also, usually it would happen
4 where they would receive a potential invoice or an
5 estimate of services, and they would send an
6 estimate to Mike Anderson, like the management staff
7 including me on the e-mail as well saying, you know,
8 we want to bring this vendor in.  He's going to do
9 XYZ for us and then we would e-mail the estimate or
10 pre-invoice and then he would make a decision or
11 talk to that specific manager, whoever wanted that
12 vendor in at that time direct.
13         And then we would usually receive
14 approval from Mike Anderson, either via text or
15 phone call or e-mail.  Or in person sometimes as
16 well when he was in town.
17     Q.  Once he gave that approval what would be
18 the process internally to set that vendor up in the
19 system?
20     A.  We would get their W-9 and if applicable,
21 obviously, their insurance information, their
22 certificate of insurance depending upon what they
23 did for us.
24         And then usually that was it and then we

Page 17

1 would create a customer for them, and the payable
2 clerk would do all of that.  We would keep their W-9
3 on file.  And then they're a vendor.
4     Q.  Who would make the request for the W-9?
5     A.  It was typically the payable clerk.  But
6 since we were there, we would train the managers to
7 get it right away.
8         So a lot of times they would bring the
9 W-9 along with the documentation or the approval
10 from Mike.
11     Q.  How does a customer number get set up in
12 the system at Mike Anderson?
13     A.  So it's software.  We use Reynolds and
14 Reynolds Power.  So at that time it was literally an
15 entry adding the -- I don't have the software in
16 front of me, but its something simple.  Go into that
17 function of name and address, add the name or the
18 vendor and then they're added.
19         It was a manual process into the system
20 if that's what you're looking for.
21     Q.  Who is responsible for manually entering
22 information regarding a vendor once they have been
23 approved?
24     A.  I would hand that over to the payable

5 (Pages 14 - 17)

Page 18

1 clerk.
2    Q.  In the 2017 time frame, who was the
3 payables clerk?
4    A.  Monica Spyropoulos.
5    Q.  Was she the only one that performed that
6 function?
7    A.  I would on occasion as well as vendors if
8 needed.  If she was off that day or needed something
9 right away, Tiffany Santiago might have, but
10 minimally.
11    Q.  The system you described, does anyone have
12 access to that software system that you described?
13    A.  The employees have access and then within
14 the functionality of the system.
15       So, for example, you would have access
16 to name and address file, but you couldn't add, you
17 could only edit.  It's secure.  It's not like
18 everybody has access to payroll or everything in the
19 system.
20    Q.  So it's password protected?
21    A.  Yes.
22    Q.  Each user has their only distinct log in
23 and password, is that right?
24    A.  Correct.

Page 19

1    Q.  So for the process, are there only certain
2 users that would have access to the Reynolds and
3 Renyolds Power system to be able to add a vendor?
4    A.  Yes.
5    Q.  Who were those people?
6    A.  It would have been the accounting staff.
7    Q.  Was Jason Kolodzinski part of the
8 accounting staff?
9    A.  No, sir.
10    Q.  Do you know whether he had access to
11 independently himself be able to add vendors into
12 the Reynolds and Reynolds Power software?
13    A.  I don't believe he'd have access.
14    Q.  Are you aware of any situations where he
15 may have done so?
16    A.  No.
17    Q.  You referenced a customer number that is
18 the result of having input the data regarding this
19 new vendor, is that right?  You get a customer
20 number?
21    A.  Correct.
22    Q.  Is that the same as an NAD number?
23    A.  Correct.
24    Q.  And NAD is name and address?

Page 20

1    A.  Correct.  That is the application within
2 the Reynolds software.
3    Q.  So a name and address number or a customer
4 number, can I use those interchangeably?
5    A.  Customer number, vendor number, NAD, name
6 and address is all interchangeable.
7    Q.  So in order for a vendor to have an NAD
8 number, they must have already been input into the
9 system, correct?
10    A.  Correct.
11    Q.  And they must have already produced a
12 signed W-9, correct?
13    A.  Correct.
14    Q.  Is the information on the W-9 necessary to
15 generate a NAD number?
16    A.  Yes.
17    Q.  So a federal EIN is one of the files that
18 has to be populated to create the NAD number, is
19 that right?
20    A.  Or social, but yes, it's one and the same.
21 Taxpayer ID, a company or a person.
22    Q.  What information would be input into the
23 system in order to generate an NAD number?
24    A.  It's very basic.  So of course, vendor

Page 21

1 name or customer name, the address, the whole thing.
2 City, state, zip, phone number.  And then just the
3 W-9 information.
4       And whether we're going to give them a
5 1099.  Should we issue a 1099 for them because the
6 system was able to do that as well.
7    Q.  So if a particular entity has an NAD
8 number, that means they have already been approved
9 to be a vendor of Mike Anderson Chevrolet of
10 Chicago, correct?
11    A.  Correct.
12    Q.  Do NAD numbers get generated before
13 approval?
14    A.  No.
15    Q.  We're going to do a quick housekeeping
16 item.  Can you see this document on my screen?
17    A.  Yes.
18    Q.  Is this a reference to you, Barbara
19 Flores?  Is that your address?
20    A.  Yes, it is.
21    Q.  Have you seen this document before?
22    A.  I believe that was the one that was
23 e-mailed to me in regards to today's deposition.
24    Q.  And attached to that notice there was a

6 (Pages 18 - 21)

Page 22

1 subpoena here. Did you receive and view this as
2 well?
3    A.  Yes.
4    Q.  So is it your understanding that you're
5 here giving testimony today pursuant to this notice
6 and subpoena?
7    A.  Yes.
8    Q.  Did you have a chance to look for any
9 texts or e-mails or any other documents relating to
10 Jason Kolodzinski or any of the entities listed
11 here?
12    A.  In what fashion? What do you mean?
13    Q.  Well, the subpoena is twofold. It seeks
14 your testimony, which is the deposition testimony
15 we're taking right now.
16       It also seeks the production of any
17 documents. It says you or your representatives must
18 also bring with you to the deposition the following
19 documents like files or permits, testing, sampling
20 material. And material sought is any tangible
21 objects related to, so any documents, any ads, any
22 e-mail or anything like that?
23    A.  I no longer am employed at Mike Anderson
24 Chevrolet. So I no longer have access to any of my

Page 23

1 e-mails. I wouldn't have anything more to offer.
2       MR. DANDELLES: That will be Exhibit 1, and
3 we'll circulate it.
4       Let's take a look and make sure I am
5 understanding the process. Let's mark this as
6 Exhibit 2. Exhibit 2 is a W-9, which bears bates
7 number MACCACKUSTOMS 00395.
8    A.  Yes.
9    Q.  Do you recognize this document?
10    A.  Yes.
11    Q.  Can you describe it?
12    A.  It's a W-9.
13    Q.  Of?
14    A.  Of AC Kustoms, Inc.
15    Q.  Are you familiar with AC Kustoms, Inc.?
16    A.  Yes. They were a vendor.
17    Q.  How do you know they were a vendor?
18    A.  Because they did body work for us if I
19 recall. Yes, they did the body work for us at Mike
20 Anderson Chevrolet.
21    Q.  Did Mike Anderson Chevrolet have a body
22 shop?
23    A.  No.
24    Q.  Is that why body work was outsourced to a

Page 24

1 third party vendor?
2    A.  Yes. The Mike Anderson Chevrolet of
3 Merrillville had a body shop. On some bigger jobs
4 it made sense for us to ship the car to Merrillville
5 for the work to be done there. For the smaller
6 things we outsourced them.
7    Q.  And that was approved by Mike Anderson,
8 correct?
9    A.  Yes, sir.
10    Q.  Do you see in the upper right corner it
11 looks like it says NAD number 1442?
12    A.  Yes.
13    Q.  Do you know whose handwriting that is?
14    A.  That might have been Monica's, but I'm not
15 100 percent sure.
16    Q.  As you look at this, does that reflect and
17 evidence that AC Kustoms, Inc. was an approved
18 vendor of Mike Anderson Chevrolet of Chicago having
19 been given an NAD number?
20    A.  Yes, sir.
21    Q.  Because it wouldn't have been assigned as
22 an NAD number if it wasn't approved, correct?
23    A.  Correct.
24    Q.  Let's mark this next exhibit as Exhibit 3

Page 25

1 to the Flores deposition. Do you recall a time
2 where AC Kustoms had a name change?
3    A.  Yes.
4    Q.  What do you recall about that?
5    A.  I believe he just changed locations, but I
6 don't know anything more of why he changed his name
7 or had a new EIN number. I don't know that
8 information.
9    Q.  Is that the type of information that once
10 somebody is already a vendor in the system, those
11 details could be changed within the system?
12    A.  Yes, because he was the same person and so
13 we just updated his name, his information.
14    Q.  And so it didn't require a new NAD number
15 because he already had one?
16    A.  Correct.
17    Q.  And do you recall the gentleman's name or
18 the individual's name who was the principal of AC
19 Kustoms?
20    A.  I believe it was Alex Cisneros, but I'm
21 not 100 percent certain because it's been a while
22 since I thought about that.
23    Q.  How much interaction or interface would
24 you have in the ordinary course with any of the

7 (Pages 22 - 25)

Page 26

1 vendors?
2    A.   Very minimal.  It was more the managers.
3 Our accounting office was on the second floor.  So
4 it was more the managers who were face to face with
5 the vendors when they came in to service whatever we
6 needed servicing.
7    Q.   But because you're responsible for every
8 last line item on the general ledger, you know who
9 typically all the vendors are?
10    A.   Correct.
11    Q.   You know who the vendors are, you know
12 where the money is going?
13    A.   Uh-huh.
14    Q.   And so you would get information if a
15 vendor was being paid, you would have information
16 provided to you that you would then enter on the
17 general ledger, is that right?
18    A.   I would not personally enter it into the
19 general ledger, but yes, that is the idea.  Once the
20 vendor is approved we would create a purchase order
21 either in the service department or the used car
22 manager or Jason himself would create a purchase
23 order authorizing this Chevrolet Equinox front
24 bumper to be repaired.

Page 27

1         They would repair the front bumper, and
2 the invoice is attached to AC Kustoms and then it
3 would go to the accounts payable clerk.  And it's
4 already ready, set up for payment.
5    Q.   Do you recall there being a union strike,
6 a mechanic strike sometime in 2017?
7    A.   There was an -- I'll say yes, there was a
8 tremendous strike.
9    Q.   What do you recall about that?
10    A.   It was a very long time for us to be out
11 of work, for those technicians to not be working.
12 I'm not really sure what else you're asking.
13    Q.   You recall there was a strike that
14 affected mechanics and technicians?
15    A.   Yes, definitely.
16    Q.   And the dealership didn't shut down, did
17 it?
18    A.   No, sir.
19    Q.   Sales was still open, correct?
20    A.   Correct.
21    Q.   The used car unit division was still in
22 taking, purchasing cars and putting them out for
23 sale on the used car lot, correct?
24    A.   Correct.

Page 28

1    Q.   How would service or mechanical work that
2 was othewise done by the inhouse Mike Anderson
3 garage, let's say service department, how would work
4 be done that was necessary to be done while the
5 strike was going?
6    A.   It was done by a third party.  We didn't
7 have a choice.
8    Q.   So you had to outsource the mechanical
9 work that otherwise would have been done by the
10 inhouse service department?
11    A.   Correct.
12    Q.   Was that approved by Mike Anderson?
13    A.   Yes.
14    Q.   You had no choice you said, right?
15    A.   We had no choice.
16    Q.   Do you recall whether AC Kustoms was one
17 such third party vendor that provided that
18 mechanical support?
19    A.   Yes.
20    Q.   Yes, they were?
21    A.   Yes.
22    Q.   So those were approved expenses to have
23 mechanical work done by AC Kustoms, correct?
24    A.   Correct.

Page 29

1    Q.   Let's mark this as Exhibit number 4, which
2 bears bates number MACCJNN 2.
3         Do you recognize this document?
4    A.   Yes.
5    Q.   And can you describe it for the record,
6 please?
7    A.   It's the W-9 for J and N Marketing.  And
8 100 percent that is Monica's writing in the corner.
9    Q.   You're referring to the handwritten NAD
10 number.  It looks like 1393?
11    A.   Yes.
12    Q.   So does that reflect that J and N
13 Marketing was an approved vendor for Mike Anderson
14 Chevrolet?
15    A.   Yes.
16    Q.   Because without such approval no NAD
17 number would have been assigned, right?
18    A.   Correct.
19    Q.   Do you remember who J and N Marketing is?
20    A.   No.
21    Q.   Other than looking at this, do you have an
22 independent recollection of them being a vendor for
23 Mike Anderson Chevrolet?
24    A.   Yes.

8 (Pages 26 - 29)

Page 30

1   Q.   You don't know what services they
2   provided?
3   A.   If I recall, they were the mailers, but
4   I'm not 100 percent sure.  I believe it was the
5   mailers.
6   Q.   Do you recognize this signature?
7   A.   Just that it is a signature.
8   Q.   Do you know who the principal of J and N
9   Marketing is?
10  A.   I recall a Nick, but nothing more than
11  that.
12  Q.   Do you recall anything about an entity
13  called TKC Entertainment?
14  A.   I believe this is the Polish radio
15  company, TKC Entertainment.
16  Q.   Do you see the document in front of you
17  that we'll mark as Exhibit 5?
18  A.   Yes.
19  Q.   And this bears bates number MACCTKC 2.
20  Can you identify this for the record?
21  A.   A W-9 for TCK Entertainment, NAD number
22  1422.
23  Q.   And you're referring to the handwriting in
24  the upper right corner reflecting NAD number 1422?

Page 31

1   A.   Yes, sir.
2   Q.   Was TKC Entertainment an approved vendor
3   at Mike Anderson Chevrolet?
4   A.   Yes.
5   Q.   That is evidenced by the fact that it had
6   an NAD number assigned to it?
7   A.   Correct.
8   Q.   Do you have an independent recollection
9   that TKC Entertainment provided services to Mike
10  Anderson Chevrolet at some point?
11  A.   I have a recollection that they said they
12  were doing Polish radio ads.
13  Q.   What's the basis of your recollection?
14  A.   I don't listen to Polish radio.  So I
15  don't know.  Nor did I hear the actual ad.
16  I also tried to call the radio station
17  to get the same type of proof that the ads ran and
18  was unsuccessful.
19  Q.   What is the source of information that
20  leads you to believe that they were doing Polish
21  radio ads as opposed to English radio ads?
22  A.   Do you in your records have a copy of the
23  check or invoice for this, representing this?
24  Q.   I have some things that we'll look at.  I

Page 32

1   am trying to understand the basis of your
2   recollection.
3   What do you recall about some connection
4   to Polish radio?
5   A.   I believe it's on the invoice.  That is
6   why I was asking that.
7   Q.   I think we'll get into this a little
8   later, but you didn't listen to the radio station
9   hosted by TKC Entertainment, is that right?
10  A.   Correct.
11  Q.   So if there were ads run, you wouldn't
12  know one way or the other?
13  A.   Correct.
14  Q.   If there were payments made to TKC
15  Entertainment, that would have hit your ledger?
16  A.   Correct.
17  Q.   As an example, let's mark this as Exhibit
18  number 6, and it reflects bates number MACCTKC 59.
19  It's a group exhibit bearing 59, 58, 56, 57.  This
20  one doesn't look to be bates stamped.
21  The last page of this Group Exhibit 6
22  reflects TKC 8, a different source.  So here's an
23  invoice.  Can you take a look at this and see if
24  this looks familiar to you and/or refreshes your

Page 33

1   recollection about the services provided?
2   A.   Yes.
3   Q.   What does this reflect?
4   A.   An invoice for custom advertising for four
5   weeks of commercials on 92.7 dance factory radio.
6   Q.   Does it say anything about Polish radio?
7   A.   No, but if you looked it up at that time
8   92.7 was a Polish radio station and might still be.
9   And at certain times they leased out
10  their time slots.  So I believe I recall that
11  information.  That is why I thought it was Polish
12  radio.
13  Q.   Are you aware that TKC Entertainment, in
14  fact, leases air time from the radio station in
15  order to play dance music?
16  A.   I believe that's what I just inferred.
17  Q.   What does this document reflect, referring
18  to MACCTKC 58?
19  A.   This is a check request that Jason
20  Kolodzinski would have presented along with the
21  invoice for payment for services rendered for the
22  radio station, for TKC Entertainment.
23  Q.   Who would he have presented that to?
24  A.   He would have presented it to Monica, who

9 (Pages 30 - 33)

Page 34

1 cut the check. And I could tell she cut the check
2 because her initials, if you go to the top -- you're
3 there as well, the same place.
4        Next to on the top line underneath Mike
5 Anderson Chevrolet, her initials are also there, MS
6 as well. Both places.
7    Q. And if TKC was not an approved vendor
8 would Monica have been able to cut a check?
9    A. No, sir.
10    Q. So when a check is cut, it's an electronic
11 process, is that right?
12    A. Correct.
13    Q. So Monica has to log into the system,
14 input data. Does that include the NAD number of the
15 vendor?
16    A. They would have already been approved.
17 But yes, that includes that once they're in the
18 system then she would have just added the invoice
19 and then created a check afterwards.
20    Q. Did Jason Kolodzinski have access to the
21 check cutting software?
22    A. He has access to the software, but the
23 application he would not have had access to.
24    Q. So could he cut a check himself?

Page 35

1    A. No.
2    Q. So this says Spanish radio.
3    A. Okay.
4    Q. We're now looking at TKC 8, which I'll
5 represent for the record was a document produced by
6 TKC itself reflecting a photocopy of the check
7 provided by Mike Anderson.
8        Whose signature is this?
9    A. Aracelli Ulloa, U-l-l-o-a.
10    Q. U-l-l-o-a?
11    A. Yes, sir.
12    Q. Who is Aracelli Ulloa?
13    A. She's an employee of Mike Anderson
14 Chevrolet. She is Mike Anderson's sister-in-law.
15    Q. And she's a signatory on the account?
16    A. Yes.
17    Q. This is an account at JP Morgan Chase?
18    A. Yes, sir.
19    Q. Is this the primary account out of which
20 vendor payments are made?
21    A. Yes, sir.
22    Q. What is this in the bottom right corner of
23 the check?
24    A. Those are my initials that I reviewed the

Page 36

1 invoice and gave her the okay to sign the check.
2    Q. Would you have done that if it was not an
3 authorized vendor?
4    A. No, sir.
5    Q. Would you have done that if you believe
6 the services invoiced on that invoice you reviewed
7 were not provided?
8    A. No, sir.
9    Q. Did you have any reason to believe at the
10 time this check was cut in August of 2017 that the
11 services reflected on the invoice were not provided?
12    A. At that time, no.
13    Q. Did there ever come a time that you had a
14 concern about whether or not the radio ads being
15 invoiced by TKC Entertainment were provided?
16    A. Yes.
17    Q. Tell me about that.
18    A. It was after Mike asked me to investigate
19 the mailers. He also said to get as much
20 information I can for TKC as well. And, like I
21 said, I called the radio station itself.
22        And I spoke with their marketing
23 department trying to get information from them.
24 Typically when a mailer and/or advertising is done,

Page 37

1 there's a notarized documentation saying at
2 5:55 p.m. on October 21st, 2021 this sample Mike
3 Anderson Chevrolet fill in the blank, selling fill
4 in the blank ad has been shown or played on the
5 radio.
6        And typically we would receive something
7 from the advertiser that as proof that this ad or
8 the ads we've purchased have been played.
9    Q. Did you ever speak with anyone at TKC
10 Entertainment?
11    A. I did.
12    Q. Who did you speak with at TKC
13 Entertainment?
14    A. It was I believe the promoter because
15 that's what he referred to himself as.
16        Was there a name on the TKC
17 documentation? I don't recall at the moment his
18 name.
19    Q. There is a name down here. It says if you
20 have any questions contact Chris Chudzik?
21    A. Yes. So I said Chris, I need to get proof
22 that you guys played the ads that we requested and
23 paid for.
24        And he basically said I'm a promoter. I

10 (Pages 34 - 37)

Page 38

1 don't really know what you're talking about. And he
2 didn't have anything else to add to the
3 conversation.
4     Q. Did he tell you that the ads were not run?
5     A. He did not, but he didn't say they were.
6 He just didn't understand what I was talking about.
7 He's never had to provide anything like that before.
8     Q. As you sit here today, are you aware of
9 any facts or evidence to establish that the ads
10 were, in fact, not run?
11     A. No.
12     Q. Let's talk a little bit about J and N
13 Marketing. Earlier you testified that Mike Anderson
14 asked you to look into the mailer issue?
15     A. Yes.
16     Q. What is your understanding of what
17 prompted him to raise that issue in the first place?
18     A. He didn't say.
19     Q. Do you recall the time frame around which
20 he asked you to look into that?
21     A. I know that I might have an e-mail that I
22 wrote. So around that time frame.
23     Q. An e-mail to whom?
24     A. To J and A Marketing. I believe it's

Page 39

1 Nick.
2     Q. J and N?
3     A. Excuse me. J and A is another company.
4     MR. DANDELLES: I would ask counsel to provide
5 those e-mails.
6 BY MR. DANDELLES:
7     Q. I will show you one e-mail that appears to
8 be a response to an e-mail that we don't have.
9 Let's mark this as next in order, Exhibit 7.
10     This is bates number J and N 105. If
11 you could take a look at this and let me know if you
12 recall this exchange? I will scroll out so you
13 could see the whole thing.
14     A. I could see it. Attached you will find
15 the mailing list per your request.
16     That's what I asked for was the mailing
17 list and, of course, the graphics for the mailer.
18 So yes, I do recall this.
19     Q. So did you send an e-mail to which he
20 responded with this information?
21     A. Yes, I must have.
22     MR. DANDELLES: Counsel, we don't have that
23 e-mail. If you would please procure it and produce
24 it.

Page 40

1     Also we don't have the e-mail in native. So
2 we don't have the attachment where it says attached
3 you will find.
4     THE WITNESS: The attachments are there. Well,
5 the images are probably not applicable, but the
6 Corvette and Camaro list and that was a listing of
7 all customers.
8     MR. DANDELLES: Right. That's fine, but we
9 don't have it in native format. So we don't have
10 the attachment. We just have a reference to the
11 attachment.
12     We need the document, counsel. I am talking
13 to the other folks there. We need a copy of the
14 attachment as well as e-mail to which this responds.
15 BY MR. DANDELLES:
16     Q. Do you know what the reference to PDF will
17 be over shortly, do you know what that is a
18 reference to?
19     A. It's referencing the next sentence.
20     Q. "We outsourced the graphics. So waiting
21 for it to get back."
22     Is that a list of the people to whom the
23 mailer was being sent?
24     A. Yes.

Page 41

1     Q. And the PDF reflects the graphics of what
2 was being sent?
3     A. Correct, the actual mailer in its form.
4     Q. Do you recall having received that from
5 him?
6     A. Never. Sorry, I should have answered no,
7 I don't recall receiving it.
8     Q. Did you follow up and ask for it?
9     A. Presumably I would have, but I don't know.
10     Q. So at the bottom of this page it has your
11 name again.
12     So it looks like there would have been
13 an e-mail from you to which he's responding, but it
14 seems to have been doctored or cut off.
15     Anyway, I will deal with counsel on that
16 to get accurate production of this e-mail exchange.
17 Who is Jason Christopoulos?
18     A. That is Lyman Law. Jason Christopoulos is
19 a lawyer for Lyman law, and Mike must have asked me
20 to forward that to Jason.
21     Q. You mentioned something about a U.S.
22 Postal bulk mailing receipt or something of that
23 nature?
24     A. Yes, sir.

11 (Pages 38 - 41)

Page 42

1    Q.  How did you obtain that?
2    A.  It would have been from Nick Cornfield, an
3  e-mail form as well, I believe.
4    MR. DANDELLES:  Counsel, we would request
5  copies of all e-mails in the system, not only
6  Barbara Flores, but all e-mails between anyone at
7  Mike Anderson Chevrolet and Nick Cornfield on behalf
8  of J and N that has not been provided in discovery
9  in this case.
10 BY MR. DANDELLES:
11   Q.  Did you ever see samples of mailers or
12 advertisements prepared by J and N for Mike Anderson
13 Chevrolet?
14   A.  No, not that I can recall.
15   Q.  I know it's sideways.  I could perhaps
16 figure out how to rotate.  All right.  Do you see
17 this?
18   A.  I do.
19   Q.  What does this appear to be?
20   A.  It appears to be a mailer for Mike
21 Anderson's Rochester store in Indiana.
22   Q.  Do you know if J and N provided services
23 to either of the Mike Anderson stores in Indiana?
24   A.  I do not know that.

Page 43

1    Q.  Mike Anderson Chevrolet, 5333 West Irving
2  Park, is that a reference to Mike Anderson Chevrolet
3  of Chicago?
4    A.  Yes.
5    Q.  Is this also what we refer to as a mailer?
6    A.  I would refer to that as a mailer, yes,
7  sir.
8    Q.  Do you know who H-a-z M-u-t-a-w-e is?
9    A.  Yes.
10   Q.  Who is he?
11   A.  He was at that time I believe the general
12 sales manager.
13   Q.  If we haven't marked this yet, Exhibit 8,
14 please.  And it's an exhibit from J and N, bates
15 number J and N 111 to 140.
16     What does this appear to be?
17   A.  That appears to be something that was
18 mailed out, but not returned.
19   Q.  So if it was returned it would have had to
20 have been mailed, correct?
21   A.  Correct.
22   Q.  And you see here Lee Garcia, 7929 West
23 Seminol.  Let me flip back.
24     Does this appear to be that mailer that

Page 44

1  was mailed out, but returned?
2    A.  Yes, sir.
3    Q.  And it references Mike Anderson Chevrolet,
4  correct?
5    A.  Yes, sir.
6    Q.  When you referenced that Mike Anderson
7  asked you to look into a mailer, was it a particular
8  mailer that he asked you to look into or a
9  particular date on which mail should have been sent?
10   A.  He didn't say in specific, but he just
11 said to look into the last mailer.
12   Q.  And so is that around October of 2017?  Is
13 that the genesis of that e-mail exchanged with Nick
14 Cornfield in that time frame?
15   A.  Correct, sir.
16   Q.  Did you ever ask J and N for all mailers
17 relating to all work J and N ever did for Mike
18 Anderson Chevrolet of Chicago?
19   A.  Yes, sir.
20   Q.  Do you see what I'm holding here?
21   A.  Yes, sir.
22   Q.  It's a glossy -- what would you call this
23 in the industry?
24   A.  A mailer, sir.

Page 45

1    Q.  A mailer, okay.  So up here is where
2  somebody's name and address would be printed, and
3  you have a postage reference up here?
4    A.  Correct.
5    Q.  And so that program headquarters, is that
6  a reference to Mike Anderson Chevrolet's address?
7    A.  Correct.
8    Q.  It's got graphics on it?  Graphics and
9  words, is that right?
10   A.  Yes, sir.
11   Q.  Do you have any facts or evidence to
12 establish that this mailer was not sent out?
13   A.  No.
14   Q.  Do you have any facts or evidence to
15 establish that any of the advertisements that J and
16 N billed to invoice to Mike Anderson Chevrolet were
17 not done?
18   A.  No.
19   Q.  Let's mark the next exhibit in order.  It
20 is Exhibit 9, which for identification purposes
21 bears bates numbers MACCJandN 23, 22, 20, 21, 24,
22 and 25.
23     Do you see what's on my screen here?
24   A.  I do.

12 (Pages 42 - 45)

Page 46

1    Q.   What does this appear to be?
2    A.   An invoice from J and N Marketing for
3  June 1, 2017.
4    Q.   Does this contain the type of information
5  that you would expect to see from a vendor?
6    A.   Yes.
7    Q.   It's billed to who?
8    A.   Mike Anderson Chevrolet in Chicago.
9    Q.   What is this document here?
10   A.   That is a check request.
11   Q.   Is this what's filled out in the ordinary
12  course?
13   A.   Yes, sir.
14   Q.   When an invoice needs to be paid?
15   A.   That's filled out when there's not an
16  actual purchase order that's created.  So yes.
17   Q.   And then the check request together with
18  the invoice is the information that the accounts
19  payable team relies on in order to cut a check, is
20  that right?
21   A.   Correct.
22   Q.   And that vendor has to be approved in the
23  system in order for a check as reflected on this
24  page to be generated?

Page 47

1    A.   Correct.
2    Q.   Was this again generated by Monica, MS?
3    A.   Yes, sir.
4    Q.   What's this reference to G/L account, what
5  does that mean?
6    A.   General ledger account.
7    Q.   What are the references under it?
8    A.   So those are the general ledger accounts
9  that we expensed the mailers to.  So we split it.
10        If you go to the page above in Jason's
11  writing he wants $8,192 expensed in June for the
12  mailers.  And $9,392 to be expensed in July.  So,
13  therefore, if you add up 65 and 65, that should be
14  that first dollar amount.  And that was expensed in
15  June.
16        And then the account 274 is prepaid.  So
17  I would have made a manual entry to expense it once
18  the July book is open.
19   Q.   Would you have made those ledger entries
20  if this was a payment for services not rendered?
21   A.   No, sir.
22   Q.   Would you have booked this payment if it
23  was to a vendor that was not authorized or approved?
24   A.   No, sir.

Page 48

1    Q.   What does this reflect?
2    A.   That looks like a mailer, sir.
3    Q.   And it's summer sale it says?
4    A.   Yes, sir.
5    Q.   June and July in the summer?
6    A.   I would agree, yes.
7    Q.   And it's referencing 2017.  And I believe
8  this check was cut in June of 2017?
9    A.   Yes.
10   Q.   Does this appear to evidence that mailers
11  were prepared on behalf of Mike Anderson Chevrolet
12  of Chicago in support of the invoice being submitted
13  by J and N?
14   A.   This is the template.  As you see, first
15  name, last name are all in brackets.
16   Q.   And do you have any facts or evidence to
17  establish that this template was not used in actual
18  mailers in or around June or July of 2017?
19   A.   No.
20   Q.   So what else did you do in terms of
21  investigating that October 2017 mailer that Mike
22  asked you to look into?
23   A.   I believe that was it.  And then Judy
24  Arnold got involved, and she took over from there.

Page 49

1    Q.   When did Judy Arnold get involved?
2    A.   I can't say.  I don't know, but
3  immediately after my findings I reported them to her
4  and Mike both.  So from there she took over.
5        Presumably that e-mail I believe we
6  looked at that was October of '17.  Shortly after
7  that I would say.
8    Q.   In what manner did you report your
9  findings to Judy and Mike?
10   A.   I would have forwarded that email or any
11  e-mail with correspondence I had with Nick.  Any of
12  the responses that he would have sent me, I would
13  have forwarded to both Judy and Mike Anderson.
14   Q.   Would you have simply forwarded them or
15  would you have forwarded them with some narrative or
16  commentary associated with it?
17   A.   I don't believe I would have forwarded it
18  with commentary only because I would have spoken in
19  particular with Judy first in regards to telling her
20  this is what I'm sending you.  But I don't know.  I
21  might have.
22   Q.   Do you recall whether it was an e-mail or
23  a memo or a summary that you would have sent with
24  your findings?

13 (Pages 46 - 49)

Page 50

A. More than likely I would have e-mailed it to Judy and/or Mike.
Q. To the best of your recollection, what were your findings as it relates to J and M and that mailer?
A. My findings were exactly what you see on the e-mail. He said he was going to provide the graphics, and I don't believe he did at that time.
He did send over a list of a CBS file for the mailers. And Mike wanted me to compare that to our customer list. And he wanted me to find out where did that customer list he had, where did it come from.
Mike is very big on the customer retention. So he wants to make sure that our NADs, our customer files are as up to date and clean as possible. And so -- I lost track of what we were talking about, excuse me.
Q. That's okay. I just want to know what your ultimate findings were.
A. My ultimate finding was I didn't have in regards to J and N, that was it. He was unable to provide a graphic at that time.
And he was very upset and short on the

Page 51

phone when I spoke with him as if I was meddling into something.
Q. You said he was unable to. How do you know that he was unable to as opposed to simply didn't provide the graphic?
A. I don't know that information. That's what I said at that time, he did not.
Q. So let's mark this next exhibit in order, Exhibit 10, which is the J and N subpoena response bearing number JandN 1 through 83.
Before I recall you referred to a template that did not have name or address, correct?
A. Correct.
Q. And we saw some other of these different names, but you see this. Does this appear to be a mailer?
A. Yes, sir.
Q. On behalf of Mike Anderson of Chicago?
A. Yes, sir.
Q. Does it appear to be a tri-fold 8 and a half by 11 mailer?
A. Yes, sir.
Q. Do you see the line here that reflects a fold and another fold?

Page 52

A. I do.
Q. And it would be in a letter sized envelope typically?
A. Yes, sir.
Q. Do you have any information, facts or evidence that this mailer or those like it were not sent out?
A. No, I don't.
Q. So in terms of your findings, you testified that your findings were that he didn't at that time provide you graphics, correct?
A. Correct, sir.
Q. Were there any other findings that you reported to Mike Anderson or Judy in relation to your investigation of J and N or any mailers?
A. No, sir.
Q. Did you ever make any findings that mailers were not, in fact, sent?
A. No, sir.
Q. Did you make any findings that Mike Anderson Chevrolet of Chicago paid for invoices reflecting services not rendered?
A. No.
Q. Here is another form of a mailer. Would

Page 53

you agree this is a mailer?
A. Yes, sir.
Q. Would you agree that it was sent on behalf of Mike Anderson Chevrolet?
A. Yes.
Q. You see the name Jack Rajewski on this document, which is bates 53. And this is to Edward Buse on 54 and Donna Curry on 55.
Is this the typical kind of thing that would be sent to potential customers to generate business for Mike Anderson Chevrolet?
A. Yes, sir.
Q. Are you familiar with a promotion at some point I believe in 2016, 2017 where as part of a mailer advertising program, a little key or a plastic key was sent out to people.
And they could come into the store and see if their key opened the door. Do you recall that?
A. No, sir.
Q. Is this also a different type of mailer we're looking at, a J and N 61?
A. Yes, sir.
Q. Did Mike Anderson Chevrolet of Chicago

Page 54

1 sell Corvettes?
2    A.  Yes, sir.
3    Q.  Were Corvettes one of the bigger draws of
4 Mike Anderson Chevrolet?
5    A.  No.  I mean, well, let me clarify that.
6 Bigger as far as more expensive, yes, but we had way
7 too many of them.
8    MR. DANDELLES:  We've been going nearly an hour
9 and a half.  Let's take a quick break.  Maybe come
10 back in about five minutes.
11        (Recess)
12
13 BY MR. DANDELLES:
14    Q.  Sticking with J and N for a minute, you
15 mentioned earlier when you were describing for me
16 the conversation you had with Mr. Quandt a few
17 months ago that at some point someone discovered
18 some checks cut from J and N to Jason Kolodzinski.
19        Do you recall that?
20    A.  Yes.
21    Q.  What specifically do you recall about
22 checks being cut from J and N to Jason?
23    A.  Just exactly what I said.  That's what he
24 told me.

Page 55

1    Q.  He told you?
2    A.  Yes, sir.
3    Q.  So it's not something that you discovered
4 in your investigation?
5    A.  No, sir.
6    Q.  Did he tell you what he thought those
7 checks were for?
8    A.  Well, no.  He said that they discovered
9 the checks were made payable to Jason.  He didn't
10 elaborate.
11    Q.  Do you know what those checks were for?
12    A.  I assumed.
13    Q.  What did you assume?
14    A.  I assumed that it was a pay back or a
15 kickback for the mailer from Mike Anderson and that
16 J and N was paying Jason.
17    Q.  Are you aware that Jason provided web
18 design services to J and N?
19    A.  No.
20    Q.  So you don't know one way or the other
21 what those payments were for, do you?
22    A.  I do not.
23    Q.  What role did Judy Arnold play within Mike
24 Anderson Chevrolet of Chicago?

Page 56

1    A.  She played a CFO role.  I reported
2 directly to her and Mike.
3    Q.  Did Mike Anderson of Chicago have a budget
4 for advertising services?
5    A.  Not an official budget, no.
6    Q.  As the controller, the person who controls
7 every line item on the general ledger, did you ever
8 red flag any J and N invoices as being improper?
9    A.  No.
10    Q.  Did you ever red flag any TKC
11 Entertainment invoices or payments as being
12 improper?
13    A.  No.
14    Q.  Nothing seemed out of the ordinary for the
15 amount involved for the services listed on the
16 invoice, correct?
17    A.  No, nothing was out of the ordinary.
18    Q.  Are you familiar with an advertising co-op
19 program through Chevrolet's manufacturer?
20    A.  Through GM, yes.
21    Q.  Is that through GM?
22    A.  General Motors, yes.
23    Q.  What can you tell me about the co-op
24 program?

Page 57

1    A.  So General Motors has a program where they
2 assist with marketing and advertising fees.  It's a
3 very specific program.
4        So like, for example, the mailer, those
5 mailers are acceptable, but it has to have a very,
6 very specific General Motors items on there.  It's a
7 whole booklet for co-ops and so it's very, very
8 specific.  You apply for the money on GM Global
9 online.
10        You have to give them proof of mailer
11 and then they give us a credit or money back towards
12 payment of those mailers.
13    Q.  Who was responsible for going into the GM
14 system to log those I guess reimbursement requests?
15    A.  There were several people.  I was
16 responsible for the Comcast commercials that we did.
17 Cars.com, I believe, did it themselves.
18        And I don't recall the other vendors at
19 this time, but they would do it themself.  There was
20 another advertising company that we used have, and
21 they had access.  And they would apply for it online
22 direct.
23    Q.  But in a situation like the mailers that J
24 and N provided, would that have to be somebody at

15 (Pages 54 - 57)

Page 58

1 Mike Anderson Chevrolet who uploads the information
2 to GM?
3    A. I don't believe those were co-opable.
4    Q. Were radio ads co-opable?
5    A. Yes. Radio ads are co-opable if you
6 follow the guidelines of what the restrictions and
7 guidelines are from General Motors.
8    Q. What would I need to look at within the
9 Mike Anderson system to determine whether any J and
10 M invoices were submitted for reimbursement or
11 contribution under the co-op program? Where would I
12 look?
13    A. You would not look in Mike Anderson's
14 software. You could look in General Motors
15 software, and it would have been applied for -- if
16 it was a vendor that was applicable or they followed
17 the co-op guidelines, we would have applied for the
18 co-op from General Motors.
19    Q. You say you would have applied for the
20 co-op from GM.
21       Where would I look to to find out
22 whether Mike Anderson applied for the co-op for the
23 J and N mailers?
24    A. On GM Global's website.

Page 59

1    Q. So there wouldn't be a record at Mike
2 Anderson to show that Mike Anderson from its own
3 computer system made that request?
4    A. So they would have printed out from GM
5 Global. If we applied for that mailer, we would
6 have the record of the actual mailer, first of all,
7 the graphic, the documentation.
8       I am going by memory for co-op. They
9 would have had to have the documentation when it was
10 mailed out and very specific, like the Chevy bow,
11 that Chevy emblem. It had to have that specific
12 item there, which one they are accepting at that
13 time because it does change.
14       And they would have went on to the GM
15 Global website and printed out, uploaded, excuse me,
16 uploaded all of those documentation into GM's Global
17 website. Once that happens, you would have received
18 confirmation that this has been applied for, and
19 they will get back to you with a decision.
20       So it just stays in pending status until
21 a decision of approved or rejection has been made by
22 GM.
23    Q. What I'm trying to understand is where
24 would those records be kept?

Page 60

1    A. At Mike Anderson Chevrolet, the
2 documentation.
3    Q. And does Mike Anderson Chevrolet as an
4 authorized GM dealer, do they have their own
5 customer number, for example, within the GM Global
6 system?
7    A. Yes, sir. It's called a BAC.
8    Q. What does BAC stand for?
9    A. I don't know, business agent. I'm not
10 sure.
11    Q. So whoever was responsible for this
12 function, you said yourself and others, you would
13 have to log into the GM Global portal or for lack of
14 a --
15    A. Website.
16    Q. But you would do that from Mike Anderson.
17 You would do that from your computer, correct?
18    A. I would do it from my computer at Mike
19 Anderson, but the other vendors who had access would
20 do it from wherever they are at because they would
21 not be on site.
22    Q. I know. I am only asking about you and
23 your experience within Mike Anderson. So the folks
24 at Mike Anderson who would log in and upload the

Page 61

1 information, the application and the request?
2    A. That would have been me.
3    Q. So there would be records either within
4 Mike Anderson's computer system or within its
5 account within the GM Global system that reflects
6 whether or not an application was made for the J and
7 N advertising. Correct?
8    A. Correct.
9    Q. And as you sit here today, do you recall
10 one way or the other whether or not any application
11 was made with respect to any of the J and N mailers?
12    A. Not from me. I only did the Comcast
13 spotlight and that was the commercials that we did
14 on cable, on Comcast.
15    Q. So it could have been someone else at Mike
16 Anderson who uploaded an application for J and N if
17 such application was submitted?
18    A. I don't believe so.
19    Q. So any applications in the GM Global
20 system would have gone through you and if not you,
21 it would have been done by the vendor itself, is
22 that right?
23    A. Correct.
24    Q. But regardless of whether or not it was

16 (Pages 58 - 61)

Page 62

1 done by you or done by the vendor, Mike Anderson
2 would have a record of whether or not an application
3 was submitted on their behalf, correct?
4     A.   The vendor would have given us the
5 information, correct.
6     Q.   Now, would there also be a record of --
7 well, strike that.  Let me ask it this way.
8         You said that there would be a
9 notification of whether or not the application was
10 approved or denied?
11    A.   Rejected, yes.
12    Q.   How would that approval or rejection be
13 conveyed?
14    A.   Since I applied, you attach your e-mail
15 address to the application.  And if there is a
16 denial or approval you will actually receive an
17 e-mail maybe I will say three to five days after.
18        I can't give the exact time frame of
19 when, but you will receive that e-mail from General
20 Motors.  It's more of a notification, very generic
21 type of thing.  But you will receive something.
22    Q.   How does the flow of funds work?
23    A.   The funds are paid directly from General
24 Motors on their weekly parts statement.

Page 63

1     Q.   Weekly parts statement?
2     A.   Yes, sir.  So General Motors is basically
3 a vendor to Mike Anderson, and we pay for parts.
4         We also pay for any of the services that
5 are required from on General Motors' behalf.  We
6 have to pay for those.  So, for example, if General
7 Motors' service entity requires us to send out a
8 mailer, a service mailer for customers who have just
9 purchased a vehicle or who have been in to our
10 service department, there are certain requirements
11 that General motors makes us comply with.
12        And every single one of those charges
13 are on that weekly statement.  Also when a client
14 purchases a brand new car and there's incentives and
15 or rebates, General Motors pays us back.
16        It's a whole tremendous in and out of
17 money and at the end the net result is the bottom
18 dollar amount, and it's either debited from our
19 account or added into our account at the end of the
20 week.
21    Q.   And so any money that was returned
22 pursuant to the co-op advertising program would be
23 reflected as a credit on that weekly statement?
24    A.   Correct.

Page 64

1     Q.   And was it dollar for dollar against the
2 invoices submitted?
3     A.   No, sir.  It's very, very specific.  Some
4 items are 100 percent co-opable.  Some are a portion
5 of it, only 50 percent, et cetera.  So it's very,
6 very specific.
7     Q.   Let's mark the next exhibit in order,
8 please.  This is Exhibit 11, which bears bates
9 number JandN 103 and 104.
10        Do you recognize this document,
11 Ms. Flores?
12    A.   Yes.
13    Q.   What is this?
14    A.   This is a USPS postage statement for bulk
15 mailers.
16    Q.   Was this the statement that you referred
17 to earlier relating to J and N?
18    A.   I don't know if this one is the specific
19 one, but presumably it is.
20    Q.   You said something about it being sent to
21 Iowa?
22    A.   Do you mind holding it for a moment so I
23 could look at it.
24    Q.   I'll go to the top.  Tell me when to

Page 65

1 scroll.
2     A.   Under mailing it says post office of
3 mailing is Cedar Rapids, Iowa.  It's in the second
4 set mailing.  It says mailers mailing date
5 10-5-2017.  10,001 mailed pieces.
6     Q.   I see that.
7     A.   I believe this is the one.  I can't say
8 for sure, though, if this is the one that was
9 emailed to me.
10    Q.   You mean emailed to you by Nick from J and
11 N?
12    A.   Yes, sir.
13    Q.   And is this the one that you reviewed with
14 an employee of the U.S. Postal Service?
15    A.   I don't know for sure.  Presumably it is
16 because you have it.
17    Q.   Are you generally familiar with these
18 types of statements and forms?
19    A.   No.  That is why I called the post office
20 to get more clarification for this.
21    Q.   So you don't know whether or not this
22 actually reflects a receipt for the postage in the
23 amount of $2,380 or not?
24    A.   No, sir.

17 (Pages 62 - 65)

Page 66

1    Q.  You testified earlier to be familiar with
2  KC Kustoms and its principal Alex Cisneros.  Do you
3  recall that?
4    A.  Yes.
5    Q.  AC Kustoms was a frequent vendor for body
6  work I think you said for Mike Anderson, correct?
7    A.  Yes, sir.
8    Q.  And also a vendor for other service and
9  mechanical work during the time of the strike, is
10  that right?
11    A.  Yes, sir.
12    Q.  Did you ever personally meet Alex
13  Cisneros?
14    A.  Yes.
15    Q.  On how many occasions?
16    A.  I can't say.  He was in the dealership
17  quite often.
18    Q.  Why would he be in the dealership?
19    A.  Either picking up cars or dropping off
20  cars.  He was very friendly with Jason and the other
21  staff.
22    Q.  When you say picking up cars or dropping
23  off cars, why would he be picking up cars or
24  dropping off cars?

Page 67

1    A.  For the work that he completed or was
2  going to do.
3    Q.  So going to do meaning picking it up,
4  correct?
5    A.  Correct.
6    Q.  Or work that you had done after dropping
7  it off?
8    A.  Correct, sir.
9    Q.  Are you aware of any work that he invoiced
10  that he did not do?
11    A.  No.
12    Q.  Did you ever have any reason to believe
13  while you were controller at Mike Anderson Chevrolet
14  and responsible for vendor payments to AC Kustoms
15  whether AC Kustoms, with a C or a K, whether he was
16  invoicing the company for work that he wasn't
17  actually doing?
18    A.  No, sir.
19    Q.  Did you ever have any reason to believe
20  while you were controller of Mike Anderson Chevrolet
21  of Chicago that AC Kustoms with a C or a K was
22  providing inflated invoices to Mike Anderson
23  Chevrolet?
24    A.  I do not know that, no.

Page 68

1    Q.  Were you asked at any point by either Judy
2  Arnold or Mike Anderson to review invoices and
3  payments to AC Kustoms?
4    A.  Not outside of the normal review that I
5  would have done.
6    Q.  What type of normal review would you do in
7  the ordinary course of business?
8    A.  There would be a purchase order attached
9  to the invoice confirming that there was approval
10  that this work was done or approved to be done.
11    Q.  So in the fall of 2017, you were asked to
12  look into J and N with respect to a mailer.
13  Correct?
14    A.  Yes, sir.
15    Q.  And you were also asked to look into the
16  TKC radio ads, correct?
17    A.  Yes, sir.
18    Q.  Were you ever asked to look into the
19  propriety of AC Kustom's billing?
20    A.  No, not that I recall.
21    Q.  As you sit here today, do you have any
22  facts or evidence to establish that AC Kustoms
23  billed Mike Anderson Chevrolet for work that it did
24  not perform?

Page 69

1    A.  No.
2    Q.  Do you have any facts or evidence to
3  establish that AC Kustoms fraudulently inflated any
4  invoices for work that it did?
5    A.  No.
6    Q.  Do you have any facts or information to
7  establish that Jason Kolodzinski had any ownership
8  or financial interest in AC Kustoms?
9    A.  No.
10    Q.  Do you have any facts or information to
11  establish that Jason Kolodzinski received any
12  payments, kickbacks or sharing in the money that
13  Mike Anderson Chevrolet paid to AC Kustoms for the
14  services it provided?
15    A.  No.
16    Q.  To J and N, the same quick line of
17  questions.  Are you aware of any facts or evidence
18  to establish that Jason Kolodzinski had any
19  financial or ownership interest in the entity J and
20  N Marketing?
21    A.  No, I did not.
22    Q.  Any facts or information to establish that
23  Jason Kolodzinski has or had any financial ownership
24  interest in TKC Entertainment?

18 (Pages 66 - 69)

Page 70

1    A.  No.
2    Q.  Any facts or information to establish that
3  Jason Kolodzinski received any payment or kickback
4  from TKC Entertainment in relation to the services
5  provided and payments received from Mike Anderson
6  Chevrolet?
7    A.  No, sir.  May I say something?
8    Q.  You May.
9    A.  As one of the human resources forms that
10  is in every single one of the employee's packets
11  like they're beginning brand new employees, there is
12  a form there that Mike and Judy specifically want
13  every employee to sign.
14         It says something to the effect -- you
15  could ask from them direct, that we are not allowed
16  to receive gifts or anything from vendors.  We all
17  sign it.  So to hear today that you are telling me
18  that J and N, that Jason was an owner of J and N or
19  a partial partner in J and N Advertising and he
20  didn't say anything, that is a little like why
21  wouldn't he just say that that is his company and be
22  up front.
23    Q.  For the record, I didn't say that he is an
24  owner of J and N.

Page 71

1    A.  You said he's a partner or a graphic
2  designer or something.
3    Q.  You're talking about my question before
4  were you aware that he performed web design services
5  for J and N.  That was my question.
6    A.  I apologize then.  So he was a potential
7  employee or a contractor with J and N.
8    Q.  Perhaps, but the question, to be clear for
9  the record, I never represented or asked that he is
10  an owner of J and N.
11         An hour ago I asked a question are you
12  aware of whether or not he provided web design
13  services to J and N.  That was the question.
14    A.  I apologize.
15    Q.  That's okay.  And my most recent line of
16  questioning was you aware of any facts or
17  evidence to establish that he was an owner or had a
18  financial interest in J and N?
19    A.  Which I once again say no.
20    Q.  Right.  So just to be clear, I am not
21  saying he was.  I'm asking whether you know he was
22  or have evidence to establish that he was.
23         Are you familiar with an entity called
24  Sir Hooptie?

Page 72

1    A.  Yes.
2    Q.  What do you know about Sir Hooptie?
3    A.  It's Alex Cisneros' company.
4    Q.  How do you know that?
5    A.  Do you have any documentation, his dealer
6  license or anything on there that you could refer
7  back to?
8    Q.  I don't know that I do.
9    A.  I believe he was a dealer that tried to
10  get this to the dealer, so he would purchase
11  vehicles from the auctions.
12         And since he was a body shop, he would
13  put them back together for very loose terms and then
14  sell them, wholesale them.
15    Q.  When you say he, you're referring to Alex
16  Cisneros?
17    A.  Yes, sir.
18    Q.  Do you have any information or evidence or
19  facts to suggest that Jason Kolodzinski was an owner
20  or had a financial interest in Sir Hooptie?
21    A.  No, sir.
22    Q.  What's the source of the information that
23  you just testified about regarding Alex's
24  relationship to Sir Hooptie?

Page 73

1    A.  I don't recall what the dealer license
2  says, but we require if we're doing business with
3  dealership purchasing or selling cars we require a
4  dealer license.
5         I don't recall if it had his name on it,
6  but he would come, and we would physically give him
7  checks or if we sold to him, he would give us
8  checks, and it would be handed in his hand at the
9  dealership.
10    Q.  Would you hand him the checks on occasion?
11    A.  It would not typically be me.  When we
12  were purchasing vehicles from him that would have
13  been Kathleen Keenan.
14         She was in charge of making sure that all
15  of the units -- she would purchase the used vehicles
16  for us.  That was part of her responsibility.
17    Q.  Including from Sir Hooptie?
18    A.  Yes, sir.
19    Q.  We talked about vendors and the NAD
20  number.  Suppliers or people from whom you're buying
21  cars like Sir Hooptie, do they have an NAD number or
22  is it different?
23    A.  No, it's the same.
24    Q.  So if Mike Anderson Chevrolet was buying

19 (Pages 70 - 73)

Page 74

1 cars from Sir Hooptie, the presumption would be that
2 they were an approved vendor, approved source from
3 which Mike Anderson could buy cars, is that correct?
4     A.   Yes.
5     Q.   And that similarly would have to be
6 approved by Mike Anderson?
7     A.   Yes, sir.
8     Q.   And so if checks were cut to Sir Hooptie,
9 they could only be cut if it was an approved vendor
10 with an NAD number, correct?
11     A.   Correct, sir.
12     Q.   Do you have any recollection of the
13 volume of business that Mike Anderson did with Sir
14 Hooptie?
15     A.   No, I would not be able to guess that.  Or
16 say if it was five cars or 100, I would not say.  I
17 don't know.
18     Q.   Would that be reflected somewhere in Mike
19 Anderson's records?
20     A.   Yes.
21     Q.   Where would we look in Mike Anderson's
22 records to determine how many cars, for example,
23 were purchased from Sir Hooptie?
24     A.   You would have the check the physical

Page 75

1 check request and all of the documentation behind as
2 well as checks made payable to Sir Hooptie.
3     Q.   So let me pull this up.  This is next in
4 order.  Exhibit 12 for the record bears MCCFH 1
5 through 18.
6          Do you recognize the handwriting on this
7 document?
8     A.   It is Judy Arnold's.
9     Q.   Do you know what these numbers represent?
10     A.   Could you bring it down a little.
11 Presumably because I have seen a repair order in a
12 sequential documentation.  It's for that stock
13 number CP 7, $23381 loss and stock number CP 2,
14 3724, 3,468.66 loss.
15          Presumably, we would have purchased those
16 vehicles from Sir Hooptie.  That is what I'm
17 thinking this is.
18     Q.   And the loss reflects what?
19     A.   The loss presumably is when we sold the
20 vehicle.  That's my assumption.  I don't know for
21 sure.
22     Q.   The next document bates two under the same
23 range identified, what is this?
24     A.   That would have been Katie Keenan,

Page 76

1 purchasing, creating that check for $90,000 for
2 three units that were purchased from Sir Hooptie, a
3 RAV 1500, a 2017 Chevy Tahoe and a '10 Escalade.
4     Q.   What process or procedure did Mike
5 Anderson Chevrolet have at the time May of 2017 to
6 determine whether or not to buy a particular car
7 from a particular dealer?
8     A.   So they would, they meaning the used car
9 manager or whichever manager is purchasing the
10 vehicle, would have to bring a check request, all of
11 the titles.
12          If it was from a client like just
13 walking in and saying I want to sell my car to you,
14 we would need the title, odometer, power of
15 attorney, all of the documents that go into the
16 purchase.
17          We would also require the MMR, which is
18 like what is saying the vehicle is worth wholesale.
19     Q.   Who would be responsible for generating
20 that MMR?
21     A.   The sales manager of whoever is purchasing
22 the vehicle.
23     Q.   Would that be verified by Katie Keenan
24 before cutting a check?

Page 77

1     A.   Yes.  It's a printout at that point.
2     Q.   I'm sorry, what is a printout?
3     A.   The MMR.  They would be required to print
4 it.
5     Q.   Who is they?
6     A.   The sales manager and/or used car manager,
7 whichever sales manager meaning potentially Jason
8 Kolodzinski was purchasing the vehicle, he would
9 also have to print out the MMR.
10     Q.   So the policies and procedures in place
11 were a check request, an MMR and other documentation
12 had to be provided in order for this process that is
13 reflected on the screen to take place, meaning for a
14 check to be cut that information had to be provided?
15     A.   Yes, sir.
16     Q.   And it would be Katie's job in the context
17 of this particular transaction to verify that all
18 the proper documentation was there.  Correct?
19     A.   Secondarily, yes.
20     Q.   What was the primary?
21     A.   So primarily she would be responsible.
22 Then secondarily I would be responsible because I
23 would put my initials in the corner of the check.
24     Q.   Let's look at this one in the middle, the

20 (Pages 74 - 77)

Page 78

1 Chevy Tahoe, 2017-3724. If the MMR said that the
2 wholesale value was only $40,000, but the check
3 request was for 46, what would you do?
4     A.  I would question Jason and/or whichever
5 manager brought that to me.  Why are you buying this
6 car.  It's too expensive.  The cost, it doesn't make
7 sense.
8     Q.  Would that happen on occasion?
9     A.  No.
10     Q.  Because the MMR always matched up with the
11 purchase price?
12     A.  Correct, sir.
13     Q.  And how is the MMR prepared?
14     A.  I believe they would go on to V Auto,
15 which is a software tool that they would use, the
16 sales team.
17         And they were able to pull pricing, pull
18 costs, pull values from that tool, and it would come
19 directly from there.
20     Q.  And so Katie Keenan, what was her specific
21 title or role in this 2017 time frame?
22     A.  She was the license and title clerk, and
23 she processed all of the customers, retail clients,
24 license and title documentation.  As well as she did

Page 79

1 the wholesales.  So any vehicles that we sold at
2 auction and purchase as well.
3     Q.  Would purchasing cars from Sir Hooptie,
4 would that fall into the wholesale categories?
5     A.  Yes, sir.
6     Q.  So she would be responsible for verifying
7 the documentation, cutting the checks with you as a
8 backup to verify it as well and sign off on the
9 check or initial the check?
10     A.  Correct, sir.
11     Q.  Does this reflect three cars purchased, I
12 think you said three cars purchased in May of 2017?
13     A.  Yes, sir.
14     Q.  So the next page in order is number three.
15 Bates number three.  With respect to this Chevy
16 Tahoe 3724, what does this document reflect?
17     A.  That is a bill of sale per se.  It says
18 customer order on top, but it's really the bill of
19 sale and that means that Jonathan Oetti purchased
20 this 2017 Tahoe for $43,250.
21     Q.  Back here it was purchased for wholesale
22 for 46 and then sold for $43,25O.  Is that where
23 roughly the Delta comes from, the net loss on this
24 transaction?

Page 80

1     A.  Presumably, if you do the math.  I'm sure
2 that is what she's referring to.  I don't know for
3 sure.
4     Q.  Were you asked by Judy Arnold to
5 participate in the effort to calculate losses that
6 were going to become part of an insurance claim?
7     A.  I facilitated with our file clerk at that
8 time pulling documents and records.  I did not
9 personally pull documents or records.
10         I advised and told our file clerk to
11 pull and make copies, but I did not do any
12 calculations.
13     Q.  What were you instructed to instruct the
14 file clerk to pull and copy?
15     A.  We had a list of vendors that started with
16 us after Jason started his employment.  So such said
17 vendors.  We did not do business with Sir Hooptie
18 before Jason was working with us.
19     Q.  And this car was sold by Mike Anderson on
20 December 30.  Is that what that reflects?
21     A.  Yes.
22     Q.  And it was purchased by Mike Anderson in
23 May of 2017.  So that is a five plus month time
24 frame?

Page 81

1     A.  Correct.
2     Q.  Is that a long period of time for a car to
3 sit on the used car lot at Mike Anderson Chevrolet?
4     A.  I will say in general for dealers you want
5 your inventory, your used car inventory to be less
6 than 60.
7         Now, with that said I don't recall what
8 the aged units were at that time.
9     Q.  Based on your experience in the auto
10 industry, does the length of time that a car sits on
11 the lot affect its price?
12     A.  Yes.
13     Q.  In which direction, up or down?
14     A.  Mostly -- I'll say in these times, it's a
15 little different.  Right now it's a very different
16 time after Covid, and people are desperate to
17 purchase cars.
18         So I would say the opposite.  But at
19 that time I would say that the value would have
20 decreased.
21     Q.  Would there be records at Mike Anderson
22 Chevrolet to reflect how much this car was put on
23 the lot for, what the asking price was?  Was it
24 sometime very close to when it was purchased?

21 (Pages 78 - 81)

Page 82

1    A.  I'm not sure what you mean by record.  So
2  like I would say yes, an internet price.  But as far
3  as any record like a written document I would say
4  no.
5    Q.  Well, I assume there's an inventory
6  system?
7    A.  Yes.
8    Q.  And so I assume that inventory system will
9  reflect the cars that Mike Anderson has in the
10  showroom or on the lot, correct?
11    A.  Correct.
12    Q.  And what I'm wondering is if there is a
13  historical, like if we pull up CP 3724, would there
14  be historical records of the asking price so it gets
15  put on the lot for $50,000 on May 20.  And then
16  after 60 days it goes down to 48.
17        And then after another 60 days it goes
18  down to 46 and after another 60 days we're up to six
19  months.  It goes down to another number.  Is there a
20  historical pricing data for cars that Mike Anderson
21  has or had on the lot?
22    A.  I understand your question, but I don't
23  have an answer for that.  That would have been a
24  sales item that they would price their cars.  That

Page 83

1  is not something I would have gotten involved with,
2  nor setting their pricing.
3        Also they probably would have used the
4  sales tool, V Auto, that software because there's a
5  couple of feeds they have there, and they would have
6  changed their pricing, but I don't know anything
7  about that specific tool in that regards.
8    Q.  And ultimately in a free market system a
9  car can only be sold for what someone is willing to
10  pay for it, correct?
11    A.  Correct.
12    Q.  So what does this reflect?
13    A.  That is a service repair order.
14    Q.  This says internal.  Does this reflect the
15  work done was done by Mike Anderson's service
16  department?
17    A.  Not necessarily.  The internal refers to
18  that it's not a customer payor a warranty ticket,
19  meaning we're not charging General Motors for the
20  repair, nor is a customer paying for it.
21        This is internal.  So that means that
22  as you see Auto Tech Company organization did the
23  front bumper and touchup.  So we paid someone else
24  to do this work, but we the company is paying for

Page 84

1  that.
2    Q.  Mike Anderson is?
3    A.  Yes.
4    Q.  Front bumper and touch up, that is
5  mechanical?
6    A.  Yes.
7    Q.  Because you didn't have a body shop you
8  had to outsource that work?
9    A.  Yes.
10    Q.  Now, what if it was truly internal,
11  meaning it was mechanical and done inhouse.  Is
12  there a way to determine that?
13    A.  I apologize.  Could you repeat that
14  question.
15    Q.  You have a service order or what did you
16  call it?
17    A.  Repair order.
18    Q.  How would I know whether as opposed to
19  having been sent out to Auto Tech, a third party
20  vendor, how would I know that it was done right
21  there on site in the inhouse service department?
22    A.  I understand.  There's a technician in the
23  first concern, concern plus 01, in that line it's
24  repair tire, screw in tire.

Page 85

1        And if you go all the way over to the
2  next box flat is the operation and then 448 is the
3  actual technician number of the employee who did
4  that work.  It looks like they patched a tire on
5  that vehicle.
6    Q.  So 448 is associated with a particular
7  tech?
8    A.  Technician, yes.
9    Q.  So what does 999 reflect?
10    A.  A miscellaneous -- no.  A nontechnician.
11  It's just we have to put something.  The software
12  requires us to put a technician number in there.  So
13  999 is what they used for their technician that work
14  was sent out.
15    Q.  And this work was done 9-13-17.  So that
16  is five months after the car was purchased.
17        Why would five months after a used car
18  was purchased would front bumper and touchup work
19  need to be done?
20    A.  Well, it is a very tight lot, and one of
21  the employees and/or customers might have bent it or
22  scratched the vehicle taking it out of its parking
23  space.  It's lot damage.
24    Q.  Here, the same thing.  This is two months

22 (Pages 82 - 85)

Page 86

1  and a half roughly after, and it's a screw in the
2  tire.
3          Is that something you assumed happened
4  onsite, there's a screw in the tire and it had to be
5  repaired?
6      A.   Could you go up to the top, repair orders.
7  So the miles in at that time are 6515 in September,
8  and the miles at that time was 6169.  So I would
9  assume that someone was driving this vehicle.
10     Q.   As a demo or something?
11     A.   Presumably.
12     Q.   Are there records to reflect who may have
13 been driving this as a demo?
14     A.   We typically did not have many employees
15 drive demos at that time and also it's a used car.
16         The only thing I could think is maybe
17 the used car manager was test driving it, making
18 sure it doesn't sit.
19     Q.   So this is a $31.26 charge.  What does
20 that mean in terms of the ledger entries?
21         Did the sales department actually pay
22 $31.26 to the service department?
23     A.   Technically, yes.  In regards, that 31.26
24 is reflected in the cost of that 2017 Tahoe.  So now

Page 87

1  if you go to the top of the screen it was $46,000
2  what we paid for it.  So now the cost is $46,031.26
3  and so forth.
4      Q.   From a sales perspective, right?  So from
5  a ledger entry where you have a debit, meaning a
6  cost to the sales department, you have a credit.
7          You have with corresponding credit
8  because no money changes hands, did it?
9      A.   No, sir.
10     Q.   So it's still a zero sum.  You have
11 additional cost to the sales department, but you
12 also have a line item of revenue to the service
13 department.  Correct?
14     A.   Yes, sir.
15     Q.   And the service department is not a
16 separate stand alone corporate entity, is it?
17     A.   No, sir.
18     Q.   Are the financials at the end of the day
19 for Mike Anderson Chevrolet of Chicago consolidated
20 as between sales and service?
21     A.   Yes.
22     Q.   So where you have a debit against one in
23 the amount of $31.26 and a credit against the other
24 in the amount of $31.26, at the end of the day it's

Page 88

1  a wash vis a vis Mike Anderson of Chicago, correct?
2      A.   Yes.
3      Q.   This looks like something that is
4  outsourced, 999 Suburban Wheel.  Is Suburban Wheel
5  another vendor?
6      A.   Yes.
7      Q.   Do you know who Suburban wheel is or do
8  you know anything about them?
9      A.   Other than they repair wheels, no, sir.
10     Q.   Do you know if Jason Kolodzinski has any
11 relationship with Suburban Wheel?
12     A.   No, I don't know that.
13     Q.   Do you know if Alex Cisneros has any
14 relationship to Suburban Wheel?
15     A.   I don't know that either, sir.
16     Q.   So this would have been an actual out of
17 pocket cost incurred by Mike Anderson Chevrolet to
18 the extent it was outsourced to a third party.  As
19 opposed to 31 dollars, it's more of an internal
20 accounting ledger entry, correct?
21     A.   Correct, sir.
22     Q.   Do you know who Auto Sky is?
23     A.   Yes, sir.
24     Q.   Who is Auto Sky?

Page 89

1      A.   A vendor who does our details.
2      Q.   Does Jason Kolodzinski have any
3  relationship with Auto Sky as far as you know?
4      A.   I don't know that information, no.
5      Q.   Who is Timothy Jenney?
6      A.   He's a service advisor at Mike Anderson
7  Chevrolet.
8      Q.   Why is his name up here in this field?
9      A.   He produced the actual repair order.
10     Q.   Would he have been responsible for
11 determining that a detail needed to be done and to
12 whom to send it to get that job done?
13     A.   No, he would not have been responsible to
14 determine that that detail needed to get done.  That
15 would have come from the sales department.
16         But he would have facilitated the actual
17 come get the car for detail.
18     Q.   So he would have picked up the phone, sent
19 an e-mail or whatever to Auto Sky and say hey, we
20 have a car for you to detail?
21     A.   Yes, sir.
22     Q.   Do you know whose initials these are?
23     A.   Tim Jenney's.
24     Q.   I thought I saw another name up here.  Do

23 (Pages 86 - 89)

Page 90

1 you know whose initials these are?

2    A.  No, sir.

3    Q.  Do you recognize this name Nassar

4 Fakhoury?

5    A.  Yes.

6    Q.  Who is he?

7    A.  At that time he might have been a used car

8 manager.  He's an employee of Mike Anderson.  I

9 apologize.  Let me take that back.

10       He started in our service department and

11 then he was promoted, but I don't recall the times.

12 So he might have been acting as a service advisor at

13 that time.

14    Q.  Now, let's take a look at this one we're

15 referencing, MECCSH 8.  This references Francisco

16 Segarra.  Do you know who that is?

17    A.  Yes.

18    Q.  Who is that?

19    A.  At that time I believe he was the service

20 manager.

21    Q.  So this reflects May 23, 2017, done

22 May 23, 2017 and invoiced May 25, 2017.  Do you see

23 that?

24    A.  Yes, sir.

Page 91

1    Q.  Now, recall that if we go to the top this

2 car was purchased May 19, 2017 --

3    A.  Let me clarify that.

4    Q.  The check was cut on that date?

5    A.  Correct.

6    Q.  So you may have the paperwork.  The actual

7 sale and taking the car on board may have occurred

8 well within a few days thereafter?

9    A.  Yes.

10    Q.  What does this reflect?  Basically it

11 looks like probably the first work that was done on

12 a car that you just took onboard, correct?

13    A.  I would agree if that was the first repair

14 order.  We use a used car inspection and make sure

15 that the -- we buy cars from all over.

16       So in Illinois you have to have a front

17 bracket, front license plate bracket and back one.

18 So we make sure to put it on right away.

19    Q.  So this is done as a matter of course on

20 all cars no matter what the source?

21    A.  Correct.

22    Q.  So it's a safety inspection because you

23 want to make sure it's safe before you sell it to a

24 customer?

Page 92

1    A.  Correct.

2    Q.  Is this done inhouse?

3    A.  Yes, sir.

4    Q.  And does this work order or service

5 statement reflect this work was done inhouse?

6    A.  Yes, sir.

7    Q.  And we know that because it's a sign of a

8 particular tech number?

9    A.  Yes.

10    Q.  So again $231.40.  No one wrote a check

11 for $231.40 and paid the service department.

12 Correct?

13    A.  Correct.

14    Q.  But it reflected as an additional cost to

15 the sales on the sales ledger, but a credit on the

16 service ledger.  Is that correct?

17    A.  Yes, sir.

18    Q.  You asked about this before.  This is the

19 Missouri Department of Revenue, Sir Hooptie, LLC.

20 And it says owner corporate officer Brian Gardner.

21       Do you know who Brian Gardner is?

22    A.  No.

23    Q.  I thought you mentioned that this was Alex

24 Cisneros' company?

Page 93

1    A.  I would like to clarify that.  He was the

2 representative of that company.

3    Q.  What does that mean?

4    A.  He was an employee or is an employee or a

5 contractor, just as I am potentially representing

6 Mike Anderson now.  My name is not on Mike

7 Anderson's dealer license.

8    Q.  As you sit here today, are you aware of

9 any facts or evidence to establish that Sir Hooptie

10 committed any fraud upon Mike Anderson Chevrolet?

11    A.  No.

12    Q.  As you sit here today, are you aware of

13 any facts or evidence to establish that Jason

14 Kolodzinski in concert with or collusion with Sir

15 Hooptie committed any fraud upon Mike Anderson

16 Chevrolet?

17    A.  No.

18    Q.  So this is another car that is at issue in

19 this case.  Does this reflect the purchase of a car

20 from Sir Hooptie by Mike Anderson Chevrolet for

21 which Katie Keenan created a check?

22    A.  Yes.

23    Q.  The check was cut for this purpose on

24 June 1, 2017?

24 (Pages 90 - 93)

Page 94

1    A.   The check was cut.
2    Q.   This reflects a sale of that car on
3  March 28 of 2018, is that correct?
4    A.   Yes.
5    Q.   So that is a period of nearly ten months,
6  correct?
7    A.   Yes, sir.
8    Q.   You would agree that in the second half of
9  2017 and the earlier part of 2018 a car that sits
10  for ten months would have a negative or declining
11  market value, is that correct?
12    A.   Yes.
13    Q.   Gap protection not taxed.  What does that
14  mean?
15    A.   In the first line of the purchase price
16  the next box over.  The $47,965, that $530 is
17  included in that $47,965, and it's letting you know
18  that the gap protection is not taxed.  It's not a
19  taxable item in the State of Illinois.
20    Q.   So you paid tax on the $47,965, net of
21  $53O?
22    A.   Correct.
23    Q.   You pay tax on the $47,435?
24    A.   Less the $4,000 for the trade in

Page 95

1  allowance.  Plus the documentation fee.  I don't
2  recall, I guess it's $175 and if they went CVR, it
3  would be $25 as well.
4    Q.   What is CVR?
5    A.   Computer vehicle registration.
6    Q.   Let's go through these one at a time.  I
7  understand that it's not taxed.  Who gets that $530?
8    A.   The third party vendor.  We sell their gap
9  product on their behalf.  We have to pay gap.
10    Q.   Does Mike Anderson Chevrolet of Chicago
11  take a commission on the sale of that product?
12    A.   Yes, because I'm sure the cost is less.  I
13  don't know what it is, though.
14    Q.   Are there records that would reflect what
15  the cost of gap protection is because you're
16  actually taking in the $53O and then you have to pay
17  the service provider, the insurance company.
18       Where would I look to find out how much
19  of that $53O was retained by Mike Anderson as
20  revenue to Mike Anderson?
21    A.   You could look at the check and/or invoice
22  that was made payable to the gap vendor at that
23  time.
24       I don't recall if it was Allied

Page 96

1  protection plan.  It might have been.
2    Q.   Is this part of the F and I?
3    A.   Yes.
4    Q.   Can you estimate or ballpark based on your
5  experience on a product sold in the amount of $530
6  how much of a commission or markup would Mike
7  Anderson be able to keep of that $53O?
8    A.   At Mike Anderson in particular, the costs
9  were -- usually at most dealerships the gap costs
10  are fixed.  At Mike Anderson they were not.  So I
11  cannot say what the cost would have been there.
12    Q.   What does it mean that they are not fixed?
13    A.   If a vehicle is financed for a term of
14  zero to 36 months, the gap cost -- I'm going to make
15  an example, is $1OO.  That's very low.
16       From 37 months their term through let's
17  say 60 months, it might be $200.  Anything over 61
18  through the highest term of the loan to 84 months
19  might be $300.  They used if I recall correctly,
20  Allied protection plan and all of the costs were
21  derived directly from Allied.  It was not set by
22  term.  That is what I'm trying to say.
23    Q.   But generally I mean do they get to keep
24  ten bucks out of the $53O or do they keep $200 out

Page 97

1  of the $53O?
2    A.   I don't know.  Presumably it's not ten
3  dollars.  I would hope it's not ten dollars, but
4  presumably more.
5    Q.   But that is information that would be
6  within Mike Anderson's records on a transaction by
7  transaction basis.
8       If we went and looked up this car or
9  records pertaining to the sale of this car, we would
10  be able to find out how much of the $53O was passed
11  on to the vendor versus how much stayed in the
12  coffers of Mike Anderson, correct?
13    A.   Yes.
14    Q.   Is that the same with respect to the
15  extended service plan or warranties that are more in
16  the $2500 range?
17    A.   Yes.
18    Q.   Whether it's a commission or markup
19  there's some amount of that that is retained by Mike
20  Anderson Chevrolet with the balance being paid to
21  the vendor insurance company?
22    A.   Yes.
23    Q.   On this particular vehicle, the 2016 Yukon
24  work done in late March of 2018, which is right when

25 (Pages 94 - 97)

Page 98

1  it was actually the day it was being sold, it
2  appears that there is a tire that couldn't be
3  repaired, that there was a puncture too close to the
4  side wall.  Do you see that?
5      A.  Yes.
6      Q.  And this had to be repaired inhouse, is
7  that correct?
8      A.  Yes, sir.
9      Q.  And there was an internal charge of
10  $317.10, right?
11      A.  Yes, sir.
12      Q.  Again, no actual money changed hands, and
13  this was a debit to one side of the house and a
14  credit to the other side of the house.  Correct?
15      A.  Yes, sir.
16      Q.  At the end of the day that is all
17  consolidated into a single financial statement such
18  that it's a net zero to Mike Anderson Chevrolet,
19  right?
20      A.  Yes.  I mean you have to pay the
21  technician, all that stuff.
22      Q.  This is the last document in this batch,
23  MACCH 18.  This is the same 2016 GMC Yukon.
24          Do you see that this reflects wheels,

Page 99

1  tires purchased from or worked done by AC Kustoms.
2  Do you see that?
3      A.  Yes.
4      Q.  Do you have any facts or information or
5  evidence to establish that the work reflected here
6  was not done?
7      A.  No.
8      Q.  In fact, this is an internal Mike Anderson
9  Chevrolet -- what did you call it, service order?
10      A.  Repair order.
11      Q.  So who would have filled out the
12  information that's populated on this form?
13      A.  Tim Jenney.  This is the advisor on this
14  repair order.
15      Q.  Would this be invoiced and reflecting
16  these charges if the work wasn't done?
17      A.  No.
18      Q.  So you have no reason to believe the work
19  wasn't done as reflected on this repair order?
20      A.  No, I don't.
21      Q.  Do you know anything about a trade in that
22  Jason K did?
23      A.  We're talking about Jason Kolodzinski.
24      Q.  Works for me.  Do you know anything about

Page 100

1  a trade in involving Jason Kolodzinski, he traded in
2  to Mike Anderson his own car, a Corvette, and
3  purchased from Mike Anderson a Maserati.  Are you
4  familiar with that scenario?
5      A.  Yes.
6      Q.  What do you know about that?
7      A.  Just that he did it.  He purchased a
8  Maserati, I believe, for his wife and traded in, I
9  believe it was a white Corvette.
10      Q.  Is that a transaction that could happen
11  without other people knowing about it?
12      A.  No, sir.
13      Q.  Who else would have been involved -- to
14  the extent you know, who else was involved in that
15  transaction at any stage of it?
16      A.  Well, I don't know how we purchased the
17  Maserati.  Presumably we would have purchased it
18  from a vendor or from auction.
19          So it would have had to have been
20  purchased.  Katie would have had to produced the
21  accounting entries, produced a check or ACH or it
22  went on our floor plan.  I don't know.  I don't
23  recall who we purchased it from.
24          Then I believe he financed the vehicle.

Page 101

1  So the finance manager and/or sales manager would
2  have had to have added him into route one or dealer
3  tract.  I don't recall what system we used at that
4  time.  They would have made the purchase price, the
5  trade in price, negotiated the deal as a normal
6  actual transaction.
7          Then he would have applied for credit,
8  signed all of the documentation.  If there was a
9  down payment to be paid, he would have paid it.  And
10  then we would have received the documentation from
11  the office, in the accounting office.
12          We would have entered the accounting
13  into the transaction for the sale, wait for the deal
14  to be funded, produced the license and title and
15  continued to file it away.  It's a done deal.
16      Q.  Who is Roland Deluna?
17      A.  Rolando.  At that time he was the finance
18  manager.
19      Q.  So finance manager.  You said your
20  recollection was that financed the car.  So that
21  would necessarily involve the credit manager,
22  correct?
23      A.  Yes.
24      Q.  Or is he someone from the credit

26 (Pages 98 - 101)

Page 102

1 department?
2   A.  Correct.
3   Q.  In this case, Rolando Deluna, does that
4 person verify the accuracy of the purchase price?
5   A.  The purchase price is set.  Do you mean
6 verify with the sales manager?
7   Q.  Yes.  Are there checks and balances
8 against that purchase price reflected on the
9 customer order is accurate, that the trade in
10 allowance is accurate?
11   A.  Yes.  So the sales managers would have
12 added the deal into the system.  And then it would
13 have gone to -- in a typical deal the client would
14 have signed the agreement saying I agree that this
15 $100 is what I'm paying for the car and $5O is my
16 trade in value.
17       And they would have the signed document
18 from the customer.  The finance manager would have
19 that document.
20   Q.  You said in a typical deal.  Are house
21 deals or employees transactions dealt with
22 differently?
23   A.  They shouldn't be.
24   Q.  Let's mark this as next in order.  This is

Page 103

1 Exhibit 13.  This reflects bates number MACCKK 1
2 through 16.
3       Were you asked by Judy Arnold to do any
4 investigation or calculations as it relates to this
5 transaction?
6   A.  No.
7   Q.  Did you have any involvement whatsoever in
8 this transaction either in real time at the time it
9 occurred or after the fact as part of an
10 investigation of Jason Kolodzinski?
11   A.  No.
12   Q.  We're looking at JK2 right now, JK1 simply
13 being a cover page.  This is where I saw the name
14 and why I said Roland as opposed to Rolando.  Do you
15 see that is cut off there?
16       Does this reflect a customer order as
17 you said in the ordinary course?
18   A.  Yes, sir.
19   Q.  It reflects this reference to U.S. Bank.
20 Does that reflect the bank from which credit was
21 received?
22   A.  Yes, sir.
23   Q.  Who would have entered the actual
24 information, actual documentation as populated on

Page 104

1 this order?
2   A.  It might have been Jason himself or
3 another sales manager or Rolando.
4   Q.  And as it relates to the trade in
5 allowance, who would have determined the trade in
6 allowance?
7   A.  It might have been Jason.
8   Q.  Would Rolando or anyone else have had to
9 verify that before credit is given?
10   A.  Yes.
11   Q.  What would they have done to verify the
12 accuracy or appropriateness of the trade in
13 allowance prior to extending credit?
14   A.  I believe they should have had the MMR
15 printout.
16   Q.  Because it looks like down here he
17 financed the whole shebang.
18   A.  Correct.
19   Q.  Now, I'm confused.
20   A.  They had a payoff.  If you see a little
21 further down, they had to pay the other bank for the
22 trade in, for the Corvette.
23   Q.  Estimated payoff, okay.  So that is what
24 he owed on the car?

Page 105

1   A.  Correct.
2   Q.  So he didn't take more than what he owed
3 on the car in a trade in allowance, correct?
4   A.  Correct.
5   Q.  So that is essentially a wash transaction,
6 the value of the trade in equal to the payoff goes
7 straight to the bank.  So U.S. Bank is who was paid
8 off, correct?
9   A.  That is what it looks like, yes.
10   Q.  And then the balance to finance?
11   A.  It doesn't say there.
12   Q.  But this you would expect would have been
13 all vetted and verified by at the very least Rolando
14 before this transaction went through?
15   A.  Yes.  Just one note, it's typically not
16 that the trade in allowance would be exactly what
17 the payoff is.  That is not typical.  I am going to
18 point that out.
19   Q.  The document fee, what is entailed in the
20 document fee?
21   A.  That is an Illinois regulated fee we could
22 charge every client.
23   Q.  Is that considered revenue to Mike
24 Anderson Chevrolet?

27 (Pages 102 - 105)

Page 106

1    A.   Yes.
2    Q.   There's no pass through or do you pay tax
3  on that?
4    A.   Yes.  The client pays tax on that.
5    Q.   To Mike Anderson from a ledger and an
6  accounting perspective that is $175.94 in revenue to
7  Mike Anderson?
8    A.   Yes, sir.
9    Q.   What about the plate transfer fee of $50?
10    A.   That goes directly to the Illinois
11  Secretary of State.
12    Q.   That is a complete pass through?
13    A.   Correct.
14    Q.   What about the state title fee of $95, the
15  same?
16    A.   The same.
17    Q.   How is tha $175.94 in this case, how is
18  that booked?
19    A.   What do you mean?
20    Q.   How does it appear in your general ledger?
21    A.   As income.
22    Q.   Would that be the same for, we looked at a
23  lot of these customer orders, Sir Hooptie, and we'll
24  try to do it quick.

Page 107

1        In all instances of a customer order
2  where Mike Anderson Chevrolet sells a used car, this
3  line item of document fee is revenue to Mike
4  Anderson Chevrolet on the sale of that car, correct?
5    A.   On a retail sale, yes.
6    Q.   And the ones we looked at before the Sir
7  Hooptie, those were retail sales, correct?
8    A.   Yes.
9    Q.   Let's take a look at this next in order,
10  Exhibit 14.  It is a single page exhibit MACC 260.
11  I can enlarge it.
12        Do you recall this e-mail?
13    A.   Yes.  I'm reading it.  It was sent from
14  Mike Anderson to me.
15    Q.   Do you recall a communication from him to
16  you about Sir Hooptie?
17    A.   Yes.
18    Q.   Did you respond to this e-mail?
19    A.   I would have, yes.
20    MR. DANDELLES:  Counsel, please make note.  We
21  do not have the response on this.
22  BY MR. DANDELLES:
23    Q.   Do you recall what or how you responded?
24    A.   I presumably would have responded from our

Page 108

1  dealer license that we had on file.  Or possibly I
2  might have called him direct and told him Mike, this
3  is Alex's company.
4    Q.   Meaning Alex Cisneros you're referring to?
5    A.   Yes, sir.
6    Q.   And when you say it's his company?
7    A.   That he is representing that company in
8  regards to purchasing and/or selling used vehicles.
9    Q.   At that point in time, January of 2O18,
10  you did, in fact, have a dealer license on file for
11  Sir Hooptie, correct?
12    A.   I believe we did.
13    Q.   And we saw some transactions prior to
14  January 2018, including checks cut to Sir Hooptie,
15  correct?
16    A.   Correct.
17    Q.   And I believe we covered -- I'll reiterate
18  to make sure we have it clear in the record that
19  those checks wouldn't have been cut unless it was,
20  in fact, an approved vendor from whom you could buy
21  wholesale cars, correct?
22    A.   Correct.
23    Q.   What do you understand this to mean where
24  it says who is Sir Hooptie that we are wholesaling

Page 109

1  cars too, t-o-o?
2        Does that reflect to you that he's
3  asking about an entity to whom you're selling cars
4  to on a wholesale basis or from whom you're buying
5  cars on a wholesale basis?
6    A.   I took it that we are selling cars.  Who
7  is Sir Hooptie, that we are wholesaling cars to.
8    Q.   So a typo t-o-o?
9    A.   I believe so.
10    Q.   Who are we wholesaling cars to, meaning
11  you're selling cars on a wholesale basis to this
12  other entity?
13    A.   Correct.
14    Q.   That's how you interpret that?
15    A.   Yes.
16    MR. DANDELLES:  Why don't we take another short
17  break.  I think I still have more unfortunately.  I
18  want to go through Epic Motor Sports.
19        There's a lot of material to go through.  We
20  have a couple of options given it is getting late.
21  We could reconvene tomorrow or sometime next week at
22  your convenience or we can keep going, but I can't
23  promise how long we'll go, and it is getting late.
24        I'm not sure if you, Ms. Flores, or counsel

28 (Pages 106 - 109)

Page 110

1 wants to weigh in on that.
2    THE WITNESS: Will you gentlemen have questions
3 as well, presumably?
4    MR. QUANDT: We will be finished when counsel
5 asking you the questions is finished.
6    MR. DANDELLES: She's asking you if you are
7 going to have questions.
8    MR. QUANDT: The answer to that is probably
9 none. It's just Stefan, and how much longer you
10 want to go.
11    MR. DANDELLES: Until we get through the
12 material. I can't promise how long that is going to
13 be.
14    Ms. Flores, do you have a preference on
15 reconvening for a couple of hours another time? I
16 don't want to go to 10:00 o'clock at night.
17    THE WITNESS: I would rather not. If it's a
18 half hour more, we'll finish.
19    MR. DANDELLES: I don't think it will be. I
20 can't promise it will be. Again, there is that much
21 material. I have to represent my client.
22    THE WITNESS: I wish I would have known. I
23 would have made other arrangements. She didn't say.
24 I just assumed it would be an hour or so. That was

Page 111

1 my fault in the scheduling part of it.
2    MR. DANDELLES: Let's take a quick break.
3    (Recess)
4    MR. DANDELLES: We're going back on the record
5 to say we are going to suspend the deposition at
6 this time. It's 8:12:00 p.m.
7    And unfortunately, it is what it is. There's
8 a lot more information that we need to get through,
9 and it's not a good time to do it right now. So
10 you remain under oath, and you remain under
11 subpoena, Ms. Flores.
12    So I very much appreciate your being
13 available here, and we'll have to coordinate another
14 time in the next week or so hopefully to get through
15 the balance of the material.
16    MR. QUANDT: For the record, you noticed this
17 deposition. It's your subpoena that started at
18 5:00 o'clock. Before the last break you thought you
19 had another hour. It's now 8:12.
20    I agree with that. You're unilaterally
21 suspending the deposition. We understand your
22 position on the record and, obviously, all we need
23 to do is complete all discovery by the court order
24 November 1st deadline.

Page 112

1    MR. DANDELLES: Subject to the motion to extend
2 discovery filed today, of course. And we scheduled
3 it at 5:00 o'clock to accommodate the witness.
4    MR. QUANDT: We understand that. I think we're
5 concluded for today.
6    THE WITNESS: I have a question. Is it
7 possible for it to be on a Saturday because that
8 would work a little better. If that is applicable.
9 If not, then we'll work something else.
10    MR. DANDELLES: I can do a Saturday. I don't
11 think I can do this Saturday, but I can do maybe the
12 following Saturday and also subject to the
13 availability of a court reporter.
14    THE WITNESS: I'm throwing it out there.
15    MR. QUANDT: We'll take it that into
16 consideration.
17    (Whereupon, the deposition was
18    continued sine die.)
19
20
21
22
23
24

Page 113

1 STATE OF ILLINOIS  )
2                    ) ss:
3 COUNTY OF C O O K  )
4
5    I, VICTORIA D. ROCKS, C.S.R., Notary
6 Public, within and for the County of Cook, State of
7 Illinois, a Certified Shorthand Reporter of said
8 state, do hereby certify:
9    That previous the commencement of the
10 examination of the witness, BARBARA FLORES, was
11 first duly sworn to testify to the whole truth
12 concerning the matters herein;
13    That the foregoing deposition
14 transcript was reported stenographically by me and
15 was thereafter reduced to typewriting via
16 computer-aided transcription under my personal
17 direction, and constitutes a true record of the
18 testimony given and the proceedings had;
19    That the said deposition was taken
20 before me at the time and place specified;
21    That the reading and signing by the
22 witness of the deposition transcript was not waived;
23    That I am not a relative or employee of
24 attorney or counsel, nor a relative or employee of

29 (Pages 110 - 113)

## Page 114

1  such attorney or counsel for any of the parties
2  hereto, nor interested directly or indirectly in the
3  outcome of this action.
4      IN WITNESS WHEREOF, I do hereunto set
5  my hand and affix my seal of office at Chicago,
6  Illinois this 5th day of November, 2021.
7
8      *Victoria Rocks*
9      VICTORIA D. ROCKS, C.S.R.
        License No. 084-002692
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 116

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

2
ASSIGNMENT REFERENCE NO: 4829746
3  CASE NAME: Mike Anderson Chevrolet Of Chicago, LLC v. QBE
   Insurance Corporation
   DATE OF DEPOSITION: 10/21/2021
4  WITNESS' NAME: Barbara Flores
5  In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7  I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date _____ Barbara Flores
10 Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13 They signed the foregoing Sworn
   Statement; and
14 Their execution of this Statement is of
   their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of _____, 20____.
17
18 _____
   Notary Public
19 _____
   Commission Expiration Date
20
21
22
23
24
25

## Page 115

1      Veritext Legal Solutions
          1100 Superior Ave
2          Suite 1820
          Cleveland, Ohio 44114
3          Phone: 216-523-1313
4  November 9, 2021
5  Barbara Flores
   bflores52@sbcglobal.net
6
   Case Name: Mike Anderson Chevrolet Of Chicago, LLC v. QBE Insurance
7  Corporation
8  Veritext Reference Number: 4829746  Deposition Date: 10/21/2021
9  Dear Sir/Madam:
10 Enclosed you will find a transcript of your deposition.
11 As the reading and signing have not been expressly
12 waived, please review the transcript and note any
13 changes or corrections on the errata sheet
14 included, indicating the page, line number, change and
15 reason for the change. Sign at the bottom of the sheet
16 in the presence of a notary and forward the errata sheet
17 back to us at the address shown above or email to
18 production-midwest@veritext.com.
19 If the errata is not returned within thirty days of your receipt of
20 this letter, the reading and signing will be deemed waived.
21 Sincerely,
22 Production Department
23
24 NO NOTARY REQUIRED IN CA

## Page 117

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

2
ASSIGNMENT REFERENCE NO: 4829746
3  CASE NAME: Mike Anderson Chevrolet Of Chicago, LLC v. QBE
   Insurance Corporation
   DATE OF DEPOSITION: 10/21/2021
4  WITNESS' NAME: Barbara Flores
5  In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7  I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9  I request that these changes be entered
   as part of the record of my testimony.
10
   I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13
   Date _____ Barbara Flores
14
   Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17 They have read the transcript;
   They have listed all of their corrections
18 in the appended Errata Sheet;
   They signed the foregoing Sworn
19 Statement; and
   Their execution of this Statement is of
20 their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of _____, 20____.
23 _____
   Notary Public
24 _____
25 Commission Expiration Date

30 (Pages 114 - 117)

Page 118

1       ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2       ASSIGNMENT NO: 4829746
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____      _____
20  Date          Barbara Flores
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
    _____
    Notary Public
24

    _____
25  Commission Expiration Date

**[& - 5th]**                                                                                          Page 1

| **&** |
| --- |

**&**   2:9

| **0** |
| --- |

**00395**   23:7
**01**   84:23
**06161**   1:6
**084-002692**   114:9

| **1** |
| --- |

**1**   3:6 23:2 46:3
  51:10 75:4 93:24
  103:1
**10**   3:11 51:9 76:3
**10,001**   65:5
**10-5-2017**   65:5
**10/21/2021**   115:8
  116:3 117:3
**100**   24:15 25:21
  29:8 30:4 64:4
  74:16 102:15
**102**   3:12
**103**   64:9
**104**   64:9
**105**   39:10
**107**   3:13
**1099**   21:5,5
**10:00**   110:16
**11**   3:11 51:21 64:8
**1100**   115:1
**111**   43:15
**112**   3:4
**12**   3:12 75:4
**12754**   114:8
**13**   3:12 103:1
**135**   2:10
**1393**   29:10
**14**   3:13 107:10
**140**   43:15
**1422**   30:22,24
**1442**   24:11

**15**   9:3
**1500**   76:3
**16**   103:2
**17**   49:6
**175**   95:2
**175.94**   106:6,17
**18**   75:5 98:23
**1820**   115:2
**19**   91:2
**1:20**   1:6
**1oo**   96:15
**1st**   111:24

| **2** |
| --- |

**2**   3:7 23:6,6 29:2
  30:19 75:13
**2,380**   65:23
**20**   5:6 9:1 45:21
  82:15 116:16
  117:22 118:22
**200**   96:17,24
**2014**   7:8,11,22
**2015**   9:6
**2016**   53:14 97:23
  98:23
**2017**   18:2 27:6
  36:10 44:12 46:3
  48:7,8,18,21 53:14
  68:11 76:3,5
  78:21 79:12,20
  80:23 90:21,22,22
  91:2 93:24 94:9
**2017-3724**   78:1
**2018**   94:3,9 97:24
  108:14
**2019**   7:8,14 8:1,16
**2020**   7:1
**2021**   1:17 11:8
  37:2 114:6 115:4
**21**   45:21
**2100**   2:10

**216-523-1313**
  115:3
**21st**   1:17 37:2
**22**   45:21
**23**   3:6,7 45:21
  90:21,22
**231.40**   92:11
**231.40.**   92:10
**23381**   75:13
**24**   45:21
**25**   3:7 11:11 45:22
  90:22 95:3
**2500**   97:16
**260**   107:10
**274**   47:16
**28**   94:3
**29**   3:8
**2o17**   86:24
**2o18**   108:9

| **3** |
| --- |

**3**   3:7 24:24
**3,468.66**   75:14
**30**   3:8 80:20
**300**   96:19
**31**   88:19
**31.26**   86:19,22,23
  87:23,24
**317.10**   98:10
**32**   3:9
**333**   2:4
**36**   96:14
**37**   96:16
**3724**   75:14 79:16
  82:13
**39**   3:9

| **4** |
| --- |

**4**   3:8 29:1
**4,000**   94:24
**40,000**   78:2

**43**   3:10
**43,250**   79:20
**43,25o**   79:22
**44114**   115:2
**448**   85:2,6
**45**   3:10
**450**   2:4
**46**   78:3 79:22
  82:18
**46,000**   87:1
**46,031.26**   87:2
**47,435**   94:23
**47,965**   94:16,17,20
**48**   82:16
**4829746**   115:8
  116:2 117:2 118:2

| **5** |
| --- |

**5**   3:8 30:17
**50**   106:9
**50,000**   82:15
**51**   3:11
**53**   53:7
**530**   94:16 95:7
  96:5
**5333**   43:1
**53o**   94:21 95:16,19
  96:7,24 97:1,10
**54**   53:8
**55**   53:8
**56**   32:19
**57**   32:19
**58**   32:19 33:18
**59**   32:18,19
**5:00**   1:16 10:3
  111:18 112:3
**5:55**   37:2
**5o**   64:5 102:15
**5th**   114:6

[6 - anderson]

**6**

**6** 3:4,9 32:18,21
**6-1-17** 3:10
**60** 81:6 82:16,17
  82:18 96:17
**60603** 2:11
**60606** 2:5
**61** 53:22 96:17
**6169** 86:8
**64** 3:11
**65** 47:13,13
**6515** 86:7

**7**

**7** 3:9 39:9 75:13
**75** 3:12
**7929** 43:22

**8**

**8** 3:10 32:22 35:4
  43:13 51:20 90:15
**8,192** 47:11
**83** 51:10
**84** 96:18
**8:12** 111:19
**8:12:00** 111:6

**9**

**9** 3:7,8,8,10 16:20
  17:2,4,9 20:12,14
  21:3 23:6,12 29:7
  30:21 45:20 115:4
**9,392** 47:12
**9-13-17** 85:15
**90,000** 76:1
**92.7** 33:5,8
**95** 106:14
**999** 85:9,13 88:4

**a**

**a.d.** 1:17
**able** 14:3,10 19:3
  19:11 21:6 34:8

74:15 78:17 96:7
  97:10
**ac** 14:14 23:14,15
  24:17 25:2,18
  27:2 28:16,23
  66:5 67:14,15,21
  68:3,19,22 69:3,8
  69:13 99:1
**acceptable** 57:5
**accepting** 59:12
**access** 18:12,13,15
  18:18 19:2,10,13
  22:24 34:20,22,23
  57:21 60:19
**accommodate**
  112:3
**account** 15:10
  35:15,17,19 47:4,6
  47:16 61:5 63:19
  63:19
**accounting** 19:6,8
  26:3 88:20 100:21
  101:11,12 106:6
**accounts** 27:3
  46:18 47:8
**accuracy** 102:4
  104:12
**accurate** 41:16
  102:9,10
**ach** 100:21
**acknowledge**
  116:11 117:16
**act** 116:14 117:20
**acting** 90:12
**action** 114:3
**actual** 31:15 41:3
  46:16 48:17 59:6
  85:3 88:16 89:9
  89:16 91:6 98:12
  101:6 103:23,24

**ad** 31:15 37:4,7
**add** 10:22 11:14
  15:21 17:17 18:16
  19:3,11 38:2
  47:13
**added** 17:18 34:18
  63:19 101:2
  102:12
**adding** 17:15
**additional** 87:11
  92:14
**address** 17:17
  18:16 19:24 20:3
  20:6 21:1,19 45:2
  45:6 51:12 62:15
  115:17
**ads** 22:21 31:12,17
  31:21,21 32:11
  36:14 37:8,22
  38:4,9 58:4,5
  68:16
**advertisements**
  42:12 45:15
**advertiser** 37:7
**advertising** 15:3
  33:4 36:24 53:15
  56:4,18 57:2,20
  61:7 63:22 70:19
**advised** 80:10
**advisor** 89:6 90:12
  99:13
**affect** 81:11
**affix** 114:5
**affixed** 116:15
  117:21
**aged** 81:8
**agent** 60:9
**ago** 4:16 5:7 10:5
  54:17 71:11
**agree** 48:6 53:1,3
  91:13 94:8 102:14

  111:20
**agreement** 102:14
**aided** 113:16
**air** 33:14
**al** 6:14
**alex** 25:20 66:2,12
  72:3,15 88:13
  92:23 108:4
**alex's** 72:23 108:3
**allied** 95:24 96:20
  96:21
**allowance** 95:1
  102:10 104:5,6,13
  105:3,16
**allowed** 15:21
  70:15
**amanda** 8:5
**amount** 47:14
  56:15 63:18 65:23
  87:23,24 96:5
  97:19
**anderson** 1:3 5:13
  6:19,22 7:10,14
  8:9,23 10:2 11:17
  11:21 12:5,23
  13:22 15:8,10
  16:6,14 17:12
  21:9 22:23 23:20
  23:21 24:2,7,18
  28:2,12 29:13,23
  31:3,10 34:5 35:7
  35:13 37:3 38:13
  42:7,12,23 43:1,2
  44:3,6,18 45:6,16
  46:8 48:11 49:13
  51:18 52:14,21
  53:4,11,24 54:4
  55:15,24 56:3
  58:1,9,22 59:2,2
  60:1,3,16,19,23,24
  61:16 62:1 63:3

66:6 67:13,20,22
68:2,23 69:13
70:5 73:24 74:3,6
74:13 76:5 80:19
80:22 81:3,21
82:9,20 84:2
87:19 88:1,17
89:6 90:8 93:6,10
93:15,20 95:10,19
95:20 96:7,8,10
97:12,20 98:18
99:8 100:2,3
105:24 106:5,7
107:2,4,14 115:6
116:3 117:3
**anderson's** 10:5
35:14 42:21 58:13
61:4 74:19,21
83:15 93:7 97:6
**answer** 5:19,20
82:23 110:8
**answered** 41:6
**answers** 6:1
**anticipate** 5:21
**anyway** 41:15
**apologize** 9:18
10:16 71:6,14
84:13 90:9
**appear** 42:19
43:16,24 46:1
48:10 51:15,20
106:20 116:11
117:15
**appearances** 2:1
**appeared** 2:7,12
**appears** 39:7
42:20 43:17 98:2
**appended** 117:11
117:18
**applicable** 16:20
40:5 58:16 112:8

**application** 20:1
34:23 61:1,6,10,16
61:17 62:2,9,15
**applications** 61:19
**applied** 58:15,17
58:19,22 59:5,18
62:14 101:7
**apply** 57:8,21
**appreciate** 111:12
**appropriateness**
104:12
**approval** 15:19
16:14,17 17:9
21:13 29:16 62:12
62:16 68:9
**approve** 15:20
**approved** 15:16
17:23 21:8 24:7
24:17,22 26:20
28:12,22 29:13
31:2 34:7,16
46:22 47:23 59:21
62:10 68:10 74:2
74:2,6,9 108:20
**approximately**
8:13
**april** 9:1
**aracelli** 35:9,12
**arnold** 48:24 49:1
55:23 68:2 80:4
103:3
**arnold's** 75:8
**arrangements**
110:23
**asked** 10:7,20
11:13,16,17,21,24
12:17 36:18 38:14
38:20 39:16 41:19
44:7,8 48:22 68:1
68:11,15,18 71:9
71:11 80:4 92:18

103:3
**asking** 9:21 12:5,7
27:12 32:6 60:22
71:21 81:23 82:14
109:3 110:5,6
**assigned** 24:21
29:17 31:6
**assignment** 116:2
117:2 118:2
**assist** 57:2
**associated** 49:16
85:6
**assume** 55:13 82:5
82:8 86:9
**assumed** 55:12,14
86:3 110:24
**assumption** 75:20
**attach** 62:14
**attached** 21:24
27:2 39:14 40:2
68:8 117:7
**attachment** 40:2
40:10,11,14
**attachments** 40:4
**attorney** 10:5
76:15 113:24
114:1
**auction** 79:2
100:18
**auctions** 72:11
**audible** 6:1
**august** 36:10
**authorization**
15:22
**authorize** 117:11
**authorized** 36:3
47:23 60:4
**authorizing** 26:23
**auto** 78:14 81:9
83:4,22 84:19
88:22,24 89:3,19

**availability**
112:13
**available** 111:13
**ave** 115:1
**aware** 19:14 33:13
38:8 55:17 67:9
69:17 71:4,12,16
93:8,12

**b**

**b** 4:4,4
**bac** 60:7,8
**back** 12:3,10
13:13 40:21 43:23
54:10 55:14 57:11
59:19 63:15 72:7
72:13 79:21 90:9
91:17 111:4
115:17
**backup** 79:8
**backwards** 10:17
**bad** 5:2
**balance** 97:20
105:10 111:15
**balances** 102:7
**ballpark** 96:4
**bank** 14:4 103:19
103:20 104:21
105:7,7
**banks** 2:2,3 10:10
10:15
**barbara** 1:10 3:3
4:4 6:6 21:18 42:6
113:10 115:5
116:4,9 117:4,13
118:20
**based** 81:9 96:4
**basic** 20:24
**basically** 13:15
37:24 63:2 91:10
**basis** 31:13 32:1
97:7 109:4,5,11

**batch** 98:22
**bates** 23:6 29:2 30:19 32:18,20 39:10 43:14 45:21 53:7 64:8 75:22 79:15 103:1
**bearing** 32:19 51:10
**bears** 23:6 29:2 30:19 45:21 64:8 75:4
**becoming** 8:15
**began** 7:10
**beginning** 70:11
**behalf** 2:7,12 11:20 42:7 48:11 51:18 53:3 62:3 63:5 95:9
**believe** 6:24 8:8 10:5,11,16,17 14:8 14:13 19:13 21:22 25:5,20 30:4,14 31:20 32:5 33:10 33:16 36:5,9 37:14 38:24 42:3 43:11 48:7,23 49:5,17 50:8 53:14 57:17 58:3 61:18 65:7 67:12 67:19 72:9 78:14 90:19 99:18 100:8 100:9,24 104:14 108:12,17 109:9
**bent** 85:21
**best** 9:4 10:24 11:4 12:12 50:3
**better** 112:8
**bflores52** 115:5
**big** 50:14
**bigger** 24:3 54:3,6

**bill** 79:17,18
**billed** 45:16 46:7 68:23
**billing** 68:19
**bit** 38:12
**blank** 37:3,4
**board** 91:7
**body** 23:18,19,21 23:24 24:3 66:5 72:12 84:7
**book** 47:18
**booked** 47:22 106:18
**booklet** 57:7
**bottom** 35:22 41:10 63:17 115:15
**bow** 59:10
**box** 85:2 94:16
**bracket** 91:17,17
**brackets** 48:15
**brand** 63:14 70:11
**break** 54:9 109:17 111:2,18
**brian** 92:20,21
**brief** 10:8
**bring** 16:8 17:8 22:18 75:10 76:10
**bringing** 10:23
**brought** 78:5
**bucks** 96:24
**budget** 56:3,5
**buick** 6:14
**bulk** 12:13,19,19 12:21 13:1,2,5,6,7 41:22 64:14
**bumper** 26:24 27:1 83:23 84:4 85:18
**buse** 53:8

**business** 4:13 53:11 60:9 68:7 73:2 74:13 80:17
**buy** 74:3 76:6 91:15 108:20
**buying** 73:20,24 78:5 109:4

**c**

**c** 67:15,21 113:3
**c.s.r.** 113:5 114:9
**ca** 115:24
**cable** 61:14
**calculate** 80:5
**calculations** 80:12 103:4
**call** 12:18 16:1,15 31:16 44:22 84:16 99:9
**called** 1:11 6:7 12:16 14:14,17,20 30:13 36:21 60:7 65:19 71:23 108:2
**camaro** 40:6
**car** 5:2 24:4 26:21 27:21,23 63:14 76:6,8,13 77:6 78:6 80:19 81:2,3 81:5,10,22 83:9 85:16,17 86:15,17 89:17,20 90:7 91:2,7,12,14 93:18 93:19 94:2,9 97:8 97:9 100:2 101:20 102:15 104:24 105:3 107:2,4
**cars** 27:22 66:19 66:20,22,23,23,24 73:3,21 74:1,3,16 74:22 79:3,11,12 81:17 82:9,20,24 91:15,20 108:21

109:1,3,5,6,7,10 109:11
**cars.com** 57:17
**case** 42:9 93:19 102:3 106:17 115:6 116:3 117:3
**categories** 79:4
**cbs** 50:9
**cedar** 65:3
**certain** 19:1 25:21 33:9 63:10
**certificate** 16:22 117:11
**certification** 12:12 13:7 116:1 117:1
**certified** 113:7
**certify** 113:8
**cetera** 64:5
**cfo** 56:1
**chance** 22:8
**change** 25:2 59:13 115:14,15 117:8 118:3
**changed** 25:5,6,11 83:6 98:12
**changes** 87:8 115:13 116:7 117:7,9
**charge** 73:14 86:19 98:9 105:22
**charges** 63:12 99:16
**charging** 83:19
**chase** 35:17
**check** 3:9 11:19,22 31:23 33:19 34:1 34:1,8,10,19,21,24 35:6,23 36:1,10 46:10,17,19,23 48:8 74:24 75:1 76:1,10,24 77:11

77:14,23 78:2
79:9,9 91:4 92:10
93:21,23 94:1
95:21 100:21
**checks** 14:5,11
54:18,22 55:7,9,11
73:7,8,10 74:8
75:2 79:7 102:7
108:14,19
**chevrolet** 1:3 4:23
5:13 6:19,22 7:11
7:14 8:10,23 10:3
15:8 21:9 22:24
23:20,21 24:2,18
26:23 29:14,23
31:3,10 34:5
35:14 37:3 42:7
42:13 43:1,2 44:3
44:18 45:16 46:8
48:11 52:21 53:4
53:11,24 54:4
55:24 58:1 60:1,3
67:13,20,23 68:23
69:13 70:6 73:24
76:5 81:3,22
87:19 88:17 89:7
93:10,16,20 95:10
97:20 98:18 99:9
105:24 107:2,4
115:6 116:3 117:3
**chevrolet's** 12:23
45:6 56:19
**chevy** 59:10,11
76:3 78:1 79:15
**chicago** 1:4 2:5,11
5:13 6:19,22 7:11
7:14 8:10,24 10:3
12:24 15:8 21:10
24:18 43:3 44:18
46:8 48:12 51:18
52:21 53:24 55:24

56:3 67:21 87:19
88:1 95:10 114:5
115:6 116:3 117:3
**choice** 28:7,14,15
**chris** 37:20,21
**christoopoulos**
41:17,18
**chudzik** 37:20
**circulate** 23:3
**cisneros** 25:20
66:2,13 72:3,16
88:13 92:24 108:4
**city** 21:2
**civil** 1:13 116:5
117:5
**claim** 80:6
**clarification** 65:20
**clarify** 54:5 91:3
93:1
**clean** 50:16
**clear** 7:9 9:4,18
71:8,20 108:18
**clerk** 17:2,5 18:1,3
27:3 78:22 80:7
80:10,14
**cleveland** 115:2
**client** 5:1 63:13
76:12 102:13
105:22 106:4
110:21
**clients** 11:20 78:23
**close** 81:24 98:3
**closed** 4:24
**coffers** 97:12
**colleague** 13:3
**colleagues** 8:18
**collusion** 93:14
**comcast** 57:16
61:12,14
**come** 9:10 12:22
36:13 50:13 53:17

54:9 73:6 78:18
89:15,17
**comes** 79:23
**coming** 11:23
**commencement**
113:9
**commencing** 1:16
**commentary**
49:16,18
**commercials** 33:5
57:16 61:13
**commission** 95:11
96:6 97:18 116:19
117:25 118:25
**committed** 93:10
93:15
**communication**
107:15
**communications**
10:1,2
**company** 9:6
14:14,17,20 20:21
30:15 39:3 57:20
67:16 70:21 72:3
83:22,24 92:24
93:2 95:17 97:21
108:3,6,7
**compare** 50:10
**complete** 106:12
111:23
**completed** 67:1
**comply** 63:11
**computer** 59:3
60:17,18 61:4
95:5 113:16
**concern** 36:14
84:23,23
**concerning** 113:12
**concert** 93:14
**concluded** 112:5

**confirmation**
59:18
**confirming** 68:9
**confused** 104:19
**connection** 32:3
**consideration**
112:16
**considered** 105:23
**consolidated**
87:19 98:17
**constitutes** 113:17
**contact** 37:20
**contain** 46:4
**context** 4:12,13
77:16
**continued** 101:15
112:18
**contractor** 71:7
93:5
**contribution**
58:11
**controller** 6:17
7:20,21 8:4,7,11
8:15 9:13 15:7
56:6 67:13,20
**controls** 56:6
**convenience**
109:22
**conversation** 10:4
10:8 11:1,5,10
13:16 38:3 54:16
**conversations**
9:24 10:1
**conveyed** 62:13
**cook** 1:15 113:6
**coordinate** 111:13
**copies** 42:5 80:11
**copy** 31:22 40:13
80:14
**corner** 24:10 29:8
30:24 35:22 77:23

**cornfield** 42:2,7 44:14
**corporate** 87:16 92:20
**corporation** 1:7 115:7 116:3 117:3
**correct** 4:7 7:11 7:15 18:24 19:21 19:23 20:1,9,10,12 20:13 21:10,11 24:8,22,23 25:16 26:10 27:19,20,23 27:24 28:11,23,24 29:18 31:7 32:10 32:13,16 34:12 41:3 43:20,21 44:4,15 45:4,7 46:21 47:1 51:12 51:13 52:11,12 56:16 60:17 61:7 61:8,23 62:3,5 63:24 66:6 67:4,5 67:8 68:13,16 74:3,10,11 77:18 78:12 79:10 81:1 82:10,11 83:10,11 87:13 88:1,20,21 91:5,12,21 92:1,12 92:13,16 94:3,6,11 94:22 97:12 98:7 98:14 101:22 102:2 104:18 105:1,3,4,8 106:13 107:4,7 108:11,15 108:16,21,22 109:13
**corrections** 115:13 117:17
**correctly** 13:12 96:19

**correspondence** 49:11
**corresponding** 87:7
**corvette** 40:6 100:2,9 104:22
**corvettes** 54:1,3
**cost** 78:6 86:24 87:2,6,11 88:17 92:14 95:12,15 96:11,14
**costs** 78:18 96:8,9 96:20
**counsel** 5:12 10:2 39:4,22 40:12 41:15 42:4 107:20 109:24 110:4 113:24 114:1
**county** 1:15 113:3 113:6 116:10 117:15
**couple** 10:4 13:9 83:5 109:20 110:15
**course** 5:9,23 10:20 12:11 20:24 25:24 39:17 46:12 68:7 91:19 103:17 112:2
**court** 1:1 5:11,15 6:3 111:23 112:13 116:7
**courts** 1:14
**cover** 103:13
**covered** 108:17
**covid** 81:16
**cp** 75:13,13 82:13
**create** 17:1 20:18 26:20,22
**created** 34:19 46:16 93:21

**creating** 76:1
**credit** 57:11 63:23 87:6,7,23 92:15 98:14 101:7,21,24 103:20 104:9,13
**csr** 1:14
**currently** 6:12
**curry** 53:8
**custom** 33:4
**customer** 3:12 17:1,11 19:17,19 20:3,5 21:1 50:11 50:12,14,16 60:5 79:18 83:18,20 91:24 102:9,18 103:16 106:23 107:1
**customers** 40:7 53:10 63:8 78:23 85:21
**cut** 11:18 34:1,1,8 34:10,24 36:10 41:14 46:19 48:8 54:18,22 74:8,9 77:14 91:4 93:23 94:1 103:15 108:14,19
**cutting** 34:21 76:24 79:7
**cv** 1:6
**cvr** 95:2,4

**d**

**d** 1:14 3:1 113:5 114:9
**damage** 85:23
**dance** 33:5,15
**dandelles** 2:9 3:4 4:2,6,9,12,15,17 4:20 5:3,6,10,24 6:11 23:2 39:4,6 39:22 40:8,15

42:4,10 54:8,13 107:20,22 109:16 110:6,11,19 111:2 111:4 112:1,10
**data** 19:18 34:14 82:20
**date** 44:9 50:16 65:4 91:4 115:8 116:3,9,19 117:3 117:13,25 118:20 118:25
**dates** 6:21 7:6
**day** 1:17 18:8 87:18,24 98:1,16 114:6 116:16 117:22 118:22
**days** 62:17 82:16 82:17,18 91:8 115:19
**deadline** 111:24
**deal** 5:2 41:15 101:5,13,15 102:12,13,20
**dealer** 60:4 72:5,9 72:10 73:1,4 76:7 93:7 101:2 108:1 108:10
**dealers** 81:4
**dealership** 27:16 66:16,18 73:3,9
**dealerships** 96:9
**deals** 102:21
**dealt** 102:21
**dear** 115:9
**debit** 87:5,22 98:13
**debited** 63:18
**december** 80:20
**decision** 16:10 59:19,21

declining 94:10
decreased 81:20
deed 116:14
  117:20
deemed 115:20
defendant 1:8,11
  2:12
definitely 27:15
delivery 11:24
delta 79:23
deluna 101:16
  102:3
demo 86:10,13
demos 86:15
denial 62:16
denied 62:10
department 26:21
  28:3,10 36:23
  63:10 83:16 84:21
  86:21,22 87:6,11
  87:13,15 89:15
  90:10 92:11,19
  102:1 115:22
depending 16:22
deposition 1:10
  4:9,15,18,22 5:4
  9:16 21:23 22:14
  22:18 25:1 111:5
  111:17,21 112:17
  113:13,19,22
  115:8,10 116:1,3
  117:1,3
derived 96:21
describe 10:18
  15:6 23:11 29:5
described 18:11
  18:12
describing 54:15
design 55:18 71:4
  71:12

designer 71:2
desperate 81:16
detail 10:18 89:11
  89:14,17,20
details 25:11 89:1
determine 58:9
  74:22 76:6 84:12
  89:14
determined 104:5
determining 89:11
die 112:18
different 9:9 32:22
  51:14 53:21 73:22
  81:15,15
differently 102:22
difficult 6:3
direct 3:4 6:10
  16:12 57:22 70:15
  108:2
direction 81:13
  113:17
directly 56:2
  62:23 78:19 96:21
  106:10 114:2
discover 14:3,10
discovered 54:17
  55:3,8
discovery 42:8
  111:23 112:2
discuss 13:17,24
discussed 14:12
discussion 10:19
dispute 4:21
distinct 18:22
district 1:1,1,13
division 1:2 27:21
doctored 41:14
document 3:7
  12:17 13:5,10
  21:16,21 23:9
  29:3 30:16 33:17

35:5 40:12 46:9
53:7 64:10 75:7
75:22 79:16 82:3
98:22 102:17,19
105:19,20 107:3
documentation
  12:6 17:9 37:1,17
  59:7,9,16 60:2
  72:5 75:1,12
  77:11,18 78:24
  79:7 95:1 101:8
  101:10 103:24
documents 22:9
  22:17,19,21 76:15
  80:8,9
doing 31:12,20
  67:17 73:2
dollar 47:14 63:18
  64:1,1
dollars 88:19 97:3
  97:3
dolowich 2:9
donna 53:8
door 11:20 53:18
draws 54:3
drive 2:4 86:15
driving 86:9,13,17
dropping 66:19,22
  66:24 67:6
duly 6:7 113:11
duties 15:6

**e**

e 3:1 4:5 10:1
  12:10 16:1,7,9,15
  21:23 22:9,22
  23:1 38:21,23
  39:5,7,8,19,23
  40:1,14 41:13,16
  42:3,5,6 43:8
  44:13 49:5,11,22
  50:1,7 62:14,17,19

89:19 107:12,18
earlier 38:13
  54:15 64:17 66:1
  94:9
eastern 1:2
edit 18:17
edward 53:7
effect 70:14
effort 80:5
ein 20:17 25:7
either 4:21 9:24
  16:1,14 26:21
  42:23 61:3 63:18
  66:19 68:1 88:15
  103:8
elaborate 55:10
electronic 34:10
elmhurst 6:14
email 3:9,13 49:10
  115:17
emailed 65:9,10
emblem 59:11
employed 6:12,18
  8:9,14,23 22:23
employee 35:13
  65:14 70:13 71:7
  85:3 90:8 93:4,4
  113:23,24
employee's 70:10
employees 18:13
  70:11 85:21 86:14
  102:21
employment 6:21
  7:10,13 13:18,19
  80:16
enclosed 115:10
ended 7:13 12:10
english 31:21
enlarge 107:11
entailed 105:19

**[enter - first]**

**enter** 26:16,18
**entered** 101:12
  103:23 117:9
**entering** 17:21
**entertainment**
  14:23 30:13,15,21
  31:2,9 32:9,15
  33:13,22 36:15
  37:10,13 56:11
  69:24 70:4
**entire** 116:5 117:5
**entities** 22:10
**entity** 21:7 30:12
  63:7 69:19 71:23
  87:16 109:3,12
**entries** 47:19
  86:20 100:21
**entry** 17:15 47:17
  87:5 88:20
**envelope** 52:2
**environment** 5:12
**epic** 14:17 109:18
**equal** 105:6
**equandt** 2:5
**equinox** 26:23
**eric** 2:3
**errata** 115:13,16
  115:19 117:7,10
  117:18 118:1
**escalade** 76:3
**essentially** 105:5
**establish** 38:9
  45:12,15 48:17
  68:22 69:3,7,11,18
  69:22 70:2 71:17
  71:22 93:9,13
  99:5
**estimate** 10:24
  11:5 16:5,6,9 96:4
**estimated** 104:23

**et** 64:5
**everybody** 18:18
**evidence** 24:17
  38:9 45:11,14
  48:10,16 52:6
  68:22 69:2,17
  71:17,22 72:18
  93:9,13 99:5
**evidenced** 31:5
**exact** 7:6 62:18
**exactly** 50:6 54:23
  105:16
**examination** 1:11
  3:4 6:10 113:10
**examined** 6:8
**example** 18:15
  32:17 57:4 60:5
  63:6 74:22 96:15
**exchange** 39:12
  41:16
**exchanged** 44:13
**excuse** 39:3 50:18
  59:15
**executed** 117:10
**execution** 116:14
  117:19
**exhibit** 3:6,7,7,8,8
  3:9,9,10,10,11,11
  3:12,12,13 23:2,6
  23:6 24:24,24
  29:1 30:17 32:17
  32:19,21 39:9
  43:13,14 45:19,20
  51:8,9 64:7,8 75:4
  103:1 107:10,10
**exhibits** 3:5
**expect** 46:5 105:12
**expense** 47:17
**expensed** 47:9,11
  47:12,14

**expenses** 28:22
**expensive** 54:6
  78:6
**experience** 60:23
  81:9 96:5
**expiration** 116:19
  117:25 118:25
**explained** 12:14
  13:13
**expressly** 115:11
**extend** 112:1
**extended** 97:15
**extending** 104:13
**extent** 88:18
  100:14

**f**

**f** 2:3 4:5 96:2
**face** 26:4,4
**facilitated** 80:7
  89:16
**facility** 12:23
**fact** 31:5 33:14
  38:10 52:18 99:8
  103:9 108:10,20
**factory** 33:5
**facts** 38:9 45:11,14
  48:16 52:5 68:22
  69:2,6,10,17,22
  70:2 71:16 72:19
  93:9,13 99:4
**fakhoury** 90:4
**fall** 68:11 79:4
**familiar** 23:15
  32:24 53:13 56:18
  65:17 66:1 71:23
  100:4
**far** 5:24 54:6 82:2
  89:3
**fashion** 22:12
**fault** 111:1

**federal** 1:12 20:17
**fee** 95:1 105:19,20
  105:21 106:9,14
  107:3
**feeds** 83:5
**fees** 57:2
**field** 89:8
**figure** 42:16
**file** 17:3 18:16
  50:9 80:7,10,14
  101:15 108:1,10
**filed** 112:2
**files** 20:17 22:19
  50:16
**fill** 37:3,3
**filled** 46:11,15
  99:11
**finance** 101:1,17
  101:19 102:18
  105:10
**financed** 96:13
  100:24 101:20
  104:17
**financial** 69:8,19
  69:23 71:18 72:20
  98:17
**financials** 87:18
**find** 11:22 39:14
  40:3 50:11 58:21
  95:18 97:10
  115:10
**finding** 50:21
**findings** 49:3,9,24
  50:4,6,20 52:9,10
  52:13,17,20
**fine** 40:8
**finish** 5:18,20
  110:18
**finished** 110:4,5
**first** 6:7 38:17
  47:14 48:14 49:19

59:6 84:23 91:11
91:13 94:15
113:11
**five** 7:18 54:10
62:17 74:16 80:23
85:16,17
**fixed** 96:10,12
**flag** 56:8,10
**flat** 85:2
**flip** 43:23
**floor** 26:3 100:22
**flores** 1:11 3:3 4:2
4:4 6:6,13 21:19
25:1 42:6 64:11
109:24 110:14
111:11 113:10
115:5 116:4,9
117:4,13 118:20
**flow** 62:22
**fold** 51:20,24,24
**folks** 40:13 60:23
**follow** 41:8 58:6
**followed** 58:16
**following** 22:18
112:12
**follows** 6:9
**foregoing** 113:13
116:13 117:18
**form** 3:7,8,8 41:3
42:3 52:24 70:12
99:12
**format** 40:9
**former** 13:21
**forms** 65:18 70:9
**forth** 87:3
**forward** 41:20
115:16
**forwarded** 49:10
49:13,14,15,17
**four** 33:4

**frame** 11:1 18:2
38:19,22 44:14
62:18 78:21 80:24
**francisco** 90:15
**fraud** 93:10,15
**fraudulently** 69:3
**free** 83:8 116:14
117:20
**frequent** 66:5
**friendly** 66:20
**front** 12:11 13:10
17:16 26:23 27:1
30:16 70:22 83:23
84:4 85:18 91:16
91:17
**function** 17:17
18:6 60:12
**functionality**
18:14
**funded** 101:14
**funds** 62:22,23
**further** 104:21

**g**

**g** 47:4
**gap** 94:13,18 95:8
95:9,15,22 96:9,14
**garage** 28:3
**garcia** 43:22
**gardner** 92:20,21
**gateway** 4:23
**general** 10:21
13:21,22 15:9,13
26:8,17,19 43:11
47:6,8 56:7,22
57:1,6 58:7,14,18
62:19,23 63:2,5,6
63:11,15 81:4
83:19 106:20
**generally** 15:4
65:17 96:23

**generate** 20:15,23
53:10
**generated** 21:12
46:24 47:2
**generating** 76:19
**generic** 62:20
**genesis** 44:13
**gentleman** 12:1
13:14
**gentleman's** 25:17
**gentlemen** 10:6
110:2
**getting** 109:20,23
**gifts** 70:16
**gist** 13:15
**give** 7:6 21:4 57:10
57:11 62:18 73:6
73:7
**given** 4:9 24:19
62:4 104:9 109:20
113:18
**giving** 4:22 12:10
22:5
**global** 57:8 59:5
59:15,16 60:5,13
61:5,19
**global's** 58:24
**glossy** 44:22
**gm** 56:20,21 57:8
57:13 58:2,20,24
59:4,14,22 60:4,5
60:13 61:5,19
**gm's** 59:16
**gmc** 6:14 98:23
**go** 17:16 27:3 34:2
47:10 64:24 76:15
78:14 85:1 86:6
87:1 91:1 95:6
109:18,19,23
110:10,16

**goes** 82:16,17,19
105:6 106:10
**going** 5:21 7:3
16:8 21:4,15
26:12 28:5 50:7
54:8 57:13 59:8
67:2,3 80:6 96:14
105:17 109:22
110:7,12 111:4,5
**good** 5:24 111:9
**gosh** 7:1
**gotten** 83:1
**graphic** 50:23
51:5 59:7 71:1
**graphics** 39:17
40:20 41:1 45:8,8
50:8 52:11
**grayson** 8:5
**great** 5:10
**group** 32:19,21
**guess** 57:14 74:15
95:2
**guidelines** 58:6,7
58:17
**guys** 37:22

**h**

**h** 43:8
**half** 11:2 51:21
54:9 86:1 94:8
110:18
**hand** 17:24 73:8
73:10 114:5
**handed** 73:8
**hands** 87:8 98:12
**handwriting**
24:13 30:23 75:6
**handwritten** 29:9
**happen** 16:3 78:8
100:10
**happened** 10:7
86:3

**happens** 59:17
**head** 6:2
**headquarters** 45:5
**hear** 13:2 31:15
  70:17
**hereto** 114:2
**hereunto** 114:4
**hey** 89:19
**highest** 96:18
**hired** 7:21 9:11
**historical** 82:13,14
  82:20
**hit** 32:15
**hold** 7:17
**holding** 44:20
  64:22
**hooptie** 14:21
  71:24 72:2,20,24
  73:17,21 74:1,8,14
  74:23 75:2,16
  76:2 79:3 80:17
  92:19 93:9,15,20
  106:23 107:7,16
  108:11,14,24
  109:7
**hope** 97:3
**hopefully** 111:14
**hosted** 32:9
**hour** 11:2 54:8
  71:11 110:18,24
  111:19
**hours** 110:15
**house** 98:13,14
  102:20
**housekeeping**
  21:15
**huh** 6:2 26:13
**human** 70:9

## i

**idea** 26:19
**identification**
  45:20
**identified** 75:23
**identify** 30:20
**illinois** 1:1,16 2:5
  2:11 6:15 13:13
  91:16 94:19
  105:21 106:10
  113:1,7 114:6
**images** 40:5
**immediately** 49:3
**important** 5:17
**improper** 56:8,12
**incentives** 63:14
**include** 15:14
  34:14
**included** 94:17
  115:14
**includes** 34:17
**including** 16:7
  73:17 108:14
**income** 106:21
**incorporated**
  117:12
**incorrect** 7:7
**incurred** 88:17
**independent** 29:22
  31:8
**independently**
  19:11
**indiana** 42:21,23
**indicating** 115:14
**indirectly** 114:2
**individual's** 25:18
**industry** 44:23
  81:10
**inferred** 33:16
**inflated** 67:22
  69:3

**information** 8:21
  12:2 16:21 17:22
  20:14,22 21:3
  25:8,9,13 26:14,15
  31:19 33:11 36:20
  36:23 39:20 46:4
  46:18 51:6 52:5
  58:1 61:1 62:5
  69:6,10,22 70:2
  72:18,22 77:14
  89:4 97:5 99:4,12
  103:24 111:8
**inhouse** 28:2,10
  84:11,21 92:2,5
  98:6
**initial** 79:9
**initials** 34:2,5
  35:24 77:23 89:22
  90:1
**input** 19:18 20:8
  20:22 34:14
**inspection** 91:14
  91:22
**instances** 107:1
**instruct** 80:13
**instructed** 80:13
**insurance** 1:7
  16:21,22 80:6
  95:17 97:21 115:6
  116:3 117:3
**interaction** 25:23
**interchangeable**
  20:6
**interchangeably**
  20:4
**interest** 69:8,19,24
  71:18 72:20
**interested** 13:2,5
  114:2
**interface** 25:23

**internal** 83:14,17
  83:21 84:10 88:19
  98:9 99:8
**internally** 16:18
**internet** 82:2
**interpret** 109:14
**interrogatories**
  6:8
**inventory** 81:5,5
  82:5,8
**investigate** 11:18
  11:22 36:18
**investigating**
  48:21
**investigation**
  12:16 52:15 55:4
  103:4,10
**invoice** 3:10 16:4
  16:10 27:2 31:23
  32:5,23 33:4,21
  34:18 36:1,6,11
  45:16 46:2,14,18
  48:12 56:16 68:9
  95:21
**invoiced** 36:6,15
  67:9 90:22 99:15
**invoices** 3:9 52:21
  56:8,11 58:10
  64:2 67:22 68:2
  69:4
**invoicing** 67:16
**involve** 101:21
**involved** 48:24
  49:1 56:15 83:1
  100:13,14
**involvement** 103:7
**involving** 100:1
**iowa** 13:12 64:21
  65:3
**irving** 43:1

**issue** 21:5 38:14
38:17 93:18
**item** 15:12 21:16
26:8 56:7 59:12
82:24 87:12 94:19
107:3
**items** 57:6 64:4

**j**

**j** 3:8,11 29:7,12,19
30:8 38:12,24
39:2,3,10 42:8,12
42:22 43:14,15
44:16,17 45:15
46:2 48:13 50:4
50:22 51:9 52:15
53:22 54:14,18,22
55:16,18 56:8
57:23 58:9,23
61:6,11,16 64:17
65:10 68:12 69:16
69:19 70:18,18,19
70:24 71:5,7,10,13
71:18
**jack** 53:6
**jandn** 51:10 64:9
**january** 108:9,14
**jason** 10:21 13:18
13:20 14:1,5,11
19:7 22:10 26:22
33:19 34:20 41:17
41:18,20 54:18,22
55:9,16,17 66:20
69:7,11,18,23 70:3
70:18 72:19 77:7
78:4 80:16,18
88:10 89:2 93:13
99:22,23 100:1
103:10 104:2,7
**jason's** 47:10
**jenney** 89:5 99:13

**jenney's** 89:23
**jk1** 103:12
**jk2** 103:12
**job** 77:16 89:12
**jobs** 24:3
**jonathan** 79:19
**jp** 35:17
**judy** 48:23 49:1,9
49:13,19 50:2
52:14 55:23 68:1
70:12 75:8 80:4
103:3
**july** 6:24 7:1,8,14
8:1,15 11:7 47:12
47:18 48:5,18
**june** 46:3 47:11,15
48:5,8,18 93:24

**k**

**k** 67:15,21 99:22
113:3
**kathleen** 73:13
**katie** 75:24 76:23
78:20 93:21
100:20
**katie's** 77:16
**kaufman** 2:9
**kay** 10:21
**kc** 66:2
**kdvlaw.com** 2:11
**keenan** 73:13
75:24 76:23 78:20
93:21
**keep** 17:2 96:7,23
96:24 109:22
**kept** 59:24
**key** 53:15,16,18
**kickback** 55:15
70:3
**kickbacks** 69:12
**kind** 12:18 53:9

**knew** 10:22
**know** 5:21 8:3,6
8:13,21,22 9:17
11:13 15:1 16:7
19:10 23:17 24:13
25:6,7 26:8,11,11
30:1,8 31:15
32:12 38:1,21
39:11 40:16,17
41:9 42:15,22,24
43:8 49:2,20
50:19 51:4,6
55:11,20 60:9,22
64:18 65:15,21
67:24 71:21 72:2
72:4,8 74:17 75:9
75:20 80:2 83:6
84:18,20 88:7,8,10
88:12,13,15,22
89:3,4,22 90:1,16
92:7,21 94:17
95:13 97:2 99:21
99:24 100:6,14,16
100:22
**knowing** 100:11
**known** 110:22
**kolodzinski** 13:18
13:21 14:1,5,11
19:7 22:10 33:20
34:20 54:18 69:7
69:11,18,23 70:3
72:19 77:8 88:10
89:2 93:14 99:23
100:1 103:10
**kustom's** 68:19
**kustoms** 14:15
23:14,15 24:17
25:2,19 27:2
28:16,23 66:2,5
67:14,15,21 68:3
68:22 69:3,8,13

99:1

**l**

**l** 4:5 35:9,9,10,10
47:4
**lack** 60:13
**lasalle** 2:10
**late** 97:24 109:20
109:23
**law** 35:14 41:18
41:19
**lawsuit** 10:23
**lawyer** 41:19
**leads** 31:20
**leased** 33:9
**leases** 33:14
**ledger** 15:9,13
26:8,17,19 32:15
47:6,8,19 56:7
86:20 87:5 88:20
92:15,16 106:5,20
**lee** 43:22
**left** 6:24 8:1
**legal** 115:1 118:1
**length** 81:10
**letter** 13:6 52:2
115:20
**letting** 94:17
**license** 72:6 73:1,4
78:22,24 91:17
93:7 101:14 108:1
108:10 114:9
**line** 26:8 34:4
51:23 56:7 69:16
71:15 84:23 87:12
94:15 107:3
115:14 117:7
118:3
**list** 11:23 39:15,17
40:6,22 50:9,11,12
80:15

**[listed - means]**

**listed** 22:10 56:15 117:7,17

**listen** 31:14 32:8

**listing** 40:6 117:7

**literally** 17:14

**little** 12:4 13:11 32:7 38:12 53:15 70:20 75:10 81:15 104:20 112:8

**llc** 1:4 2:2 92:19 115:6 116:3 117:3

**llp** 2:9

**loan** 96:18

**locations** 25:5

**log** 18:22 34:13 57:14 60:13,24

**long** 8:13,22 11:2 11:10 27:10 81:2 109:23 110:12

**longer** 22:23,24 110:9

**look** 7:3 22:8 23:4 24:16 31:24 32:20 32:23 38:14,20 39:11 44:7,8,11 48:22 58:8,12,13 58:14,21 64:23 68:12,15,18 74:21 77:24 90:14 95:18 95:21 107:9

**looked** 13:8,11 33:7 49:6 97:8 106:22 107:6

**looking** 17:20 29:21 35:4 53:22 103:12

**looks** 11:23 24:11 29:10 32:24 41:12 48:2 85:4 88:3 91:11 104:16 105:9

**loose** 72:13

**loss** 75:13,14,18 75:19 79:23

**losses** 80:5

**lost** 50:17

**lot** 17:8 27:23 81:3 81:11,23 82:10,15 82:21 85:20,23 106:23 109:19 111:8

**low** 96:15

**lyman** 41:18,19

**m**

**m** 43:8 50:4 58:10

**macc** 107:10

**maccackustoms** 23:7

**macch** 98:23

**maccjandn** 45:21

**maccjnn** 29:2

**macckk** 103:1

**macctkc** 30:19 32:18 33:18

**madam** 115:9

**mail** 10:1 12:10,19 12:20,21 13:1,2,5 13:6,8 16:1,7,9,15 22:22 38:21,23 39:7,8,19,23 40:1 40:14 41:13,16 42:3 44:9,13 49:5 49:11,22 50:7 62:14,17,19 89:19 107:12,18

**mailed** 11:19 21:23 43:18,20 44:1 50:1 59:10 65:5

**mailer** 3:10 11:17 11:18,22 12:13 14:9 36:24 38:14

39:17 40:23 41:3 42:20 43:5,6,24 44:7,8,11,24 45:1 45:12 48:2,21 50:5 51:16,21 52:6,24 53:1,15,21 55:15 57:4,10 59:5,6 63:8,8 68:12

**mailers** 11:19 14:2 30:3,5 36:19 42:11 44:16 47:9 47:12 48:10,18 50:10 52:15,18 57:5,12,23 58:23 61:11 64:15 65:4

**mailing** 11:23 39:15,16 41:22 65:2,3,4,4

**mails** 22:9 23:1 39:5 42:5,6

**maintained** 7:24 9:12

**making** 73:14 86:17

**management** 16:6

**manager** 8:12,14 9:9,10,11 10:21 13:21,22 16:11 26:22 43:12 76:9 76:9,21 77:6,6,7 78:5 86:17 90:8 90:20 101:1,1,18 101:19,21 102:6 102:18 104:3

**managers** 17:6 26:2,4 102:11

**manner** 49:8

**manual** 17:19 47:17

**manually** 17:21

**manufacturer** 56:19

**march** 9:1,6 94:3 97:24

**mark** 23:5 24:24 29:1 30:17 32:17 39:9 45:19 51:8 64:7 102:24

**marked** 43:13

**market** 83:8 94:11

**marketing** 29:7,13 29:19 30:9 36:22 38:13,24 46:2 57:2 69:20

**markup** 96:6 97:18

**marmor** 2:2

**maserati** 100:3,8 100:17

**matched** 78:10

**material** 22:20,20 109:19 110:12,21 111:15

**math** 80:1

**matter** 91:19,20

**matters** 113:12

**mccfh** 75:4

**mean** 22:12 47:5 54:5 65:10 82:1 86:20 93:3 94:14 96:12,23 98:20 102:5 106:19 108:23

**meaning** 5:18 11:2 67:3 76:8 77:7,13 83:19 84:11 87:5 108:4 109:10

**means** 21:8 79:19 83:21

meccsh  90:15
mechanic  27:6
mechanical  28:1,8
  28:18,23 66:9
  84:5,11
mechanics  27:14
meddling  51:1
meet  66:12
memo  49:23
memory  59:8
mentioned  41:21
  54:15 92:23
merrillville  24:3,4
middle  77:24
midwest  115:18
  118:1
mike  1:3 5:12 6:18
  6:22 7:10,13 8:9
  8:23 10:2,5 11:17
  11:21 12:5,23
  13:22 15:8,10,20
  16:6,14 17:10,12
  21:9 22:23 23:19
  23:21 24:2,7,18
  28:2,12 29:13,23
  31:3,9 34:4 35:7
  35:13,14 36:18
  37:2 38:13 41:19
  42:7,12,20,23 43:1
  43:2 44:3,6,17
  45:6,16 46:8
  48:11,21 49:4,9,13
  50:2,10,14 51:18
  52:14,20 53:4,11
  53:24 54:4 55:15
  55:23 56:2,3 58:1
  58:9,13,22 59:1,2
  60:1,3,16,18,23,24
  61:4,15 62:1 63:3
  66:6 67:13,20,22
  68:2,23 69:13

70:5,12 73:24
  74:3,6,13,18,21
  76:4 80:19,22
  81:3,21 82:9,20
  83:15 84:2 87:19
  88:1,17 89:6 90:8
  93:6,6,10,15,20
  95:10,19,20 96:6,8
  96:10 97:6,12,19
  98:18 99:8 100:2
  100:3 105:23
  106:5,7 107:2,3,14
  108:2 115:6 116:3
  117:3
miles  86:7,8
mind  7:3 64:22
minimal  26:2
minimally  18:10
minute  54:14
minutes  11:11
  54:10
miscellaneous
  85:10
missouri  92:19
mmr  76:17,20
  77:3,9,11 78:1,10
  78:13 104:14
moment  37:17
  64:22
money  26:12 57:8
  57:11 63:17,21
  69:12 87:8 98:12
monica  18:4 33:24
  34:8,13 47:2
monica's  24:14
  29:8
month  80:23
months  10:4 54:17
  82:19 85:16,17,24
  94:5,10 96:14,16
  96:17,18

morgan  35:17
motion  112:1
motor  14:17
  109:18
motors  56:22 57:1
  57:6 58:7,14,18
  62:20,24 63:2,5,7
  63:11,15 83:19
music  33:15

**n**

n  3:1,8,11 29:7,12
  29:19 30:8 38:12
  39:2,10 42:8,12,22
  43:14,15 44:16,17
  45:16 46:2 48:13
  50:22 51:9 52:15
  53:22 54:14,18,22
  55:16,18 56:8
  57:24 58:23 61:7
  61:11,16 64:17
  65:11 68:12 69:16
  69:20 70:18,18,19
  70:24 71:5,7,10,13
  71:18
nad  19:22,24 20:5
  20:7,15,18,23 21:7
  21:12 24:11,19,22
  25:14 29:9,16
  30:21,24 31:6
  34:14 73:19,21
  74:10
nads  50:15
name  4:3 8:3
  17:17,17 18:16
  19:24 20:3,5 21:1
  21:1 25:2,6,13,17
  25:18 37:16,18,19
  41:11 45:2 48:15
  48:15 51:12 53:6
  73:5 89:8,24 90:3
  93:6 103:13 115:6

116:3,4,15 117:3,4
  117:21
names  51:15
narrative  49:15
nassar  90:3
native  40:1,9
nature  4:20 10:18
  16:2 41:23
nearly  7:18 54:8
  94:5
necessarily  15:24
  83:17 101:21
necessary  20:14
  28:4
need  12:4,6 37:21
  40:12,13 58:8
  76:14 85:19 111:8
  111:22
needed  12:1 18:8,8
  26:6 89:11,14
needs  46:14
negative  94:10
negotiated  101:5
net  63:17 79:23
  94:20 98:18
never  38:7 41:6
  71:9
new  19:19 25:7,14
  63:14 70:11
nick  30:10 39:1
  42:2,7 44:13
  49:11 65:10
night  110:16
nods  6:1
nontechnician
  85:10
normal  68:4,6
  101:5
northern  1:1
notarized  37:1

**notary** 1:15 113:5
115:16,24 116:10
116:18 117:15,23
118:23
**note** 105:15
107:20 115:12
**notice** 1:12 21:24
22:5
**noticed** 111:16
**notification** 62:9
62:20
**november** 111:24
114:6 115:4
**number** 17:11
19:17,20,22 20:3,4
20:5,5,8,15,18,23
21:2,8 23:7 24:11
24:19,22 25:7,14
29:1,2,10,17 30:19
30:21,24 31:6
32:18,18 34:14
39:10 43:15 51:10
60:5 64:9 73:20
73:21 74:10 75:13
75:13 79:14,15
82:19 85:3,12
92:8 103:1 115:8
115:14
**numbers** 21:12
45:21 75:9 117:7

**o**

**o** 4:5 35:9,10
109:1,1,8,8 113:3
113:3
**o'clock** 1:16 10:3
110:16 111:18
112:3
**oath** 4:7 5:4
111:10
**objects** 22:21

**obtain** 42:1
**obviously** 5:10
11:20 16:21
111:22
**occasion** 18:7
73:10 78:8
**occasions** 66:15
**occurred** 91:7
103:9
**october** 1:17 11:6
37:2 44:12 48:21
49:6
**odometer** 76:14
**oetti** 79:19
**offer** 23:1
**office** 8:12,14 9:9
9:10,11 12:13,16
12:24 26:3 65:2
65:19 101:11,11
114:5
**officer** 92:20
**official** 56:5
116:15 117:21
**officially** 8:20
**oh** 7:1
**ohio** 115:2
**okay** 5:8,22 12:5,9
13:1 35:3 36:1
45:1 50:19 71:15
104:23
**oldest** 7:18
**onboard** 91:12
**once** 10:14 16:17
17:22 25:9 26:19
34:17 47:17 59:17
71:19
**ones** 107:6
**online** 57:9,21
**onsite** 86:4
**op** 56:18,23 58:11
58:17,18,20,22

59:8 63:22
**opable** 58:3,4,5
64:4
**open** 27:19 47:18
**opened** 53:18
**operation** 85:2
**opposed** 31:21
51:4 84:18 88:19
103:14
**opposite** 81:18
**ops** 57:7
**options** 109:20
**oral** 6:8
**order** 3:12,12 20:7
20:23 26:20,23
33:15 39:9 45:19
46:16,19,23 51:8
64:7 68:8 75:4,11
77:12 79:14,18
83:13 84:15,17
89:9 91:14 92:4
99:9,10,14,19
102:9,24 103:16
104:1 107:1,9
111:23
**orders** 86:6
106:23
**ordinary** 25:24
46:11 56:14,17
68:7 103:17
**organization** 4:14
5:1 83:22
**othewise** 28:2
**outcome** 114:3
**outside** 68:4
**outsource** 28:8
84:8
**outsourced** 23:24
24:6 40:20 88:4
88:18

**owed** 104:24 105:2
**owner** 12:7 70:18
70:24 71:10,17
72:19 92:20
**ownership** 69:7,19
69:23

**p**

**p.m.** 1:16 37:2
111:6
**packets** 70:10
**page** 3:5 32:21
41:10 46:24 47:10
79:14 103:13
107:10 115:14
117:7 118:3
**paid** 14:11 26:15
37:23 46:14 52:21
62:23 69:13 83:23
87:2 92:11 94:20
97:20 101:9,9
105:7
**paperwork** 91:6
**park** 43:2
**parking** 85:22
**part** 19:7 53:14
73:16 80:6 94:9
96:2 103:9 111:1
117:9
**partial** 70:19
**participate** 80:5
**participating** 5:13
**particular** 21:7
44:7,9 49:19 76:6
76:7 77:17 85:6
92:8 96:8 97:23
**particularly** 11:16
**parties** 114:1
**partner** 70:19
71:1
**parts** 62:24 63:1,3

**party** 5:16 24:1
28:6,17 84:19
88:18 95:8
**pass** 106:2,12
**passed** 97:10
**password** 18:20
18:23
**patched** 85:4
**pay** 55:14 63:3,4,6
83:10 86:21 94:23
95:9,16 98:20
104:21 106:2
**payable** 14:5 17:1
17:5,24 27:3
46:19 55:9 75:2
95:22
**payables** 18:3
**paying** 55:16
83:20,24 102:15
**payment** 27:4
33:21 47:20,22
57:12 70:3 101:9
**payments** 15:14
15:17 32:14 35:20
55:21 56:11 67:14
68:3 69:12 70:5
**payoff** 104:20,23
105:6,17
**payor** 83:18
**payroll** 18:18
**pays** 63:15 106:4
**pdf** 40:16 41:1
**pending** 59:20
**people** 19:5 40:22
53:16 57:15 73:20
81:16 100:11
**percent** 24:15
25:21 29:8 30:4
64:4,5
**perform** 68:24

**performed** 18:5
71:4
**period** 7:18 81:2
94:5
**permits** 22:19
**person** 8:3 12:21
16:15 20:21 25:12
56:6 102:4
**personal** 113:16
**personally** 26:18
66:12 80:9 116:11
117:15
**perspective** 87:4
106:6
**pertaining** 97:9
**phone** 10:1 12:18
16:1,15 21:2 51:1
89:18 115:3
**photocopy** 35:6
**physical** 74:24
**physically** 73:6
**picked** 89:18
**picking** 66:19,22
66:23 67:3
**pieces** 65:5
**piemonte** 6:14
**place** 11:5 34:3
38:17 77:10,13
113:20
**places** 34:6
**plaintiff** 1:5 2:7
5:12
**plan** 96:1,20 97:15
100:22
**plastic** 53:16
**plate** 91:17 106:9
**play** 33:15 55:23
**played** 14:2 37:4,8
37:22 56:1
**please** 4:3 29:6
39:23 43:14 64:8

107:20 115:12
**plus** 80:23 84:23
95:1
**pocket** 88:17
**point** 6:18 8:19
31:10 53:14 54:17
68:1 77:1 105:18
108:9
**policies** 77:10
**polish** 14:24 30:14
31:12,14,20 32:4
33:6,8,11
**populated** 20:18
99:12 103:24
**portal** 60:13
**portion** 64:4
**position** 6:16 7:24
111:22
**positions** 7:17
**possible** 50:17
112:7
**possibly** 108:1
**post** 12:13,16,24
65:2,19
**postage** 3:11 45:3
64:14 65:22
**postal** 14:9 41:22
65:14
**potential** 16:4
53:10 71:6
**potentially** 77:7
93:5
**power** 17:14 19:3
19:12 76:14
**pre** 16:10
**preference** 110:14
**prepaid** 47:16
**preparation** 9:15
**prepare** 9:17,21
**prepared** 7:2
42:12 48:11 78:13

**presence** 115:16
**presented** 33:20
33:23,24
**presumably** 41:9
49:5 64:19 65:15
75:11,15,19 80:1
86:11 97:2,4
100:17 107:24
110:3
**presumption** 74:1
**previous** 113:9
**price** 78:11 81:11
81:23 82:2,14,24
94:15 101:4,5
102:4,5,8
**pricing** 78:17
82:20 83:2,6
**primarily** 77:21
**primary** 35:19
77:20
**principal** 25:18
30:8 66:2
**print** 77:3,9
**printed** 45:2 59:4
59:15
**printout** 77:1,2
104:15
**prior** 8:14 10:3
104:13 108:13
**probably** 9:1 11:6
40:5 83:3 91:11
110:8
**procedure** 1:13
76:4 116:5 117:5
**procedures** 77:10
**proceedings**
113:18
**process** 5:8 15:19
15:23 16:18 17:19
19:1 23:5 34:11
76:4 77:12

processed 78:23
procure 39:23
produce 39:23
produced 20:11
35:5 89:9 100:20
100:21 101:14
product 95:9,11
96:5
production 22:16
41:16 115:18,22
program 45:5
53:15 56:19,24
57:1,3 58:11
63:22
promise 109:23
110:12,20
promoted 90:11
promoter 37:14
37:24
promotion 53:13
prompted 12:19
12:21 38:17
proof 11:24 31:17
37:7,21 57:10
proper 77:18
propriety 68:19
protected 18:20
protection 94:13
94:18 95:15 96:1
96:20
provide 38:7 39:4
50:7,23 51:5
52:11
provided 26:16
28:17 30:2 31:9
33:1 35:7 36:7,11
36:15 42:8,22
55:17 57:24 69:14
70:5 71:12 77:12
77:14

provider 95:17
providing 67:22
public 1:15 113:6
116:10,18 117:15
117:23 118:23
pull 75:3 78:17,17
78:18 80:9,11,14
82:13
pulling 14:4 80:8
puncture 98:3
purchase 26:20,22
46:16 68:8 72:10
73:15 76:16 78:11
79:2 81:17 93:19
94:15 101:4 102:4
102:5,8
purchased 37:8
63:9 74:23 75:15
76:2 79:11,12,19
79:21 80:22 81:24
85:16,18 91:2
99:1 100:3,7,16,17
100:20,23
purchases 63:14
purchasing 27:22
73:3,12 76:1,9,21
77:8 79:3 108:8
purpose 93:23
purposes 45:20
pursuant 1:12,12
22:5 63:22
put 72:13 77:23
81:22 82:15 85:11
85:12 91:18
putting 27:22

**q**

qbe 1:7 115:6
116:3 117:3
quandt 2:3 10:10
10:11,13,17 12:14
13:14,18,24 14:12

54:16 110:4,8
111:16 112:4,15
question 5:19,20
7:2 71:3,5,8,11,13
78:4 82:22 84:14
112:6
questioning 71:16
questions 37:20
69:17 110:2,5,7
quick 21:15 54:9
69:16 106:24
111:2
quickly 7:4
quite 66:17

**r**

r 2:9 4:4,4,5
radio 14:24 15:3
30:14 31:12,14,16
31:21,21 32:4,8
33:5,6,8,12,14,22
35:2 36:14,21
37:5 58:4,5 68:16
raise 38:17
rajewski 53:6
ran 31:17
range 75:23 97:16
rapids 65:3
rav 76:3
read 116:5,6,12
117:5,6,17
reading 107:13
113:21 115:11,20
ready 27:4
real 12:17 103:8
really 12:22 13:1
27:12 38:1 79:18
reason 4:21 5:17
36:9 67:12,19
99:18 115:15
117:8 118:3

rebates 63:15
recall 5:6 9:8
23:19 25:1,4,17
27:5,9,13 28:16
30:3,10,12 32:3
33:10 37:17 38:19
39:12,18 41:4,7
42:14 49:22 51:11
53:18 54:19,21
57:18 61:9 66:3
68:20 73:1,5 81:7
90:11 91:1 95:2
95:24 96:19
100:23 101:3
107:12,15,23
receipt 14:10
41:22 65:22
115:19
receive 16:4,13
22:1 37:6 62:16
62:19,21 70:16
received 41:4
59:17 69:11 70:3
70:5 101:10
103:21
receiving 41:7
recess 54:11 111:3
recognize 23:9
29:3 30:6 64:10
75:6 90:3
recollection 5:7
9:5 12:12 29:22
31:8,11,13 32:2
33:1 50:3 74:12
101:20
reconvene 109:21
reconvening
110:15
record 4:3,6 5:16
29:5 30:20 35:5
59:1,6 62:2,6

70:23 71:9 75:4
82:1,3 108:18
111:4,16,22
113:17 117:9
**records** 14:4 31:22
59:24 61:3 74:19
74:22 80:8,9
81:21 82:14 86:12
95:14 97:6,9
**red** 56:8,10
**reduced** 113:15
**refer** 43:5,6 72:6
**reference** 21:18
40:10,16,18 43:2
45:3,6 47:4
103:19 115:8
116:2 117:2
**referenced** 19:17
44:6 116:11
117:15
**references** 44:3
47:7 90:15
**referencing** 40:19
48:7 90:15
**referred** 37:15
51:11 64:16
**referring** 29:9
30:23 33:17 72:15
80:2 108:4
**refers** 83:17
**reflect** 24:16 29:12
33:3,17 48:1
79:11,16 81:22
82:9 83:12,14
85:9 86:12 91:10
92:5 93:19 95:14
103:16,20 109:2
**reflected** 36:11
46:23 63:23 74:18
77:13 86:24 92:14
99:5,19 102:8

**reflecting** 30:24
35:6 52:22 99:15
**reflects** 32:18,22
41:1 51:23 61:5
65:22 75:18 80:20
90:21 94:2 98:24
103:1,19
**refresh** 5:7
**refreshes** 32:24
**regarding** 5:7
17:22 19:18 72:23
**regardless** 8:22
61:24
**regards** 13:19
21:23 49:19 50:22
83:7 86:23 108:8
**registration** 95:5
**regulated** 105:21
**reimbursement**
57:14 58:10
**reiterate** 7:9
108:17
**rejected** 62:11
**rejection** 59:21
62:12
**related** 22:21
**relates** 50:4 103:4
104:4
**relating** 13:17,20
14:1 22:9 44:17
64:17
**relation** 52:14
70:4
**relationship** 72:24
88:11,14 89:3
**relative** 113:23,24
**relies** 46:19
**remain** 111:10,10
**remember** 10:9
13:12 29:19

**remote** 1:10 5:11
**remotely** 5:14
**rendered** 33:21
47:20 52:22
**renyolds** 19:3
**repair** 3:12 27:1
75:11 83:13,20
84:17,24 86:6
88:9 89:9 91:13
99:10,14,19
**repaired** 26:24
86:5 98:3,6
**repeat** 84:13
**report** 12:19 49:8
**reported** 49:3
52:14 56:1 113:14
**reporter** 5:11,15
6:3 112:13 113:7
116:7
**represent** 35:5
75:9 110:21
**representative**
93:2
**representatives**
22:17
**represented** 71:9
**representing**
31:23 93:5 108:7
**request** 3:9 17:4
33:19 39:15 42:4
46:10,17 59:3
61:1 75:1 76:10
77:11 78:3 117:9
117:11
**requested** 37:22
**requests** 57:14
**require** 25:14 73:2
73:3 76:17
**required** 63:5 77:3
115:24

**requirements**
63:10
**requires** 63:7
85:12
**resources** 70:9
**respect** 14:2 61:11
68:12 79:15 97:14
**respond** 107:18
**responded** 39:20
107:23,24
**responding** 41:13
**responds** 40:14
**response** 3:11 39:8
51:9 107:21
**responses** 49:12
**responsibilities**
15:7
**responsibility**
73:16
**responsible** 15:9
15:12 17:21 26:7
57:13,16 60:11
67:14 76:19 77:21
77:22 79:6 89:10
89:13
**restrictions** 58:6
**result** 19:18 63:17
**resume** 6:23 7:4
**retail** 78:23 107:5
107:7
**retained** 95:19
97:19
**retention** 50:15
**returned** 43:18,19
44:1 63:21 115:19
**revenue** 87:12
92:19 95:20
105:23 106:6
107:3
**review** 68:2,4,6
115:12 116:1

117:1
**reviewed** 6:23
35:24 36:6 65:13
**reynolds** 17:13,14
19:2,12,12 20:2
**right** 6:4 9:13 17:7
18:9,23 19:19
20:19 22:15 24:10
26:17 28:14 29:17
30:24 32:9 34:11
35:22 40:8 42:16
45:9 46:20 61:22
66:10 71:20 81:15
84:20 87:4 91:18
97:24 98:10,19
103:12 111:9
**rise** 4:21
**rochester** 42:21
**rocks** 1:14 113:5
114:9
**roland** 101:16
103:14
**rolando** 101:17
102:3 103:14
104:3,8 105:13
**role** 8:10,14 9:9,12
9:13 13:21 14:1
15:11 55:23 56:1
78:21
**rotate** 42:16
**roughly** 79:23
86:1
**route** 101:2
**rules** 1:12 116:5
117:5
**run** 32:11 38:4,10

**s**

**s** 2:10 4:5 117:8,8
118:3
**safe** 91:23

**safety** 91:22
**sale** 27:23 48:3
79:17,19 91:7
94:2 95:11 97:9
101:13 107:4,5
**sales** 27:19 43:12
76:21 77:6,7
78:16 82:24 83:4
86:21 87:4,6,11,20
89:15 92:15,15
101:1 102:6,11
104:3 107:7
**salesperson** 12:22
**sample** 37:2
**samples** 42:11
**sampling** 22:19
**santiago** 8:8 9:5
18:9
**saturday** 112:7,10
112:11,12
**saw** 51:14 89:24
103:13 108:13
**saying** 16:7 37:1
71:21 76:13,18
102:14
**says** 22:17 24:11
35:2 37:19 40:2
48:3 65:2,4 70:14
73:2 79:17 83:14
92:20 108:24
**sbcglobal.net**
115:5
**scenario** 100:4
**scharf** 2:2
**scharfbanks.com**
2:5,6
**scheduled** 112:2
**scheduling** 111:1
**scratched** 85:22
**screen** 21:16 45:23
77:13 87:1

**screw** 84:24 86:1,4
**scroll** 39:12 65:1
**sdandelles** 2:11
**se** 79:17
**seal** 114:5 116:15
117:21
**second** 26:3 65:3
94:8
**secondarily** 77:19
77:22
**secretary** 106:11
**secure** 18:17
**see** 6:24 12:9
21:16 24:10 30:16
32:23 39:13,14
42:11,16 43:22
44:20 45:23 46:5
48:14 50:6 51:15
51:23 53:6,18
65:6 83:22 90:22
98:4,24 99:2
103:15 104:20
**seeks** 22:13,16
**seen** 21:21 75:11
**segarra** 90:16
**sell** 13:1 54:1
72:14 76:13 91:23
95:8
**selling** 37:3 73:3
108:8 109:3,6,11
**sells** 107:2
**seminol** 43:23
**send** 12:18,20 13:7
16:5 39:19 50:9
63:7 89:12
**sending** 49:20
**sense** 24:4 78:7
**sent** 11:18,19
12:13 40:23 41:2
44:9 45:12 49:12
49:23 52:7,18

53:3,10,16 64:20
84:19 85:14 89:18
107:13
**sentence** 40:19
**separate** 87:16
**september** 7:7,11
7:21 86:7
**sequential** 75:12
**service** 14:10 26:5
26:21 28:1,3,10
63:7,8,10 65:14
66:8 83:13,15
84:15,21 86:22
87:12,15,20 89:6
90:10,12,19 92:4
92:11,16 95:17
97:15 99:9
**services** 16:5 30:1
31:9 33:1,21 36:6
36:11 42:22 47:20
52:22 55:18 56:4
56:15 63:4 69:14
70:4 71:4,13
**servicing** 26:6
**set** 16:18 17:11
27:4 65:4 96:21
102:5 114:4
**setting** 83:2
**shakes** 6:1
**sharing** 69:12
**shebang** 104:17
**sheet** 115:13,15,16
117:7,10,18 118:1
**ship** 24:4
**shop** 23:22 24:3
72:12 84:7
**short** 50:24 109:16
**shorthand** 113:7
**shortly** 9:2 40:17
49:6

**show** 39:7 59:2
**shown** 37:4 115:17
**showroom** 82:10
**shut** 27:16
**side** 98:4,13,14
**sideways** 42:15
**sign** 36:1 70:13,17
  79:8 92:7 115:15
**signatory** 35:15
**signature** 30:6,7
  35:8 114:8
**signed** 20:12 101:8
  102:14,17 116:13
  117:18
**signing** 113:21
  115:11,20
**similarly** 74:5
**simple** 17:16
**simply** 49:14 51:4
  103:12
**sincerely** 115:21
**sine** 112:18
**single** 15:12 63:12
  70:10 98:17
  107:10
**sir** 6:20 9:7 11:9
  14:20 15:15,18
  19:9 24:9,20
  27:18 31:1 34:9
  35:11,18,21 36:4,8
  41:24 43:7 44:2,5
  44:15,19,21,24
  45:10 46:13 47:3
  47:21,24 48:2,4
  51:17,19,22 52:4
  52:12,16,19 53:2
  53:12,20,23 54:2
  55:2,5 60:7 63:2
  64:3 65:12,24
  66:7,11 67:8,18
  68:14,17 70:7

71:24 72:2,17,20
  72:21,24 73:17,18
  73:21 74:1,7,8,11
  74:13,23 75:2,16
  76:2 77:15 78:12
  79:3,5,10,13 80:17
  87:9,14,17 88:9,15
  88:21,23 89:21
  90:2,24 92:3,6,17
  92:19 93:9,14,20
  94:7 98:8,11,15
  100:12 103:18,22
  106:8,23 107:6,16
  108:5,11,14,24
  109:7 115:9
**sister** 35:14
**sit** 38:8 61:9 68:21
  81:3 86:18 93:8
  93:12
**site** 15:24 60:21
  84:21
**sits** 81:10 94:9
**situation** 57:23
**situations** 19:14
**six** 82:18
**sized** 52:2
**sky** 88:22,24 89:3
  89:19
**slots** 33:10
**smaller** 24:5
**social** 20:20
**software** 17:13,15
  18:12 19:12 20:2
  34:21,22 58:14,15
  78:15 83:4 85:11
**sold** 73:7 75:19
  79:1,22 80:19
  83:9 96:5 98:1
**solutions** 115:1
  118:1

**somebody** 25:10
  57:24
**somebody's** 45:2
**sorry** 7:1 9:2 11:4
  41:6 77:2
**sought** 22:20
**source** 31:19
  32:22 72:22 74:2
  91:20
**space** 85:23
**spanish** 35:2
**speak** 10:12,15
  37:9,12
**specific** 16:11
  44:10 57:3,6,8
  59:10,11 64:3,6,18
  78:20 83:7
**specifically** 54:21
  70:12
**specified** 113:20
**spell** 4:3
**split** 47:9
**spoke** 10:6,9 11:3
  36:22 51:1
**spoken** 49:18
**sports** 14:18
  109:18
**spotlight** 61:13
**spyropoulos** 18:4
**ss** 113:2
**staff** 16:6 19:6,8
  66:21
**stage** 100:15
**stamped** 32:20
**stand** 60:8 87:16
**start** 5:20
**started** 9:2,5 80:15
  80:16 90:10
  111:17
**starting** 7:18

**state** 1:15 4:2 21:2
  94:19 106:11,14
  113:1,6,8 116:10
  117:15
**statement** 3:11
  62:24 63:1,13,23
  64:14,16 92:5
  98:17 116:13,14
  117:19,19
**statements** 65:18
**states** 1:1,13
**station** 31:16 32:8
  33:8,14,22 36:21
**status** 59:20
**stayed** 97:11
**stays** 59:20
**stefan** 2:9 110:9
**stenographically**
  113:14
**sticking** 54:14
**stock** 75:12,13
**store** 42:21 53:17
**stores** 42:23
**straight** 105:7
**strange** 13:11
**street** 2:10
**strike** 27:5,6,8,13
  28:5 62:7 66:9
**stuff** 98:21
**subject** 112:1,12
**submitted** 48:12
  58:10 61:17 62:3
  64:2
**subpoena** 3:6,11
  22:1,6,13 51:9
  111:11,17
**subscribed** 116:10
  117:14 118:21
**suburban** 88:4,4,7
  88:11,14

succeeded   8:4,6
sued   5:1
suggest   72:19
suggesting   9:20
suite   2:4,10 115:2
sum   87:10
summary   49:23
summer   11:7 48:3
   48:5
superior   115:1
suppliers   73:20
support   28:18
   48:12
sure   7:5 8:20
   11:12 12:22 23:4
   24:15 27:12 30:4
   50:15 60:10 65:8
   65:15 73:14 75:21
   80:1,3 82:1 86:18
   91:14,18,23 95:12
   108:18 109:24
suspend   111:5
suspending   111:21
sworn   4:1 6:8
   113:11 116:10,13
   117:14,18 118:21
system   16:19
   17:12,19 18:11,12
   18:14,19 19:3
   20:9,23 21:6
   25:10,11 34:13,18
   42:5 46:23 57:14
   58:9 59:3 60:6
   61:4,5,20 82:6,8
   83:8 101:3 102:12

**t**

t   43:8 109:1,8
tahoe   76:3 78:1
   79:16,20 86:24
take   6:3 23:4
   32:23 39:11 54:9

77:13 90:9,14
   95:11 105:2 107:9
   109:16 111:2
   112:15
taken   1:14 4:7
   113:19
takes   5:15
talk   5:17 16:11
   38:12
talked   73:19
talking   38:1,6
   40:12 50:18 71:3
   99:23
tangible   22:20
tax   94:20,23 106:2
   106:4
taxable   94:19
taxed   94:13,18
   95:7
taxpayer   20:21
tbanks   2:6
tck   30:21
team   46:19 78:16
tech   83:22 84:19
   85:7 92:8
technically   86:23
technician   84:22
   85:3,8,12,13 98:21
technicians   27:11
   27:14
tell   11:14 34:1
   36:17 38:4 55:6
   56:23 64:24
telling   49:19 70:17
template   48:14,17
   51:12
ten   94:5,10 96:24
   97:2,3
term   96:13,16,18
   96:22

terms   48:20 52:9
   72:13 86:20
test   86:17
testified   6:9 38:13
   52:10 66:1 72:23
testify   113:11
testimony   4:10,18
   4:22 5:3 22:5,14
   22:14 113:18
   116:6,7 117:6,9,12
testing   22:19
text   16:1,14
texts   22:9
tha   106:17
themself   57:19
theodore   2:3
thing   21:1 39:13
   53:9 62:21 85:24
   86:16
things   13:9 24:6
   31:24
think   11:11 12:24
   32:7 66:6 79:12
   86:16 109:17
   110:19 112:4,11
thinking   75:17
third   24:1 28:6,17
   84:19 88:18 95:8
thirty   115:19
thought   12:4 15:2
   25:22 33:11 55:6
   89:24 92:23
   111:18
three   62:17 76:2
   79:11,12,14,15
throwing   112:14
ticket   83:18
tiffany   8:8,9 9:5
   18:9
tight   85:20

tim   89:23 99:13
time   4:17 10:21,24
   12:15 15:7 16:12
   17:14 18:2 25:1
   27:10 33:7,10,14
   36:10,12,13 38:19
   38:22 43:11 44:14
   50:8,23 51:7
   52:11 57:19 59:13
   62:18 66:9 76:5
   78:21 80:8,23
   81:2,8,10,16,19
   86:7,8,15 90:7,13
   90:19 95:6,23
   101:4,17 103:8,8
   108:9 110:15
   111:6,9,14 113:20
times   10:12 17:8
   33:9 81:14 90:11
timothy   89:5
tire   84:24,24 85:4
   86:2,4 98:2
tires   99:1
title   8:21,22 76:14
   78:21,22,24
   101:14 106:14
titles   76:11
tkc   3:8 14:23,24
   30:13,15 31:2,9
   32:9,14,22 33:13
   33:22 34:7 35:4,6
   36:15,20 37:9,12
   37:16 56:10 68:16
   69:24 70:4
today   9:16 10:3
   22:5 38:8 61:9
   68:21 70:17 93:8
   93:12 112:2,5
today's   21:23
told   14:3 54:24
   55:1 80:10 108:2

tomorrow 109:21
tool 78:15,18 83:4
83:7
top 34:2,4 64:24
79:18 86:6 87:1
91:1
touch 84:4
touchup 83:23
85:18
town 16:16
track 50:17
tract 101:3
trade 94:24 99:21
100:1 101:5 102:9
102:16 104:4,5,12
104:22 105:3,6,16
traded 100:1,8
train 17:6
transaction 77:17
79:24 97:6,7
100:10,15 101:6
101:13 103:5,8
105:5,14
transactions
102:21 108:13
transcribed 116:7
transcript 113:14
113:22 115:10,12
116:5,12 117:5,11
117:17
transcription
113:16
transfer 106:9
tremendous 27:8
63:16
tri 51:20
tried 31:16 72:9
true 113:17
truly 84:10
truth 113:11

try 106:24
trying 32:1 36:23
59:23 96:22
twenty 4:16
two 75:22 85:24
twofold 22:13
type 25:9 31:17
46:4 53:21 62:21
68:6
types 65:18
typewriting
113:15
typical 53:9
102:13,20 105:17
typically 17:5 26:9
36:24 37:6 52:3
73:11 86:14
105:15
typo 109:8

**u**

u 35:9,10 43:8
u.s. 41:21 65:14
103:19 105:7
uh 6:2,2,2 26:13
ulloa 35:9,12
ultimate 50:20,21
ultimately 83:8
unable 50:22 51:3
51:4
underneath 34:4
understand 32:1
38:6 59:23 82:22
84:22 95:7 108:23
111:21 112:4
understanding
22:4 23:5 38:16
unfortunately
109:17 111:7
unilaterally
111:20

union 27:5
unique 5:11
unit 27:21
united 1:1,13
units 73:15 76:2
81:8
unprepared 9:19
unsuccessful
31:18
unusual 12:5
updated 25:13
upload 60:24
uploaded 59:15,16
61:16
uploads 58:1
upper 24:10 30:24
upset 50:24
use 17:13 20:4
78:15 91:14
user 18:22
users 19:2
usps 3:11 64:14
usually 16:3,13,24
96:9

**v**

v 78:14 83:4 115:6
116:3 117:3
valid 12:19
validity 12:17
value 78:2 81:19
94:11 102:16
105:6
values 78:18
vehicle 63:9 75:20
76:10,18,22 77:8
85:5,22 86:9 95:5
96:13 97:23
100:24
vehicles 72:11
73:12,15 75:16
79:1 108:8

vendor 12:1 14:6
15:14,19,21,21
16:8,12,18 17:3,18
17:22 19:3,19
20:5,7,24 21:9
23:16,17 24:1,18
25:10 26:15,20
28:17 29:13,22
31:2 34:7,15
35:20 36:3 46:5
46:22 47:23 58:16
61:21 62:1,4 63:3
66:5,8 67:14 74:2
74:9 84:20 88:5
89:1 95:8,22
97:11,21 100:18
108:20
vendors 15:16,17
18:7 19:11 26:1,5
26:9,11 57:18
60:19 70:16 73:19
80:15,17
verbal 5:24
verified 76:23
105:13
verify 77:17 79:8
102:4,6 104:9,11
verifying 79:6
veritext 115:1,8
118:1
veritext.com.
115:18
versus 97:11
vetted 105:13
victoria 1:14
113:5 114:9
view 22:1
vis 88:1,1
voluck 2:9
volume 74:13

**vs** 1:6

**w**

**w** 2:4 3:7,8,8
16:20 17:2,4,9
20:12,14 21:3
23:6,12 29:7
30:21 43:8
**wacker** 2:4
**wait** 7:1 101:13
**waiting** 40:20
**waived** 113:22
115:12,20
**walking** 76:13
**wall** 98:4
**want** 11:24 16:8
50:19 70:12 76:13
81:4 91:23 109:18
110:10,16
**wanted** 13:1 16:11
50:10,11
**wants** 47:11 50:15
110:1
**warranties** 97:15
**warranty** 83:18
**wash** 88:1 105:5
**way** 32:12 54:6
55:20 61:10 62:7
84:12 85:1
**we've** 37:8 54:8
**web** 55:17 71:4,12
**website** 58:24
59:15,17 60:15
**week** 63:20 109:21
111:14
**weekly** 62:24 63:1
63:13,23
**weeks** 33:5
**weigh** 110:1
**went** 13:12 15:13
59:14 95:2 97:8
100:22 105:14

**west** 43:1,22
**whatsoever** 103:7
**wheel** 88:4,4,7,11
88:14
**wheels** 88:9 98:24
**whereof** 114:4
**whichever** 76:9
77:7 78:4
**white** 100:9
**wholesale** 72:14
76:18 78:2 79:4
79:21 108:21
109:4,5,11
**wholesales** 79:1
**wholesaling**
108:24 109:7,10
**wife** 100:8
**willing** 83:9
**wish** 110:22
**witness** 3:3 4:1,4,8
4:11,13,16,19,23
5:4,5,9,23 6:5,7
40:4 110:2,17,22
112:3,6,14 113:10
113:22 114:4
116:1,4,11 117:1,4
117:15
**wondering** 13:6
82:12
**words** 45:9
**work** 15:23 23:18
23:19,24 24:5
27:11 28:1,3,9,23
44:17 62:22 66:6
66:9 67:1,6,9,16
68:10,23 69:4
83:15,24 84:8
85:4,13,15,18
91:11 92:4,5
97:24 99:5,16,18
112:8,9

**worked** 4:14 10:20
99:1
**working** 9:2 27:11
80:18
**works** 99:24
**worry** 7:7
**worth** 76:18
**writing** 29:8 47:11
**written** 82:3
**wrote** 38:22 92:10

**x**

**x** 3:1
**xyz** 16:9

**y**

**year** 7:18 11:8,9
**years** 4:16,24 5:6
8:18
**yukon** 97:23 98:23

**z**

**z** 43:8
**zero** 87:10 96:14
98:18
**zip** 21:2
**zoom** 10:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.