# EXHIBIT A



**Kaufman Dolowich & Voluck, LLP**
135 S. LaSalle Street, Suite 2100
Chicago, Illinois 60603

Main: (312) 646-6744
Fax: (312) 896-9403

www.kdvlaw.com

**Stefan R. Dandelles**
Email:    sdandelles@kdvlaw.com
Direct:    (312) 646-6742
Mobile:   (312) 206-4976

April 20, 2018

**<u>VIA EMAIL</u>**

Judy Arnold
Controller
Mike Anderson Auto Group/Mike Anderson Chevrolet of Chicago
5333 W. Irving Park Rd.
Chicago, IL 60641
judy.arnold@mikeandersonchevy.com

| | |
|---|---|
| Insured: | Mike Anderson Auto Group/Mike Anderson Chevrolet of Chicago |
| Policy No.: | QPL0766816 |
| Policy Period: | October 1, 2017 to October 1, 2018 |
| Our File No.: | 033516-0040 |

Dear Ms. Arnold:

As you are aware, we represent QBE Insurance Corporation ("QBE") in connection with Commercial Crime Policy No. QPL0766816 issued to Mike Anderson Auto Group/Mike Anderson Chevrolet of Chicago ("MACC") for the Policy Period of October 1, 2017 to October 1, 2018 (the "Policy"), regarding the proof of loss ("POL") submitted on March 1, 2018. Please direct all future communications regarding this matter to our attention. We write to acknowledge receipt of the POL and request additional information in order to evaluate potential coverage for the POL under the Policy. All prior correspondence from QBE regarding this matter is incorporated herein by reference.

**<u>Factual Background</u>**

According to the POL and accompanying information, MACC operates multiple car dealerships and, in connection with those dealerships, purchases used cars from various sources to be sold at those dealerships. In or about the summer of 2017, Mike Anderson became aware of rumors regarding an employee, Jason Kolodzinski ("Kolodzinski"), and his connection with the purchase of used cars from sellers named Epic Motor Sports and Sir Hooptie. It is our understanding that the rumors involved Mr. Kolodzinski's purported interest in Epic Motor Sports, as well as entities named "J & N Marketing" and "AC Customs," and the resulting implication that he may have been purchasing used cars from Epic or others at a premium, which were then sold at a loss by MACC, or otherwise caused MACC to incur a loss. According to the POL, Mike Anderson instructed Mr. Kolodzinski in October 2017 to cease purchasing cars from Epic Motor Sports or Sir Hooptie, and that "November Wholesale Loss" totaled $59,000 subsequent to that instruction. Further, Mike Anderson received multiple text messages that were purportedly sent by Mr. Kolodzinski and intended for an employee of Epic Motor Sports, which

Judy Arnold
April 20, 2018
Page 2

referenced a purported "kickback" expected by Mr. Kolodzinski. According to the POL, Mr. Kolodzinski eventually ceased showing up for work at MACC, but he allegedly purchased used cars as recently as January 18, 2018 in MACC's name from Epic Motor Sports.

According to the POL and other documents provided, MACC completed an Original Case Incident Report police report regarding Mr. Kolodzinski's hiring of vendors for advertising and services that never occurred. In addition, MACC has retained the Lyman Law Firm to represent its interests in attempting to recover purported losses due to Mr. Kolodzinski's alleged activity. The POL indicates that this matter is under investigation but that loss resulting from Theft or Forgery totals in excess of $250,000.

**Request for Information**

The Policy is a Commercial Crime Policy, which generally affords coverage for losses sustained by MACC and discovered during the Policy period. MACC appears to have submitted the POL for consideration under the Employee Theft Insuring Agreement of the Policy. Please advise us if our understanding in this regard is incorrect. In order to assist with QBE's consideration of potential coverage under the Policy, we set forth below a series of requests for additional information and documentation that are tailored to an assessment of coverage under the Employee Theft Insuring Agreement. In this regard, we request that you please provide the following at your earliest convenience:

1.  Complete details regarding MACC's interaction with Epic Motor Sports, Sir Hooptie, J & N Marketing and/or VC Customs, including but not limited to:
    a)  How MACC came into contact with these entities;
    b)  Whether MACC has ever conducted business with these entities prior to the events at issue in the POL;
    c)  Whether MACC performed any due diligence on these entities and/or its employees; if so, please describe;
    d)  Whether employees of MACC other than Kolodzinski communicated with these entities on behalf of MACC and, if so, who;

2.  Complete details regarding the used car purchase process, including but not limited to:
    a)  Details regarding the purchase and sale of used cars, including any oversight by MACC regarding purchase price, and whether Kolodzinski had discretion as to what sellers he was able to purchase cars from and for what price;
    b)  Complete itemization of all the cars alleged to have caused the loss and/or were purchased from Epic Motor Sports and/or Sir Hooptie, whether through third-party auctions or otherwise, including but not limited to bills of sale for said cars;

3.  Complete details regarding MACC's utilization of J & N Marketing and/or VC Customs, including but not limited to:
    a)  Details regarding when and how these vendors were selected;
    b)  Details regarding all communications between these vendors and MACC or its employees;
    c)  Details regarding which employees were able to contract or bind MACC with respect to these vendors;
    d)  Details regarding payments made to either of these vendors, including proof of payment and any invoices submitted for same;

4.  To the extent MACC has any written policies or procedures relating to the purchase, sale, verification or any other process involved with vendors generally, please provide same;

Judy Arnold
April 20, 2018
Page 3

5. To the extent MACC has a personnel file for Mr. Kolodzinski or any other employee of MACC alleged to have been involved in this events at issue in the POL, please provide same;

6. To the extent MACC received any information or documents pursuant to the correspondence issued by the Lyman Law Firm on January 24, 30 and 31, 2018, as appended to the POL, please provide same;

7. To the extent MACC has compiled a timeline or written chronology regarding the events at issue in the POL, please provide same;

8. To the extent MACC has any written files relating to the events at issue in the POL, please provide those; and,

9. A detailed breakdown of the loss allegedly resulting directly from theft by Kolodzinski.

QBE reserves its rights under the Policy and operative law with respect to coverage for the loss alleged in the POL, including the right to seek additional information. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by QBE.

If you would like to discuss this matter further, please do not hesitate to contact us.


Very truly yours,

Kaufman Dolowich & Voluck, LLP

Stefan R. Dandelles
Co-Managing Partner – Chicago Office

cc: Priyanka Gandhi
    QBE

4840-8931-5679, v. 1



**Kaufman Dolowich & Voluck, LLP**
135 S. LaSalle Street, Suite 2100
Chicago, Illinois 60603

Main: (312) 646-6744
Fax: (312) 896-9403

**Stefan R. Dandelles**
Email:     sdandelles@kdvlaw.com
Direct:    (312) 646-6742
Mobile:   (312) 206-4976

www.kdvlaw.com

October 3, 2018

**<u>VIA EMAIL</u>**

Judy Arnold
Controller
Mike Anderson Auto Group/Mike Anderson Chevrolet of Chicago
5333 W. Irving Park Rd.
Chicago, IL 60641
judy.arnold@mikeandersonchevy.com

| | |
|---|---|
| Insured: | Mike Anderson Auto Group/Mike Anderson Chevrolet of Chicago |
| Policy No.: | QPL0766816 |
| Policy Period: | October 1, 2017 to October 1, 2018 |
| Our File No.: | 033516-0040 |

Dear Ms. Arnold:

As you are aware, we represent QBE Insurance Corporation ("QBE") in connection with Commercial Crime Policy No. QPL0766816 issued to Mike Anderson Auto Group/Mike Anderson Chevrolet of Chicago ("MACC") for the Policy Period of October 1, 2017 to October 1, 2018 (the "Policy"), regarding the proof of loss ("POL") submitted on March 1, 2018 in respect of purported theft by MACC's former employee Jason Kolodzinski (the "Claim"). Thank you for providing certain materials pertinent to our investigation of this Claim. We have reviewed the entirety of the hard copy materials provided to us. However, several of our requests as previously set forth either were not answered fully or remain outstanding. This information is necessary to gain a full understanding of the facts and circumstances surrounding this matter. In this regard, we reiterate below the outstanding requests and include a series of supplemental requests for documents and/or information that will assist us in our review. As QBE's investigation and analysis of this matter is ongoing, no final determination of coverage can be made at this time.

**<u>INITIAL REQUESTS THAT REMAIN OUTSTANDING</u>**

We request that you provide the following records and information. To the extent that MACC is not in possession or control of any responsive documents or information, please affirmatively so state.

1.      Complete details regarding the used car purchase process, including but not limited to:

Judy Arnold
October 3, 2018
Page 2

    a)    Details regarding the purchase and sale of used cars, including any oversight by MACC regarding purchase price, and whether Kolodzinski had discretion as to what sellers he was able to purchase cars from and for what price.

2.    Complete details regarding MACC's utilization of J&N Marketing and/or VC Customs, including but not limited to:

    a)    Details regarding all communications between these vendors and MACC or its employees; and

    b)    Details regarding which employees were able to contract or bind MACC with respect to these vendors.

3.    To the extent MACC has any written policies or procedures relating to the purchase, sale, verification or any other process involved with vendors generally, please provide same.

4.    To the extent MACC has any written files relating to the events at issue in the POL, please provide those.

**SUPPLEMENTAL REQUEST FOR DOCUMENTS AND INFORMATION**

Further to QBE's ongoing investigation and analysis of this matter, we request that you provide the following records and information. To the extent MACC is not in possession or control of any responsive documents or information, please affirmatively so state.

5.    Further to Request 1(a) above, please provide a step-by-step description of how MACC's purchase and sale of used vehicles works, inclusive of a description of the individuals involved throughout the process.

6.    In respect of the used car purchase and sale process, please describe the following:

    a)    Where did funds used to purchase vehicles come from? How were funds disbursed?

    b)    Which employees of MACC were authorized to purchase new and used vehicles from January 1, 2016 to the present date?

    c)    Who determined the sale price for used cars, how was that price determined, who was authorized to change the sale price, and please provide a list of those individuals authorized to sell vehicles for MACC from January 1, 2016 to the present date.

7.    In the context of this Claim, please describe any and all actions of Kolodzinski that you assert were:

    a)    Beyond the scope of Kolodzinski's authority; and/or

    b)    Unlawful.

8.    Please provide an update on the status of MACC's recovery efforts for the Loss.

9.     Please provide an update on the status of any criminal investigation associated with the Loss. We note that grand jury subpoenas were issued to certain purported vendors of MACC.

10.    In respect of the communications briefly mentioned in your response to our previous Request 3(b) where you wrote: "Jason would handle these vendors along with Barbara Flores, Monica in A/P"; please provide all email and other written correspondence between MACC employees and the following vendors:

    a)     J&N Marketing, and

    b)     TKC Entertainment.

11.    Furthermore, please describe the extent of services provided by J&N Marketing and TKC Entertainment to MACC, and any supporting information or documentation relating to same.

12.    We note that you previously provided certain email correspondence from Mike Anderson (mike@mikeandersonchevy.com) to Kolodzinski.  Please provide all written and email correspondence between either Mike Anderson Jr. or Mike Anderson Sr. and Kolodzinski from January 1, 2016 to the present date.

13.    Please provide details in respect of Kolodzinski's employment with MACC, including:

    a)     Who did Kolodzinski report to?

    b)     What were Kolodzinski's job responsibilities?

    c)     Was Kolodzinski formally terminated? Was there any sort of separation agreement? If so please provide a copy of same.

    d)     What was the last communication anyone at MACC had with Kolodzinski? Please provide any documentation reflecting such communication(s).

14.    In the text messages provided by MACC from Kolodzinski, Kolodzinski purportedly wrote  "And you're right Rory I've been doing this for 2 years I need you as a partner and a friend. Not to buy cars. I buy them for money from you. You know that. **And I was told not to and I do anyways cause I need money**." (Emphasis added). Please provide details regarding this assertion, including:

    a)     Who "Rory" is;

    b)     The relationship between Kolodzinski and "Rory";

    c)     Kolodzinski's assertion that he was told not to buy cars from "Rory". What are the circumstances of Kolodzinski being told not to purchase vehicles from "Rory", when did that occur, why did that occur, and please provide any other details relating to that incident;

    d)     Additionally, please provide full details regarding any and all other instances where Kolodzinski was disciplined or reprimanded while employed at MACC.

15.     Further, in the text messages provided by MACC from Kolodzinski he sends a picture of what appears to be a newly installed interior drain tile system. Kolodzinski writes: "See you help me make money by saving me time so I can do it all!" Please provide any and all known details of any moonlighting and/or other business ventures by Kolodzinski while he was employed at MACC.

QBE reserves its rights under the Policy and operative law with respect to coverage for the loss alleged in the POL, including the right to seek additional information. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by QBE.

If you would like to discuss this matter further, please do not hesitate to contact us.


Very truly yours,

Kaufman Dolowich & Voluck, LLP

Stefan R. Dandelles
Co-Managing Partner – Chicago Office


cc:     Priyanka Gandhi
        QBE


4840-5615-9348, v. 1



**Kaufman Dolowich & Voluck, LLP**
135 S. LaSalle Street, Suite 2100
Chicago, Illinois 60603

Main: (312) 646-6744
Fax: (312) 896-9403

www.kdvlaw.com

**Stefan R. Dandelles**
Email:    sdandelles@kdvlaw.com
Direct:   (312) 646-6742
Mobile:  (312) 206-4976

July 22, 2019

**<u>VIA EMAIL</u>**

Judy Arnold
Controller
Mike Anderson Chevrolet of Chicago
5333 W. Irving Park Rd.
Chicago, IL 60641
judy.arnold@mikeandersonchevy.com

| | |
|---|---|
| Matter: | Jason Kolodzinski Transactions |
| Insured: | Mike Anderson Auto Group |
| Policy No.: | QPL0766816 |
| Policy Period: | October 1, 2017 to October 1, 2018 |
| Claim No.: | 565862N |
| Our File No.: | 033516-0040 |

Dear Ms. Arnold:

As you are aware, we are assisting QBE Insurance Corporation ("QBE") in its review of coverage under the above-referenced Policy ("the Policy") for the purported loss sustained by Mike Anderson Chevrolet of Chicago ("MACC") regarding various transactions involving MACC's former general manager, Jason Kolodzinski (the "Kolodzinski Matter"). We want to thank you, once again, for your continued cooperation in respect of this matter.

The purpose of this letter is to advise MACC that the information provided to date does not establish that the Kolodzinski Matter involves loss covered under the Policy. Please note, however, that this letter does not represent a denial of coverage by QBE. Rather, QBE plans to continue its investigation of the Kolodzinski Matter and further evaluate coverage based on additional information provided by MACC.

Below, we detail our understanding of the Kolodzinski Matter based on the information provided to date. We then identify, for MACC's reference, the relevant Insuring Clause and certain potentially relevant exclusions to coverage. We also identify information that is not contained in the materials provided to date and request additional information that may assist QBE with its ongoing review of coverage.

<b><u>FACTUAL BACKGROUND</u></b>

Below we set forth our current understanding of the Kolodzinski Matter. Please let us know if our understanding is incorrect.

The Kolodzinski Matter involves the following six categories of transactions:  (1) purchase of used cars from Sir Hooptie; (2) purchase of used cars from Epic Motorsports ("Epic"); (3) trade-in of Kolodzinski's Corvette; (4) purchase of mail advertisement services from J&N Marketing ("J&N"); (5) purchase of radio

Judy Arnold
Mike Anderson Chevrolet of Chicago
July 22, 2019

advertising from TKC Entertainment ("TKC"); and (6) purchase of auto services from AC Customs and AC Kustoms (collectively ("AC")).

## 1. Purchase of Used Cars from Sir Hooptie

MACC contends that Kolodzinski caused MACC to incur a loss of $5,806.97 by purchasing two cars from Sir Hooptie in May and June 2017 (the "Sir Hooptie Transactions"). MACC believes that Kolodzinski may have been purchasing used cars from Sir Hooptie at a premium based on rumors in the summer of 2017 that Kolodzinski may have had an interest in Sir Hooptie. However, we have seen no evidence supporting these rumors.

MACC's response to our RFI did not identify any unlawful activity by Kolodzinski with respect to the Sir Hooptie Transactions. Specifically, MACC states that Kolodzinski's duties as General Manager included purchasing, pricing, and servicing used vehicles. The Used Vehicle Purchase Procedures provided by MACC state that a manager (such as Kolodzinski) negotiates with the seller on the price of the vehicle and then "confirms on VAuto that price is within range to re-sell with a profit."

The purported loss MACC submitted for coverage is not based on the difference between what Kolodzinski paid for a car and the car's "true" value or what Kolodzinski "should" have paid for that car. Rather, it appears that MACC calculated its loss as the difference between its expenses (i.e., the amount it paid to purchase the car and costs of preparing the car for sale, including inspections and repairs) and its revenue for the car (i.e., the price for which it sold the car itself, after deducting the price of other items, such as gap protection, service plans, or other options included in the "purchase price").

As an example, MACC claims a $2,338.33 loss in connection with a 2016 GMC Yukon (referenced as CP3741) purchased from Sir Hooptie for $45,500 and then incurred $639.00 for two new tires, $102.00 for a complete detail, and a total of $3,532.33 for a spare key, repairs to a rear bumper harness and outer sensor, a safety inspection, and 22" Dub Wheels (apparently supplied and/or installed by AC) before and selling it for $47,965 (which included $530 for gap protection). The total expenses of $49,773.33 minus the revenue $47,435.00 results in a MACC's purported loss of $2,338.33.

Further, the information provided does not indicate that Kolodzinski retained MACC's funds that were to pay for the Sir Hooptie Transactions or received a direct or indirect benefit from Sir Hooptie for the Sir Hooptie Transactions.

## 2. Purchase of Used Cars from Epic

MACC contends that Kolodzinski caused MACC to incur losses totaling $131,383.43 by purchasing 91 cars from Epic between March 18, 2016 and January 18, 2018 (the "Epic Transactions"). MACC believes that Kolodzinski may have been purchasing used cars from Epic at a premium based on rumors in the summer of 2017 that Kolodzinski may have had an interest in Epic. However, we have seen no evidence supporting these rumors. MACC also provided text messages from Kolodzinski purportedly referencing a kickback regarding the Epic Transactions.

In response to our RFI, MACC advised that Kolodzinski's continued purchase of vehicles from Epic after Mike Anderson told him not purchase any more vehicles from Epic in an October 31, 2017 email was beyond the scope of Kolodzinski's authority. We note that it appears that only 11 cars, for which MACC claims a purported loss of $33,359.98, were purchased by Kolodzinski directly or indirectly from Epic following October 31, 2017. MACC did not identify any unlawful acts by Kolodzinski with respect to his purchase of cars from Epic prior to November 2017.

Additionally, the purported loss calculated by MACC for cars purchased from Epic is generally the same as its calculation of loss for cars purchased from Sir Hooptie. However, for certain cars that apparently had

not been sold by MACC by the time it provided its hard copy documentation to us, it appears that MACC is substituting a VAuto appraised value in place of a "purchase price" in its calculation of loss. We lack information regarding the basis for the appraised value and how it relates to the true value of the cars or alternative valuations, including the value based on comparable local sales or the "rbook," "Black Book," "MMR," and "KBB.com" values listed on the print out from the VAuto website containing the appraised value. In addition, we lack information regarding the relationship to the "Profit" figure next to the "Appraised Value" figure on the VAuto website print out.

Further, the information provided does not show that Kolodzinski either retained MACC's funds that were to pay for the Epic Transactions or received a direct or indirect benefit from Epic for the Epic Transactions.

### 3. Trade-In of Kolodzinski's Corvette

MACC contends Kolodzinski caused MACC to incur losses totaling $10,000 by receiving a trade-in value for his 2017 Corvette for $60,901.93, which MACC contends was higher than the appraised value (the "Trade-In Transaction").

MACC's response to our RFI did not identify any unlawful activity by Kolodzinski with respect to the Trade-In Transaction. We note that the sales slip for the trade-in lists Roland De Luna as the Business Manager and appears to contain multiple signatures on the line for Dealership Authorized Manager.

As with the appraisals for cars purchased from Epic discussed above, we lack information regarding the basis for the VAuto appraised value from which MACC appears to calculate its purported loss. In this regard, we note that VAuto appraisal submitted with the loss listing a $50,000 "Appraised Value" also lists a "rbook" value of the Corvette as $62,875. We further note that a January 18, 2018 email from Mike Anderson to Debbie Wick and Bill Thompson states that Kolodzinski "put 5k more in the trade than it was worth." Therefore, it is not clear how MACC calculated its purported $10,000 loss for the Trade-In Transaction.

### 4. Purchase of Mail Advertisement Services from J&N

MACC contends that Kolodzinski caused MACC to incur losses totaling $191,610 for payment of invoices for purported mail advertising services by J&N from May 2016 to September 2017 that MACC believes were not performed (the "J&N Transactions"). MACC did not have vendor agreements at the time of the J&N Transactions and all communication with J&N regarding the J&N Transactions occurred via Kolodzinski. The documentation provided includes J&N invoices and corresponding check requests by Kolodzinski and checks issued by MACC. However, MACC has been unable to obtain information from J&N – aside from an unsigned United States Postal Service Plant-Verified Drop Shipment form for an October 10, 2017 delivery and sample mailers – to confirm whether the invoiced services were performed.

MACC's response to our RFI identified "falsified billing" with J&N Marketing as an unlawful activity by Kolodzinski. However, we lack information showing that the J&N invoices were falsified or that some or all the invoiced services were not performed.

According to the POL, Mike Anderson questioned the J&N Bills in Fall 2017. However, we lack details regarding the questioning regarding the J&N Bills.

In addition, MACC believes that Kolodzinski may have had an interest in J&N or obtained a benefit from J&N for the J&N Transactions. However, the information provided does not indicate that Kolodzinski either retained MACC's funds that were to pay for the J&N Transactions or received a direct or indirect benefit from J&N for the J&N Transactions.

Judy Arnold
Mike Anderson Chevrolet of Chicago
July 22, 2019

### 5. Purchase of Radio Advertising from TKC

MACC contends that Kolodzinski caused MACC to incur losses totaling $75,000 for payment of invoices for purported radio advertising services by TKC from August 2016 to September 2017 that MACC believes were not performed (the "TKC Transactions"). MACC did not have vendor agreements at the time of the TKC Transactions and all communication with TKC regarding the TKC Transactions occurred via Kolodzinski. The documentation provided includes TKC invoices and corresponding check requests by Kolodzinski and checks issued by MACC. However, MACC has been unable to obtain information from TKC to confirm whether the services were performed.

MACC's response to our RFI identified "falsified billing" with TKC as an unlawful activity by Kolodzinski. However, we lack information showing that the TKC invoices were falsified or that some or all the invoiced services were not performed.

In addition, MACC believes that Kolodzinski may have had an interest in TKC or obtained a benefit from TKC for the TKC Transactions. However, the information provided does not indicate that Kolodzinski either retained MACC's funds that were to pay for the TKC Transactions or received a direct or indirect benefit from TKC for the TKC Transactions.

### 6. Purchase of Auto Services from AC

While not identified in the POL, we understand that MACC seeks coverage for $176,572.76 for payment of invoices for auto repair, accessorizing, or customization services performed by AC from August 2016 to October 2017 (the "AC Transactions"). MACC did not have vendor agreements at the time of the AC Transactions and all communication with AC regarding the AC Transactions occurred via Kolodzinski. The documentation provided includes copies of AC invoices and mechanics liens as well as corresponding MACC purchase orders (many of which list persons other than Kolodzinski as the purchaser) and checks issued by MACC.

MACC's response to our RFI did not identify any unlawful activity by Kolodzinski with respect to the AC Transactions. We also lack information showing that AC did not perform the services for which MACC paid. Further, we lack information showing a connection between AC and Kolodzinski or Kolodzinski's purported interest in AC. Additionally, we lack information indicating that Kolodzinski obtained any sums in connection with the AC Transactions. In sum, we lack information regarding the basis of, and support for, MACC's claim for coverage with respect to the AC Transactions.

We note that the invoices for services provided to cars that MACC purchased from Sir Hooptie and Epic appear to include services provided by AC. However, it is not clear whether the sums on those invoices include sums that are also part of MACC's purported loss for the Sir Hooptie or Epic Transactions.

Finally, there are pending criminal and civil investigations regarding the Kolodzinski Matter. However, there have been few developments in the criminal investigation and no charges have been filed against anyone in connection with the Kolodzinski Matter. MACC is conducting its own investigation and sent letters to involved parties in January 2018 via the Lyman Law Firm. However, there has been no response to those letters or further developments in MACC's investigation.

### PRELIMINARY COVERAGE ANALYSIS

MACC seeks coverage for the Kolodzinski Matter under the Policy's Insuring Clause A – Employee Theft, which is subject to a $25,000 retention. In relevant part, Insuring Clause A states that QBE shall pay the Insured for direct loss of Money or Property sustained by an Insured resulting from Theft by an Employee, whether acting alone of in collusion with others. The Policy defines Theft, for purposes of Insuring Clause A, as "the unlawful taking of Money, Securities or Property to the deprivation of an Insured." Therefore,

Judy Arnold
Mike Anderson Chevrolet of Chicago
July 22, 2019

to meet its burden to establish coverage, MACC must show it sustained a direct loss of Money or Property as a result of Kolodzinski unlawfully taking that Money or Property to the deprivation of MACC. We note that the information provided to date does not appear to establish an unlawful taking by Kolodzinski to the deprivation of MACC. We also note that MACC's calculation of loss appears to involve indirect or consequential loss. QBE reserves its right to deny coverage, in whole or in part, on the basis that the MACC's purported loss for the Kolodzinski Matter does not implicate the Employee Theft Insuring Clause.

In addition, we direct MACC's attention to the following exclusions that appear to be potentially relevant to the Kolodzinski Matter:

- Exclusion G – Income, which precludes coverage for loss of income, whether earned or accrued, or potential income, not realized as the result of any loss covered under the applicable Coverage Part; and

- Exclusion H – Indirect or Consequential Loss, which precludes coverage for indirect or consequential loss of any kind, except for Expenses…;

QBE reserves its rights with respect to exclusions G and H.

## REQUESTS FOR INFORMATION

Further to QBE's ongoing investigation and analysis of this matter, we request that you provide any evidence of Kolodzinski's financial interest in the entities or transactions at issue that would amount to an unlawfully taking of money to the deprivation of MACC. Please also keep us updated on any developments in the criminal or civil investigations regarding the Kolodzinski Matter. Additionally, please do not hesitate to provide us with any other information or documentation that MACC believes supports its claim for coverage under the Policy. We would also be glad to meet with MACC to meet and discuss the circumstances surrounding the Kolodzinski Matter and MACC's claim for coverage under the Policy at a mutually convenient time and place.

## CONCLUSION

The information provided by MACC to date regarding the Kolodzinski Matter does not establish coverage under the Policy's Employee Theft coverage. As such, QBE requests that MACC provide the information requested above so that QBE may continue its investigation and evaluation of coverage accordingly. QBE reserves all rights, remedies and defenses under the Policy and applicable law with respect to this matter. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by QBE.

In the meantime, we look forward to receiving the additional requested information. Please do not hesitate to contact us with any questions or to discuss this matter further.

Very sincerely yours,

Kaufman Dolowich & Voluck, LLP

Stefan R. Dandelles
Co-Managing Partner – Chicago Office

Cc:     Priyanka Gandhi (QBE)

4852-5458-4477, v. 1



**Kaufman Dolowich & Voluck, LLP**
135 S. LaSalle Street, Suite 2100
Chicago, Illinois 60603

Main: (312) 646-6744
Fax: (312) 896-9403

www.kdvlaw.com

**Stefan R. Dandelles**
Email:   sdandelles@kdvlaw.com
Direct:   (312) 646-6742
Mobile:  (312) 206-4976

February 6, 2020

**VIA EMAIL**

Theodore L. Banks
SCHARF BANKS MARMOR LLC
333 West Wacker Drive
Suite 450
Chicago, IL 60606
tbanks@scharfbanks.com

| | |
|---|---|
| Matter: | Jason Kolodzinski Transactions |
| Insured: | Mike Anderson Auto Group |
| Policy No.: | QPL0766816 |
| Policy Period: | October 1, 2017 to October 1, 2018 |
| Claim No.: | 565862N |
| Our File No.: | 033516-0040 |

Dear Mr. Banks:

As you are aware, we are assisting QBE Insurance Corporation ("QBE") in its review of coverage under the above-referenced Policy (the "Policy") for the purported loss sustained by Mike Anderson Chevrolet of Chicago ("MACC") regarding various transactions involving MACC's former general manager, Jason Kolodzinski (the "Kolodzinski Matter"). We understand that you represent MACC with respect to its claim for coverage of the Kolodzinski Matter under the Policy. The purpose of this letter is to address certain issues discussed in our December 17, 2019 meeting with yourself and Mike Anderson and Judy Arnold of MACC.

As an initial matter, we want to thank MACC once again for its cooperation. However, as indicated previously, it appears that the currently available information (including additional information provided at the December 17 meeting) is not sufficient for MACC to sustain its burden of establishing coverage for the Kolodzinski Matter under Insuring Agreement (A) of the Policy. Therefore, we reiterate QBE's request for any evidence of Kolodzinski's financial interest in the transactions at issue, as well as any other information or documentation that MACC believes supports its claim for coverage under the Policy. QBE also asks that MACC please:

1. provide any documentation which MACC believes shows that services for which MACC paid AC Customs were not performed;

2. clarify the amount of loss claimed for the trade-in of Kolodzinski's Corvette;

3. provide examples of the documentation generally received by MACC from legitimate mail and radio advertisers verifying advertisements were transmitted;

New York | Pennsylvania | New Jersey | San Francisco | Los Angeles | Florida | Chicago

Theodore L. Banks
SCHARF BANKS MARMOR LLC
February 6, 2020

4.  provide all emails or other electronic communications to or from Kolodzinski from January 1, 2016 to the present that are in MACC's possession or accessible to MACC;

5.  secure and preserve any computer used by Kolodzinski, as well as any other electronic or physical records pertaining to Kolodzinski or this matter;

6.  provide all documentation in MACC's possession regarding the transactions at issue in the Kolodzinski Matter;

7.  provide a detailed description of MACC's policies and procedures regarding submission, review, and approval of vendor invoices and the issuance and transmission of payments for such invoices (collectively, "Vendor Payment Procedures") between January 1, 2016 and January 30, 2018, as well as copies of any such written policies and procedures;

8.  provide a detailed description of the process, including all persons involved, by which the invoices at issue in the Kolodzinski Matter were paid and state whether that process complied with MACC's Vendor Payment Procedures;

9.  with respect to mail and radio advertising vendors, please advise whether it was MACC's policy to issue payment without receiving verification that the advertisements had been transmitted; and

10. provide the name and contact information of any person that MACC believes has knowledge regarding the transactions at issue in the Kolodzinski Matter or Kolodzinski's interests in those transactions, including "Angie" at J&N Marketing referenced by Ms. Arnold at the December 17 meeting and current or former employees of MACC, and brief description of their role and knowledge regarding this matter.

If there is any information requested herein that MACC believes cannot be provided to QBE, or if you wish to discuss the content of any request or the best means by which to provide the information requested, please let us know and we are happy to discuss. If any information requested does not exist, please also state as such. QBE expects that information supplied may lead to further inquiries, and QBE does not suggest that the aforementioned requests include all of the information that QBE requires with respect to the Kolodzinski Matter.

We also write to address MACC's inquiry regarding coverage for potential attorney fees it may incur. As a general matter, the Policy does not provide coverage for legal costs, fees, or expenses or indirect or consequential loss, except for "Expenses," [1] which are defined as

> Reasonable costs, charges, fees (including, attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of any Insured): 1. Incurred by the Insured to determine the amount and extent of loss covered under [the Crime] Coverage Part; or 2. Incurred and paid by the Insured to establish the existence, amount and preparation of the Insured's proof of loss in support of a covered loss under Insuring Clauses A – I.

Coverage for Expenses is subject to a $25,000 limit, which is part of, and not additional to, the limit of liability under the applicable Insuring Agreement. Further, please note that Expenses do not include sums incurred with respect to loss that is not otherwise covered under the Policy. Therefore, QBE is not in a position to confirm or deny coverage for Expenses that MACC may wish to incur with respect to the Kolodzinski Matter. Nonetheless, it appears possible that certain sums incurred to obtain discovery from Kolodzinski or third-parties in a civil action by MACC against Kolodzinski might constitute Expenses – should coverage ultimately be established. Such discovery might yield additional information regarding the

---

[1] *See* Exclusions H and K.

Theodore L. Banks
SCHARF BANKS MARMOR LLC
February 6, 2020

Kolodzinski Matter, such as financial records, documentation, communications, and witness statements, which MACC might be able to present to QBE in support its claim for coverage. Please contact us to discuss MACC's plans regarding a civil action against Kolodzinski or others.

As QBE's investigation and analysis of this matter is ongoing, no final determination of coverage can be made at this time. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by QBE.

In the meantime, we look forward to receiving the additional requested information. Please do not hesitate to contact us with any questions or to discuss this matter further.

Very sincerely yours,

Kaufman Dolowich & Voluck, LLP

Stefan R. Dandelles
Co-Managing Partner – Chicago Office

cc:      Gabriel Speciale (QBE)

4843-2047-3007, v. 2



**Kaufman Dolowich & Voluck, LLP**
135 S. LaSalle Street, Suite 2100
Chicago, Illinois 60603

Main: (312) 646-6744
Fax: (312) 896-9403

www.kdvlaw.com

**Stefan R. Dandelles**
Email:    sdandelles@kdvlaw.com
Direct:    (312) 646-6742
Mobile:    (312) 206-4976

September 4, 2020

**VIA EMAIL**

Theodore L. Banks
SCHARF BANKS MARMOR LLC
333 West Wacker Drive
Suite 450
Chicago, IL 60606
tbanks@scharfbanks.com

| | |
|---|---|
| Matter: | Jason Kolodzinski Transactions |
| Insured: | Mike Anderson Auto Group |
| Policy No.: | QPL0766816 |
| Policy Period: | October 1, 2017 to October 1, 2018 |
| Claim No.: | 565862N |
| Our File No.: | 033516-0040 |

Dear Mr. Banks:

As you are aware, we are assisting QBE Insurance Corporation ("QBE") in its review of coverage under the above-referenced Policy (the "Policy") for the purported losses sustained by Mike Anderson Chevrolet of Chicago ("MACC") regarding six categories of transactions involving MACC's former general manager, Jason Kolodzinski (the "Kolodzinski Matter") as reflected in MACC's July 20, 2020 Amended POL (the "Amended POL"). We are writing in response to your August 19, 2020 letter regarding MACC's purported plan to sue QBE for breach of contract without first providing the information necessary for QBE to complete its investigation of the Kolodzinski Matter. This letter also follows up on outstanding information requests and identifies additional information that QBE asks MACC to provide pursuant to QBE's ongoing investigation of the Kolodzinski Matter and potential coverage under the Policy. Please note that because significant information remains outstanding, no final determination of coverage can be made at this time.

Your August 19 letter asserts that MACC's proposed action against QBE is "necessary to get the ability to subpoena Jason Kolodzinski and witnesses to his various thefts." However, we continue to believe that the best way to obtain evidence from Kolodzinski and others either directly or indirectly involved in his purported scheme is to file suit against him which MACC has refused to do despite having already filed a criminal complaint against him. Further, MACC's proposed suit against QBE will not accomplish its apparent goal of developing information that it can use to meet its burden of establishing coverage under the Policy. This is because MACC's proposed complaint for breach of contract necessarily requires that MACC establish that QBE owed coverage *before* MACC files its complaint. For example, MACC could not use information first obtained in a deposition of Kolodzinski in December 2020 as evidence that QBE breached the Policy by not paying MACC's purported losses in September 2020. Accordingly, any *new* information developed in discovery in an action against QBE could not be used to support MACC's breach of contract claim.

Theodore L. Banks
SCHARF BANKS MARMOR LLC
September 4, 2020

We also question your assertions that MACC's proposed complaint "states a cause of action" and that MACC "could prevail on a motion for full or partial summary judgment." Given the recent submission of the Amended POL, the unanswered pending requests for information, the new requests for information, the anticipated need for further information and/or examinations under oath, and the fact that QBE has not taken a coverage position, it appears that there may not even be a justiciable controversy at this time. Moreover, MACC's potential failure to cooperate or other potential breaches of its obligations under the Policy regarding QBE's coverage investigation may eliminate any potential coverage at the motion to dismiss or summary judgment stage.

We also note that your August 19 letter asserts that "[MACC] agreed that [it] would provide additional information *as a courtesy*" (emphasis added). MACC providing information "as a courtesy" to QBE was not discussed during our August 11 telephone conversation and it is indeed MACC's obligation to do so. During our recent call, you indicated that MACC would be providing a narrative summary of its claim and responses to QBE's pending requests for information. Section VI.B.4 of the Policy states that MACC "shall . . . cooperate with the Insurer in the investigation of any claim." QBE reserves its rights in this regard and looks forward to MACC's cooperation in responding to the requests for information set forth below.

## REQUESTS FOR INFORMATION

We appreciate the additional information provided with your August 19 letter – some of which was not previously provided to QBE despite appearing to be responsive to our previous requests. However, the information provided with your August 19 letter is not responsive to most of the requests for information set forth in our February 6, 2020 letter. Below we identify certain outstanding requests for information, as well as additional requests based on the newly provided information.

1. Our February 6 letter asked that MACC please confirm that it has provided all evidence in its possession of Kolodzinski's purported financial interest in the transactions at issue (i.e., each of the six schemes identified in MACC's July 20, 2020 Amended POL). Your August 19 letter did not address this request. Therefore, we reiterate the request for such confirmation.

2. Request No. 1 in our February 6 letter asked MACC to "provide any documentation which MACC believes shows that services for which MACC paid AC Customs were not performed." Your August 19 letter did not respond to Request No. 1, other than to state at Paragraph 8.d.: "AC Customs – invoice for $8,000 rims that were never received." In this regard, we ask that MACC please:

   a. Provide (or identify if previously provided) the invoice for the $8,000 rims that were purportedly never received;

   b. Explain the basis for MACC's contention that the $8,000 rims were not received and provide supporting documentation;

   c. Advise whether MACC contends that other parts or services representing the $176,000 of Inflated Repair Charges in the Amended POL were not received; and

   d. Confirm whether MACC seeks coverage for the $168,000 of the Inflated Repair Charges not represented by the $8,000 rims referenced above and, if so, please:

      i. Identify any repairs that MACC contends were performed at inflated prices, explain why MACC believes the prices were inflated, the amount by which the price of each repair was inflated, and provide supporting documentation;

Theodore L. Banks
SCHARF BANKS MARMOR LLC
September 4, 2020

    ii.    Identify any repairs that MACC contends were unnecessary, explain why MACC believes the repairs were unnecessary, and provide supporting documentation; and

    iii.    Confirm whether Kolodzinski had discretion to authorize the repairs for which MACC seeks coverage.

3.    Request No. 2 in our February 6 letter asked MACC to "clarify the amount of loss claimed for the trade-in of Kolodzinski's Corvette." Your August 19 letter states that the trade-in value given by MACC was "approximately $61,000, while the actual trade in value was approximately $52,000, and with repair costs necessary, the dealership lost approximately $10,000 on the transaction." As noted in our July 22, 2019 letter to MACC, the VAuto appraisal submitted with the loss lists various values including an "rbook" value of $62,875 and a January 18, 2018 email from Mike Anderson to Debbie Wick and Bill Thompson states that Kolodzinski "put $5k more in the trade than it was worth." In this regard, we ask that MACC please:

    a.    Identify the specific (not approximate) amount that MACC seeks for the Personal Trade-In category in the Amended POL;

    b.    Identify the "actual trade-in value" on which MACC it bases its claim and provide supporting documentation;

    c.    Explain the discrepancy between MACC's assertion of the "actual trade in value" and the $62,875 "rbook" value;

    d.    Explain the discrepancy between MACC's assertion of the "actual trade in value" and the email referencing a purported $5,000 increase in the trade-in value; and

    e.    Identify all persons involved in the Kolodzinski's trade-in of his Corvette and describe their positions and roles in the trade-in.

4.    Request No. 3 in our February 6 letter asked MACC to "provide examples of documentation generally received by MACC from legitimate mail and radio advertisers verifying advertisements were transmitted." Your August 19 letter did not respond to Request No. 3. Therefore, we reiterate this request.

5.    Request No. 4 in our February 6 letter asked MACC to "provide all emails or other electronic communications to or from Kolodzinski from January 1, 2016 to the present that are in MACC's possession or accessible to MACC." Request No. 5 in our February 6 letter asked MACC to "secure and preserve any computer used by Kolodzinski, as well as any other electronic or physical records pertaining to Kolodzinski or this matter." Your August 19 letter states that MACC "does not have access to all of the emails sent or received by Kolodzinski, and such a request is excessive in any case. Several emails were located, and copies are attached." However, QBE understands that Kolodzinski used a business email account hosted or otherwise operated or maintained by MACC (e.g., via Microsoft Enterprise or Outlook365). QBE also understands that MACC has retained the computer used by Kolodzinski at MACC. Therefore, please explain why MAC lacks access to all emails sent or received by Kolodzinski from his MACC account. In any event, QBE will gladly coordinate with MACC to obtain a copy of Kolodzinski's email account (e.g., a .PST file). Therefore, we ask that you please contact us to discuss the best way for QBE to obtain a copy of Kolodzinski's email account and/or the hard drive on the computer he used at MACC.

Theodore L. Banks
SCHARF BANKS MARMOR LLC
September 4, 2020

6. Request No. 6 in our February 6 letter asked MACC to "provide all documentation in MACC's possession regarding the transactions at issue in the Kolodzinski Matter." Your August 19 letter did not respond to Request No. 6. We note that MACC continues to provide additional information that was not previously provided, despite appearing responsive to our prior requests for information. Therefore, we reiterate Request No. 6 and ask for MACC's careful consideration in response to this request.

7. Request No. 7 in our February 6 letter asked MACC to "provide a detailed description of MACC's policies and procedures regarding submission, review, and approval of vendor invoices and the issuance and transmission of payments for such invoices (collectively, "Vendor Payment Procedures") between January 1, 2016 and January 30, 2018, as well as copies of any such written policies and procedures." Your August 19 letter did not respond to Request No. 7, other than to state in Paragraph 7 that "the usual method to obtain payment is to submit a check request." In this regard, we note that MACC responded "Yes" to the following question on its June 15, 2017 application pursuant to which the Policy was issued: "Does the Applicant: [] c. verify invoices against a corresponding purchase order, receiving report and the authorized master vendor list prior to issuing payment." Therefore, we reiterate Request No. 7 and also request that MACC please:

    a. Provide a copy of the purchase order corresponding to each invoice it paid to TKC or J&N;

    b. Provide a copy of the master vendor list, and any revisions thereto, effective between May 2016 and December 2017; and

    c. Identify the persons who verified the TKC and J&N invoices against the master vendor list and the applicable purchase orders before authorizing payment and provide supporting documentation of the verifications.

8. Request No. 8 in our February 6 letter asked MACC to "provide a detailed description of the process, including all persons involved, by which the invoices at issue in the Kolodzinski Matter were paid and state whether that process complied with MACC's Vendor Payment Procedures." Your August 19 letter did not respond to Request No. 8, other than to state in Paragraph 7 that "the usual method to obtain payment is to submit a check request." Therefore, we reiterate this request.

9. Request No. 9 in our February 6 letter asked MACC to "with respect to mail and radio advertising vendors, please advise whether it was MACC's policy to issue payment without receiving verification that the advertisements had been transmitted." Your August 19 letter did not respond to Request No. 9. Therefore, we reiterate this request.

10. Request No. 10 in our February 6 letter asked MACC to provide the name and contact information of any person that MACC believes has knowledge regarding the transactions at issue in the Kolodzinski Matter or Kolodzinski's interests in those transactions, including . . . current or former employees of MACC, and brief description of their role and knowledge regarding this matter." Your August 19 letter identified the following "current MACC employees involved with this matter," but did not provide the requested description of their role and knowledge regarding this matter: Mike Anderson, Judy Arnold, Tim Jenney, Katie Keenan, and Tiffany Santiago. The documentation previously provided indicates that other MACC employees may have been involved in the transactions at issue in the Kolodzinski Matter (e.g., Barbara Flores and Roland De Luna). Therefore, we ask that you please confirm that the five MACC employees identified above are the only current or former employees with the knowledge specified in Request No. 10. If not, please identify all current or former employees with such knowledge. We also ask that you please provide

Theodore L. Banks
SCHARF BANKS MARMOR LLC
September 4, 2020

a description of each persons' role and knowledge regarding the transactions at issue as previously requested.

11. The October 26, 2017 email from Bill Thompson to Mike Anderson in the "1-19-18" email attached to your August 19 letter does not appear to have been previously provided to QBE. In the email, Thompson advises Anderson that he might have a thief at MACC and describes the Direct Mail Advertising scheme in the Amended POL. In response to QBE's prior requests regarding documentation concerning the Kolodzinski Matter, including with respect to evidence of the purported "theft," MACC primarily provided emails from January 2018 that summarized events in 2017. In light of the newly submitted information regarding MACC's apparent knowledge of the issues regarding J&N and its investigation in the Fall 2017, we ask that MACC please provide:

   a. All written and email correspondence between with Mike Anderson Jr. or Mike Anderson Sr. and Kolodzinski from January 1, 2016 to the present date (as previously requested in our October 3, 2018 letter);[1]

   b. All written and email correspondence between MACC and anyone else referencing or regarding Kolodzinski, Epic, Sir Hooptie, TKC, J&N, AC Custom, or reports of suspected theft or dishonesty from January 1, 2016 to the present.

   c. A detailed description of MACC's October 2017 investigation into J&N, with supporting documentation, including whether and why MACC stopped doing business with J&N.

   d. A detailed description of when, how, and who at MACC first learned of the purported theft for each of the schemes identified in the Amended POL and supporting documentation.

12. As Paragraph 4 of your August 19 letter states that J&N could not provide proof of mailing and the "proof of mailing.pdf" that they did provide "was confirmed by the postmaster to be phony," we ask that MACC please:

   a. Provide all communications between MACC and J&N regarding requests for proof of mailing;

   b. Describe how, when, and to whom the "postmaster" confirmed that the proof of mailing was phony and provide supporting documentation; and

   c. Describe any action taken by MACC with respect to J&N after learning that it could not provide proof of mailing.

13. As Paragraph 4 of your August 19 letter states that the "supposed mailing list for the mailing was also phony," we ask that MACC please:

   a. Provide all written communications between MACC and J&N regarding the mailing list;

   b. Explain why MACC concluded the mailing list was phony and provide supporting documentation,

---

[1] Please contact us to discuss an efficient method of obtaining the email or other electronic information responsive to the Requests 11.a. and b.

Theodore L. Banks
SCHARF BANKS MARMOR LLC
September 4, 2020

    c.   Describe how, when, why, and who at MACC concluded that the mailing was phony and provide supporting documentation;

    d.   Describe any action taken by MACC with respect to J&N after concluding that mailing list was phony and provide supporting documentation.

14.  As Paragraph 5 of your August 19 letter appears to assert that MACC's purported losses resulting from cars purchased from Epic and Sir Hooptie are covered because Kolodzinski violated instructions not to do business with those entities and MACC previously provided an October 31, 2017 email from Mike Anderson instructing Kolodzinski not to buy anything else from AC Customs or Epic, please advise if MACC is seeking coverage for claims related to cars purchased before Mike Anderson's October 31, 2017 email and, if so, explain why such claims involve an unlawful taking of Money, Securities, or Property to the deprivation of MACC committed by Kolodzinski and provide supporting documentation.

15.  As Paragraph 8.e. of your August 9 letter states "Contact with Chris (owner) [of TKC] who refused to provide transcripts supporting the radio time that was billed but never aired," we ask that MACC please:

    a.   Provide all written communications between MACC and TKC regarding request for confirmation that advertisements aired, and provide supporting documentation

    b.   Identify and describe, including the date and the persons involved, all non-written communications between MACC and TKC regarding the request for confirmation that advertisements aired and provide supporting documentation;

    c.   Explain why MACC concluded that the "radio time" never aired and provide supporting documentation,

    d.   Describe how, when, why, and who at MACC concluded that the "radio time" never aired and provide supporting documentation;

    e.   Describe any action taken by MACC with respect to TKC after concluding that "radio time" never aired and provide supporting documentation.

If there is any information requested herein that MACC believes cannot be provided to QBE, or if you wish to discuss the content of any request or the best means by which to provide the information requested, please let us know and we are happy to discuss. If any information requested does not exist, please also state as such. QBE expects that information supplied may lead to further inquiries, and QBE does not suggest that the aforementioned requests include all of the information that QBE requires with respect to the Kolodzinski Matter. Additionally, QBE anticipates that, after reviewing the relevant documentation provided by MACC, it may wish to exercise its right under Section VI.B.3.to conduct examinations under oath of certain persons with information regarding the Kolodzinski Matter. Finally, after reviewing this letter, we invite you to contact us to discuss this matter further.

As QBE's investigation and analysis of this matter is ongoing, no final determination of coverage can be made at this time. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by QBE.

Theodore L. Banks
SCHARF BANKS MARMOR LLC
September 4, 2020

In the meantime, we look forward to receiving the additional requested information. Please do not hesitate to contact us with any questions or to discuss this matter further.

Very sincerely yours,

Kaufman Dolowich & Voluck, LLP

Stefan R. Dandelles
Co-Managing Partner – Chicago Office

cc:     Eric Quandt (SBM)
        Christopher Blum (KDV)
        Gabriel Speciale (QBE)

4836-4638-8426, v. 1