# EXHIBIT L

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MIKE ANDERSON CHEVROLET OF CHICAGO, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) 1:20 cv 06161 ) |
| QBE INSURANCE CORPORATION, | ) ) |
| Defendant. | ) |

The Remote Deposition of BARBARA FLORES, called by the Defendant for examination, pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts, taken before Victoria D. Rocks, CSR, and Notary Public in and for the County of Cook, State of Illinois, commencing at 5:00 o'clock p.m., on the 21st day of October 2021, A.D.

Page 18

1 clerk.
2    Q. In the 2017 time frame, who was the
3 payables clerk?
4    A. Monica Spyropoulos.
5    Q. Was she the only one that performed that
6 function?
7    A. I would on occasion as well as vendors if
8 needed. If she was off that day or needed something
9 right away, Tiffany Santiago might have, but
10 minimally.
11    Q. The system you described, does anyone have
12 access to that software system that you described?
13    A. The employees have access and then within
14 the functionality of the system.
15       So, for example, you would have access
16 to name and address file, but you couldn't add, you
17 could only edit. It's secure. It's not like
18 everybody has access to payroll or everything in the
19 system.
20    Q. So it's password protected?
21    A. Yes.
22    Q. Each user has their only distinct log in
23 and password, is that right?
24    A. Correct.

Page 19

1    Q. So for the process, are there only certain
2 users that would have access to the Reynolds and
3 Renyolds Power system to be able to add a vendor?
4    A. Yes.
5    Q. Who were those people?
6    A. It would have been the accounting staff.
7    Q. Was Jason Kolodzinski part of the
8 accounting staff?
9    A. No, sir.
10    Q. Do you know whether he had access to
11 independently himself be able to add vendors into
12 the Reynolds and Reynolds Power software?
13    A. I don't believe he'd have access.
14    Q. Are you aware of any situations where he
15 may have done so?
16    A. No.
17    Q. You referenced a customer number that is
18 the result of having input the data regarding this
19 new vendor, is that right? You get a customer
20 number?
21    A. Correct.
22    Q. Is that the same as an NAD number?
23    A. Correct.
24    Q. And NAD is name and address?

Page 20

1    A. Correct. That is the application within
2 the Reynolds software.
3    Q. So a name and address number or a customer
4 number, can I use those interchangeably?
5    A. Customer number, vendor number, NAD, name
6 and address is all interchangeable.
7    Q. So in order for a vendor to have an NAD
8 number, they must have already been input into the
9 system, correct?
10    A. Correct.
11    Q. And they must have already produced a
12 signed W-9, correct?
13    A. Correct.
14    Q. Is the information on the W-9 necessary to
15 generate a NAD number?
16    A. Yes.
17    Q. So a federal EIN is one of the files that
18 has to be populated to create the NAD number, is
19 that right?
20    A. Or social, but yes, it's one and the same.
21 Taxpayer ID, a company or a person.
22    Q. What information would be input into the
23 system in order to generate an NAD number?
24    A. It's very basic. So of course, vendor

Page 21

1 name or customer name, the address, the whole thing.
2 City, state, zip, phone number. And then just the
3 W-9 information.
4       And whether we're going to give them a
5 1099. Should we issue a 1099 for them because the
6 system was able to do that as well.
7    Q. So if a particular entity has an NAD
8 number, that means they have already been approved
9 to be a vendor of Mike Anderson Chevrolet of
10 Chicago, correct?
11    A. Correct.
12    Q. Do NAD numbers get generated before
13 approval?
14    A. No.
15    Q. We're going to do a quick housekeeping
16 item. Can you see this document on my screen?
17    A. Yes.
18    Q. Is this a reference to you, Barbara
19 Flores? Is that your address?
20    A. Yes, it is.
21    Q. Have you seen this document before?
22    A. I believe that was the one that was
23 e-mailed to me in regards to today's deposition.
24    Q. And attached to that notice there was a

6 (Pages 18 - 21)

Page 38

1  don't really know what you're talking about. And he
2  didn't have anything else to add to the
3  conversation.
4      Q.  Did he tell you that the ads were not run?
5      A.  He did not, but he didn't say they were.
6  He just didn't understand what I was talking about.
7  He's never had to provide anything like that before.
8      Q.  As you sit here today, are you aware of
9  any facts or evidence to establish that the ads
10 were, in fact, not run?
11     A.  No.
12     Q.  Let's talk a little bit about J and N
13 Marketing.  Earlier you testified that Mike Anderson
14 asked you to look into the mailer issue?
15     A.  Yes.
16     Q.  What is your understanding of what
17 prompted him to raise that issue in the first place?
18     A.  He didn't say.
19     Q.  Do you recall the time frame around which
20 he asked you to look into that?
21     A.  I know that I might have an e-mail that I
22 wrote.  So around that time frame.
23     Q.  An e-mail to whom?
24     A.  To J and A Marketing.  I believe it's

Page 39

1  Nick.
2      Q.  J and N?
3      A.  Excuse me.  J and A is another company.
4      MR. DANDELLES:  I would ask counsel to provide
5  those e-mails.
6  BY MR. DANDELLES:
7      Q.  I will show you one e-mail that appears to
8  be a response to an e-mail that we don't have.
9  Let's mark this as next in order, Exhibit 7.
10         This is bates number J and N 105.  If
11 you could take a look at this and let me know if you
12 recall this exchange?  I will scroll out so you
13 could see the whole thing.
14     A.  I could see it.  Attached you will find
15 the mailing list per your request.
16         That's what I asked for was the mailing
17 list and, of course, the graphics for the mailer.
18 So yes, I do recall this.
19     Q.  So did you send an e-mail to which he
20 responded with this information?
21     A.  Yes, I must have.
22     MR. DANDELLES:  Counsel, we don't have that
23 e-mail.  If you would please procure it and produce
24 it.

Page 40

1      Also we don't have the e-mail in native.  So
2  we don't have the attachment where it says attached
3  you will find.
4      THE WITNESS:  The attachments are there.  Well,
5  the images are probably not applicable, but the
6  Corvette and Camaro list and that was a listing of
7  all customers.
8      MR. DANDELLES:  Right.  That's fine, but we
9  don't have it in native format.  So we don't have
10 the attachment.  We just have a reference to the
11 attachment.
12     We need the document, counsel.  I am talking
13 to the other folks there.  We need a copy of the
14 attachment as well as e-mail to which this responds.
15 BY MR. DANDELLES:
16     Q.  Do you know what the reference to PDF will
17 be over shortly, do you know what that is a
18 reference to?
19     A.  It's referencing the next sentence.
20     Q.  "We outsourced the graphics.  So waiting
21 for it to get back."
22         Is that a list of the people to whom the
23 mailer was being sent?
24     A.  Yes.

Page 41

1      Q.  And the PDF reflects the graphics of what
2  was being sent?
3      A.  Correct, the actual mailer in its form.
4      Q.  Do you recall having received that from
5  him?
6      A.  Never.  Sorry, I should have answered no,
7  I don't recall receiving it.
8      Q.  Did you follow up and ask for it?
9      A.  Presumably I would have, but I don't know.
10     Q.  So at the bottom of this page it has your
11 name again.
12         So it looks like there would have been
13 an e-mail from you to which he's responding, but it
14 seems to have been doctored or cut off.
15         Anyway, I will deal with counsel on that
16 to get accurate production of this e-mail exchange.
17 Who is Jason Christopoulos?
18     A.  That is Lyman Law.  Jason Christopoulos is
19 a lawyer for Lyman law, and Mike must have asked me
20 to forward that to Jason.
21     Q.  You mentioned something about a U.S.
22 Postal bulk mailing receipt or something of that
23 nature?
24     A.  Yes, sir.

11 (Pages 38 - 41)

Page 42

1  Q. How did you obtain that?
2  A. It would have been from Nick Cornfield, an
3 e-mail form as well, I believe.
4     MR. DANDELLES: Counsel, we would request
5 copies of all e-mails in the system, not only
6 Barbara Flores, but all e-mails between anyone at
7 Mike Anderson Chevrolet and Nick Cornfield on behalf
8 of J and N that has not been provided in discovery
9 in this case.
10 BY MR. DANDELLES:
11  Q. Did you ever see samples of mailers or
12 advertisements prepared by J and N for Mike Anderson
13 Chevrolet?
14  A. No, not that I can recall.
15  Q. I know it's sideways. I could perhaps
16 figure out how to rotate. All right. Do you see
17 this?
18  A. I do.
19  Q. What does this appear to be?
20  A. It appears to be a mailer for Mike
21 Anderson's Rochester store in Indiana.
22  Q. Do you know if J and N provided services
23 to either of the Mike Anderson stores in Indiana?
24  A. I do not know that.

Page 43

1  Q. Mike Anderson Chevrolet, 5333 West Irving
2 Park, is that a reference to Mike Anderson Chevrolet
3 of Chicago?
4  A. Yes.
5  Q. Is this also what we refer to as a mailer?
6  A. I would refer to that as a mailer, yes,
7 sir.
8  Q. Do you know who H-a-z M-u-t-a-w-e is?
9  A. Yes.
10  Q. Who is he?
11  A. He was at that time I believe the general
12 sales manager.
13  Q. If we haven't marked this yet, Exhibit 8,
14 please. And it's an exhibit from J and N, bates
15 number J and N 111 to 140.
16     What does this appear to be?
17  A. That appears to be something that was
18 mailed out, but not returned.
19  Q. So if it was returned it would have had to
20 have been mailed, correct?
21  A. Correct.
22  Q. And you see here Lee Garcia, 7929 West
23 Seminol. Let me flip back.
24     Does this appear to be that mailer that

Page 44

1 was mailed out, but returned?
2  A. Yes, sir.
3  Q. And it references Mike Anderson Chevrolet,
4 correct?
5  A. Yes, sir.
6  Q. When you referenced that Mike Anderson
7 asked you to look into a mailer, was it a particular
8 mailer that he asked you to look into or a
9 particular date on which mail should have been sent?
10  A. He didn't say in specific, but he just
11 said to look into the last mailer.
12  Q. And so is that around October of 2017? Is
13 that the genesis of that e-mail exchanged with Nick
14 Cornfield in that time frame?
15  A. Correct, sir.
16  Q. Did you ever ask J and N for all mailers
17 relating to all work J and N ever did for Mike
18 Anderson Chevrolet of Chicago?
19  A. Yes, sir.
20  Q. Do you see what I'm holding here?
21  A. Yes, sir.
22  Q. It's a glossy -- what would you call this
23 in the industry?
24  A. A mailer, sir.

Page 45

1  Q. A mailer, okay. So up here is where
2 somebody's name and address would be printed, and
3 you have a postage reference up here?
4  A. Correct.
5  Q. And so that program headquarters, is that
6 a reference to Mike Anderson Chevrolet's address?
7  A. Correct.
8  Q. It's got graphics on it? Graphics and
9 words, is that right?
10  A. Yes, sir.
11  Q. Do you have any facts or evidence to
12 establish that this mailer was not sent out?
13  A. No.
14  Q. Do you have any facts or evidence to
15 establish that any of the advertisements that J and
16 N billed to invoice to Mike Anderson Chevrolet were
17 not done?
18  A. No.
19  Q. Let's mark the next exhibit in order. It
20 is Exhibit 9, which for identification purposes
21 bears bates numbers MACCJandN 23, 22, 20, 21, 24,
22 and 25.
23     Do you see what's on my screen here?
24  A. I do.

12 (Pages 42 - 45)

Page 94

1  A.  The check was cut.
2  Q.  This reflects a sale of that car on
3 March 28 of 2018, is that correct?
4  A.  Yes.
5  Q.  So that is a period of nearly ten months,
6 correct?
7  A.  Yes, sir.
8  Q.  You would agree that in the second half of
9 2017 and the earlier part of 2018 a car that sits
10 for ten months would have a negative or declining
11 market value, is that correct?
12  A.  Yes.
13  Q.  Gap protection not taxed.  What does that
14 mean?
15  A.  In the first line of the purchase price
16 the next box over.  The $47,965, that $530 is
17 included in that $47,965, and it's letting you know
18 that the gap protection is not taxed.  It's not a
19 taxable item in the State of Illinois.
20  Q.  So you paid tax on the $47,965, net of
21 $53O?
22  A.  Correct.
23  Q.  You pay tax on the $47,435?
24  A.  Less the $4,000 for the trade in

Page 95

1 allowance.  Plus the documentation fee.  I don't
2 recall, I guess it's $175 and if they went CVR, it
3 would be $25 as well.
4  Q.  What is CVR?
5  A.  Computer vehicle registration.
6  Q.  Let's go through these one at a time.  I
7 understand that it's not taxed.  Who gets that $530?
8  A.  The third party vendor.  We sell their gap
9 product on their behalf.  We have to pay gap.
10  Q.  Does Mike Anderson Chevrolet of Chicago
11 take a commission on the sale of that product?
12  A.  Yes, because I'm sure the cost is less.  I
13 don't know what it is, though.
14  Q.  Are there records that would reflect what
15 the cost of gap protection is because you're
16 actually taking in the $53O and then you have to pay
17 the service provider, the insurance company.
18      Where would I look to find out how much
19 of that $53O was retained by Mike Anderson as
20 revenue to Mike Anderson?
21  A.  You could look at the check and/or invoice
22 that was made payable to the gap vendor at that
23 time.
24      I don't recall if it was Allied

Page 96

1 protection plan.  It might have been.
2  Q.  Is this part of the F and I?
3  A.  Yes.
4  Q.  Can you estimate or ballpark based on your
5 experience on a product sold in the amount of $530
6 how much of a commission or markup would Mike
7 Anderson be able to keep of that $53O?
8  A.  At Mike Anderson in particular, the costs
9 were -- usually at most dealerships the gap costs
10 are fixed.  At Mike Anderson they were not.  So I
11 cannot say what the cost would have been there.
12  Q.  What does it mean that they are not fixed?
13  A.  If a vehicle is financed for a term of
14 zero to 36 months, the gap cost -- I'm going to make
15 an example, is $1OO.  That's very low.
16      From 37 months their term through let's
17 say 60 months, it might be $200.  Anything over 61
18 through the highest term of the loan to 84 months
19 might be $300.  They used if I recall correctly,
20 Allied protection plan and all of the costs were
21 derived directly from Allied.  It was not set by
22 term.  That is what I'm trying to say.
23  Q.  But generally I mean do they get to keep
24 ten bucks out of the $53O or do they keep $200 out

Page 97

1 of the $53O?
2  A.  I don't know.  Presumably it's not ten
3 dollars.  I would hope it's not ten dollars, but
4 presumably more.
5  Q.  But that is information that would be
6 within Mike Anderson's records on a transaction by
7 transaction basis.
8      If we went and looked up this car or
9 records pertaining to the sale of this car, we would
10 be able to find out how much of the $53O was passed
11 on to the vendor versus how much stayed in the
12 coffers of Mike Anderson, correct?
13  A.  Yes.
14  Q.  Is that the same with respect to the
15 extended service plan or warranties that are more in
16 the $2500 range?
17  A.  Yes.
18  Q.  Whether it's a commission or markup
19 there's some amount of that that is retained by Mike
20 Anderson Chevrolet with the balance being paid to
21 the vendor insurance company?
22  A.  Yes.
23  Q.  On this particular vehicle, the 2016 Yukon
24 work done in late March of 2018, which is right when