# EXHIBIT N

Page 1

1                UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4

5    MIKE ANDERSON CHEVROLET      )

6    OF CHICAGO, LLC,             )

7          Plaintiff,            )

8      vs.                       ) No. 1:20-cv-06161

9    QBE INSURANCE                )

10   CORPORATION,                 )

11         Defendant.            )

12

13        The remote videoconference deposition of

14   JUDY ARNOLD, taken in the above-entitled cause,

15   before Paula Ann Erickson, Certified Shorthand

16   Reporter, Registered Professional Reporter and

17   Notary Public, on October 18, 2021, at the

18   approximate hour of 9:32 a.m.

19

20

21

22

23            REPORTED BY:  PAULA A. ERICKSON

24              C.S.R. LICENSE NO. 084-003899

Page 78

1 one of those deals in that time period and
2 finding true losses and pulling out all the true
3 losses.
4          Now this isn't even in regards to what
5 we had to deal with since 2018 because in 2018,
6 '19, we had to deal with a lot of angry
7 customers with cars that had actually had frame
8 damage or insurance claim damage that in looking
9 into it now, we look back and we see that Jason
10 did even more. We did uncover more after all of
11 this in regards to the cars we were purchasing
12 out of Texas, not allowing enough time because
13 our reports show the car was clean when we
14 pulled the deals recently but people are coming
15 in saying this car frame damage and so there was
16 some scheme out of Texas -- I don't know, but
17 there is just uncovering that onion, you get
18 more shenanigans.
19     Q.  Okay. So just in terms of the
20 methodology for calculating the loss, as I
21 understand what you said, you looked at all cars
22 purchased from Epic and identified only those on
23 which a loss was sustained by the company upon
24 resale of that car; is that correct?

Page 79

1     A.  Yes. That's correct.
2     Q.  Do you know during the period of March
3 2016 to January 2018 how many cars in total Mike
4 Anderson Chevrolet of Chicago bought from Epic?
5     A.  No, I do not.
6     Q.  Do you have a ball park?
7     A.  No, not at all.
8     Q.  Would it be in the hundreds?
9     A.  I don't know at all.
10     Q.  Would it be possible to identify
11 those -- do you have records that would give us
12 the opinions to that?
13     A.  I don't know how. I suppose we could
14 figure it out somehow. It might take a while.
15     Q.  Well, you identified -- For purposes of
16 identifying those on which you incurred a loss,
17 you had to have identified those that were
18 purchased from Epic.
19     A.  Correct.
20     Q.  So we could do that, correct?
21     A.  We could. It will take a while. I am
22 only concerned about the length of time that
23 it's been and trying to find all the deal
24 jackets and documents and I am sure it's

Page 80

1 possible. I am just saying this took a long
2 time and that would take a while but I am sure
3 we can try and figure it out.
4     Q.  So your position isn't that the whole
5 relationship with Epic was a fraud, only those
6 cars on where you sustained a loss involves a
7 fraudulent transaction?
8     A.  No. If you are asking me that right
9 now, I can tell you that some of those may have
10 profited have ended with us having additional
11 bills and expenses in trying to get those people
12 out of those vehicles that they were messing
13 with.
14     Q.  Do you have records that reflect that?
15     A.  Boy, at this time it was we were
16 dealing with it. It was a matter of just trying
17 to make the customers happy. Getting the
18 repairs done. Getting them out of them, trading
19 them out of them, losing our butts to wholesale
20 them. At that time during the end we were just
21 trying to move past; so I don't know how I would
22 find all the names of those people that we had
23 to help out afterwards.
24     Q.  So there were certainly cars that Mike

Page 81

1 Anderson Chevrolet of Chicago had bought on Epic
2 in which it enjoyed a profit, correct?
3     A.  Oh, I am sure so.
4     Q.  And there are many things that go into
5 whether or not the resell of a used car would be
6 profitable or in the red, correct?
7     A.  Can you ask that question again?
8     Q.  Are there multiple factors that go into
9 whether or not the resell of a used car will be
10 profitable?
11     A.  Yeah.
12     Q.  Like market conditions?
13     A.  Yeah.
14     Q.  Like how long it sits on your lot?
15     A.  Sure. Of course. Not right now.
16     Q.  Different times right now, right?
17     A.  Oh, boy and how.
18     Q.  Did Jason Kolodzinski control how long
19 a car sat on the lot?
20     A.  Yes.
21     Q.  How would he do that?
22     A.  I mean, he controlled the inventory.
23 He was in charge of the whole Sales Department,
24 so...

21 (Pages 78 - 81)

1    Q.  Let's see if we find some.  Okay.  So
2 let's take this and we will mark this, Paula, as
3 next in order, please.
4        THE REPORTER:  This will be No. 17,
5 please.
6        MR. DANDELLES:  Thank you.
7 BY MR. DANDELLES:
8    Q.  This is for identification purposes a
9 group exhibit of documents taken from the
10 production of MACC that reflect or may reflect
11 wheels or tires for purposes of a further
12 discussion on that topic.  As we identify or
13 discuss a particular document, we'll identify it
14 by bates number.
15       So the first document in the exhibit
16 bears bates No. MACC: AC Kustoms 181 and it
17 appears to be a customer sales report or
18 statement on which two separate invoices and
19 jobs let's say are reflected.
20       Do you see this, Ms. Arnold?
21    A.  Yes.
22    Q.  Do you have any specific facts or
23 evidence as it relates to the work or parts
24 reflected on this statement with respect to

1    A.  I don't know which car it was but what
2 if it was that car?  What if it was the Tahoe?
3 I can't make a statement --
4    Q.  The question is whether or not as you
5 sit here today you have any facts or evidence --
6    A.  I just don't remember.
7    Q.  Let me -- We got to not talk over each
8 other.
9        As you sit here today, do you or to
10 your knowledge does Mike Anderson Chevrolet of
11 Chicago, have any facts or evidence to establish
12 that the parts reflected on this statement were
13 not delivered?
14    A.  Without a core returned tire and rim, I
15 believe those were not installed.
16    Q.  Is it possible that they were installed
17 and delivered but he just held on to the core
18 tire or the core wheel?
19    A.  It has tremendous value.  It should
20 have been given back.
21    Q.  Okay.  But the fact that it wasn't,
22 does that establish in and of itself that these
23 parts were not delivered?
24    A.  I feel like I am -- I don't know.  It

1 these specific vehicles any facts or evidence to
2 establish that these parts or services were not
3 delivered?
4    A.  I have no core returned wheels and we
5 went online to look and I don't remember which
6 one it was.  I am not sure if it was this one or
7 not and there were no tires and rims on that
8 vehicle.
9    Q.  And you went -- you did -- you looked
10 at what pictures?
11    A.  We went on our website to find some
12 pictures.
13    Q.  Who takes the pictures for the website?
14    A.  Our video person.  And I believe at the
15 time we might -- It might have been on the
16 internet so we Googled the VIN to pull up
17 pictures.
18    Q.  Do you know whether it was this Tahoe?
19    A.  I don't remember which vehicle it was.
20    Q.  So as it relates to these two documents
21 reflected on this statement, you are not aware
22 of any facts or evidence to establish that the
23 parts reflected on this statement were not
24 delivered; is that correct?

1 just doesn't feel right right now.  All I am
2 saying is we researched a vehicle.  There were
3 no tires or rims placed on that car.  I don't
4 know which car it is and so can I say I don't
5 know?
6    Q.  Well, you can answer the question which
7 is:  Do you have facts or evidence to establish
8 that the parts reflected on this statement were
9 not delivered, it's a yes or no?
10    A.  I don't know because I have information
11 that we looked up on a vehicle, but I don't know
12 which vehicle it was.
13    Q.  What information do you have?
14    A.  Research.
15    Q.  What research do you have?
16    A.  Going online and looking at the
17 pictures.
18    Q.  And how was that memorialized?
19    A.  Pardon?
20    Q.  And how was that memorialized?
21    A.  In my brain.
22    Q.  So you don't actually have research to
23 reflect that, do you?
24    A.  But we did do research.

46 (Pages 178 - 181)

Page 198

1      My question was:  Based on your last
2  answer, what's the basis of your assumption that
3  Rory has anything to do with Sir Hooptie?
4      A.  I wish I would have done homework now
5  because I believe it's because Rory also owned
6  Sir Hooptie.
7      Q.  What facts or evidence do you have --
8      A.  I don't have anything right now.
9      Q.  Let me -- Hold on.  I have to ask the
10  question for the record.
11      What facts or evidence do you have to
12  establish that Rory owns Sir Hooptie, LLC?
13      A.  I would have to research it.  I don't
14  have that in my mind right now.
15      Q.  Isn't it true that there is no evidence
16  that Rory has a connection to Sir Hooptie?
17      A.  I don't know that.
18      Q.  And so this money went to Sir Hooptie,
19  LLC, correct?
20      A.  Yes.
21      Q.  Do you have any evidence that Jason
22  Kolodzinski has any financial interest in Sir
23  Hooptie, LLC, the entity to whom Mike Anderson's
24  money was sent?

Page 199

1      A.  I don't have knowledge of any that he
2  does or does not.
3      Q.  Is it your position that any
4  transaction on any given car that doesn't result
5  in profit is the result of fraud?
6      A.  No.
7      Q.  Are you aware of any facts or evidence
8  that MACC's counsel has been able to uncover
9  that establishes any unlawful taking by Jason
10  Kolodzinski in relation to the Sir Hooptie
11  transactions at issue?
12      A.  I don't know of any at this time.  I
13  don't have any updates on that.
14      Q.  Okay.  If we look at -- This is within
15  the same exhibit.  It's the second car alleged
16  to have incurred a loss in relation to a
17  purchase from Sir Hooptie.  This one involves a
18  payment made to Sir Hooptie in the amount of
19  45,500 to a GMC Yukon.  Do you see that?
20      A.  Yes, I do.
21      Q.  And you are claiming a loss of $2,338?
22      A.  Yes.
23      Q.  Because that car was sold at a loss,
24  correct?

Page 200

1      A.  47,000 -- purchased for 45, 47,435,
2  yes.
3      Q.  And this car was purchased in June
4  of 2017, correct?
5      A.  Yes.
6      Q.  And it wasn't sold until March of 2018,
7  correct?
8      A.  Yes.  That's correct.
9      Q.  That's almost ten months.  Is that a
10  long time for a used car to sit on the lot?
11      A.  Yeah.
12      Q.  And does that impact the value of the
13  car?
14      A.  It may or may not.
15      Q.  It's a whole calendar year older, isn't
16  it?
17      A.  No.
18      Q.  No.  At the time it was purchased it
19  was a 2016 GMC purchased in 2017.  At the time
20  it was sold it was a 2018.  That doesn't reflect
21  that it's now a whole calendar year older as a
22  vehicle.
23      A.  Well, I'm sorry but that was not
24  12 months.

Page 201

1      Q.  But it's a 2016 being sold in 2018 as
2  opposed to in 2017, correct?
3      A.  Oh, I see what you are talking about,
4  the year of the vehicle, not the fact that we
5  owned the car for nine months.  You are saying
6  that the car does -- and there is a certain day
7  when those usually age based on model rollout.
8      I don't know that year when the GMC
9  rolled out its new model.  It's less important
10  these days than it was 20 years ago because all
11  the model rollouts are all kind of scattered.
12      Q.  What's gap protection $535?
13      A.  That is a protection of policy if they
14  should total the vehicle and the payoff was
15  greater than what they owed that that insurance
16  policy would pay that gap.
17      Q.  Who provides that insurance?
18      A.  I am not -- I believe it might be
19  Allstate.
20      Q.  How is that -- So who purchases the
21  policy?
22      A.  The customer does.  We sell it to them.
23      Q.  Okay.  Do you mark that up?
24      A.  I don't know what they do and how often

51 (Pages 198 - 201)

Page 202

1 that price varies from cost to sale. That's an
2 F&I product.
3    Q.   What about we seen them on other
4 transactions and we'll get to it with Epic but
5 often there will be a service agreement or
6 extended warranty purchased and it similarly
7 will be reflected in the sales, where is it,
8 right in here like a 2000 or 2500 extended
9 warranty. Are you familiar with that?
10    A.   Yes.
11    Q.   Is that also like a separately issued
12 insurance policy?
13    A.   That is a separate policy done through
14 the F&I Department, that's correct.
15    Q.   Okay. And Mike Anderson sells that
16 policy, correct?
17    A.   Yes.
18    Q.   Does Mike Anderson either mark up the
19 cost of that policy or take a commission on the
20 sale of that policy?
21    A.   The finance manager may mark that up
22 for profit in the Finance Department.
23    Q.   Okay.
24    A.   Which is a separate entity.

Page 203

1    Q.   A separate entity?
2    A.   As far as on the financial statement.
3 You know, how you have the service, the parts,
4 okay? So on the financial statement it would be
5 a separate entity.
6    Q.   So do you know whether it's a markup or
7 a commission or both?
8    A.   No. This would be marked up.
9    Q.   Okay. So there is -- How is that
10 booked from an accounting perspective? If you
11 receive $2500 for an extended warranty from a
12 customer so the purchase price would reflect the
13 additional 2500, how is that booked from an
14 accounting perspective at MACC?
15    A.   Well, there would be a cost that you
16 would submit to the insurance company and your
17 Finance Department would incur a profit and then
18 you would have to hold on for any cancellations
19 where your profit would be given back.
20    Q.   Okay. And assuming no cancellation,
21 there is -- essentially there is revenue booked
22 in for the benefit of Mike Anderson's Chevrolet
23 on the sale of an extended warranty, right?
24    A.   Yes. Yes.

Page 204

1    Q.   So with respect to this second
2 transaction with Sir Hooptie, that sat for ten
3 months on the lot and was sold after Jason was
4 no longer with Mike Anderson Chevrolet, what
5 evidence or facts do you have to establish that
6 Jason Kolodzinski unlawfully took anything from
7 Mike Anderson Chevrolet with respect to this
8 transaction?
9    A.   It was in regards to the purchase price
10 of the vehicle. I have no facts but we can
11 assume or I am assuming that based on the
12 overpriced purchase price and the e-mails that
13 he benefited from that transaction.
14    Q.   But you don't know as a matter of fact
15 that he did?
16    A.   Not until we are able to get their
17 accounts and their checking account statements
18 for that time.
19    Q.   Okay. So we will move on to -- Well,
20 let me ask you about the Corvette. That's one
21 of the components -- that's the sixth component
22 of loss that's a claim of 10,000 as it relates
23 to his trade-in of a Corvette. What -- I don't
24 believe we have any records regarding the sale

Page 205

1 of that Corvette.
2      Is Mike Anderson Chevrolet of Chicago
3 in possession of records that reflect the sale
4 of that Corvette?
5    A.   He gave all of that information to
6 Chris when he came in and sat down with us.
7    Q.   I don't know that we have seen
8 specifically the sale. I know what's been
9 presented in relation to the Corvette is the
10 inflated trade-in value and that's where the
11 10,000 was quantified, but I am not sure that we
12 have seen the sale -- the back end of it when it
13 was actually sold.
14      So do you know that Mike Anderson still
15 has a record of that?
16    A.   I am going to ask Ted. Don't we have
17 that printout that showed that loss? Does
18 anybody have the stock number of the car? I am
19 pretty sure we gave that all to Chris.
20    Q.   Well, regardless, my question as of
21 today, do you have records relating to the sale
22 of the Corvette?
23    A.   Sure. Sure. I thought they were
24 provided to you. That's my only question.

52 (Pages 202 - 205)

Page 206

1    Q.   Here we can look at this together.
2  Mark this -- and if I missed it, point it out.
3    A.   Okay.
4    Q.   So this is what was produced to us
5  which reflects, oops, bates No. MACC JK 1
6  through 16 in relation to the Corvette.  Is this
7  your file jacket relating to the Jason
8  Kolodzinski Corvette?
9    A.   Yes, it is.
10   Q.   And that's your handwriting?
11   A.   Yes, it is.
12   Q.   Customer order.  This reflects a
13 trade-in allowance of 60.  Is this what you are
14 saying was fraudulently inflated?
15   A.   Yes.  Let's keep scrolling through
16 this.
17   Q.   What does this reflect?
18   A.   Okay.  Here is the screen for the
19 Maserati that he purchased, so he purchased this
20 Maserati.
21   Q.   Uh-huh.
22   A.   And showed our total loss so we lost
23 money on that and then keep scrolling.
24   Q.   Well, hold on.  Where does it reflect

Page 207

1  that you lost money on the Maserati?
2    A.   On the right-hand corner, total gross
3  on the detail.
4    Q.   TG?
5    A.   Total gross, yeah.
6    Q.   Where does it say -- I guess walk me
7  through there where does it say the purchase --
8    A.   This is just on his deal.  This is when
9  he bought the Maserati and we showed that we
10 were going to put $60,901 in his trade and then
11 so if we go scroll down --
12   Q.   But I don't want to scroll down yet
13 because I want to understand what this says,
14 okay?
15   A.   Okay.
16   Q.   So where does it reflect the -- what's
17 Mike Anderson's cost on the Maserati?
18   A.   Oh, that's not in here.
19   Q.   Okay.  So how --
20   A.   We didn't bring this into it, so we
21 don't have to stay here.
22   Q.   Well, but I'd like to because I have
23 questions about it because I'd like to
24 understand it.

Page 208

1        So -- So where does the 946 come from?
2  Where does this figure come from?
3    A.   The sale price minus the cost of sale.
4    Q.   And where is the cost of sale?
5    A.   It's not on that screen.
6    Q.   Okay.  What does ACV No. 1 mean?
7    A.   The actual cash value of that vehicle,
8  the trade.
9    Q.   The trade?
10   A.   Right.
11   Q.   59,000?
12   A.   Correct.
13   Q.   Okay.  So if it had a cash value of 59
14 and he took a trade value of 60, he was only off
15 by 1900?
16   A.   The loss happens when you sell the
17 trade.  Not when you take it in.
18   Q.   Okay.  That's not what this says.  This
19 is the basis of your claim.  The basis of the
20 claim is that Kolodzinski traded in a Corvette
21 he owned and gave himself an inflated appraisal
22 of the car at approximately 10,000 more than it
23 was worth.  That's why I am saying we don't have
24 the back end of the transaction.  The basis of

Page 209

1  Mike Anderson's claim has been the trade-in
2  value all along.
3    A.   Okay.  Can we see what was the rest of
4  what was in that file?
5    Q.   This is the next document.
6    A.   Okay.  Right here, that was the trade.
7  Okay.  This is the auto.  Now I cannot -- I
8  don't work in the auto but this is where it
9  shows its appraised value at 50,000 when he did
10 it and he clearly put 59 in it and showed 60.
11   Q.   And this shows that an average list
12 price of almost 58,000 for similar cars at Mike
13 Anderson Chevrolet, correct?
14   A.   No.  I don't know what that is
15 honestly.  That's not something --
16   Q.   You don't know?
17   A.   No.  I don't know anything about that.
18   Q.   It wouldn't reflect average list price
19 of Mike Anderson Chevrolet that's reflected
20 here?
21   A.   No.  I don't know what that is.  It
22 says group stores.  I don't know what that is.
23 I don't know if that's Merrillville or his
24 dad's.  I don't know.

53 (Pages 206 - 209)

Page 210

1  Q.  And do you know what the R book is?
2  A.  The reconditioning.
3  Q.  Do you know what NADA is?
4  A.  National Auto Dealers Association.
5  Q.  In stock average price 57,888, do you
6  see that?
7  A.  I don't know what that means, though.
8  Retail.  It says retail.  Is that --
9  Q.  Don't you see an average marked price
10  for seven similar vehicles of 62 almost $63,000?
11  A.  Yeah.  I don't know.  I mean, this car
12  was damaged and had work we had to do on it.
13       MR. DANDELLES:  We would request,
14  Counsel, that the sale documentation be provided
15  on this because it hasn't been and the basis of
16  the claim has always been just the delta between
17  the trade-in value and -- that he listed of
18  60,000 and the stated actual trade-in value of
19  50.  That's always been the basis of this claim
20  and Ms. Arnold is saying something different,
21  that it's reflected in the ultimate sale price
22  and we don't have that information.
23       MR. QUANDT:  Well, we'll gather
24  information that's relevant.  I think the

Page 211

1  deposition of Haz actually touched on this point
2  because on exactly what occurred on the day that
3  Jason left with regards to this car.
4       MR. DANDELLES:  That may be but
5  regardless, we don't have the documentation so
6  we need it.  That's all I am asking for.
7       MR. QUANDT:  Okay.
8       MR. DANDELLES:  Let's -- We are going
9  to turn to Epic but why don't we just take a
10  quick break before we do that because that's
11  going to be -- there is a lot of transactions
12  involved in Epic and it's going to take a while
13  to get through, so let's take a break if we can,
14  5 minutes, 10 minutes, what do you prefer?
15       THE WITNESS:  It doesn't matter to me.
16       MR. DANDELLES:  All right.  Let's split
17  the difference.  Call it ten minutes to 4:00.
18       MR. QUANDT:  That's fine.
19          (Whereupon, a short recess was
20          taken.)
21       MR. DANDELLES:  So we are back on the
22  record at 4:00 o'clock central and for the
23  record, we have been on the record 4 hours
24  51 minutes continuing now.

Page 212

1  BY MR. DANDELLES:
2  Q.  Back to the Amended Proof of Loss, with
3  respect to Epic, Ms. Arnold, you were
4  responsible for calculating transactions or
5  identifying transactions on which a loss was
6  incurred on cars purchased from Epic; is that
7  correct?
8  A.  Yes.
9  Q.  Did you yourself identify those
10  transactions as well as calculate?
11  A.  With Mike's assistance on identifying
12  them through a report he could run.
13  Q.  So as far as you know, would he be able
14  to run a report reflecting all cars purchased
15  directly from Epic?
16  A.  I don't know.
17  Q.  As we did with Sir Hooptie, would you
18  be able to identify from the financial records
19  all checks issued to Epic Motor Sports from Mike
20  Anderson's system?
21  A.  Checks but I am not so sure that they
22  are so old that we'll still have them but we
23  should be able to and then we don't have the
24  ability for the ones through the auction that

Page 213

1  way.
2  Q.  Understood.  Can you approximate the
3  number of cars Mike Anderson purchased from Epic
4  Motor Sports?
5  A.  Say that again.
6  Q.  Do you know how many cars Mike Anderson
7  Chevrolet of Chicago purchased from Epic Motor
8  Sports between March 2016 and January 2018?
9  A.  No.
10  Q.  Do you have any ball park --
11  A.  No.
12  Q.  -- figure?  But, again, the methodology
13  here was only to identify those on which you --
14  those on which Mike Anderson Chevrolet of
15  Chicago incurred a loss, correct?
16  A.  Correct.
17  Q.  And the position taken then is that if
18  it incurred a loss, it must have resulted from
19  some theft or stealing by Jason; is that right?
20  A.  You had told me in order to make the
21  claim I needed to just get the losses, just give
22  you the losses, the cars that had true losses
23  because a loss of profit is not a claim and I
24  remember that.

54 (Pages 210 - 213)

Page 246

1     (Whereupon, a short recess was
2         taken.)
3     MR. DANDELLES:  Let's go back on the
4 record, please, Paula, 5:02 and I think we'll
5 try to short circuit and streamline rather than
6 going through all 91 transactions.
7 BY MR. DANDELLES:
8     Q.  I believe you said this earlier, but I
9 want to make it clear for the record, that with
10 respect to all 91 transactions submitted as part
11 of the Epic loss, you were -- they made that
12 list simply because they resulted in a net
13 negative outcome; is that correct?
14     A.  Uh-huh.
15     Q.  Is that a yes?
16     A.  Yes.
17     Q.  Okay.  And your methodology in
18 calculating the net outcome was purchase price,
19 in relation to sale price minus any internal or
20 external costs incurred.  In addition, the
21 purchase price as reflected on the documentation
22 we have reviewed would also net off the cost of
23 any insurance product; is that correct?
24     A.  The sale, yes.

Page 247

1     Q.  Correct.  The sale price would net off
2 the cost of any insurance product, correct?
3     A.  That's the way I computed it, yes.
4     Q.  And by netting those figures together
5 taking purchase price, sale price, net of any
6 insurance product, and net of any internal or
7 external costs allocated to that particular car,
8 you would end up at the bottom line figure and
9 it was either positive or negative and those
10 that fell into the negative bucket, made it onto
11 the Epic claim list; is that correct?
12     A.  Yes.
13     Q.  And with respect to each of those 91
14 transactions, did you research or otherwise
15 factor in any information regarding the value of
16 the vehicles purchased from Epic at the time
17 they were purchased?
18     A.  No.
19     Q.  Do you have any facts or evidence that
20 any of the 91 cars at issue reflect a
21 fraudulently inflated purchase price at the time
22 of the purchase?
23     A.  No.
24     Q.  Other than reference to the text

Page 248

1 messages that we have looked at, do you have any
2 actual facts or evidence that reflect a kickback
3 having been paid from Rory or Epic to Jason
4 Kolodzinski?
5     A.  I just want to add, I want to say no
6 but my conversation with Bill Kay plays in.
7     Q.  I am not asking about suspicions or
8 speculation.  I am asking about facts and
9 evidence that establish the transfer of money
10 between Epic and/or Rory and Jason Kolodzinski,
11 do you have any such --
12     A.  Just the text.  Just the text.
13     Q.  So other than that, there are no facts
14 or evidence establishing the transfer of any
15 funds between Epic or Rory and Jason Kolodzinski
16 that you are aware of?
17     A.  That's correct.
18     Q.  And you are not aware of any facts or
19 evidence establishing, in fact, any ownership or
20 financial interest that Jason Kolodzinski had in
21 the entity Epic Motor Sports; is that correct?
22     A.  I don't know if he did or does not or
23 did at the time or did later.
24     Q.  Right.  So you don't have any facts or

Page 249

1 evidence to establish that he in fact did?
2     A.  That's correct.
3     MR. DANDELLES:  Okay.  Subject to, I
4 think there were a couple transactions that we
5 indicated were -- it was flipped reflecting a
6 negative but it really should have been a
7 positive, and, Counsel, there will be some
8 follow-up requests for production of documents
9 relating to some of these transactions.  For
10 today, I have nothing further with Ms. Arnold.
11     MR. BANKS:  Okay.  Thank you very much.
12 We have nothing further here.  Unfortunately,
13 Eric had to leave for a preexisting medical
14 appointment but that's great.  Happy to end it.
15     MR. DANDELLES:  So off the record.
16 Thank you very much.  We are off the record at
17 5:08.
18     THE REPORTER:  Copy, Counsel?
19     MR. BANKS:  Yes and we would like to
20 have the witness be able to review the text.
21     THE REPORTER:  Would you like also the
22 exhibits attached?
23     MR. BANKS:  Not necessary.  We have the
24 exhibits.

63 (Pages 246 - 249)