EXHIBIT O

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKE ANDERSON CHEVROLET OF )
CHICAGO, LLC, )
                                )
        Plaintiff,              )
                                )   1:20-cv-06161
   v.                           )
                                )
QBE INSURANCE CORPORATION,      )
                                )
        Defendant.              )
_____ )

    The deposition of MIKE ANDERSON, taken on behalf of the defendant in the above-entitled case before Debra L. Kleszyk, a Certified Shorthand Reporter within and for the State of Illinois, taken remotely via videoconference on September 30, 2021, commencing at 9:07 a.m., pursuant to the Federal Rules of Civil Procedure. The witness was located at 1847 South Prairie Avenue, Chicago, Illinois.

Page 2

```
 1         A P P E A R A N C E S
 2
 3   SCHARF BANKS MARMOR LLC
       BY: MR. THEODORE L. BANKS
 4         MR. ERIC F. QUANDT
       333 West Wacker Drive, Suite 450
 5     Chicago, Illinois 60606
       (312) 726-6000
 6     tbanks@scharfbanks.com
       equandt@scharfbanks.com
 7
         Appeared via videoconference on behalf
 8       of the plaintiff
 9
10   KAUFMAN DOLOWICH & VOLUCK LLP
       BY: MS. JEAN Y. LIU
11     135 South LaSalle Street, Suite 2100
       Chicago, Illinois 60603
12     (312) 759-1400
       jliu@kdvlaw.com
13
         Appeared via videoconference on behalf
14       of the defendant
15
16
17
18   ALSO PRESENT VIA VIDEOCONFERENCE:
19   MS. GABRIELA CALDERON, Law Clerk
     Scharf Banks Marmor LLC
20
     MS. SARAH SUDDARTH, Law Clerk
21   Kaufman Dolowich & Voluck
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3   WITNESS: MIKE ANDERSON
 4   EXAMINATION                          PAGE
 5    By Ms. Liu                        6, 388
 6    By Mr. Quandt                        386
 7
 8
 9         INDEX OF EXHIBITS
10   EXHIBIT   DESCRIPTION              MARKED
11   Exhibit 1  Defendant QBE Insurance     10
               Corporation's Notice of
12             Deposition of Mike
               Anderson Pursuant to
13             Federal Rule of Civil
               Procedure Rule 30
14
     Exhibit 2  Defendant QBE Insurance     10
15             Corporation's Notice of
               Deposition of Mike
16             Anderson Chevrolet of
               Chicago, LLC Pursuant
17             to Federal Rule of Civil
               Procedure 30(b)(6)
18
     Exhibit 3  Used Vehicle Purchase       98
19             Procedures
               (MACC 318)
20
     Exhibit 4  Police report and original 108
21             insurance claim
               (MACC:POL 1 - 13)
22
     Exhibit 5  Amended Sworn Proof of Loss 108
23             (MACC:POL 14 - 18)
24   Exhibit 6  Amended Complaint at Law   109
               (MACC:Complaint 1 - 64)
25
```

Page 4

```
 1         INDEX OF EXHIBITS
 2   EXHIBIT   DESCRIPTION              MARKED
 3   Exhibit 7  Second Amended Complaint  113
               at Law
 4             (MACC:Complaint 65 - 131)
 5   Exhibit 8  Jason Kolodzinski Corvette 161
               (MAC:JK 1 -16)
 6
     Exhibit 9  Sir Hooptie Losses         178
 7             (MAC-SH 1 - 36)
 8   Exhibit 10  AC Kustoms Corp.          231
               (MAC:ACKustoms 1 - 393)
 9
     Exhibit 11  J&N Marketing             239
10             (MAC:J&N 1 - 90)
11   Exhibit 12  J&N documents             254
               (J&N 84 - 109)
12
     Exhibit 13  e-mail                    292
13             (J&N 110)
14   Exhibit 14  2016 Epic Losses          303
               (MACC:Epic 634 - 892)
15
     Exhibit 15  text messages             309
16             (MACC:JK 98 - 101)
17   Exhibit 16  TKC Entertainment         329
               (MACC:TKC 1 - 59)
18
     Exhibit 17  original police report    333
19             (MACC:POL 5 - 6)
20   Exhibit 18  supplemental police       337
               report
21
     Exhibit 19  e-mails                   356
22             (MACC 118 - 120)
23   Exhibit 20  e-mails                   363
               (MACC 279 - 281)
24
     Exhibit 21  e-mails                   371
25             (MAC 259 - 269)
```

Page 5

```
 1         THE COURT REPORTER:  My name is
 2   Debbie Kleszyk.  I am an Illinois Certified
 3   Shorthand Reporter.
 4         The parties participating in this
 5   deposition acknowledge that, due to COVID-19, I am
 6   not physically present in the room with the
 7   witness and that I will be reporting this
 8   deposition remotely.
 9         At this time I ask counsel to
10   identify yourself, state whom you represent, and
11   then indicate your stipulation to waive any
12   objections to the validity of the oath
13   administered remotely and to proceeding in this
14   manner, starting with the noticing attorney.
15         MS. LIU:  My name is Jean Liu, last
16   name L-i-u.  And I agree to the terms set forth.
17         MR. QUANDT:  Eric Quandt and
18   Ted Theolakis for the -- Theodore Banks, sorry,
19   Ted Banks, for the witness and for the plaintiff
20   in this case.  And we agree to the stipulation.
21              (The witness was duly
22               sworn.)
23         MIKE ANDERSON,
24   called as a witness herein, having been
25   first duly sworn, was examined and
```

Page 190

1  A. Sublet.
2  Q. I'm sorry?
3  A. That's a sublet.
4  Q. Another sublet for additional work.
5  Correct?
6  A. Mm-hmm. For a detail.
7  Q. And then what is page eight?
8  A. That's a safety inspection. That's
9  what they do to -- when you take a car in on
10 trade.
11 Q. So safety inspections are done on
12 trade-ins as a matter of course?
13 A. Oh, yeah, on everything. That's --
14 that's servicing of the used cars.
15 Q. Oh, that's just what they do. Okay.
16    So the safety inspection is
17 generally around $150 it looks like. Is that
18 pretty consistent?
19 A. That's if it doesn't need anything.
20 That's just for them to go inspect the vehicle, to
21 go through and make sure that the brakes meet the
22 specs, make sure the tires have the tread and
23 correct tire depth and that, you know. They spend
24 about -- I think it takes them about an hour and a
25 half, two hours to go through.

Page 191

1  Q. Okay. So that's $231.40.
2     So, going back, this safety
3  inspection was done on May 23, 2017. Do we know,
4  based on these documents, when this vehicle was
5  actually purchased?
6  A. Purchased, meaning that we purchased
7  it?
8  Q. Correct. Because I see a check typed
9  but I don't see when the purchase --
10 A. Right there at the top. It says
11 5/19/2017.
12 Q. I'm sorry, I've got to finish my
13 question. Otherwise, it's really hard for the
14 court reporter to keep track.
15    I'm saying this check says it's cut
16 5/19/2017. But can I tell when the car was
17 actually invoiced in? How do I tell when you
18 actually obtained possession of the car?
19 A. From that, you wouldn't be able to.
20 And that's been so long I'm not sure that I could
21 either. But it would have been around that date
22 because they usually want the money right away.
23 Q. Okay. I'm looking at some of these
24 invoices that we went through earlier. I'm on
25 page four. And there's work being done in

Page 192

1  September 2017. The safety inspection was in May.
2  Is there a reason that repairs are being done
3  later on?
4  A. Yeah. Like that one somebody could
5  have backed into the car when it was sitting in
6  the lot or ran into a -- you know, we have a
7  storage garage, the poles that hold up the roof,
8  you know, or like a lamp, the lot lights.
9  Q. Oh, so this could have been subsequent
10 damage that needed touchup is what you're saying?
11 A. Could have been. There could have
12 been not spotted or found. It could have been,
13 you know.
14 Q. A number of things?
15 A. Mm-hmm.
16 Q. Whose signature --
17 A. That was also in '17, so that was
18 during that strike.
19 Q. Okay. Whose signature is on the
20 bottom?
21 A. I don't know.
22 Q. Who would typically sign off on these?
23 A. That would be the used car manager
24 typically.
25 Q. And the used car manager at this

Page 193

1  time --
2  A. Jason never -- he never hired a used
3  car manager. The only -- like I told you, the
4  only time he ever got close was during
5  Christmastime of I guess it would have had to have
6  been '16. Yeah.
7  Q. So I understand the used car manager
8  typically signs off on this. But if you had two
9  years without a used car manager, who would
10 typically sign off on this?
11 A. That -- that even could have been the
12 invoicer is calling and saying, hey, this is the
13 charge, is it okay, and then, yeah, or whatever,
14 signed it and went on.
15 Q. The invoicer would call whom?
16 A. Jason.
17 Q. And I see on the very left side ADV
18 405 Timothy Jenney.
19 A. That's the guy that invoiced for used
20 cars.
21 Q. That's the guy who what?
22 A. Would invoice used cars.
23 Q. What about on the next invoice, page
24 five, Nassar Fakhoury. Who was that?
25 A. He was a service advisor.

49 (Pages 190 - 193)

Page 194

1  Q.  What is the difference between an
2 invoicer and a service advisor?
3  A.  The advisor would be the one that
4 writes it up.  The invoicer is the one that would
5 close it.  The advisor would be the one that
6 writes it up, sends it in, gives it to dispatch.
7 The invoicer would be the one who finishes it up
8 and then sends it upstairs to the accounting.
9  Q.  And then this invoice reflects some
10 services done with respect to the tire of this car
11 done in July 2017, again about two months after
12 this safety inspection.  Is there a reason that
13 that's two months later?  Is that similar to what
14 you were saying before, it could be a bunch of
15 unrelated incidents --
16  A.  A screw in the tire could -- a screw
17 in the tire, could have simply been the tire went
18 flat.
19  Q.  Okay.  So back to our initial -- the
20 initial reason we went through all of this.  If
21 we're doing the math, how did you arrive -- or how
22 did Mike Anderson Chevy arrive at the number, it
23 was 3468.66, now that you have all the numbers in
24 front of you?
25  A.  Okay.  These are different -- are

Page 195

1 these different cars or are they all the Tahoe?
2  Q.  They are all the same stock number,
3 the 3724, the pages we went through just now.
4  A.  2750.  And then can you scroll down
5 again?
6  Q.  Yeah.  Tell me when to stop.
7  A.  One invoice for 216.  31.26.  138.
8 102.  231.
9  Q.  That's it.
10  A.  Can you scroll up one more time --
11 scroll down I mean.  Down.  Down.  Is that -- so
12 3468.66.  Yeah, so if you add up those invoices,
13 okay --
14  Q.  Okay.
15  A.  -- the 216, 31.26, 138, 102, and
16 231.40 you get 1,018.66.  Right?
17  Q.  Yes.
18  A.  And then if you take the difference
19 between what we bought the car for and what we
20 sold it for, it's 2750.  So you add the two
21 together.  It's 3768.66 -- 3468.
22  Q.  3468.  Okay.  So the calculation of
23 loss is based on the purchase price plus any work
24 that was done to the car and then taking the
25 difference between that and what you ended up

Page 196

1 selling it for --
2  A.  Right.
3  Q.  -- correct?
4  A.  Because we normally add a pack to it,
5 like a hard pack to the car.  Obviously an
6 insurance can back that out.
7  Q.  You add a hard pack?
8  A.  Like, so, in other words, we increase
9 the value by like a thousand dollars that we use
10 to write down on the cars for further things.  But
11 in an insurance claim you don't get that money, so
12 you have to back it out.
13  Q.  Okay.
14  A.  So that's net net net net.
15  Q.  On this customer order -- I know
16 earlier when we were looking at Jason's Corvette
17 it had Jason's name.  Now we have Emmanuel Kalou.
18  A.  Yes.
19  Q.  And he, I assume, is a sales manager.
20 Correct?
21  A.  Yes.  He was, yes.
22  Q.  Is he able to negotiate a purchase
23 price with the buyer?
24  A.  Yeah.
25  Q.  And ultimately he's the person that

Page 197

1 determines the purchase price.  Correct?
2  A.  You mean the selling price to the
3 buyer?
4  Q.  Yes.
5  A.  Yes.
6  Q.  And, I'm sorry, I'm misusing that.
7 I'm using what's on here as far as the purchase
8 price.
9  A.  Right.  Because that would be from the
10 customer's point of view.  Right.
11  Q.  Okay.  I see two other vehicles on
12 here, the Ram 1500 and the Cadillac Escalade.  Is
13 there a reason that -- at least there doesn't seem
14 like there's being a claim brought with respect to
15 these two vehicles.
16  A.  We probably broke out of them okay.
17  Q.  So the reason that you're --
18  A.  It worked out right or.
19  Q.  Okay.  So the reason that the Chevy
20 Tahoe is on here is because eventually it became a
21 net loss to like -- when I say loss, I mean --
22  A.  Well, it was -- the reason is because
23 it was probably overstated would be my guess,
24 would be the initial, like, exception that popped
25 up, and then the loss of it.  To lose that kind of

Page 366

1  to say after that.
2      It seems like there was a series
3  of, I guess, inadequacies by Jason with respect to
4  how he was performing his duties and --
5      A.  Mm-hmm.
6      Q.  -- and that these were documented
7  here.  Why didn't you fire him --
8      A.  Well, like I told you, I was gone --
9      Q.  -- by December?
10     A.  I was taking care of my dad.  And if I
11 had -- had my dad not had cancer and died, I would
12 have launched him probably in October, November.
13 But it was --
14     Q.  So, during this period of time, you
15 were out of town and he was your --
16     A.  It was a really traumatic time in my
17 family's life, so it --
18     Q.  I'm sorry to hear that.
19     A.  And yesterday was his birthday, so
20 then it's like you got this and then all this
21 coming up and --
22     Q.  A few weeks ago, my dad text
23 Jason and asked him about a Corvette.
24 Jason was also texting Rory, the owner
25 of Epic, and inadvertently texted my

Page 367

1  dad a message that was meant for Rory.
2      So knowing that this e-mail is
3  January 2018, I think we can safely see a couple
4  weeks ago this text message was exchanged.  Is
5  that fair?
6      A.  There is -- I am like -- I'd be
7  willing to bet almost anything that when I got
8  that, my dad sent that text to me, and then I
9  purposely e-mailed myself those text messages so
10 that I would have the date.  So it has to be in
11 this.  I just can't imagine myself not doing that
12 because I like everything documented.
13     Q.  Right.  But in here you're saying a
14 few weeks ago the text thread happened.  And this
15 was January 18.  So would it be fair to say that a
16 few weeks before January 18 these texts were
17 exchanged?
18     A.  Yeah, if that's what I said.
19     Q.  Well, I wanted to ask you.  The first
20 full paragraph in the second page, the last
21 sentence, it says:  He also bought a used Maserati
22 for his wife and traded in a Corvette he bought a
23 year ago and put 5K more if the trade than it was
24 worth.  Is that an accurate statement?
25     A.  Probably -- well, no, I think we found

Page 368

1  out it to be more than that.
2      Q.  So I'm trying to reconcile, though,
3  because I have $10,000 that we talked about
4  earlier today --
5      A.  Well, this was a -- this was probably
6  an emotional e-mail I just shot off to them.  And
7  it seemed high.  But then when we actually booked
8  it out -- because I want to say that that car I
9  want to say -- I want to say ended up booking out
10 for like 10 grand less than what he put in there.
11     Actually, we talked about this
12 earlier, didn't we?
13     Q.  So it's your position that it is the
14 10,000 difference versus the --
15     A.  It's whatever the book value was.  It
16 would be -- this was the e-mail, I was confused
17 and, you know, everything in the world was going
18 on at the time that I just shot off to them for --
19 I mean, this was for feedback.
20     Q.  On the last sentence -- or last
21 paragraph it says:  I mentioned this to my dad.
22 We had a horrible year in Chicago and amongst the
23 union strike I was getting excuse after excuse.
24     What excuses was Jason providing
25 you?

Page 369

1      A.  Where are you at?
2      Q.  The last -- the last paragraph:  I
3  mentioned this to my dad.
4      A.  Oh.  I mentioned it to my dad, like I
5  told him that -- I was just looking for it.
6  Basically I was looking for maybe guidance or
7  something like that.  Bill has been in a business
8  a long time.  Debbie Wick was a controller, and
9  she was good at -- I forget what she had.  She had
10 taken some course or something on internal theft
11 and how to spot it and whatnot.  So that's the
12 only reason I would have sent them any of this.
13     And at that time I tried to keep my
14 dad away from anything stressful.
15     Q.  Mike, while I'm pulling up the next
16 exhibit, I have to ask you questions that I ask
17 every witness, so please don't be offended.
18     Have you ever been accused of a
19 crime of dishonesty?
20     A.  No.
21     Q.  Have you ever given a deposition
22 before?
23     A.  No.
24     Q.  Have you ever been involved in another
25 lawsuit before?

93 (Pages 366 - 369)